## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**TAMPA BAY WATER,**
**A Regional Water Supply Authority**

      **Plaintiff,**                      **CASE NO.:**

**v.**

**HDR ENGINEERING, INC., a**
**Nebraska corporation,**
**CONSTRUCTION DYNAMICS**
**GROUP, INC., a Maryland corporation,**
**BARNARD CONSTRUCTION**
**COMPANY, INC., a**
**Montana corporation,**

      **Defendants.**
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, TAMPA BAY WATER, A Regional Water Supply Authority, sues the

Defendants, HDR ENGINEERING, INC., CONSTRUCTION DYNAMICS GROUP, INC.,

and BARNARD CONSTRUCTION COMPANY, INC., and states as follows:

### THE PARTIES

1.    Plaintiff, TAMPA BAY WATER ("TBW"), A Regional Water Supply

Authority, is a governmental entity authorized by §§ 373.1962, 373.1963, and 163.01,

Florida Statutes, and created by an Interlocal Agreement (the "Governance Agreement")

among the counties of Hillsborough, Pasco, and Pinellas, and the cities of New Port Richey,

St. Petersburg, and Tampa, Florida (the "Member Governments").

2.      At all times material hereto, Defendant, HDR ENGINEERING, INC. ("HDR") was a corporation created by and existing under the laws of the state of Nebraska with its home office and principal place of business in Omaha, and was engaged in the business of performing architectural, engineering, and consulting services in the state of Florida.  For the purposes of 28 U.S.C. §1332, HDR is a citizen of the state of Nebraska, but is not a citizen of the state of Florida.

3.      At all times material hereto, Defendant, CONSTRUCTION DYNAMICS GROUP, INC. ("CDG") was a corporation created by and existing under the laws of the state of Maryland with its home office and principal place of business in Columbia, Maryland, and was engaged in the business of performing program and construction management services in the state of Florida.  For the purposes of 28 U.S.C. §1332, CDG is a citizen of the state of Maryland, but is not a citizen of the state of Florida.

4.      At all time material hereto, Defendant, BARNARD CONSTRUCTION COMPANY, INC. ("BARNARD"), was a corporation created by and existing under the laws of the state of Montana with its principal place of business in Bozeman, Montana, and was engaged in the construction business throughout the United States, including the state of Florida.  For the purposes of 28 U.S.C. §1332, BARNARD is a citizen of the state of Montana, but is not a citizen of the state of Florida.

## JURISDICTION AND VENUE

5.      The causes of action set forth herein all arise out of the design, construction management, and construction of the C.W. Bill Young Regional Reservoir ("Regional

2

Reservoir"), which is a large, off-stream reservoir located in Hillsborough County, Florida, owned and operated by TBW.

6.     Pursuant to 28 U.S.C. §1332, subject matter jurisdiction is proper in this Court because the amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorneys fees, and there is complete diversity of citizenship between TBW and all Defendants.

7.     The counts set forth below against HDR arise from HDR's failure to perform its contractual obligations to provide certain design, engineering and other services related to the Regional Reservoir, pursuant to the terms and conditions of the contract between HDR and TBW (the "HDR Contract").  A copy of the HDR Contract and the amendments thereto are attached hereto and incorporated by reference as composite Exhibit 1.

8.     Defendant, HDR, is subject to personal jurisdiction and service of process in Florida pursuant to Section 48.193(1)(g), Florida Statutes, in that the causes of action set forth below against HDR arose from HDR breaching the HDR Contract in Hillsborough County, Florida, by failing to perform acts required by the HDR Contract to be performed in the state of Florida.  In addition, HDR is subject to personal jurisdiction and service of process in Florida pursuant to §48.193(1)(a), Florida Statutes, in that HDR at all times material hereto was operating, conducting, engaging in or carrying on a business or business venture in the state of Florida or had an office in the state of Florida, and the matters alleged herein arise from such activities by HDR.   Alternatively, HDR is subject to personal jurisdiction and service of process in Florida pursuant to §48.193(2), Florida Statutes, in that

3

HDR was engaged in substantial and not isolated activity within the state of Florida, whether such activity was wholly interstate, intrastate, or otherwise.

9.      The counts set forth below against CDG arise from CDG'S failure to perform its contractual obligations to provide certain construction management and other services related to the Regional Reservoir, pursuant to the terms and conditions of the contract between CDG and TBW (the "CDG Contract").  A copy of the CDG Contract and the amendment thereto are attached hereto and incorporated by reference as composite Exhibit 2.

10.      Defendant, CDG, is subject to personal jurisdiction and service of process in Florida pursuant to Section 48.193(1)(g), Florida Statutes, in that the causes of action set forth below against CDG arose from CDG breaching the CDG Contract in Hillsborough County, Florida, by failing to perform acts required by the CDG Contract to be performed in the state of Florida.

11.      The counts set forth below against BARNARD arise from BARNARD'S failure to perform its contractual obligations to construct the Regional Reservoir, pursuant to the terms and conditions of the construction contract between BARNARD and TBW (the "Construction Contract").  A copy of the Construction Contract is attached hereto and incorporated by reference as Exhibit 3.

12.      Defendant, BARNARD, is subject to personal jurisdiction and service of process in Florida pursuant to Section 48.193(1)(g), Florida Statutes, in that the causes of action set forth below against BARNARD arose from BARNARD breaching the Construction Contract in Hillsborough County, Florida, by failing to perform acts required by the Construction Contract to be performed in the state of Florida.

4

13.   Pursuant to 28 U.S.C. §1391(a), venue is proper in this Court because the causes of action accrued in this judicial district, the property in litigation is located in this judicial district, all of the above referenced contracts between TBW and Defendants were to be performed in this judicial district, and all of the above referenced contracts between TBW and Defendants were breached in this judicial district.  Furthermore, all of the Defendants have agreed that Florida law shall apply to their respective contracts with TBW, and all of the Defendants have stipulated that venue for any actions arising from the above referenced contracts shall lie in Pinellas County, Florida, which is within this judicial district.

14.   All conditions precedent, if any, to the filing or maintenance of this action have been performed, have occurred, or have otherwise been waived.

15.   Based upon the foregoing, jurisdiction and venue of this action is proper in the United States District Court, for the Middle District of Florida.

## GENERAL ALLEGATIONS

16.   TBW was created to fulfill two paramount governmental public purposes, namely:

a.   To develop and deliver a safe and dependable supply of drinking water in sufficient quantities to meet the potable water needs of its Member Governments, which, in turn, distribute said water to the more than two million residents that live in the Tampa Bay area; and

b.   To develop and deliver such water supply in such a manner as will give priority to reducing adverse environmental effects of excessive or improper withdrawals of water from concentrated areas.

5

17.     The geographic jurisdiction of TBW includes all of Hillsborough County, Florida; Pasco County, Florida; and Pinellas County, Florida.

18.     Pursuant to Florida law, TBW is the sole and exclusive wholesale supplier of potable (drinking) water to all of its Member Governments, and it has been charged with the "absolute and unequivocal obligation" to satisfy the Member Governments' wholesale potable water supply needs.   Sections 373.1963(1)(b)2. and 373.1963(1)(b)3., Florida Statutes.

19.     Historically, the majority of the Tampa Bay area's water supply has been produced from groundwater wells that withdraw water directly from the Floridan aquifer.

20.     Over the years, as the population of the Tampa Bay area grew, more and more water was withdrawn from the Floridan aquifer to satisfy the region's growing demand for water. As a result of these groundwater withdrawals, concerns arose regarding actual and potential environmental impacts, including the degradation of lakes and wetlands.

21.     In response to its concerns about environmental impacts associated with concentrated groundwater withdrawals, in 1998, the Southwest Florida Water Management District[1] (the "District") required TBW to dramatically reduce groundwater withdrawals from eleven (11) of its well fields, through a series of three (3) phased reductions that were each to occur by a specified date.

22.     In order to comply with the phased water-production reduction deadlines imposed by the District and continue to fulfill its absolute and unequivocal obligation to meet

---

[1] The District is one of five water management boards within the state created by the Florida Legislature pursuant to Chapter 373, Florida Statutes.  The District is the agency responsible for managing water resources in the Tampa Bay area.  It is charged with maintaining the balance between the water needs of current and future water users without damaging the water resources of the state or the environment.

the Member Governments' wholesale potable water supply needs, in 1998, TBW created a plan and embarked upon a process to identify, evaluate, select and construct over Six Hundred Fifty Million Dollars ($650,000,000) in new water supply projects and related infrastructure.

23.     Accordingly, TBW[2] began evaluating the feasibility of developing alternative (*i.e.*, non-groundwater) water supply sources.  Among the various projects evaluated was the development of a large, off-stream reservoir that could be used to store approximately fifteen billion (15,000,000,000) gallons of surface water from the Alafia River, the Tampa Bypass Canal, and the Hillsborough River prior to treatment and use as a potable water supply (*i.e.*, the Regional Reservoir).

24.     The Regional Reservoir is indispensable to Tampa Bay Water's ability to fulfill its legislative mandate to provide for the needs of the Member Governments, and in turn to ensure the health, safety and welfare of the citizens of the Tampa Bay area while preserving and protecting the water resources and environmental systems of the Tampa Bay area.

25.     On September 16, 1996, TBW and Law Engineering and Environmental Services, Inc. ("LAW") entered into an Agreement for Professional Services (the "LAW Contract") whereby LAW was to perform, among other things, a geotechnical study, feasibility analysis, and a conceptual design for the Regional Reservoir.

---

[2]   At the time, TBW had not yet been created.  Rather, TBW's predecessor in interest, the West Coast Regional Water Supply Authority ("WCRWSA"), initiated this process.  The WCRWSA was not reorganized into TBW until 1998.  However, for the purposes of this Complaint, we will use the term "TBW" when referring to actions taken by its predecessor, the WCRWSA.

26.     Pursuant to the express terms of the LAW Contract, one of LAW's employees, C. Edwin Copeland, Jr., was specifically designated as a "key" person that could not be removed from the project without TBW's prior written approval.

27.     In late 1997 or early 1998, TBW was notified by C. Edwin Copeland, Jr. and representatives of LAW that C. Edwin Copeland, Jr. would be leaving the employ of LAW and would be joining HDR.

28.     On or about January 26, 1998, the Law Contract was amended to provide that HDR was assuming all duties, responsibilities and obligations of LAW under the LAW Contract.

29.     On or about November 11, 1998, TBW and HDR entered into the *Agreement for Professional Services* (Contract No. 99-19) for the Regional Reservoir (Project No. 01301).   Over time, there have been eight amendments to the November 11, 1998 HDR Contract (the November 11, 1998 HDR Contract and all amendments thereto shall hereinafter collectively be referred to as the "HDR Contract").

30.     Pursuant to the HDR Contract, HDR agreed, among other things, to do the following:

    a.     Perform all geotechnical engineer studies and services necessary to design the Regional Reservoir;

    b.     Design the Regional Reservoir itself, including, but not limited to, the Regional Reservoir's embankments and appurtenant facilities; and

8

    c.  Prepare applications for all permits necessary to construct the Regional Reservoir, including but not limited to the Environmental Resources Permit ("ERP") to be issued by the Florida Department of Environmental Protection.

    31.  On February 25, 1999, HDR completed its draft Basis of Design Report for "Stage A" feasibility of the Regional Reservoir.

    32.  In December 1999, HDR completed its geotechnical site characterization report for the proposed Regional Reservoir site.

    33.  On or about February 7, 2000, HDR submitted its draft Basis of Design Report for the Reservoir Embankment Design and Transmission Main Report to TBW.

    34.  On or about February 28, 2000, TBW and CDG entered into the *Construction Management Services Agreement for the Master Water Plan Project – Southern Section* (the "CDG Contract").

    35.  Pursuant to the CDG Contract, CDG agreed to provide TBW with, among other things, construction management services for the Regional Reservoir project, including, but not limited to, the following:

    a.  Review the design documents and make recommendations to TBW and HDR as to constructability, scheduling and time of construction;

    b.  Review all technical Addenda to the bid documents submitted by HDR for constructability, effect on the project and Construction Budget, scheduling and time of construction, and for clarity and coordination in documents;

c.      Assist in the evaluation of, and make recommendations to TBW, concerning the acceptance or rejection of  bids received from pre-qualified construction contractors;

d.      Assist in the assembly, delivery and execution of the contract to be awarded the successful construction contractor;

e.      Provide on-site construction contract administration as an agent of TBW;

f.      Examine the construction contractor's requests for information, shop drawings, samples, and other submittals to determine the anticipated effect on compliance with the project requirements, the project and construction budget, and the master schedule;

g.      Coordinate technical services, including geotechnical evaluations, specialty inspections and testing provided by others and ensure that materials have been inspected and tested per project specifications;

h.      Establish and implement a program to monitor and inspect the quality of the construction performed by the construction contractor;

i.      Monitor the Quality Assurance/Quality Control (QA/QC) procedures contained in the construction contractor's QA/QC procedures manual;

j.      Inspect the progress of construction contractor's work at time appropriate to the construction and advise TBW of any deviation, defects, or deficiencies observed in the work;

k.      Reject any portion of construction contractor's work that does not conform to the project's designs and specifications;

10

l. Adjust and update the construction schedule;

m. Determine, in participation with the construction contractor, a schedule of values for contractor's construction contract;

n. Review payment applications submitted by the construction contractor and determine whether the amount requested reflects the progress of the construction contractor's work; and

o. Upon completion of construction, perform a final inspection of the project in coordination with HDR, TBW and the construction contractor, and produce a final inspection report based on the observations made during the final inspection.

36. Also on or about February 28, 2000, TBW and HDR entered into the First Amendment to the HDR Contract. A copy of the First Amendment to the HDR Contract is attached hereto as part of composite Exhibit 1.

37. Pursuant to the First Amendment to the HDR Contract, HDR agreed, among other things, to do the following:

a. Assist in the preparation of the bidding documents as related to the technical components of the project;

b. Review bidders' proposals for technical requirements only;

c. Review the technical submittals for the construction contracts, including but not limited to Section Number 02779, entitled Soil Cement;

d. Provide one full-time resident engineer to perform field observations, testing and quality assurance during construction;

e.      Provide one full-time project engineer and one full-time engineering technician to assist the resident engineer in field observations, testing and quality assurance during construction;

f.      Provide services to respond to technical matters that arise during construction;

g.      Respond to Requests for Information from the construction contractor;

h.      Prepare supplemental drawings required to supplement or modify the construction contract drawings to maintain design intent;

i.      Provide quality assurance during construction for reservoir elements being observed by CDG, including spot checks and testing of construction materials and methods;

j.      Prepare certifications of completion with test results as required by permitting agencies at completion of construction; and

k.      Prepare record drawings of the contract drawings.

38.     In or about May 2000, HDR prepared and submitted to TBW a draft ERP application for the Regional Reservoir.

39.     On or about May 18, 2000, HDR submitted its 60% design drawings for the Regional Reservoir to TBW.

40.     In or about August 2000, HDR finalized its draft ERP application for the Regional Reservoir.

41.     On or about December 18, 2000, the ERP application for the Regional Reservoir prepared by HDR was submitted to the Florida Department of Environmental

Protection ("FDEP").   As originally submitted on or about December 18, 2000, HDR's design of the Regional Reservoir's embankment included an erosion control element that consisted of: (a) a synthetic geomembrane that covers the entire interior slope of the Regional Reservoir's earthen embankment; and (b) from elevation 145 feet NGVD to the bench, a stair-step soil-cement layer that overlays the synthetic geomembrane, and from the bench to the soil cement footer, a flat plate soil cement layer over the synthetic geomembrane.

42.     On or about January 31, 2001, the FDEP issued its first request for additional information with regard to the ERP application prepared by HDR (the "1st RAI").

43.     HDR prepared the response to FDEP's 1st RAI, which was submitted to the FDEP on or about February 29, 2001.

44.     On or about April 13, 2001, HDR submitted its 90% design drawings for the Regional Reservoir to TBW.

45.     On or about April 30, 2001, the FDEP issued a request for clarification with regard to the ERP application prepared by HDR (the "2nd RAI").

46.     HDR prepared the responses to FDEP's 2nd RAI, which were submitted to the FDEP on or about June 15, 2001 and June 26, 2001 (the "Responses to the 2nd RAI").

47.     In the Responses to the 2nd RAI, HDR described certain modifications that it proposed to make to its design of the erosion control element on the interior slope of the Regional Reservoir's earthen embankment (the "Wedge").

48.     In general, HDR's proposed design modification included adding a layer of geotextile and a layer of soil between the synthetic geomembrane and the soil cement that was part of HDR's original erosion control element design, and changing all but the top

13

sections of soil cement from a "stair-step" configuration to a "flat-plate" configuration. Accordingly, HDR's new erosion control element design (the "Wedge") consisted of the following components: (a) a synthetic geomembrane that covers the entire interior slope of the Regional Reservoir's earthen embankment; (b) a blanket of soil that overlays the geomembrane; (c) a geotextile that overlays the soil blanket; and (d) overlaying the geotextile, a combination "flat-plate" and "stair-step" soil cement layer, with the "flat-plate" configuration extending from the soil cement footer upward to an elevation of approximately 134 feet NVGD and the "stair-step" configuration extending up from the flat-plate to the crest of the embankment.

49.     On or about July 27, 2001, the FDEP issued another request for clarification with regard to the ERP application prepared by HDR (the "3rd RAI").

50.     On or about July 31, 2001, HDR submitted its design documents for the Regional Reservoir to TBW.

51.     HDR prepared the response to FDEP's 3rd RAI, which was submitted to the FDEP on or about August 10, 2001 (the "Response to the 3rd RAI").

52.     On or about August 31, 2001, HDR finalized the Regional Reservoir design documents for the purpose of incorporating them into the Request for Bids to be issued to the pre-qualified construction contractors.  HDR's design drawings included the Wedge.

53.     HDR's Regional Reservoir design documents were incorporated into the bid documents.

54.     On September 4, 2001, TBW issues a Request for Bids to construct the Regional Reservoir to the pre-qualified construction contractors.

55.     On or about September 7, 2001, the FDEP issued another request for clarification with regard to the ERP application prepared by HDR (the "4th RAI").

56.     HDR prepared the response to FDEP's 4th RAI, which was submitted to the FDEP on or about October 2, 2001 (the "Response to the 4th RAI").

57.     On or about October 2, 2001, the FDEP deemed the ERP application for the Regional Reservoir to be complete.

58.     On or about October 15, 2001, TBW and HDR entered into the Fourth Amendment to the HDR Contract.  A copy of the Fourth Amendment to the HDR Contract is attached hereto as a part of composite Exhibit 1.

59.     Pursuant to the Fourth Amendment to the HDR Contract, HDR agreed, among other things, to: provide design support during the bid phase, including responding to the pre-qualified contractors' questions; prepare the design related portions of addendums to the bid documents for submission to CDG; and attend meetings during the bid phase of the project.

60.     On or about December 28, 2001, the FDEP issued its notice of intent to issue the ERP for the Regional Reservoir.

61.     On or about April 2, 2002, TBW received bids to construct the Regional Reservoir from three pre-qualified construction contractors, one of which was BARNARD.

62.     On or about April 3, 2002, the FDEP issued the ERP for the Regional Reservoir (*i.e.*, Environmental Resources Permit No. 29-0178328-3-001).

63.     On or about April 15, 2002, TBW awarded the construction contract to BARNARD in the amount of Eighty-Six Million Three Hundred and Seventy Thousand Dollars ($86,370,000).

64.     On or about April 24 2002, TBW and CDG entered into the Third Amendment to the CDG Contract.  A copy of the Third Amendment to the CDG Contract is attached hereto as part of composite Exhibit 2.

65.     Pursuant to the Third Amendment to the CDG Contract, CDG agreed to do the following:

a.      Provide occasional periodic parallel testing of the on-site soils testing to be performed by HDR;

b.      Prepare and provide a Quality Assurance Program to meet the intent of Specific Conditions 28 and 43 of Environmental Resources Permit No. 29-0178328-3-001; and

c.      Retain a Quality Assurance Officer to fill the role of the third-party engineer referenced in Specific Condition 28 of Environmental Resources Permit No. 29-0178328-3-001.

66.     On or about April 24, 2002, TBW and HDR entered into the Fifth Amendment to the HDR Contract.  A copy of the Fifth Amendment to the HDR Contract is attached hereto as part of composite Exhibit 1.

67.     Pursuant to the Fifth Amendment to the HDR Contract, HDR's scope of work was expanded to include the following:

a.      In accordance with Specific Condition 27 of Environmental Resources Permit No. 29-0178328-3-001, provide field observation during all phases of reservoir embankment and pipeline construction including, but not limited to: construction and testing of embankment foundation materials; installation and testing of geomembrane installation;

16

construction and testing of soil-cement interior protection layer; and final selection of tailing sand source and quality control specifications prior to construction; and

       b.      Provide quality control testing for reservoir elements.

68.     On or about June 24, 2002, TBW and BARNARD entered into the Construction Contract for the construction of the Regional Reservoir and appurtenant facilities. A copy of the Construction Contract is attached hereto as Exhibit 3.

69.     During construction of the Regional Reservoir, HDR provided, among other things, field observations, testing and quality control for said construction.

70.     During construction of the Regional Reservoir, CDG provided, among other things, quality assurance for said construction.

71.     Construction of the Regional Reservoir was completed in April 2005.

72.     Operation of the Regional Reservoir commenced in June 2005.

73.     The Regional Reservoir was full for the first time in November 2005.

74.     In December 2006, TBW discovered large cracks in the soil cement flat-plate located in the northeast quadrant of the interior slope of the Regional Reservoir.

75.     As the water elevation in the Regional Reservoir continued to be lowered, more large cracks developed in the soil cement flat-plate located in the northeast quadrant and large cracks also developed in the southwest quadrant of the interior slope of the Regional Reservoir.

76.     A subsequent investigation of the cracking revealed that the cracks were caused by HDR's defective design of the Regional Reservoir or BARNARD'S defective

construction of same, in conjunction with HDR's inadequate field observations, testing and quality control and CDG's inadequate quality assurance, or some combination of these.

**COUNT I**
**HDR'S BREACH OF CONTRACT**
**(Defective Design)**

77.     Plaintiff, TBW, realleges and incorporates by reference paragraphs 1 through 76, above.

78.     Pursuant to the HDR Contract, HDR was required to design the Regional Reservoir, which included preparation of the design drawings and construction specifications for the Regional Reservoir.

79.     Pursuant to the HDR Contract, HDR's design responsibilities included preparation of the design and construction specification for the Wedge.

80.     Pursuant to the express terms of the HDR Contract, HDR had a duty to perform said design work in accordance with the following standard of care:

> 18.0   STANDARD OF PERFORMANCE.   CONSULTANT shall perform and complete the Work in a timely manner and in accordance [sic] the standard of care, skill, and diligence customarily provided by an experienced consulting organization rendering the same services, and in accordance with sound professional principles and practices. …

81.     HDR did, in fact, prepare the design drawings and construction specifications for the Regional Reservoir.

82.     Subsequently, BARNARD was awarded the Construction Contract to construct the Regional Reservoir in accordance with the design drawings and construction specifications prepared by HDR.

18

83.     HDR breached its duty by, among other things, failing to take into consideration or otherwise failing to incorporate into its design a means to manage pore pressure within the Wedge.  The lack of an adequate means to manage pore pressure within the Wedge has caused or contributed, and continues to cause or contribute, to the large cracks that have developed in the soil-cement that overlays the interior slope of the Regional Reservoir.

84.     HDR has failed to correct, repair, replace or otherwise make good such defects or deficiencies.

85.     As a result of HDR breaching its duties under the HDR Contract, TBW has been damaged in that it: (a) has incurred and continues to incur costs associated with identifying, monitoring, investigating and temporarily repairing the cracks that have developed in the soil-cement; and (b) will incur the costs associated with investigating and correcting HDR's defective design of the Wedge and the resulting cracks that have developed in the soil-cement, including, but not limited to, the costs necessary to procure one or more design engineers to design and permit an adequate repair and the costs necessary to procure a construction contractor to construct said repair.

86.     TBW's damages are substantially in excess of $75,000.00.

87.     Pursuant to §21.4 of the HDR Contract, TBW is entitled to recover all costs and expenses incurred, including, without limitation, attorneys' and legal assistants' fees and costs, in the event that TBW is the prevailing party in this litigation.

88.     TBW has retained the law firm of Allen Dell, P.A., and has agreed to pay a reasonable fee for its professional legal services rendered herein.

19

89.     TBW can anticipate incurring additional damages in the form of fines and penalties that may be imposed by the District if the Regional Reservoir cannot be utilized to offset the dramatic reduction in groundwater withdrawal imposed on TBW by the District.

90.     TBW expressly reserves its rights to later amend this Complaint with regard to other claims that are not expressly set forth herein but which hereafter become known.

**WHEREFORE**, Plaintiff, TBW, demands judgment against Defendant, HDR, for general and special damages in excess of $75,000.00 for: (a) the costs to correct HDR's design defects, including but not limited to all related engineering, permitting, construction management, and construction costs, (b) loss of use, (c) interest, (d) litigation and court costs, (e) attorneys fees, and (f) for such other relief as the Court may deem just and proper.

### COUNT II
### BARNARD'S BREACH OF CONTRACT
### (Defective Construction)

91.     Plaintiff, TBW, realleges and incorporates by reference paragraphs 1 through 76, above.

92.     Pursuant to the Construction Contract, BARNARD was required to construct the Regional Reservoir in accordance with, among other things, the "DRAWINGS" and "SPECIFICATIONS" prepared by HDR.

93.     BARNARD breached the Construction Contract by failing to construct the Wedge in accordance with the DRAWINGS and SPECIFICATIONS prepared by HDR.

94.     BARNARD'S failure to construct the Wedge in accordance with the DRAWINGS and SPECIFICATIONS prepared by HDR has caused or contributed, and

continues to cause or contribute, to the large cracks that have developed in the soil-cement portion of the Wedge.

95.     As a result of BARNARD'S breach of the Construction Contract, TBW has been damaged in that it: (a) has incurred and continues to incur costs associated with identifying, monitoring, investigating and temporarily repairing the cracks that have developed in the soil-cement; and (b) will incur the costs associated with investigating and correcting BARNARD'S defective construction of the Wedge and the resulting cracks that have developed on the soil-cement.

96.     TBW's damages are substantially in excess of $75,000.00.

97.     TBW can anticipate incurring additional damages in the form of fines and penalties that may be imposed by the District if the Regional Reservoir cannot be utilized to offset the dramatic reduction in groundwater withdrawal imposed on TBW by the District.

98.     TBW expressly reserves its rights to later amend this Complaint with regard to claims not expressly set forth herein but which hereafter become known.

**WHEREFORE**, Plaintiff, TBW, demands judgment against Defendant, BARNARD, for general and special damages in excess of $75,000.00 for: (a) the cost of correcting BARNARD'S defective construction, including but not limited to all related engineering, permitting, construction management, and construction costs, (b) loss of use, (c) interest, (d) litigation and court costs, and (e) for such other relief as the Court may deem just and proper.

**COUNT III**
**HDR'S BREACH OF CONTRACT**
**(Inadequate Field Observations, Testing and Quality Control)**

99.     Plaintiff, TBW, realleges and incorporates by reference paragraphs 1 through 76 and paragraphs 92 through 94, above.

100.    Pursuant to the HDR Contract, HDR was required to perform certain field services ("Field Services") during the construction of the Regional Reservoir, including the following:

a.      Provide a full-time resident engineer to perform field observations, testing and quality control of the construction of the Regional Reservoir;

b.      Provide project engineers and full-time engineering technicians to assist HDR'S resident engineer in performing field observations, testing and quality control of the construction of the Regional Reservoir;

c.      Provide field observations during all phases of reservoir embankment construction, including but not limited to:

i.   Construction and testing of embankment foundation materials;

ii.  Installation and testing of geomembrane installation;

iii. Construction and testing of soil-cement interior protection layer;

iv.  Final selection of tailings sand source and quality control specifications prior to construction; and

d.  Provide quality control testing for reservoir elements, including the Wedge.

101.    Pursuant to the express terms of the HDR Contract, HDR had a duty to perform said Field Services in accordance with the following standard of care:

22

18.0   <u>STANDARD OF PERFORMANCE</u>.   CONSULTANT shall perform and complete the Work in a timely manner and in accordance [sic] the standard of care, skill, and diligence customarily provided by an experienced consulting organization rendering the same services, and in accordance with sound professional principles and practices. …

102.   HDR breached its duty by failing to adequately perform its Field Services for the construction of the Regional Reservoir.

103.   As a result of HDR'S breach, HDR failed to discover BARNARD'S defective construction, which could have been eliminated during the construction of the Regional Reservoir had HDR properly performed its Field Services.

104.   As a result of HDR breaching its duties under the HDR Contract, TBW has been damaged in that it: (a) has incurred and continues to incur costs associated with identifying, monitoring, investigating and temporarily repairing the cracks that have developed in the soil-cement; and (b) will incur the costs associated with correcting BARNARD'S defective construction of the Wedge and the resulting cracks that have developed on the soil-cement.

105.   TBW's damages are substantially in excess of $75,000.00.

106.   Pursuant to §21.4 of the HDR Contract, TBW is entitled to recover all costs and expenses incurred, including, without limitation, attorneys' and legal assistants' fees and costs, in the event that TBW is the prevailing party in this litigation.

107.   TBW has retained the law firm of Allen Dell, P.A., and has agreed to pay a reasonable fee for its professional legal services rendered herein.

108.    TBW can anticipate incurring additional damages in the form of fines and penalties that may be imposed by the District if the Regional Reservoir cannot be utilized to offset the dramatic reduction in groundwater withdrawal imposed on TBW by the District.

109.    TBW expressly reserves its rights to later amend this Complaint with regard to claims that are not expressly set forth herein but which hereafter become known.

**WHEREFORE**, Plaintiff, TBW, demands judgment against Defendant, HDR, for general and special damages in excess of $75,000.00 for: (a) the cost to correct the defective construction, including but not limited to all related engineering, permitting, construction management, and construction costs, (b) interest, (c) litigation and court costs, (d) attorneys fees, and (e) for such other relief as the Court may deem just and proper.

**COUNT IV**
**CDG'S BREACH OF CONTRACT**
**(Inadequate Quality Assurance)**

110.    Plaintiff, TBW, realleges and incorporates by reference paragraphs 1 through 76 and paragraphs 92 through 94, above.

111.    Pursuant to the CDG Contract, CDG was required to perform certain Construction Phase Services during the construction of the Regional Reservoir, including the following[3]:

a.      "3.5.1.7 *Coordination of Other Independent Consultants*:  The CM shall coordinate Technical Services, including geotechnical evaluations, specialty inspections and testing provided by others and ensure that materials have been inspected and tested per

---

[3]  As used in this paragraph, the terms "CM" and "CONSULTANT" means CDG, the term "Contractor" means BARNARD, the term "Owner" means TBW, and the term "Design Professional" means HDR.

Project Specifications. …HDR will provide soils testing on-site.   CDG will provide occasional periodic parallel tests."

b.      "3.5.1.11 *Quality Control and Inspection*:  The CM shall monitor and inspect the Contractor's work.  CM will establish and implement a program to monitor the quality of the construction.  Procedures for monitoring and inspections will be established by the CM and quality control as set forth in the specifications."

c.      "3.5.1.11.1 *Contractor QA/QC*:   The CM will monitor the Quality Assurance/Quality Control (QA/QC) procedures contained in the Contractor's QA/QC procedures manual."

d.      "3.5.1.11.2 *Construction Monitoring*:   The CM will inspect the progress of the Work at times appropriate to the construction and advise the Owner of any deviations, defects, or deficiencies observed in the Work.  The CM shall reject any portion of the Work and transmit to the Owner and Contractor a notice of nonconforming Work when it is the opinion of the CM, Owner, or Design Professional that such Work does not conform to the requirements of the Contract Documents.  …"

e.      "3.5.1.15 *Substantial Completion*:  The CM shall determine when the Project and the Contractor's Work are substantially complete and may be put to beneficial use by the Owner.  In consultation with the Design Professional, the CM shall, prior to issuing a Certificate of Substantial Completion, prepare a list of incomplete Work or Work that does not conform to the requirements of the Contract Documents.  This list shall be attached to the Certificate of Substantial Completion."

f.      "3.5.1.16 *Final Completion*:   In consultation with the Design Professional, the CM shall determine when the Project and Contractor's Work is finally completed, shall issue a Certificate of Final Completion and shall provide to the Owner a written recommendation regarding payment to the Contractor."

g.      CDG "…will provide a Quality Assurance Program to meet the intent of the Florida Department of Environmental Protection (FDEP) Environmental Resources Permit (ERP) for the Reservoir, Specific Conditions 28 and 43.  The CONSULTANT will retain an appropriate Quality Assurance Officer to fill the role of the third-party engineer referenced in Specific Condition 28…"

i.      "The Quality Assurance Office, or his or her personal representative, will be on site at all times during embankment construction and during installation of all critical design components.  These design components include but are not limited to: …Construction and testing of embankment foundation materials; …Installation and testing of geomembrane installation; Construction and testing of soil cement interior protection layer; Final selection of tailings sand source and quality control specifications prior to construction;…"

ii.      "The Quality Assurance Officer's role will be to verify that the Construction Quality Control Plan, to be developed and conducted by the Engineer of Record, has been implemented.  Responsibilities will include random duplication of tests, and assembly and checking of test data, inspection of logs and other similar information generated through the Quality Control program during construction of the Reservoir."

26

112.     CDG had a duty to exercise reasonable care, technical skill and ability, and diligence, as are ordinarily required of such professionals in the course of performing its Construction Phase Services.

113.     CDG breached its duty by failing to adequately perform its Construction Phase Services.

114.     As a result of CDG'S breach, CDG failed to discover BARNARD'S defective construction, which could have been eliminated during the construction of the Regional Reservoir had CDG properly performed its Construction Phase Services.

115.     As a result of CDG breaching its duties under the CDG Contract, TBW has been damaged in that it: (a) has incurred and continues to incur costs associated with identifying, monitoring, investigating and temporarily repairing the cracks that have developed in the soil-cement; and (b) will incur the costs associated with correcting BARNARD'S defective construction of the Wedge and the resulting cracks that have developed on the soil-cement.

116.     TBW's damages are substantially in excess of $75,000.00.

117.     TBW can anticipate incurring additional damages in the form of fines and penalties that may be imposed by the District if the Regional Reservoir cannot be utilized to offset the dramatic reduction in groundwater withdrawal imposed on TBW by the District.

118.     TBW expressly reserves its rights to later amend this Complaint with regard to claims that are not expressly set forth herein but which hereafter become known.

**WHEREFORE**, Plaintiff, TBW, demands judgment against Defendant, CDG, for general and special damages in excess of $75,000.00 for: (a) the cost of correcting

BARNARD'S defective construction, including but not limited to all related engineering, permitting, construction management, and construction costs, (b) interest, (c) court costs, and (d) for such other relief as the Court may deem just and proper.

**COUNT V**
**BARNARD'S BREACH OF EXPRESS WARRANTIES AND GUARANTEES**

119.    Plaintiff, TBW, realleges and incorporates by reference paragraphs 1 through 76, and 92 through 94, above.

120.    BARNARD expressly warranted and guaranteed to TBW that all of its WORK would be in accordance with the DRAWINGS and SPECIFICATIONS prepared by HDR and would not be DEFECTIVE, including all WORK performed or furnished by any of BARNARD'S subcontractors or suppliers.

121.    BARNARD further warranted that it would

…make, at its own expense, all repairs or replacements necessitated by its DEFECTIVE WORK, and pay for any damage (whether to the WORK itself or other property), including routine repairs resulting from such DEFECTIVE WORK, which becomes evident within three (3) years after the date of SUBSTANTIAL COMPLETION established by CONSTRUCTION MANAGER and ENGINEER for the entire WORK, or within such longer period of time as my be prescribed by LAWS AND REGULATIONS ("CORRECTION PERIOD"). After the CORRECTION PERIOD, CONTRACTOR shall remain liable to TAMPA BAY WATER, and its successors, for DEFECTIVE WORK and damage resulting from such DEFECTIVE WORK, but such liability shall not include an obligation to make routine repairs, unless otherwise agreed to in writing. CONTRACTOR and SURETY shall remain liable for repair of latent defects for a period of three (3) years after discovery of such latent defects.

122.    BARNARD also expressly warranted that it would "make all repairs and replacements promptly upon receipt of written order for same from TAMPA BAY WATER, or CONSTRUCTON MANAGER.  If CONTRACTOR fails to make the repairs and

replacements promptly, or in an emergency, where delay would cause serious risk, loss, or damage, TAMPA BAY WATER may have the DEFECTIVE WORK corrected or the rejected WORK removed and replaced, and CONTRACTOR and its Surety shall be liable for the cost thereof."

123.    By letter dated November 4, 2008, TBW issued BARNARD and its surety, St. Paul Fire and Marine Insurance Company, a Notice of Rejected Work, Warranty Claim, and Order to Promptly Repair or Replace Defective Work.  A copy of the November 4, 2008 letter is attached hereto and incorporated herein by reference as Exhibit 4.

124.    To date, BARNARD has not commenced making any repairs or replacements to its DEFECTIVE WORK.

125.    BARNARD has breached the above express warranties of the Construction Contract, each constituting a separate and independent default, as follows:

    a.   BARNARD did not construct the WEDGE in accordance with the DRAWINGS and SPECIFICATIONS prepared by HDR;

    b.   BARNARD'S construction of the WEDGE is DEFECTIVE.

    c.   BARNARD has not promptly made all repairs or replacements necessitated by its DEFECTIVE WORK upon receipt of the work order from TBW.

126.    As a result of BARNARD'S breach of warranty, TBW has been damaged in that it: (a) has incurred and continues to incur costs associated with identifying, monitoring, investigating and temporarily repairing the cracks that have developed in the soil-cement; and (b) will incur the costs associated with correcting BARNARD'S defective construction of the Wedge and the resulting cracks that have developed on the soil-cement.

127.    TBW's damages are substantially in excess of $75,000.00.

128.    TBW can anticipate incurring additional damages in the form of fines and penalties that may be imposed by the District if the Regional Reservoir cannot be utilized to offset the dramatic reduction in groundwater withdrawal imposed on TBW by the District.

129.    TBW expressly reserves its rights to later amend this Complaint with regard to claims not expressly set forth herein but which hereafter become known.

**WHEREFORE**, Plaintiff, TBW, demands judgment against Defendant, BARNARD, for general and special damages in excess of $75,000.00 for: (a) the cost of correcting BARNARD'S DEFECTIVE WORK, including but not limited to all related engineering, permitting, construction management, and construction costs, (b) interest, (c) court costs, and (d) for such other relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable.


Dated this 10th day of December, 2008

**s/ Richard A. Harrison**
Richard A. Harrison, Esquire
Florida Bar Number 0602493
ALLEN DELL, P.A.
202 South Rome Avenue, Ste. 100
Tampa, Florida 33606
Phone: (813) 223-5351
Fax: (813) 229-6682
rharrison@allendell.com
Lead Trial Counsel

David Forziano, Esquire
Florida Bar Number 0025755

30

ALLEN DELL, P.A.
202 South Rome Avenue, Ste. 100
Tampa, Florida 33606
Phone: (813) 223-5351
Fax: (813) 229-6682
dforziano@allendell.com
Trial Counsel

Attorneys for Plaintiff, Tampa Bay Water, A
Regional Water Supply Authority