## AGREEMENT FOR PROFESSIONAL SERVICES
(Contract No. _99-19_)

## TAMPA BAY REGIONAL RESERVOIR
(Project No. 01301)

This Agreement for Professional Services is made this _11th_ day of _November_ 199 _8_, by and between **TAMPA BAY WATER**, A Regional Water Supply Authority (TAMPA BAY WATER), an interlocal governmental agency, and HDR Engineering, Inc. (CONSULTANT), a Corporation in the State of Nebraska.

## W I T N E S S E T H:

**WHEREAS**, TAMPA BAY WATER desires to retain CONSULTANT as its consultant in connection with the Tampa Bay Regional Reservoir; and

**WHEREAS**, TAMPA BAY WATER has selected CONSULTANT in accordance with the provisions of the Florida Consultant's Competitive Negotiation Act; and

**WHEREAS**, CONSULTANT desires to serve as TAMPA BAY WATER's consultant in connection with the Project (as hereinafter defined);

**NOW, THEREFORE**, in consideration of the premises set forth above, and of the mutual promises set forth below, and other good and valuable consideration, the sufficiency and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.0    DEFINITIONS.   The following terms as used in this Agreement shall have the following meanings:

    1.1    Agreement - This written document, as it may be amended from time to time in accordance with paragraph 21.3 hereof.

    1.2    Date of Commencement - The date on which TAMPA BAY WATER delivers to CONSULTANT written notice to proceed with the Work.

    1.3    Law - All laws, statutes, rules, regulations, ordinances, codes and/or orders applicable to the given subject matter.

    1.4    Project - The consulting services for the Tampa Bay Regional Reservoir.

    1.5    Work - The services as provided for in Article 4.0 and Schedule "A" as well as any and all obligations, duties and responsibilities undertaken by CONSULTANT or necessary to complete the services undertaken by CONSULTANT pursuant to this Agreement.


EXHIBIT

2.0     <u>ENGAGEMENT OF SERVICES</u>.    TAMPA BAY WATER hereby contracts with CONSULTANT for CONSULTANT to perform the Work, and CONSULTANT hereby agrees to perform the Work upon the terms and conditions set forth in this Agreement.

3.0     <u>TERM</u>. The obligations of the parties hereto shall exist from the Date of Commencement until completion of the Project, or until this Agreement is terminated pursuant to the provisions of Article 10.0 hereof.

4.0     <u>SCOPE OF SERVICES</u>. CONSULTANT shall perform those services in connection with the Project as are described in this Agreement and Schedule "A" attached hereto and made a part hereof. CONSULTANT shall commence the performance of said services upon receipt of written notice to proceed from TAMPA BAY WATER.

5.0     <u>PROJECT COMPENSATION</u>. TAMPA BAY WATER shall pay CONSULTANT for the Work provided for in Article 4.0 and Schedule "A" the compensation set forth in Schedule "B" attached hereto and made a part hereof, according to the provisions for payment set forth in said schedule. TAMPA BAY WATER shall reimburse CONSULTANT for travel expenses other than travel expenses which are included in lump sum payment items (subject to the limitations of Florida Statutes Section 112.061, a copy of which is attached and made a part hereof as Schedule "C"), provided CONSULTANT (a) maintains appropriate documentation substantiating the expense, (b) discloses that such claim is true and correct as to every material matter, and (c) honors a claim for refund by TAMPA BAY WATER should such reimbursement be in excess of the statutory limit. Nothing herein shall prevent the payment to CONSULTANT for lump sum items which include travel expenses consistent with the statutory limits.

6.0     <u>PROJECT SCHEDULING</u>. CONSULTANT shall perform the Work as required pursuant to Article 4.0 and Schedule "A" in accordance with the project schedule as set forth in Schedule "D" attached hereto and made a part hereof (the "Project Schedule").

7.0     <u>CONSULTANT'S REPRESENTATIONS AND WARRANTIES</u>. CONSULTANT represents and warrants to TAMPA BAY WATER as follows:

7.1     CONSULTANT is duly authorized to conduct business in the State of Florida.

7.2     CONSULTANT has, or it will secure at its own expense, all personnel, facilities, and equipment required to perform and complete the Work.

7.3     CONSULTANT shall maintain an adequate and competent staff of professionals licensed and operating within the State of Florida. CONSULTANT shall designate in writing a single representative with whom TAMPA BAY WATER shall coordinate. This representative shall have authority to transmit instructions, receive information, and interpret and deliver CONSULTANT's policy and decisions related to the Work.

7.4     CONSULTANT has or shall secure all licenses or permits required by Law for the performance of the Work and shall be in compliance with all Laws in effect at the time of the execution of this Agreement and the time of performance of the Work.

7.5     CONSULTANT shall perform all property acquisition services required for this Project as described in Schedule "A".

7.6     CONSULTANT has familiarized itself with the nature and extent of this Agreement, the Project, the Work, the site, locality, and all local conditions and Law that may affect CONSULTANT's performance of this Agreement, including CONSULTANT's compensation, the progress schedule and/or the performance or furnishing of the Work.

7.7     CONSULTANT has reviewed this Agreement (including its Schedules) and all available information and data shown or indicated in this Agreement and has given TAMPA BAY WATER written notice of all conflicts, errors, ambiguities, or discrepancies that it has discovered in this Agreement or information or data, and the written resolution thereof by TAMPA BAY WATER is acceptable to CONSULTANT.

7.8     CONSULTANT shall obtain and review all information and data which relates to the Work or which CONSULTANT may reasonably anticipate may affect cost, scheduling, progress, performance or furnishing of the Work, including, but not limited to, information and data related to work under separate contracts, to the extent that such work may interface with CONSULTANT's Work pursuant to this Agreement.

7.9     CONSULTANT recognizes and acknowledges that the time for the performance of CONSULTANT's Work as set forth in the Project Schedule is of the essence of this Agreement.

7.10    At all times during the performance of the Work, CONSULTANT shall comply with Title VII of the Civil Rights Act of 1964, as amended (45 C.F.R. Part 1010), and the Florida Civil Rights Act of 1992. CONSULTANT does not discriminate in any form or manner against its employees or applicants for employment on the basis of race, color, national origin, religion, sex, age, handicap or marital status.   Further, CONSULTANT shall comply with all applicable rules, regulations, or executive orders promulgated to give effect to the Civil Rights Act of 1964, as amended.

7.11    CONSULTANT has not employed or retained any company or person, other than a bona fide employee working solely for CONSULTANT, to solicit or secure this Agreement.   Further, CONSULTANT has not paid or agreed to pay any person, company, corporation, individual or firm, other than a bona fide employee working solely for CONSULTANT, any fee, commission, percentage, gift, or any other consideration, contingent upon or resulting from the award of or the making of this Agreement.   CONSULTANT represents that it has complied with the provisions of Section 287.055(6) Florida Statutes.

8.0     TAMPA BAY WATER'S DUTIES.

    8.1     TAMPA BAY WATER shall review and consider, in a reasonably prompt and thorough fashion, all applications for payments, reports, schedules, estimates, drawings, proposals, or other documents presented to TAMPA BAY WATER by CONSULTANT and shall inform CONSULTANT of all of TAMPA BAY WATER's decisions or otherwise take appropriate action within a reasonable time so as to not unduly delay the work of CONSULTANT.

    8.2     TAMPA BAY WATER shall pay (i) all costs of publishing advertisements for bids.

    8.3     TAMPA BAY WATER shall designate in writing a single representative with whom CONSULTANT shall coordinate.  This representative shall have authority to transmit instructions, receive information and interpret and deliver TAMPA BAY WATER's policy and decisions pertinent to the Work.

    8.4     TAMPA BAY WATER shall cooperate in providing to CONSULTANT, upon CONSULTANT's specific request, all existing and available studies, reports, surveys and other available information and data regarding the Project.

9.0     CHANGE OF PLAN.

    9.1     TAMPA BAY WATER, through its General Manager, shall have the absolute right to terminate, suspend, or amend the Work or the Project at any time and for any reason, and such action on its part shall not be deemed a default or breach of this Agreement. Suspensions of the Work or the Project by TAMPA BAY WATER shall be in writing.

    9.2     In the event the Work or Project is entirely or partly suspended for one or more periods of time, there shall be no claim for compensation for the suspended period(s). Upon resumption of the Work or Project, CONSULTANT shall resume its Work until the Work is completed in accordance with this Agreement, and the time for completion of the services which were suspended shall be extended for the duration of the suspension.  If the cumulative total of such suspensions, excluding periods of suspension during the design phase, is 270 days or less, the extension of time shall be CONSULTANT's sole remedy.  If the cumulative total of such suspensions is more than 270 days, CONSULTANT's sole remedy shall be to terminate this Agreement pursuant to Article 10.

    9.3     If TAMPA BAY WATER amends the Work and CONSULTANT is of the opinion that Extra Work is made necessary as a result thereof, the provisions of Article 11.0 herein shall apply.

10.0    TERMINATION OF AGREEMENT.

10.1    Either party to this Agreement may terminate or cancel this Agreement at its pleasure and said termination shall be effective sixty (60) days after written notice has been provided to the other party.

10.2    Upon the occurrence of any one or more of the following events:

10.2.1  CONSULTANT is adjudged bankrupt or insolvent or makes a general assignment for the benefit of its creditors;

10.2.2  a trustee or a receiver is appointed for CONSULTANT or for any of its property;

10.2.3  CONSULTANT files a petition to take advantage of any debtor's act or to reorganize under the Federal Bankruptcy Code or any similar Law, federal or state, now or hereafter in effect; or

10.2.4  CONSULTANT disregards the Law of any public body having jurisdiction, or disregards authority of TAMPA BAY WATER or otherwise violates the provisions of this Agreement;

TAMPA BAY WATER may, without prejudice to any other right or remedy, and after giving CONSULTANT ten (10) days prior written notice, terminate or cancel this Agreement.

10.3    If TAMPA BAY WATER violates the provisions of this Agreement, and if said violation continues for sixty (60) days after CONSULTANT has delivered to TAMPA BAY WATER written notice of such violation, then CONSULTANT may, without prejudice to any other right or remedy, terminate or cancel this Agreement by giving TAMPA BAY WATER written notice of such termination or cancellation.

10.4    Following termination of this Agreement, TAMPA BAY WATER shall make an offer of settlement with CONSULTANT upon an equitable basis as determined by TAMPA BAY WATER, which shall fix the value of, and constitute full payment for, the Work performed by CONSULTANT prior to the termination or cancellation of this Agreement. In determining the value of the Work performed, TAMPA BAY WATER shall consider the following:

10.4.1  the amount of Work performed by CONSULTANT prior to the termination of this Agreement relative to the total amount of Work, less any payments previously made;

10.4.2  the amount of the expense to which CONSULTANT is put in performing the Work prior to the termination relative to the amount of expense to which CONSULTANT would have been put had it been allowed to complete the total Work, less any payments previously made; and

w:\in_ag_ex\mngmnt\prfsvsbk1.doc

10.4.3 if the termination is brought about (i) by TAMPA BAY WATER pursuant to paragraph 10.1 above or (ii) pursuant to paragraph 10.3 above, consideration shall be given to the profit which CONSULTANT might have made on the total Work relative to the portion of the Work completed. If the termination is brought about (i) by CONSULTANT pursuant to paragraph 10.1 above or (ii) pursuant to 10.2 above, the value of the Work performed by CONSULTANT prior to termination shall be fixed solely upon the ratio of such Work performed relative to the total Work.

10.5   Upon termination of this Agreement and payment under paragraph 10.4, CONSULTANT shall deliver to TAMPA BAY WATER within ten (10) days of payment all papers, drawings, models, or other material to which TAMPA BAY WATER is entitled pursuant to this Agreement or otherwise.

## 11.0   EXTRA WORK.

11.1   If CONSULTANT is of the opinion that any service TAMPA BAY WATER directs it to perform is beyond the scope of the Work under this Agreement, CONSULTANT shall, within ten (10) days of such direction, notify TAMPA BAY WATER in writing of this opinion.   TAMPA BAY WATER shall, within ten (10) working days after receipt of such notification, determine as to whether or not such service is in fact beyond the scope of this Agreement and constitutes Extra Work.   If TAMPA BAY WATER determines that such service does constitute Extra Work, it shall provide extra compensation to CONSULTANT based upon the provisions of Article 5.0 above.

11.2   If, in the opinion of TAMPA BAY WATER, the progress of the Work during any period is substantially less than the amount which is necessary to meet the Project Schedule, TAMPA BAY WATER may require CONSULTANT to take whatever action is necessary, in the opinion of TAMPA BAY WATER, to put the Work back on schedule.   Such action shall not constitute Extra Work unless the delays were caused by circumstances beyond the control of CONSULTANT or its agents, employees or subcontractors.

11.3   In the event of claims by others against TAMPA BAY WATER in connection with the Project or the Work, CONSULTANT shall provide to TAMPA BAY WATER such technical assistance that TAMPA BAY WATER may request. Such assistance shall constitute Extra Work, unless such claims are caused by the failure of CONSULTANT, its agents, employees or subcontractors to comply with the terms and conditions of this Agreement or otherwise perform their duties under this Agreement.

11.4   CONSULTANT shall not make any charges or claims for damages for any delays or hindrances of less than thirty (30) days from any cause whatsoever during the progress of any portion of the Work.   Such delays or hindrances of less than thirty (30) days may be compensated for by an extension of time as TAMPA BAY WATER may decide. However, any such extension shall not operate as a waiver of any other rights of TAMPA BAY WATER.   If the total of such delays or hindrances exceeds thirty (30)

Page 6 of 17

days, any additional work required to be performed by CONSULTANT as a result of such delays or hindrances will be considered Extra Work unless such delays or hindrances were caused in whole or in part by CONSULTANT, its employees, agents, or subcontractors or as a result of a suspension of the Project entirely or partly by TAMPA BAY WATER. This paragraph 11.4 shall not apply to suspensions of the Project by TAMPA BAY WATER, which suspensions shall be governed by Article 9.0.

11.5   If TAMPA BAY WATER requires CONSULTANT to provide it with an audit of the Project costs, such audit shall not be considered Extra Work.

12.0   STATUS REPORTS AND INSPECTIONS.   TAMPA BAY WATER shall be entitled at all times to be advised of the status of the Project, including, but not limited to, the Work of CONSULTANT.   CONSULTANT shall cooperate with TAMPA BAY WATER and its agents to keep TAMPA BAY WATER advised as to the status of the Project. TAMPA BAY WATER and/or its authorized representative shall have the right to visit the site and/or the office of CONSULTANT in order to inspect the Work or any of the drawings or documents of CONSULTANT at any reasonable time. The documents obtained or generated under this Agreement shall be maintained by CONSULTANT and made available to TAMPA BAY WATER upon request by TAMPA BAY WATER at all times during the term of this Agreement and for three (3) years thereafter. In addition to the documents and reports set forth in Schedule "A," CONSULTANT shall, at no cost to TAMPA BAY WATER, deliver to TAMPA BAY WATER copies of such documents or reports that TAMPA BAY WATER may request from time to time.

13.0   COORDINATION WITH OTHERS.   CONSULTANT shall cooperate with other engineers, consultants, construction contractors, and suppliers retained by TAMPA BAY WATER to assist TAMPA BAY WATER in the coordination of the various projects, work, and engineering and consulting services. CONSULTANT shall review all information and attend all meetings as shall be reasonably necessary to accomplish the coordination of the various projects, work, and engineering and consulting services, and eliminate any problems where the projects, work or services interface, which meetings are generally described in Schedule "A."

14.0   SUBCONTRACTORS.   CONSULTANT shall not sublet, assign, or transfer this Agreement or any Work without the prior written consent of TAMPA BAY WATER, which consent may be withheld in TAMPA BAY WATER's sole discretion. CONSULTANT shall be solely responsible for the employment, direction, supervision, compensation and control of any and all subcontractors, consultants, experts or other persons employed by CONSULTANT. CONSULTANT shall cause all subcontractors, consultants, experts, or other persons employed by CONSULTANT to provide special services which may be necessary for the completion of the Work to abide by terms and conditions of this Agreement and all Laws as their work or services affect TAMPA BAY WATER.

15.0   INDEMNIFICATION.   In consideration of One Hundred Dollars ($100.00) separately allocated from the consideration paid hereunder, the receipt of sufficiency of which is acknowledged by CONSULTANT's execution of this Agreement, to the fullest extent permitted by law, the CONSULTANT shall pay on behalf of, indemnify, and hold harmless and defend, TAMPA BAY, its officers, directors, employees, and agents from and against all

claims, causes of action, lawsuits, damages, losses and expenses, whether direct, indirect or consequential, including but not limited to bodily injury, sickness, disease or death, personal injury, or injury to or destruction of tangible property, including loss of use, to the extent such claims arise out of or are related to or in any way connected with or resulting from CONSULTANT's, or any of its subcontractors or any person or organization employed by the CONSULTANT, negligent acts or errors or omissions or wrongful or willful misconduct during performance of the Work as provided for herein. CONSULTANT shall also pay any claim, damage, loss or expense attributable to the wrongful failure, neglect or refusal of the CONSULTANT to faithfully perform the Work, to the extent that any such claim, damage, loss or expense is caused by the CONSULTANT, any of its sub-contractors or any person or organization employed by CONSULTANT, to perform or furnish any of the Work, or anyone for whose acts any of them may be liable. This indemnity shall include, but not be limited to, reasonable charges of engineers, attorneys, legal assistants, and other professionals, and costs of both defense and appeal in a court of law, or arbitration, or other tribunal, for any reason. This indemnification shall also include all claims, damages, losses and expenses, including reasonable attorneys' and legal assistants' fees and costs, arising out of any infringement of patents or copyrights incident to providing the Work.

16.0   CONSULTANT'S INSURANCE-GENERAL REQUIREMENTS.

16.1   The types of insurance CONSULTANT shall purchase and maintain shall include the specific coverage set forth in Article 17.0 and be written for the limits of $1,000,000 for insurance coverage other than professional liability, and $5,000,000 for professional liability coverage. All said limits shall be per occurrence and in the aggregate combined single limit for all liability, except professional liability coverage which shall be on a claims made basis, with excess or umbrella insurance making up the difference between the policy limits of underlying policies and the total amount of coverage required.

16.2   CONSULTANT shall not commence or continue to perform any Work unless CONSULTANT has in full force and effect all required insurance, and until CONSULTANT has delivered to TAMPA BAY WATER all insurance certificates required hereunder evidencing the specific insurance coverage required, nor shall any payment for Work performed become due and payable until CONSULTANT has delivered all such certificates to TAMPA BAY WATER. CONSULTANT shall not permit any subcontractor, supplier or other person or organization to perform the Work unless such subcontractor, supplier or other person or organization has complied with the workers' compensation insurance requirements contained herein.

16.3   Insurance coverage shall be placed with insurers or self-insurance funds, satisfactory to TAMPA BAY WATER, licensed to do business in the State of Florida and with a resident agent designated for the service of process. All insurers shall have an "A" policyholder's rating and a financial rating of at least Class IX in accordance with the most current Best's rating. CONSULTANT shall provide TAMPA BAY WATER with financial information concerning any self insurance fund insuring CONSULTANT. At TAMPA BAY WATER's option, a Best's rating or Self-Insurance Fund financial information may be waived.

16.4     As evidence of the insurance coverages required by this Agreement, CONSULTANT shall provide TAMPA BAY WATER certificates of insurance evidencing the specific policies issued, the limits of coverage afforded, and the specific endorsement provided, all in accordance with the form attached hereto as Schedule "E" and made a part hereof. An accord form meeting these requirements may be substituted with prior written consent of TAMPA BAY WATER.

16.5     All the policies of insurance so required of CONSULTANT, except professional liability and workers' compensation insurance, shall be endorsed to include as additional insureds: TAMPA BAY WATER, its directors, officers, employees, representatives, agents, and volunteers. Such insurance policies shall include or be endorsed to include a cross liability clause so the additional insureds will be treated as if a separate policy were in existence and issued to them. If the additional insureds have other insurance which might be applicable to any loss, the insurance required of CONSULTANT shall be considered primary, and all other insurance shall be considered excess. The cross liability clause does not increase the limits of liability or aggregate limits of the policy.

16.6     Deductible and self-insured retention amounts shall be subject to approval by TAMPA BAY WATER, which approval shall not be unreasonably withheld. CONSULTANT is responsible for the amount of any deductibles or self-insured retentions.

16.7     Approval of the insurance by TAMPA BAY WATER shall not relieve or decrease the liability of CONSULTANT hereunder. CONSULTANT acknowledges and agrees that TAMPA BAY WATER does not in any way represent that the insurance (or the limits of insurance) specified in this Article is sufficient or adequate to protect CONSULTANT's interests or liabilities, but are merely minimums.

16.8     All insurance shall be maintained in full force and effect for the period provided in paragraph 16.10 hereof. Should any coverage approach expiration during the period in which it is to remain in full force and effect, it shall be renewed prior to its expiration, and a certificate of insurance again filed with TAMPA BAY WATER at least five (5) days prior to coverage renewal.

16.9     All of the policies of insurance required to be purchased and maintained (or the certificates or other evidence thereof) shall contain a provision or endorsement that the coverage afforded will not be canceled, materially changed, or renewal refused, until at least thirty (30) days prior written notice has been given to TAMPA BAY WATER and CONSULTANT by certified mail. CONSULTANT shall give notice to TAMPA BAY WATER within (24) hours of any oral or written notice of adverse change, non-renewal, or cancellation.

16.10    All insurance required hereunder shall remain in full force and effect until final payment and at all times thereafter when CONSULTANT may be observing the correction, removal or replacement of defective Work.

16.11    Professional liability insurance shall continue in force until the end of one (1) calendar year following the calendar year in which the completion of the Project is estimated to

occur pursuant to the Project Schedule. The professional liability insurance policy shall be endorsed to provide for renewals through said one (1) calendar year, or if the current policy is not renewed, to provide for an extended reporting period on the existing policy through said one (1) calendar year.

16.12   CONSULTANT shall, upon request by TAMPA BAY WATER, deliver to TAMPA BAY WATER a copy of each insurance policy purchased by CONSULTANT pursuant to this Article 16.0 and Article 17.0.

16.13   All policies, except for workers' compensation and professional liability, shall contain provisions to the effect that in the event of payment of any loss or damage the insurer will have no rights of subrogation against TAMPA BAY WATER, its consultants, directors, officers, employees, representative or agents. Nothing contained in these insurance requirements is to be construed as limiting the liability of CONSULTANT or CONSULTANT's insurance carriers.

17.0   <u>LIABILITY AND WORKERS' COMPENSATION INSURANCE.</u>

17.1   CONSULTANT shall purchase and maintain such commercial (occurrence form) or comprehensive general liability (occurrence form), professional liability, and other appropriate insurance for the Work being performed and furnished by CONSULTANT that will provide protection from the types of claims set forth below which may arise out of or result from CONSULTANT's performance and furnishing of the Work, whether it is to be performed by CONSULTANT or its agents:

17.1.1   Claims under workers' compensation, disability benefits and other similar employee benefit acts;

17.1.2   Claims for employer's liability;

17.1.3   Claims for damages because of bodily injury, sickness or disease, or death to any person other than CONSULTANT's employee;

17.1.4   Claims for damages insured by personal injury liability coverage which are sustained by any person as a result of a negligent or wrongful offense related to the employment of such person by CONSULTANT;

17.1.5   Claims for damages because of injury to or destruction of tangible property wherever located, including loss of use resulting therefrom;

17.1.6   Claims for damages because of bodily injury or death of any person, or property damage arising out of the ownership, maintenance, operation, use or loading and unloading of any owned, hired or non-owned motor vehicle used in connection with the Work, including employee non-ownership use; and

17.1.7   Claims for damages because of bodily injury or death of any person or property damage arising out of the ownership, maintenance, operation, use or loading

and unloading of any owned, hired or non-owned aircraft and watercraft used in connection with the Work, including employee non-ownership use.

17.2   The insurance required by this Article shall include the specific coverage and be written for the limits of liability and coverage provided in Article 16.0 or required by Law, whichever is greater.   Where appropriate for the Work being performed, the commercial (occurrence form) or comprehensive general liability (occurrence form) insurance shall also include: broad form property damage, explosion, collapse, and underground hazard coverage and independent contractor's coverage.

17.3   The commercial (occurrence form) or comprehensive general liability (occurrence form) insurance shall include contractual liability insurance applicable to all of CONSULTANT's obligations under this Agreement that are covered by such insurance.

17.4   CONSULTANT shall require each of its subcontractors, suppliers, and other persons or organizations working for CONSULTANT or performing any Work to procure and maintain, until the completion of that party's work, insurance of the types and in the coverage amounts required to be carried by CONSULTANT in this Agreement unless TAMPA BAY WATER agrees, in writing, to other types of coverage and/or lower coverage amounts.  Provided however, that professional liability insurance shall not be required under this Agreement for subcontractors, suppliers, or other persons or organizations working for CONSULTANT, unless such party is a licensed professional. The preceding sentence does not preclude CONSULTANT from requiring such insurance.  CONSULTANT shall be responsible for ensuring that all of its subcontractors, suppliers, and other persons or organizations working for CONSULTANT in connection with the Work comply with all of the insurance requirements contained herein relative to each such party.

17.5   TAMPA BAY WATER requires contractor employers to purchase workers compensation insurance for all their employees regardless of the number of employees they have and regardless of any other exemptions.  Florida law permits employers who may be exempt from purchase of coverage to waive their exemptions and purchase the coverage voluntarily.  TAMPA BAY WATER will expect contractor to voluntarily purchase said coverage.

18.0   <u>STANDARD OF PERFORMANCE.</u>   CONSULTANT shall perform and complete the Work in a timely manner and in accordance the standard of care, skill, and diligence customarily provided by an experienced consulting organization rendering the same services, and in accordance with sound professional principles and practices. TAMPA BAY WATER shall decide all questions, difficulties, and disputes of any nature whatsoever that may arise under or by reason of this Agreement, the prosecution and fulfillment of the services called for hereunder, or the character, quality, amount, or value thereof. The decision of TAMPA BAY WATER upon all such claims, questions, or disputes shall be reasonable and in accordance with sound professional principles and practices.

19.0   <u>PROJECT DOCUMENTS AND DATA.</u>

19.1     One (1) copy of all technical data and working papers regarding the Work, as described in Schedule A, of CONSULTANT whether existing in the office of TAMPA BAY WATER or in the office of CONSULTANT shall be made available to the other party to this Agreement without expense to such other party.   Additional copies shall be made available at the expense of the requesting party.

19.2     All tracings, plans, specifications, maps, evaluations, reports, and technical data, other than working papers prepared or obtained under this Agreement, shall become the property of TAMPA BAY WATER without restriction or limitation of use, and shall be made available, upon request, to TAMPA BAY WATER at any reasonable time. CONSULTANT may retain copies thereof for its files and internal use. Any use by TAMPA BAY WATER of such materials obtained under this Agreement for any purpose not within the scope of the Work of CONSULTANT pursuant to this Agreement or use of incomplete materials obtained from CONSULTANT by TAMPA BAY WATER shall be made at the risk of TAMPA BAY WATER and made without liability to CONSULTANT.   However, this does not constitute a disclaimer of the professional competency of the original Work as used within the scope of that Work.

19.3     All final plans and documents that are required by Florida Law to be endorsed and are prepared by CONSULTANT in connection with the Work shall bear the endorsement of a person in the full employment of CONSULTANT or duly retained by CONSULTANT and duly licensed in the appropriate professional category.

19.4     CONSULTANT shall make any patentable product or result of the Work and all information, design, specifications, know-how, data, and findings available to TAMPA BAY WATER without cost to TAMPA BAY WATER. No material prepared in connection with this Project will be subject to copyright. TAMPA BAY WATER shall have the right to publish, distribute, disclose and otherwise use any material prepared pursuant to the Work of CONSULTANT. Any use of material or patents obtained by TAMPA BAY WATER under this Agreement for any purpose not within the scope of Work of CONSULTANT pursuant to this Agreement shall be at the risk of TAMPA BAY WATER.   In TAMPA BAY WATER's discretion, whenever any renderings, photographs of renderings, photographs of models, or photographs of the Project are released by TAMPA BAY WATER for publicity, proper credit shall be given to CONSULTANT, provided the giving of such credit is without cost to TAMPA BAY WATER.

19.5     CONSULTANT shall make no statements, press releases, or public releases concerning this Agreement or its subject matter or otherwise disclose or permit to be disclosed any of the data or any other information obtained or furnished in compliance with this Agreement, except at meetings where representatives of TAMPA BAY WATER are present, without TAMPA BAY WATER's prior written consent. CONSULTANT shall not publish, copyright, or patent any of the data furnished or developed pursuant to the Work without first obtaining TAMPA BAY WATER's written consent.

20.0     BREACH OR DEFAULT.

20.1    The events which give rise to the right of termination of this Agreement by TAMPA BAY WATER under paragraph 10.2 above shall constitute a material breach or default under this Agreement.

20.2    In the event of a material breach or default under this Agreement by either party, the non-defaulting party shall be permitted to terminate this Agreement in accordance with their respective rights as set forth in Article 10.0 above, and in addition thereto, either party may seek any and all other remedies as may be provided by law or equity.

20.3    CONSULTANT's non-performance of this Agreement may be excused by the occurrence of strikes, or other labor disputes, damage to or destruction of the Project if not caused by the fault of CONSULTANT, or prevention of performance by governmental authority or by an act of God.

20.4    CONSULTANT shall be responsible for work or design problems caused by others when prepared or performed as part of the Work.

21.0    <u>MISCELLANEOUS PROVISIONS.</u>

21.1    CONSULTANT is retained by TAMPA BAY WATER only for the purposes and to the extent set forth in this Agreement, and its relationship with TAMPA BAY WATER shall, during the term of this Agreement, be that of an independent contractor. CONSULTANT shall have the discretion, subject to the requirement that it perform the Work competently and professionally in accordance with the highest professional standards and otherwise comply with the terms of this Agreement, to select the detail, method and means of performing the Work and shall have no obligation to work any particular schedule. Neither CONSULTANT nor CONSULTANT's subcontractors, suppliers, experts or other persons or organizations retained or utilized by CONSULTANT shall be considered by reason of the provisions of this Agreement or otherwise as being an employee or agent of TAMPA BAY WATER.

21.2    TAMPA BAY WATER and CONSULTANT each hereby binds itself, its successors, assigns, and legal representatives to the other. The rights and obligations pursuant to this Agreement shall inure solely to the parties hereto (their successors, assigns and legal representatives) and no other party shall have any rights or obligations under or by virtue of this Agreement.

21.3    This written document shall constitute the entire agreement between the parties hereto and said Agreement shall not be amended or modified except in writing duly executed by the party against whom such an amendment or modification is sought to be enforced. This Agreement shall govern the relationship between TAMPA BAY WATER and CONSULTANT on the Project.

21.4   In any litigation arising out of this Agreement or in any way related to the performance of the Work, the prevailing party shall be entitled to recover all costs and expenses incurred, including, without limitation, attorneys' and legal assistants' fees and costs incurred prior to trial, at trial, on any appeal, and in any bankruptcy proceedings.

21.5   This Agreement shall be governed by and construed under the laws of the State of Florida.

21.6   Venue for any action arising under this Agreement shall lie in Pinellas County, Florida.

21.7   Any notices or other writings permitted or required to be delivered under the provisions of this Agreement must be in writing and shall be delivered by sending the notice by personal delivery, U.S. regular mail, U. S. express mail or by U.S. certified mail, return receipt requested, in any event with sufficient postage affixed, and addressed as follows:
If to TAMPA BAY WATER:

> Tampa Bay Water
> 2535 Landmark Drive, Suite 211
> Clearwater, Florida 33761
> Attention:  Amanda E. Rice

If to CONSULTANT:

> HDR Engineering, Inc
> 5100 West Kennedy Blvd.
> Tampa, FL 33609
> Attention:  C. Edwin Copeland, Jr., P.E.

Either party may change said address by notice in writing to the other party in the manner herein provided.

21.8   TAMPA BAY WATER shall have the right during the three (3) year period following the expiration or termination of this Agreement to audit CONSULTANT with regard to any financial matters in connection with Work of CONSULTANT, except items for which payment is made solely on a lump sum basis.  The requested audit shall be performed by a certified public accountant selected and paid for by TAMPA BAY WATER, and all documents and data shall be made available by CONSULTANT to TAMPA BAY WATER at TAMPA BAY WATER's expense. CONSULTANT may have the audit reviewed by CONSULTANT's auditor at CONSULTANT's expense.

21.9   Key personnel and subconsultants assigned to the Project by CONSULTANT shall not be removed from the Project without the prior written approval of TAMPA BAY WATER. Such key personnel are as follows:

> C. Edwin Copeland, Jr.
> J. Erin Cochrane
> George Eliason
> Barry J. Meyer
> Nicholas J. Houmis

21.10  If at any time during the course of the Work TAMPA BAY WATER notifies CONSULTANT in writing that any of CONSULTANT's employees or the employees of any of its subcontractors are objectionable to TAMPA BAY WATER, CONSULTANT shall remove or have its subcontractor remove the objectionable employee from the Work and not re-employ the objectionable employee on any portion of the Work.

21.11  The CONSULTANT's communications with TAMPA BAY WATER shall be limited to TAMPA BAY WATER's General Manager and designated staff. Communications with TAMPA BAY WATER's Board Members are prohibited, except with the prior written permission of TAMPA BAY WATER's General Manager or at a duly noticed public board meeting.

21.12  When CONSULTANT is requested by TAMPA BAY WATER to utilize special consultants not heretofore agreed upon, CONSULTANT shall be reimbursed for the reasonable cost of such consulting services. Any request of TAMPA BAY WATER to utilize specific firms shall be subject to the reasonable refusal of CONSULTANT. CONSULTANT shall obtain TAMPA BAY WATER's prior written consent before it retains such consultants.

21.13  Nothing in this Agreement shall prevent CONSULTANT or TAMPA BAY WATER from seeking judicial redress.

21.14  All words used herein in the singular shall extend to and include the plural, and the use of any gender shall extend to and include all genders.

21.15  The captions and headings herein are for convenience of reference only and in no way define or limit the scope or content of this Agreement or in any way affect its provisions. Unless otherwise indicated, references to Articles and paragraphs shall include all subparts.

21.16  This Agreement shall be effective as of the last date upon which all of the parties hereto have executed this Agreement, as demonstrated by the date under the signatures on the signature page.

21.17  Time is of the essence of this Agreement and each of its provisions.

w:\in_ag_ex\mngmnt\prfsvsbk1.doc

21.18   In the event of a conflict between this Agreement and the Scope of Services contained in Schedule "A" attached hereto, this Agreement shall control.

21.19   A person or affiliate who has been placed on the convicted vendor list following a conviction for a public entity crime may not submit a bid on a contract to provide any goods or services to a public entity, may not submit a bid on a contract with a public entity for the construction or repair of a public building or public work, may not submit bids on leases of real property to a public entity, may not be awarded or perform work as a contractor, supplier, subcontractor, or consultant under a contract with any public entity, and may not transact business with any public entity in excess of the threshold amount provided in Section 287.017, for CATEGORY TWO for a period of 36 months from the date of being placed on the convicted vendor list.

21.20   CONSULTANT recognizes that the documents and information provided or prepared pursuant to this Agreement is the property of TAMPA BAY WATER. CONSULTANT shall not disclose such information to third parties, except as necessary to perform the Work, or if compelled by a court of competent jurisdiction after notice to TAMPA BAY WATER.

21.21   CONSULTANT understands that TAMPA BAY WATER has applied for a federal grant for this project.  CONSULTANT agrees to comply with any and all laws and regulations required by the granting agency as a condition of receiving the grant.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed by their duly qualified representatives on the dates set forth below.

WITNESSES:

CONSULTANT

HDR Engineering, Inc.

By: *William H. Wadsworth*

Print
Name: *Paul Bowdoin*

Print
Name: William H. Wadsworth

Its: Vice-President

Its: Senior Vice President

Dated: _____, 199__.

Print
Name: Louis J. Pachman

Its: Secretary

As to Consultant

(CORPORATE SEAL)

TAMPA BAY WATER, A Regional Water
Supply Authority

ATTEST:

By: _____

SECRETARY

As: Chairman

Dated: Nov. 16 , 199 8.

Approved as to form:

By: _____

Office of General Counsel

c:\windows\temp\prfsvsbk1.doc

## INDEX OF SCHEDULES

Schedule "A"  -  Scope of Work

Schedule "B"  -  Compensation

Schedule "C"  -  Florida Statutes Section 112.061

Schedule "D"  -  Project Schedule

Schedule "E"  -  Certificate of Insurance Form

SCHEDULE "A"

SCOPE OF WORK

SCHEDULE "A"

SCOPE OF WORK

TAMPA BAY REGIONAL RESERVOIR DESIGN

## 1.0 INTRODUCTION

Tampa Bay Regional Reservoir is an off-stream, above-ground reservoir that will be used to store surface water from the Alafia River, Tampa Bypass Canal and the Hillsborough River prior to treatment and use as a potable water supply. While these three surface water sources can alone provide significant quantities of water, the addition of an off-stream reservoir to the system increases the sustainable yield significantly. It is estimated that without the reservoir the sustainable yield from the sources of supply during a dry year will be approximately 25 mgd as opposed to the sustainable yield of 55 mgd with a 1,200-acre reservoir. The reservoir will increase the yield and reliability by providing storage for high flows from the surface water sources so that they can be utilized when water is not available for withdrawals. The Tampa Bay Regional Reservoir volume is anticipated to be approximately 15 billion gallons (48,000 acre-feet). The reservoir would be an earthen structure with an average of 45-foot high berms and 40 feet of water.

This scope of work includes the following work elements:

- Embankment Design
- Reservoir Intake Structure Design
- Pipeline Design from Alafia River Intake to Reservoir
- Land Acquisition
- Aquifer Storage & Recovery
- Permitting
- Water Quality Modeling
- Federal Funding
- Public Involvement/Information

## 2.0 TASKS

The Tampa Bay Regional Reservoir is a unique project to the Tampa Bay Region with its unique challenges and opportunities. The objectives of this project will be addressed in a series of tasks to be executed in coordination with the Tampa Bay Water staff. Where possible, these tasks will be conducted concurrently to expedite the construction and implementation of the reservoir into the regional system.

### Task 1.0 – Project Kick-Off

This task will serve as a project kick-off as well as an update of the tasks accomplished to date as a part of the Stage A Feasibility Study. The project update will serve as a means of

---

ensuring that both the Tampa Bay Water staff and the CONSULTANT Team members are current on the project tasks and issues.

The CONSULTANT will prepare and conduct an initial kick-off meeting with the appropriate Tampa Bay Water staff and consultants. This meeting will be the official kick-off for the project and is intended to accomplish the following:

- Introduce Tampa Bay Water to the CONSULTANT Team Members.

- Establish the reporting and coordination paths and lines of communication.

- Present the project's tasks, schedule and deliverables. Any proposed changes or modifications will be reviewed.

- Review data and information needed to accomplish the project tasks.

- Review the goals and objectives of the Public Involvement/ Information Program

- Schedule future project status meetings.

The CONSULTANT Team will complete the following tasks:

- Review appropriate background and technical information, prepare the agenda and schedule the kick-off meeting with Tampa Bay Water.

- Prepare attendees list and notify appropriate parties of the scheduled meeting.

- Convene and conduct the kick-off meeting. Maintain agenda and address the previously referenced items during the meeting.

- Summarize the meeting and all action items and submit the summary to Tampa Bay Water.

## Task 2.0 - Reservoir Design

This task involves a detailed characterization of the potential reservoir site and the design of the reservoir itself along with the ancillary facilities such as roads and drainage systems. The result of this task will be the preparation of design drawings and construction specifications for the reservoir.

### Task 2.1 – Surveying

The CONSULTANT will provide a signed/sealed boundary survey of the reservoir site marking the perimeter of the 1,200 acres reservoir with wooden stakes at 500-foot intervals and iron rods at the corners of the exterior of the boundary. This survey will show any occupation of fences or other such objects within 10 feet of the exterior of the property

boundary line not including interior improvements such as buildings, ponds, access roadways, etc. The property line between the three property owners of the reservoir site will be marked and a separate boundary survey for each of the 3 parcels will be created. A survey of the cross-sections of the portions of Doe Creek affected by the reservoir will also be taken. In addition, the boring locations discussed below (140 locations) will be marked and the elevation of these borings aboveground will be obtained. An aerial map of the reservoir site with contours will also be provided for the reservoir site. The aerial map will be at a 1"=200' scale and the contours will be at every 2 feet. The CONSULTANT shall submit the survey to Tampa Bay Water's System Surveyor for quality control review. The CONSULTANT shall provide the System Surveyor with one week to review and return comments on the surveys.

Task 2.2 – Geotechnical Investigation

One of the key elements of the reservoir design is a thorough understanding of the geologic, historic, and geotechnical engineering characteristics of the site. The characterization of the off-stream reservoir, Site 8, is unusual because a portion of this site has been previously mined for phosphate.

The purpose of the site characterization is to attempt to create a 3-dimensional characterization of the site using 1-dimensional data from the exploratory borings (a 4-inch diameter boring is essentially 1-dimensional) and 2-dimensional data from the geophysical survey. This 3-dimensional characterization can only occur with a thorough understanding of the natural geologic processes that have occurred and the man made processes caused by the phosphate strip mining operations.

Based on the results of the reservoir site characterization, embankment cross-sections will be developed considering the properties of the available borrow materials. Additionally, a design for the slurry cut-off wall will be developed. The following sub-tasks will be performed for the geotechnical investigation:

A. Develop a thorough Understanding of the site's Geologic and Hydrogeologic Setting

- Study and review readily available geologic/geotechnical literature.
- Review readily available current and historic maps, plans and aerial photographs covering the reservoir site.
- Perform a detailed site reconnaissance and mapping of existing features.

As part of the site characterization study, the CONSULTANT has already conducted a comprehensive literature review to obtain available information on the geologic and hydrogeologic conditions of the reservoir site. This review included United States Geologic Survey (USGS) reports and maps, Florida Geological Survey Reports, Southwest Florida Water Management District (SWFWMD) Reports and various other sources.

The CONSULTANT has acquired and evaluated aerial photographs of Site 8, but the CONSULTANT will verify that copies of photographs for readily available flights

covering the sites have been obtained. This information will be very useful to provide a better understanding of the strip mining operations and the impact that these operations may have on the reservoir design, construction, and operation. Aerial photographs will also be evaluated for circular depressions and photolineaments that may indicate sinkhole development on or in the vicinity of Site 8.

The CONSULTANT has performed a preliminary reconnaissance of Site 8, however, a more detailed site reconnaissance will be performed during the site characterization phase. The reconnaissance will include field mapping of unusual features identified on aerial photographs, and the location and access of the exploratory borings and CPTU soundings and geophysical survey lines.

B.  Research History of Site 8

For most sites evaluated for construction of typical earth embankment reservoirs where water is impounded in a valley, the man made features are not significant and do not impact the reservoir. However, to properly evaluate Site 8, it is essential that the CONSULTANT investigate the site history to determine the degree that the phosphate strip mining operations have altered the site.

Since some of the phosphate mining operations were apparently conducted from the 1930's to the 1960's, there is very little published information concerning some of the strip mining techniques. Therefore, it is essential that the CONSULTANT has a thorough understanding of historic mining practices to enable the CONSULTANT to evaluate site-specific data and to formulate a reasonable site characterization. The CONSULTANT will develop a historic understanding of the phosphate mining practices that most likely were used for Site 8, which will greatly increase the understanding of the physical characteristics of the reservoir site.

C.  Geotechnical Exploration and Field Program

The geotechnical exploration and in situ testing program for Site 8 will include the following:

- Exploratory borings and soil sampling and rock coring
- Test Pits
- In-situ soil testing including piezocone penetrometer testing and flat-plate dilatometer testing
- In-situ permeability testing
- Surface seismic refraction and ground penetrating radar survey -
  The field exploration program for the embankment design will include both exploratory borings and in-situ piezocone penetrometer testing (CPTU). The CONSULTANT will drill the exploratory borings using conventional rotary-wash drilling equipment. The typical sequence of borings and CPTU soundings will be:
- Two exploratory borings

- CPTU Sounding -
  This pattern will be repeated around the reservoir site with the borings and CPTU soundings at an approximate spacing of 300 feet along the centerline of the embankment. Assuming an embankment length of 28,000 feet, 62 borings and 32 CPTU soundings will be performed. Additionally, the CONSULTANT has anticipated 16 additional borings along the embankment in the event the CPTU's are unable to penetrate the underlying hard silt material. Therefore, a total of 78 borings are included in our estimate for exploration for the reservoir embankment design.

The boring depths and sampling interval are as follows:

| Number of Borings | Depth (feet) | Sampling Interval | Sampler Type |
|---|---|---|---|
| 53 | 60 | Semi-continuous | SPT |
| 25 | 110 | Continuous | Pitcher Barrel/Rock Core Barrel |

The CPTU's will be performed to a depth of 60 feet or until practical refusal. Because of the presence of the relatively hard silt, refusal may occur at depths as shallow as 30 feet. During the CPTU soundings, the test will be stopped and the excess pore pressure will be allowed to dissipate to allow an estimation of the permeability of the silt material.

Within the reservoir, explorations will be performed to confirm the thickness and lateral extent of the confining layer. The CONSULTANT will perform 36 additional exploratory borings on a 1000-foot grid pattern. In areas where there appears to be greater variability, additional explorations will be performed. The CONSULTANT has assumed that 16 additional borings and 10 CPTU soundings will be required to evaluate geologic anomalies that may be identified based on the results of the geophysical survey; therefore, the CONSULTANT has included 52 exploratory borings in our budget. The CONSULTANT has assumed an average depth of 60 feet for the CPTU soundings.

The boring depths and sampling interval are as follows:

| Number of Borings | Depth (feet) | Sampling Interval | Sampler Type |
|---|---|---|---|
| 28 | 60 | Semi-continuous | SPT |
| 24 | 110 | Continuos | Pitcher Barrel/Rock Core Barrel |

In addition to the above exploration program, the CONSULTANT will also perform 10 exploratory borings to a depth of 40 feet for the inlet and outlet structures. All exploratory borings will be grouted.

### Flat-Plate Dilatometer Testing

The CONSULTANT will perform flat plate dilatometer tests in 20 selected boreholes along the embankment center line to determine the friction angle of the sand and the sand stiffness for the purpose of embankment stability and settlement calculations. The CONSULTANT has used this instrument extensively at numerous sites in Florida and the Southeast to characterize very loose to dense sandy soil deposits. Tests will be performed on 1 foot intervals until practical refusal of the instrument is obtained. For budgeting purposes, the CONSULTANT has assumed an average borehole depth of 40 feet.

### Test Pits

Test pits will also be constructed in the area of the reservoir to further characterize the surficial soils to determine the suitability of these soils as embankment material. The CONSULTANT will perform approximately 150 test pits to determine the areal extent, depth of topsoil and locations of unsuitable soils such as organic muck deposits.

### Hydraulic Properties of Subsurface Soils (In Situ Permeability Test)

One important design consideration is the potential for seepage through the sandy soils that will underlie the embankment. Even though a cut-off wall may be constructed beneath the embankment to reduce seepage, it is important to determine the in situ permeability of the saturated surficial sands present in the uppermost soil section on the proposed reservoir site. These sands may represent native material, or may consist of sand tailings from mining reclamation activities. Additionally, the piezometers that will be installed will be used to monitor the shallow unconfined groundwater level and the piezometric level in the intermediate aquifer.

Fifteen (15) shallow piezometers will be installed to a maximum depth of 40 feet to determine the in-situ horizontal permeability of the surficial sands and for long-term monitoring of ground water levels. Slug testing will be performed at each piezometer to determine the hydraulic conductivity (K) of the saturated soils in the vicinity of each piezometer. The slug tests will be performed by lowering a slug of known volume into each piezometer, and recording the head drop to static conditions over time. The head data will be recorded automatically with an automatic data logger and pressure transducer. Once the water levels return to near static, the slug is removed and the head rise recorded. The rate at which the water level falls or rises is controlled by the formation characteristics. The slug test data

will be downloaded following testing and analyzed utilizing the Bouwer and Rice method of analysis (Bouwer and Rice, 1976). The method provides theory and equations for determining hydraulic conductivity and transmissivity for wells completed in unconfined aquifers. The test locations will be selected after completion of the exploration boring program.

The piezometers installed on site will also be utilized to determine horizontal components of groundwater flow in the shallow aquifer at the proposed reservoir site.  The top of casing elevations will be determined and water elevation data obtained on a regular basis at each piezometer to establish groundwater elevations and flow direction at the site.

The CONSULTANT will also install 15 deep piezometers to a maximum depth of 110 feet into the intermediate aquifer (below the silt/clay confining unit) to allow the determination of vertical flow components between the surficial and intermediate aquifers, allow aquifer testing of the deep aquifer, and evaluation of the interaction of the deep aquifer with the reservoir.

The CONSULTANT will also perform borehole packer testing in the confining layer to evaluate the permeability of this layer.  Borehole testing will be performed from a depth of approximately 30 to 60 feet at 5 foot intervals in up to 20 boreholes.

D.  Geophysical Investigation

A geophysical investigation to utilize seismic shear-wave refraction (SR) and global-penetrating radar (GPR) techniques will be performed at the reservoir site. The CONSULTANT suggests these techniques based on the results of the preliminary soil borings and our knowledge of the general geologic characteristics of the project site area.

The CONSULTANT anticipates that Shear-wave refraction (SR) will be the method of choice to determine the depth to the impervious layer along the embankment centerline. Based on the available information, the CONSULTANT has determined that a geophone spacing of 5 feet will be required. The CONSULTANT plans to use 5 shot locations per seismic spread.  Based on 28,000-foot length of embankment, this task will require approximately 18 field days to complete.

The results of this portion of the survey will be shown as a cross-section indicating the top of the impervious layer. The results of the SR survey will be calibrated with the boring and CPTU data.

The CONSULTANT also suggests that a GPR survey be performed along the proposed path of the embankment.  The CONSULTANT suggests that the survey be performed along two transect lines, offset 75 feet on each side of the centerline. The GPR survey along the embankment will help identify locations of suspected karst activity within the near-surface sediments. Depressions in the near-surface strata are often indicators of deeper karst activity. The CONSULTANT anticipates that about 10,000 to 15,000 linear

feet of GPR survey can be performed in a reconnaissance mode. Suspect areas observed on the GPR data may be further investigated using a grid pattern of transect lines to better characterize the anomaly.  The CONSULTANT estimates that this task will require about 5 field days to complete.

The results of this portion of the survey will be shown as cross-sections indicating the top of the first fine-grained (clay or silt) layer. The results of this study will be compared with the seismic data and boring logs to enhance the lateral characterization of near-surface strata out from the centerline seismic data. The GPR data will also provide an indication of potential karst activity.

The CONSULTANT will also perform a geophysical investigation across the future bottom of the reservoir within areas of suspect geology. Areas of suspect geology include suspected sinkhole activity, relic sinkholes, lineaments, and lateral discontinuities of impervious strata. Information collected and analyzed from the other surveys will help determine the location and extent of these features.

A seismic reflection (SFL) survey will be performed across specific areas of the project site. The areas to be investigated using SFL will be determined from the results of the other surveys. The SFL will be performed in such a manner as to characterize geology to a depth of about 150 feet below land surface.  The CONSULTANT anticipates that karst activity of concern would be expressed in the rock formations and overlying sediments within 150 feet of land surface. The CONSULTANT estimates that the quantity of SFL that will be performed during this portion of the investigation will be approximately 10,000 to 20,000 linear feet. The CONSULTANT estimates that 15 field days would be required to complete this portion of the survey.

A GPR survey will be performed along a 1,000 by 1,000-foot grid across the bottom of the proposed reservoir. This grid configuration of transect lines will result in the collection of approximately 40,000 linear feet of GPR data. In addition, the CONSULTANT estimates that 4 days will be required to investigate anomalous areas identified from the other surveys. Therefore, the time to complete this portion of the survey will be about 8 days.

E.  Laboratory Testing Program

The CONSUTANT has complete in-house soil/rock laboratory testing capabilities required for this project.  The CONSULTANT intends to make use of these capabilities to obtain the geotechnical properties needed for the design of the proposed reservoir. All tests will be performed in accordance with the applicable ASTM standards, and a detailed testing program will be developed as the reservoir exploration program proceeds.   The CONSLUTANT shall complete all necessary soil tests for this project during the design phase. The CONSULTANT estimates that the required laboratory tests will include:

| | | |
|---|---|---|
| Sieve Analysis | 200 | Tests |
| Hydrometer | 200 | Tests |
| Atterberg Limits Tests | 100 | Tests |

| Specific Gravity Tests | 100 | Tests |
|---|---|---|
| Percent Organics Test | 50 | Tests |
| Modified Proctors | 50 | Tests |
| Triaxial Tests (CU with pore pressure) | 50 | Tests |
| Unconfined Compression tests | 50 | Tests |
| Consolidation Tests | 20 | Tests |
| Flex-Wall Permeability Tests | 50 | Tests |
| Corrosion Series Tests | 5 | Tests |
| Slurry Wall Backfill Evaluation | 1 | Test |
| Soil Cement Testing | 20 | Tests |

F.  Site Characterization Report

The site characterization report will include:

- Project information.
- Results of the field explorations and laboratory tests, including logs of borings.
- Results of the geophysical surveys
- Discussion of surface and subsurface conditions.
- Maps and cross-sections showing general site conditions and geologic features including but not limited to suspected sinkhole activity, relic sinkholes, lineaments, and lateral discontinuities of impervious strata
- General location and description of potentially deleterious materials encountered in the borings that may interfere with construction progress or embankment performance, including existing fills or surficial/subsurface organics.
- Suitability of the on site soils for use as embankment fill materials.  This will include maps delineating potential borrow areas.
- Presentation of measured ground water level data for shallow and deep piezometers.
- Discussion of geologic and geotechnical conditions.
- Recommendations for the design of the slurry wall containment system
- Recommendations for deep ground improvement that may be necessary prior to embankment construction.
- Recommended soil subgrade preparation operations, including stripping, grubbing and compaction.  Recommended engineering criteria for placement and compaction of approved embankment fill materials.

Task 2.3 – Embankment Design

Preliminary Design

The preliminary design of the embankments includes the development of the concepts and design strategies that will be utilized in the final design of the reservoir.

The initial step in the preliminary design efforts will be the collection, review and utilization of the site characterization generated for the reservoir site from the surveying and geotechnical investigation to create a preliminary design of the embankment. The CONSULTANT shall also utilize appropriate input received from the public as a basis of design. The initial geotechnical and geologic data obtained in the Stage A Feasibility activities indicates that the borrow soils in the reservoir area could range from the original stratigraphy to a heterogeneous mixture of reclaimed soil backfill. The site characterization study will determine the index properties, shear strength, compressibility and permeability of the foundation and borrow area soils. The CONSULTANT understands that public safety must be held paramount in the design of the reservoir.

The CONSULTANT Team will coordinate with the appropriate agencies (ACOE, FDEP, SWFWMD, etc.) to confirm design and construction observation requirements for the reservoir. Initial contact was made with the State Dam Safety Officer in Stage A to determine the design standards that will be required for this reservoir. Based on these conversations, the CONSULTANT will be utilizing the State of Georgia Dam Standards and "Best Engineering Practices" in the design of this reservoir.

The CONSULTANT Team will reevaluate the preliminary embankment designs prepared as a part of the Stage A Feasibility study. This review will allow for the incorporation of the findings of the detailed geotechnical characterization described above. The CONSULTANT Team will evaluate the strength and compressibility of the foundation soils, the strength of the compacted berm soils and the required berm height at various locations around the reservoir site. In addition, the CONSULTANT Team will consider the effects of wind orientation, fetch and reservoir level to refine the soil-cement thickness requirements around the reservoir interior. The CONSULTANT will also include any design requirements for public use/access if necessary. The CONSULTANT Team will develop a typical cross-section of the embankment for the reservoir. This cross-section will include specifications for the following embankment components:

- Slurry Walls
- Toe Drain/Filter Blanket
- Embankment Stabilization/Erosion Control
- Berm Earthwork

The CONSULTANT Team will develop embankment design and geotechnical documentation, including stability, seepage, settlement and erosion control analysis. Embankment sections will be identified for stability analysis. Stability analyses will be conducted using circular arc methods such as the Spencer method,

The CONSULTANT Team will utilize our extensive construction cost database to develop cost estimates based on the preliminary design of the reservoir and will evaluate the cost effectiveness of varying design alternatives.

<u>Final Design</u>

The final design efforts of the reservoir will include all of the work efforts necessary to prepare a set of design documents and their required specifications to be bid and constructed by an outside contractor. The CONSULTANT Team will provide cost estimates at the 30%, 60%, 90% and 100% design phases of the project. The Final Design will also include all of the preliminary contract documents required to bid the project. These documents may include but are not limited to designs, drawings, special conditions, general conditions, supplemental conditions, specifications, bid forms and any other information necessary for the construction of the project. It is expected that the CONSULTANT will utilize Tampa Bay Water's existing base of contract documents and will supplement and modify them as necessary for the construction of the project.

Final design tasks associated with the reservoir include the following:

- Finalize Embankment Design

   This task includes plan layout, cross sections (zoning), excavation limits, material specifications, slope protection, instrumentation requirements, and construction quantities.

   This work will include all of the efforts necessary to complete the design of the inlet/outlet features and spillway design. The preliminary design documents will be updated to reflect improvements to the design features based on comments received from Tampa Bay Water, the member governments, regulatory agencies and interested parties.

- Inlet/Outlet Design

   This work will include all of the efforts necessary to complete the design of the embankment features of the reservoir. The preliminary design documents will be updated to reflect improvements to the design features based on comments received for Tampa Bay Water, the member governments, regulatory agencies and interested parties.

   Prepare inlet/outlet and overflow control orifice designs, including plan layouts, cross sections, foundation requirements, material specifications, associated electrical and instrumentation facilities, and construction quantities.

- Design Plans and Specifications

This work will include the preparation of final design plans, specifications, and conditions of the construction contract (Contract Documents).

The CONSULTANT Team will prepare the construction documents in accordance with the guidelines set forth by Tampa Bay Water. Thus, the design plans and specifications will be developed to meet the needs of Tampa Bay Water.

- Construction Cost Estimates

  The CONSULTANT Team will prepare a construction cost estimate for the reservoir. This construction cost estimate will be based on recent costs for similar work efforts developed from the CONSULTANT's database on costs. In addition, the CONSULTANT Team will contact vendors to obtain updated cost information. This cost estimate will form the basis for the engineer's cost estimate for this project.

Deliverables

The CONSULTANT will prepare a Basis of Design Report (BODR) for the embankment design tasks. The Preliminary BODR will be submitted after the preliminary embankment design tasks defined above are complete. The preliminary BODR will include the results of the slope stability and seepage analyses for a variety of embankment cross-sections and critical reservoir conditions and preliminary recommendations for embankment geometry, embankment drainage options, up slope soil-cement stabilization, and slurry wall construction. The preliminary BODR will document all of the schematics, sketches, design concepts, engineering practices, application of experience from similar projects, cost estimates, required permits and fees, permitting schedule, project construction schedule, equipment lists, sample specifications, functional performance criteria, functional narrative, operational control strategy, conceptual layout of facilities and other conceptual design criteria to insure that all stakeholders are thoroughly informed prior to the commencement of Final Design. Ten (10) copies of the Preliminary BODR will be provided to Tampa Bay Water for their use and dissemination.

Upon completion of the final embankment design tasks, the CONSULTANT Team will prepare a final BODR. This Final BODR will be an edited update of the Preliminary BODR and will document the changes and rational for changes that occurred during design. The final design will also include all of the preliminary contract documents required to bid the project. These documents may include but are not limited to designs, drawings, special conditions, general conditions, supplemental conditions, specifications, bid forms and any other information necessary for the construction of the project. Ten (10) copies of the Final BODR

and contract documents will be provided to Tampa Bay Water for their use and dissemination.

The CONSULTANT will prepare the preliminary and final BODR to comply with Tampa Bay Water's standard format (to be provided by Tampa Bay Water).

Based on the BODR, the CONSULTANT Team will develop 30, 60, 90, and 100 percent design plans for the project. These plans will follow previous design plans developed for and by Tampa Bay Water and will utilize consistent design protocols and Tampa Bay Water's standard layout features. These plans will be provided as Microstation files and as five (5) sets of hard copy prints. Information provided will be consistent with State Plane Coordinates (NAD 1983 in feet). At the 100% design stage, the CONSULTANT shall provide along with the design documents, a report of all property acquisition agreements/deeds, specific conditions of said agreements, all permits and a summary of all special permit conditions

## Task 2.4 Groundwater Modeling

The piezometers installed on site will also be utilized to determine horizontal components of groundwater flow in the shallow aquifer and deep aquifers at the proposed reservoir site. The top of casing elevations will be determined and groundwater elevation data will be obtained on a regular basis at each piezometer to establish groundwater elevations and flow direction at the site. The deep piezometers would allow the determination of vertical flow components between the surficial and intermediate aquifers, aquifer testing of the deep aquifer, and evaluation of the interaction of the deep aquifer with the reservoir. Aquifer testing will be performed to determine the hydraulic properties of the permeable water-bearing units beneath the site.  Aquifer testing will include a combination of single well (slug tests) and multiple well (pump tests) tests.  The test data will be analyzed using the appropriate methods to determine the hydraulic conductivity and storage coefficients of the aquifer units.  Permeability data for the confining units will be determined by laboratory methods (described in geotechnical investigation).

The CONSULTANT team will utilize flow modeling to determine the interaction between the reservoir and the underlying aquifers based on the site-specific conditions. The vertical components of flow will determine the seepage from the bottom of the reservoir through the confining layers beneath the site.  The Modular Finite-Difference Groundwater Flow Model (MODFLOW) developed by the U.S Geological Survey, contains a reservoir package which allows for the simulation of leakage between a reservoir and an underlying groundwater system as the reservoir area expands and contracts in response to reservoir stage. The MODFLOW model or equivalent will be utilized to determine reservoir/aquifer interactions and impacts on seepage from the reservoir bottom.

## Task 2.5 Dam Safety Analysis

The CONSULTANT team will perform a Dam Safety Analysis on the final reservoir design. The purpose of the dam break or dam failure analysis is to determine the impact of a catastrophic failure of the reservoir berm and to aid in the development of the Emergency

Action Plan for the facility. The dam break analysis considers a breach of the reservoir occurs causing a failure of the berm and the release of water through the breach.

Typically, the dam failure analysis of an in-stream reservoir is accomplished through the routing of the flood wave through the downstream portions of the riverine system which has been controlled or dammed. When considering this project, which is an off-stream reservoir, the potential exists for the breach to occur at virtually any location on the berm with the resulting discharge propagating in any direction from the reservoir. Thus, the analysis of the breach and the responding flood wave propagation must consider all possible directions. There is a potential for the flood wave to propagate away from the reservoir for some distance until a topographic high is encountered. Once this high is encountered, the flow will then travel down-gradient. Thus, there is the potential for flow to return to the reservoir area and then to flow in another direction. The simulation tool selected for the effort must have the capacity to simulate flows in any direction.

The CONSULTANT proposes to utilize the Advanced Interconnected Pond Routing Model rather then the National Weather Service "DAMBREAK" as was originally planned. This model has the required ability to simulate flow in multi-directions and was recently used on the Lake Grady Berm failure analysis which has been reviewed and accepted by the State regulatory agencies.

The CONSULTANT will identify the extent of the flooding which may occur, as well as the potential for damages and loss of life. The CONSULTANT Team will use this information for the placement of overflow features in the reservoir that can be used to channel the flood flows to appropriate locations. The CONSULTANT Team will utilize the results of the Dam Break analysis as part of the development of an Emergency Action Plan. The Emergency Action Plan is developed to provide for the identification and amelioration of potential harmful impacts of a reservoir failure.

The proposed reservoir will be considered a zero-discharge facility and is thus not required to have a spillway designed or constructed. Since the flow into the reservoir is fully controlled by pumping, the only potential for overtopping would occur when:

- Inflow continues past the maximum design stage,
- Significant stormwater flow occurs on the reservoir when it is already at a full condition, or
- Climatalogical factors such as winds and or low pressure areas raise the level of water to a high stage.

The design of the reservoir will incorporate an overflow control orifice at some level above the normal high water level. This overflow orifice will be sized to accommodate the volume of water that can reasonably be expected to occur during high water events. Additionally, an overflow area will be constructed along each face of the dam. The purpose of this overflow location will be to facilitate the controlled discharge of flow from the reservoir without berm overtopping. This location will likely consist of a depressional area which is armored across the top and down the face, so that flow will not cause a breach.

The flow will be routed from this overflow location to the appropriate waterway to minimize the potential for deleterious impacts to the surrounding area.

Area Evaluation

One of the primary steps necessary in the development of the Dam Break Analysis is the development of an understanding of the potential areas which may experience inundation due to a dam failure. The CONSULTANT will review existing aerial mapping to develop an understanding of the location and extent of development within the area of the reservoir. For the purpose of this analysis, Tampa Bay Water will assist the CONSULTANT by providing access to Hillsborough County Property Appraiser Aerial Maps. These maps are flown and produced on a two-year basis and provide the best opportunity for near term development depiction.

In addition, the CONSULTANT will obtain and review information on the U.S. Geological Survey (USGS) quadrangle maps for the area surrounding the reservoir. For the purposes of this evaluation, maps covering an area of at least three quadrangle widths from the reservoir will be accessed and reviewed. It is expected that for the purposes of an initial review, the 5-foot contours normally provided with the USGS Quadrangle maps will be utilized. The CONSULTANT currently has these maps in electronic format. Thus, the CONSULTANT will utilize these electronic maps in this review.

In addition to the USGS Qauadrangle map coverage discussed above, the CONSULTANT will also obtain the Southwest Florida Water Management District's aerials with contours. These contour maps, furnished by the District as a partner to this project will if possible be obtained electronically. The purpose of the evaluation of the SWFWMD contour maps will be to gain a better understanding of the watershed which may be impacted by a dam failure.

Development of Hydraulic Cross-Section

The CONSULTANT will utilize the information gathered in the above task to generate cross-sectional information for potential breaches that may occur on any face of the dam. This will involve the development of hydraulic capacity information such as elevation and stationing, roughness, slope, etc. for each potential flow course. Each cross-section location will be identified as well as structures and appurtenances which may impact the floodwave's propagation. This information will be used in the development of the dam breach simulation in the following task.

Development of the Breach Flow Regime

The development of the floodwave propagation analysis requires the development of the potential dam break scenarios. The breach of the reservoir is dependent on the location, time of breach, and the extent to which failure occurs. For the

purposes of this analysis, the dam breach parameters will be estimated using information in *Predicting Embankment Dam Breach Parameters*. Chow 1988. The breaches will be simulated using the HEC-1 simulation model. This model can be used to develop the breach flow information as well as estimate the flow rate and elevation at various cross-sections downstream of the breach. The breach flows are considered to be accurately reflected by this model. However, the flows at the downstream cross-sections are not accurately depicted. Rather, they are provided as an initial elevation. Detailed hydraulic analysis using another simulation tool will occur as discussed below.

Development of the Berm Failure Simulation

The CONSULTANT will utilize an appropriate simulation tool for the analysis of a breach of the dam on any face. Initially, it was thought that the use of the National Weather Services "DamBreak" model would be appropriate for this analysis. The DamBreak model is similar in computational process to the U.S. Army Corps of Engineers HEC-2 and FLDWAVE Models in that it uses known flows to generate stage and duration information on a steady-state one-directional basis. That is, flood flow from the breach would be allowed to flow in one direction. These models are appropriate and highly effective in watersheds where the dam is across a riverine or stream bed with a known direction of breach. Because the proposed reservoir is an off-line system, there is no well defined path for breach flow. Rather, the location of the reservoir will allow breach flow to occur in any direction.

For the purposes of analyzing breach flow, the Advanced Interconnected Pond Routing Model (ADICPR) will likely be used for the simulation of floodwave propagation. This model provides a hydrodynamic computational engine. This hydrodynamic capability allows for the simulation of floodwave propagation in multiple directions during a single simulation. Further, this model was used in the analysis of the Lake Grady Reservoir and thus, has been recently accepted by the permitting agencies as meeting their requirements.

The CONSULTANT will utilize, to the extent practical, the cross-sectional information developed in the tasks above. The flow information for use in the model will be developed from the HEC-1 model. As noted above, the HEC-1 model has limited success when evaluating a hydrodynamic condition where floodwave propagation may occur in multiple directions and have significant reverse flow possibilities. The CONSULTANT will utilize the hydrodynamic model to simulate floodwave propagation to the flows eventual downstream outflow.

Berm Failure Impact Development

Based on the above tasks, the CONSULTANT will develop an estimate of the level of flow and inundation that will occur as a result of the breach of the reservoir.

Since there are multiple directions into which the floodwave may propagate, it will be necessary to develop various floodwave inundation scenarios. In addition to the inundation and flow levels which will occur, the CONSULTANT will also attempt to estimate the potential damage generated by a breach. This estimate will include the development of flood loss estimates in accordance with the procedures developed by the Federal Emergency Management Agency in the evaluation of flood impacts.

Berm Failure Report

The CONSULTANT will develop a report detailing the results of the Berm Failure Analysis. This report will contain information on the expected elevations and location of flooding caused by a catastrophic failure of the reservoir berm. This report will detail the estimate of costs associated with the failure including an estimate of the property damage and loss of life due to a breach of the reservoir berm.

Emergency Action Plan Development

The CONSULTANT, as part of the Berm Failure evaluation will develop an Emergency Action Plan (EAP) for the reservoir. The EAP is designed to provide for the surveillance, warning, and evacuation of the dam and surrounding properties to mitigate the potential impacts of failure.

This EAP will be developed based on the guidelines provided by the State of Florida and may include:

- Promulgation and Concurrence
- Purpose and scope of Emergency Action Plan
- Situation
- Concept of operations
- Surveillance
- Notification
- Warning
- Responsibilities and Duties – Emergency response
- Authorities and References
- Exercise and Training
- Plan Maintenance

The CONSULTANT will develop the plan in coordination with local, state, and federal dam safety authorities. The plan must be approved and concurred by each participating entity.

Emergency Agency Coordination

The CONSULTANT will meet with the appropriate emergency response agencies to discuss the needs for the EAP. The purpose of these meetings is to determine the range of services that are provided by each entity and to review their emergency preparedness procedures. The agencies that will typically be included in the review encompass those from Plant City, Hillsborough County, and the City of Tampa and may include:

- Federal Emergency Management Agency
- Sheriff's Department
- Police Agencies
- Fire and Rescue
- Ambulance Services
- Hospitals, clinics, and other emergency response agencies
- Emergency shelters
- American Red Cross

Since it is necessary that the agencies that will be used to provide emergency services in the event of a catastrophic occurrence agree on the precepts of the EAP, it is necessary to involve them early in the process.

Draft Emergency Action Plan Development

Following an initial meeting with those agencies which would be utilized during an emergency event the CONSULTANT will develop a Draft EAP in accordance with the applicable regulations. The EAP will include the information discussed in the introduction to this section and will identify agencies and authorities for action at the time of an event. Further, it will designate specific entities to take charge over the event and the specific steps to be taken in the alert of entities to the potential for their being utilized. The purpose of the draft document is to provide a vehicle where responses to the draft EAP can be elicited.

Assimilation of Agency Responses and Revision to the EAP

The CONSULTANT will incorporate the agencies responses to the draft EAP into a Final Draft EAP document. The purpose of this document is to provide the final plan to the agencies and to get their concurrence for their respective role in the response to an event at the reservoir. This document will be provided to Tampa Bay Water for the commencement of a public information process for the EAP.

Public Involvement Process

The CONSULTANT will develop a public involvement process for use with the EAP. The process will likely include a direct mail-out to all individuals who have

been identified as being impacted by a breach event.   Three public information meetings will be held to review the concept and precepts of the EAP.

The CONSULTANT will prepare graphics and conduct these public information meetings.  The format of these meetings will be determined with input from Tampa Bay Water.

Final EAP Plan Development and Submittal

The CONSULTANT will take the results of the previous tasks as well as the comments by the public and incorporate them into a final EAP document.  This document will detail information on the agencies responsible, reporting procedures, emergency warning and response procedures, etc. This final EAP will be presented to the responsible agencies and will be included in the Dam Construction and Operations Permit process.

The CONSULTANT will provide ten (10) copies of the final EAP to Tampa Bay Water for their use and posting.  Other copies for each of the agencies will be provided.

Task 2.6 Water Quality Analysis

Water quality within the reservoir is a key parameter that drives the type of water quality treatment process that is appropriate. High organic, nutrient, or bacteriological constituents within either the source water to the reservoir or the water which is transferred to the water treatment plant will impact the overall performance of the water supply system. Therefore, it is imperative that an evaluation of the water quality in the reservoir be conducted.

This task considers the efforts necessary to:

- develop water quality goals for the reservoir,
- implement a simulation model for the evaluation of the long-term water quality based on assumed inflows,
- evaluate the potential protective/corrective measures for the reservoir, and
- incorporate water quality measures into the  reservoir and appurtenant structure design.

The proposed project consists of collecting surface water during moderate and high flow periods and storing the excess water in a reservoir for subsequent use as a public water supply. The reservoir will behave similar to a lake system. However, in contrast to a normal lake, the reservoir will experience significant water surface elevation fluctuations. The primary goal for the project is to develop a reservoir for public supply uses. However, recreational uses of the reservoir will also be explored if compatible with a potable water supply.

Establish Water Quality Goals

The reservoir water quality goal must focus primarily on the optimization of in-lake water quality to facilitate potable water treatment. When considering water quality of the reservoir there are three locations at which improvements can be made. These three locations include:

- The Watershed – improvements to the point and non-point sources within the watershed to enhance the quality of water that enters the reservoir. The Alafia River Watershed is discussed elsewhere in this proposal,
- In the Reservoir – provides the opportunity for water quality enhancement within the storage area, and
- Final Treatment – at the water treatment plant.

The purpose of this task therefore, is to establish the expected water quality within the reservoir and to gage its impact on the treatment process. For this reason, a significant level of interface between the CONSULTANT and the Water Treatment Plant Design Team it imperative.

The CONSULTANT will evaluate the potential water quality from the three sources of water and the results of the Stage A water quality modeling efforts to determine expected water quality within the inflows to the reservoir. Additionally the CONSULTANT Team's water treatment experts will evaluate the potential impacts to the treatment regime of various potential outflow water qualities and will, with assistance from Tampa Bay Water and its member governments, and the water treatment plant design team develop a water quality goal for the project. This goal will define the specific parameter levels that will be considered appropriate for the reservoir discharge.

Water Quality Modeling

The water quality of the potential inflows to the reservoir greatly impacts the water quality that can be expected in the facility. The CONSULTANT has completed a preliminary water quality assessment of the potential trophic status of the proposed reservoir. These efforts have focused on calculating the proposed reservoir trophic status using source water nutrient concentrations. While this technique provides a gross estimate of in-reservoir water quality and trophic status, it does not consider in-reservoir biological response to nutrient functions or changes in water level.

In the Predictive Response Assessment which is in process by the CONSULTANT, the BATHTUB (US Army Engineer Waterways Experiment Station (AEWES)) model was used for the reservoir. The BATHTUB model is a steady-state evaluation tool which develops relationships between nutrient loading, transparency and hydrology, and eutrophication responses. The BATHTUB model was used to apply a series of empirical eutrophication models to the reservoir. The program performs steady-state water and nutrient balance calculations in a spatially

segmented hydraulic network, which accounts for advective and diffusive transport and nutrient sedimentation. Eutrophication-related water quality conditions (total phosphorus, total nitrogen, chlorophyll-a, transparency, and hypolimnetic oxygen depletion) were predicted using empirical relationships derived from the assessment of projected reservoir data.

The reservoir was simulated using various scenarios of pool level (water elevation) and input water quality.

This modeling work effort resulted in the formulation of a matrix of results. These results describe the "envelope" of potential reservoir water quality. The statistics of the analysis also yielded the probability, return interval and potential duration of various water quality scenarios.

The design model will be used to further evaluate the reservoir water quality. This model will be either the Water Quality Analysis Simulation Program (WASP) or another simulation model that can be used to more accurately predict water quality within the reservoir. This water quality model will then be used to enhance water quality design.

The use of a design model will be used to simulate water quality interactions in more detail. This detail will aid in the determination of whether undesirable biochemical reactions will occur in the reservoir and have a degrading impact on water quality. If the model results predict the level at which an anaerobic zone would occur in the reservoir, the placement of the intake would be away from this zone to reduce the potential for taste and odor issues for the plant. Conversely, the simulations may identify the extent to which algal biomass will occur and aid in the positioning of the intake such that algal withdrawal is limited.

Data Retrieval and Assimilation

The CONSULTANT will gather all of the necessary background information and water source historical data for use in the simulation of the water quality within the reservoir. At a minimum this information would include water quality data from the three water sources. Additional operational information including the volume of water that will be provided by each source and its expected quality will be retrieved and assimilated into the model process.

Develop Scenarios

The simulation of the reservoir requires a long-term evaluation of not only the impact of the incoming water but also the impact of the operations of the landfill such as leachate and stormwater management. The CONSULTANT will, with Tampa Bay Water's concurrence, develop operational scenarios that will be simulated using the model. For the purposes of this scope of work it is anticipated that up to five different scenarios will be simulated using the model. These

scenarios may include variations in the inflow and outflow configurations as well as the water quality of the inflow streams.

Model Simulation

Simulations using the water quality model will be based on the scenarios developed above. The CONSULTANT will develop the necessary input files for the various scenarios. The model will then simulate the water quality within the reservoir for a specified period. Once the simulations have been completed the CONSULTANT will provide a post-processing of the model output and review the findings.

Preliminary Modeling Report

The CONSULTANT will summarize all of the work effort that was completed as part of Task 2.6 above. This report will condense the various model simulation outputs into a report form. The CONSULTANT will provide five (5) copies of the report for the Agency review. The incorporation of the comments into a final report will be accomplished at the end of the overall modeling task.

Design Enhancement Modeling

The design model will be used to determine if enhancements to the internal workings of the reservoir should occur. The design model will be used to predict the water quality based on the best scientific data prior to the reservoir being constructed. Once the reservoir is on-line, this same models can be calibrated and verified such that "real-time" water quality within the reservoir can be known. The water quality models can then be used to develop enhancements, either prior to reservoir design or during operations which may include but not be limited to:

- Baffles or internal dams — to increase the travel time from the inflow to the outflow and thus eliminate short-circuiting,
- Inflow or outflow treatment areas such as sumps, wetland areas, etc. - the purpose of inflow and outflow treatment areas is to incorporate design features into the reservoir that will provide a long-term water quality or operational benefit. The use of a sump or treatment area may obviate or localize the need for sediment removal over the long-term.
- Artificial circulation — artificial circulation is used to eliminate thermal stratification or prevent its formation.
- Hypolimnetic aeration — wherein air is pumped into the hypolimnetic area to bring the colder bottom waters to the top and aid in their mixing.
- Hypolimnetic withdrawal — where layers of the hypolimnion area are removed so that nutrient transfers are reduced or eliminated.

The model will be used to develop potential enhancement or corrective action in the reservoir. The CONSULTANT, working with Tampa Bay Water and their treatment plant design team will use the results of the predictive response

assessment to determine the range of potential treatment systems needed to provide a quality water supply. The CONSULTANT Team will also use the water quality model to evaluate in-reservoir enhancement techniques to determine their feasibility and range of potential costs. Potential in lake reservoir management practices that may be simulated with the model include:

1. Chemical treatment with Ferric chloride, Alum, or Copper sulfate
2. Aeration (metalimnetic or hypolimnetic) using mechanical or natural aeration methods
3. Inflow and outflow location to minimize water quality impacts to the treatment plant
4. Biomanipulation, i.e. creating a situation in which desirable algae out-compete blue-greens.

The results of these simulations will be design enhancement to the reservoir that will positively impact the water quality within the reservoir either by improvement or maintenance.

The CONSULTANT will incorporate the design enhancements into the reservoir that have been simulated by the model if they are found to provide a cost effective method of water quality improvement. It is imperative that the CONSULTANT work closely with the water treatment plant design team to assure that improvements in the reservoir operations to enhance water quality provide a positive impact to the treatment plant.

Final Water Quality Report

The CONSULTANT will prepare a final report detailing the modeling efforts that have been completed within this project based on the water quality evaluation performed above. This final report, in addition to being summary of all the activities that have occurred related to in-lake water quality will also include the modeling assumptions and precepts. This report will then serve as the transmittal of the water quality simulation model for the continued refinement of the model simulation capabilities based on historic operations.

The CONSULTANT will provide five (5) copies of the final report for the water quality assessment. Additionally, the CONSULTANT will provide a copy of the model input parameters as well as any pre- or post-processors used in the simulation of the reservoir.

Task 2.7 Civil/Site Planning and Design

To develop the reservoir site in a manner that is functional for its intended purpose and meets the needs of the surrounding community, while also meeting regulatory requirements and is aesthetically suitable, planning and design of the various facilities that comprise the project is needed.

---

Site Planning

In concert with the reservoir is the planning and design of facilities that will service the reservoir and or compliment its intended use. The planning aspects take into consideration all of the precepts and directives of County, State, and Federal planning agencies and considers those issues related to the community. The CONSULTANT Team will work with Tampa Bay Water, the District, other community agencies and the public to plan the facilities that support the reservoir in a sensible and environmentally conscious manner. The CONSULTANT Team will contact Hillsborough County to determine the setback and buffering requirements for a reservoir. If these requirements do not exist the CONSULTANT Team will work with Hillsborough County to establish these requirements.

The planning work effort for the reservoir facility must contain aspects of civil/site work including:

- Site Access – includes the location of internal and external roadways and points of access in support of the reservoir facility.
- Site Drainage – considers not only the design of facilities to capture, convey, treat and discharge stormwater runoff that originates on site but also drainage issues relating to the routing of flow around the site.
- Landscaping – considers the aesthetic improvements to the site to make it compatible with the surrounding area.
- Security – considers the control of access to the site both appropriate and inappropriate. That is, because of the nature of the facility, the depth of the reservoir, the fluctuation in water levels and the appurtenant facilities, access to the site may need to be limited or controlled.
- Recreational Use – It is envisioned that the reservoir facility may be made available for certain recreational uses. The CONSULTANT Team's recreational planners will aid the team in the determination of which types of passive or active recreation uses may be appropriate for the facility and what design measures are necessary to accommodate these uses.
- Infrastructure – considers the need for water, sewer, electric, gas and cable connections depending on the facilities located on the reservoir site. In addition, the infrastructure will include parking, buffering, power facility, and pipeline considerations for the reservoir site. The location of on-site facilities will be considered along with any required internal buffering for these facilities.

Deliverables

The CONSULTANT Team will prepare, with input from Tampa Bay Water, a use and demand analysis for the reservoir site that will determine the facilities to be located on the site, the size of the facilities and any location requirements. From

this analysis, the CONSULTANT Team will develop a Conceptual Plan for the reservoir site and a planning document that outlines the goals and objectives of the site plan as well as the regulatory framework which will govern the design efforts on the site. This document will serve as the BODR for the civil site work on the project. The CONSULTANT will provide Tampa Bay Water with ten (10) hard copies of the BODR for their use and dissemination.

Civil/Site Design

The CONSULTANT team will prepare plans and specifications for all of the work efforts described above that are related to the design of the facilities considered to be a part of the reservoir water supply facilities. The plans and specifications will be based on an acceptable format to Tampa Bay Water and will consider all of the information necessary for the construction of the facility. Additionally, these plans will be used in the permitting of any of the facilities for which they are required.

These plans and specifications will be provided in electronic format to Tampa Bay Water. Five (5) hard copies of the plans and specifications will also be provided for Tampa Bay Water's use and dissemination.

Drainage Design

As part of the overall design of the reservoir, stormwater issues must be considered. The reservoir, because of its design, will capture most of the water that falls within its overall boundaries. Only the stormwater which falls on the outside face of the berm will generate runoff that must be collected, treated and discharged from the site. The design of the reservoir berms will provide stability to the upper layers of soil such that erosion will not be of significant concern. Because of the slope of the outside of the berm and the types of soils and groundcover that will be placed on this face, the volume of stormwater to be considered will be small. Treatment of this runoff from the face of the berms is proposed to be performed in shallow swale areas along the outside of the reservoir. The design of this collection, conveyance, treatment and disposal of stormwater will be based on the applicable regulations of the Southwest Florida Water Management District in regards to both quality of water collected and treated and the volume and rate of water that is discharged from the site. Permitting for this will occur through the Environmental Resource Permit process.

A second issue when considering the drainage design is the re-routing of Doe Creek. This creek is located in the northeast quadrant of the proposed reservoir site. The creek drains an area southeast of the reservoir site which consists of a former mined area and a small residential area along Wendel Avenue. The Doe Creek conveyance system consists of both natural and chanelized sections. These sections contain and are bordered by wetlands. Because of the placement of the reservoir, portions of the Doe Creek will have to be re-routed around the reservoir

footprint. Thus, this new channel segment must be engineered to provide flow capacity and wetland mitigation.

The wetland mitigation effort has been discussed elsewhere in this scope of work document. The following tasks detail the engineering efforts necessary to provide stormwater collection, treatment and discharge from the reservoir area as well as the re-routing of Doe Creek.

*Reservoir Stormwater Design*

This task involves the engineering necessary to provide the analysis and design of the storm water system for the reservoir. As indicated above, the analysis will focus on the aspects of the work effort necessary for the Environmental Resource Permit application demonstrating that the reservoir meets the requirements of the Chapter 40D-4. Thus, the CONSULTANT will develop the calculations necessary to support the design and permitting of the storm water system to service the reservoir. Included herein will be the necessary calculations and/or computer simulations necessary to verify that the reservoir will not have a deleterious effect on downstream properties.

*Doe Creek Reestablishment Engineering*

The CONSULTANT will analyze the impact of the placement of the reservoir on Doe Creek. The purpose of this analysis will be to support the engineering efforts necessary to provide the hydraulic capacity to a reestablished creek outside of the reservoir footprint. This effort will include the analysis of the hydraulics of the watershed which drains to Doe Creek as well as the creek itself to determine is existing capacity. Further, the CONSULTANT will work with Hillsborough County Stormwater to determine if improvements are contemplated in the upstream reaches which could be further refined with an improved channel. A proposed design of the impacted creek area will be developed and regulatory concurrence for its use established. Final design of the creek improvements will be made such that the hydraulic and hydrologic capacity of the creek is maintained. Additionally, the creek's environmental capacities will be analyzed and incorporated into the design as discussed elsewhere in this scope of work.

The CONSULTANT will develop plans and specification necessary for the contractor to reestablish Doe Creek outside the footprint of the reservoir. These plans and specifications will become part of the overall design sets for the reservoir.

Task 2.8 QA/QC

The CONSULTANT shall use personnel not associated directly with the project to conduct a peer review of the design documents at the 50% complete point of the project. The

personnel shall represent all project disciplines.  The output of this review shall be a written document describing the results of the review.

## Task 3.0 - Facilities Design

### Task 3.1 Geotechnical Investigation

Geotechnical engineering services are required to support the design of the proposed nine (9) miles of 84-inch-diameter water transmission main in southeast Hillsborough County.  In general, these services consist of investigations, testing, consultation, advice and recommendations relating to earth support, excavations, thrust restraint, soil corrosion potential, unsuitable materials, bedding and backfill requirements, ground water and other geotechnical issues affecting the design and construction of a long-term, reliable water transmission main.

A.  Review readily available current and historic maps, plans and aerial photographs covering the proposed pipeline route.

B.  Study and review readily available geological reports and maps of relevance to the general pipeline route area and previous soils investigations.

C.  Conduct a mile-by-mile detailed field reconnaissance of the proposed pipeline routing to identify areas with possible near-surface poor soil or shallow ground water conditions.

D.  Conduct a site exploration program to evaluate soil and ground water conditions. This program shall include borings and *in situ* testing along the pipeline route with laboratory testing of soil samples for strength, compressibility and corrosion potential.

Borings shall generally be spaced at 300-foot intervals and shall average 25 feet in depth.  The boring spacing may be greater or less based upon reconnaissance and aerial photo geological interpretation of near-surface conditions.  A total of 195 borings will be drilled along the pipeline alignment.  Twenty of the borings will be drilled to a depth of 40 feet at roadway, river or stream crossings where a deeper pipeline invert depth may be required.

Borings shall be supplemented by shallow augering or probing where poor surface conditions are noted.  All borings shall be referenced to the survey baseline established by others for this pipeline route, if such baseline exists at the time the respective borings are drilled.  The following laboratory testing will be performed.

| Sieve Analysis | 195 | Tests |
|---|---|---|
| Hydrometer | 98 | Tests |
| Atterberg Limits Tests | 50 | Tests |
| Specific Gravity Tests | 10 | Tests |

| Percent Organics Test | 30 | Tests |
|---|---|---|
| Modified Proctors | 30 | Tests |
| Triaxial Tests (CU with pore pressure) | 20 | Tests |
| Consolidation Tests | 0 | Tests |
| Flex-Wall Permeability Tests | 0 | Tests |
| Corrosion Series Tests | 53 | Tests |

With regard to corrosion potential, samples will be obtained at not more than 1,000-foot intervals, then placed in double-sealed sample containers and sent to a qualified laboratory. The corrosion series testing will include the following analyses: pH, Chloride (ppm), Sulfate (ppm), Moisture Content (% weight), Redox Potential and Conductivity. The results of the corrosion potential analyses shall be sent to the CONSULTANT immediately upon completion of the analyses.

E. Provide engineering evaluation, consultation, advice and recommendations as required and provide a Report summarizing the findings of the investigations and assessing the soil and ground water conditions as they relate to the design and construction of the pipeline. The Report shall include all boring logs and soil sample analyses, identification of corrosion potential, identification of unsuitable materials, the need for select fill material, thrust restraint design recommendations, pipe bedding and backfill requirements, dewatering considerations and related issues.

The following information will be included by station number along the alignment:

- Excavatability of materials
- Slope inclinations of permanent slopes and temporary excavations, including provisions for heavy equipment surcharges and stockpiling of spoil adjacent to construction excavation.
- Design lateral earth pressures for any required cantilevered or braced shoring or sheeting.
- Seepage potential and dewatering requirements.
- Shrinkage and bulk factors.
- Design soil parameters.
- Modulus of soil subgrade reaction.

Deliverables

The geotechnical report will include:

- Project information.
- Results of the field explorations and laboratory tests, including logs of borings.
- Discussion of surface and subsurface conditions.
- Discussion of geologic and geotechnical conditions.

- Design recommendations for pipeline jacking or tunneling at each crossing.
- Recommendations for lateral earth pressures.

Graphics will include a pipeline alignment map, boring logs, and laboratory test data.

Task 3.2 Pipeline Design

Project

The PROJECT shall comprise the TASKS defined herein which are required to accomplish the final design, permitting and construction bidding services for 45,000 linear feet of 84-inch diameter water transmission main connecting the proposed Regional Reservoir to the proposed South Central Hillsborough Intertie along a route determined through the Stage A Feasibility study activities.

Preliminary Engineering

The CONSULTANT shall accomplish the following Subtasks required to prepare a final Basis of Design Report and to support the final design of the proposed water transmission main:

Data Collection and Review

The CONSULTANT shall acquire and review all of the following known available existing data affecting the development of the Basis of Design Report and the final design of the proposed water transmission main:

- Reports and studies
- Existing and proposed utility information
- Existing and proposed roadway information
- Structures
- Rights-of-way and easement information
- Geotechnical data
- System hydraulic information

Field Reconnaissance

The CONSULTANT shall conduct a field reconnaissance of the entire length of the proposed water transmission main to assess conditions that may affect the development of the Basis of Design Report and the final design and to locate any suspect places. A brief report shall be prepared and submitted to Tampa Bay Water summarizing the findings of the field reconnaissance.

Establish Water Transmission Main Alignment

Concurrently with aerial mapping, the CONSULTANT shall establish the specific alignment of the proposed water transmission main along the route based upon the evaluation of acquired data, field reconnaissance, property owner meetings, known PROJECT requirements and the CONSULTANT's experience and expertise in pipeline design. The CONSULTANT shall evaluate alternative methods of trenchless construction for crossings of waterways, railroads, major highways and streets and select the most practicable, cost-effective methods. A brief report shall be prepared and submitted to Tampa Bay Water defining the recommended pipeline alignment and methods of trenchless construction. Tampa Bay Water's review of the water transmission main alignment and methods of trenchless construction shall be completed prior to undertaking final design. Said review shall not be unreasonably withheld.

*Identify Property Requirements*

Based upon the established water transmission main alignment, the CONSULTANT shall identify all property rights required to be acquired, including permanent and temporary easements, necessary for the construction, operation and maintenance of the water transmission main. A brief report identifying all property rights required for the proposed water transmission main shall be prepared and submitted to Tampa Bay Water. Tampa Bay Water's approval of the proposed property requirements shall be obtained prior to undertaking any property surveying for land acquisition efforts. Said approval shall not be unreasonably withheld.

*Establish Permit Requirements*

The CONSULTANT shall identify all permits and license agreements required for construction of the proposed water transmission main. A memorandum listing the required permits and license agreements shall be prepared and submitted to Tampa Bay Water. The CONSULTANT shall coordinate the acquisition of all permits and license agreements. The CONSULTANT shall prepare applications and agreements required to obtain the necessary approvals for permit application submittal. The CONSULTANT shall meet with the member governments and other interested parties to facilitate acquisition of all permits and license agreements.

*Hydraulic Modeling*

Tampa Bay Water shall retain an expert in hydraulic modeling to develop a hydraulic model of the pipeline from the Alafia River intake to the reservoir and conduct sufficient steady-state and transient simulations with the model to determine the hydraulic design criteria, including operating and surge pressures, thrust restraint requirements and other necessary information for the design and operation of the pipeline. The CONSULTANT shall cooperate with Tampa Bay Water's hydraulic modeler during the development of the model and provide such

information as the CONSULTANT has available on the pipeline, such as preliminary vertical alignment, valves, appurtenances and pipe material data.

*Corrosion Protection Investigation*

The CONSULTANT shall retain an experienced, qualified corrosion control specialist firm to conduct an investigation along the entire route of the proposed water transmission main of potential corrosion problems arising from corrosive soil conditions, stray currents and the like. Evaluation of potential soil corrosion shall be based in part upon soil borings and soil samples obtained by the geotechnical engineer. All soil sampling and analysis shall be provided to corrosion control specialist to accomplish this Subtask. Both welded steel and prestressed concrete cylinder pipe shall be considered in the investigation. The corrosion control specialist firm shall also model and evaluate the potential effects of the electromagnetic field in power transmission corridors and ground fault currents from electrical transmission towers. A report shall be prepared and submitted to Tampa Bay Water summarizing the corrosion control, electromagnetic fields investigations and ground fault analysis and recommending actions to be taken to protect the pipe from corrosion and mitigate adverse effects.

*Geotechnical Investigation Coordination*

The CONSULTANT shall provide route mapping indicating boring locations, depths and testing requirements.

*Alternative Pipe Materials Evaluation*

The CONSULTANT shall evaluate carbon steel spiral welded pipe and prestressed concrete embedded cylinder pipe for use in the proposed water transmission main. The evaluation shall include advantages and disadvantages of each pipe material with respect to hydraulics, corrosion protection requirements, reliability, service life, maintenance considerations, estimated purchase and operating costs, in-plant pipe manufacturing inspection requirements, field inspection requirements, pipe bedding requirements, estimated production, delivery and installation rates, and other appropriate comparison factors. The CONSULTANT shall prepare and submit to Tampa Bay Water a brief report containing a summary of the pipe materials evaluation and a recommendation for the appropriate pipe material(s) for the proposed water transmission main. Tampa Bay Water shall direct the CONSULTANT which pipe material(s) to use in the final design.

*Alternative Delivery Systems*

The CONSULTANT shall evaluate the advantages and disadvantages of a.) a separate direct purchase contract for pipe materials and valves, and b.) multiple construction contract divisions. The evaluation shall consider potential savings in cost and time, as well as responsibilities, procedures and liabilities related to each

---

alternative delivery system.   A brief report summarizing the evaluation shall be prepared and submitted to Tampa Bay Water.

*Basis of Design Report*

The CONSULTANT shall prepare and submit to Tampa Bay Water a Basis of Design Report (BODR).   The BODR shall summarize the development of and recommendations for the proposed water transmission main design criteria, including:

- Pipeline alignment
- Pipe materials, linings and protective coatings
- Hydraulic design criteria
- Pipe structural design criteria and methods
- Pipe bedding and backfill requirements
- Thrust restraint design criteria
- Pipeline appurtenances
- Corrosion control system design criteria
- Special crossing preliminary design arrangements
- In-plant pipe manufacturing inspection requirements

The CONSULTANT shall confer with Tampa Bay Water during the preparation of the BODR.  Upon submittal of the BODR, Tampa Bay Water shall review the report and comment promptly.  The CONSULTANT shall modify the BODR as directed by Tampa Bay Water and then submit the final report for acceptance, which shall not be unreasonably withheld.

Surveying For Final Design

The CONSULTANT shall retain the services of a qualified, experienced surveying firm to accomplish all surveying required for the proposed water transmission main design.  The surveying firm shall provide land and, through a subcontract with a qualified, experienced aerial surveying firm, aerial survey.  Aerial topographic strip mapping shall be provided with one-foot contour intervals at a final scale of 1" = 40' meeting the National Map Accuracy Standards.  A recoverable traverse line suitable for use during construction shall be established in the field.  The horizontal and vertical locations of all necessary physical features and utilities affecting the proposed water transmission main design and construction, along with all necessary rights-of-way, easement, property and wetlands delineation lines and hydroperiods shall be obtained during the survey.  All land surveying services shall be performed under the direction and control of a Florida Registered Professional Land Surveyor and shall be in accordance with Chapter 21HH-6, Florida Administrative Code: Minimum Technical Standards for Land Surveying.  The CONSULTANT shall provide the survey report to Tampa Bay Water's system surveyor for quality control review. .  The CONSULTANT shall provide the System Surveyor with one week to review and return comments on the surveys.

<u>Surveying For Land Acquisition</u>

The CONSULTANT shall retain the services of a qualified, experienced land surveying firm to provide all surveying, legal descriptions and acquisition sketches required for land acquisition by Tampa Bay Water. Not more than one permanent and one temporary easement or other similar property rights shall be acquired per parent parcel. Not more than 52 parent parcels shall be encumbered. All land surveying services shall be performed under the direction and control of a Florida Registered Professional Land Surveyor and shall be in accordance with Chapter 21HH-6, Florida Administrative Code: Minimum Technical Standards for Land Surveying. The CONSULTANT shall provide the survey report to Tampa Bay Water's system surveyor for quality control review.

<u>Final Design</u>

On the basis of the approved BODR, the CONSULTANT shall prepare final plans and specifications for the construction of the proposed water transmission main as follows:

*Construction Plans*

Construction plans shall be prepared in electronic format using Microstation and shall comply with Tampa Bay Water's standard format for design drawings (to be provided). The information presented shall be consistent with State Plane Coordinates (NAD 1983 in feet). Submittals will be made at 30%, 60%, 90% and 100% design. The plans will include the following:

- Cover
- Location map, vicinity map and sheet index
- Abbreviations, legends and general notes
- Index map with baseline coordinates (3)
- Right-of-way maps
- Plan and profile sheets (40) at 1"=40' horizontal and 1"=5' vertical scales
- Special crossing details (1)
- Pipeline appurtenance details (1)
- Standard pipeline details (1)
- Cathodic protection details (3)
- Erosion protection details (2)

*Construction Specifications*

Construction specifications shall be prepared in Construction Specifications Institute format and shall comprise the following sections:

- Notice to Bidders

- Instructions to Bidders
- Bid Form
- Bid Bond
- Agreement
- Performance Bond
- Payment Bond
- General Conditions
- Supplementary Conditions
- Division 1 - General Requirements
- Division 2 - Site Work
- Division 3 - Concrete
- Division 5 - Metals
- Division 9 - Finishes
- Division 15 - Mechanical
- Division 16 - Electrical

*Final Opinion of Probable Construction Cost*

The CONSULTANT shall prepare a final opinion of cost for the construction of the proposed water transmission main under a purchase and install contract and a pre-purchase contract.

Permitting

The CONSULTANT shall prepare and submit to the appropriate regulatory agencies permit applications and licensing agreement including but not limited to the following:

- Florida Department of Transportation
- Hillsborough County Right-of-Way Use
- TECO Licensing Agreement

The CONSULTANT shall coordinate and provide route mapping with wetland delineation, proposed impacts and areas targeted for restoration.   Coordination includes consideration of minimization and avoidance techniques.

The CONSULTANT shall respond to two rounds of questions from the permitting agencies.

Services During Bidding

The CONSULTANT shall perform the following services related to bidding of the proposed water transmission main construction contract:

- Prepare requirements for prequalification of pipe manufacturers
- Prepare requirements for prequalification of construction contractors

- Conduct pre-bid meeting
- Receive, evaluate and log all bidder inquiries
- Prepare and issue addenda as required
- Evaluate bids, including qualifications of pipe manufacturers and contractors, and recommend awards

Pipe Manufacturing Inspection Specifications

The CONSULTANT shall prepare specifications for in-plant pipe manufacturing inspection for both welded steel pipe and prestressed concrete embedded cylinder pipe. The specifications shall define all testing and inspection requirements to be performed by independent testing firms during the manufacturing of the pipe and shall be suitable for inclusion in contracts with the testing firms.

Task 3.3 Reservoir Water Quality Pump Station Design

The pump station described in this task will used for the purpose of maintaining water quality. Based on the water quality analysis described above, it will most likely be necessary to utilize a pump station to recirculate water or other design options in the reservoir to maintain the water quality. The scope provided below describes the steps necessary to design such a pump station.

Information Phase

The CONSULTANT shall obtain information, as defined herein, on the selected Reservoir Pumping Station site. The CONSULTANT shall obtain the necessary geotechnical information. Soil borings shall be taken to sufficient depth to allow for foundation recommendations for the pumping station. This geotechnical information will be obtained as a part of the geotechnical investigation performed on the reservoir site described above.

The CONSULTANT shall obtain a topographic survey of the selected site. This information will be obtained as a part of the survey being performed for the reservoir design described above. The survey will provide all property line, surface features and contours at two-foot intervals for the selected site. The survey data will be converted to an Autocad file.

The CONSULTANT shall obtain existing utility information affecting the selected site.

Preliminary Design Report

The CONSULTANT shall prepare a preliminary design report for the Reservoir Pumping Station. The report will recommend a layout for the station and major equipment types. The report will contain up to four drawings showing the proposed layout for the pumping station. Each discipline will have input to the

preliminary design, including architectural, electrical, mechanical, structural, and instrumentation. The work shall include providing up to five (5) copies of the report and layout figures.

## Permits

The CONSULTANT shall provide the technical information and obtain permits regarding the Reservoir Pumping Station. The permits covered by this task include but are not limited to building permits from Hillsborough County and all stormwater permits.

## Final Design

The CONSULTANT shall prepare final design documents for the Reservoir Pumping Station. The design shall include the pumping station and related site work. Plans shall be prepared using Microstation. Specifications shall be prepared using the CSI format and shall comply with Tampa Bay Water's standard drawing format (to be provided). It is anticipated that the level of effort for the final design is related to about 50 plan sheets. Preliminary copies of the plans and specifications shall be submitted for review at the 30%, 60%, 90% and 100% completion stages. Up to 10 copies of the documents shall be submitted each time. The CONSULTANT shall prepare the "front end" documents using Tampa Bay Water's standard format.

## Task 3.4 Reservoir Appurtenant Structures Design

Appurtenant structures for the reservoir are anticipated to consist of a raw water outlet basin, intake tower, raw water delivery conduit and emergency spillway. The CONSULTANT will evaluate the option of combining some of these structures, however it is believed that the structures will have to be separate due to their size.

The design considerations for the appurtenant structures include the following:

- Geotechnical Investigation – Investigate geotechnical conditions at proposed structure locations (coordinate investigation with reservoir site characterization).
- Intake Design – Design intake tower using appropriate structural design criteria with consideration given to hydrostatic pressures, buoyancy, lateral loading (wind and waves) and overturning moments.
- Foundation Analysis – Evaluate bearing capacity and settlement foundation for all structures, including conduits penetrating the embankment.
- Defense Measures – Design defensive measures, including seepage collars and sand filtration/drainage, for potential seepage penetrating the embankment along the water supply and spillway conduits.
- Intake Gate Configuration – Determine size, type and configuration of gates for raw water supply chamber at the intake tower

- Overflow Weir and Spillway – Determine the dimensions of the overflow weir at the intake tower and the emergency spillway.
- Walkways – Design the walkway between the embankment and intake tower and intermediate support piers, if needed.
- Electrical System – Design electrical systems for site lighting and gates (if remote operation is desired).
- Instrumentation and SCADA – Determine instrumentation and SCADA requirements for the operation of the facility.

Deliverables

The CONSULTANT will prepare a BODR for the appurtenant structures design tasks. The BODR will be submitted after the appurtenant structures design tasks defined above are complete. The BODR will document all of the schematics, sketches, design concepts, engineering practices, application of experience from similar projects, cost estimates, equipment lists, sample specifications, functional performance criteria, functional narrative, operational control strategy, conceptual layout of facilities and other conceptual design criteria to insure that all stakeholders are thoroughly informed prior to the commencement of Final Design. Ten (10) copies of the BODR will be provided to Tampa Bay Water for their use and dissemination.

Based on the BODR, the CONSULTANT Team will develop 30, 60, 90, and 100 percent design plans for the appurtenant structures. These plans will follow previous design plans developed for and by Tampa Bay Water and will utilize consistent design protocols and layout features. These plans will be provided as Microstation files and as five (5) sets of hard copy prints.

Task 3.5 Pump Station (Optional, Not Budgeted)

The pump station discussed in this task will be used to pump water to the treatment plant from the reservoir if required. Based on the initial studies such a pump station does not appear to be necessary but this could change based on the more detailed pipeline analysis and design and route selection.

Information Phase

The CONSULTANT shall obtain information, as defined herein, on the selected pump station site. The CONSULTANT shall obtain the necessary geotechnical information. Soil borings shall be taken to sufficient depth to allow for foundation recommendations for the pumping station.

The CONSULTANT shall obtain a topographic survey of the selected site. This information will be obtained as a part of the survey being performed for the reservoir design described above. The survey will provide all property line, surface features and contours at two-foot intervals for the selected site. The survey data will be converted to an Autocad file.

The CONSULTANT shall obtain existing utility information affecting the selected site.

Preliminary Design Report

The CONSULTANT shall prepare a preliminary design report for the pump station. The report will recommend a layout for the station and major equipment types. The report will contain up to four drawings showing the proposed layout for the pumping station. Each discipline will have input to the preliminary design, including architectural, electrical, mechanical, structural, and instrumentation. The work shall include providing up to five (5) copies of the report and layout figures.

Permits

The CONSULTANT shall provide the technical information and obtain permits regarding the pump station. The permits covered by this task include but are not limited to building permits from Hillsborough County and all stormwater permits.

Final Design

The CONSULTANT shall prepare final design documents for pump station. The design shall include the pumping station and related site work. Plans shall be prepared using Microstation. Specifications shall be prepared using the CSI format and shall comply with Tampa Bay Water's standard drawing format (to be provided). It is anticipated that the level of effort for the final design is related to about 50 plan sheets. Preliminary copies of the plans and specifications shall be submitted for review at the 30%, 60%, 90% and 100% completion stages. Up to 10 copies of the documents shall be submitted each time. The CONSULTANT shall prepare the "front end" documents using Tampa Bay Water's standard format.

Task 3.6 QA/QC

The CONSULTANT shall use personnel not associated directly with the project to conduct a peer review of the design documents at the 50% complete point of the project. The personnel shall represent all project disciplines. The output of this review shall be a written document describing the results of the review.

Task 4 – Aquifer Storage and Recovery

Aquifer storage and recovery (ASR) has been considered as a possible enhancement to the reservoir by increasing the reliability of the reservoir as a source of water for the region. A preliminary evaluation was performed during Stage A to determine the components of ASR including siting, water quality issues, permitting, and geology. The results of the initial evaluation indicate that ASR may be a viable option to work in concert with the reservoir, thereby increasing the reservoir reliability. During Stage B, the CONSULTANT

will fully evaluate the potential of ASR as an enhancement to the reservoir. The following tasks are proposed, with the later tasks contingent upon the findings of the initial feasibility study and testing program.

Task 4.1 Feasibility Study

The feasibility study would include the investigation of raw water ASR feasibility at the proposed reservoir site, and along the transmission pipeline routes. During the feasibility study, criteria will be examined in detail that will determine whether or not ASR is feasible for this project, and if the testing program should be performed. The feasibility study would evaluate the following:

- Surface water availability to the ASR system
- Suitable storage zone at each proposed ASR site
- Water quality of the surface water and chemical compatibility with the proposed storage zone
- Limiting competing groundwater users in the potential ASR zone for each potential ASR site
- Chemical properties of recovered water and compatibility with the water treatment plant
- Permittability of ASR at each site
- Pretreatment requirements
- Contamination potential
- Site considerations

A feasibility report will be prepared that will describe the methodology and results of the feasibility study. The goal of the feasibility study will be to determine if ASR is feasible and beneficial to the reservoir project. If ASR is feasible, the report will include recommendations for the best ASR site, and will recommend an ASR testing program.

Task 4.2 Testing Program (Optional, Not Budgeted)

The purpose of the ASR testing program will be to determine if ASR is feasible at the selected site based on site-specific conditions. The site-specific testing program will include drilling of a deep test well, a test ASR well, and associated monitoring wells. The objective of the program will be to select and evaluate the best ASR storage zone, determine the recoverability of the injected water, obtain construction and operating permits for the ASR well, and provide design criteria for the ASR system. At a minimum, the conceptual testing program would consist of the following:

- Obtain an FDEP Class V injection well construction permit and any required FDEP or EPA exemptions.

- Storage zone observation well. The storage zone observation well would be used to obtain hydrogeologic data during construction, and to evaluate the potential ASR zone. Testing of this well would include, at a minimum, lithologic sampling,

straddle packer tests of potential flow zones, specific capacity testing, water quality sampling, geophysical logging, and pumping tests.

- Test ASR well. The ASR well would be utilized for cycle testing to determine the performance of the ASR system.

- Storage zone monitoring well. This well would be used as an observation well during aquifer testing, and to evaluate the migration of injected waters during cycle testing of the ASR well.

- Shallow monitoring well(s). A shallow monitoring well would be installed into the aquifer above the ASR storage zone to determine the effects of injection on the shallower aquifers.

- Pretreatment Studies. Pilot studies will be performed on the source water (Alafia River water) to determine the level of filtration and disenfection that would be required. Various treatment options (such as UV disenfection) will be evaluated.

The data obtained during the installation and testing of the wells will be analyzed and interpreted to determine hydrogeologic conditions at the ASR site, and to evaluate chemical data for periods of recharge, storage, and recovery. Some of the test data will be utilized to perform groundwater flow modeling, which would determine the number of ASR wells, well spacing, and optimum layout of the ASR system. The results of cycle testing will determine the recovery efficiency of the ASR system and the quality of the recovered water. An ASR report will be prepared describing the well installation procedures, aquifer test procedures and results, cycle testing procedures and results, and will include recommendations on the feasibility of a full ASR system.

Task 4.3 Design and Permitting (Optional, Not Budgeted)

The results of the testing program will provide the basis for the design of the full ASR system. Task 4.3 will include design and permitting of additional ASR wells (in addition to the ASR well installed during the testing program) for an anticipated total capacity of approximately 20 million gallons per day (mgd). The design phase for the ASR system would include at least the following:

- Obtain all necessary permits including but not limited to FDEP Class V permit, FDEP exemptions, SWFWMD water use permit

- Design layout and spacing of the ASR wells. This would be based on groundwater flow modeling and expected recharge and recovery periods.

- Design of the ASR wells

- Design of the pre-treatment system

- Design of piping and pump facilities, instrumentation and control facilities.

A final design and securing all permits for the ASR system will be the final products of Task 4.3. The design will be the basis of the bidding and construction phase (Task 4.4) of the ASR system.

## Task 4.4 Bidding and Construction (Optional, Not Budgeted)

Task 4.4 will include preparation of drilling and construction contract documents, approval of contact documents by FDEP, and the preparation of contractor documents for bid. Once all permits are secured, the CONSULTANT will obtain proposals from qualified contractors. The proposals will be evaluated and a contractor selected to construct the ASR system. The ASR wells and associated monitoring wells will be drilled, and testing will be performed during drilling. Cycle testing will be performed on the ASR wells following installation. An evaluation of the testing program will be performed by the CONSULTANT. All surface piping will be installed during installation of the ASR wells. A final engineering report will be prepared for the Alafia River ASR describing construction and testing activities. The report will contain the required documentation for submittal to FDEP and SWFWMD.

## Task 4.5 QA/QC

The CONSULTANT shall use personnel not associated directly with the project to conduct a peer review of the design documents at the 50% complete point of the project. The personnel shall represent all project disciplines. The output of this review shall be a written document describing the results of the review.

## Task 5 - NEPA Compliance

The National Environmental Policy Act (NEPA) requires an environmental evaluation be completed for construction projects utilizing federal funding. This process provides the basis for the evaluation of the purpose and need of a project, consideration of viable alternatives including the no-build alternative, and a final recommendation of the preferred action. It is anticipated that the Tampa Bay Regional Reservoir project will be eligible for federal funding through the Environmental Protection Administration (EPA). The CONSULTANT will prepare the appropriate level of documentation required to satisfy the NEPA process for the siting of the regional reservoir. The CONSULTANT will identify the viable alternative design for comparison to the preferred alternative. The alternatives presented will be those identified in the Stage A activities.

## Task 5.1 Data Collection

This activity consists of collecting various information and materials relative to engineering, and the social, economic, and environmental concerns within the study area. The information will include all data necessary to perform adequate evaluation of the location and design of the reservoir. Memos or notes will be generated for all meetings

and on-site reviews while gathering this information.   This documentation will be furnished to Tampa Bay Water along with the environmental document.

Task 5.2 Analysis

Land Use Information

a. Collect data on active development in the vicinity of the proposed reservoir site.
b. Determine if provisions of the Coastal Barrier Resources Act apply and provide documentation. As part of this subject, Tampa Bay Water will supply a determination by the Florida Department of Community Affairs that the project is consistent with Florida's Coastal Zone Management Plan. This will be accomplished through an Advanced Notification Process.

Cultural Features

The CONSULTANT will collect the data necessary to identify the Community Facilities, and also to identify any Section 4(f) lands (parks, recreation areas, wildlife refuges) in the vicinity of the project. This data will be analyzed and the results documented in the Impacts section of the Environmental Document.

Social-Economic Impact Analysis

The CONSULTANT will perform an analysis of the social-economic impacts of all viable design alternatives.   This will include and changes in neighborhoods or community cohesion, changes in travel patters or access to existing residences or public facilities, impacts to school districts, churches, businesses, police and fire protection etc..   Changes in ethnic or minority or minority populations will be identified. The results of this analysis will be documented in the Impacts section of the Environmental Document

Relocation Impact Analysis

The CONSULTANT will collect the data and determine the number of relocations required for the reservoir site.  An analysis will be performed and provided in the environmental document.

Determination of Section 4(f) Involvement

The CONSULTANT will determine if Section 4(f) applies to the preferred alternative, and if so, evaluate the impacts to the Section 4(f) property.

The CONSULTANT will completely evaluate all alternatives and endeavor to avoid any involvement with those lands as defined in Section 4(f).  However, if an

involvement with Section 4(f) lands is unavoidable, then the required Section 4(f) statement will be included within the environmental documentation prepared.

In the event of an unavoidable involvement with those lands defined in Section 4(f) the CONSULTANT will perform the necessary Section 4(f) analysis, and the required documentation will be included within the environmental document prepared for this project.

Tampa Bay Water's approval of all applicable Section 4(f) Statements is required before environmental documents are submitted to the EPA.

Visual and Aesthetic Impact Analysis

The CONSULTANT will analyze the visual and aesthetic impacts of all proposed alternatives.

Farmlands Impact Analysis

The CONSULTANT will determine if a farmland evaluation is required by any proposed alternatives, and if so, perform a farmland impact evaluation.

Biological Assessment Data

As needed, the CONSULTANT will collect data necessary to perform a Biological Assessment for the viable design alternatives. Work under this task will include conducting a literature search and personal contacts with knowledgeable specialists; requesting an official list of endangered, threatened and proposed species from FWS, and conducting a field survey of the study area. This information will be used to prepare an Endangered Species Biological Assessment (ESBA) for any federally listed threatened or endangered species potentially affected by the proposed action.

Wildlife and Habitat Impact Analysis

The CONSULTANT will analyze the impacts to wildlife and habitat for each viable alternative. This task will include designing a study to determine the impact on the habitat of endangered and threatened species known to occur in the study area.

Aquatic Preserve Impact Analysis

The CONSULTANT will analyze the impacts to any identified aquatic preserves by all proposed alternatives.

Outstanding Florida Waters and Wild and Scenic Rivers Impact Analysis

The CONSULTANT will determine if any of the proposed alternatives impact an Outstanding Florida Water (OFW) or a Wild and Scenic River (WSR).

## Water Quality Impact Analysis

The CONSULTANT will analyze the impacts to water quality by all viable design alternatives. A brief summary of this analysis will be contained in the Impacts section of the Environmental Document.

## Floodplain Impact Analysis

The CONSULTANT will analyze the significance of any encroachments to floodplains and floodways by all viable design alternatives. The results of this report will be briefly summarized in the Impacts section of the Environmental Document.

## Air Quality Impact Analysis

The CONSULTANT will collect the data necessary and perform the air quality impact analysis for the proposed alternatives.

## Noise Impact Analysis

The CONSULTANT will collect the data necessary and perform the noise impact analysis for the proposed alternatives.

## Contamination Impact Analysis

The CONSULTANT will perform the necessary analysis to complete the Contamination Screening Evaluation for all proposed alternatives.

After all potential sites are identified, the CONSULTANT will provide the following information:

a. The location of suspected contamination sites, former and existing land use, and the name and address of the property owner. NOTE: Contamination potential is not only limited to sites within the right-of-way – may include adjacent locations.

b. The natures of suspected contamination, i.e., landfills, underground tanks, visible discharges, drum storage, known violations.

c. Relationship of contamination site to alignment right-of-way.

d. Status of any regulatory enforcement.

e.  For underground tank sites, information from FDEQ Form 17-1.218(5); identify any sites which are not included in this tank registration program.

f.  The CONSULTANT will strive to avoid developing alternative alignments that involve parcels with potential hazardous material or petroleum contamination.   The CONSULTANT will consider alternatives with involvement with potentially contaminated parcels only if other alternative alignments are not feasible for other reasons.

All information will be assembled by the CONSULTANT in a concise Contamination Impacts Evaluation Report

Coastal Barrier Impact Analysis

The CONSULTANT will determine if the provisions of the Coastal Barrier Resources Act apply to any of the viable design .

Energy Impact Analysis

The CONSULTANT will analyze the energy impacts of all proposed alternatives.

Task 5.3 Environmental Documents

At this time it is anticipated that an Environmental Impact Statement (EIS) will be prepared for submittal to the U.S. Environmental Protection Agency in support of potential future federal Funding for the construction of the Tampa Bay Regional Reservoir. Prior to the preparation of the NEPA document, the CONSULTANT will conduct meetings with EPA representatives for purposes of determining the class of action that is required.  It is possible an Environmental Assessment or Categorical Exclusion will satisfy the NEPA process.   The   document will be prepared in accordance with all applicable federal requirements.

The following provides list of the Sections (Chapters) to be included in the EIS.

Purpose and Need

Identify and describe the proposed action.  This section will clearly demonstrate that a "need" exists and should define the need in terms understandable to the general public. This discussion will clearly describe the problems that the proposed action is to correct.

Alternatives

This section of the EIS will discuss a maximum of three alternative site locations under consideration.  The section will begin with a concise discussion of how and why the "reasonable alternatives" were selected for detailed study and explain why

other alternatives were eliminated. All reasonable alternatives under consideration (including the no-build) need to be developed to a comparable level of detail in the draft EIS so that their comparative merits may be evaluated.

Affected Environment

This section provides a concise description of the existing social, economic, and environmental setting for the area affected by all alternatives presented in the EIS. All socially, economically and environmentally sensitive locations or features in the proposed project impact area, (e.g. neighborhoods, hazardous material sites, historic resources, wetlands etc.) will be identified on exhibits and briefly described in the text.

Environmental Consequences

This section will include the probable beneficial and adverse social, economic and environmental effects of alternatives under consideration and describe the measures proposed to mitigate adverse impacts. The information will have sufficient scientific and analytical substance to provide a basis for evaluating the comparative merits of the alternatives.

## Task 6 – Federal Funding

Task 6.1 EPA Planning Document Assistance

Planning Document Assistance

This task includes assisting the technical staff in the production of a planning document, discussed in Task 5, which will satisfactorily meet the Public Information requirements for the program. A review of the planning document will be conducted to ensure it complies with EPA requirements. Follow-up information will be provided as requested by EPA to ensure acceptance and approval of the document.

Public Meetings

This task includes assistance including meeting attendance from the funding experts on the CONSULTANT team in the public involvement program that is required as a part of the grant process.

Final Plan Adoption

The CONSULTANT will assist in the preparation for a meeting of the Tampa Bay Water Board of Directors for the adoption of the final planning document. The COUNSULTANT will assist in the monitoring of the approval process at EPA to ensure project funding.

Task 6.2 Planning & Bidding Approvals

### Pre-Bid Requirements

The funding experts on the CONSULTANT team will provide pre-bid assistance to review documents, bidding processes and appropriate advertising of bids in accordance with EPA Regulations. The bid packages to be reviewed include the those from the following project tasks:

- Embankment Design
- Pipeline and Pump Station Design
- Civil/Site Design
- Appurtenant Structures Design

### Bidding Approval Documentation

Bidding approval documentation will be compiled by the CONSULTANT and prepared for submittal to EPA to secure approval to award.

### EPA Approval

The progress of the approval award will be monitored by the CONSULTANT and issues will be resolved on a timely basis to avoid delay in the project. The CONSULTANT will secure EPA approval for Tampa Bay Water to award construction contract(s).

Task 6.3 Grant Administration Services

### Grant Compliance

The CONSULTANT will monitor ongoing grant compliance for various issues as they arise. This effort includes acting as the liaison with the Program Management Office at EPA in Atlanta to address grant issues as they arise and responding in a timely manner to maintain the financial integrity of the program.

### Engineering Contract Review

The CONSULTANT shall review Engineering Services contracts between the firms providing services associated with the EPA Grant and Tampa Bay Water for compliance with EPA procurement and contracting requirements associated with this program. This CONSULTANT shall provide appropriate changes/insertions required to be incorporated into an Amendment to the Engineering Services Contract. The CONSULTANT shall prepare the Amended Engineering Services Contract for submission of EPA. The CONSULTANT will attend one (1) meeting to discuss required changes/insertions to the Contract. The CONSULTANT will

cause the transmittal of the Engineering Services and Contract to the EPA and provide follow-up assistance to ensure the acceptance and approval of the Contract.

<u>EPA Requests Processing and Reporting</u>

The CONSULTANT will prepare and process to EPA SF 271 Forms (18) with required supporting documentation. Twelve Quarterly Reports will be prepared and submitted in accordance with the grant conditions. Interim information will be provided to EPA as requested to support continued funding of the project. These reporting services will be carried through the end of 2001 or the beginning of the construction administration services, which ever occurs first. The processing services through the construction phase of this project are not included in this scope and budget.

<u>EPA Grant Administration</u>

The CONSULTANT will attend one (1) meeting to discuss the issues requiring the Grant Agreement to be amended. The CONSULTANT shall act as a liaison between EPA and Tampa Bay Water to identify and resolve issues regarding the completion of the Grant Amendment. The CONSULTANT shall develop a project schedule that will be the basis for determining an appropriate budget period for the Grant. The CONSULTANT will prepare the Grant Amendment to provide for a budget period extension if necessary. The CONSULTANT will transmit the proposed Grant Amendment to EPA and provide follow-up assistance to ensure the acceptance and approval of the Grant Amendment. The CONSULTANT will provide assistance to ensure the execution of the Final Grant Amendment by Tampa Bay Water.

<u>Task 6.4 Other Agency Funding</u>

The CONSULTANT will work with Tampa Bay Water in obtaining and allocating funding from other agencies such as the Southwest Florida Water Management District (SWFWMD) and the US Army Corps of Engineers (USACOE). The CONSULANT will assist Tampa Bay Water in lobbying for these funds, applying for grants and obtaining reimbursement.

**Task 7 – Land Acquisition**

This task describes the land acquisition services required for a total of up to 57 parcels associated with this project.

Definitions:

A. <u>Parcel:</u>  An easement interest over a portion of property where land is contiguous, or non-contiguous, developable as one parent tract, owned by the same owner(s), and represented by one or more folio number(s).

B. <u>Appraisal:</u>  A short form report for vacant lands with no damages other than to fences, gates, or removable and/or replaceable appurtenances backed up by a full narrative data book which shall include, but is not limited to, regional and neighborhood data, comparable data and appraiser qualifications.  On data book shall be prepared for all common or alike properties appraised in one acquisition phase.  A full narrative report identifying before and after values is necessary for improved properties with probable damages.  The reports shall be prepared in accordance with the latest edition of the Code of Ethics and Uniform Standards of Professional Practice of the American Institute of Real Estate Appraisers.

C. <u>Survey:</u>  Legal description, and sketch of the easement area including identity of folio numbers, adjacent property lines, section lines, section corners, encumbrances, encroachments and rights of way.

D. <u>Qualified Title Company:</u>  see Title Information and Insurance Requirements in Exhibit A-1.

## Task 7.1 Acquisition Services

### Record Maintenance

The CONSULTANT shall maintain all files and distribute all original documents in accordance with the requirements of the Uniform Act and Tampa Bay Water.  All files shall be maintained in a form and fashion suitable for audit purposes and remain available to the Tampa Bay Water at all times during normal business hours for the duration of the project.

### Production Control

The CONSULTANT shall maintain a production reporting system that tracks all critical events, both scheduled and actual, for each parcel on the project.  A report on the complete status of right of way production shall be prepared and submitted on a bi-weekly basis.  This report shall relate current status to the overall acquisition phase schedule, noting exceptions and suggesting actions required to correct these exceptions. CONSULTANT's Project Manger, Project Administrator, assigned Acquisition and Relocation Agents, Property Manager and Suit Specialist shall be prepared to present and address the right of way production schedule at regularly scheduled project production meetings.

### Personnel and License Requirements

The CONSULTANT shall provide a sufficient number of qualified personnel as necessary to effectively carry out its responsibilities as identified in this scope of services.  Upon approval of the Tampa Bay Water Project Manager, the CONSULTANT may subcontract for specialized professional services that may be necessary in order to carry out its requirements pursuant to this scope of services.

<u>Title Services</u>

A search and examination of the public records shall be performed for recorded instruments that create, or purport to create, an interest in, a lien against, or an encumbrance on the title to the parcel of land under search (up to 57 parcels). Such search shall include records beginning 30 years prior to the date of search and continuing through the date of certification of the Title Search Report. The title search shall be performed per Marketable Record Titles to Real Property (MARTA) as specified under Chapter 712, Florida Statutes and the CONSULTANT's Title Report Policies and Procedures.

*Title Search Reports*

Title searches shall be performed for each property of record from which any interest will be acquired. Such searches shall be performed upon receipt of the confirmed legal description of the area to be acquired.

A typewritten report of the findings resulting from the title search as defined above, prepared per the CONSULTANT's standard Title Report Policies and Procedures, shall be submitted in triplicate.

*Title Updates*

Title updates shall be performed immediately prior to closing or order of taking. The update will reflect recordation of instruments, as described above, which have arisen since the date of the Title Report. If there have been no changes since the last search, the notation "NO CHANGE SINCE PRIOR SEARCH" must appear on the typewritten Title Update report.

<u>Appraisals</u>

All real property interests to be acquired shall be appraised for up to 57 parcels at market value before the initiation of negotiations with an owner. A Data Book and complete summary Appraisal Reports shall be prepared in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP). The CONSULTANT shall review each appraisal report for accuracy including, but not limited to data calculations and appropriate comparable sales. The CONSULTANT shall take necessary action to ensure inaccuracies are corrected. A written report will be prepared providing the estimate of just compensation and an allocation of compensation to any separately held interests by tenants or others, and will constitute the basis for the offer to the property owner. Four copies will be submitted to Tampa Bay Water.