Negotiations

The CONSULTANT shall be responsible for conducting good faith negotiations with the property owners and/or their representatives for the acquisition of fee and easement interests required for the project.   These negotiations will be conducted compliant with the mandates of the Uniform Relocation and Real Property Acquisition Policies Act of 1970, and any amendments thereto, and the CONSULTANT's Policies and Procedures for acquisition under the Uniform Act, as approved by Tampa Bay Water.

The CONSULTANT will review the right of way maps and construction plans and will verify those legal descriptions, surveys and appraisals correspond with the right of way maps.

The CONSULTANT shall initiate negotiations by making a verbal offer to purchase, such offer including approved market value estimate, and if applicable, approved business damages, replacement housing payments, and an explanation of relocation benefits.  These offers will be made in person during a meeting with each property owner.  After initiation of negotiations the CONSULTANT will conduct negotiations for the acquisition of each parcel in accordance with the Uniform Act and the CONSULTANT's Policies and Procedures for acquisition under the Uniform Act.  Written offers will not be provided without the prior approval of Tampa Bay Water.  CONSULTANT will coordinate with Tampa Bay Water's Project Manager and General Counsel's Office to determine when approval of an offer to purchase by Tampa Bay Water's Board of Directors may be necessary.

The CONSULTANT will issue all applicable notices as mandated by the Uniform Act.

The CONSULTANT will establish and maintain accurate and complete working files for each parcel and thoroughly document all contacts with property owners and/or their representatives.

Settlements and Closings

The CONSULTANT shall receive counteroffers from property owners or their representatives for consideration by Tampa Bay Water.  When appropriate, justifications and recommendations for settlements shall be prepared and submitted to Tampa Bay Water's Project Manager for further consideration.  The CONSULTANT shall prepare purchase and sales agreements.

Prior to closing the CONSULTANT shall provide title updates.  The CONSULTANT will prepare Public Disclosure Act Affidavit & possession affidavit and perform all required closing activities including satisfaction of all liens and transfers, recording of all title documents, collection and payment of

prorated real estate taxes and execution of IRS form 1099S, if the contract is approved by Tampa Bay Water's Board.

The CONSULTANT shall be responsible for all recordation fees. In the event of condemnation the CONSULTANT shall deposit Order of Taking funds.

### File Retirement

Within 60 days after title transfer on an acquisition parcel, the CONSULTANT shall thoroughly review and transmit the working file complete, with any residual original documents, to the Tampa Bay Water Project Manager for retirement approval/disapproval.

## Task 7.2 Other Land Acquisition Services

This task includes subtasks required for the Uniform Relocation Act as a part of the federal funding process and those subtasks required for condemnation and relocation. These subtasks will be performed on an as needed basis.

### Relocation Services

The CONSULTANT shall provide relocation assistance benefits to each displaced person in accordance with the Florida Administrative Code and the Uniform Relocation and Real Property Acquisition Policies Act of 1970, and any amendments thereto.

At the initiation of negotiations a Statement of Eligibility shall be presented to Tampa Bay Water as well as the relocation payment type. The Statement of Eligibility for tenants shall be presented as soon as practicable thereafter. At these presentations owners and tenants shall be made aware of the advisory assistance to which they are entitled.

The CONSULTANT shall prepare all appropriate relocation payments and costs. All computations which determine compensation for owners or displacee shall be prepared, reviewed by separate, qualified individuals and approved by the CONSULTANT's Project Manager.

The CONSULTANT shall prepare claim packages and submit them to Tampa Bay Water's Project Manager for approval. On approval of the claim the CONSULTANT shall prepare and process invoices requesting warrants for payment of claims and on receipt deliver payment to the displacee. When required the CONSULTANT shall provide field surveillance and documentation of business and residential relocation.

When Tampa Bay Water assumes possession of the parcel the CONSULTANT shall issue and deliver notices to owners and tenants to vacate the property. In the

event of refusal to vacate, the CONSULTANT shall notify and coordinate with the Tampa Bay Water's Project Manager for any required eviction notices.

In the event of relocation appeals the CONSULTANT shall review the appeal and prepare analysis for submission to the Tampa Bay Water's Project Manager.

The CONSULTANT shall establish and maintain accurate and complete working files for each displacee, while transmitting all original documents to Tampa Bay Water's Project Manager for review and approval. Within 60 days after completion of final relocation activity for a displacee, the CONSULTANT shall thoroughly review and transmit the working file to Tampa Bay Water's Project Manager for retirement approval/disapproval.

Property Management Services

The CONSULTANT's property manager shall prepare a preliminary real/personal property inventory with serial numbers for each parcel and maintain and update this inventory as appropriate until all improvements are cleared from the project. This inventory shall be reviewed for discrepancies, if any, between parcel inventories, appraisal reports, relocation inventories, property owner's inventories, and tenant inventories. In addition the CONSULTANT shall maintain an inventory of all uneconomic remainders.

The CONSULTANT shall assist in coordination with any organization, public or private, when requested to do so by Tampa Bay Water for the purpose of identifying, investigating and/or remediating any environmentally unsafe condition on any parcel.

The CONSULTANT shall receive and respond to all inquiries for the sale or lease of surplus real property acquired during the life of the project, preparing salvage value estimates, when required, for improvements that are acquired.

The CONSULTANT shall maintain an accurate and current working file for each parcel requiring property management services, and forward original documents to Tampa Bay Water's Project Manager or designated representative on a timely basis. At the conclusion of the project, the CONSULTANT shall submit to Tampa Bay Water's Project Manager a detailed report including an inventory of all potential surplus property acquired and a record of all inquiries for the sale of such surplus.

Condemnation Services

*Suit Preparation*

The CONSULTANT shall recommend eminent domain proceedings for parcel acquisitions to avoid project delays. The CONSULTANT shall review title, verify

and update all title information, obtain all suit information from property owners and/or public records i.e., names, addressed, lien holders, mortgagees, lessees, etc. and comply with Florida Public Disclosure Act. The CONSULTANT shall obtain an updated title search from a licensed and experienced title company within two (2) days prior to suit submission. The CONSULTANT shall obtain an updated appraisal report in a "short form" format acceptable to Tampa Bay Water for the purpose of estimating Fair Market Value as of the date of the Order of Taking.

Tampa Bay Water's General Counsel shall prepare any necessary lawsuits to acquire the necessary property. CONSULTANT shall provide administrative support as requested by the General Counsel.

*Legal Support*

The CONSULTANT shall provide personnel to assist Tampa Bay Water's attorneys in obtaining Orders of Taking; including, but not limited to, providing testimony and responding to interrogatories.

Deliverables

The CONSULTANT will provide TAMPA BAY WATER five (5) sets of notebooks that include a copy of all property acquisition agreements and a summary of special conditions that require follow-up work.

## Task 8 – Public Involvement/Information

This task is a joint program of public involvement and public relations. The Stage A Feasibility activities have primarily consisted of public involvement tasks. As the project progresses towards final design and construction the program will evolve into more of a public relations program. This task will be fully integrated with the project technical tasks.

Task 8.1 Public Involvement/Information Planning

The CONSULTANT will work with Tampa Water to develop a Public Involvement Plan at the onset of the project. This plan will be prepared according to Tampa Bay Water's Public Involvement Guidelines, including project background, list of stakeholders, decision-making process, and a sequential plan of activities, showing the relationship between the public involvement activities and technical tasks.

Task 8.2 Stakeholder Database

The CONSULTANT will review the database of stakeholders developed through the Stage A activities and update the database as necessary. This database will be used as a mailing list for public information material and meeting notices to interested groups and citizens throughout the project.

### Task 8.3 Public Meetings

The CONSULTANT will plan, advertise and facilitate/moderate up to eight (8) public meetings or workshops throughout the project. It is anticipated that these workshops will include three meetings necessary for the EAP and one meeting for EPA funding. These meetings will be conducted at various periods throughout the project to inform the public about the progress of the project and to receive input on the project. The CONSULTANT will advertise and promote the meetings using newspaper advertisements, news releases, direct mail and flyers placed in key locations in relevant neighborhoods. The CONSULTANT will prepare handouts for these meetings along with a list of Frequently Asked Questions (FAQ) to summarize the comments from these meetings.

### Task 8.4 Informational Newsletter/Project Updates

The CONSULTANT will prepare an informational newsletter or project updates about the project on a semi-annual basis. Up to Six (6) newsletters or project updates will be prepared and distributed to the stakeholders via direct mail. In addition, the CONSULTANT will prepare One (1) brochure about the project to provide to the stakeholders.

### Task 8.5 Media Briefings

The CONSULTANT will plan and conduct up to two (2) media briefings per year (6 total briefings) through the design process of the project. These briefings will include issuance of new releases and updating media databases. The CONSULTANT will generally try to have these briefings prior to some of the public meetings.

### Task 8.6 Group and Agency Meetings or Presentations

The CONSULTANT will plan and prepare up to eight (8) informational presentations/meetings with agencies or other interested groups. The CONSULTANT will plan the message points and agendas for these meetings. In addition, the CONSULTANT will prepare any necessary handouts for these meetings.

### Task 8.7 Project Web Page

The CONSULTANT will provide information for the development of a web page for Tampa Bay Water to incorporate into their existing web page. The web page will provide general information on the project, along with the project status, and contact people. This update information will be provided on a quarterly basis.

### Task 8.9 Project Milestone Communication (Optional, Not Budgeted)

The CONSULTANT will develop public relations events in coordination with Tampa Bay Water's Public Relations Coordinator at the project milestones. These events may include:

- Groundbreaking Ceremony
- Protocol for complaint response during construction
- Contractor Training
- Reservoir Filling Ceremony

Deliverables

The primary deliverable for Task 8 will be a project specific Public Involvement/Information Plan, which is described above. In addition, the public involvement/information program will produce public information materials such as fact sheets and newsletters and an ongoing record of public contacts, meeting summaries, correspondence, newsclips, etc. which will be maintained by the public involvement/information team. A summary of the Public Involvement/Information activities will be prepared at the end of this project.

## Task 9 – Technical Support of Involvement Program

This task is the integration of the technical team into the Public Involvement/Information Program. This task will support the Task 8 efforts.

The CONSULTANT will provide technical support to the meetings and workshops identified above in Task 8 (up to 8 public meetings, 8 agency/group meetings and 6 media briefing). This task will include the preparation of any displays, presentations or other technical handouts.

Deliverables

The deliverable for this task will be included in the deliverable for Task 8.

## Task 10 – Bidding Services

Task 10.1 Design Build Options

At approximately the time of 30 percent design on the embankments, the CONSULTANT will submit to Tampa Bay Water, a report and recommendation on the potential of turning this project into a design build project. This recommendation will be based on the CONSULTANT's experience, industry practices and experiences, and an analysis of potential cost and time savings. If it is the CONSULTANT's recommendation that this project become a design build project, the CONSULTANT will work with Tampa Bay Water to convert this project to a design build project. At that time the CONSULTANT will work Tampa Bay Water to develop a revised scope and budget for the CONSULTANT based on design build management responsibilities.

Task 10.2 Preparation of Request for Qualifications

Due to the time sensitive nature of the project, the CONSULTANT recommends limiting bids to be submitted by pre-qualified contractors only – effectively reducing the possibility of potential problems with apparent low bids that could be deemed unacceptable due to level of experience or past performance and/or quality problems.

The CONSULTANT and Tampa Bay Water will establish base criteria to be requested from potential contractors in the RFQ from a guideline list. Such items may include: general qualifications; resources and experience with similar size projects; project approach; preliminary construction schedule; financial information; insurance and bonding limits; key personnel experience; a list of projects completed within the last 5 years involving comparable work, etc. Also included in the RFQ package will be an evaluation and acceptance procedure to identify our process for the respondents.

Task 10.3 Pre-Qualification of Contractors

Utilizing the RFQ package, the CONSULTANT Team will invite firms to submit qualifications and set forth instructions and guidelines for consideration. Requirements such as instructions for questions or clarifications; opening date(s) and location; RFQ form delivery requirements; clarification and addenda; subcontracting limitations; minority business goals; and equal employment opportunity guidance will be addressed.

The CONSULTANT will review the RFQs received and provide written recommendations to Tampa Bay Water regarding acceptability of each submittal.

Task 10.4 Preparation of Bid Packages

Using the previously prepared contract documents, the CONSULTANT will prepare bid packages for distribution to pre-qualified contractors for construction of the project. the CONSULTANT will:

- Maintain a record of prospective bidders to whom Contract Documents have been issued, attend pre-bid conferences and receive and process deposits for Contract Documents;

- Issue addenda as appropriate to interpret, clarify or expand the Contract Documents;

- Consult with Tampa Bay Water to determine the acceptability of substitute materials and equipment proposed by potential contractor(s) when substitution prior to the award of contracts is allowed by the Contract Documents; and

- Attend the bid opening(s) and prepare bid tabulation sheets.

Task 10.5 Selection of Contractors

Subsequent to bid opening, the CONSULTANT will assist Tampa Bay Water in evaluating the bids and in assembling and awarding contracts for construction, materials, equipment and services. The CONSULTANT will assist Tampa Bay Water with review of the

Contractor's proposed subcontractors, equipment manufacturers, fabricators, suppliers and distributors, prior to award of bids. Review and approval of proposed subcontractor's equipment manufacturers, fabricators, suppliers and distributors should be accomplished as soon as possible after bid opening to enable the contractor's scheduling activities to commence as soon as possible.

Task 10.6 Construction Administration and Inspection (Optional, Not Budgeted)

The CONSULTANT will provide a full-time Resident Project Representative (RPR) to observe the progress and quality of the work and to determine, in general, if the work is proceeding in accordance with the Contract Documents. The CONSULTANT will keep Tampa Bay Water informed as to the progress and quality of the work and alert Tampa Bay Water and Contractor(s) to defects and deficiencies in the work. Specific design engineers will make visits to the site at intervals appropriate to the stage of the construction to observe the progress and quality of the work and to determine if the work is proceeding in general accordance with the design intent.

Field Construction Administration services provided by our full-time RPR and Construction Inspectors will include the following:

- Make recommendations to Tampa Bay Water concerning the disapproval or rejection of Contractors' work while it is in progress if such work will not produce a completed project that conforms generally to the Contract Documents.

- Maintain all project records at the site and report progress weekly to Tampa Bay Water.

- Review or take other appropriate actions with respect to shop drawings, samples and other submittals that the Contractor is required to submit for conformance with the project design and compliance with the Contract Documents.

- Schedule and participate in project meetings and distribute minutes to attendees.

- Evaluate and determine the acceptability of substitute materials and equipment proposed by the Contractor (post bid award).

- Accompany visiting inspectors representing public or other agencies having jurisdiction over the project, record the outcome and report to Tampa Bay Water.

- Make recommendations to Tampa Bay Water regarding the need for special inspections or testing during construction.

- Monitor tests and inspections by independent testing laboratories.

- Act as initial interpreter of the requirements of the Contract Documents. Judge the acceptability of the work and make decisions on any claims involving Tampa Bay Water and the Contractor relating to acceptability of the work or the interpretation of the requirements of the Contract Documents.

- Evaluate the Contractor's suggestions for modifications or changes to the project.
- Review Contractor's Applications for Payment and make recommendations to Tampa Bay Water regarding release of payments.
- Receive and review maintenance and operating instructions, schedules, guarantees, bonds, certificates of inspection and tests and approvals of equipment which are to be provided by Contractor(s) in accordance with the Contract Documents. Determine that their content complies with the requirements of the Contract Documents and transmit them to Tampa Bay Water with written comments.
- Review Contractor-generated punch lists.
- Conduct construction reviews to determine if the work is: a) substantially complete, and b) finalized and acceptable so that final payment can be released to the Contractor(s).

The CONSULTANT will prepare a set of reproducible record prints of drawings showing changes made during the construction process, based on the marked-up prints, drawings and other data furnished by the Contractor as a part of their Contract close-out requirements. The CONSULTANT will also assist Tampa Bay Water in developing systems and procedures for control of the operation and maintenance of record keeping for the project, utilizing electronic format to the fullest extent possible. Finally, the CONSULTANT will compile, review and comment on operating, maintenance and staffing manuals, and assist Tampa Bay Water in training staff to monitor, operate and maintain the project

### Task 10.7 In-plant Pipe Manufacturing Inspection (Optional, Not Budgeted)

An optional but, in our opinion, very important service necessary to assure the quality of the pipe materials used in your project is in-plant pipe manufacturing inspection. For both steel and pre-stressed concrete cylinder pipe (PCCP), inspection should be full-time, since fabrication of these pipe materials involves multiple steps and, in the case of PCCP, multiple components. Poor workmanship and substandard materials can be avoided with careful in-plant inspection. The CONSULTANT provided this service through our experienced sub-consultant, R.W. Hunt Company, for Pinellas County's 60-inch diameter steel water transmission main. Intermittent inspection combined with materials testing can suffice for ductile iron pipe.

### Task 10.8 Documentation (Optional, Not Budgeted)

Through the use of time-tested standard and customized forms, the CONSULTANT will document all phases of the construction services, specifically: communication with Tampa Bay Water, the Contractor(s), vendors, regulatory agencies, and HDR Subconsultants; monitoring of project status and schedules; shop drawing reviews, record drawings and other documentation submitted by the Contractor(s); project visitation records; interpretation of contract documents; project meeting minutes; any documentation resulting from the Contractor's ongoing operations. coordination between the Team's off-site personnel and on-site Team representatives; and coordination with any third party

quality control services under direct contract with Tampa Bay Water. All project documentation will be available in electronic format.

### Task 11 – Project Status and Communication Reporting

The CONSULTANT Team will provide a monthly progress report to Tampa Bay Water. This report will include a listing of the project tasks accomplished during the previous month and a work projection for the next month. Included in this report will be an updated monthly cash flow projection through the end of construction and an update on status of permit acquisition, including which properties may be ready for next month's Board Meeting.

The CONSULTANT will meet with Tampa Bay Water and the time scheduling consultant (TSC) on a bi-weekly basis to update the Primavera Project Schedule. The CONSULTANT will provide the TSC a written update of the project schedule for the TSC to input into the Primavera schedule.

Tampa Bay Water and its Consultants reserve the right to visit the CONSULTANT's office on a regular, reasonable basis to evaluate project status. CONSULTANT shall cooperate during said visits by making available all documents, reports, etc. that are being produced for the purpose of completing the project. Tampa Bay Water and its Consultants also reserve the right to visit CONSULTANT on a regular, reasonable basis to review project time schedule status.

To assist in the development of the progress report, the CONSULTANT will conduct monthly team meetings that will include representatives for the CONSULTANT, the pertinent subconsultants, and the Tampa Bay Water project manager. At these meetings the team members will describe the tasks accomplished the previous month along with the tasks for the following month. In addition, the team members will discuss any outstanding issues for the project.

A summary of the meetings held with the public, agencies and other stakeholders will also be provided to Tampa Bay Water on a monthly basis. In addition, a telephone memoranda of any pertinent conversations will be distributed to Tampa Bay Water and Consultant Team member within 48 hours of the conversation. These memoranda will include the time and date of the conversation along with a summary of the conversation. In addition, any information and outstanding issues that need to be resolved with the person or group will be identified in the memoranda.

The CONSULTANT Team will provide two copies of the progress report, monthly meeting summary, and telephone memoranda to Tampa Bay Water through the 25th of each month by the 30th day of that month.

The CONSULTANT will coordinate on an as-needed basis with Tampa Bay Water's System Engineer to ensure that the project design is consistent with system requirements and objectives.

**Task 12 – Permitting**

<u>Introduction</u>

Two separate environmental resource permits will be prepared. One each for activities associated with reservoir construction and for activities associated with pipeline construction.

**Reservoir Environmental Permits**

<u>Task 12.1  Establish of Wetland Jurisdictional Limits for the Reservoir</u>

The CONSULTANT will establish wetland jurisdictional lines in the field. These lines will be confirmed by regulatory agency representatives in the field. Coordination with survey crews will be established and all staked wetland lines will be surveyed. The CONSULTANT may use alternative methods for wetland mapping including the use of a Global Positioning System (GPS) or delineation on aerial photography if these alternative methods are approved by regulatory agencies.

<u>Task 12.2  Agency Coordination for the Reservoir</u>

The CONSULTANT will conduct all regulatory agency coordination required in support of environmental (natural resource) permits. The CONSULTANT will notify Tampa Bay Water of all scheduled meetings with the regulatory agencies, and will copy Tampa Bay Water on all permit related correspondence. Regulatory agencies anticipated to require permits for construction within jurisdictional wetlands include the Southwest Florida Water Management District (SWFWMD), U. S. Army Corps of Engineers (ACOE) and the Hillsborough County Environmental Protection Commission (HEPC). Additionally, meetings and coordination will be completed with Florida Game and Freshwater Fish Commission and US Fish and Wildlife Service.

<u>Task 12.3  Field Reviews and Site Assessment for the Reservoir</u>

Following field reviews, wetland delineation, and preliminary agency coordination, all impacts to upland and wetland resources will be characterized and quantified. This information will be utilized during the development of mitigation alternatives, coordination with wildlife resource agencies, and included in any supporting environmental documents required for the project.

<u>Task 12.4      Prepare Permit Application for the Reservoir</u>

The CONSULTANT will prepare Permit application packages in support of Wetland Resource/Dredge and Fill permits as required by local, state, and federal regulatory agencies. Agencies anticipated to require these permit applications include Southwest Florida Water Management District (SWFWMD), U. S. Army Corps of Engineers (ACOE) and the Hillsborough County Environmental Protection Commission (HEPC).

Additionally, NPDES/EPA permits will be required. The CONSULTANT will prepare the Environmental Resource Permit (ERP) application to be submitted to the SWFWMD and the ACOE. The CONSULTANT will prepare a cultural resource assessment for archaeological and historical resources. This information will be included in the ERP permit as required by the ACOE. The CONSULTANT will respond to all requests for additional information from regulatory agencies. All permit application fees will be prepared by the CONSULTANT with funds to be provided from the Owner's allowance.

An application for Directors Authorization for wetland impacts as required under Chapter 1-11 of the Environmental Protection Commission of Hillsborough County will be completed.

Wetland resource permit applications will not include those authorizations required for wetland mitigation.

The CONSULTANT will prepare applications for permits necessary for excavation required by Hillsborough County.

The CONSULTANT will be responsible for meeting all NPDES permitting requirements associated with the construction of the reservoir.

### Task 12.5  Mitigation Coordination and meetings for the Reservoir

The CONSULTANT will participate in agency meetings and provide information on the type, quality, and extent of impacts to wetlands. This information will be used by Tampa Bay Water for the determination of mitigation ratios and mitigation strategies required to off-set wetland impacts associated with reservoir construction.

### Task 12.6  Mitigation site alternatives evaluation for the Reservoir (**Optional Service, Not Budgeted**)

The CONSULTANT will provide an alternative mitigation site evaluation report if necessary. If required, these services will be provided as time and materials and drawn from contingency funds.

### Task 12.7  Mitigation plans for the Reservoir (**Optional Service, Not Budgeted**)

The CONSULTANT shall prepare a mitigation plan to offset impacts to wetland resources associated with reservoir construction. The design will be completed at a location identified in Task 5 above. The mitigation plan will be specific to the reservoir. The plan will be reviewed and accepted by appropriate regulatory agencies including the SWFWMD, HCEPC, and ACOE.

<u>Deliverables</u>

The CONSULTANT will provide up to ten (10) copies of the permit applications to Tampa Bay Water. The CONSULTANT will input permitting data and update Tampa Bay Water's permitting data base on a monthly basis. The CONSULTANT will provide Tampa Bay Water with five (5) notebooks containing all applicable permits along with special permit conditions that require follow-up.

**Pipeline Environmental Permits**

<u>Task 12.8  Establish of Wetland Jurisdictional Limits for Pipelines</u>

The CONSULTANT will establish wetland jurisdictional lines in the field. These lines will be confirmed by regulatory agency representatives in the field. Coordination with survey crews will be established and all staked wetland lines will be surveyed. The CONSULTANT may use alternative methods for wetland mapping including the use of a Global Positioning System (GPS) or delineation on aerial photography if these alternative methods are approved by regulatory agencies.

<u>Task 12.9  Agency Coordination for pipelines</u>

The CONSULTANT will conduct all regulatory agency coordination required in support of environmental (natural resource) permits. The CONSULTANT will notify Tampa Bay Water of all scheduled meetings with the regulatory agencies, and will copy the Tampa Bay Water on all permit related correspondence. Regulatory agencies anticipated to require permits for construction within jurisdictional wetlands include the Southwest Florida Water Management District (SWFWMD), U. S. Army Corps of Engineers (ACOE) and the Hillsborough County Environmental Protection Commission (HEPC). Additionally, meetings and coordination will be completed with Florida Game and Freshwater Fish Commission.

<u>Task 12.10  Field Reviews and Site Assessment for pipelines</u>

Following field reviews, wetland delineation, and preliminary agency coordination, all impacts to upland and wetland resources will be characterized and quantified. This information will be utilized during the development of mitigation alternatives, coordination with wildlife resource agencies, and included in any supporting environmental documents required for the project.

<u>Task 12.11  Prepare Permit Application for Pipelines</u>

The CONSULTANT will prepare Permit application packages in support of Wetland Resource/Dredge and Fill permits as required by local, state, and federal regulatory agencies. Agencies anticipated to require these permit applications include Southwest Florida Water Management District (SWFWMD), U. S. Army Corps of Engineers (ACOE) and the Hillsborough County Environmental Protection Commission (HEPC).

Additionally, NPDES/EPA permits will be required.  The CONSULTANT will prepare the Environmental Resource Permit (ERP) application to be submitted to the SWFWMD and the ACOE.  The CONSULTANT will prepare a cultural resource assessment for archaeological and historical resources.  This information will be included in the ERP permit as required by the ACOE.  The CONSULTANT will respond to all requests for additional information from regulatory agencies.  All permit application fees will be prepared by the CONSULTANT with funds to be provided form the Owner's Allowance.

An application for Directors Authorization for wetland impacts as required under Chapter 1-11 of the Environmental Protection Commission of Hillsborough County will be completed.  An authorization for wetland involvement will be obtained.

The CONSULTANT will prepare applications for permits necessary for excavation required by Hillsborough County.

Wetland resource permit applications will not include those authorizations required for wetland mitigation.

The CONSULTANT will be responsible for meeting all NPDES permitting requirements associated with the construction of pipelines.

Task 12.12  Mitigation Coordination and meetings for Pipelines

The CONSULTANT will participate in meetings with appropriate agencies for the determination of mitigation ratios based on wetland quality, as required to offset unavoidable impacts to wetland resources.  Mitigation Plans for pipeline impacts will be provided as an optional service (not budgeted) or will be completed by others.

Task 12.13  Mitigation site alternatives evaluation for Pipelines **(Optional Service, Not Budgeted)**

The Consultant will provide alternative mitigation site evaluations if required.  These services will be performed as Time and Materials from contingency funds.

Task 12.14  Mitigation plans for Pipelines **(Optional Service, Not budgeted)**

The CONSULTANT shall prepare a mitigation plan to be included as part of the permit applications submitted to the appropriate regulatory agencies.  The mitigation plan will be limited to one off-site location as identified in Task 5.  Since the location and nature of the mitigation site is unknown at this time, costs associated with survey and geotechnical have not been funded.

Deliverables

The CONSULTANT will provide up to ten (10) copies of the permit applications to Tampa Bay Water.  The CONSULTANT will input permitting data and update Tampa

Bay Water's permitting data base on a monthly basis. . The CONSULTANT will provide Tampa Bay Water with five (5) notebooks containing all applicable permits along with special permit conditions that require follow-up.

Exhibit A-1

TITLE REPORT REQUIREMENTS
FOR TAMPA BAY WATER

1.  The performance of services or delivery of documents required hereunder shall not relieve the Title Company (Company), from obligation to correct any defective work subsequently discovered and all incomplete, inaccurate, or defective work shall be remedied promptly by Company on demand without cost to the TAMPA BAY WATER or its assigns.

2.  The Company shall have and maintain, during the period of this Agreement, a professional liability insurance policy or policies with a company or companies authorized to do business in the State of Florida, affording professional liability coverage for the professional services to be rendered in accordance with this Agreement in the amount of $250,000. The Company shall maintain professional liability coverage for a minimum of three years after completion of the services rendered herein. Proof of insurance, provided by the TAMPA BAY WATER, is required prior to contract execution. The requirements for the professional liability insurance may be waived by the TAMPA BAY WATER, if the Company obtains and maintains an unexpired, irrevocable letter of credit payable to the TAMPA BAY WATER, established pursuant to Chapter 675, Florida Statute, in an amount not less than the minimum insurance coverage required of $250,000.

3.  The Company shall have engaged in the business of providing title information in Hillsborough, Pasco or Pinellas Counties for a minimum of two (2) years. The TAMPA BAY WATER reserves the right to inspect the Company's facility to insure that the Company's work force is sufficiently staffed for providing the required services. At a minimum, Company shall have five (5) full-time employees, two (2) of which shall be qualified abstractors. For the purpose of this Agreement, qualified abstractors shall be defined as persons possessing a minimum of two (2) years experience in earliest records abstracting here in the tri-county area. The TAMPA BAY WATER further reserves the right to request resumes of said company employees. Sub-contracting of any portion of this Agreement is prohibited without prior written approval by the TAMPA BAY WATER.

4.  The Company shall have a title plant on premises or have immediate access to a title plant. The plant shall contain complete records covering a minimum of thirty (30) years. If the Company uses a plant owned by another company, the written contract (lease) detailing the terms of said use shall be attached to the bid. The duration of said use contract must meet or exceed the Contract Effective Period with the TAMPA BAY WATER.

5.  The Company shall submit the name, address, telephone number and the name of a contact person for at least two references for whom the Company has provided similar services as those requested by the TAMPA BAY WATER.

6.  The Company shall submit a claims history for the last five (5) years of for the length of time engaged in this business, whichever is less.

7.  The title report shall contain the complete legal description of each parcel requested.

8.   The name and/or names and address of the last grantee of record is needed, along with a copy of the conveying instrument, and the name and address from the tax roll should be given if different from that shown on the deed.

9.   Give complete report reflecting all outstanding encumbrances for the period described in Chapter 712 of the Florida Statutes, on any property involved in the title search (30 years).

10.  In all instances, any information regarding deeds or encumbrances shown on the title report should also include the complete names of all parties to the instrument, the type of deed or instrument, date of instrument, book and page of recordation, date of recordation, amount of mortgage, lien, deed reservations, etc. Copies of all instruments cited in said report must be attached to original report. Copies of documents previously provided on duplicate reports are not required.

11.  The report should include a thirty year history of the ownerships of the subject lands, in addition to the conveyances of the last grantee of record. If no conveyance of the subject lands has been made during the past thirty years, following notations should be made – "thirty year history" – None. This information is to be used for appraisal purposes.

12.  State and Federal Documentary and Surtax Stamps must be shown for each conveyance reported in the title search, including both those shown the last grantee of record and those reported to disclose the five year history.

13.  Tax payment information or delinquent tax information must be shown along with the current folio number and TAMPA BAY WATER parcel number for each parcel. In reporting any outstanding tax certificates, it is essential that the name or names of the holder of the certificate be given.

14.  All oil, gas and mineral leases, deed or royalty transfers that include any surface rights are to be reported.

15.  When a description of the parent tract is given in a transfer of property and there is an exception to the parent tract referred to as "Less than part as recorded in "O.R. Book _____, Page _____", the Company should include such exception in the description or furnish a copy of the instrument referred to. When several metes and bounds descriptions are within a subdivision used as a tie point for several descriptions a copy of that plat showing such subdivision should be furnished with reference made thereto stating parcels affected by such plat.

16.  Where an owner is deceased and probate proceedings have been filed, it is necessary that the title search show the name of the heirs as set forth in the petition filed, the name of the Personal Representative, whether or not they are permitted to convey without bond, and whether or not the estate has been closed. Distribution of the property shall be reported.

17.  When reporting insanity proceedings of a present record owner, the date of commitment should be given and name of the appointed Guardian, if any, should be provided. The report should also state if the record owner's disabilities have been lawfully removed.

W:\IN_AG_EX\MNGMNT\La-sos.doc

18. When a dissolution of marriage is reported between the record owners, said dissolution and any property settlement agreement shall be attached as to any real property involved.

19. In any instance where title to real property has been vested in a person that is a minor, or otherwise incompetent, the title report should show the name, address and telephone number of the appointed guardian, if any, and in the event no appointment of a guardian has been made, the report shall so state.

20. When the record title to a parcel of land appears to be vested in the United States, State or County Government, the title report shall show the branch or agency of government as designated, if any.

21. Frequently Tax Certificates have been reported as having been foreclosed by the County, with no further information given as to whether or not such title remains in the County. In most of these instances an individual owner has been reported. The title search shall disclose whether or not the title has passed from the former record owner to the County.

22. When the description of a parcel of land on which the ownership is being reported refers to another deed as its basis for a point of beginning, to establish a corner, or an exception, the description of the land in the deed must be furnished.

23. Care shall be exercised in reporting any reservations found to be included in any conveyance affecting ownership of a given parcel of land. Such reservations shall be shown in detail setting out the extent of the reservations, as in the case of a deed issued by the Trustees of the Internal Improvement Trust Fund, and full detail in the reservation of life estate.

24. When property includes former Right of Way this report shall show Board minutes vacating Right of Way, creating easements and/or any action involving properties.

25. The interests of Drainage Districts, in lands involving existing drainage systems shall be reported. This report shall also disclose any tax certificates held by individuals or the Drainage District for drainage assessments on any lands within a drainage system.

26. All information concerning Bankruptcy shall be reported. The report shall include but not be limited to: case number; type of filing; date of filing; exempt lands (if any); details of any petitions and/or court to handle assets (if applicable); and current status of proceedings and name and address of receiver, if any.

27. The Company is encouraged to make any comments concerning any knowledge of local matters not or record, including but not limited to, minors becoming of age after the date they may have acquired an interest in property, change in marital status and any other information not of record that may affect the title to the lands to be acquired.

28. On any State, County, and/or City owned park, and/or recreational area, furnish copy of deed whereby property was acquired for such purpose.

29. The above information shall be furnished in triplicate and in suitable form, including full and complete sets of legible back up documents, for use in preparation of parcel maps & for real estate appraisal purposes.

30. Updated title reports should include only information from the date of the last report through present, with legible back up documents included. If the ownership has changed, it should be so noted on the report and new ownership information shall be included; if ownership has not changed "no change" shall be noted on report. It shall also be noted if any previous mortgages, and/or liens, etc. have been satisfied.

31. When performing a closing, the Company will submit an original settlement statement at least 14 days prior to closing date for signature by Real Estate Coordinator.

32. The Company will ensure that prorated taxes for fee simple purchases are paid to the appropriate TAMPA BAY WATER.

33. The Company will furnish the land agent copies of all closing documents prior to closing for review and a copy of all closing documents after closing.

34. Updated reports will include only title activities from the date of the original or previous report to the current date, and will continue to be presented in the aforesaid format.

35. Closing/settlement fees will be requested a minimum of two (2) weeks prior to closing date.

36. The Company will make best efforts to provide legible copies of recorded document. In the event an illegible copy is provided, Company will provide a second more legible copy if available in public records.

37. Updated title reports for purposes of Eminent Domain will be a 30-year title search.

38. Updated title search for changed owner or to make report current (not for Eminent Domain). Report will be from last report date and will list only activities during the reporting period.

## SCHEDULE "B"

### 1.0 Compensation for Services

TAMPA BAY WATER shall pay the CONSULTANT and the CONSULTANT agrees to accept full compensation for its services (as set forth in Schedule "A" of this Agreement) compensation as provided in Table B-1. Payment will be computed by the following methods:

### 1.1 Method of Payment: Lump Sum (LS)

Compensation to the CONSULTANT shall be determined using the following formula:

Percent Complete x Task Lump Sum Amount

where:

(a) Percent Complete shall mean the fraction of Work completed on a specific "lump sum" task during a billing period.

(b) Task Lump Sum Amount shall mean the contract amount for completion of a specific task as identified in Table B-1.

(c) All costs outlined in Section 1.1(a) and 1.1(b) are subject to audit at any time by TAMPA BAY WATER.

### 1.2 Method of Payment:  Time and Materials (TM)

For those tasks for which the method of compensation is TM, Tampa Bay Water agrees to compensate the CONSULTANT for labor by taking the hourly wages paid to those persons engaged directly on the work and applying a multiplier of 3.00 for all labor classifications.

TAMPA BAY WATER agrees to reimburse the CONSULTANT, in addition to compensation for labor, for the fees of subconsultants and/or subcontractors and out-of-pocket, non-personnel expenses and costs, at the actual cost incurred. Typical out-of-pocket expenses shall include, but not be limited to, travel expenses (lodging, meals, etc), job-related mileage, computer charges, long distance telephone calls, printing and reproduction costs, and survey supplies and materials. All out-of-pocket expenses shall be limited to the statutory per diem. In the event of the requested service requires the use of special equipment an additional direct charge shall be made for the use of this equipment.

The not-to-exceed compensation amounts shown in Table B-1 include compensation for labor and reimbursement for direct expenses.

All costs outlined in Section 1.2 are subject to audit at any time by TAMPA BAY WATER.

## 2.0 Contract Limit

The limit of this Agreement shall not exceed the amount shown in Table B-1 without approval from TAMPA BAY WATER in the form of a written amendment to this Agreement.

## 3.0 Compensation of Extra Work

Compensation to the CONSULTANT for performance of Extra Work pursuant to paragraph 11 of this Agreement, as well as the Work to be performed at time of completion, shall be determined in a written amendment to this Agreement in advance of performance for said Work, unless TAMPA BAY WATER authorizes compensation for said Work from the Owner's Allowance. Non-scope services must be identified by the CONSULTANT within (10) days of which such services are provided. Failure to notify TAMPA BAY WATER in writing of non-scope services shall be cause to reject payment of said Work.

## 4.0 Time of Payment

The CONSULTANT shall submit invoices to TAMPA BAY WATER by the 20th day of the month for all work accomplished the previous calendar month. If TAMPA BAY WATER fails to make any payment due the CONSULTANT for services and expenses within sixty (60) days after receipt of CONSULTANT's invoice, CONSULTANT may, after giving seven (7) days written notice to TAMPA BAY WATER, suspend services under this Agreement until it has paid in full all amounts due to the CONSULTANT for services and expenses.

Monthly invoices shall include, separately listed, charges for services for which Time and Materials compensation applies, including fees for subconsultant and/or subcontractors and reimbursable expenses and costs. Such invoices shall be submitted by the CONSULTANT as soon as possible after the end of the month in which the work was accomplished.

Work Conducted for the preparation of permit applications will be indicated on invoices as a separate line item. Any other reporting requirements for cooperative funding compliance, such as time sheets, will be included with the invoices.

For each of the work tasks identified in Table B-1, TAMPA BAY WATER will make payments for the services identified in Schedule "A" on the basis of percent complete or on the basis of completing project milestones. The CONSULTANT will provide

TAMPA BAY WATER a monthly Task Summary Report, which will define the work completed and the associated percent complete. Payment of these services will be contingent on these reports and other milestone completions. At the request of Tampa Bay Water, the CONSULTANT will develop a list of milestone activities to assist in gaging the completeness of work performed on the lump sum tasks as related to the monthly CONSULTANT invoices.

## 5.0 Owner's Allowance

The Owner's Allowance is for TAMPA BAY WATER's use, in the sole discretion of TAMPA BAY WATER, for the payment for extra work beyond the budgeted scope of services set forth in Schedule "A". Of this allowance $15,000 is set aside for the payment by the CONSULTANT for the required permit application fees for the project.

## 6.0 Early Completion Incentive Bonus

TAMPA BAY WATER will pay the CONSUTLANT a $25,000 bonus if the Final Design, Bidding Documents, Property Acquisition and Permitting Reports are delivered 30 days early to TAMPA BAY WATER's satisfaction (865 days from the Notice to Proceed/4:30 p.m. EST).

TAMPA BAY WATER will pay the CONSULTANT a $50,000 bonus if the Final Design, Bidding Documents, Property Acquisition and Permitting Reports are delivers 60 days early to TAMPA BAY WATER's satisfaction (835 days from the Notice to Proceed/4:30 p.m. EST).

The early completion incentive bonus will be paid only if the project deliverables are provided to TAMPA BAY WATER by the early completion dates described herein. Said bonus will not be paid if the project deliverables are not completed and delivered to TAMPA BAY WATER by the specified herein dates, regardless of any circumstances including, but not limited to, delays caused by TAMPA BAY WATER or any other third party.

## 7.0 Changed Quantities

At the option of TAMPA BAY WATER, up to 20 percent of the total lineal footage of water transmission main may be added to or deleted from the CONTRACT. Adjustment of the CONSULTANT's Compensation for the changes in lineal footage of water transmission main shall be based on a mutually agreed cost.

## TABLE B-1
## COMPENSATION PLAN

| Task | Task Description | Total | Compensation Plan |
|---|---|---|---|
| 1 | Project Kickoff | $16,473 | Lump Sum |
| 2 | Reservoir Design | $3,124,538 | Lump Sum |
| 3 | Facilities Design | $1,645,208 | Lump Sum |
| 4 | Aquifer Storage & Recovery | $68,185 | Lump Sum |
| 5 | NEPA Compliance | $229,949 | Lump Sum |
| 6 | Federal Funding | $142,575 | Lump Sum |
| 7 | Land Acquisition | | |
| | Acquisition Services | $359,100 | Lump Sum $6,300 per Parcel Based on 57 Parcels |
| | Other Services - Relocation, Suits, etc. | $142,813 | Time and Materials |
| 8 | Public Involvement/Relations | $189,833 | Time and Materials |
| 9 | Technical Support of PI | $105,168 | Time and Materials |
| 10 | Bidding Services | $133,364 | Lump Sum |
| 11 | Status Reports and Reporting, Meetings | $498,017 | Lump Sum |
| | **SUBTOTAL** | **$6,655,223** | |
| 12 | Permitting | $380,275 | Lump Sum |
| | **OWNER's ALLOWANCE** | **$500,000** | Time and Materials |
| | **TOTAL** | **$7,535,498** | |

SCHEDULE "C"

FLORIDA STATUTES CH. 112.061

PER DIEM AND TRAVEL EXPENSES OF
PUBLIC OFFICERS, EMPLOYEES, AND AUTHORIZED PERSONS

state shall diminish or impair the rights of any public employee in any retirement or pension fund or plan which existed at the date of such consolidation or merger and in which the employee was participating, nor shall such consolidation or merger result in any impairment or reduction in benefits or other pension rights accruing to such employee.

History.—s. 1, ch. 72-210.

**112.061  Per diem and travel expenses of public officers, employees, and authorized persons.—**

(1)  LEGISLATIVE INTENT.—There are inequities, conflicts, inconsistencies, and lapses in the numerous laws regulating or attempting to regulate travel expenses of public officers, employees, and authorized persons in the state. It is the intent of the Legislature:

(a)  To remedy same and to establish uniform maximum rates, and limitations, with certain justifiable exceptions, applicable to all public officers, employees, and authorized persons whose travel expenses are paid by a public agency.

(b)  To preserve the standardization and uniformity established by this law:

1.  The provisions of this section shall prevail over any conflicting provisions in a general law, present or future, to the extent of the conflict; but if any such general law contains a specific exemption from this section, including a specific reference to this section, such general law shall prevail, but only to the extent of the exemption.

2.  The provisions of any special or local law, present or future, shall prevail over any conflicting provisions in this section, but only to the extent of the conflict.

(2)  DEFINITIONS.—For the purposes of this section, the following words shall have the meanings indicated:

(a)  Agency or public agency—Any office, department, agency, division, subdivision, political subdivision, board, bureau, commission, authority, district, public body, body politic, county, city, town, village, municipality, or any other separate unit of government created pursuant to law.

(b)  Agency head or head of the agency—The highest policymaking authority of a public agency, as herein defined.

(c)  Officer or public officer—An individual who in the performance of his or her official duties is vested by law with sovereign powers of government and who is either elected by the people, or commissioned by the Governor and has jurisdiction extending throughout the state, or any person lawfully serving instead of either of the foregoing two classes of individuals as initial designee or successor.

(d)  Employee or public employee—An individual, whether commissioned or not, other than an officer or authorized person as defined herein, who is filling a regular or full-time authorized position and is responsible to an agency head.

(e)  Authorized person—

1.  A person other than a public officer or employee as defined herein, whether elected or commissioned or not, who is authorized by an agency head to incur travel expenses in the performance of official duties.

2.  A person who is called upon by an agency to contribute time and services as consultant or adviser.

3.  A person who is a candidate for an executive or professional position.

(f)  Traveler—A public officer, public employee, or authorized person, when performing authorized travel.

(g)  Travel expense, traveling expenses, necessary expenses while traveling, actual expenses while traveling, or words of similar nature—The usual ordinary and incidental expenditures necessarily incurred by a traveler.

(h)  Common carrier—Train, bus, commercial airline operating scheduled flights, or rental cars of an established rental car firm.

(i)  Travel day—A period of 24 hours consisting of four quarters of 6 hours each.

(j)  Travel period—A period of time between the time of departure and time of return.

(k)  Class A travel—Continuous travel of 24 hours or more away from official headquarters.

(l)  Class B travel—Continuous travel of less than 24 hours which involves overnight absence from official headquarters.

(m)  Class C travel—Travel for short or day trips where the traveler is not away from his or her official headquarters overnight.

(n)  Foreign travel—Travel outside the United States.

(3)  AUTHORITY TO INCUR TRAVEL EXPENSES.

(a)  All travel must be authorized and approved by the head of the agency, or his or her designated representative, from whose funds the traveler is paid. The head of the agency shall not authorize or approve such a request unless it is accompanied by a signed statement by the traveler's supervisor stating that such travel is on the official business of the state and also stating the purpose of such travel.

(b)  Travel expenses of travelers shall be limited to those expenses necessarily incurred by them in the performance of a public purpose authorized by law to be performed by the agency and must be within the limitations prescribed by this section.

(c)  Travel by public officers or employees serving temporarily in behalf of another agency or partly in behalf of more than one agency at the same time, or authorized persons who are called upon to contribute time and services as consultants or advisers, may be authorized by the agency head. Complete explanation and justification must be shown on the travel expense voucher or attached thereto.

(d)  Travel expenses of public employees for the sole purpose of taking merit system or other job placement examinations, written or oral, shall not be allowed under any circumstances, except that upon prior written approval of the agency head, candidates for executive or professional positions may be allowed travel expenses pursuant to this section.

(e)  The agency head, or a designated representative, may pay by advancement or reimbursement, or a combination thereof, the costs of per diem of travelers and authorized persons for foreign travel at the current rates as specified in the federal publication "Standardized Regulations (Government Civilians, Foreign

Areas)" and incidental expenses as provided in this section.

(f)   A traveler who becomes sick or injured while away from his or her official headquarters and is therefore unable to perform the official business of the agency may continue to receive subsistence as provided in subsection (6) during this period of illness or injury until such time as he or she is able to perform the official business of the agency or returns to his or her official headquarters, whichever is earlier. Such subsistence may be paid when approved by the agency head.

(g)   The secretary of the ¹Department of Health and Rehabilitative Services or a designee may authorize travel expenses incidental to the rendering of medical services for and on behalf of clients of the ¹Department of Health and Rehabilitative Services. The ¹Department of Health and Rehabilitative Services may establish rates lower than the maximum provided in this section for these travel expenses.

(4)   OFFICIAL HEADQUARTERS.—The official headquarters of an officer or employee assigned to an office shall be the city or town in which the office is located except that:

(a)   The official headquarters of a person located in the field shall be the city or town nearest to the area where the majority of the person's work is performed, or such other city, town, or area as may be designated by the agency head provided that in all cases such designation must be in the best interests of the agency and not for the convenience of the person.

(b)   When any state employee is stationed in any city or town for a period of over 30 continuous workdays, such city or town shall be deemed to be the employee's official headquarters, and he or she shall not be allowed per diem or subsistence, as provided in this section, after the said period of 30 continuous workdays has elapsed, unless this period of time is extended by the express approval of the agency head.

(c)   A traveler may leave his or her assigned post to return home overnight, over a weekend, or during a holiday, but any time lost from regular duties shall be taken as annual leave and authorized in the usual manner. The traveler shall not be reimbursed for travel expenses in excess of the established rate for per diem allowable had he or she remained at his or her assigned post. However, when a traveler has been temporarily assigned away from his or her official headquarters for an approved period extending beyond 30 days, he or she shall be entitled to reimbursement for travel expenses at the established rate of one round trip for each 30-day period actually taken to his or her home in addition to pay and allowances otherwise provided.

(5)   COMPUTATION OF TRAVEL TIME FOR REIMBURSEMENT.—For purposes of reimbursement and methods of calculating fractional days of travel, the following principles are prescribed:

(a)   The travel day for Class A travel shall be a calendar day (midnight to midnight). The travel day for Class B travel shall begin at the same time as the travel period. For Class A and Class B travel, the traveler shall be reimbursed one-fourth of the authorized rate of per diem for each quarter, or fraction thereof, of the travel day included within the travel period. Class A and Class B travel shall include any assignment on official business outside of regular office hours and away from regular places of employment when it is considered reasonable and necessary to stay overnight and for which travel expenses are approved.

(b)   A traveler shall not be reimbursed on a per diem basis for Class C travel, but shall receive subsistence as provided in this section, which allowance for meals shall be based on the following schedule:

1.   Breakfast—When travel begins before 6 a.m. and extends beyond 8 a.m.

2.   Lunch—When travel begins before 12 noon and extends beyond 2 p.m.

3.   Dinner—When travel begins before 6 p.m. and extends beyond 8 p.m., or when travel occurs during nighttime hours due to special assignment.

No allowance shall be made for meals when travel is confined to the city or town of the official headquarters or immediate vicinity; except assignments of official business outside the traveler's regular place of employment if travel expenses are approved. The Comptroller shall establish a schedule for processing Class C travel subsistence payments at least on a monthly basis.

(6)   RATES OF PER DIEM AND SUBSISTENCE ALLOWANCE.—For purposes of reimbursement rates and methods of calculation, per diem and subsistence allowances are divided into the following groups and rates:

(a)   All travelers shall be allowed for subsistence when traveling to a convention or conference or when traveling within or outside the state in order to conduct bona fide state business, which convention, conference, or business serves a direct and lawful public purpose with relation to the public agency served by the person attending such meeting or conducting such business, either of the following for each day of such travel at the option of the traveler:

1.   Fifty dollars per diem; or

2.   If actual expenses exceed $50, the amounts permitted in paragraph (b) for meals, plus actual expenses for lodging at a single-occupancy rate to be substantiated by paid bills therefor.

When lodging or meals are provided at a state institution, the traveler shall be reimbursed only for the actual expenses of such lodging or meals, not to exceed the maximum provided for in this subsection.

(b)   All travelers shall be allowed the following amounts for subsistence while on Class C travel on official business as provided in paragraph (5)(b):

1.   Breakfast ......................................................$3
2.   Lunch ...........................................................$6
3.   Dinner...........................................................$12

(c)   No one, whether traveling out of state or in state, shall be reimbursed for any meal or lodging included in a convention or conference registration fee paid by the state.

(7)   TRANSPORTATION.—

(a)   All travel must be by a usually traveled route. In case a person travels by an indirect route for his or her own convenience, any extra costs shall be borne by the

traveler; and reimbursement for expenses shall be based only on such charges as would have been incurred by a usually traveled route. The agency head shall designate the most economical method of travel for each trip, keeping in mind the following conditions:

1. The nature of the business.

2. The most efficient and economical means of travel (considering time of the traveler, impact on the productivity of the traveler, cost of transportation, and per diem or subsistence required). When it is more efficient and economical to either the traveler or the agency head, jet service offered by any airline, whether on state contract or not, may be used when the cost is within an approved threshold determined by the agency head.

3. The number of persons making the trip and the amount of equipment or material to be transported.

(b) The Department of Banking and Finance may provide any form it deems necessary to cover travel requests for traveling on official business and when paid by the state.

(c) Transportation by common carrier when traveling on official business and paid for personally by the traveler, shall be substantiated by a receipt therefor. Federal tax shall not be reimbursable to the traveler unless the state and other public agencies are also required by federal law to pay such tax. In the event transportation other than the most economical class as approved by the agency head is provided by a common carrier on a flight check or credit card, the charges in excess of the most economical class shall be refunded by the traveler to the agency charged with the transportation provided in this manner.

(d)1. The use of privately owned vehicles for official travel in lieu of publicly owned vehicles or common carriers may be authorized by the agency head. Whenever travel is by privately owned vehicle, the traveler shall be entitled to a mileage allowance at a fixed rate of 25 cents per mile for state fiscal year 1994-1995 and 29 cents per mile thereafter or the common carrier fare for such travel, as determined by the agency head. Reimbursement for expenditures related to the operation, maintenance, and ownership of a vehicle shall not be allowed when privately owned vehicles are used on public business and reimbursement is made pursuant to this paragraph, except as provided in subsection (8).

2. All mileage shall be shown from point of origin to point of destination and, when possible, shall be computed on the basis of the current map of the Department of Transportation. Vicinity mileage necessary for the conduct of official business is allowable but must be shown as a separate item on the expense voucher.

(e) Transportation by chartered vehicles when traveling on official business may be authorized by the agency head when necessary or where it is to the advantage of the agency, provided the cost of such transportation does not exceed the cost of transportation by privately owned vehicle pursuant to paragraph (d).

(f) The agency head may grant monthly allowances in fixed amounts for use of privately owned automobiles on official business in lieu of the mileage rate provided in paragraph (d). Allowances granted pursuant to this paragraph shall be reasonable, taking into account the customary use of the automobile, the roads customarily traveled, and whether any of the expenses incident to the operation, maintenance, and ownership of the automobile are paid from funds of the agency or other public funds. Such allowance may be changed at any time, and shall be made on the basis of a signed statement of the traveler, filed before the allowance is granted or changed, and at least annually thereafter. The statement shall show the places and distances for an average typical month's travel on official business, and the amount that would be allowed under the approved rate per mile for the travel shown in the statement, if payment had been made pursuant to paragraph (d).

(g) No contract may be entered into between a public officer or employee, or any other person, and a public agency, in which a depreciation allowance is used in computing the amount due by the agency to the individual for the use of a privately owned vehicle on official business; provided, any such existing contract shall not be impaired.

(h) No traveler shall be allowed either mileage or transportation expense when gratuitously transported by another person or when transported by another traveler who is entitled to mileage or transportation expense. However, a traveler on a private aircraft shall be reimbursed the actual amount charged and paid for the fare for such transportation up to the cost of a commercial airline ticket for the same flight, even though the owner or pilot of such aircraft is also entitled to transportation expense for the same flight under this subsection.

(8) OTHER EXPENSES.—

(a) The following incidental travel expenses of the traveler may be reimbursed:

1. Taxi fare.

2. Ferry fares; and bridge, road, and tunnel tolls.

3. Storage or parking fees.

4. Communication expense.

5. Convention registration fee while attending a convention or conference which will serve a direct public purpose with relation to the public agency served by the person attending such meetings. A traveler may be reimbursed the actual and necessary fees for attending events which are not included in a basic registration fee that directly enhance the public purpose of the participation of the agency in the conference. Such expenses may include, but not be limited to, banquets and other meal functions. It shall be the responsibility of the traveler to substantiate that the charges were proper and necessary. However, any meals or lodging included in the registration fee will be deducted in accordance with the allowances provided in subsection (6).

(b) Other expenses which are not specifically authorized by this section may be approved by the Department of Banking and Finance pursuant to rules adopted by it. Expenses approved pursuant to this paragraph shall be reported by the Department of Banking and Finance to the Auditor General annually.

(9) RULES AND REGULATIONS.—

(a) The Department of Banking and Finance shall promulgate such rules and regulations, including, but not limited to, the general criteria to be used by a state agency to predetermine justification for attendance by state officers and employees and authorized persons at conventions and conferences, and prescribe such forms as may be necessary to effectuate the purposes of this section. The department may also adopt rules prescribing the proper disposition and use of promotional items and rebates offered by common carriers and other entities in connection with travel at public expense; however, before adopting such rules, the department shall consult with the appropriation committees of the Legislature.

(b) Each state agency shall promulgate such additional specific rules and regulations and specific criteria to be used by it to predetermine justification for attendance by state officers and employees and authorized persons at conventions and conferences, not in conflict with the rules and regulations of the Department of Banking and Finance or with the general criteria to be used by a state agency to predetermine justification for attendance by state officers and employees and authorized persons at conventions, as may be necessary to effectuate the purposes of this section.

(10) FRAUDULENT CLAIMS.—Claims submitted pursuant to this section shall not be required to be sworn to before a notary public or other officer authorized to administer oaths, but any claim authorized or required to be made under any provision of this section shall contain a statement that the expenses were actually incurred by the traveler as necessary travel expenses in the performance of official duties and shall be verified by a written declaration that it is true and correct as to every material matter; and any person who willfully makes and subscribes any such claim which he or she does not believe to be true and correct as to every material matter, or who willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under the provisions of this section of a claim which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such claim, is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083. Whoever shall receive an allowance or reimbursement by means of a false claim shall be civilly liable in the amount of the overpayment for the reimbursement of the public fund from which the claim was paid.

(11) TRAVEL AUTHORIZATION AND VOUCHER FORMS.—

(a) *Authorization forms.*—The Department of Banking and Finance shall furnish a uniform travel authorization request form which shall be used by all state officers and employees and authorized persons when requesting approval for the performance of travel to a convention or conference. The form shall include, but not be limited to, provision for the name of each traveler, purpose of travel, period of travel, estimated cost to the state, and a statement of benefits accruing to the state by virtue of such travel. A copy of the program or agenda of the convention or conference, itemizing registration fees and any meals or lodging included in the registration fee, shall be attached to, and filed with, the copy of the travel authorization request form on file with the agency. The form shall be signed by the traveler and by the traveler's supervisor stating that the travel is to be incurred in connection with official business of the state. The head of the agency or his or her designated representative shall not authorize or approve such request in the absence of the appropriate signatures. A copy of the travel authorization form shall be attached to, and become a part of, the support of the agency's copy of the travel voucher.

(b) *Voucher forms.*—

1. The Department of Banking and Finance shall furnish a uniform travel voucher form which shall be used by all state officers and employees and authorized persons when submitting travel expense statements for approval and payment. No travel expense statement shall be approved for payment by the Comptroller unless made on the form prescribed and furnished by the department. The travel voucher form shall provide for, among other things, the purpose of the official travel and a certification or affirmation, to be signed by the traveler, indicating the truth and correctness of the claim in every material matter, that the travel expenses were actually incurred by the traveler as necessary in the performance of official duties, that per diem claimed has been appropriately reduced for any meals or lodging included in the convention or conference registration fees claimed by the traveler, and that the voucher conforms in every respect with the requirements of this section. The original copy of the executed uniform travel authorization request form shall be attached to the uniform travel voucher on file with the respective agency.

2. Statements for travel expenses incidental to the rendering of medical services for and on behalf of clients of the ¹Department of Health and Rehabilitative Services shall be on forms approved by the Department of Banking and Finance.

(12) ADVANCEMENTS.—Notwithstanding any of the foregoing restrictions and limitations, an agency head may make, or authorize the making of, advances to cover anticipated costs of travel to travelers. Such advancements may include the costs of subsistence and travel of any person transported in the care or custody of the traveler in the performance of his or her duties.

(13) DIRECT PAYMENT OF EXPENSES BY AGENCY.—Whenever an agency requires an employee to incur either Class A or Class B travel on emergency notice to the traveler, such traveler may request the agency to pay his or her expenses for meals and lodging directly to the vendor, and the agency may pay the vendor the actual expenses for meals and lodging during the travel period, limited to an amount not to exceed that authorized pursuant to this section. In emergency situations, the agency head may authorize an increase in the amount paid for a specific meal, provided that the total daily cost of meals does not exceed the total amount authorized for meals each

day. The agency head or his or her designee may also grant prior approval for a state agency to make direct payments of travel expenses in other situations that result in cost savings to the state, and such cost savings shall be documented in the voucher submitted to the Comptroller for the direct payment of travel expenses. The provisions of this subsection shall not be deemed to apply to any legislator or to any employee of either house of the Legislature or to the Joint Legislative Management Committee.

History.—ss. 1, 3, ch. 22830, 1945; ss. 1, 2, 3, ch. 23892, 1947; ss. 1, 3, ch. 25040, 1949; ss. 1, 3, ch. 26910, 1951; s. 1, ch. 28303, 1953; s. 1, ch. 29628, 1955; s. 1, ch. 57-230; s. 1, ch. 61-183; s. 1, ch. 63-5; s. 1, ch. 63-192; s. 1, ch. 63-122; s. 1, ch. 63-400; ss. 2, 3, ch. 67-371; ss. 1, 2, ch. 67-2206; s. 1, ch. 69-193; s. 1, ch. 69-381; ss. 12, 23, 31, 35, ch. 69-106; s. 65, ch. 71-136; s. 1, ch. 72-213; s. 1, ch. 72-217; s. 1, ch. 72-324; s. 26, ch. 72-404; s. 1, ch. 73-169; s. 1, ch. 74-15; s. 1, ch. 74-246; s. 1, ch. 74-365; ss. 1, 2, ch. 75-33; s. 1, ch. 76-166; s. 2, ch. 76-208; ss. 1, 2, ch. 76-250; s. 1, ch. 77-174; s. 1, ch. 77-231; ss. 1, 2, ch. 77-437; s. 2, ch. 78-95; s. 51, ch. 79-190; s. 1, ch. 79-205; s. 1, ch. 79-303; s. 1, ch. 79-412; ss. 1, 2, ch. 81-207; ss. 1, 2, ch. 83-307; s. 1, ch. 85-140; s. 1, ch. 87-407; s. 4, ch. 88-235; s. 12, ch. 89-291; s. 18, ch. 91-45; s. 1, ch. 94-139; s. 1403, ch. 95-147; s. 26, ch. 95-312; s. 5, ch. 96-310; s. 43, ch. 96-399.

¹Note.—The Department of Health and Rehabilitative Services was redesignated as the Department of Children and Family Services by s. 5, ch. 96-403, and the Department of Health was created by s. 8, ch. 96-403.

**112.062  Cabinet members; educational and informational travel expenses.**—When he or she deems it necessary in order to carry out an official function of office, a member of the Cabinet may incur and be reimbursed for travel expenses pursuant to s. 112.061 for the purpose of educating and informing the public as to the Cabinet member's official duties.

History.—s. 1, ch. 80-212; s. 685, ch. 95-147.

**112.063  Reimbursement of county employees for educational expenses.**—County constitutional officers and county commissioners are authorized to reimburse employees for educational expenses, subject to the following conditions:

(1) The coursework must be designed to enhance the knowledge, skills, and abilities relating to official duties which the employees perform.

(2) The reimbursement of educational expenses in no way obligates the officer or commissioner to grant time off or leave for the taking or completion of such course or program of instruction.

(3) An employee shall not be permitted to utilize any space, personnel, equipment, or supplies of the office by which he or she is employed in the process of fulfilling any of the requirements imposed by the coursework for which he or she is being reimbursed.

(4) The limitations contained in subsections (1)-(3) shall not be construed to apply to any courses offered by or as a part of an educational program sponsored by any state agency for which the constitutional officer or commissioner is obligated to perform duties prescribed by law, or any educational program conducted in furtherance of s. 195.002, if such limitations did not exist prior to July 1, 1990.

Nothing in this section shall be construed as prohibiting employees from receiving otherwise authorized per diem expenses provided for by s. 112.061, nor shall it be construed as prohibiting the payment of wages otherwise due under the provisions of state or federal law.

History.—s. 1, ch. 90-80; s. 686, ch. 95-147.

**112.08  Group insurance for public officers, employees, and certain volunteers; physical examinations.**—

(1) As used in this section, the term "local governmental unit" means any county, municipality, community college district, school board, or special district or any county officer listed in s. 1(d), Art. VIII of the State Constitution.

(2)(a) Every local governmental unit is authorized to provide and pay out of its available funds for all or part of the premium for life, health, accident, hospitalization, legal expense, or annuity insurance, or all or any kinds of such insurance, for the officers and employees of the local governmental unit and for health, accident, hospitalization, and legal expense insurance for the dependents of such officers and employees upon a group insurance plan and, to that end, to enter into contracts with insurance companies or professional administrators to provide such insurance. Before entering any contract for insurance, the local governmental unit shall advertise for competitive bids; and such contract shall be let upon the basis of such bids. However, the local governmental unit may undertake simultaneous negotiations with those companies which have submitted reasonable and timely bids and are found by the local governmental unit to be fully qualified and capable of meeting all servicing requirements. Each local governmental unit may self-insure any plan for health, accident, and hospitalization coverage or enter into a risk management consortium to provide such coverage, subject to approval based on actuarial soundness by the Department of Insurance; and each shall contract with an insurance company or professional administrator qualified and approved by the Department of Insurance to administer such a plan.

(b) In order to obtain approval from the Department of Insurance of any self-insured plan for health, accident, and hospitalization coverage, each local governmental unit or consortium shall submit its plan along with a certification as to the actuarial soundness of the plan, which certification is prepared by an actuary who is a member of the Society of Actuaries or the American Academy of Actuaries. The Department of Insurance shall not approve the plan unless it determines that the plan is designed to provide sufficient revenues to pay current and future liabilities, as determined according to generally accepted actuarial principles. After implementation of an approved plan, each local governmental unit or consortium shall annually submit to the Department of Insurance a report which includes a statement prepared by an actuary who is a member of the Society of Actuaries or the American Academy of Actuaries as to the actuarial soundness of the plan. The report is due 90 days after the close of the fiscal year of the plan. The report shall consist of, but is not limited to:

1. The adequacy of contribution rates in meeting the level of benefits provided and the changes, if any, needed in the contribution rates to achieve or preserve a level of funding deemed adequate to enable payment of the benefit amounts provided under the plan and a valuation of present assets, based on statement value, and prospective assets and liabilities of the plan and the extent of any unfunded accrued liabilities.

SCHEDULE "D"

PROJECT SCHEDULE

**Activity Description**

RESERVOIR DESIGN
Surveying of Reservoir Sites
Geotechnical Investigation
Embankment Design
Preliminary Embankment Design
30% Embankment Design Submittal
30% Embankment Review
60% Embankment Design Submittal
60% Embankment Review
90% Embankment Design Submittal
90% Embankment Review
Final Embankment Design
Embankment Specifications
Submit 100% Embankment Specs & Plans
Water Quality Analysis
Civil Site Design
Berm Failure Analysis
FACILITIES DESIGN
Reservoir Appurtenant Structures Design
30% Reservoir Structures Submittal
30% Reservoir Structures Review
60% Reservoir Structures Submittal
60% Reservoir Structures Review
90% Reservoir Structures Submittal
90% Reservoir Structures Review
Submit 100% Res Struct Specs & Plans
Water Quality Pump Station Design
30% Pump Station Submittal
30% Pump Station Review
60% Pump Station Submittal
60% Pump Station Review
90% Pump Station Submittal
90% Pump Station Review
Submit 100% Pump Station Specs & Plans
Pipline Design
Acquire Data

HDR Engineering, Inc.

Tampa Bay Regional Reservoir

© Primavera Systems, Inc.

| Activity Description | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|

Develop Design Parameters

Establish Permit Requirements

Identify Property Requirements

Preliminary Cost Estimate

Hydraulics / Corrosion

Design Survey & Aerials

Geotechnical Services

Pipeline Plans & Specifications

Pipeline Permit Preparation

Submit Pipeline Permit

Response to Comments

Obtain Pipeline Permit

Construction Cost Estimate

Submit 100% Pipeline Specs & Plans

Review of Design - Build Option

ERP/ACOE/HEPC PERMITTING

Set Jurisdictional Limits

Agency Coordination (Pre-App & Field Review)

Survey

Develop Permit Application

Develop Mitigation Plan

Submit App. after 60% Design

Client Review Permit App.

Agency Review of Permit

Respond to Comments

Agency Review of Permit

Obtain Permit

Other Local Permits

LAND ACQUISITION

Title Searches

Prepare Appraisal Data Book

Perform Appraisals

Appraisal Review ( by TBW)

Approved Values (by TBW)

Initiation of Negotiations

On-Going Negotiation w/ Owners

HDR Engineering, Inc.

Tampa Bay Regional Reservoir

© Primavera Systems, Inc.

Activity Description
1999
2000
2001
2002
2003
2004
2005
Relocation Services
Appraisal Updates
Title Updates
Closing Services
Property Mgmt Services
First Order of Taking
Suit Preparation
Legal Support
File Retirement
TBW Possession of Parcels
BIDDING & CONSTRUCTION SERVICES
Request for Qualifications
Review of Contractors & Qualifications
Prepare Bid Package
Advertise for Bids
Select & Award Contract
Construction Administration & Inspection
NEPA COMPLIANCE
FUNDING
Planning Document Assistance
Pre-Bid Requirements
Grant Administration Services
Other Agency Funding
PUBLIC RELATIONS/INVOLVEMENT
Public Meetings
Project Newsletter
Public Meeting
Project Newsletter
Public Meeting
Public Meeting
Project Newsletter
Public Meeting
Project Newsletter
Public Meeting
Public Meeting
Project Newsletter
Project Start 16DEC00
Project Finish 29DEC04
Data Date 15DEC00
Run Date 12NOV08
Early Bar
Progress Bar
Critical Activity
© Primavera Systems, Inc.
HDR Engineering, Inc.
Tampa Bay Regional Reservoir

| Activity Description | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|
| Public Meeting | | | | | | | |
| Project Newsletter | | | | | | | |
| CONSTRUCTION PUBLIC RELATIONS | | | | | | | |
| BEGIN WATER PRODUCTION | | | | | | | |

BEGIN WATER PRODUCTION

Public Meeting

Project Newsletter

CONSTRUCTION PUBLIC RELATIONS

HDR Engineering, Inc.

Tampa Bay Regional Reservoir

Project Start    15DEC89
Project Finish   29DEC24
Data Date        15DEC89
Run Date         12NOV96

© Primavera Systems, Inc.

Early Bar
Progress Bar
Critical Activity

Sheet 4 of 4

SCHEDULE "E"

CERTIFICATE OF INSURANCE FORM

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

06/01/99

| | DATE (MM/DD/YY) |
|---|---|
| | 11/05/98 |

| PRODUCER | 71 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|---|

Lockton Companies
P.O. Box 419351
Kansas City  Mo 64141-6351
(913) 676-9000

| | INSURERS AFFORDING COVERAGE |
|---|---|

| INSURED  13135  HDR ENGINEERING, INC. | |
|---|---|
| ATTN: LOUIS J. PACHMAN | |
| 8404 INDIAN HILLS DRIVE | |
| OMAHA, NE  68114-4049 | |

| INSURER A: | ZURICH INSURANCE COMPANY |
|---|---|
| INSURER B: | AMERICAN GUARANTEE & LIAB (ZURICH) |
| INSURER C: | HARTFORD FIRE INSURANCE COMPANY |
| INSURER D: | CONTINENTAL CAS.(V.O. SCHINNERER) |
| INSURER E: | |

## COVERAGES                              23A

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY | | | | EACH OCCURRENCE | $ 1,000,000 |
| | X  COMMERCIAL GENERAL LIABILITY | CPO802204404 | 06/01/98 | 06/01/99 | FIRE DAMAGE (Any one fire) | $ 1,000,000 |
| | CLAIMS MADE  X  OCCUR | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | GENERAL AGGREGATE | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | POLICY  PRO-JECT  LOC | | | | | |
| B | AUTOMOBILE LIABILITY | BAP229252701 | 06/01/98 | 06/01/99 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | X  ANY AUTO | BAP802204504 | | | | |
| | ALL OWNED AUTOS | TAP802460704 | | | BODILY INJURY (Per person) | $ XXXXXXXXXX |
| | SCHEDULED AUTOS | | | | | |
| | X  HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ XXXXXXXXXX |
| | X  NON-OWNED AUTOS | | | | | |
| | | | | | PROPERTY DAMAGE (Per accident) | $ XXXXXXXXXX |
| | GARAGE LIABILITY | NOT APPLICABLE | | | AUTO ONLY - EA ACCIDENT | $ |
| | ANY AUTO | | | | OTHER THAN  EA ACC AUTO ONLY:  AGG | $ |
| | | | | | | $ |
| | EXCESS LIABILITY | NOT APPLICABLE | | | EACH OCCURRENCE | $ XXXXXXXXXX |
| | OCCUR  CLAIMS MADE | | | | AGGREGATE | $ XXXXXXXXXX |
| | | | | | | $ |
| | DEDUCTIBLE | | | | | $ |
| | RETENTION  $ | | | | | $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | 37WBRMX9752 | 06/01/98 | 06/01/99 | X  WC STATU-TORY LIMITS  OTH-ER | |
| | | | | | E.L. EACH ACCIDENT | $ 100,000 |
| | | | | | E.L. DISEASE - EA EMPLOYEE | $ 100,000 |
| | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| D | OTHER  ARCHS & ENGS PROFESSIONAL LIABILITY | PLN113978408 | 06/01/98 | 06/01/99 | PER CLAIM: $5,000,000. AGG: $5,000,000. | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS

TAMPA BAY WATER, ITS DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, AGENTS AND VOLUNTEERS
ARE ADDITIONAL INSUREDS AS RESPECTS GENERAL LIABILITY AND AUTOMOBILE LIABILITY.

| CERTIFICATE HOLDER | ADDITIONAL INSURED; INSURER LETTER: | CANCELLATION |
|---|---|---|

339804
TAMPA BAY WATER
ATTN:  AMANDA RICE
2535 LANDMARK DRIVE
SUITE 211
CLEARWATER  FL  33761-3930

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL XXXXXXXXXX MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, XXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXX

AUTHORIZED REPRESENTATIVE

ACORD 25-S (7/97)

© ACORD CORPORATION 1988

Amendment #1



Contract No. 99-19

**FIRST AMENDMENT**
**TO THE**
**TAMPA BAY REGIONAL RESERVOIR PROJECT**
**AGREEMENT FOR PROFESSIONAL ENGINEERING SERVICES**
**CONTRACT NO.: 99-19**

This First Amendment to the Tampa Bay Regional Reservoir Project Agreement for Professional Engineering Services is made in Clearwater, Florida on this *28th* day of *February*, 2000, by and between TAMPA BAY WATER, A Regional Water Supply Authority, a public body of the State of Florida (TAMPA BAY WATER), and HDR Engineering, Inc. (hereinafter referred to as "CONSULTANT"), a corporation doing business in the State of Florida.

### *WITNESSETH:*

WHEREAS, on November 11, 1998, TAMPA BAY WATER and CONSULTANT entered into an Agreement for Professional Services   under Agreement Contract Number 99-19 (the "AGREEMENT"); and,

WHEREAS, TAMPA BAY WATER and CONSULTANT desire to amend the scope of service, project compensation and delivery schedule included in the AGREEMENT.

NOW THEREFORE, in consideration of the premises set forth hereinabove, and the mutual promises hereinafter set forth, the sufficiency and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     The Scope of Services attached hereto as Exhibit A-1 is approved and incorporated herein as an addition to the Scope of Services attached to the AGREEMENT.

2.     The Schedule of Project Compensation, attached hereto as Table B-1 is approved and incorporated herein and increases the total project compensation attached to the AGREEMENT by an additional $4,272,913.00.

3.     All other provisions of the AGREEMENT shall remain in full force and effect.

**IN WITNESS WHEREOF,** the parties hereto have caused these presents to be executed by their duly qualified representatives on the day and year first written above.

(Seal)

Attest:

_Secretary_

TAMPA BAY WATER, A REGIONAL
WATER SUPPLY AUTHORITY

By: _____
                    Chairman

DAVID J. FISCHER
_____
                Print or Type Name

Date: _____4-4-00_____

APPROVED AS TO FORM:

By: _____
              Office of General Counsel

DONALD D. CONN
_____
                Print or Type Name

Witness:

_____
                    Signature
C. EDWIN COPELAND Jr.
_____
                Print or Type Name

_____
                    Signature
Jodie M. Mutchler
_____
                Print or Type Name

"CONSULTANT"

By _____
                    Signature
William H. Wadsworth
_____
                Print or Type Name
Sr. Vice President
_____
                        Title

Date: _____3-13-00_____

# EXHIBIT A-1

**TAMPA BAY REGIONAL RESERVOIR**
**HDR Engineering, Inc.**
**Amendment No. 1**

Attached is the revised scope of services for the Tampa Bay Regional Reservoir project to reflect the addition of construction phase services and reduction of the current scope as related to the preparation of an Environmental Impact Statement (EIS) for the Environmental Protection Agency (EPA).

The construction phase services for both the Tampa Bay Regional Reservoir and its associated pipeline have been added to HDR's scope of services as Task 13. The addition of these services to the scope will be provided in late 2001 through 2005. The budget for this task is $3,998,000, which includes a $100,000 for Owner's Allowance. The attached table presents this budget along with the other budget changes discussed below.

As a result of the addition of Task 13, Task 10 will be renamed to Procurement Options and all of the subtasks, except for Task 10.1, will be removed from this task. Task 10 will only include the evaluation of procurement options for the design and construction of the reservoir and its pipeline. The budget for this task will be reduced from $133,364 to $35,000. The remainder of the original budget will be transferred to the Owner's Allowance for this project.

Due to criteria established by the EPA, that requires a independent third party consultant to prepare an EIS for this project, $150,000 of the budget from Task 5 NEPA Compliance will be transferred from HDR's existing contract to contract for a third party consultant, who will prepare the EIS. HDR's role on the EIS will be reduced to that of an advisor. The budget for this task will be reduced to $79,948.91 including the fees billed to date by HDR ($24,501) for the preparation of the Environmental Information Document and initial meetings with the EPA.

The Owner's Allowance for this project will be increased. This change order includes an increase of $425,000 for services through design. This is to account for the additional geotechnical and geophysical investigations required for the reservoir site characterization and to ensure that there is adequate Owner's Allowance for the detailed design of the reservoir and pipeline. In addition, the changes to Task 10 include a reallocation of $98,364 to the Owner's Allowance.

SCHEDULE "A"
Amendment 1

TAMPA BAY REGIONAL RESERVOIR
Revised Scope of Services for Task 5, Task 10 and Task 13
January 10, 2000
HDR Engineering, Inc.
Contract 99-19

## Task 5 – NEPA Compliance

HDR (the CONSULTANT) will assist Tampa Bay Water and its third party consultant in the preparation of an EIS for the Tampa Bay Regional Reservoir. This assistance shall include attending initial meetings with the EPA to establish the scope of the EIS. In addition, the CONSULTANT will provide background information and data to Tampa Bay Water and its third party consultant for preparation of an EIS for the Tampa Bay Regional Reservoir. The CONSULTANT will attend meetings on an as needed basis during the preparation of the EIS. The CONSULTANT will attend these meetings only upon the request of TAMPA BAY WATER

## Task 10 – Delivery Options

In this task, the CONSULTANT will evaluate delivery alternatives for the final design and construction of the Tampa Bay Regional Reservoir. At approximately the time of the 30 percent design of the reservoir, the CONSULTANT will submit to Tampa Bay Water, a report and recommendation of the potential of turning this project into a design build project. This recommendation will be based on the CONSULTANT's experience, industry practices and experiences, and an analysis of potential cost and time savings.

## Task 13 – Construction Phase Services

See Attached Scope

SCHEDULE "A" (con't)
Amendment 1

Scope of Services
Tampa Bay Regional Reservoir
Contract 99-19
HDR Engineering, Inc.
DRAFT
January 8, 2000

Task 13
Services During Construction

Introduction

The development of the Tampa Bay Regional Reservoir, a Master Water Plan Project, will be conducted with three construction contracts. These separate contracts are as follows:

1. Initial Landscaping Package
2. Reservoir Construction
3. Pipeline Construction

The Initial Landscaping Package can be initiated as soon as permitting will allow. This task will be managed by the Construction Manager. The schedule for the remaining contracts is anticipated to occur as follows:

Reservoir
1   Advertise Bid for Reservoir May 28, 2001
2.  Award Bid for Reservoir October 15, 2001
3.  Begin Construction November 14, 2001
4.  Begin Reservoir filling October 1, 2003

Pipeline
1.  Advertise Bid for Pipeline June 12, 2001
2.  Award Bid for Pipeline September 17, 2001
3.  Begin Construction October 17, 2001
4.  Complete Construction February 15, 2003

The estimated level of effort for this scope is based on the assumption that the total construction time will exceed 100 weeks.

It is understood that TAMPA BAY WATER will employ a construction management firm to assist in the implementation of the construction and act as TAMPA WATER BAY WATER's representative. This firm will be defined as the CONSTRUCTION MANAGER throughout this scope. Also, TAMPA BAY WATER will provide or will require the appropriate contractors to provide fully equipped field office space including but not limited to computers, copiers, fax machines and other appropriate equipment for the use of the CONSULTANT.

TAMPA BAY WATER establish a requirement that the construction contractors and subcontractors shall indemnify and provide insurance coverage to the CONSULTANT, its subconsultants, professional associates, and each of their officers and employees to the same

extent as to TAMPA BAY WATER. Furthermore, TAMPA BAY WATER shall provide CONSULTANT with certificates of insurance from each construction contractor or subcontractor.

<div align="center">Tasks</div>

13.1    Pre-Bid Conference/Bid Documents

CONSULTANT shall prepare for and attend four pre-bid conferences and one on-site tour of the reservoir site. The pre-bid meetings will include one meeting for the initial landscape package, one meeting for the pipeline, and up to two meetings for the reservoir construction package. Each pre-bid conference shall be chaired by CONSTRUCTION MANAGER. The CONSULTANT shall assist in the preparation of the bidding documents as related to the technical components of the project. TAMPA BAY WATER shall prepare the front-end documents, which will define the general requirements of the contract. The CONSULTANT shall distribute the bid documents and maintain a log of prospective bidders who have received them. In addition, the CONSULTANT shall receive payments for the contract documents. The CONSULTANT shall respond to one (1) round of questions from the prospective bidders.

13.2    Review of Bids

CONSULTANT shall review bidders' proposals for three construction contracts associated with the reservoir and pipeline for technical requirements only. CONSTRUCTION MANAGER shall receive, tabulate and review proposals for all non-technical issues and shall review qualifications of bidders and manufacturers.

13.3    In-Plant Observation – Pipe (Not budgeted nor authorized at this time)

CONSULTANT shall retain the services of a SUBCONSULTANT experienced in the observation of pipe materials during manufacture of pipe for the Regional Reservoir Transmission Main Project. Pipe may be either steel pipe or prestressed concrete cylinder pipe. The type of pipe and manufacturer are unknown at this time. If TAMPA BAY WATER elects not to have the CONSULTANT perform these services then TAMPA BAY WATER shall retain the services of a Consultant experienced in the observation of pipe materials during manufacture of pipe for the Regional Reservoir Transmission Main Project. Pipe may be either steel pipe or prestressed concrete cylinder pipe. TAMPA BAY WATER will provide to the CONSULTANT all data, reports and other pertinent information related to the in plant observation.

13.4    Review Technical Submittals

CONSULTANT shall review the technical submittals for the construction contracts as listed in the attached table: The review of these submittals shall be limited to the review of one (1) original submittal and the review of one (1) revised submittal. CONSULTANT shall not be required to review more than one submittal for more than 50 percent of the items without authorization for additional compensation. Additional reviews of any submittal shall be considered additional services. CONSTRUCTION MANAGER shall

be responsible to review submittals of progress schedules, payments, change orders, and any other submittal not specifically listed below.

CONSULTANT shall review the following technical submittals for the construction contracts:

<u>Reservoir and Pumping Station</u>

| SECTION NUMBER | SECTION TITLE |
|---|---|
| 01800 | Openings And Penetrations In Construction |
| | |
| 02120 | Test Borings |
| 02130 | Monitoring Wells |
| 02200 | Earthwork |
| 02221 | Trenching, Backfilling, And Compacting For Utilities |
| 02260 | Topsoiling And Finished Grading |
| 02270 | Soil Erosion And Sediment Control |
| 02271 | Stone Revetment (Rip Rap) |
| 02423 | Storm Drainage System |
| 02441 | Irrigation System |
| 02444 | Chain Link Fence And Gates |
| 02512 | Foundation Drain System |
| 02513 | Asphaltic Concrete Vehicular Paving |
| 02528 | Concrete Curb And Gutter |
| 02529 | Concrete Sidewalk And Steps |
| 02580 | Gravel Pack Wells |
| 02778 | Geotextiles |
| 02779 | Soil Cement |
| 02930 | Seeding, Sodding And Landscaping |
| | Slurry Walls |
| | |
| 03108 | Formwork |
| 03208 | Reinforcement |
| 03308 | Concrete, Materials And Proportioning |
| 03311 | Concrete Mixing, Placing, Jointing, And Curing |
| 03348 | Concrete Finishing And Repair Of Surface Defects |
| 03350 | Testing |
| 03431 | Precast And Prestressed Concrete |
| | |
| | |
| 05505 | Metal Fabrications |
| 05522 | Aluminum Railings |
| | |
| 07190 | Under Slab Vapor Barrier |
| 07210 | Building Insulation |

3

| | |
|---|---|
| 08110 | Metal Doors And Frames |
| 08305 | Access Doors |
| 08363 | Overhead Door (Insulated – Sectional Steel) |
| | |
| | |
| 09110 | Non-Load-Bearing Wall Framing Systems |
| 09130 | Acoustic Suspension System |
| 09512 | Acoustical Materials |
| 09520 | Metal Acoustical Wall And Ceiling Panels |
| 09660 | Vinyl Composition Tile Flooring And Resilient Base |
| 09680 | Carpet |
| 09905 | Painting And Protective Coatings |
| | |
| | |
| 10100 | Liquid Chalkboard And Tackboards |
| 10200 | Louvers And Vents |
| 10400 | Identification, Stenciling, And Tagging Systems |
| 10444 | Signage |
| 10800 | Toilet And Bath Accessories |
| | |
| | |
| 11005 | Equipment:  Basic Requirements |
| 11073 | Pumping Equipment:  Propeller |
| | |
| 13440 | Instrumentation For Process Control:  Basic Requirements |
| 13441 | Control Loop Descriptions |
| 13442 | Primary Elements And Transmitters |
| 13447 | Telemetry Systems |
| 13448 | Control Panels |
| | |
| | |
| 14301 | Hoists, Trolleys, And Monorails |
| 14305 | Bridge Cranes |
| | |
| | |
| 15060 | Pipe And Pipe Fittings:  Basic Requirements |
| 15061 | Pipe:  Steel |
| 15063 | Pipe:  Copper |
| 15070 | Pipe:  Reinforced Concrete Cylinder |
| 15073 | Pipe:  Cast-Iron Soil |
| 15090 | Pipe Support Systems |
| 15100 | Valves:  Basic Requirements |
| 15101 | Gate Valves |
| 15103 | Butterfly Valves |
| 15106 | Check Valves |
| 15114 | Miscellaneous Valves |

| 15115 | Water Control Gates |
|-------|---------------------|
| 15440 | Plumbing Fixtures And Equipment |
| 15510 | Fire Hydrant |
| 15515 | Hydronic Specialties |
| 15605 | Hvac: Equipment |
| 15890 | Hvac: Ductwork |
| 15970 | Instrumentation And Control For Hvac Systems |
|       | |
| 16010 | Electrical: Basic Requirements |
| 16111 | Conduit, Conduit Fittings, Conduit Supports{, Wireway,} {And Underfloor Duct} |
| 16115 | Underground Conduit, Ducts, And Manholes, Handholes And Precast Cable Trench |
| 16120 | Wire And Cable - 600 Volt And Below |
| 16121 | Cable: Medium Voltage |
| 16130 | Outlet, Pull, And Junction Boxes |
| 16140 | Wiring Devices |
| 16150 | Panelboards |
| 16190 | Dry-Type Transformers |
| 16265 | Variable Frequency Drives - Low Voltage |
| 16301 | Distribution Transformers |
| 16410 | Power Factor Connection Equipment |
| 16450 | Grounding |
| 16470 | Switchboards |
| 16474 | Motor Control Centers, Control Equipment & Separately Mounted Devices |
| 16510 | Interior Lighting |
| 16525 | Exterior Building Lighting |
| 16530 | Site Lighting |
| 16670 | Lightning Protection System |
| 16760 | Communication System |

<u>Reservoir Transmission Main</u>

- Alignment Survey
- Laying Schedule
- Design Calculations
- Pipe Details
- Proof of Design Test Results
- Sheeting/Shoring
- Air Release, Vacuum and Blow-off Valves
- Leakage Tests
- Disinfection
- Appurtenances
- Concrete, Flowable Fill and Grout
- Road Base
- Pavement Details
- Corrosion Control

- Drainage Pipe
1. Elliptical Reinforced Concrete Pipe
2. Reinforced Concrete Pipe
3. Polyethylene Pipe
- Drainage Structures
- Stop Log Grooves
- Geoweb
- Silt Fences and Curtains
- Utility Survey
- Settlement Monitoring
- Trenchless Construction Details

13.5    Advice

The CONSULTANT shall provide engineering and administrative support services for those field services discussed in Task 13.6. These support services will include consultation from senior design team consultant's data evaluation, analysis of laboratory results and review of field service activities. Also included are CADD support, project management and clerical support.

CONSULTANT shall provide services to respond to technical matters that arise during construction. The technical matters consist of the following:

- Attend three Preconstruction Conferences, one for each construction contract. The CONSTRUCTION MANAGER shall chair each conference and prepare minutes. CONSULTANT shall address technical matters only;
- Respond to Requests for Information;
- Prepare Supplemental Drawings required to supplement or modify the construction contract drawings to maintain design intent;
- Attend biweekly construction progress meetings. Meetings shall be chaired, and minutes prepared by, CONSTRUCTION MANAGER. CONSULTANT shall address technical matters only; and
- Consultation with TAMPA BAY WATER and its CONSTRUCTION MANAGER regarding technical matters during construction.

CONSTRUCTION MANAGER shall be responsible to prepare meeting minutes and change orders, review payment requests, review non-technical matters, and review all matters that are not specifically listed above.

13.6    Field Services During Construction
13.6.1  Reservoir
The CONSULTANT will provide a full-time resident engineer for the combination of reservoir and pump station. In addition the CONSULTANT will provide one (1) full-time project engineer, and one (1) full-time engineering technician to assist the resident reservoir engineer in field observation, testing and quality assurance. For the purpose of this scope, full time consists of 45 hours per week for 23 months for the resident engineer and the engineering technicians.

The resident engineer and the engineering technicians will provide observation of the following key elements of the reservoir construction:

- Slurry wall construction (Below Grade and Embankment) – focuses on the proper placement and tie-in to a reasonable confining unit of the slurry wall. This slurry wall may consist of both a below grade slurry wall and a slurry wall through the center of the reservoir embankment. If the slurry wall consists of both of these, a two phase construction will be required. The CONSULTANT will be responsible for collecting samples of the slurry wall material for quality assurance (QA) testing and will observe the material excavated for the slurry wall to determine if the proper depth has been reached to meet the specified confining soil layer.

- Removal of unsuitable material – focuses on the removal and replacement of the waste clay slimes in the southern portion of the reservoir site left from the phosphate mining operation. The CONSULTANT will observe the removal of the waste clay slimes in the mined portion of the reservoir site and observe the replacement of these material with other borrow material from the site in compliance with the contract documents. The CONSULTANT shall observe the placement and compaction of these borrow materials under the proposed embankment to determine if compliance with the design specifications and contract documents has been reached. The CONSULTANT will collect samples of this material for testing.

- Grouting – focuses on the grouting of any anomalies identified on the site during the design and construction phases of the project. The CONSULTANT will observe the on grouting of the anomalies and determine when the anomaly has been sufficiently grouted to comply with the design specifications.

- Embankment penetrations – focuses on the places where the embankment will be penetrated by the inlet/outlet pipeline and other structures. The CONSULTANT will observe the construction of these penetrations and the installation of any necessary components such as seepage collars to prevent piping through the embankment.

- Environmental compliance – focuses on National Pollution Discharge Elimination System (NPDES), Environmental Resource Permit and Army Corps of Engineer permit wetland compliance. Environmental scientists, inspectors and ecologists will provide the necessary documentation and coordination with agency representatives as well as the resident engineer to ensure all construction activities are in compliance with environmental permits

The CONSULTANT will provide quality assurance for reservoir elements being observed by CONSTRUCTION MANAGER. This quality assurance will include spot checks and testing of construction material and methods. The CONSULTANT will provide the quality assurance for the following tasks, which will be observed on a full time basis by the CONSTRUCTION MANAGER:

- Additional geotechnical investigations required during construction

7

- Placement of soil cement along the upstream face of the reservoir embankment

- Embankment build-up

- Construction of the intake tower

- Construction of the toe/blanket drain in the reservoir embankment

- Construction of the stormwater management areas

- Construction of access and toe road through out the reservoir site

- Installation of embankment monitoring devices or instrumentation

- Installation of geomembranes related to seepage control

The CONSTRUCTION MANAGER will provide full-time on-site laboratory testing services or equivalent necessary for project certification.

The CONSULTANT will provide senior advisors or consultants, senior engineers/geologist and project manager to periodically visit the site as a part of the quality assurance and field observation program.  These site visits shall be limited to one (1) site visits per month by the project manager, four (4) site visits for a senior engineer/geologist and two (2) site visits for the project consultant.

13.6.2   Pipeline
CONSULTANT shall provide site visits during construction of each construction contract, as CONSULTANT deems necessary. CONSTRUCTION MANAGER shall have full responsibility for administration and observation of the construction contractors' work. CONSULTANT shall not be responsible to make exhaustive reviews of the construction contractors' work and can rely upon the observations made by CONSTRUCTION MANAGER.

CONSULTANT's level of effort for the combination of Tasks 13.5 and 13.6.2 for the pipeline shall be limited to one full time (40 hours per week) Resident Engineer with limited office support for the above listed duration of construction for construction contract.

13.7   Certification to Agencies

CONSULTANT shall prepare certification of completion with test results as required by permitting agencies at completion of construction.  Permits to be certified shall be limited . to the permits required in the AGREEMENT that this AMENDMENT is made a part of. Certification of all other permits will be the responsibility of others.  Where it is decided that the CONSTRUCTION MANAGER will conduct observation and/or testing services the CONSUTLANT will rely on the CONSTRUCTION MANAGER to verify that all work and required tests have been completed in accordance with the construction contract documents.   The CONSULTANT will be provided the opportunity to review the

CONSTRUCTION MANAGER's contract to determine if the appropriate site observation and quality control and quality assurance testing has been provided within the CONSTRUCTION MANAGER's and the CONSULTANT's contracts.   If not TAMPA BAY WATER the CONSTRUCTION MANAGER and the CONSULTANT will meet to add the necessary tasks to the appropriate contract(s) to the satisfaction of the CONSULTANT.

13.8    Certification of Project Completion

CONSULTANT shall prepare two project completion certifications, one (1) at the completion of the reservoir contract and one (1) at the completion of the pipeline contract.

Where it is decided that the CONSTRUCTION MANAGER will provide observation and/or testing services, the CONSULTANT will rely on the CONSTRUCTION MANAGER to provide verification that all work and required tests have been completed in accordance with the construction contract documents.  The CONSULTANT will be provided the opportunity to review the CONSTRUCTION MANAGER's contract to determine if the appropriate site observation and quality control and quality assurance testing has been provided within the CONSTRUCTION MANAGER's and the CONSULTANT's contracts.   If not TAMPA BAY WATER the CONSTRUCTION MANAGER and the CONSULTANT will meet to add the necessary tasks to the appropriate contract(s) to the satisfaction of the CONSULTANT.

13.9    Record Drawings

CONSULTANT shall prepare record drawings of contract drawings for the Regional Reservoir and Transmission Main contracts.  The CONSTRUCTION MANAGER and contractors shall provide record drawing information and O&M manuals to CONSULTANT for the purpose of preparing record drawings. CONSULTANT can rely upon record drawing information and O&M manuals provided by CONSTRUCTION MANAGER and contractors.

13.10   Start up

13.10.1 Year 1 reservoir start-up

TAMPA BAY WATER will provide field observation during filling of the reservoir, anticipated to require one year. This observation will include daily (7 day per week) monitoring of embankment instrumentation and compilation of data collected into a database from the instrumentation.  The monitoring will include daily collection of data from the embankment piezometers and periodic monitoring of site monuments. The CONSULTANT will analyze this data once a week for a year and make recommendations to TAMPA BAY WATER regarding the further action or analysis required.  The CONSULTANT will train TAMPA BAY WATER staff on this monitoring, data compilation and trend analysis.  The CONSULTANT will assess environmental compliance (2 trips per month) with permit conditions.

13.10.2 Year 2 reservoir start-up

9

TAMPA BAY WATER will provide field observation during the first year of reservoir operation. This observation will include monitoring of embankment instrumentation twice a week and compilation of the data in a database. The CONSULTANT will analyze the data collected twice a month (analysis will take two days per month) for a year. The CONSULTANT will assess environmental compliance (1 trip per month) with permit conditions.

13.10.3 Pipeline start-up

CONSULTANT shall provide start-up assistance during the tie-in of the Regional Transmission Main to the system and start-up of the Regional Reservoir Pumping Station. Start-up assistance shall be limited to the furnishing of an experienced construction engineer during the start-up phase to meet with the CONSTRUCTION MANAGER and contractors to review the contractors' proposed tie-in and start-up sequence for technical requirements and to be present on an as needed basis during the tie-in and start-up. CONSTRUCTION MANAGER shall be responsible for administration and detailed observation of the contractor's work.

TABLE B-1
COMPENSATION PLAN

| Task | Task Description | Total | Compensation Plan | Changes as Result of Amendment No. 1 | | Total Amended Compensation Plan |
|---|---|---|---|---|---|---|
| 1 | Project Kickoff | $16,473 | Lump Sum | No Change | | $16,473 |
| 2 | Reservoir Design | $3,124,538 | Lump Sum | No Change | | $3,124,538 |
| 3 | Facilities Design | $1,645,208 | Lump Sum | No Change | | $1,645,208 |
| 4 | Aquifer Storage & Recovery | $68,185 | Lump Sum | No Change | | $68,185 |
| 5 | NEPA Compliance | $229,949 | Lump Sum | -$150,000 | Time and Materials | $79,949 |
| 6 | Federal Funding | $142,575 | Lump Sum | No Change | | $142,575 |
| 7 | Land Acquisition | | Lump Sum $6,300 per Parcel Based on 57 Parcels | | | |
| | Acquisition Services | $359,100 | | No Change | | $359,100 |
| | Other Services - Relocation, Suits, etc. | $142,813 | Time and Materials | No Change | | $142,813 |
| 8 | Public Involvement/Relations | $189,833 | Time and Materials | No Change | | $189,833 |
| 9 | Technical Support of PI | $105,168 | Time and Materials | No Change | | $105,168 |
| 10 | Site Planning/Design/Drainage | $133,364 | Lump Sum | -$98,364 | | $35,000 |
| 11 | Status Reports and Reporting, Meetings | $498,017 | Lump Sum | No Change | | $498,017 |
| | SUBTOTAL | $6,655,223 | | | | $6,406,859 |
| 12 | Permitting | $380,275 | Lump Sum | No Change | | $380,275 |
| | Design Phase Owner's Allowance | $500,000 | Time and Materials | | | $500,000 |
| | Design Services | | | $425,000 | Time and Materials | $425,000 |
| | Reallocation from Above Tasks | | | $98,364 | Time and Materials | $98,364 |
| | TOTAL DESIGN PHASE SERVICES | $7,535,498 | | | | $7,810,498 |
| 13 | Construction Phase Services | | | $3,898,000 | Time and Materials | $3,898,000 |
| | Construction Owner's Allowance | | | $100,000 | Time and Materials | $100,000 |
| | TOTAL CONSTRUCTION PHASE SERVICES | | | | | $3,998,000 |
| | TOTAL | $7,535,498 | | | | $11,808,498 |

Tampa Bay Regional Reservoir
HDR Engineering, Inc.
Services During Construction
Estimates by Task

| TASK | STAFF | Hours | Fee |
|------|-------|-------|-----|
| **Task 1 - Pre Bid** | | | |
| Reservoir | Resident Eng. | 110 | $17,828 |
| | Sr. Eng | 24 | $3,782 |
| | Sr. Eng/Sr. Geologist | 24 | $2,431 |
| | Clerical | 12 | $608 |
| | Senior Consultants | 24 | $4,052 |
| | EXPENSES | | $1,435 |
| Reservoir Subtotal | | | $30,135 |
| Pipeline | Partner | | |
| | Project Manager | 1 | |
| | Project Design Engineer | 20 | |
| | Senior Engineers | 28 | |
| | Engineer | | |
| | CADD | 16 | |
| | Clerical | 2 | |
| Pipeline Subtotal | | | $11,700 |
| **SUBTOTAL** | | | $41,835 |
| **Task 2 - Review Bids** | | | |
| Reservoir | Resident Eng. | 40 | $6,483 |
| | Sr. Eng | 16 | $2,521 |
| | Sr. Eng/Sr. Geologist | 16 | $1,621 |
| | Clerical | 8 | $405 |
| | Senior Consultant | 16 | $2,701 |
| | EXPENSES | | $687 |
| Reservoir Subtotal | | | $14,418 |
| Pipeline | Partner | 1 | |
| | Project Manager | 4 | |
| | Project Design Engineer | 6 | |
| | Senior Engineers | | |
| | Engineer | 16 | |
| | CADD | | |
| | Clerical | 1 | |
| Pipeline Subtotal | | | $3,000 |
| **SUBTOTAL** | | | $17,418 |
| **Task 3 - Review Tech Sub** | | | |
| Reservoir | Resident Eng. | 996 | $134,507 |
| | Sr. Eng | 935 | $147,373 |
| | Sr. Eng/Sr. Geologist | 624 | $63,160 |
| | Clerical | 480 | $24,311 |
| | Senior Consultants | 240 | $40,518 |
| | EXPENSES | | $20,493 |
| Reservoir Subtotal | | | $430,363 |
| Pipeline | Partner | 23 | |
| | Project Manager | 69 | |
| | Project Design Engineer | 344 | |

Tampa Bay Regional Reservoir
HDR Engineering, Inc.
Services During Construction
Estimates by Task

| | | | |
|---|---|---|---|
| | Clerical | | |
| | Expenses | | $9,700 |
| Pipeline Subtotal | | | $266,300 |
| **SUBTOTAL** | | | **$1,907,303** |
| **Task 6 - Certify Test** | | | |
| Reservoir | Resident Eng. | 40 | $6,483 |
| | Sr. Scientist | 80 | $9,634 |
| | Sr. Eng | 160 | $25,211 |
| | Clerical | 80 | $4,052 |
| | Senior Consultants | 80 | $13,506 |
| | EXPENSES | | $4,122 |
| Reservoir Subtotal | | | $63,009 |
| Pipeline | Partner | | |
| | Project Manager | | |
| | Project Design Engineer | | |
| | Senior Engineers | | |
| | Engineer | | |
| | CADD | | |
| | Clerical | | |
| | Expenses | | $600 |
| Pipeline Subtotal | | | $17,100 |
| **SUBTOTAL** | | | **$80,109** |
| **Task 7 - Certify Completion** | | | |
| Reservoir | Resident Eng. | 40 | $6,483 |
| | Sr. Scientist | 80 | $9,634 |
| | Sr. Eng | 160 | $25,211 |
| | Clerical | 80 | $4,052 |
| | Senior Consultants | 80 | $13,506 |
| | EXPENSES | | $4,122 |
| Reservoir Subtotal | | | $63,009 |
| Pipeline | Partner | 5 | |
| | Project Manager | 10 | |
| | Project Design Engineer | 16 | |
| | Senior Engineers | 40 | |
| | Engineer | | |
| | CADD | 5 | |
| | Clerical | 2 | |
| | Expenses | 600 | |
| Pipeline Subtotal | | | $11,300 |
| **SUBTOTAL** | | | **$74,309** |
| **Task 8 - Start Up year 1** | | | |
| | | | |
| | | | |
| | PM | 48 | $7,623 |
| | Sr. Eng/Geoligist | 416 | $43,370 |
| | Clerical | 100 | $5,217 |
| | Consultant | 240 | $41,734 |
| | Engineer | 256 | $20,169 |

Tampa Bay Regional Reservoir
HDR Engineering, Inc.
Services During Construction
Estimates by Task

| Environmental | Sr. Scientist | 52 | $6,445 |
|---|---|---|---|
| | Scientist | 208 | $14,457 |
| | | | |
| | EXPENSES | . | $11,121 |
| Reservoir Subtotal | | | $150,136 |
| Pipeline | Partner | 2 | |
| | Project Manager | 5 | |
| | Project Design Engineer | 40 | . |
| | Senior Engineers | 10 | |
| | Engineer | | |
| | CADD | | |
| | Clerical | 2 | |
| | Expenses | | $300 |
| Pipeline Subtotal | | | $9,300 |
| SUBTOTAL | | | $159,436 |
| Task 9 - Start Up Year 2 | | | |
| | | | |
| | | | |
| | PM | 48 | $7,852 |
| | | | |
| | Clerical | 80 | $4,299 . |
| | Consultant | 80 | $14,329 |
| | Sr. Engineer | 192 | $19,449 |
| | | | |
| Environmental | Sr. Scientist | 52 | $6,639 |
| | Scientist | 104 | $7,445 |
| | | | |
| | EXPENSES | | $4,801 |
| | | | |
| SUBTOTAL | | | $64,813 |
| Task 10 - Record Drawings | | | |
| | | | |
| Reservoir | Resident Eng. | 104 | $16,843 |
| | Sr. Eng | 187 | $29,475 |
| | Clerical | 130 | $6,579 |
| | Senior Consultants | 44 | $7,369 |
| | Tech. . | 140 | $10,213 |
| | | | |
| | EXPENSES | | $6,343 |
| Reservoir Subtotal | . | | $76,821 |
| Pipeline | Partner | | |
| | Project Manager | | |
| | Project Design Engineer | | |
| | Senior Engineers | | |
| | Engineer | | |
| | CADD | | |
| | Clerical | | |
| | Expenses | | $3,200 |
| Pipeline Subtotal | | | $29,200 |

Tampa Bay Regional Reservoir
HDR Engineering, Inc.
Services During Construction
Estimates by Task

| SUBTOTAL | | | $106,021 |
|---|---|---|---|
| | | | |
| Reservoir | | | $2,981,400 |
| Pipeline | | | $916,600 |
| Owners Allowance | | | $100,000 |
| TOTAL | | | $3,998,000 |

Amendment #2

SENT BY:                              1- 9- 1 : 13:13 :HDR ENGINEERING, INC~        727 724 8413:# 2/ 4

## TAMPA BAY WATER, A REGIONAL WATER SUPPLY AUTHORITY
### SECOND AMENDMENT TO AS NEEDED PROFESSIONAL
### SERVICES AGREEMENT NO. 99-19

**THIS SECOND AMENDMENT** is made and entered into this _____ day of May, 2000, by and between **TAMPA BAY WATER, A REGIONAL WATER SUPPLY AUTHORITY**, an interlocal governmental agency created and existing pursuant to Sections 373.1962 and 163.01, Florida Statutes, acting by and through its Board of Directors, the governing board thereof ("TAMPA BAY WATER"), and **HDR ENGINEERING, INC.**, a corporation doing business in the State of Florida ("CONSULTANT").

**WHEREAS**, TAMPA BAY WATER has retained the CONSULTANT for engineering services under Professional Services Agreement Number 99-19; and

**WHEREAS**, TAMPA BAY WATER selected CONSULTANT in accordance with the provisions of the Florida Consultants' Competitive Negotiation Act for services to be performed under Agreement Number 99-19; and

**WHEREAS**, CONSULTANT has performed services under Agreement Number 99-19, as previously amended, in support of TAMPA BAY WATER's efforts to develop the Tampa Bay Regional Reservoir; and

**WHEREAS**, TAMPA BAY WATER desires to continue to utilize CONSULTANT as an engineering consultant for TAMPA BAY WATER for engineering services based upon the terms and conditions set forth in Agreement Number 99-19, as hereby amended.

**NOW, THEREFORE**, in consideration of the forgoing premises, which shall be deemed an integral part of this Second Amendment to Professional Services Agreement Number 99-19, TAMPA BAY WATER and the CONSULTANT, intending to legally bound, agree as follows:

1.    Schedule "A" is hereby amended to provide for a preliminary feasibility study of potable water ASR at a fee of $60,000 as shown on the Exhibit attached hereto and made a part hereof.

2.    This Second Amendment is hereby made a part of, and incorporated in its entirety, into Agreement Number 99-19.

3.    In all other respects, Agreement Number 99-19, as previously amended, is hereby reaffirmed by the parties and remains in full force and effect.

**IN WITNESS WHEREOF,** the parties hereto have caused these presents to be executed by their duly qualified representatives.

**WITNESSES:**                                        **HDR ENGINEERING, INC.**

_Jodie M. Mutchler_                    By: _William H. Wadsworth_
Signature

_Jodie M. Mutchler_                    Its: _Sr. Vice President_
Print Name

_C. Edwin Copeland, Jr._
Signature                                              Date:_____

_C. Edwin Copeland, Jr._
Print Name                                                      (SEAL)

**ATTEST:**

_____

Secretary

**TAMPA BAY WATER, A REGIONAL
WATER SUPPLY AUTHORITY**

By: _____

Its: _____

Date: _____6-14·00_____

(SEAL)

**APPROVED AS TO FORM:**

_____

Office of the General Counsel

C:\TEMP\HDR-Engineering 2ndAmdt.DOC

-3-

Amendment #3

*THIRD AMENDMENT*
*TO THE*
*TAMPA BAY REGIONAL RESERVOIR PROJECT*
*AGREEMENT FOR PROFESSIONAL ENGINEERING SERVICES*
*CONTRACT NO. 99-19*

This Third Amendment to the Tampa Bay Regional Reservoir Project Agreement for Professional Engineering Services is made in Clearwater, Florida on this _____ day of _____, 2000, by and between TAMPA BAY WATER, A Regional Water Supply Authority, a public body of the State of Florida (TAMPA BAY WATER), and HDR Engineering, Inc., (hereinafter referred to as "CONSULTANT"), a corporation doing business in the State of Florida.

## *WITNESSETH:*

**WHEREAS**, on November 11, 1998, TAMPA BAY WATER and CONSULTANT entered into an Agreement for Professional Services under Contract Number 99-19 (the "AGREEMENT"); and,

**WHEREAS**, TAMPA BAY WATER and CONSULTANT desire to amend the scope of services, project compensation and contractual language included in the AGREEMENT.

**NOW THEREFORE**, in consideration of the premises set forth hereinabove, and the mutual promises hereinafter set forth, the sufficiency and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     The Scope of Services attached hereto as Exhibit A-1 is approved and incorporated herein as an addition to the Scope of Services to the AGREEMENT.

2.     The Schedule of Project Compensation, attached hereto as Exhibit B-1 is approved and incorporated herein and increases the total project compensation of the AGREEMENT by an additional $499,240.

3.     The following language is approved to be added to Item 21.21 of the above referenced Contract, and Exhibit F attached hereto is approved and incorporated as Schedule F.

"CONSULTANT agrees to comply with EPA Subagreement Clause Requirements set forth in 40 C.F.R. 33.1005 through 33.1030. These requirements are attached as Schedule F to this Contract."

4.     All other provisions of the AGREEMENT shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed by their duly qualified representatives on the day and year first written above.

WITNESSES:                                  HDR ENGINEERING, INC.

_Jodie M. Mutchler_                         By: _Paul Bowdin_
Signature

_Jodie M. Mutchler_                         Its: _Sr. Vice President_
Print Name

_J. Erin Hunt_                              Date: _11/8/00_
Signature

_J. Erin Hunt_
Print Name                                          (SEAL)


ATTEST:                                     TAMPA BAY WATER, A REGIONAL
                                            WATER SUPPLY AUTHORITY

_____                           By: _____
Secretary                                   Its: _Chairman_

                                            Date: _11-13-00_


                                                    (SEAL)


                                            APPROVED AS TO FORM:

                                            _____
                                            Office of the General Counsel


Page 2 of 2

Exhibit A-1

SCHEDULE "A"
Amendment 3

TAMPA BAY REGIONAL RESERVOIR
Revised Scope of Services for Task 2, Task 7, Task 12 and Task 14
HDR Engineering, Inc.
Contract 99-19

**Task 2 – Reservoir Design**

The CONSULTANT conducted four additional pump tests at the request of the Hillsborough County Water Resource Team. Prior to this request the CONSULTANT had conducted five pump tests on the site and had completed modeling efforts to characterize the potential for seepage from the Tampa Bay Regional Reservoir. In response to the Water Team's request, the CONSULTANT conducted two additional pump tests near Wendel Avenue, a pump tests in the area of boring ERM-16 and a pump test in the area of boring B-15-C/h. Based on the results of these additional pump tests, HDR then remodeled the seepage from the reservoir.

**Task 7-Land Acquisition**

The CONSULTANT will conduct a Phase II Site Assessment of J. Crayton Pruitt's parcels which are to be acquired for the reservoir site. This Phase II Site Assessment will focus on the northwest portion of this parcel where agricultural activities have been occurring based on the recommendation of the Phase I Site Assessment conducted for this site. The CONSULTANT will coordinate with the Southwest Florida Water Management District on the format of this investigation and recommendations.

**Task 12 - Permitting**

The CONSULTANT will complete permitting activities for a water use permit (WUP) for dewatering during construction activities on the reservoir site on behalf of Tampa Bay Water. The CONSUTLANT will respond to one (1) round of request for additional information and one (1) round to a request for clarification from the Southwest Florida Water Management District. In addition, the Consultant will complete a Source Water Permit for the Tampa Bay Regional Reservoir for submission to the Hillsborough County Health Department (HCHD) on behalf of Tampa Bay Water. The CONSULTANT will conduct two pre-application meetings with the HCHD and will respond to two rounds of questions from the HCHD.

**Task 14 – Monitoring**

As a part of the reservoir seepage modeling and mitigation plan, monitoring of groundwater and surrounding surface water systems are needed. The CONSULTANT will lay out and design a monitoring plan for these systems and will work with Tampa Bay Water on the acquisition and installation of the necessary monitoring equipment.

Exhibit B-1
REVISED TABLE B
COMPENSATION PLAN

| Task | Task Description | Total | Compensation Plan | Changes as Result of Amendment No. 3 | Total Ammended Compensation Plan |
|---|---|---|---|---|---|
| 1 | Project Kickoff | $16,473 | Lump Sum | No Change | $16,473 |
| 2 | Reservoir Design | $3,124,538 | Lump Sum | $193,240 | Lump Sum | $3,317,778 |
| 3 | Facilities Design | $1,645,208 | Lump Sum | No Change | $1,645,208 |
| 4 | Aquifer Storage & Recovery | $103,185 | Lump Sum | No Change | $103,185 |
| 5 | NEPA Compliance | $104,949 | Lump Sum | No Change | $104,949 |
| 6 | Federal Funding | $142,575 | Lump Sum | No Change | $142,575 |
| 7 | Land Acquisition | | | | |
| | Acquisition Services | $359,100 | Lump Sum $6,300 per Parcel Based on 57 Parcels | No Change | $359,100 |
| | Other Services - Relocation, Suits, etc. | $142,813 | Time and Materials | $34,000 | Time and Materials | $176,813 |
| 8 | Public Involvement/Relations | $189,833 | Time and Materials | No Change | $189,833 |
| 9 | Technical Support of PI | $105,168 | Time and Materials | No Change | $105,168 |
| 10 | Delivery Options | $35,000 | Lump Sum | -$34,000 | $1,000 |
| 11 | Status Reports and Reporting, Meetings | $498,017 | Lump Sum | No Change | $498,017 |
| 12 | Permitting | $380,275 | Lump Sum | $91,000 | Lump Sum | $471,275 |
| 13 | Construction Phase Services | $3,898,000 | | $215,000 | $3,898,000 |
| 14 | Monitoring | | | $215,000 | Time and Materials | $215,000 |
| | Design Phase Owner's Allowance | $1,023,364 | Time and Materials | No Change | $1,023,364 |
| | Construction Owner's Allowance | $100,000 | | | $100,000 |
| | TOTAL | $11,868,497 | | $499,240 | $12,367,737 |

# Exhibit F

# EPA SUBAGREEMENT CLAUSES

## Subpart F - Subagreement Provisions

### § 33.1005 Applicability and Scope of this subpart.

(a)   This subpart applies to all EPA recipients and describes the minimum content of each subagreement (contract and subcontract).

(b)   Nothing in this subpart prohibits a recipient from requiring more assurances, guarantees, or indemnity or other contractual requirements from any party to a subagreement.

### §33.1010 Requirements for subagreement clauses.

Recipients shall include clauses that meet the requirements of §§33.1015 through 33.1021, and the appropriate clauses in §33.1030, in each procurement subagreement.

### §33.1015 Subagreement  provisions clause.

Each subagreement must include provisions defining a sound and complete agreement, including the:

(a)   Nature, scope, and extent of work to be performed;
(b)   Time frame for performance;
(c)   Total cost of the subagreement; and
(d)   Payment provisions.

### §33.1016 Labor standards provisions.

(This clause applies only when required by statute.) Recipients shall include a copy of EPA Form 5720-4 "Labor Standards Provisions for Federally Assisted Construction Contracts" in each subagreement for construction (as defined by the Secretary of Labor). The form contains the Davis-Bacon Act requirements (40 U.S.C. 276a—276a-7); the Copeland Regulations (29 CFR part 3); the Contract Work Hours and Safety Standards Act--Overtime Compensation (940 U.S.C. 327-333) and the nondiscrimination provisions in Executive Order 11246, as amended.

[48 FR 12926, Mar.28, 1983; 48 FR 30365 July 1.1983]

### §33.1019 Patents data and copyrights clause.

Except for construction grant subagreements, all subagreements shall include notice of EPA requirements and regulations pertaining to reporting and  patent  rights  under  any subagreement involving research, developmental, experimental or  demonstration work  with respect  to any discovery or invention which arises or is developed in the conduct of work under a subagreement. This notice shall also include EPA requirements and regulations pertaining to copyrights and rights in data contained in 40 CFR part 30.

### § 33.1020 Violating facilities clause.

Subagreements in excess of $100,000 shall contain a provision which requires contractor compliance with all applicable standards, orders or requirements issued under section 306 of the Clean Air Act (42 U.S.C. 1857(h)), section 508 of the Clean Water Act (33 U.S.C. 1368), Executive

Order 11738, and EPA regulations (40 CFR part 15) which prohibit the use under nonexempt Federal contracts, grants or loans of facilities included on the EPA List of Violating Facilities.

## §33.1021 (Reserved]

## §33.1030 Model subagreement clauses.

Recipients must include. when appropriate, the following clauses or their equivalent in each subagreement. Recipients may substitute other terms for "recipient and" "contractor" in their subagreements.

### I. SUPERSESSION

The recipient and the contractor agree that this and other appropriate clauses in 40 CFR 33.1030 apply to that work eligible for EPA assistance to be performed under this subagreement and that these clauses supersede any conflicting provisions of this subagreement.

### 2. PRIVITY OF SUBAGREEMENT

This subagreement is expected to be funded in part with funds from the U.S. Environmental Protection Agency. Neither the United States nor any of its departments, agencies or employees is, or will be, a party to this subagreement or any lower tier subagreement. This subagreement is subject to regulations contained in 40 CFR part 33 in effect on the date of the assistance award for this project.

### 3. SUSPENSION OF WORK

*The following clause applies only to construction subagreements.*

(a)   The recipient may order the contractor in writing to suspend, delay or interrupt all or any part of the work for such period of time as the recipient may determine to be appropriate for the convenience of the recipient.

(b)   If the performance of all or any part of the work is suspended, delayed or interrupted for an unreasonable period of time by an act of the recipient in administration of this subagreement, or by the recipient's failure to act within the time specified in this subagreement (or if no time is specified, within a reasonable time), the recipient shall make an adjustment for any increase in the cost of performance of this subagreement (excluding profit) necessarily caused by such unreasonable suspension, delay or interruption and modify the subagreement in writing.  However, no adjustment shall be made under this clause for any suspension, delay or interruption to the extent (1) that performance would have been so suspended, delayed or interrupted by any other cause, including the fault or negligence of the contractor, or (2) for which an equitable adjustment is provided for or excluded under any other provision of this subagreement.

(c)   No claim under this clause shall be allowed (1) for any costs incurred more than 20 days before the contractor notified the recipient  in writing of the act, or failure to act,
involved (this requirement does not apply to a claim resulting from a suspension order), and (2) unless the amount claimed is asserted in writing as soon as practicable after the termination of such suspension, delay or interruption, but not later than the date of final payment under the subagreement.

### 4. TERMINATION

(a)   This subagreement may be terminated in whole or in part in writing by either party in the event of substantial failure by the other party to fulfill its obligations under this subagreement through

no fault of the terminating party, provided that no termination may be effected unless the other party is given (1) not less than ten (10) calendar days' written notice (delivered by certified mail, return receipt requested) of intent to terminate, and (2) an opportunity for consultation with the terminating party prior to termination.

(b)   This subagreement may be terminated in whole or in part in writing by the recipient for its convenience, provided that the contractor is given (1) not less than ten (10) calendar days' written notice (delivered by certified mail, return receipt requested) of intent to terminate, and (2) an opportunity for consultation with the terminating party prior to termination.

(c)   If termination for default is effected by the recipient, an equitable adjustment in the price provided for in this subagreement shall be made, but (1) no amount shall be allowed for anticipated profit on unperformed services or other work, and (2) any payment due to the contractor at the time of termination may be adjusted to cover any additional costs to the recipient because of the contractor's default. If termination for default is effected by the contractor, or if termination for convenience is effected by the recipient, the equitable adjustment shall include a reasonable profit for services or other work performed. The equitable adjustment for any termination shall provide for payment to the contractor for services rendered and expenses incurred prior to the termination, in addition to termination settlement costs reasonably incurred by the contractor relating to commitments which had become firm prior to the termination.

(d)   Upon receipt of a termination action under paragraphs (a) or (b) above, the contractor shall (1) promptly discontinue all affected work (unless the notice directs otherwise), and (2) deliver or otherwise make available to the recipient all data, drawings, specifications, reports, estimates, summaries and such other information and materials as may have been accumulated by the contractor in performing this subagreement, whether completed or in process.

(e)   Upon termination under paragraphs (a) or (b) above, the recipient may take over the work and may award another party a subagreement to complete the work under this subagreement.

(f)   If, after termination for failure of the contractor to fulfill contractual obligations, it is determined that the contractor had not failed to fulfill contractual obligations, the termination shall be deemed to have been for the convenience of the recipient. In such event, adjustment of the subagreement price shall be made as provided in paragraph (c) of this clause.

## 5. REMEDIES

Unless Otherwise provided in this subagreement, all claims, counter-claims, disputes and other matters in question between the recipient and the contractor arising out of, or relating to, this subagreement or the breach of it will be decided by arbitration if the parties mutually agree, or in a court of competent jurisdiction within the State in which the recipient is located.

## 6. AUDIT; ACCESS TO RECORDS

(a)   The contractor shall maintain books, records, documents and other evidence directly pertinent to performance on EPA funded work under this subagreement in accordance with generally accepted accounting principles and practices consistently applied, and 40 CFR part 30 in effect on the date of execution or this subagreement. The contractor shall also maintain the financial information and data used in the preparation or support of the cost submission required under 40 CFR 33.290 for any negotiated subagreement or change order and a copy of the cost summary submitted to the recipient. The United States Environmental Protection Agency, the Comptroller General of the United States, the United States Department of Labor, the recipient, and (the State) or any of their authorized representatives shall have access to all such books, records, documents

3

and other evidence for the purpose of inspection, audit and copying during normal business hours. The contractor will provide proper facilities for such access and inspection.

(b)   If this is a formally advertised, competitively awarded, fixed price subagreement, the contractor agrees to make paragraphs (a) through (g) of this clause applicable to all negotiated change orders and subagreement amendments affecting the subagreement price. In the case of all other types of prime subagreements, the contractor agrees to make paragraphs (a) through (g) applicable to all subagreements he awards in excess of $10,000, at any tier, and to make paragraphs (a) through (g) of this clause applicable to all change orders directly related to project performance.

(c)   Audits conducted under this provision shall be in accordance with generally accepted auditing standards and with established procedures and guidelines of the reviewing or audit agency(ies).

(d)   The contractor agrees to disclose all information and reports resulting from access to records under paragraphs (a) and (b) of this clause to any of the agencies referred to in paragraph (a).

(e)   Records under Paragraphs (a) and (b) above shall be maintained by the contractor during performance on EPA assisted work under this subagreement and for the time periods specified in 40 CFR part 30. In addition, those records which relate to any controversy arising under an EPA assistance agreement, litigation, the settlement of claims arising out of such performance or to costs or items to which an audit exception has been taken shall be maintained by the contractor for the time periods specified in 40 CFR part 30.

(f)   Access to records is not limited to the required retention periods. The authorized representatives designated in paragraph (a) of this clause shall have access to records at any reasonable time for as long as the records are maintained.

(g)   This right of access clause applies to financial records pertaining to all subagreements (except formally advertised, competitively awarded, fixed price subagreements) and all subagreement change orders regardless of the type of subagreement, and all subagreement amendments regardless of the type of subagreement. In addition this right of access applies to all records pertaining to all subagreements, subagreement change orders and subagreement amendments:

(1)   To the extent the records pertain directly to subagreement performance;

(2)   If there is any indication that fraud, gross abuse or corrupt practices may be in involved; or

(3)   If the subagreement is terminated for default or for convenience.

## 7. COVENANT AGAINST CONTINGENT FEES

The contractor assures that no person or selling agency has been employed or retained to solicit or secure this subagreement upon an agreement or understanding for a commission, percentage, brokerage or contingent fee excepting bona fide employees or bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business. For breach or violation of this assurance, the recipient shall have the right to annul this agreement without liability or, at its discretion, to deduct from the subagreement price or consideration, or otherwise recover the full amount of such commission, percentage, brokerage or contingent fee.

## 8. GRATUITIES

(a)   If the recipient finds after a notice and hearing that the contractor or any of the

contractor's agents or representatives offered or gave gratuities (in the form of entertainment, gifts or otherwise) to any official, employee or agent of the recipient, the State or EPA in an attempt to secure a subagreement or favorable treatment in awarding, amending or making any determinations related to the performance of this subagreement, the recipient may, by written notice to the contractor, terminate this subagreement. The recipient may also pursue other rights and remedies that the law or this subagreement provides. However, the existence of the facts on which the recipient bases such findings shall be in issue and may be reviewed in proceedings under the Remedies clause of this subagreement.

(b)   In the event this subagreement Is terminated as provided in paragraph (a), the recipient may pursue the same remedies against the contractor as it could pursue in the event of a breach of the subagreement by the contractor, and as a penalty, in addition to any other damages to which it may be entitled by law, be entitled to exemplary damages in an amount (as determined by the recipient) which shall be not less than three nor more than ten times the costs the contractor incurs in providing any such gratuities to any such officer or employee.

## 9. RESPONSIBILITY OF THE CONTRACTOR

(a)   *The following clause applies only to subagreements for services.*

(1)   The contractor is responsible for the professional quality, technical accuracy, timely completion and coordination of all designs, drawings, specifications, reports and other services furnished by the contractor under this subagreement.   If the subagreement involves environmental measurements or data generation, the contractor shall comply with EPA quality assurance requirements in 40 CFR 30.503. The contractor shall, without additional compensation, correct or revise any errors, omissions or other deficiencies in his designs, drawings, specifications, reports and other services.

(2)   The contractor shall perform the professional services necessary to accomplish the work specified in this subagreement in accordance with this subagreement and applicable EPA requirements in effect on the date of execution of the assistance agreement for this project.

(3)   The owner's or EPA's approval of drawings, designs, specifications, reports and incidental work or materials furnished hereunder shall not in any way relieve the contractor of responsibility for the technical adequacy of his work. Neither the owner's nor EPA'S review, approval, acceptance or payment for any of the services shall be construed as a waiver of any rights under this agreement or of any cause for action arising out of the performance of this subagreement.

(4)   The contractor shall be, and shall remain, liable in accordance with applicable law for all damages to the owner or EPA caused by the contractor's negligent performance of any of the services furnished under this subagreement, except for errors, omissions or other deficiencies to the extent attributable to the owner, owner-furnished data or any third party. The contractor shall not be responsible for any time delays in the project caused by circumstances beyond the contractor's control.

(5)   The contractor's obligations under this clause are in addition to the contractor's other express or implied assurances under this subagreement or State law and in no way diminish any other rights that the owner may have against the contractor for faulty materials, equipment or work.

(b)   *The following clause applies only to subagreements for construction.*

(1) The contractor agrees *to* perform all work under this subagreement in accordance with this agreement's designs, drawings and specifications.

(2)   The contractor guarantees for a period of at least one (1) year from the date of

40 CFR Ch. 1 (7/1/95 Edition)

substantial completion of the work that the completed work is free from all defects due to faulty materials, equipment or workmanship and that he shall promptly make whatever adjustments or corrections which may be necessary to cure any defects, including repairs of any damage to other parts of the system resulting from such defects. The owner shall promptly give notice to the contractor of observed defects. In the event that the contractor fails to make adjustments, repairs, corrections or other work made necessary by such defects, the owner may do so and charge the contractor the cost incurred. The performance bond shall remain in full force and effect through the guarantee period.

(3)   The contractor's obligations under this clause are in addition to the contractor's other express or implied assurances under this subagreement or State law and in no way diminish any other rights that the owner may have against the contractor for faulty materials, equipment or work.

## 10. FINAL PAYMENT

Upon satisfactory completion of the work performed under this subagreement, as a condition before final payment under this subagreement or as a termination settlement under this subagreement the contractor shall execute and deliver to the owner a release of all claims against the owner arising under, or by virtue of, this subagreement, except claims which are specifically exempted by the contractor to be set forth therein. Unless otherwise provided in this subagreement, by State law or otherwise expressly agreed to by the parties to this subagreement, final payment under this subagreement or settlement upon termination of this subagreement shall not constitute a waiver of the owner's claims against the contractor or his sureties under this subagreement or applicable performance and payment bonds.

[48 FR 12926, Mar.28, 1983; 48 FR 30365, July 1, 1983, as amended at 53 FR 8077, Mar. 11, 1988]

Amendment #4