```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3      TAMPA BAY WATER, a Regional Water
        Supply Authority,
 4
                 Plaintiff,
 5
                 versus                   CASE NO. 8:08-CV-2446
 6                                         8 JULY 2010
                                           TAMPA, FLORIDA
 7      HDR ENGINEERING, INC.,             10:42 - 11:40 AM
        a Nebraska corporation;
 8      CONSTRUCTION DYNAMICS
        GROUP, INC., a Maryland
 9      corporation;
        BARNARD CONSTRUCTION COMPANY,
10      INC., a Montana corporation,

11               Defendants.

12      BARNARD CONSTRUCTION COMPANY,
        INC., a Montana corporation,
13
                 Third Party Plaintiff,
14
                 versus
15
        McDONALD CONSTRUCTION
16      CORPORATION, a Florida corporation,

17               Third Party Defendant.

18             TRANSCRIPT OF STATUS CONFERENCE
           BEFORE THE HONORABLE THOMAS B. McCOUN, III
19             UNITED STATES MAGISTRATE JUDGE

20      APPEARANCES:

21      For Tampa Bay Water: David Forziano
                             Allen Dell, PA
22                           Suite 100
                             202 S. Rome Avenue
23                           Tampa, Florida 33606

24       Proceedings recorded and transcribed by
        computer-aided stenography.
25
```

```
 1    ADDITIONAL APPEARANCES:

 2    For Tampa Bay Water:  Richard Anthony Harrison
                            Allen Dell, PA
 3                          Suite 100
                            202 S. Rome Avenue
 4                          Tampa, Florida 33606

 5    For Construction      Anthony R. Kovalcik
      Dynamics Group:       Moye, O'Brien, O'Rourke, Pickert
 6                            & Dillon, LLP
                            800 S Orlando Avenue
 7                          Maitland, Florida 32751

 8                          Stephen William Pickert
                            Moye, O'Brien, O'Rourke, Pickert
 9                            & Dillon, LLP
                            800 S Orlando Avenue
10                          Maitland, Florida 32751

11    For Barnard           Michael R. Candes
      Construction:         Holland & Knight, LLP
12                          200 S. Orange Avenue
                            Suite 2600
13                          PO Box 1526
                            Orlando, Florida 32802-1526
14
                            Richard Miles Stanislaw
15                          Watt, Tieder, Hoffar
                              & Fitzgerald, LLP
16                          Suite 2210
                            1215 Fourth Ave
17                          Seattle, WA 98161

18    For HDR Engineering:  Wayne B. Mason
                            Sedgwick, Detert, Moran &
19                              Arnold, LLP
                            Suite 5400
20                          1717 Main Street
                            Dallas, Texas 75201
21
                            Timothy D. Woodward
22                          Forizs & Dogali, PA
                            Suite 300
23                          4301 Anchor Plaza Pkwy
                            Tampa, Florida 33634
24

25
```

```
1    For McDonald           Kate B. Munkittrick
     Construction:          Banker Lopez Gassler
2                           Suite 900
                            501 First Avenue N.
3                           St Petersburg, Florida 33701

4    Court Reporter:        Linda Starr, RPR
                            Official Court Reporter
5                           801 N. Florida Avenue
                            Suite 13B
6                           Tampa, Florida 33602

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            THE COURT:  Okay.  Let's call the case,

 2   please.

 3            COURTROOM DEPUTY CLERK:  Matter of Tampa Bay

 4   Water versus HDR Engineering, Case Number 8:08-CV-

 5   2446-T27.

 6            THE COURT:  Okay.  We've got a slew of counsel

 7   here.  Again, let's go ahead and start with the

 8   plaintiff's side and get everybody to state their

 9   appearance.  And, again, we've got a court reporter,

10   but we also record the proceedings electronically

11   and it feeds off the mic there.  So if you would

12   speak into the microphone, it would help us -- help

13   us make a good record.

14            As far as I'm concerned, you may remain

15   seated, if you wish.  If you want to come to the

16   podium, that's fine, as well.  So who's here for

17   Tampa Bay Water?

18            MR. FORZIANO:  Good morning, Your Honor.  Dave

19   Forziano with Allen Dell on behalf of Tampa Bay

20   Water.

21            THE COURT:  All right.

22            MR. HARRISON:  Richard Harrison for Tampa Bay

23   Water.

24            MR. KOVALCIK:  Tony Kovalcik on behalf of

25   Construction Dynamics Group.
```

1          THE COURT:  Okay.

2          MR. CANDES:  Michael Candes on behalf of

3     Barnard Construction.

4          MR. MASON:  Wayne Mason on behalf of HDR

5     Engineering.

6          MR. WOODWARD:  Also Tim Woodward on behalf of

7     HDR Engineering.

8          MS. MUNKITTRICK:  Your Honor, Kate Munkittrick

9     on behalf of McDonald Construction.

10         THE COURT:  All right.  Okay.  We -- we

11    noticed two particular motions.  There's actually a

12    third discovery matter that's kicking around related

13    to the Tampa Bay Water's experts.  And we have two

14    parties on the phone, as well.  Who's here on the

15    phone?

16         MR. PICKERT:  Steven Pickert for Construction

17    Dynamics Group.

18         MR. STANISLAW:  Miles Stanislaw for Barnard

19    Construction.

20         THE COURT:  Okay.  We -- as I said, we have

21    two motions to compel.  We also have a motion

22    related to depositions of Tampa Bay Water's experts

23    and also a motion kicking around with regards to the

24    scheduling order, which at least at present is going

25    to be ruled on by Judge Whittemore.

1          But with regards to the discovery stuff, I'm

2      going to work through the two motions to compel that

3      we noticed.  I'd also like to talk about the -- the

4      issue of the plaintiff's depositions, as well,

5      before we leave here.

6          So the first motion that we noticed is

7      Construction Dynamics' motion related to compelling

8      documents that are listed on a privilege log for

9      Golder and Associates.  And in looking through the

10     various pleadings, the -- it appears that at least

11     when the -- when Tampa Bay Water responded to this

12     that at that point the documents in dispute had been

13     narrowed down rather significantly to what it

14     identifies as 145 documents.

15         But then in the reply that we've permitted

16     Construction Dynamics, there's specific documents

17     that have been listed.  When I put it altogether,

18     quite frankly I wasn't able to figure out just

19     exactly where we were on the motions.  And that's

20     one of the reasons why we set the matter for a

21     hearing.  So let me -- let me go ahead and start

22     with, I guess, Mr. Kovalcik, you're the one on that

23     one?

24         MR. KOVALCIK:  Yes, sir.

25         THE COURT:  All right.  Where these

```
 1    particular -- let me just jump in here, and if it's

 2    the wrong place to jump in, get me -- get me reset.

 3    But looking at your reply, the specific documents

 4    that you identify in your reply are documents that

 5    are among the 145 that Tampa Bay Water says it's now

 6    narrowed this down -- the dispute down to?

 7         MR. KOVALCIK:  It is actually all 145 broken

 8    down into various categories, Your Honor.

 9         THE COURT:  All right.  Well, I didn't count

10    them so that's why I didn't know that, I guess.  All

11    right.  I mean, fundamentally your position is

12    because they've now listed representatives from

13    this -- this Golder company, all communications have

14    been opened up.  Is that basically it?

15         MR. KOVALCIK:  Correct, Your Honor.  Under

16    Rule 26 (a)(2) and case law interpreting same, it

17    mandates once you list your testifying expert

18    witness and those witnesses actually produce written

19    reports that, under Rule 26 (a)(2), all documents

20    generated, reviewed, considered by those experts

21    must be produced, and must be produced even without

22    a subpoena.

23         The case law that I cited in my reply brief,

24    there's a Sixth Circuit case, *Regional Airport*

25    *Authority*, that goes into pretty good detail on the
```

1    requirements, the disclosure requirements under Rule

2    26, and it's automatic.  Once the experts are

3    disclosed, a report is written, you must produce

4    those.

5        THE COURT:  On the other hand, there is some

6    case law -- at the district court level, there is

7    some case law that basically supports if there's

8    a -- if there's a clear demarkation between matters

9    that related to the -- the company when they were

10   wearing their litigation consultant hat that -- that

11   there's authority to say that that doesn't have to

12   be produced.

13       MR. KOVALCIK:  Correct, Your Honor.  There's a

14   limited exception if -- and these are very difficult

15   situations.  The district courts have said, you

16   know, they -- they kind of really wrangled with

17   these situations because there are certain

18   situations where an expert may be initially retained

19   to serve as a nontestifying litigation consultant.

20       Later on the decision is made to designate

21   them as a testifying expert witness and then they

22   produce a report.  Oftentimes, though, it's -- it's

23   used in an attempt to shield documents that will

24   give a window into the thinking of these experts by

25   saying, well, these documents were reviewed or

1    generated when they were a consultant as opposed to

2    a testifying expert witness.

3         What these cases stand for, Your Honor, and

4    that the general theme is the burden is on the

5    proponent of this work product privilege, this two

6    hats theory, to show that there's a clear

7    distinction that the expert only solely reviewed

8    those documents or generated those documents in his

9    or her role as a litigation consultant and had no

10   relation whatsoever to their expert testimony and

11   opinions.

12        And what the courts have said is that, for

13   example, there's one category of documents that is

14   clearcut.  If an -- in an expert report, the expert

15   lists a document that he or she considered, there's

16   no way that he can say he only reviewed that in his

17   role as a consultant.  And there are about, oh, I

18   would say 20, 25, maybe more documents, in that

19   category where the Golder experts listed documents

20   that are also listed on the privileged log, so those

21   should be produced automatically.

22        There's a second category of documents the

23   courts have said if the documents listed on the

24   privileged log, if the topics of those documents

25   relate in any way to the opinions, topics or facts

1    in the expert reports, that creates an ambiguity as

2    to whether you can -- can you say for sure that this

3    expert only reviewed that document in a consultant

4    capacity.  And the courts have said, if there is an

5    ambiguity, that the ambiguity must be resolved in

6    favor of disclosure.  And then there is also --

7        THE COURT:  Well, let me jump ahead because

8    I'm fairly familiar with the -- with the case law, I

9    think.  Your -- the intention here, I take it from

10   what the -- the way you've structured your reply is

11   to say that in regards to all the documents there is

12   some nexus between the expert opinion and the

13   documents such that it ought to be given up.

14       MR. KOVALCIK:  Correct.  Or the descriptions

15   are so ambiguous or have changed that at the very

16   least, an in camera review would be necessitated

17   because, for example, Your Honor, in the previous

18   version of the privilege log, there were -- there

19   was one document, Document 352, and the description

20   was Golder litigation support re B&V report.

21       Well, Black & Veatch was another expert --

22   another listed testifying witness for Tampa Bay

23   Water that has performed investigation into the

24   cracking of the soil cement and has done reports on

25   repair plans, remediation, etcetera.  And it's

1    clearly related to the Golder reports, the Black &

2    Veatch reports are referenced in the -- in the

3    Golder reports.

4         In the latest version of the privilege log,

5    the description has now changed to Golder litigation

6    support re preparation of discovery requests.

7    Black & Veatch is no longer referenced.  Document

8    354, the same thing, Golder litigation support re

9    soil cement documents was the description of the

10   document.  It's now listed as Golder litigation

11   support re preparation of discovery requests.  It's

12   very ambiguous.

13        THE COURT:  Let me ask you this.  If, in fact,

14   that's what it related to, would you agree that it

15   does not have to be produced?

16        MR. KOVALCIK:  Not without --

17        THE COURT:  Assuming that it wasn't otherwise

18   referenced by the expert, relied on by the expert.

19        MR. KOVALCIK:  Not automatically without

20   seeing what the document says, Your Honor, because

21   there's a case that plaintiffs have cited in their

22   briefs and that we cite in ours, as well, this *In Re*

23   *Air Crash at Dubrovnik* case.  And that case stands

24   for that -- the judge in that case said you can't

25   automatically take the proponent at its face -- face

1      value if they say, well, this document relates to

2      document review or deposition preparation or -- or

3      locating witnesses.

4            In that case, the -- the court looked at the

5      documents, and some of the documents the court found

6      actually related to the topics in the expert's

7      reports.  So just a vague reference to a discovery

8      request doesn't end the inquiry.  It actually has

9      to -- if the topic -- that's what's critical, the

10     topic of the document.

11           If the topic of a document relates in some

12     manner to the expert's opinions or the facts related

13     in those reports, then it's open game to examine

14     that witness about did this change your mind on --

15     on the case.  Now, we know in this -- this matter --

16           THE COURT:  All right.  Let me go to Tampa Bay

17     Water.  Mr. Forziano?

18           MR. FORZIANO:  Yes, Your Honor.

19           THE COURT:  It's your burden here to satisfy

20     me that these matters are privileged.  The -- has

21     there been any movement since you filed your

22     response?  In other words, at that point you

23     indicated we were down to 145 documents, whatever

24     that looks like.  And then you got the reply

25     identifying other matters.

```
1              Has there been further production since then
2       or is the position -- is your position essentially
3       the same as it was when you made your response that
4       these 145 don't have to be produced?
5              MR. FORZIANO:  Your Honor, we'd be happy to
6       take another look at that and review those 145
7       documents.  At this time we haven't done that.  As
8       a -- as a point of order, I think there's -- we can
9       shorten this hearing quite a bit.  There are --
10      there's a procedural issue here on which you can
11      deny these motions without even getting into the
12      substantive merits of the motions.
13             THE COURT:  Well, I'm all ears, although I'm
14      not thinking that I'm going to be inclined to go
15      that way.
16             MR. FORZIANO:  Okay.
17             THE COURT:  We're pretty far into the matter.
18      We've got to get these things resolved so we can
19      move forward.  But anyway, what's the procedure?
20             MR. FORZIANO:  Sure.  The crux of both of the
21      motions, as you aptly pointed out, is that since
22      Tampa Bay Water has designated certain Golder
23      employees and certain Black & Veatch employees as
24      testifying experts, that every document, basically,
25      in their possession is fair game.  That's the
```

1    position of both -- both motions.  But that does fly

2    in the face of the dual role capacity exception that

3    Your Honor has alluded to.

4         The -- the procedural issue here is that

5    neither Barnard nor CDG has issued a subpoena

6    requesting these documents.  Rather, that subpoena

7    was issued in late 2009 by HDR.  At that time,

8    neither Golder's folks or Black & Veatch's folks

9    have been designated as testifying experts.

10        In light of that, I had communications and

11   discussions with HDR's counsel and basically said,

12   hey, these guys haven't been designated yet, we

13   don't know if they're going to be designated.

14   Therefore, privilege applies, work product privilege

15   applies.

16        And that resulted and culminated in stipulated

17   protective orders issued by this Court.  And we made

18   sure that those stipulated protective orders

19   addressed this very issue.  In fact, I've got copies

20   of those for you here, Your Honor.

21        THE COURT:  Let me jump ahead because I

22   anticipated this.  It is -- we're at something of an

23   odd posture in -- as to how we're proceeding on

24   this.  But, you know, I also in the back of my mind

25   assumed, though, that there has been some agreement

1    going on, maybe I'm wrong, but I had assumed that

2    there was sort of a collective effort on this

3    activity so that everybody didn't have to issue

4    subpoenas or everybody didn't have to do this or

5    that.  You're shaking your head saying you've

6    assumed wrong so --

7         MR. KOVALCIK:  Your Honor, if I may respond to

8    that?

9         MR. FORZIANO:  Unfortunately -- unfortunately,

10   no, Your Honor.  There's been no agreement on the

11   parties to automatically produce all the documents

12   that were considered or relied upon by the experts.

13   In fact, we've issued subpoenas to all the

14   defendants' experts and they have subsequently -- or

15   at least HDR has -- subsequently subpoenaed our

16   experts' documents.  So there is a subpoena

17   outstanding, and we're in the process of gathering

18   those documents now.

19        MR. KOVALCIK:  Your Honor, may I just respond?

20   I'm sorry.

21        THE COURT:  Well, that particular issue, the

22   one we're -- the procedural issue.

23        MR. KOVALCIK:  Right.  The stipulated

24   protective order expressly provides that in the

25   event Tampa Bay Water subsequently designates any

1    Golder employee to serve as a testifying expert,

2    then discovery regarding said Golder employee shall

3    be in accordance with the Federal Rules of Civil

4    Procedure, and any scheduling order or pretrial

5    orders issued by the Court, and notwithstanding this

6    order or any other order addressing challenges to

7    TBW's privilege log, all designations on the

8    privilege log shall be subject to challenge by any

9    party.  So that would apply to Barnard, to HDR, and

10   there were similar orders entered into as far as the

11   Black & Veatch documents, which is the subject of

12   Barnard's motion to compel.

13       And also as to the Regional Authority Sixth

14   Circuit case, the *Tyson Food* case and most of the

15   other cases cited in our reply brief, it stands for

16   the principle that, under Rule 26(a)(2) and the

17   advisory committee notes to the 1993 Amendments to

18   Rule 26, it says that these documents must be

19   produced voluntarily through disclosures.  There's

20   no need for a subpoena, no need for a request for

21   production.

22       You designate your expert as a testifying

23   expert and he produces a report, you must disclose

24   those documents.  You don't have to be caught in a

25   trap of, well, you didn't subpoena these documents

1     or you didn't request them.  It's an automatic

2     disclosure.

3          THE COURT:  Mr. Forziano, let me go back, and

4     let's put aside the procedural issue here.  You're

5     not the one that did the privilege review; right?

6          MR. FORZIANO:  I was involved with the

7     privilege review, yes, Your Honor.

8          THE COURT:  You were.  Well, what was the

9     standard used in deciding the dual role issue?  I

10    mean, what -- what led to the conclusion that I

11    guess now we're down to 145 documents, they

12    shouldn't be produced?

13         MR. FORZIANO:  Sure.  It was based on the case

14    law, Your Honor.  The -- the Golder agreement, for

15    instance, is actually entitled litigation support

16    services and expert witness testimony agreement,

17    because they did have a dual role and that was

18    recognized by the parties and this Court when it

19    entered into the -- when it entered the stipulated

20    protective order.  And that role was maintained,

21    even though they were subsequently designated as a

22    testifying expert.

23         Some of the things they've helped us do is --

24    Black & Veatch is one of the other consultants that

25    we've used in this case, they've been a Tampa Bay

1    Water system engineer for over 10 years and have

2    been involved in this project at various points in

3    time.  We've had -- we know that they're going to be

4    deposed.  In fact, some of those folks -- some of

5    the Black & Veatch folks are already noticed for

6    deposition.  So we had Golder review some of their

7    work to help us get ready to help defend those

8    depositions.  That some of the work that they've

9    done.

10        Now, did Black & Veatch look into things such

11   as the cause of cracking and things of that nature?

12   Yes, they did.  But Golder performed an independent

13   analysis and independent investigation of those

14   issues.  So that's our basis for belief that, while

15   some of the Black & Veatch documents may touch upon,

16   obviously, the topics in this litigation, Golder

17   reviewed those documents to help us prepare for

18   discovery in this case.

19        THE COURT:  And assuming it was a B&V

20   document, in those circumstances did you claim

21   privilege?

22        MR. FORZIANO:  Your Honor, the underlying

23   documents that were reviewed have all been produced.

24   It's Golder's work product that we directed them to

25   regarding the analyzing in helping us getting ready

1    for the upcoming depositions.  Those -- that's the

2    work product that we've claimed privilege over.  The

3    underlying Black & Veatch documents have all been

4    produced.

5         THE COURT:  Okay.

6         MR. MASON:  Your Honor, if I may, Wayne Mason

7    for HDR.  We had a similar issue and originally took

8    a privilege position with respect to our expert.

9    But when we designated our expert who has done

10   similar work, we believe that, with the limited

11   exception that Your Honor has already acknowledged

12   that it is not protected and that it is a dangerous

13   and slippery slope, I think the position that

14   Mr. Forziano presents here, to suggest that his

15   testifying experts can do all of this analysis and

16   work with respect to essentially assisting them in

17   work product and then it can't be disclosed, it can

18   somehow be shielded.  I don't believe the case law

19   supports that, and I think that the exception is

20   very limited.

21        When we looked at it ourselves, Your Honor, we

22   believed that that limitation was such that it would

23   not provide protection and, therefore, voluntarily

24   agreed to produce everything.  And we think that the

25   same should apply here.

1           THE COURT:   What I'm inclined to do on this

2       one, Mr. Forziano, is -- and I want to preface what

3       I say here by saying that I don't want to create any

4       type of significant delay.   But what I'm -- what I'm

5       inclined to do after reading the -- the reply, I

6       think their aspect of the work that they did for you

7       in a consultant role that I think that I would honor

8       the work product privilege on.

9           I tend to think that if you -- I'm not sure of

10      the case or cases that I'm referring to here, but

11      the cases that resonated with me in terms of drawing

12      a line and maintaining some type of work product

13      doctrine privilege are those where it can be --

14      where it's clearly demonstrated that -- that they

15      acted purely in a consultant's role.

16           And so to the extent that, perhaps, they may

17      have assisted in getting you prepared for a

18      discovery deposition or something, I think that I

19      might be inclined to honor that.   On the other hand,

20      the case law is pretty clear that, once you identify

21      the person as the testifying expert or the entity --

22      the employees of an entity as a testifying expert,

23      it's pretty wide open after that.   And I have a

24      pretty wide open view about what should be produced.

25           What I'm inclined to do is just to -- if we

1    can do this in a relatively short period of time is

2    to request you to revisit your 145 documents in

3    light of the reply here, produce any additional

4    documents that you think are appropriate, and then

5    submit the balance to me for an in camera review and

6    I'll make the final call on the thing.

7         I'm reluctant to do that because, frankly, the

8    first time I ever did an in camera review, I was

9    told, well, there's only 33 documents, Judge.  And

10   I'm thinking -- you know, 16 years ago I'm thinking,

11   well, 32 documents isn't too bad, and then it turned

12   out to be like 4000 pages.  So I'm not sure about

13   145 documents.  It could be an enormous amount.  But

14   I think that's the appropriate way to proceed here.

15        Some of what they say in their -- in their

16   reply strikes me as being dead on accurate.  If it's

17   referenced, for instance, in your expert's report,

18   as something that he's obviously considered, I think

19   it's got to be given up, and I'm surprised that it

20   hasn't been.

21        So -- but I -- but then some of the other

22   stuff, I think if you can show a clear instance

23   where they were acting purely as a consultant, I

24   think that there's case law that suggests that that

25   can be withheld is the appropriate way to go on it

1      so --

2          MR. FORZIANO:  Your Honor, if I may.

3          THE COURT:  One more thing.

4          MR. FORZIANO:  Sorry.

5          THE COURT:  What I need to know is how soon do

6      you think you can do that?

7          MR. FORZIANO:  I could get through those

8      documents within a week's time, Your Honor.

9          THE COURT:  Okay.

10         MR. FORZIANO:  If I may respond to the -- one

11     issue, though.  I understand fully if a document's

12     listed in an expert report that usually is an

13     indication that they've considered it.

14         What Golder did, though, based on my

15     conversation with them is they listed every document

16     they had in their possession regarding -- regardless

17     of whether they considered it or relied upon it or

18     anything else just in -- in -- to try to -- they

19     wanted to have full disclosure of everything that

20     was in their possession so they couldn't be accused

21     of hiding any documents.  So that's why a lot of

22     these documents are listed in there.  They've listed

23     basically hundreds of thousands of documents in

24     their expert report, but they didn't consider or

25     rely upon all of them.

1              THE COURT:  Okay.

2              MR. FORZIANO:  And review them.

3              THE COURT:  If that appears to be the

4      circumstance and you think you've got some

5      privilege, then you can withhold it and I'll take a

6      look at it.  But I'm thinking that we ought to be

7      able to cull this down, narrow this down even

8      further than where we are right now.

9              MR. KOVALCIK:  I just want to make sure, I

10     mean, the standard, Your Honor, is not whether or

11     not the expert relied on the document and actually

12     used it in his report.  Case law is pretty clear,

13     it's whether you read it, you generated it, whether

14     or not you relied upon it so if it's considered, not

15     relied.  I want to make sure we don't have a second

16     round of, well, we looked at the document but we

17     actually didn't adopt that position.

18             THE COURT:  Well, ultimately if we have a

19     second round, at that point you'll have to have

20     relied on my review of the matters.  But what I've

21     attempted to do is to narrow it down even further

22     because I do think there's probably some documents

23     in here.

24             You know, for instance, under the category of

25     site inspection field data, I mean, if that's stuff

1    that you no doubt would have had to rely upon, you

2    know, then you're going to have a difficult time

3    convincing me that that should remain privileged.

4         So in any event, I'm going to allow -- we'll

5    issue a short order after this.  I'll allow you ten

6    days from the date of the order to file your

7    supplemental privilege log.  Hopefully, it will

8    result in greater protection and production.  And

9    then when you file that privilege log, I want you to

10   make an in camera submission -- you can do that

11   directly to chambers -- of the documents, and we'll

12   get on it as quick as we can.

13        MR. FORZIANO:  Thank you, Your Honor.

14        THE COURT:  Now, there's a similar -- a

15   similar motion related to B&V that Barnard has --

16   has filed here.  Who's going to speak to this on

17   behalf of Barnard?

18        MR. CANDES:  I will, Your Honor, Mike Candes.

19        THE COURT:  Okay.  Mr. Candes.

20        MR. CANDES:  Your Honor, if I -- if I may

21   approach, I have a document that I've prepared that

22   since we didn't have the benefit of a reply, the B&V

23   documents withheld and the categories.

24        THE COURT:  Go ahead and hand it up here.

25        (Brief pause.)

```
 1            THE COURT:  All right.  Go ahead, sir.

 2            MR. CANDES:  And, your Honor, just really

 3       briefly.  Mr. Forziano touched on this a little bit

 4       during his argument in response to the Golder

 5       documents.  But in 2008 after the -- the cracking

 6       had been discovered, Black & Veatch was tasked to go

 7       out to the reservoir and conduct intensive

 8       investigations to determine the cause of the

 9       cracking at the reservoir.

10            In fact, in -- that culminated in June of 2009

11       with Black & Veatch actually giving a presentation

12       to the Tampa Bay Water board that detailed the

13       results of the Black & Veatch investigation and

14       determined the cause of the cracking and proposed

15       fixes to remediate the -- the cracking.

16            As a result of that presentation, TBW's board

17       approved a 125-million-dollar line item in their

18       budget to repair the reservoir.  The documents that

19       are withheld, Your Honor, from the -- from the

20       production of the Black & Veatch records started out

21       at 569 documents in March of 2010.  After Barnard

22       filed its -- its motion to compel, 180 of those

23       documents were produced.  And the documents that

24       were produced specifically were designated on the

25       privilege log previously as confidential information
```

1    shared during confidential negotiations towards

2    compromise and settlement.

3        To date, TBW is continuing to withhold from

4    the Black & Veatch production 353 documents.  As was

5    touched on by Mr. Forziano and as detailed in our

6    brief, Black & Veatch, while they weren't a retained

7    expert for the purposes of this litigation, they

8    were disclosed in April of 2010 by TBW in a

9    supplemental Rule 26(a)(2) disclosure which stated

10   that certain Black & Veatch employees are witnesses

11   who are not retained or specially employed to

12   provide expert testimony in this case, whose duties

13   do not regularly involve giving expert testimony,

14   but who may be called at trial to present evidence

15   under -- and then it lists the Federal Rules of

16   Evidence 702, 703 and 705.

17       The documents that have been produced to date

18   by TBW were subpoenaed by HDR from Black & Veatch's

19   files show that Black & Veatch did do a very

20   intensive investigation into the cause of the

21   cracking.  The -- the documents that I've listed on

22   the -- on the sheet I've handed to Your Honor are

23   broken into 12 different categories.  And I'd like

24   to briefly touch on a few of those, if Your Honor

25   will allow me to.

1             The first category is lumped into notes,

2     agendas, e-mails, all relating to meetings with

3     Black & Veatch, some of which involved Allen Dell,

4     it appears, the -- TBW's lawyers.  But on disclosing

5     Black & Veatch as an expert, those types of

6     documents now become discoverable.  And this is true

7     whether the information was privileged at the time

8     it was provided to the expert but now it's all

9     discoverable since they've been disclosed.

10            Here we have a meeting where TBW and its

11     counsel are conferring with their expert witnesses,

12     Black & Veatch, and -- and all these communications

13     occur in the 2008-2009 timeframe when they were

14     developing their opinions that will be expressed at

15     trial in this matter.

16            But it's important when you look at the

17     privilege log that many of the entries, they don't

18     provide detail as to the subject matter.  All it

19     says is -- for instance, Document 72 states,

20     redacted -- meeting with TBW, redacted discussion of

21     litigation support tasks from Allen Dell.

22            Document 20 is described as a Power Point made

23     by Black & Veatch for a legal team briefing.  Two --

24     documents 251 to 257 state this is a string of

25     e-mails re preparation for legal team meeting

1    between Allen Dell, B&V and TBW.

2         Now, the 251 to 257 e-mails are interesting

3    because all of those e-mails are exchanged only

4    between Black & Veatch employees.  There's no lawyer

5    copied on any of those e-mails, or TBW employees.

6    Document 266 is an internal Black & Veatch meeting

7    to discuss upcoming legal team meeting.  Again, only

8    Black & Veatch employees are copied on that.

9         But it's difficult when you're looking at

10   the -- the first category of documents to really

11   determine -- although on the face they say they're

12   litigation support, I don't think that Tampa Bay

13   Water has met their burden to prove that this is

14   litigation support.  Simply a statement listing it

15   as a privilege log as litigation support I don't

16   think it cuts it under -- under the case law.

17        And the case law clearly states -- even the

18   case cited by Tampa Bay Water in their brief, if

19   there's -- if the document belongs even marginally

20   in the second category, which is the expert

21   category, it must be produced.  So if there's any

22   crossover, this Court must err on the side of

23   production.

24        There's one document under number two, moving

25   to category number two, that appears to relate to

1    settlement communications.  And I'm -- I'm assuming

2    this -- this was an oversight by Mr. Forziano or

3    Tampa Bay Water's part, but that document should be

4    produced, as well, since there is no privilege on

5    settlement communications.  It only goes to

6    admissibility.

7         Now, turning to number three, which is

8    documents relating to the Black & Veatch back

9    analysis, the back analysis performed by

10   Black & Veatch was -- was performed in connection

11   with their investigation into the cause of the

12   cracking.

13        Just to briefly explain what the back analysis

14   was, it's essentially where the Black & Veatch

15   engineers performed a series of analyses and

16   modeling, and it was all in order to demonstrate the

17   cause of the cracking or the mechanism that was

18   causing the cracking.  And this is a document that

19   they called the back analysis.  And I have a copy

20   here for Your Honor, if you'd like to review that.

21        But -- but all entries listed under this

22   category all state, legal teams comments to Black &

23   Veatch's back analysis.  And many of these documents

24   in this category are only exchanged, again, between

25   Black & Veatch employees and are not copied to Tampa

1     Bay Water or its lawyers.

2          Now, the back analysis is an essential piece

3     to the Black & Veatch overall analysis and

4     conclusions.  This is essentially their -- one of

5     their reports that they prepared that has been

6     produced.  It is at the very least a component of

7     the data that Black & Veatch considered in arriving

8     at their conclusions.  Thus, it is discoverable, and

9     all the documents that relate to the Tampa Bay Water

10    lawyers commenting on the back analysis are all

11    discoverable, as well.

12         And, Your Honor, that goes to the case law

13    that the *In Re Tri State Outdoor* case, the 283(b)(R)

14    358, where the court stated, courts must be careful

15    to not allow testifying expert opinions to be

16    influenced by the attorney.  And those documents

17    would all be discoverable for that reason.

18         Similarly, the category four, which is the

19    constructive --

20         THE COURT:  Not if it's simply a notation made

21    by a lawyer in looking at a document or something, a

22    notation, you know, of his mental impression.  Is

23    that protected?

24         MR. CANDES:  Well, Your Honor, I don't think

25    that's the case we have here because I think what we

1    have here is -- from the description, it appears

2    that the lawyers are making comments to the back

3    analysis.  I agree that if it's just a mental

4    impression that the lawyer's making as a note,

5    that's not discoverable.  But here where they're

6    sharing it with their expert and they're providing,

7    quote, unquote, comments to the back analysis, those

8    are discoverable.

9         That's no different than a lawyer providing

10   comments to any expert's report, and those become

11   discoverable.  The -- the constructability analysis

12   is similar.  Here Tampa Bay Water's expert, Golder

13   and Associates, has opined that construction work

14   performed by Barnard and its subcontractor,

15   McDonald, were performed defectively.  For Black &

16   Veatch to reach a conclusion as to the cause and

17   cracking at the reservoir, surely they looked at the

18   construction, the design, the construction

19   management, they looked at the whole picture and

20   they came to their conclusions.

21        Here, again, it's important to remember that

22   Black & Veatch made this presentation to the board

23   where they summarized all their opinions as to the

24   cause of the cracking.  During this presentation, no

25   mention was made of construction defects.  And, Your

1      Honor, there was actually a document that was

2      produced out of the 180 documents that were

3      previously withheld as settlement communications,

4      and I have a copy of that, also, for Your Honor, but

5      basically it's an e-mail between Black & Veatch

6      employees that is dated July 23rd of 2009 that

7      states in part, I am concerned that it is morally,

8      ethically and professionally wrong for us, meaning

9      the TBW team --

10          THE COURT:  I've read it.  You don't need to

11     read it.

12          MR. CANDES:  Okay.  And, Your Honor, those are

13     the types of documents that -- that we're entitled

14     to see.  And that document did have a notation, an

15     attorney/client communication exempt from

16     disclosure.  And if we hadn't filed our motion to

17     compel, chances are we never would have seen that

18     document because it was withheld as settlement

19     communication, wrongfully.

20          THE COURT:  All right.  Let me --

21     Mr. Forziano, let me jump over to you.  This is -- I

22     might not be able to articulate it well, but the

23     thought occurred to me last night that it's an odd

24     posture that B&V is in.  Is Tampa Bay Water a public

25     entity?

 1          MR. FORZIANO:  Yes, it is, Your Honor.

 2          THE COURT:  Okay.  And they have been using

 3     B&V for years, as I understand it.

 4          MR. FORZIANO:  That's correct.

 5          THE COURT:  As their essential consultant for

 6     the -- for the reservoir, for all their projects.

 7          MR. FORZIANO:  As a system engineer, but not

 8     particular to the reservoir.

 9          THE COURT:  Okay.  Is it appropriate in the

10     circumstances when litigation strikes, if you will,

11     to -- for the lawyers to attempt to put a different

12     hat on them in order to protect against disclosure?

13          MR. FORZIANO:  Yes, there is.  In fact,

14     there's exceptions to the public records law when

15     there's threatened litigation or pending litigation,

16     that documents are exempt from the public records

17     law.  And I think the defendants have

18     mischaracterized Black & Veatch's role, Your Honor,

19     and what they're going to be expected to testify to.

20     They're not going to testify as to what caused the

21     cracking.

22          Their limited role is to talk about a short

23     term repair program that they prepared and

24     implemented at the reservoir.  Golder is going to be

25     our testifying expert with regard to causation.  And

1    one of the reasons is is because think they have a

2    misconception of Black & Veatch's role.

3        Early on before Tampa Bay Water, probably

4    naively, wasn't even thinking of litigation until

5    very late in the game, they were trying to work

6    things out with the defendants, especially HDR.  In

7    fact, we paid HDR over a million dollars to

8    investigate the cause of the cracking for us before

9    we realized they were never going to give us an

10    answer.

11        So eventually, Tampa Bay Water tasked its

12    system engineer to perform an investigation.  That

13    task did not include identifying who was liable, who

14    was responsible.  Rather, they determined what the

15    root cause was without determining what was causing

16    that root cause, i.e., was it a construction defect,

17    was it a design defect.  That's why they -- at that

18    board meeting they never stood up and said, hey,

19    it's a construction defect or it's lack of

20    construction management, because they weren't tasked

21    to do that.  Golder and other experts have been

22    tasked to do that.

23        With regard to the e-mail which I know just

24    looks horrible when you see it, that was generated

25    during confidential settlement negotiations with

1        HDR.   After we filed suit, HDR approached us and

2        they wanted to try to work this out, or at least

3        they said they did.   There was a couple of meetings.

4        At one meeting Black & Veatch made a presentation

5        regarding what they thought was wrong.   The next

6        meeting, HDR made a presentation.

7              That e-mail that Mr. Candes referred to is

8        Black & Veatch's internal discussions regarding the

9        HDR presentation that was made the previous day, not

10       to any direction or communication or comments or

11       experts that Tampa Bay Water had.   That was in

12       response to HDR's presentation.

13             And since they had not been tasked to identify

14       who was actually at fault, when -- it appears from

15       my reading of this and my discussions with the Black

16       & Veatch folks, at that meeting HDR tried to

17       persuade our folks that, hey, this is a construction

18       issue, not a design issue.   And that was -- one of

19       the Black & Veatch's employee's response was, hey,

20       we don't have any information that's a construction

21       defect, so it would be immoral for us to try to go

22       there now.

23             And that's what that is.   That has no

24       reflection on any direction that Black & Veatch was

25       given by Tampa Bay Water.

 1          MR. PICKERT:  Your Honor, if I may, this is

 2     Steve Pickert on the phone for Construction Dynamics

 3     Group.  I just want to say that Black & Veatch did

 4     determine what the cause of the cracking was and

 5     opined in written reports that it was a design

 6     issue.

 7          MR. STANISLAW:  This is Miles Stanislaw, also

 8     on the phone.  I totally second what Mr. Pickert has

 9     to say.  There are numerous e-mails and reports and

10     communications prepared by Black & Veatch that

11     totally indicate that this is a complete design

12     failure at the reservoir, and there's not an e-mail

13     anywhere from Black & Veatch saying that there is

14     anything wrong with the construction work.

15          And to try and mask that reality by saying

16     they weren't tasked with pointing their finger at

17     anybody simply doesn't square with the

18     professionalism that Black & Veatch brings to this

19     litigation.  They've been the systems engineer for

20     ten years.  They've been the Tampa Bay Water's go-to

21     person on all water issues for ten years.

22          They spent over a million dollars doing an

23     investigation and they concluded that this was a

24     design problem, Your Honor.  And it's clear and

25     unequivocal.  And that the e-mail that they

1     reference is kind of the bottom line of their whole

2     approach and thinking on this thing.

3          They'd be like people in England, in Florida,

4     in Kansas City, in Baltimore, Maryland to conduct an

5     extensive and intensive investigation.

6          MR. FORZIANO:  Your Honor, Black & Veatch was

7     not tasked with assigning liability or determining

8     who was at fault; rather, they were determine --

9     tasked with determining the root cause, and they

10    determined that it was pour pressure.  And as part

11    of their investigation, they did determine that

12    there was design implications.

13         THE COURT:  Okay.  You don't need to go there.

14         MR. FORZIANO:  Okay.

15         THE COURT:  My question to you, you brought

16    the same approach to the review here that you

17    outlined on the earlier review?

18         MR. FORZIANO:  Well, Your Honor, we never got

19    there because it was -- one thing, another

20    procedural issue is that Barnard's motion doesn't

21    concern the required certificate of good faith

22    because there was none.  We received a letter from

23    them on May 24th demanding that we produce all the

24    documents the following day.

25         My partner, Mr. Harrison, responded on May

1    24th and said, hey, we'll begin the review right

2    away.  We're willing to work with you on this.

3    However, one day is unreasonable, especially since

4    I, who had been taking the lead on this, was in

5    Kansas City attending depositions, and for the rest

6    of the week I was out in Montana on depositions on

7    this very case.

8         Two days later Barnard files their motion.

9    Had they given us time, we would have gladly gone

10   back and done the same level of review.  The one

11   thing that we did manage to do in the interim,

12   though, is we did manage to release those documents

13   that were part of the settlement discussions with

14   HDR.

15        The reason we held up on disclosing those is

16   that all those meetings and the documents generated

17   by those meetings were subject to a confidentiality

18   agreement that we have in writing with HDR that says

19   we can't produce those documents unless we have

20   their agreement or a court order.  So we asked them

21   to review the documents that we had and get their

22   approval to release those documents.  They granted

23   that approval on June the 10th, I believe it was,

24   and by June the 14th, we produced those documents.

25        THE COURT:  How long will it take you to look

1    at the 353 documents in light of the breakdown here,

2    assuming this is the appropriate breakdown?

3        MR. FORZIANO:  Sure.  Well, Your Honor, it --

4    I would like to say I could do it quickly, but I

5    need to be candid with the Court.  I'm in --

6    scheduled to be in depositions five days next week.

7    In addition, I've got 145 documents to review on the

8    Golder matter.

9        THE COURT:  Which is more urgent from the

10   defendant's standpoint, the Golder docs or the B&V?

11       MR. CANDES:  Well, we have B&V employees set

12   for deposition.  We don't have any Golder employees

13   set for deposition, and that's the subject of HDR's

14   motion to compel the plaintiffs to produce their

15   experts.  So I guess from that standpoint, depending

16   on when the Golder experts get slotted by the Court,

17   if the Court's still willing to rule that way, that

18   might determine the urgency of the matters.

19       MR. STANISLAW:  Your Honor, this is

20   Mr. Stanislaw on the phone again.  This is part of a

21   TBW pattern of delay.  TBW has literally unlimited

22   resources devoted to this case.  In a disclosure as

23   of the end of June, TBW had invested $4.6 million in

24   attorneys fees on this case.

25       Federal Rule of Civil Procedure number one

1      says these cases are supposed to be resolved, speedy

2      and inexpensively.  And we are constantly faced with

3      TBW trying to delay what's going on.  And the big

4      reason behind TBW's desire to delay things is, is

5      they don't have any kind of a fix in place.

6           This Golder fix that you've referred to, it

7      isn't going to be shown to the board, it isn't going

8      to be shown to any possible replacement contractor,

9      and they're trying to -- trying to delay this whole

10     case as long as they can so they can finally get

11     a -- a repair contractor in place out there.

12          And, I mean, this situation has been going on

13     since December of 2006 when the cracks were first

14     discovered.  And I'm -- I'm just urging the Court to

15     recognize that -- that this matter continues to be

16     delayed and delayed and TBW continues to hide behind

17     these procedural Catch 22s in an effort to avoid the

18     spirit and intent of the federal rules, which is

19     full disclosure and timely and speedy resolution of

20     these cases.

21          THE COURT:  Okay.  Well, they're not hiding

22     behind the -- in my mind, they're not hiding behind

23     our local rule which requires you all to talk about

24     these things before you file your pleadings.

25     That's -- frankly, we deny motions all the time out

1    of hand for that reason.  Y'all know the rules and

2    we expect you to abide by them.

3         However, it's pretty obvious to me that it

4    wouldn't have resulted in a great deal of progress

5    here.  I gave you ten days on the other documents.

6    I'm going to give you 20 days on these documents to

7    make your review, file a supplemental privilege log

8    if it's appropriate to do so.  If not, submit it in

9    camera.  We'll take a look at it as quickly as we

10   can.

11        I understand your schedule, Mr. Forziano.

12   But, obviously, there are a lot of other lawyers

13   capable of working on it that can get involved in

14   this, perhaps Mr. Harrison or somebody else.

15        But the last thing -- it's not ripe, but the

16   last thing I want to talk about, and I need to do so

17   quickly because I need to move on to a criminal

18   matter here.  There's a motion related to compelling

19   Tampa Bay Water to -- to produce its experts for

20   deposition.  And it -- in particular, we're talking

21   about Mr. Brumund and Mr. O'Connell, who I

22   understand are -- are Golder employees?

23        MR. KOVALCIK:  Mr. Brumund is a Golder,

24   Mr. O'Connell is another testifying expert witness

25   with O'Connell and Lawrence.

1          THE COURT:  Okay.

2          MR. MASON:  They're their key liability

3     experts and they're also opining on damages.  But

4     they are their key liability experts.

5          THE COURT:  Okay.  And the problem is that for

6     whatever reason we can't agree on -- slot them in in

7     your all's schematic here?  Is that the problem

8     or --

9          MR. MASON:  Your Honor, we have tried.  And

10    we have been willing to pull the defense notices

11    that we properly noticed so that -- pursuant to your

12    prior order that we would sequentially take the

13    plaintiff's experts first, which certainly makes

14    sense.

15         And we have offered multiple dates.  We have

16    offered to do an off week -- everyone else has

17    agreed to add an extra week because of the

18    accommodation to Mr. Harrison, who indicated that he

19    had a deal with the mediator that we would not do

20    expert depositions the week of the mediation.  And

21    that's fair.  I'm not trying to suggest that's not

22    fair.

23         But we cannot get any agreement as to when he

24    will produce them, and we have offered either to

25    take another week that's not otherwise noticed or

1    switch out so that we can take the plaintiff's

2    first.  And all -- the bottom line response we

3    always get is, well, there's more discovery and we

4    need to extend the discovery deadline.  And so we

5    just fundamentally think that's unfair, got

6    frustrated and that's why we filed the motion.

7         THE COURT:  Is there any magic in the August

8    15th deadline that you propose for -- for compelling

9    their depos?

10        MR. MASON:  The -- it's before the next

11   mediation.  There's a supplemental mediation.  And

12   we do think that's important to flush out.  And

13   that's why we had noticed them early in the process,

14   both consistent with your order that we should be

15   able to take them first, and now we're trying to be

16   flexible by not saying it has to be July the 12th,

17   which is what we'd prefer, but we're trying to get

18   it done before that next mediation so that we can

19   have accomplished that and have meaningful

20   discussions.

21        THE COURT:  How long -- how long are these

22   depos scheduled to take?

23        MR. MASON:  We would anticipate probably three

24   days for each individual.

25        THE COURT:  Each?

1          MR. MASON:  Yes, Your Honor.  These are their

2     key folks.

3          THE COURT:  All right.  Mr. Forziano,

4     Mr. Harrison, what's up?

5          MR. HARRISON:  Judge, let me just say --

6          THE COURT:  Obviously, they've got a right

7     to --

8          MR. HARRISON:  Absolutely.  There's no

9     question they get to depose our experts.  Let me

10    clarify a couple of things.

11         First of all, the case management order does

12    not say that they get to depose our experts before

13    we get to depose theirs.  What it says is we can't

14    notice the defense experts until after they've

15    noticed ours.  Well, we haven't noticed their

16    experts, they've noticed each other's experts.  So

17    let's put that aside.

18         The issue is not that they don't get to depose

19    these people.  Clearly, they do.  The mediation

20    deadline is a red herring because them deposing our

21    experts before mediation is no more important than

22    us deposing their experts before mediation.

23         The issue is that, while they want to depose

24    our experts, and they're absolutely entitled to do

25    it, the defendants collectively refuse to

1    acknowledge the simple fact that there's more

2    depositions to do, including the five new experts

3    they've just identified on damages, and there's no

4    time.  Every deposition week between now and

5    December 15th is full.

6         And I've asked repeatedly, let's have a

7    conversation, let's decide who's left to depose,

8    let's get together and estimate how much more time

9    we need.  We'll go to the Court together as

10   reasonable people and say, this is how much time we

11   need.  And the defendants refuse to acknowledge that

12   the schedule's full, there are no more days.  And

13   squeezing those two experts in doesn't solve the

14   problem.

15        And, frankly, I'm not inclined to disrupt a

16   schedule that has us doing depositions every other

17   week through December to squeeze in these two guys,

18   when we know there's more.  And that's the purpose

19   of us having filed last week the motion to amend the

20   case management order.

21        It doesn't solve the overall problem, which is

22   that there's more experts to do that aren't noticed,

23   there's many more fact witnesses to do that aren't

24   noticed, all within the constraints of the number of

25   depositions the Court's already permitted the

1      parties to do.  We're not asking for more

2      depositions.  We're asking for more time to do the

3      depositions the Court's already said we can do.

4           THE COURT:  Okay.  I understand your position.

5      And it seems to me what you're really angling for

6      here is an extension of the discovery cutoff along

7      with the other dates.  But I don't -- at this point

8      that's not my concern.

9           But you say that you have offered to give

10     up -- or you've offered to bring these individuals

11     in on the extant schedule by giving up the depo of

12     what, defense -- other defense witnesses?

13          MR. MASON:  Yes, Your Honor.  And we've worked

14     with the -- the other defendants, as well, and they

15     are willing to do that.

16          THE COURT:  Yeah.  If they're willing to give

17     up a slot for somebody who's already been deposed

18     because they think that it's more urgent for them to

19     do so, it seems very reasonable, it's consistent

20     with the schedule, why can't we do that?

21          MR. HARRISON:  As -- as long as it's done with

22     sufficient time and sufficient notice, Judge, we can

23     do it.  There are notice requirements.  We can't

24     swap out experts at the last minute.  Obviously, if

25     they've noticed, we've been preparing to depose the

1    people that have been noticed.

2        THE COURT:  Okay.

3        MR. PICKERT:  Your Honor, this is Steve

4    Pickert again.  What Mr. Harrison neglected to

5    mention is that his experts were noticed and -- and

6    they were noticed by HDR first.  As the case

7    management order says, they go first.  And

8    Mr. Harrison refused to produce them in that week.

9        Then we talked about doing them in the

10   following week, and he said that Mr. Brumund was not

11   available in the following week but he would check

12   on Mr. O'Connell.  Well, Mr. O'Connell was not

13   available, either.

14       And then he changed his position and said he

15   was not going to produce them until the first week

16   of January 2011, even though all the defendants had

17   agreed to push back on the other expert depositions

18   that had been noticed so that we could do Brumund

19   and O'Connell first, which have been noticed first.

20       And I'm -- I'm with Mr. Mason.  I think it was

21   reasonable for Mr. Harrison to say, don't take

22   expert depositions during the week we're having the

23   mediation.  I don't fault him for that at all.  But

24   it follows reason and logic that you would still put

25   them next in line as the first experts out of the

1    box.

2         MR. MASON:  Your Honor, just to cut to the

3    chase, we have agreement amongst the defendants the

4    week of August the 9th, which is a time that we can

5    reschedule the defense experts, and that gives Tampa

6    Bay Water 30 days from now, which is clearly

7    adequate time to prepare their experts.

8         And we would propose that we take those

9    depositions that week, Your Honor, and then all we

10   would ask is that we have one additional week within

11   the current discovery schedule to do those other two

12   depos that we're pulling.  And we have the agreement

13   of the defendants to do that, and that we will work

14   together to find an appropriate date.  And so

15   everyone has agreed to that from the defense

16   standpoint, and we respectfully believe that that is

17   an appropriate way to handle this.

18        THE COURT:  All right.  Well --

19        MR. STANISLAW:  Your Honor, this is

20   Mr. Stanislaw for Barnard.  There's one development

21   that has occurred in this deposition schedule that

22   Your Honor should be made aware of.  HDR noticed one

23   of Barnard's experts for August 9th, the date

24   indicated by Mr. Mason.  And tragically and

25   unfortunately, this expert is dealing with an

1     extremely serious family health issue involving one

2     of his children.  And he cannot sit for this

3     deposition on August 9th and may not be able to

4     serve as an expert in the future.

5          And so I communicated that information to all

6     of the counsel in this case by e-mail and sent out a

7     notice of deposition for one of Tampa Bay Water's

8     two expert witnesses, Mr. O'Connell, to be deposed

9     on August 9th.  So currently there is a Tampa Bay

10    Water expert witness deposition noted for August

11    9th.  And so that just leaves the need to create a

12    time slot to take the deposition of the second Tampa

13    Bay Water expert, Mr. Brumund.

14          THE COURT:  All right.  Thank you.  Is there a

15    reason why we can't resolve this today from y'all's

16    standpoint?  I mean, it seems reasonable to me that

17    30 days is plenty of notice.  One of them has

18    already been noticed.  Can we agree to set aside the

19    week of the 9th to conduct these two plaintiff's

20    experts, the deposition of these two plaintiff's

21    experts, setting aside this issue of what you do

22    with who's being bumped, because I think that that

23    needs to be addressed in a larger way because of the

24    indication that there are -- it's not just a matter

25    of slotting those in, but we've got others,

1    apparently, that have been identified.

2        If it comes back to me, we'll address it

3    globally.  But it seems to me that we don't need to

4    resolve what we do with those two right this second.

5    If they think it's important to get the plaintiff's

6    experts in, I don't see why we can't do that.

7    Agreeable?

8        MR. HARRISON:  If that week of August 9th, and

9    it is about 30 days out, if the defense are going to

10   withdraw the depositions that they've noticed, I

11   don't know that we would have any objection to them

12   noticing ours.  I can virtually assure the Court

13   that Dr. O'Connell and Dr. Brumund are not going to

14   get completed in the same week.  So we'll leave it

15   up to them to decide what they want to do.

16       But, again, this is not a case where we're

17   talking about one or two day depositions, Judge, so

18   the week is available on the calendar.  If they

19   withdraw their other notices, it's within the 30-day

20   notice required under the case management order.  I

21   don't really have a basis to object as long as we

22   have some understanding that we are leaving open

23   until we get there the issue of the overall schedule

24   because I'm extremely concerned about just trying to

25   cram more depositions in because we're already doing

1        depositions every other week through December.

2             THE COURT:  All right.  Your motion's granted

3        to the extent that you wish to substitute in these

4        two experts during the week of the 9th, notice

5        them -- apparently one of them has already been

6        noticed, notice the other and move forward with

7        those depositions.  At this point I'm not going to

8        make a ruling about what we're going to do about the

9        other two because I think it sounds like we're going

10       to need to address that in a bigger way -- experts

11       in a bigger way.

12            The -- if on reflection you think actually

13       that it's going to take three, four, five days for

14       one witness, then proceed with that one witness,

15       then.  And if you want to use the same approach to

16       getting the other witness in by dumping out one of

17       the defense experts that's already scheduled, move

18       ahead and do that, provide them adequate notice.

19       And, again, we'll address what to do with the ones

20       that are being, you know, sort of pushed aside at an

21       appropriate time here.

22            MR. MASON:  We will do that.  Just one minor

23       clarification.  I don't know that it will be an

24       issue with Mr. Stanislaw.  But I did not double

25       notice and Mr. Stanislaw did notice it because his

```
1        witness is now unavailable.

2             Since I have played by the rules and I did

3        notice them originally, I would respectfully ask

4        that I could take the lead on these experts that

5        I -- and I will reissue a notice myself so that I

6        can go first as I have properly scheduled originally

7        with respect to the plaintiff's experts.

8             THE COURT:  Well, that sounds like a problem

9        that y'all need to work out.  But anybody who wants

10       to participate, can take the depo, notice them.  I

11       think Mr. Harrison may be correct.  If everybody

12       jumps in, it's not something that's going to be

13       accomplished in one or two days, but --

14            MR. PICKERT:  I agree.

15            MR. MASON:  All right.  We'll work on it.

16            THE COURT:  But that's something that you all

17       can work on.  But what I'm doing is I'm okaying the

18       week of August 9th to slot those people in.  Let's

19       move forward in making that happen.

20            MR. MASON:  Thank you, Your Honor.

21            THE COURT:  No need for any further response

22       from you, Mr. Harrison, because I think it will all

23       end up getting discussed at some point in connection

24       with the case management issue, which is not mine at

25       this point, anyway, so -- all right.  We'll issue a
```

1       short order.   Thank you.

2                (Proceedings concluded at 11:40 AM.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                      C E R T I F I C A T E
 3
 4    STATE OF FLORIDA          )
 5    COUNTY OF HILLSBOROUGH   )
 6        I, Linda Starr, RPR, Official Court Reporter for
 7    the United States District Court, Middle District,
 8    Tampa Division,
 9        DO HEREBY CERTIFY, that I was authorized to and
10    did, through use of Computer Aided Transcription,
11    report in machine shorthand the proceedings and
12    evidence in the above-styled cause, as stated in the
13    caption hereto, and that the foregoing pages,
14    numbered 1 through 54, inclusive, constitute a true
15    and correct transcription of my machine shorthand
16    report of said proceedings and evidence.
17        IN WITNESS WHEREOF, I have hereunto set my hand in
18    the City of Tampa, County of Hillsborough, State of
19    Florida, this 1st day of September 2010.
20
21
22        _____/s/ Linda Starr_____
             Linda Starr, RPR, Official Court Reporter
23
24
25
```