# EXHIBIT B

```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION

 3     TAMPA BAY WATER,
       A Regional Water Supply
 4     Authority,

 5            Plaintiff,      CASE NO.:  8:08-CV-2446-T27-TBM

 6     vs.

 7     HDR ENGINEERING, INC., a
       Nebraska corporation,
 8     CONSTRUCTION DYNAMICS
       GROUP, INC., a Maryland
 9     corporation,
       BARNARD CONSTRUCTION
10     COMPANY, INC., a Montana
       corporation,
11     ST. PAUL FIRE AND MARINE
       INSURANCE COMPANY, a
12     Minnesota corporation,

13            Defendants.
       _____/
14     BARNARD CONSTRUCTION COMPANY, INC.,
       a Montana corporation,
15
              Third Party Plaintiff,
16
       vs.
17

18     MCDONALD CONSTRUCTION CORPORATION,
       a Federal corporation,
19
              Third Party Defendant.
20     _____/

21                       VOLUME I of X
                        (Pages 1 - 133)
22
                    VIDEOTAPED DEPOSITION OF
23           KENNETH J. O'CONNELL, Ph.D., P.E.

24

25
```

1   testimony that you read and whose deposition was it?

2      A.    The substance of the testimony was the use of

3   a dozer blade to scarify the surface between lifts of

4   soil placed in the embankment.   That's the substance

5   that I read.   The individual, I'm not sure if it was

6   addressed by more than one or not.   There was an

7   individual named Colvin who discussed that in his

8   deposition.

9      Q.    What's the change you would make?

10      A.    The change I would make is that in our report

11   we indicate that the surface was not scarified between

12   lifts, and I would check that.

13      Q.    To say that it is scarified between lifts?

14      A.    That apparently it was scarified between lifts

15   using different methodologies other than the disk.

16      Q.    By the way, in connection with your

17   assignment, you read a lot of documents, right?

18      A.    Yes.

19      Q.    Prior to reading all the project records?

20      A.    Yes.

21      Q.    Did you ever read any projects record written

22   by anyone from HDR who's in charge of quality control

23   that complained or criticized about the scarification

24   effort that was used on each successive lift in the

25   course of constructing the embankment?

1          MR. MEADERS:   Object to the form.

2      A.    I don't recall that, no.

3      Q.    In the course of reading all of these project

4  documents, did you ever read any piece of paper written

5  by anyone on behalf of CDG that complained or criticized

6  the scarification that was done on each successive lift

7  while the embankment was constructed?

8      A.    I don't recall so, no.

9      Q.    Why did you include in your report criticism

10 of the scarification if no one from the QC company and

11 no one from the QA company ever raised it as a concern

12 or criticism at any point during the two-year period of

13 time that the embankment was being constructed?

14     A.    Because my independent review of the records

15 and the documents indicated that a disk was not used to

16 scarify the surface.

17     Q.    Yeah.  Well, your independent review of the

18 documents indicates that one disk was used during the

19 course of construction, correct?

20     A.    That's correct.

21     Q.    Are you now prepared to change that answer,

22 sir, now that you know that there were at least three

23 disks used?

24     A.    No.

25     Q.    Well, you didn't read that in the depositions,

```
 1        A.    Primarily, yes.

 2        Q.    And when did you find out that someone wanted

 3   you to do more than just cost estimating, that they

 4   wanted you to do a performance analysis of Barnard's

 5   performance and CDG's performance?

 6        A.    I don't recall that specifically.

 7        Q.    How -- how -- how long after you first visited

 8   the reservoir did you find that out approximately?

 9        A.    It was probably in a matter of weeks, but I

10   don't recall.

11        Q.    How did you find that out?

12        A.    I don't recall if it was in a meeting or a

13   phone call.

14        Q.    Who did you find it out from?

15        A.    It would have been Mr. Forziano.

16        Q.    What did Mr. Forziano tell you?

17        A.    He said that he believed that there would be a

18   report necessary, looking at the performance of the

19   contractor and the construction manager.

20        Q.    And you've not issued a report that is

21   entitled or styled performance analysis of HDR, have

22   you, sir?

23        A.    No.

24        Q.    HDR is the principal inspector on the Tampa

25   Bay Water reservoir project, aren't they?
```

```
 1              MR. MEADERS:  Object to form.

 2              MR. FORZIANO:  Object to form.

 3       A.   Well, they are the quality control entity on

 4  the reservoir.

 5       Q.   And you read the HDR quality control report

 6  that was submitted to Tampa Bay Water and approved by

 7  the Florida Department of Environmental Protection,

 8  didn't you?

 9              MR. FORZIANO:  Object to form.

10              MR. MEADERS:  Object to form.

11       A.   I think it's a plan.  It's entitled "Plan,"

12  but yes, I have read that.

13       Q.   That's an important document in the scheme of

14  this case, isn't it, sir?

15       A.   I believe it is.

16       Q.   And doesn't that lay out a whole host of

17  inspection duties that HDR was supposed to perform on

18  this project?

19              MR. MEADERS:  Object to form.

20       A.   Yes, it does.

21       Q.   So wouldn't it be fair to say that HDR was the

22  party that had primary inspection duties on this

23  project?

24              MR. FORZIANO:  Object to form.

25              MR. MEADERS:  Objection to form.
```

1      A.   I don't know that I would classify it that

2  way.

3      Q.   Okay.  Would it be fair to say that HDR had

4  primary responsibility for the quality control duties on

5  this project?

6      A.   I don't know if I'd say that either.

7      Q.   Who did?

8      A.   I think Barnard had the initial quality

9  control responsibilities on this project.

10      Q.   I didn't say who had the first, I said the

11  primary.  Do you understand the difference between

12  "first" and "primary," sir?

13          MR. FORZIANO:  Object to form.

14          MR. MEADERS:  Objection to form.

15      A.   Yes.

16      Q.   Okay.  "Primary" means the most important,

17  doesn't it?

18          MR. MEADERS:  Objection to form.

19          MR. FORZIANO:  Objection to form.

20      A.   It could.

21      Q.   How do you define it?

22      A.   I think "primary" means significant.

23      Q.   HDR had significant inspection

24  responsibilities on this project, didn't they, sir?

25          MR. MEADERS:  Objection to form.

1     A.    Yes.

2     Q.    Okay.  You are qualified by background and

3  experience to do an analysis of a party that has

4  significant inspection responsibilities on a project

5  such as this one, aren't you, sir?

6     A.    I believe that I am, yes.

7     Q.    You have not prepared an analysis of the

8  performance of HDR's inspection responsibilities on this

9  project, have you, sir?

10     A.    I don't know if that's true or not.  I've not

11  issued a report.  I certainly have reviewed and analyzed

12  the inspection on this project.

13     Q.    Performed by HDR?

14     A.    Some of it performed by HDR, some of it

15  performed by Barnard, some of it performed by CDG.

16     Q.    Right now I want to just talk about HDR.  Can

17  we just do that?

18         Did you ever discuss with any lawyer whether

19  or not you should or should not issue a report that

20  analyzed the performance of HDR's inspection

21  responsibilities on this project?

22     A.    No.

23     Q.    The decision to not issue a report on the

24  inspection responsibilities of HDR on this project was

25  yours, then; is that correct, sir?

```
 1              MR. FORZIANO:  Object to form.

 2         A.   I don't know if it's fair to say that, no.

 3         Q.   Whose decision was it that O'Connell &

 4    Lawrence would not issue a report on HDR's performance

 5    of its inspection responsibilities on this project?

 6         A.   I was not asked by counsel to do such a

 7    report.

 8         Q.   And as a result of not being asked by counsel

 9    to not issue a report on the performance by HDR of its

10    inspection responsibilities on this project, you did not

11    issue a report; is that correct, sir?

12         A.   That's correct.

13         Q.   And it's your intent in connection with your

14    assignment on this case to be independent and objective;

15    is that correct, sir?

16         A.   Yes.

17         Q.   And to be objective, in order to analyze the

18    inspection responsibilities on this project, you would

19    have to include Barnard, CDG, and HDR, wouldn't you,

20    sir?

21         A.   Yes.

22         Q.   But you didn't include HDR in your analysis

23    reports, did you, sir?

24              MR. FORZIANO:  Object to form.

25         A.   I don't think that's necessarily true.
```

```
 1        Q.    Where is your report that analyzes the

 2   inspection performance by HDR?

 3        A.    It is discussed in -- in both of our reports.

 4        Q.    Did HDR fulfill their inspection

 5   responsibilities on this project adequately, sir?

 6             MR. MEADERS:  Objection to form.

 7        A.    No.

 8        Q.    In any of the conclusions of any of your

 9   reports, do you state the conclusion that HDR did not

10   fulfill its inspection responsibilities adequately on

11   this project?

12        A.    (Reviewing documents.)

13             Not directly, no.

14        Q.    HDR was a important participant in the quality

15   control process on this project, correct, sir?

16             MR. FORZIANO:  Object to form.

17             MR. MEADERS:  Objection to form.

18        A.    Yes.

19        Q.    And it's your opinion that HDR did not perform

20   their inspection duties on this project adequately or

21   sufficiently, correct?

22             MR. MEADERS:  Objection to form.

23        A.    That is correct.

24        Q.    And it's your goal to prepare an independent

25   and objective report that fairly sets out your
```

1    conclusions on this project, correct, sir?

2         A.    That is correct.

3         Q.    And in no place did you set out the conclusion

4    that HDR failed to adequately and sufficiently perform

5    their inspection duties on this project, did you, sir?

6         A.    Not directly.

7         Q.    The answer is no, isn't it, sir?

8         A.    Yes.

9         Q.    None of your conclusions contain that

10   statement, do they, sir?

11             MR. FORZIANO:  Object to form.

12        A.    And the statement again specifically?

13        Q.    In substance or effect, you never stated in

14   any of your conclusions that O'Connell -- excuse me,

15   that HDR failed to adequately and sufficiently perform

16   their inspection duties on this project.

17             MR. MEADERS:  Objection to form.

18        A.    I think in effect we did.

19        Q.    What conclusion in effect states that, sir?

20        A.    Conclusions related to --

21        Q.    Take -- take me to your book.  Find me the

22   conclusion that says that.

23        A.    BCC failed to construct the reservoir

24   embankment pursuant to the terms and conditions of the

25   construction contract.  BCC failed to construct the

1  reservoir embankment wedge pursuant to the terms and

2  conditions of the construction contract.   BCC failed to

3  construct the reservoir foot soil-cement facing pursuant

4  to the terms and conditions of the contract.   BCC failed

5  to provide quality control functions pursuant to the

6  terms and conditions of the contract.   BCC failed to

7  provide quality control functions pursuant to its

8  approved quality control plan.

9       Q.   Do you have my question in mind?

10      A.   Yes.

11      Q.   Are you trying to find a place where it says

12  HDR failed to sufficiently and adequately perform their

13  inspection duties?

14      A.   No, sir.   I said "in effect," and you said to

15  go ahead and find them and that's what I'm doing.

16      Q.   Well, you don't even mention HDR in any of

17  your conclusions, do you, sir?

18      A.   That's correct.

19           Do you want me to finish answering the

20  question that you've asked me or not?

21      Q.   No, I'll go on to the next one, if it's okay

22  with you.

23           No place in any of your conclusions in your

24  reports do you ever use the word or the term "HDR" to

25  identify HDR as having failed to adequately and

```
 1    sufficiently perform their inspection responsibilities

 2    on this project, do you, sir?

 3              MR. FORZIANO:  Object to form.

 4              MR. MEADERS:  Objection to form.

 5         A.   I don't specifically recall that, no.

 6         Q.   Okay.  Would it be fair to say you have a

 7    laundry list of Barnard's failures to perform their

 8    construction work; true, sir?

 9         A.   I wouldn't characterize it as a laundry list.

10         Q.   How would you characterize that list you just

11    read?

12         A.   I would say it's a list.

13         Q.   Okay.  A lengthy list?

14         A.   It's a relative term.  It's a list.

15         Q.   Okay.  You don't have any list anyplace of

16    HDR's -- examples of HDR's failures to perform their

17    inspection duties on this project, do you, sir?

18              MR. MEADERS:  Objection to form.

19         A.   Anyplace in writing in these reports?

20         Q.   Yeah.  Anyplace in writing.

21         A.   Is that your question?

22         Q.   Yes, sir.

23         A.   I would have to go through the reports and see

24    if it's mentioned, but I don't recall anything right

25    now.
```

```
 1        Q.   You have a list of CDG's failures to perform

 2   their responsibilities on this project, don't you, sir?

 3        A.   Yes, I do.

 4        Q.   So you have a list for Barnard, a list for

 5   CDG, and no list that you can recall as you sit here

 6   today of HDR's failures to perform their inspection

 7   duties and responsibilities on this job, correct?

 8             MR. MEADERS:   Object to form.

 9        A.   That is incorrect.

10        Q.   Where -- where is the list that recites of all

11   HDR's failures to perform their duties and

12   responsibilities as an inspector on this job?

13        A.   It is, in part, described in these reports.

14        Q.   No, I said a list, a summary list like you did

15   for Barnard and CDG.

16        A.   Let me understand your question.  Are you

17   asking for in writing?

18        Q.   Of course I'm asking for in writing.

19        A.   Well, I'm asking for clarification of your

20   question.  There may be lists in my working papers that

21   would list those failures.  That's possible.

22        Q.   Okay.  Those are working papers that none of

23   the lawyers in this case have had the benefit of because

24   your lawyers delayed and delayed and delayed, are you

25   aware of that fact, in providing those working papers to
```

```
 1    the party that hired you, Tampa Bay Water, correct?

 2             MR. FORZIANO:  Object to form.

 3        A.   I consider it to be valuable time on this --

 4    yes, on this case.

 5        Q.   And -- and so the 40 to 50 hours of valuable

 6    time that you're charging several hundred dollars an

 7    hour for was so you would be well informed at the time

 8    the deposition occurred, correct?

 9             MR. FORZIANO:  Object to form.

10        A.   I think generally that's probably a fair

11    description.

12        Q.   But you can't tell me one place in your

13    reports where you have a list of what HDR did wrong in

14    performing their inspections, and the reason that is is

15    because no such list exists; isn't that true, sir?

16             MR. FORZIANO:  Object to form.

17        A.   I believe I've already told you that there may

18    be a list in some format in my working papers that have

19    been provided.

20        Q.   Did you bring those working papers with you,

21    sir?

22        A.   No.

23        Q.   Is it your intention to be independent and

24    objective during the course of your deposition?

25        A.   Yes.
```

```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION


 3    TAMPA BAY WATER,
      A Regional Water Supply
 4    Authority,

 5           Plaintiff,      CASE NO.:  8:08-CV-2446-T27-TBM

 6    vs.

 7    HDR ENGINEERING, INC., a
      Nebraska corporation,
 8    CONSTRUCTION DYNAMICS
      GROUP, INC., a Maryland
 9    corporation,
      BARNARD CONSTRUCTION
10    COMPANY, INC., a Montana
      corporation,
11    ST. PAUL FIRE AND MARINE
      INSURANCE COMPANY, a
12    Minnesota corporation,

13           Defendants.
      _____/
14    BARNARD CONSTRUCTION COMPANY, INC.,
      a Montana corporation,
15
             Third Party Plaintiff,
16
      vs.
17

18    MCDONALD CONSTRUCTION CORPORATION,
      a Federal corporation,
19
             Third Party Defendant.
20    _____/

21                  VOLUME II of X
                  (Pages 134 - 306)
22
                  VIDEOTAPED DEPOSITION OF
23           KENNETH J. O'CONNELL, Ph.D., P.E.

24

25
```

151

1    Q.   Okay.  So getting back to my question that you

2    didn't answer was:  What was Ardaman's role in this

3    project?

4    A.   I thought I did answer that question.

5    Ardaman's role was to provide individuals who were

6    involved in the inspection on the project.

7    Q.   Well, were they like a -- a temporary labor

8    source that just furnished labor or did Ardaman, as a

9    company, have any duties and responsibilities on this

10   job other than just furnish people?

11        MR. FORZIANO:  Object to form.

12   A.   I don't know the answer to that.  They did

13   provide people who worked on this project.

14   Q.   And included in the people provided on this

15   project by Ardaman & Associates were people who

16   performed inspection duties, correct?

17   A.   Yes.  I believe they also performed some site

18   evaluation duties.

19   Q.   During construction, Ardaman's primary role is

20   to furnish inspectors on the project, correct?

21        MR. FORZIANO:  Form.

22   A.   Inspection and laboratory services, I believe

23   that's correct.

24   Q.   Do you have an opinion as to whether or not

25   Ardaman adequately performed their inspection duties on

1    this project during construction, sir?

2         A.    Yes.

3         Q.    What's your opinion?

4         A.    They did not.

5         Q.    And what was wrong with the inspection

6    services performed by Ardaman?

7              MR. MEADERS:   Object to form.

8         A.    That they failed to provide notice of certain

9    work that was done not in accordance with the plans and

10   specifications.

11        Q.    Anything else?

12        A.    I think that's generally it.

13        Q.    And -- and your understanding is is that

14   Ardaman was a subconsultant to HDR?

15             MR. FORZIANO:   Object to form.

16             MR. MEADERS:   Objection to form.

17        A.    That is my understanding.

18        Q.    So just like in your report --

19        A.    I think -- excuse me.  I wasn't finished yet.

20   I think they were also a subcontractor to Barnard too.

21        Q.    Ardaman was?

22        A.    I believe so.

23        Q.    What duties did Ardaman perform on behalf of

24   Barnard during construction?

25        A.    I think -- not during construction, prior to

153

```
 1   construction.  Site investigation.
 2        Q.   Did Ardaman perform any duties to Barnard
 3   during construction, sir?
 4        A.   To Barnard?  For Barnard, I assume is what you
 5   meant.  Not that I'm aware of.
 6        Q.   So the Ardaman's failure to perform inspection
 7   duties during construction was while they were a
 8   subconsultant to HDR, correct?
 9             MR. FORZIANO:  Object to form.
10             MR. MEADERS:   Join.
11        A.   That's my understanding.
12        Q.   And just like in your report where you said
13   that Barnard was responsible for McDonald's failure to
14   comply with the specifications, HDR was similarly
15   responsible for Ardaman's failure to perform their
16   inspection duties, correct?
17             MR. FORZIANO:  Object to form.
18             MR. MEADERS:  Objection to form.
19        A.   I would agree with that.
20        Q.   So it's your opinion that because Ardaman did
21   not adequately and satisfactorily perform their
22   inspection duties, HDR also did not adequately and
23   satisfactorily perform HDR's inspection duties, correct?
24             MR. MEADERS:  Objection to form.
25        A.   I believe that's correct.
```

```
 1   specifications; is that right?

 2        A.   Yes.

 3        Q.   So it was HDR's duty to test Barnard's work,

 4   correct?

 5             MR. MEADERS:   Objection to form.

 6        A.   Yes, yes.

 7        Q.   And it was HDR's duty to inspect Barnard's

 8   work; is that correct?

 9        A.   Yes.

10        Q.   And the purpose of HDR's testing and

11   inspection with respect to Barnard's work was to verify

12   that the reservoir embankment performed in accordance

13   with the contract drawings and specifications?

14        A.   That's part of it, yes.

15        Q.   All right.  And at the end of the job, isn't

16   it true that HDR did verify that Barnard's embankment

17   construction, including the soil-cement, was performed

18   in accordance with the contract drawings and

19   specifications?

20             MR. FORZIANO:   Object to form.

21        A.   I don't believe that's correct.

22        Q.   You're not aware that HDR certified at the end

23   of construction the project was performed in accordance

24   with the plans and specifications?

25        A.   Yes.
```

1    Q.    "Yes" what?

2    A.    Yes, I'm aware of that.

3    Q.    When Barnard completed its construction work

4    on this project, HDR certified and verified that the

5    construction work performed by Barnard had been

6    performed in accordance with the plans and

7    specifications, correct?

8            MR. MEADERS:   Objection to form.

9            MR. FORZIANO:   Object to form.

10   A.    I would not characterize it as -- as that.

11   Q.    How -- how would you characterize what HDR did

12   to sign off on Barnard's construction?

13   A.    I would say that they certified it.

14   Q.    At the end of construction, HDR certified

15   Barnard's construction work as being in accordance with

16   the plans and specifications; isn't that correct?

17   A.    I believe that's correct.

18   Q.    What did that certification mean?

19   A.    It meant that they were certifying to the

20   owner that the work had been completed in compliance

21   with the plans and specifications.

22   Q.    All right.  And the owner was Tampa Bay Water,

23   correct?

24   A.    Yes.

25   Q.    And if in fact Barnard's construction work had

```
 1    construction that was approved by the State of Florida,

 2    Barry Meyer had the primary responsibility for

 3    inspections and associated testing of the embankment,

 4    the wedge, and the soil-cement, correct?

 5              MR. FORZIANO:  Object to form.

 6              MR. MEADERS:  Objection to form.

 7        A.    I wouldn't probably characterize it as primary

 8    responsibility, no.

 9        Q.    Who did have primary responsibility under the

10    HDR quality control plan that was approved by the State

11    of Florida?

12        A.    Personal representatives appointed by the

13    engineer of record.

14        Q.    Well, what -- what is that person's name?

15        A.    Mr. Milhorn.  There were several others.

16        Q.    Well, I want to know who was the person in

17    charge of the inspection and testing on this project.

18    Who -- where did the buck stop, sir?

19              MR. FORZIANO:  Object to form.

20        A.    That's a different --

21              MR. FORZIANO:  You can go ahead and answer.

22        A.    That's a different question.  Barry Meyer, I

23    believe.

24        Q.    And how would you describe Barry Meyer's

25    duties with respect to inspections and associated
```

1   testing of the embankment, the wedge, and soil-cement on

2   this project?

3       A.   That of the CQC engineer.

4       Q.   And according to the plan here, all of that

5   inspection and testing was supposed to be done by Barry

6   Meyer or a personal representative that he was directly

7   supervising, correct?

8       A.   Yes --

9            MR. MEADERS:  Objection to form.

10      A.   Yes, that's correct.

11      Q.   And who was Barry Meyer's personal

12  representative that he was directly supervising with

13  respect to inspection and associated testing of the

14  embankment, the wedge, and the soil-cement?

15           MR. MEADERS:  Objection to form.

16      A.   There were several people.

17      Q.   Well, this quality control plan says there

18  should be just one.  It says "a."  Was there "a"

19  personal representative under Barry Meyer's direct

20  supervision responsible for inspection and associated

21  testing?

22           MR. MEADERS:  Objection to form.

23      A.   I would disagree that this says just one.

24      Q.   Does "a" personal representative, to you, mean

25  more than one, sir?

```
 1        A.    In this context where it says "or a personal
 2   representative," yes, it could apply to several people.
 3        Q.    It doesn't say or personal representatives,
 4   plural, does it?
 5        A.    No, it does not.
 6        Q.    Did HDR do a bad job of drafting this HDR
 7   quality control plan?
 8             MR. MEADERS:  Objection to form.
 9             MR. FORZIANO:  Object to form.
10        A.    I don't believe so.
11        Q.    Well, let's turn to page two.  Page two
12   defines the CQC engineer.  That would be Barry Meyer,
13   correct?
14        A.    Yes, that is correct.
15        Q.    It says that "the registered professional
16   engineer or his or her designated representative."
17   Singular.  Do you see that?
18        A.    I do see that.
19        Q.    And -- and who was Barry Meyer's designated
20   representative?
21             MR. MEADERS:  Objection to form.
22        A.    Again, I believe there were several of them.
23        Q.    What were there names?
24        A.    Mr. Milhorn was one.  There was another
25   individual whose name I can't remember for HDR, whose
```

1    name began with a B.  There were several other

2    inspectors employed by Ardaman and CDG.

3       Q.   Well, were those people inspectors or were

4    they designated representatives of Barry Meyer?

5       A.   Both.

6       Q.   Well, I want to know who the designated

7    representatives of Barry Meyer were, not the inspectors.

8            MR. MEADERS:   Objection to form.

9            MR. FORZIANO:   Object to form.

10      A.    I believe that they are the inspectors.

11      Q.   This definition of CQC engineer says, "The

12   registered professional engineer or its designated

13   representatives will oversee all aspects of construction

14   quality control during all phases of embankment and

15   pipeline construction activity."

16           Do you see that?

17      A.   Yes.

18      Q.   Who was the person or persons who was

19   overseeing all aspects of construction quality control

20   during all phases of embankment construction?

21           MR. MEADERS:   Objection to form.

22      A.   I don't think I -- I can answer that question

23   the way you asked it.

24      Q.   It says, "The CQC engineer is responsible for

25   implementing the CQC plan and supervising the personnel

```
 1   who are responsible for construction engineering, site

 2   inspection, quality control testing, and report

 3   preparation."

 4           Do you see that?

 5       A.   Yes, I do.

 6       Q.   That doesn't say the designated

 7   representative, does it?

 8           MR. MEADERS:  Objection to form.

 9       A.   No, it does not.

10       Q.   That says in essence Barry Meyer is

11   responsible for implementing the CQC plan and

12   supervising the personnel who are responsible for

13   construction engineering, site inspection, quality

14   control testing, and report preparation, does it?

15           MR. MEADERS:  Objection to form.

16       A.   Yes.

17       Q.   And it goes on to state that Barry Meyer will

18   also be responsible for preparing final construction

19   documents and signing and sealing the final certificate

20   of completion reports.  Do you see that?

21       A.   It says the QC -- CQC engineer.

22       Q.   And that's Barry Meyer, isn't it?

23           MR. MEADERS:  Objection to form.

24       A.   That's correct.

25       Q.   Okay.  So Barry Meyer is supposed to sign and
```

1   seal the final certificate of completion report,

2   correct?

3           MR. MEADERS:  Objection to form.

4       A.   Correct.

5       Q.   And he did that, didn't he?

6       A.   I believe that he did, yes.

7       Q.   And that final certificate of completion

8   report is the report that certifies that all of

9   Barnard's work was done in accordance with the plans and

10  specifications, correct, sir?

11      A.   I would want to look at the specific language

12  on that.

13      Q.   But that was your understanding what the

14  purpose of the report was, isn't it?

15      A.   That is my --

16          MR. MEADERS:  Objection to form.

17      A.   That is my understanding.

18      Q.   On page three, it says, the CQC has the

19  following general responsibilities, compliance with

20  permit conditions ...

21          Do you see that?

22      A.   You left out the word "engineer," but other

23  than that, that's what it says.

24      Q.   And the CQC engineer also is supposed to

25  verify that construction is per- -- performed in

216

```
 1    accordance with the plans and specifications, right?

 2         A.    With the design plans and specifications.

 3              MR. MEADERS:  Objection to form.

 4    BY MR. STANISLAW:

 5         Q.    And who was the engineer in charge of the

 6    design on this project?

 7         A.    I believe it was Mr. Meyer.

 8         Q.    And so from a quality control standpoint,

 9    who's the person who best knew what the intent of the

10    plans and specifications were?

11              MR. MEADERS:   Objection to form.

12              MR. FORZIANO:   Object to the form.

13         A.    I don't know the answer to that.

14         Q.    Is there any person that you can identify for

15    me who would be in a better position to understand what

16    the intent of the plans and specifications on this

17    project were than the person who was in charge of the

18    design, Mr. Barry Meyer?

19              MR. MEADERS:   Objection to form.

20         A.    No, I can't.

21         Q.    This HDR QC plan goes on to say, "the CQC

22    inspection personnel."  That would be Mr. Milhorn and

23    the other people whose names you can't remember, right,

24    they are the inspection personnel?

25              MR. MEADERS:   Objection to form.
```

1    A.    That's some of them, yes.

2    Q.    Those inspection personnel are responsible for

3    performing independent inspection and testing of the

4    work in progress to verify compliance with the QC plans,

5    drawings, and specifications, correct?

6         MR. MEADERS:   Object to form.

7    A.    That's generally correct, yes.  I think it

8    says "CQC plans."

9    Q.    And then the next paragraph down here, it says

10   "the responsibility of the general contractor."  That

11   would be Barnard, right?

12   A.    Barnard was the general contractor, yes.

13   Q.    So according to this quality control plan,

14   Barnard's responsibility was to perform all the

15   construction activities in accordance with the design

16   plans and specifications.  Do you see that?

17   A.    Yes, I do.

18   Q.    And this quality control plan that you have

19   reviewed thoroughly is approximately 80 pages long, goes

20   from page 459 to page 531.  Approximately 80 pages long,

21   correct?

22   A.    I don't have those page numbers on this

23   exhibit, I don't think.

24   Q.    Do you have any Bates numbers on the exhibit?

25   A.    Yes.

```
 1    least one document.
 2         Q.   And -- and the person responsible or the party
 3    responsible for taking that test was HDR, correct?
 4              MR. MEADERS:   Objection to form.
 5         A.   The tests listed here, that's correct.
 6         Q.   And in your opinion, did HDR take a sufficient
 7    number of tests in the embankment constructed by Barnard
 8    for density, moisture content, and fines contents?
 9         A.   No.
10         Q.   How many more tests should they have taken?
11         A.   They should have taken enough tests to comply
12    with this requirement.
13         Q.   Well, how many more would that be?
14         A.   I have not done that calculation, but it would
15    be more than what were done.
16         Q.   The HDR quality control plan that was approved
17    by the State of Florida does not indicate where these
18    tests in the embankment were supposed to be taken, does
19    it, sir?
20         A.   Indirectly, yes, it does.
21         Q.   Where does it indicate where the tests were to
22    supposed to be taken?
23         A.   Within every 1500 cubic yards that's placed.
24         Q.   Well, that could be 1500 yards straight up or
25    1500 yards horizontally, couldn't it be?
```

```
 1          A.   I wouldn't characterize it like that.  It

 2    would be every 1500 yards partitions that were placed on

 3    this project.

 4          Q.   Okay.  HDR was also supposed to test,

 5    according to their own HDR quality control plan,

 6    whenever a suspicion of change in moisture control or a

 7    effectiveness of compaction was observed, correct?

 8          A.   Yes.

 9          Q.   Did HDR adequately test for -- do a sufficient

10    number of tests where there they should have had a

11    suspicion about change in moisture control or

12    effectiveness of compaction?

13          A.   I don't believe so.

14          Q.   How many more tests should they have done for

15    that?

16          A.   I haven't done that analysis to quantify it.

17          Q.   Are we talking about a magnitude of between

18    one and ten or several hundred or how many?

19               MR. MEADERS:  Objection to form.

20          A.   I haven't done that analysis.

21          Q.   You can't even approximate how many more tests

22    should have been done by HDR of the material in the

23    embankment; is that correct?

24          A.   I would have to go back through the documents

25    and come up with that quantity.
```

```
 1        A.    Yes, I believe it is.

 2        Q.    And HDR had the primary quality control

 3   responsibility for testing that soil-cement?

 4             MR. FORZIANO:  Object to form.

 5             MR. MEADERS:  Objection to form.

 6        A.    I don't agree with that.

 7        Q.    Who did have the primary responsibility?

 8        A.    Barnard.

 9        Q.    What test was Barnard supposed to perform to

10   see if the soil-cement was thick enough or not?

11             MR. FORZIANO:  Object to form.

12        A.    I don't believe I testified they were supposed

13   to perform any tests.

14        Q.    Okay.  My question was:  What party had the

15   primary responsibility for testing to determine if the

16   soil-cement was thick enough?

17             MR. FORZIANO:  Object to the form.

18             MR. MEADERS:  Objection to form.

19        A.    HDR.

20        Q.    And HDR was also, in accordance with the HDR

21   quality control plan that was approved by the State of

22   Florida, supposed to do additional tests on the

23   soil-cement when, quote, whenever suspicion of

24   inadequate thickness or change of quality, end quote,

25   became apparent, correct?
```

```
 1              MR. MEADERS:  Objection to form.

 2              MR. FORZIANO:  Object to form.

 3   BY MR. STANISLAW:

 4        Q.    That would be on page 333, sir.

 5        A.    I'm there.

 6        Q.    Okay.  In the lower right-hand corner.

 7        A.    Okay.  And the question again, please?

 8        Q.    The question is:  If there was any instance

 9   when there was a suspicion of inadequate thickness of

10   the soil-cement or change in quality of the soil-cement,

11   HDR was supposed to do additional testing, correct?

12              MR. MEADERS:  Objection to form.

13        A.    That is correct.

14        Q.    Did HDR adequately test the thickness of the

15   soil-cement in connection with their obligation to test

16   it whenever there was suspicion of inadequate thickness

17   or change in quality?

18              MR. MEADERS:  Objection to form.

19        A.    I don't recall that.

20        Q.    You don't have an opinion as to whether or not

21   they adequately tested the soil-cement for thickness or

22   change in quality?

23        A.    Not at this time.

24        Q.    You have no opinion on that?

25        A.    Not at this time.
```

1    Q.   What additional information would you need to

2    know to form an opinion as to whether or not HDR

3    performed an adequate number of tests with respect to

4    the thickness of the soil-cement?

5    A.   I would have to go back and review the records

6    to see how many of the cores were taken to check for

7    thickness.

8    Q.   That's something that's not in your report, is

9    it, sir?

10   A.   I don't believe it is.

11   Q.   Turn -- turn to page 342.

12   Well, let me ask you this:  How many cores

13   should have been taken by HDR --

14   MR. MEADERS:  Objection to form.

15   MR. FORZIANO:  Object to form.

16   BY MR. STANISLAW:

17   Q.   -- to test the thickness of the soil-cement?

18   MR. FORZIANO:  Object to form.

19   MR. MEADERS:  Join in the objection.

20   A.   I can't give you a precise number, but it

21   would be at least one test for every 2000 linear feet of

22   step stair -- of stair-step soil-cement and at least one

23   test for every 10,000 square feet of flat-plate.

24   Q.   At any point during this project should HDR

25   have been suspicious that there was an inadequate

1   thickness of soil-cement?

2           MR. MEADERS:  Objection to form.

3       A.    Yes.

4       Q.    So they should have done more tests because of

5   that suspicion than just -- in the flat-plate other than

6   just one test every 10,000 square feet, right?

7       A.    I said "at least."  So possibly yes.

8       Q.    How -- how many more tests should they have

9   done?

10          MR. FORZIANO:  Object to form.

11          MR. MEADERS:  Objection to form.

12      A.    I have not done that analysis.  I can't answer

13  that question now.

14      Q.    Is there any requirement in the specifications

15  or in Barnard's quality control plan that Barnard do

16  cores to test the thickness of the soil-cement?

17          MR. MEADERS:  Objection to form.

18      A.    I'd want to look at Barnard's quality control

19  plan to answer that fully, but I don't recall.

20          MR. FORZIANO:  Do you need a break?

21          THE DEPONENT:  Yes.

22          MR. FORZIANO:  There's not a question pending,

23      is there, Miles?  Mr. Stanislaw?  Mr. Stanislaw,

24      there's not a question pending, is there?  I don't

25      believe there is.  The witness has indicated he

1    Q.   And in comparison with the over 200,000 cubic

2  yards of soil-cement on this project, it was a tiny

3  piece of work, correct?

4         MR. FORZIANO:  Object to form.

5    A.   There was more than one, but it was a small

6  volume of work, that's correct.

7    Q.   And you have never seen a piece of paper

8  prepared by anyone that says or complains about Barnard

9  failing to do cores in the soil-cement to determine its

10  thickness, have you, sir?

11         MR. FORZIANO:  Object to form.

12    A.   I believe that's correct.

13    Q.   There's no requirement in this contract that

14  Barnard prepare or perform cores in the soil-cement to

15  determine its thickness, is there, sir?

16         MR. FORZIANO:  Object to form.

17    A.   I've already said I'd want to review the test

18  section to confirm that, but I believe that's correct.

19    Q.   Let me take you back to Exhibit 228.  Exhibit

20  228 is right in front of you.  It's the HDR construction

21  quality control plan.

22         Under this plan, we have agreed that HDR had

23  inspection observation -- obligations, testing

24  obligations, observing obligations, and reporting

25  obligations, correct?

```
 1                MR. MEADERS:   Objection to form.

 2          A.   I don't believe we've talked about reporting

 3     yet.

 4          Q.   Well, did -- doesn't HDR have reporting

 5     obligations under the terms of its quality control plan,

 6     which is Exhibit 228?

 7          A.   I believe that they do, yes.

 8          Q.   Turn -- turn to page seven of Exhibit 228.

 9     And that talks about field inspection and testing,

10     correct?

11          A.   I must be on the wrong page.  You said page

12     seven of this exhibit?

13          Q.   Page seven.  Lower right-hand corner, it says

14     page seven.

15          A.   Okay.

16          Q.   And it is titled "Field Inspection and

17     Testing."

18          A.   Yes, it is.

19          Q.   And the second paragraph says, "The CQC

20     engineer will be responsible for directing activities of

21     the inspection staff and performing the quality control

22     activities as specified in the CQC plan."  Do you see

23     that?

24          A.   Yes, I do.

25          Q.   And the CQC engineer is Mr. Meyer, correct?
```

```
 1        A.     Correct.

 2        Q.     So Mr. Meyer is responsible for directing

 3   activities of the inspection staff, correct?

 4        A.     Correct.

 5        Q.     And Mr. Meyer is also responsible for

 6   performing the quality control activities specified in

 7   HDR's CQC plan, which is Exhibit 228.

 8             MR. MEADERS:   Objection to form.

 9        A.     Yes.

10        Q.     And then there's a number of items listed

11   under specific responsibilities that Mr. Meyer had,

12   correct?

13             MR. MEADERS:   Objection to form.

14        A.     Yes.

15        Q.     And about the seventh down says, "Recommending

16   acceptance or rejection of work completed by the

17   construction contractor."

18             Do you see that?

19        A.     I do.

20        Q.     And Mr. Meyer was responsible for recommending

21   acceptance or rejection of work completed by the

22   construction contractor; correct?

23             MR. MEADERS:   Objection to form.

24        A.     Yes.

25        Q.     Now, turn to the next page.  Among the
```

1    responsibilities of the CQC team on this project was to

2    document the CQC activities, correct?

3        A.   Yes.

4        Q.   And that documentation was supposed to be

5    daily field reports, number one; number two, inspection

6    of test data sheets; and number three, periodic site

7    photographs, correct?

8        A.   Yes.

9        Q.   And then they were supposed to prepare a daily

10   field report, the CQC staff, right?

11            MR. MEADERS:  Objection to form.

12       A.   Yes.

13       Q.   And one of the things the daily field report

14   was supposed to do was any approval of completed work or

15   rejection of work that did not meet the project

16   specifications, correct?

17            MR. FORZIANO:  Object to form.

18       A.   Yes, that's correct.

19       Q.   And -- okay.  And among the documentation that

20   the CQC staff was supposed to do was to take photographs

21   as necessary to keep a pictorial record of completed

22   work, work in progress, and problems or corrected work

23   or corrective action, right?

24            MR. MEADERS:  Objection to form.

25       A.   Yes.

```
 1        Q.   And then on page ten, the last -- the thing

 2   that's mentioned on page ten is that the quality control

 3   personnel, who are the HDR people, shall report any site

 4   observations or field tests documenting work by

 5   contractor that is not in accordance with the project

 6   drawings and specifications, correct?

 7             MR. MEADERS:  Objection to form.

 8        A.   Correct.

 9        Q.   So between the testing, the observations, the

10   photographs, the daily field reports, there should be a

11   complete record of any defective work performed by

12   Barnard on this project, correct?

13             MR. MEADERS:  Objection to form.

14        A.   There should be, yes.

15        Q.   Have you ever seen any inspection report,

16   meeting minute, or photograph taken in the course of

17   construction that shows lenses, pockets, streaks, or

18   layers in the wedge?

19        A.   I don't believe so.

20        Q.   Have you ever seen a meeting minute from any

21   of the subcontractor meetings, the biweekly meetings, or

22   any other meeting during this project that comments on

23   the existence of lenses, pockets, streaks, or layers in

24   the wedge.

25        A.   I don't believe so.
```

1      clay was beneath the HDPE geomembrane liner, correct?

2           A.    I believe that's correct.

3           Q.    Well, to the best knowledge -- to the best of

4      your knowledge and information, this one instance where

5      there is an indefinable quantity of possibly clay below

6      the geomembrane liner, it has nothing to do with causing

7      the problems at the reservoir that resulted in excess

8      high water pressure, correct?

9                MR. MEADERS:   Objection to form.

10          A.    Not that I'm aware of.

11          Q.    We -- we've now reviewed HDR's inspection work

12     in connection with the embankment and the soil-cement,

13     the testing in connection with the embankment and

14     soil-cement, the observations in connection with the

15     embankment and wedge and soil-cement, and the reporting

16     obligations.  Is that fair?

17               MR. FORZIANO:   Object to form.

18               MR. MEADERS:   Objection to form.

19          A.    I don't think we've talked about the

20     reporting.

21          Q.    Well, aren't the photographs part of the

22     reporting process?

23          A.    I think that's part of the documentation

24     process.

25          Q.    And then on page 13 -- strike that.

```
 1              On page eight, paragraph 3.2, "field

 2   inspection documentation," do you see that?

 3        A.   Yes.

 4        Q.   Didn't we talk about number one, the daily

 5   field reports; number two, the inspection data sheets;

 6   and number three, the periodic site photos?

 7        A.   Yes, we did.

 8        Q.   Isn't that what they are supposed to be

 9   reporting?

10              MR. FORZIANO:  Object to form.

11              MR. MEADERS:  Objection to form.

12        A.   I wouldn't necessarily characterize it that

13   way.  They are supposed to create that documentation.

14        Q.   For reporting purposes, correct?

15              MR. FORZIANO:  Object to form.

16        A.   It doesn't say that here.

17        Q.   What else were they supposed to do to report?

18        A.   There is specific discussion of reporting of

19   laboratory test results on page 12.  Specific discussion

20   on page 13 of reporting and remediation of noncompliant

21   work.  That would be the specific reporting discussions.

22        Q.   Okay.  So let me back up and ask you these

23   questions.  In your opinion as an expert with prior

24   experience doing inspection work, in your opinion, did

25   HDR do an adequate job of inspecting the construction
```

1    work on this project to see if it complied with the

2    plans and specifications?

3           MR. MEADERS:   Objection to form.

4     A.   No.

5     Q.   In your opinion, did HDR do an adequate job of

6    testing the material in the embankment, the wedge, and

7    the soil-cement to see if it complied with the plans and

8    specifications on this project?

9           MR. MEADERS:   Objection to form.

10     A.   No.

11     Q.   In your opinion, did HDR do an adequate job of

12    observing the construction work done in the embankment,

13    the wedge, and the soil-cement to determine if it

14    complied with the plans and specifications?

15           MR. MEADERS:   Objection to form.

16     A.   No.

17     Q.   In your opinion, did HDR do an adequate job of

18    reporting the work in the embankment, the wedge, and the

19    soil-cement with respect to contract compliance?

20           MR. MEADERS:   Objection to form.

21           MR. FORZIANO:   Object to the form.

22     A.   No.

23     Q.   Inspection, testing, observing, and reporting

24    are HDR's principal obligations under the construction

25    quality control plan that was approved by the State of

1    Florida, correct?

2              MR. MEADERS:  Objection to form.

3         A.   Yes.

4         Q.   Did HDR do an adequate job of performing their

5    duties under the construction quality control plan that

6    was approved by the State of Florida on this project?

7              MR. MEADERS:  Objection to form.

8         A.   No.

9         Q.   And what is the basis for your opinions that

10   HDR didn't do an adequate job of inspection, testing,

11   observing, reporting, and complying with the

12   construction quality control plan?

13        A.   That's my review of the project record, plans,

14   and specifications.

15        Q.   All right.  Anything else?

16        A.   My experience.

17        Q.   You have indicated on Exhibit 443 that the

18   various construction defects -- do you have Exhibit 443?

19        A.   I'm not sure.

20             Yes.

21        Q.   We've talked about Exhibit 443, page seven, of

22   your Analysis of Performance by Barnard Construction.

23   It says, "However, the various construction defects in

24   this report have been determined to contribute to the

25   unusual cracking and exacerbate the effects of

```
 1    excessively high water pressure."
 2             Do you have that sentence that you wrote in
 3    mind?
 4        A.   Yes.
 5        Q.   Is it your opinion, sir, that the failures of
 6    HDR to do an adequate job of quality control, an
 7    adequate job of inspecting, an adequate job of testing,
 8    an adequate job of observing, and an adequate job of
 9    reporting also contributed to the unusual cracking
10    observed in the flat-plate soil-cement and exacerbated
11    the effects of excessively high water pressure on the
12    wedge?
13             MR. MEADERS:  Objection to form.
14             THE DEPONENT:  Could you just read that back,
15        please?
16             (The question was read back by the court
17        reporter.)
18        A.   Yes.
19             MR. MEADERS:  Same objection.
20    BY MR. STANISLAW:
21        Q.   And have you ever made any attempt to quantify
22    on any kind of percentage basis what percent of concrete
23    you should -- HDR's failures to do all this quality
24    control work were made to the -- strike that.  Let --
25    let me start over.
```

```
 1              Have you ever made any attempt to quantify, as
 2     between Barnard and HDR, a percentage of who contributed
 3     what percent to the unusual cracking and who per- --
 4     contributed what percent to the exacerbation of the
 5     effects of the excessively high water pressure?
 6              MR. MEADERS:  Objection to form.
 7         A.   No, sir.
 8         Q.   So based on your analysis, from all you know,
 9     it could have been 90 percent Barnard and ten percent
10     HDR or ten percent Barnard and 90 percent HDR when it
11     comes to the contributions of the unusual cracking in
12     the flat-plate soil-cement and the exacerbation of the
13     effects of the excessively high water pressure in the
14     wedge, correct?
15              MR. FORZIANO:  Object to form.
16              MR. MEADERS:  Objection to form.
17         A.   I haven't done that analysis, so I don't know
18     the answer to that.
19         Q.   What you can say is, is that Barnard, standing
20     alone, is not the only party that contributed to the
21     unusual cracking observed in the flat-plate soil-cement
22     and exacerbated the effects of the excessively high
23     water pressure, correct?
24              MR. MEADERS:  Objection to form.
25              MR. FORZIANO:  Object to the form.
```

1      A.   That's correct.

2      Q.   Have you discussed with any other OCL employee

3  whether or not they are going to testify at trial?

4      A.   No.

5      Q.   Have you ever been present with the lawyers or

6  had any discussions with the lawyers at Allen Dell as to

7  whether or not any employee is going to testify at

8  trial?

9      A.   I don't believe we've ever had that

10 discussion.

11     Q.   Have you had any meetings or conversations in

12 connection with your assignment here with any TBW

13 employees?

14     A.   Yes.

15     Q.   Who?

16     A.   Jon Kennedy.

17     Q.   Anyone else?

18     A.   I believe the current general manager.

19     Q.   Mr. Seeber?

20     A.   Yes.

21     Q.   Mr. Seeber wasn't employed by Tampa Bay Water

22 when this construction project was performed by Barnard,

23 was he?

24     A.   Not that I'm aware of.

25     Q.   The two Tampa Bay Water employees who had

```
1    on-site responsibilities during construction were Amanda

2    Rice and Rick Menzies, as I understand it.  Is that your

3    understanding?

4         A.   I believe they were on site, yes, at times.

5         Q.   And is it your understanding that they were

6    the primary on-site representatives of TBW during

7    construction?

8              MR. FORZIANO:  Object to form.

9         A.   I'm sorry, just one more time.

10        Q.   Is it your understanding that Ms. Rice and

11   Mr. Menzies were the primary on-site representatives of

12   Tampa Bay Water during construction?

13             MR. FORZIANO:  Object to form.

14        A.   No.

15        Q.   Who was the primary on-site representatives of

16   Tampa Bay Water during construction?

17        A.   HDR and CDG.

18             MR. MEADERS:  Objection to form.

19        Q.   Is it your understanding that Amanda Rice and

20   Richard Menzies were the two Tampa Bay Water employees

21   who had primary responsibility on behalf of Tampa Bay

22   Water on site during construction?

23             MR. FORZIANO:  Object to form.

24        A.   No.

25        Q.   Who -- what Tampa Bay Water employee had more
```

```
 1    besides those four people?

 2         A.    I don't know.

 3         Q.    Are there any other assignments you would

 4    recommend be completed by you in connection with this

 5    case?

 6         A.    Not that I can think of.

 7         Q.    Have you ever made any investigation or

 8    analysis to determine the locations of where soil

 9    density tests were taken?

10         A.    Yes.

11         Q.    And is the work product of that analysis

12    contained in any of your reports?

13         A.    To the extent that there was written work

14    product, yes -- I'm sorry, in the reports.  I thought

15    you said the record.  It would not be in the reports.

16         Q.    Have you reached any conclusions about the

17    adequacy and sufficiency of the density tests that were

18    taken in the wedge?

19              MR. MEADERS:  Objection to form.

20         A.    Yes.

21         Q.    And what opinions or conclusions have you

22    reached there?

23         A.    That they were not taken in the proper

24    locations and there were not sufficient number of those

25    tests.
```

ORANGE REPORTING   800.275.7991