Q. And whose fault was that?

MR. MEADERS: Objection to form.

A. I would say that was HDR's.

Q. Barnard was not responsible for doing moisture density tests in the wedge, were they?

MR. FORZIANO: Object to form.

MR. MEADERS: Objection to form.

BY MR. STANISLAW:

Q. Let -- let me see if I can make it easier for you. In order to do moisture density tests, you have to have either your own laboratory or have access to a laboratory; isn't that correct?

A. Or you hire a laboratory, that's correct.

Q. Yeah. Access to a laboratory.

Barnard did not have a laboratory on this job, did they?

A. I don't believe they did, no.

Q. Barnard never hired a laboratory to do tests on this project, did they?

MR. FORZIANO: Object to form.

A. I believe they did.

Q. What laboratory did they hire?

A. A laboratory that was used by Ardaman. I don't recall the name.

Q. You're talking about the preconstruction

section that we discussed to answer that.

Q. As you sit here today, you are not aware of any section in the specifications that requires Barnard to perform moisture density or compaction tests, are you, sir?

MR. FORZIANO: Object to form.

MR. MEADERS: Objection to form.

A. No.

Q. Your report entitled analysis of Barnard's performance lists a number of failures in Barnard's performance, but it does not list Barnard's to failure to perform moisture density tests or compaction tests, does it, sir?

MR. MEADERS: Objection to form.

A. No.

Q. Is it fair to define the term "quality control" to be making sure construction's performed in compliance with the requirements of the drawings and specifications?

MR. MEADERS: Objection to form.

A. I think that's an acceptable definition.

Q. So it's HDR's job as the quality control on this project to make sure that construction was performed in compliance with the plans and drawings and specifications, correct?

MR. FORZIANO: Object to form.
MR. MEADERS: Objection to form.
A. I think that's fair.
**Q. You used the term "unusual cracking" in your report. What -- what does -- what does that term mean, "unusual cracking"?**
A. Unusual cracking would be cracking that would not be expected.
**Q. And what cracking would be expected?**
A. Probably hairline cracks, minimal amount of hairline cracks indicating plastic shrinkage cracking, things of that nature.
**Q. Okay. And you say cracks that would not be expected. Now, who is the person who's supposed to be doing the inspecting -- or expected to determine if a crack is unusual or not?**
MR. FORZIANO: Objection to form.
MR. MEADERS: Same objection.
A. I would think the contractor, the quality control and the quality assurance individuals.
**Q. So if Barnard did not expect a crack and HDR did expect a crack, would that be an unusual crack or not?**
MR. FORZIANO: Object to form.
A. Possibly.

MR. MEADERS: Objection to form.

A. I don't know that definitively, no.

**Q. You can't state that Barnard's failure to mix the soil increased or exacerbated the high water pressure in the wedge at any location in the reservoir, can you, sir?**

MR. MEADERS: Objection to form.

A. I can't do that, no.

**Q. Now, part of what you've done is -- let me back up.**

**Did -- did HDR have a sufficient number of inspectors on this project --**

MR. MEADERS: Objection to form.

BY MR. STANISLAW:

**Q. -- with -- for doing the soil-cement and embankment work?**

MR. MEADERS: Objection to form.

A. I haven't looked at that independently, but there was some indication in the testimony that there were times when they did not.

**Q. Well, how many inspectors did they have assigned to the soil-cement and embankment work; do you know?**

A. I don't recall those numbers.

**Q. Did the inspectors that HDR assigned to this**

course of construction?

A. That's correct.

Q. In your report you have stated that there is a total failure of -- by Barnard of the quality control on the soil-cement. Do you recall making that statement?

A. Yes, I believe that's correct.

Q. Would it also be fair to state that there was a total failure by HDR to carry out their inspection, testing, and observation duties with respect to the soil-cement?

MR. MEADERS: Objection to form.

A. Yes, I think that's fair.

Q. And are you familiar with Barnard's background and experience doing soil-cement work?

A. No.

Q. You made no investigation to find out whether or not Barnard had ever performed soil-cement work in the past; is that right?

A. That's correct.

Q. Did you make any investigation to find out what Barnard's background and experience in the reservoir or dam construction was?

A. No.

Q. Did you read the statement of -- of qualifications that were prepared by Tampa Bay Water in

A. A large design and design/build firm in the United States.

Q. Was there a total breakdown of the quality assurance work on the soil-cement by CDG, also, sir, in your opinion?

A. Yes.

Q. Was there a total breakdown of the quality control on the wedge construction by Barnard and McDonald?

A. Yes.

Q. Was there a total breakdown of the quality control on the wedge by HDR?

MR. MEADERS: Objection to the form.

A. Yes.

Q. Was there a total breakdown of the quality assurance work done by CDG on the wedge?

A. Yes.

Q. You're aware that the Florida Department of Environmental Protection hired a special consultant by the name of Dr. David Carrier?

A. Yes.

Q. And what did you understand Dr. David Carrier's duties to be on this project?

A. Primarily the review of the permit application and the permit.

he reported no defects in the -- the wedge other than the soil-bentonite issue and the soil-cement?

MR. FORZIANO: Object to form.

A. I haven't made that determination.

Q. Well, let me ask you to make that determination right now, if you would, sir.

MR. FORZIANO: Object to form.

A. I don't think I can make that determination right now.

Q. Well, Dr. Carrier failed to essentially do all the same things that HDR failed to do; namely, observe, report, et cetera, any -- any noncompliance with the plans and specifications, did he?

MR. MEADERS: Objection to form.

MR. FORZIANO: Object to form.

A. No. I believe I told you he did report noncompliance with the plans and specifications.

Q. Above the soil-bentonite cut-off wall issue?

A. Above the soil-bentonite cut-off wall.

Q. Yeah. And that was an issue that was corrected, wasn't it, sir?

A. No, sir.

Q. Never corrected?

A. No, sir.

Q. Does that contribute or exacerbate at all the

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TAMPA BAY WATER,
A Regional Water Supply
Authority,

Plaintiff, CASE NO.: 8:08-CV-2446-T27-TBM

vs.

HDR ENGINEERING, INC., a
Nebraska corporation,
CONSTRUCTION DYNAMICS
GROUP, INC., a Maryland
corporation,
BARNARD CONSTRUCTION
COMPANY, INC., a Montana
corporation,
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, a
Minnesota corporation,

Defendants.
_______________________________/

BARNARD CONSTRUCTION COMPANY, INC.,
a Montana corporation,

Third Party Plaintiff,

vs.

MCDONALD CONSTRUCTION CORPORATION,
a Federal corporation,

Third Party Defendant.
_______________________________/

VOLUME III of X
(Pages 307 - 434)

VIDEOTAPED DEPOSITION OF
KENNETH J. O'CONNELL, Ph.D., P.E.

resident engineer, correct?

MR. MEADERS: Objection to form.

A. I don't think directly, no. I think he was directly working under Mr. Milhorn.

Q. Okay. And Mr. Milhorn was working under Mr. Barry Meyer's direction and supervision, correct?

MR. MEADERS: Same objection.

A. I believe he testified that some of the time yes and some of the time another individual from HDR.

Q. In -- in any event, the HDR quality control plan says that Barry Meyer was supposed to be in charge of the inspection staff on behalf of HDR, right?

MR. MEADERS: Objection to form.

A. I'm not sure if he uses that exact phrase, but that's the implication, I think.

Q. Okay. Exhibit 153, that's the Department of Environmental Protection permit for this project. You say you're familiar with this document and you've read it before?

A. Yes.

Q. And Exhibit 153 is a document that if the State of Florida had not issued it, this reservoir never would have been built; isn't that correct?

A. I would assume that's correct, yes.

Q. So Exhibit 153 is a highly important piece of

and HDR Engineering. Do you see that?

A. Yes, I do see that.

Q. And do you understand that to mean that both Tampa Bay Water and HDR were responsible for all aspects of permit compliance?

MR. FORZIANO: Object to form.

MR. MEADERS: Join.

A. I think from the perspective of DEP for Florida, that's correct.

Q. Okay. Let me ask you to turn to page two of the permit and there's a heading there called "General Conditions." Do you see that?

A. Yes, I do see that.

Q. And it says, "all activities shall be implemented as set forth in the plans, specifications and performance criteria as approved by this permit." Do you see that?

A. Yes, I do see that.

Q. And do you understand from that to mean that in order to be in compliance with the permit, the construction work performed by Barnard had to comply with the plans and specifications for this project?

A. Yes.

Q. And if there's any deviation from the plans and specifications, that constitutes a violation of the

A. (Complies.)

Q. You see paragraph 13 on page four?

A. I see it, yes.

Q. And it states there, "additionally, if deviation from the approved drawings is discovered during the certification process, the certification must be accompanied by a copy of the approved permit drawings with deviations noted."

With respect to the list of deviations from the plans and specifications that you've just identified, were those noted on the drawings that were -- the approved permit drawings that were submitted to the Florida Department of Environmental Protection?

MR. MEADERS: Objection to form.

MR. FORZIANO: Object to form.

A. I recall that some may have been.

Q. The only one you recall is thin soil-cement, correct?

A. Yes, that's correct.

Q. And according to your testimony, it was the responsibility of both TBW and HDR to make sure that there was compliance with the environmental protection permit, correct?

MR. FORZIANO: Object to form.

A. From the perspective of DEP, I believe that's

correct.

Q. Now, did HDR ever report this list of defects that you've given us today to the Florida Department of Environmental Protection, that you're aware of?

MR. MEADERS: Objection to form.

A. As I said, with the exception of the thin soil-cement in one location or one area, I don't think so.

Q. Has Tampa Bay Water ever reported this long list of defects that you've identified in the permit to the Florida Department of Environmental Protection?

MR. FORZIANO: Object to form.

A. Not that I'm aware of.

Q. So to the best of your knowledge, there is a multitude of violations of this permit that have never been reported to the Florida Department of Environmental Protection by either HDR or TBW, the two parties responsible for making those reports; is that correct?

MR. MEADERS: Objection to form.

MR. FORZIANO: Join.

A. Well, with one correction, as I've said. From the perspective of DEP, I believe that's correct.

Q. Were there as-built and record certification drawings submitted to the Florida Department of Environmental Protection?

Q. Do you have an opinion as to whether or not Dr. Carrier is adequately qualified by background and experience to be the primary consultant for the State of Florida in connection with the Tampa Bay Water reservoir?

MR. FORZIANO: Object to form.

A. I don't have an opinion about that.

Q. Can you name any person in the state of Florida who is more qualified than Dr. Carrier to be the State's consultant in connection with the Tampa Bay Water reservoir, sir?

A. No.

Q. Turn to -- well, wait a second.

In connection with HDR's design, do -- do you have any opinions or conclusions whatsoever with respect to what was wrong with HDR's design?

MR. MEADERS: Objection to form.

A. I have some specific opinions about things in the specifications that were missing, but not from a geotechnical perspective about the design.

Q. What things in the specifications prepared by HDR were missing, in your opinion?

A. Treatment of embankment that was eroded, specific requirements for that. Specific requirements with respect to -- to evaluating the embankment for

consistency, things of that nature.

Q. Okay. What -- what else besides the two you've just mentioned?

A. Those are the two I can think of right now.

Q. Was there anything in the specifications that provided for the installation of a protective layer over the geomembrane?

A. No, sir.

Q. Should there have been?

MR. MEADERS: Objection to form.

A. I don't believe so.

Q. Did you ever read the manufacturer's recommendations for this particular project?

A. Yes, sir, I did.

Q. And -- and did the manufacturer's recommendations -- when I'm talking about the manufacturer of -- the manufacturer of the geomembrane. You understand what I'm talking about?

A. Yes, I understand that.

Q. Didn't the manufacturer of the geomembrane recommend a protective layer be placed over the geomembrane?

A. Only uncertain conditions. It wasn't a general requirement.

Q. Okay. And what were the conditions?

**Q. Did you make any effort to find out?**

A. We have looked at the documents that were available to us, but that detailed information was not available.

**Q. And you didn't call or interview any of the representatives of other bidders to find out how they planned to this, did you, sir?**

A. No, I did not.

**Q. Using this technique that you've described, would any of this piece of equipment ever come in contact with the geomembrane?**

A. No.

**Q. And so how -- how would you -- where would the dozer operate? I don't understand where the dozer would operate.**

A. The dozer, the small dozer, would operate within that zone that is immediately adjacent to the geomembrane.

**Q. Okay. Are you aware that Ardaman made a recommendation, prior to these -- construction starting on this project, to HDR for a specification that dealt with placing and compacting fill over this liner?**

MR. MEADERS: Objection to form.

MR. FORZIANO: Object to form.

A. I recall hearing that or reading that, but I

don't have a specific recollection of that.

Q. Do you think it was appropriate for HDR to reject and not incorporate Ardaman's recommendation -- recommended specification for placing com- -- compacted fill over the layer?

MR. FORZIANO: Object to form.

MR. MEADERS: Join.

A. Before I answer that question, I just want to look at that Ardaman document and then I could answer the question for you.

Q. Okay. You -- you're aware that this project, as originally designed, called for stair-stepped soil-cement from the top to the bottom of the upstream face of the reservoir?

A. Yes.

Q. And there was a decision made to switch from stair-step to flat-plate below elevation 135; are you aware of that?

A. I recall that.

Q. And the -- one of the repair recommendations recommended by Golder and Associates is to redo this reservoir with stair-step going the full length of the upstream face, correct?

A. Yes, sir.

Q. Was it a prudent decision to switch from

A. No, sir. I think I told you specifically I was looking at 01400.

In specification 02200, D.698, test method for laboratory compaction and characteristics of soil using standard effort. Test method D.2434, standard test method for permeability of granular soils. Test method D.2487, standard classification of soils for engineering purposes, Unified Soil Classification System.

**Q. Are there any tests that it says Barnard's supposed to perform, sir?**

A. I believe, to answer your question, I have linked specification 01400 and the requirement for that specification to then the specific tests that are referenced in section 02200.

**Q. Okay. Did Barnard perform any of the tests that you just listed during the course of this project?**

A. Not that I'm aware of.

**Q. Did anyone from HDR complain about Barnard not performing any required tests on this project?**

MR. FORZIANO: Object to form.

A. Not that I recall.

**Q. Did anyone from CDG ever complain about Barnard not performing any tests that it was required to perform on this project?**

MR. FORZIANO: Object to form.

Q. Well, who was in charge?

A. The fact -- I believe that ultimately Mr. Meyer was.

Q. Did Mr. Meyer complain about Barnard's failure to adequately blend any soils on this project to remove lenses, pockets or streaks?

MR. MEADERS: Objection to form.

A. Not that I'm aware of.

Q. It was Mr. Milhorn's job to document any failure of Barnard to adequately blend soils on this project, wasn't it, sir?

A. Yes, I believe that's correct.

Q. And are -- are you aware that Mr. Milhorn has testified that he would have documented the fact that Barnard was improperly blending soils if he was aware of it?

MR. MEADERS: Objection to form.

A. I don't recall that spe- -- specific testimony.

Q. You're not aware that he was asked this question, quote, and blending of soils, you would have documented that if that was wrong, correct?

Answer: "Yes, sir."

MR. MEADERS: Objection to form.

A. Can I see the transcript? I can tell you if I

A. I'm not sure if that's true or not.

Q. You're not aware of any of McDonald's work in the wedge ever having been rejected by CDG because it contained lenses, pockets or streaks; isn't that true, sir?

A. I am not aware of that, sir.

Q. If there were lenses, pockets or streaks observed by either HDR or CDG, it was their job to document it, point it out and reject the work, isn't that true, sir?

A. I believe that's correct.

Q. Have you quantified the extent to which any lenses, pockets or streaks exacerbated the excess high water pressure in the wedge?

MR. FORZIANO: Object to form.

A. I'm sorry. Could you rephrase that?

Q. Have you quantified, in any way, the extent to which lenses, pockets and streaks in the wedge exacerbated the excess high water pressure?

MR. FORZIANO: Object to form.

MR. MEADERS: Objection to form.

A. I have not quantified that, no.

Q. Have you qualified at all the extent of the contributions that lenses, pockets or streaks made to the unusual cracking in the soil-cement facing?

MR. FORZIANO: Object to form.

A. That would be inaccurate.

**Q. Well, you haven't accepted their testimony, have you, that the embankment was a quality embankment, constructed in accordance with the plans and specifications?**

A. I considered their entire testimony. I certainly accepted portions of it and I disagree with other portions.

**Q. You disagree with the portion of Mr. Milhorn's testimony and Dr. Carrier's testimony to the effect that this was a quality embankment built in accordance with the plans and specifications, correct?**

A. That is --

MR. MEADERS: Objection to form.

A. That is correct.

**Q. Because there is not a piece of paper written by anyone during this entire project that made any note of lenses, pockets or streaks, would it be fair to say that there was a total failure of the quality control and quality assurance programs in connection with the construction of the wedge on this project?**

MR. MEADERS: Objection to form.

A. I believe that's correct.

**Q. As I understand your testimony, you don't know**

Q. Well, what's that complaint? Describe that for me, if you will.

A. That violates the specification requirement that lifts be placed substantially vertical.

Q. And --

A. I'm sorry. Horizontally.

Q. And are you aware of any piece of paper written by anybody on this project that complains about the haul roads in connection with the building of this wedge on this project?

A. No.

Q. Neither HDR nor CDG nor anyone else ever told Barnard or McDonald, the way you're building the haul roads on this project is wrong or improper, correct?

MR. MEADERS: Objection to form.

A. I don't remember that, no.

Q. You don't remember seeing anything to that effect, do you, sir?

A. I do not.

Q. The only person you're aware of who has any complaints about the way the haul roads were constructed on this project is you; isn't that true, sir?

A. I don't think that's accurate.

Q. Who else does?

A. People from my firm. People from Golder's

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TAMPA BAY WATER,
A Regional Water Supply
Authority,

Plaintiff, CASE NO.: 8:08-CV-2446-T27-TBM

vs.

HDR ENGINEERING, INC., a
Nebraska corporation,
CONSTRUCTION DYNAMICS
GROUP, INC., a Maryland
corporation,
BARNARD CONSTRUCTION
COMPANY, INC., a Montana
corporation,
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, a
Minnesota corporation,

Defendants.
_____________________________/

BARNARD CONSTRUCTION COMPANY, INC.,
a Montana corporation,

Third Party Plaintiff,

vs.

MCDONALD CONSTRUCTION CORPORATION,
a Federal corporation,

Third Party Defendant.
_____________________________/

VOLUME IV of X
(Pages 435 - 586)

VIDEOTAPED DEPOSITION OF
KENNETH J. O'CONNELL, Ph.D., P.E.

Construction." Do you see that?

A. Yes, I do.

Q. And then in the second sentence in the next paragraph it says, "in addition, the consultant" -- which means HDR -- "will provide project engineers and full-time engineering technicians to assist the resident reservoir engineer in field observation, testing and quality control." Do you see that?

A. Yes, I do.

Q. And do you understand this to be the agreement between HDR and TBW; whereby, HDR was going to provide field observation, testing and quality control during construction?

MR. MEADERS: Objection to form.

A. Yes, I do.

Q. Now, let me ask you to turn to the last page of Exhibit 292. And there is a table there called table B1. Do you see that?

A. Yes, I do.

Q. "Compensation Plan," it's entitled, right?

A. Yes, it is.

Q. And then there's a series of tasks, and I'm directing your attention to task number 13, "Construction Phase Services." Do you see that?

A. Yes, I do.

Q. Do you understand construction phase services to be observation, testing and inspection?

MR. MEADERS: Objection to form.

A. Generally, yes, I do understand.

Q. And the amount to be paid HDR as a result of amendment number five for construction phase services, which includes construction, observation, testing, is $3,899 582. Do you see that?

MR. MEADERS: Object to the form.

A. No. I'm not sure that that's what that says there.

Q. Is there -- there a column at the top that says "changes as a result of amendment number five"?

A. Yes.

Q. And is there a line item, line item number 13, "Construction Phase Services"?

A. Yes.

Q. And under the changes as a result of this amendment is the number $3,899,582?

A. Yes, that's correct.

Q. Is it your understanding that $3,899,582 was added to HDR's contract on or about April of 2002 to pay HDR for construction phase services?

A. Yes, that's correct.

Q. And do those construction phase services

**include observation, testing and inspection for quality control purposes?**

MR. MEADERS: Objection to form.

A. I believe that's correct.

**Q. And in your opinion is the sum of $3,899,582 sufficient compensation to pay for the inspection, observation and testing that should have been performed by HDR during the course of construction by Barnard on this project?**

MR. FORZIANO: Object to the form.

A. I haven't done an analysis of that to know the answer to that.

**Q. Well, do you have an opinion, as you sit here today, as to whether or not, given what you do know about this project if $3,899,000 is a sufficient sum of money?**

A. I haven't --

MR. FORZIANO: Object to the form.

A. I haven't done any analysis of that number to know if that's sufficient or not.

**Q. So you don't have an opinion about that?**

A. No.

**Q. Has your firm ever been paid $3,899,000 to perform quality control inspection, testing and observation on any single project?**

Q. You're aware, are you not, that each lift in the embankment had to be approved by HDR before Barnard or McDonald could place the next lift; isn't that true?

A. That was the intent, yes.

Q. And if HDR was doing their job properly, each lift of the embankment would have been inspected and approved by HDR before the next lift was placed, correct?

MR. MEADERS: Objection to form.

A. Yes, I believe that's correct.

Q. And one of the things that HDR was supposed to inspect for before approving each lift of the embankment was lenses, pockets or streaks, correct?

MR. MEADERS: Objection to form.

A. Yes, I believe that's correct.

Q. And to the best of your knowledge and information, HDR approved every single lift in the embankment before -- in the soil wedge before the next lift was placed, correct?

MR. MEADERS: Objection to form.

A. No, I don't believe that's true.

Q. Are there any lifts that were rejected by HDR and a succeeding lift was placed over a rejected lift during the course of this project?

A. Not that I'm aware of.

Q. Turn to the next page in Exhibit 228. This should be page 319. Is that what you have?

A. Yes.

Q. May I see your exhibit, please?

A. Sure.

Q. It's out of order. The whole works.

A. Oh, I'm sorry. I disconnected it here. (Tenders document.)

Q. Now, the next page -- there's a page you didn't have. 319 is the page I want you to look at.

A. Okay.

Q. And that's a page that's entitled "Testing," correct?

A. Yes, sir.

Q. And those are the tests that are supposed to be done for the material in the wedge, correct?

MR. MEADERS: Objection to form.

A. Yes, I believe that is correct.

Q. And I think we agreed yesterday that the first entry there, "embankment fill and backfill material," indicates ten different tests that are supposed to be formed -- performed on the embankment fill and backfill material, correct?

A. Yes, sir.

Q. And each of those ten tests are tests that HDR

are supposed to perform, correct?

MR. MEADERS: Objection to form.

A. That is correct.

**Q. Are any of those tests intended to detect the presence of lenses, pockets or layers?**

MR. FORZIANO: Object to form.

A. I don't believe they were intended for that purpose.

**Q. Are any of the ten tests listed under Testing intended to determine whether or not material differs substantially in gradation or texture from surrounding layers?**

MR. FORZIANO: Object to form.

A. I -- I don't believe they were intended for that purpose.

**Q. Should HDR have included in their quality control plan tests which were intended to detect the presence of lenses, pockets or layers or materials differing substantially in gradation or texture from surrounding layers?**

MR. MEADERS: Objection to form.

A. Yes.

**Q. And so HDR prepared, in your opinion, a deficient quality control plan, right?**

MR. MEADERS: Objection to form.

A. Yes.

Q. And the State of Florida approved the deficient quality control plan because it did not include those tests, correct?

A. Yes.

Q. In connection with the protective layer that was placed over the geomembrane that was pushed up the slope by Barnard and McDonald, you're aware of that procedure, correct?

A. Yes.

Q. And in your opinion, that's a violation of the specification?

A. Yes.

Q. And in your opinion that violation of the specification, namely building a protective layer over the geomembrane, occurred throughout the five-mile perimeter of the reservoir?

A. That is my understanding, yes.

Q. And in connection with the protective layer that was placed over the geomembrane, did that get compacted in any way?

A. Yes.

Q. How -- how did it get compacted?

A. Through the placement procedure.

Q. And what was the placement procedure that

MR. MEADERS: Objection to the form.

A. I did not see any documents that specifically indicated that it was in that layer, no.

**Q. Did you see documents that showed the location of tests from an elevation and -- and distance from center line?**

A. I saw documents that indicated an approximate location, yes.

**Q. And the approximate location was determined by handheld GPS devices that were utilized in the field by the inspectors, correct?**

MR. MEADERS: Objection to form.

A. Partially, that's my understanding.

**Q. All right. And did you make any attempt to take the data that was prepared by the inspectors in the field at the test locations and plot that to determine where the tests were taken?**

A. No, I don't believe that would be reliable.

**Q. Well, why wouldn't it be reliable?**

A. Because in the first instance, the handheld GPS devices would have no greater accuracy than three meters, and my understanding of how the vertical elevation was determined would not give me any level of comfort in the accuracy of its location.

**Q. So is it your testimony that HDR did a**

**defective job of testing the compaction of the material in the protective layer that was placed over the geomembrane?**

MR. MEADERS: Objection to form.

A. Yes.

**Q. And as a result of that defective testing, you're not able to tell either the amount of compaction in the protective layer over the geomembrane or the locations of the tests; is that correct, sir?**

MR. MEADERS: Objection to form.

A. I believe that's fair.

**Q. CDG, as the quality assurance firm on this project, was basically supposed to look over the shoulder of HDR to make sure that HDR was doing their testing that was part of their quality control work correctly; is that true, sir?**

A. I don't know if I would phrase it as looking over their shoulder, but generally that's the gist of what they were to do.

**Q. Are you aware of any complaints by CDG ever having been made about HDR doing inadequate or a defective job of testing the soil that was placed on the protective layer over the geomembrane?**

A. I don't recall that, no.

**Q. Both HDR and CDG allowed Barnard or McDonald**

to place this protective layer over the geomembrane in a vertical fashion by pushing soil up the slope; isn't that true, sir?

MR. MEADERS: Objection to form.

A. I would agree with that.

Q. And as I understand your testimony, Barnard should not have placed the material vertically up the slope; is that true?

A. That's correct.

Q. And HDR and CDG should not have approved Barnard placing the material up the slope, correct?

MR. MEADERS: Object to the form.

MR. PICKERT: Join.

A. That is also true.

Q. And Dr. Carrier, as the representative of the people of the state of Florida, should have objected or made some other -- or raised some -- some concern about the fact that Barnard was placing the material vertically up the slope to build this protective layer over the geomembrane, correct?

MR. FORZIANO: Object to form.

A. If he was aware that it was a violation of the specification, then yes, that's correct.

Q. How -- how long did the operation go on, the vertical placing of the protective layer over the

**certainty, correct?**

A. That's correct.

**Q. Were the inspectors in the field who were doing this work on a daily basis supposed to reach their conclusions to a reasonable degree of engineering certainty, sir?**

MR. FORZIANO: Object to form.

A. The field inspectors, I don't know that I would hold them to any kind of engineering standard.

**Q. What -- what standard were these inspectors supposed to meet that were employed by HDR to inspect the wedge to determine if it was -- had lenses, pockets and streaks and differed substantially in gradation and texture?**

A. The standard, to the extent of their understanding, are the requirements of the plans and specifications. To the extent that they didn't understand any of the requirements of the plans and specifications, then I think they would have asked the question of their supervisors.

**Q. Have you seen any evidence anyplace that any inspector ever asked Barry Meyer or Jim Brittain what constitutes a lens, pocket or streak?**

MR. MEADERS: Object to the form.

A. No, I have not.

back up.

You're aware that these meeting minutes were distributed to project participants by e-mail, correct?

A. I believe that is correct, yes.

Q. And among the recipients of these meeting minutes for the October 26th meeting were Mr. Milhorn, Mr. Brittain and Barry Meyer, correct?

A. That's what the e-mail indicates, yes.

Q. Those were the key members of the HDR quality control team during construction, correct?

MR. MEADERS: Object to the form.

A. I don't know if I'd characterize them as "the key."

Q. Well, who are the key members of the HDR quality control team if these aren't the ones?

A. I think it --

MR. MEADERS: Object to the form.

A. -- it would be these individuals plus the other inspectors on the project.

Q. Okay. These were the bosses, right, Milhorn, Brittain and Mr. Meyer, of the other inspectors on the project?

MR. MEADERS: Objection to form.

A. That would be my understanding, yes.

Q. Okay. So the bosses of the inspectors on the

**project, Messrs. Milhorn, Brittain and Meyer, all got this Exhibit 230, right?**

MR. MEADERS: Objection to form.

MR. FORZIANO: Object to form.

A. I don't know that.

**Q. Isn't that what this shows?**

A. It indicates that it was sent to them. I -- I don't know if they received it or not.

**Q. You're not willing to assume, in your role as an expert who was given after-the-fact review of the documents, that a document addressed to somebody was actually received by them?**

A. I don't know that. I don't have any reason to not believe that, though.

**Q. In doing your work on this case, did you assume that letters addressed to a person were received by the person and e-mails addressed to a person were received by the person?**

MR. FORZIANO: Object to form.

A. Yes.

**Q. So based on your review of Exhibit 230, you're -- you're assuming that Messrs. Milhorn, Brittain and Meyer received a copy of Exhibit 230, correct?**

A. Yeah.

**Q. Now, turn to the last page of Exhibit 230, the**

Q. Would it be fair to characterize this as an effort by Barnard and McDonald to reach out to the inspectors on the project and say, please notify us if there's something wrong with the soil after the rainstorm --

MR. MEADERS: Objection to form.

BY MR. STANISLAW:

Q. -- so they can do something about it?

MR. MEADERS: Same objection.

MR. FORZIANO: Object to form.

A. I would agree with that.

Q. Turn -- turn to page -- turn to Exhibit 283, please.

A. (Complies.)

Q. Do you understand Exhibit 283 to be a memo from George Inlow of CDG to James Brittain of HDR Engineering?

MR. MEADERS: Object to the form.

A. Yes.

Q. And the last sentence of the second paragraph states, "Further, any uncorrected noncompliant work must be fully documented in the inspector's daily report." Do you see that?

A. I see that statement, yes.

Q. And those inspector's daily reports were

circulated to Barnard, correct?

A. That's my understanding, yes.

Q. So if there was any noncompliant work, the protocol on this project was that it was supposed to be fully documented in HDR's daily report and a copy would have been given to Barnard, correct?

MR. MEADERS: Objection to form.

A. I believe that's correct.

Q. Are you aware of any noncompliant work being documented in a inspector's daily report that Barnard or McDonald did not correct?

MR. MEADERS: Objection to form.

A. No, not that I can recall.

Q. Exhibit 283 goes on to state, CDG is not aware of any instance on this project where the contractor has failed to take any appropriate corrective action once any deficient work properly documented has been brought to its attention. Do you see that?

A. Not exactly correct. "To his attention," it says, but I do see that.

Q. And you're not aware of any instance on this project where Barnard failed to take appropriate corrective action once any deficient work was brought to Barnard's attention; isn't that true, sir?

MR. MEADERS: Objection to form.

A. That's correct.

**Q. Turn to Exhibit 285, please. And Exhibit 285 is a memo from Jon Kennedy -- or an e-mail from Jon Kennedy dated 12/20/02. Do you see that?**

A. Yes, I see that.

**Q. Jon Kennedy is the one on-site TBW person that you've met with in connection with your assignment on this case, correct?**

MR. FORZIANO: Object to form.

A. I think we established he was not on site full time, but yes, that's correct.

**Q. And in Exhibit 285, Mr. Kennedy states in paragraph three, "CDG and HDR exists, in my view, solely to make sure Barnard is in compliance with applicable regulations as, in B, the completed job meets design and regulatory criteria." Do you see that?**

A. No, I don't. Can I -- can I just read this for a second, please. (Reviewing document.)

Okay. Now, I do see what you've just read.

**Q. Okay. And so Mr. Kennedy is stating that as of December 20, 2002, he viewed CDR and H- -- CDG and HDR's role as to be solely to make sure Barnard was in compliance with applicable regulation, correct?**

MR. FORZIANO: Object to form.

A. Generally, yes, that is correct.

Q. And -- and one of the applicable regulations would be the permit issued by the State of Florida, correct?

A. Yes.

Q. And Mr. Kennedy is stating that CDG and HDR exist, in his view, solely to make sure that Barnard is in compliance with in B, quote, the completed job meets design and regu- -- regulatory criteria, end quote, correct?

MR. MEADERS: Objection to form.

A. Yes, sir, that's correct.

Q. And -- and do you also view CDG and HDR's role to make sure that Barnard is in compliance with the applicable re- -- regulations as they relate to the completed job meeting design and regulatory criteria?

MR. MEADERS: Objection to form.

MR. FORZIANO: Object to form.

A. I believe that's part of each of their roles.

Q. Is that what Mr. Kennedy has told you, that he viewed CDG and HDR as existing solely to make sure that Barnard complied with applicable regulations and -- and make sure that Barnard's work met the design criteria?

A. I don't believe he's ever told me that, no.

Q. Turn to Exhibit 291, please.

A. (Complies.)

Q. Turn to Exhibit 358.

A. (Complies.)

Q. Exhibit 358 is a letter signed by Jerry Maxwell, the general manager for Tampa Bay Water, and Amanda Rice, P.E., the project manager for the Tampa Bay Water reservoir, dated November 14, 2005. Do you see that?

MR. FORZIANO: Object to form.

A. I do see that.

Q. And -- and this is right about the same time that the last letter that Tampa Bay Water wrote was sent, more than about six months after construction was completed, correct?

A. It's just about a week before Exhibit 291.

Q. And so the -- there's a list of bullet items there and the last bullet item is entitled "Construction Services." Do you see that?

A. Yes, I do see that.

Q. And Mr. Maxwell and Mr. -- Ms. Rice signed this letter which states, quote, HDR was involved daily during construction to ensure compliance with the design intent.

Is that your understanding of what HDR did, mainly they were involved daily to ensure compliance with the design intent?

A. Yes.

Q. The last paragraph of this letter states, "we," meaning Tampa Bay Water, "believe the successful development of this project would not have been possible without the vast expertise and many" district -- "distinct disciplines available from HDR's offices located across the country." Do you see that?

A. Yes, I do see that.

Q. Then it goes on to say, "their," meaning HDR's, "dedication to this vision over the past nine years exceeded our expectation for the standard client-consultant relationship." Do you see that?

A. I see that.

Q. And one of the essential things that HDR did during the course of construction, as indicated in the last bullet point in this letter, was to be involved daily during construction to ensure the compliance with the design intent, correct?

MR. MEADERS: Objection to form.

A. I agree with that.

Q. And ensuring compliance with the design intent means to ensure compliance with the plans and specifications; isn't that true, sir?

MR. MEADERS: Objection to form.

A. Yes.

unusual cracking in the flat-plate soil-cement?

MR. FORZIANO: Object to form.

A. I don't know the answer to that.

Q. And as I understand your prior testimony, you do agree with Golder that the excessive high water pressure is the cause of the unusual cracking at the reservoir, correct?

MR. MEADERS: Objection to form.

A. I do agree with that, yes.

Q. And you do not know to what extent Barnard's construction work caused the high water pressure or exacerbated the high water pressure, correct?

MR. FORZIANO: Object to form.

MR. MEADERS: Objection to form.

A. That is also correct.

Q. Sir, is it more likely true than not true that this reservoir would have experienced unusual cracking in the flat-plate soil-cement regardless of whether Barnard performed defective construction because of HDR's design?

MR. MEADERS: Objection to form.

A. Under certain con- -- conditions, I believe that's true.

Q. And what are those conditions?

MR. MEADERS: Objection to form.

A. Under certain drawdown conditions.

**Q. Okay. The -- the reservoir's drawn down at approximately two inches per day, correct?**

A. I have seen that indication in the documents, yes.

**Q. And that two inches a day is referred to as operational drawdown, correct?**

A. I don't think it's quite that simplistic, but generally, yes.

**Q. Okay. If the reservoir had been drawn down at two inches per day, is it more likely than -- than not that the reservoir would have experienced unusual cracking in the flat-plate soil-cement regardless of whether Barnard performed defective construction work or not?**

MR. FORZIANO: Object to form.

MR. MEADERS: Objection to form.

A. I don't know the answer to that.

**Q. You have made no effort to qualify what percent of the unusual cracking in the reservoir was a result of Barnard's defective construction work, correct?**

A. That is correct.

**Q. Have you made any attempt to segregate what defective work occurred within the zones containing**

Mr. Milhorn, who you just recited, who was present during construction that stated prior to the time the lawsuit was started that Barnard performed defective work in the wedge and soil-cement?

MR. MEADERS: Objection to form.

A. I believe Dwayne Williams.

Q. All right. An inspector?

A. Yes.

Q. How do you know what Dwayne Williams stated before the lawsuit was filed?

A. It was in his reports.

Q. Okay. Can you tell me the name of any person who stated before the lawsuit was started that Barnard performed defective construction work in the wedge or soil-cement that remained uncorrected?

MR. MEADERS: Objection to form.

MR. FORZIANO: Object to form.

A. No, not that stated it at the time that the work was defective and that it remained uncorrected.

Q. We've previously discussed the fact that HDR had certain quality control obligations that included inspecting, testing, observation and reporting, correct?

A. Yes, we have.

Q. And I -- I believe you have stated that HDR failed to adequately perform their quality control

**duties that included inspecting, testing, observation and reporting, correct?**

MR. MEADERS: Objection to form.

A. Yes.

**Q. Do you have an opinion to a reasonable degree of engineering certainty whether or not HDR failed to meet the standard of care that would be expected of an inspector performing quality control duties pursuant to the care, skill and diligence customarily provided by an experienced consulting or inspecting firm rendering the same or similar services as HDR?**

MR. MEADERS: Objection to form.

A. Yes.

MR. STANISLAW: What's wrong with the form of the question?

MR. MEADERS: Because it's asked in the Rule 26 disclosure and he hasn't even disclosed any of this information, so I'll object to the form of the question.

MR. STANISLAW: Okay.

MR. MEADERS: He's not qualified to render an opinion by the fact -- by virtue of the fact that he's never provided a Rule 26 report or disclosure that he's going to provide opinions of this nature.

BY MR. STANISLAW:

Q. And what is your opinion, sir?

MR. MEADERS: Objection to form.

A. That they did not meet the standard of care.

Q. And -- and what's the basis for your opinion?

MR. MEADERS: Objection to form.

A. My review of the project record.

Q. Is it fair to state that it is your opinion that HDR did not perform the quality control duties on this project in accordance with the care, skill and diligence customarily provided by an experienced consulting or inspection firm rendering the same or similar services as rendered by HDR on this project?

MR. MEADERS: Objection to form.

A. Yes.

Q. You prepared a report entitled "Evaluation of Performance by Construction Dynamics Group," right?

A. Yes.

Q. Could you get that report, please? Do you have that report?

A. Yes.

Q. Turn to page 47, please.

A. (Complies.)

Q. On page 47, you list a series of instances that you've determined that CDG failed to comply with

their contract with TBW, correct?

A. I think it's a general description of those, not necessarily "instances."

**Q. Okay. Page 47, you say, "O'Connell & Lawrence has determined that CDG failed to perform the construction management services on the project pursuant to CDG's contract with TBW in the following respects," correct?**

A. Correct.

**Q. Is it also true that you have an opinion that HDR failed to perform its design and construction duties on the project pursuant to HDR's contract with TBW?**

MR. MEADERS: Objection to form.

MR. FORZIANO: Object to form.

A. I can't answer that question the way you phrased it.

**Q. Why not?**

A. Because you included design.

**Q. You haven't done a review of the design?**

A. I have not.

**Q. And you don't have an opinion about the adequacy or sufficiency or the satisfactory nature of the design?**

A. I do not.

**Q. So with respect to HDR, let me go down this**

list.

A. Well, let me just scratch that last answer. To the extent that I said there were some things missing from the specification, but not as to the geotechnical design.

**Q. Okay. Let -- let me direct you to this list of where you say CDG failed to perform their services.**

MR. MEADERS: Object to the last answer as nonresponsive.

BY MR. STANISLAW:

**Q. Did HDR fail to properly inspect the contractor, Barnard's, work?**

MR. MEADERS: Objection to form.

A. You did say HDR, correct?

**Q. I did, sir.**

A. Yes.

**Q. Did HDR fail to properly implement the quality control program required by its agreement with TBW?**

MR. MEADERS: Objection to form.

A. Yes.

**Q. Did HDR failed to advise the owner, TBW, of deviations, defects or deficiencies observed in the work?**

MR. MEADERS: Objection to form.

MR. FORZIANO: Object to the form.

A. Yes.

Q. Turn to the next page.

A. (Complies.)

Q. Did HDR wrongfully certify that the quality of work performed by Barnard on the project was in accordance with the contract documents and that -- period?

MR. MEADERS: Objection to form.

MR. FORZIANO: Object to the form.

A. I don't believe that I can state that without reviewing certification that's HDR performed. I don't recall it.

Q. Okay. Did HDR fail to meet the standard of care required by the terms and conditions of their contract with TBW to perform quality control services?

MR. MEADERS: Objection to form.

A. Yes.

Q. You say here that CDG's failures contributed to defective construction not being corrected on the project. Do you see that?

A. Yes.

Q. Did HDR's failures contribute to the defective construction not being corrected on the project?

MR. MEADERS: Objection to form.

A. Yes.

Q. You say here that the actions and inactions of CDG exacerbated the condition of the upstream face of the reservoir. Do you see that?

A. Yes.

Q. Did HDR's actions and inactions in carrying out their quality control duties exacerbate the condition of the upstream face of the reservoir embankment?

MR. MEADERS: Objection to form.

A. Yes.

Q. Have you made any effort to quantify or assign a percentage of fault or in any other way distinguish the extent to which Barnard's failures or CDG's failures or HDR's failures contributed to the defective construction not being corrected on the project?

MR. MEADERS: Objection to form.

A. No.

MR. FORZIANO: Object to form.

BY MR. STANISLAW:

Q. Have you made any review or analysis or attempt to qualify or attempt to assign a percentage to determine the extent to which Barnard's defective construction, the actions or inactions of CDG and the actions or inactions of HDR exacerbated the condition of the upstream face of the reservoir embankment?