```
 1        A.    I'm going to have to have that read back,

 2   please.  I didn't catch all of it.

 3        Q.    Have you made any review or analysis that

 4   would allow you to qualify or segregate or assign a

 5   percentage to the extent to which Barnard's defective

 6   construction, the actions or inactions of CDG, the

 7   actions or inactions of HDR exacerbated the condition of

 8   the upstream face of the reservoir embankment?

 9             MR. FORZIANO:  Object to form.

10             MR. MEADERS:  Objection to form.

11        A.    No.

12        Q.    Are you aware that HDR got fired from this job

13   by TBW?

14             MR. MEADERS:  Objection to form.

15        A.    I was aware that HDR was terminated by Tampa

16   Bay Water, yes.

17        Q.    Do you know why HDR was terminated by Tampa

18   Bay Water on this project?

19             MR. MEADERS:  Objection to form.

20             MR. FORZIANO:  Object to form.

21        A.    I do not know specifically, no.

22        Q.    Do you have an opinion as to whether or not it

23   was reasonable and proper under the circumstances for

24   TBW to terminate Tampa Bay Water's services on this

25   pro- -- or to terminate HDR's services on this project?
```

1          MR. MEADERS:  Objection to form.

2          MR. FORZIANO:  Object to form.

3     A.    Can you try that again, please?

4     Q.    **Do you have an opinion as to whether or not**

5   **TBW was justified in firing HDR on this project?**

6          MR. MEADERS:  Objection to form.

7          MR. FORZIANO:  Object to form.

8     A.    No, I do not.

9     Q.    **Ardaman was a subconsultant to HDR on this**

10  **project, correct?**

11    A.    That was one of the relationships that I

12  understand.  They may have had other relationships.

13    Q.    **And -- and Ardaman is a firm that is engaged**

14  **in geotechnical engineering?**

15          MR. MEADERS:  Objection to form.

16          MR. FORZIANO:  Object to the form.

17    A.    I know that they're en- -- engaged in

18  inspection and testing.  I'm not sure about the

19  geotechnical engineering part.

20    Q.    **You're not sure what kind of a firm Ardaman**

21  **is; is that correct?**

22    A.    I recognize Ardaman to be engaged in testing

23  and inspection.  I'm just not sure if they perform

24  geotechnical engineering work.

25    Q.    **Okay.  And what was Ardaman's role on this**

```
 1    project --
 2              MR. FORZIANO:  Object to form.
 3    BY MR. STANISLAW:
 4        Q.    -- during construction on behalf of HDR?
 5              MR. MEADERS:  Objection to form.
 6        A.    They provided inspection personnel for the
 7    quality control work on the project.
 8        Q.    And --
 9        A.    And they also performed testing work,
10    laboratory work.
11        Q.    On behalf of HDR?
12              MR. MEADERS:  Objection to form.
13              MR. FORZIANO:  Object to form.
14        A.    And perhaps others.
15        Q.    The moisture density test required for
16    laboratory analysis, correct?
17        A.    That is correct.
18        Q.    And H- -- HDR is the party that took the
19    moisture density tests on this project, correct?
20              MR. MEADERS:  Objection to form.
21              MR. FORZIANO:  Object to form.
22        A.    Yes, that's correct.
23        Q.    And they took over 9,000 tests?
24        A.    That's what's been stated in the record,
25    correct.
```

1   Q.   And I've asked you this with respect to other

2   entities, but I haven't asked you with respect to

3   Ardaman.

4           Did anyone from Ardaman ever make note of the

5   fact that lenses, pockets or streaks existed in the

6   wedge?

7           MR. FORZIANO:   Object to form.

8   A.   Mr. Milhorn may have acknowledged that in his

9   deposition.

10   Q.   My question was during construction, sir.

11   A.   I don't believe it was.  But if you want to

12   ask me that question now, I can answer that.

13   Q.   During construction, did anyone from Ardaman

14   ever note -- make note of the fact that lenses, pockets

15   or streaks existed in the wedge?

16   A.   Not --

17           MR. FORZIANO:   Object to form.

18           MR. MEADERS:   Objection to form.

19   A.   Not that I'm aware of.

20   Q.   Did -- during construction, did anyone from

21   Ardaman ever reject any work performed in the wedge

22   because it contained a pocket, streak or a layer?

23           MR. MEADERS:   Objection to form.

24   A.   I don't believe so.

25   Q.   Did anyone from Ardaman, during construction,

1    ever reject any work in the wedge because the soil was

2    not homogeneous?

3            MR. MEADERS:  Objection to form.

4        A.   Not that I'm aware of.

5        Q.   If a pocket, streak or lens did exist in the

6    wedge or if the soil was not homogeneous, was it part of

7    Ardaman's job to either reject that work or to bring it

8    to someone's attention?

9            MR. MEADERS:  Objection to form.

10           MR. FORZIANO:  Object to form.

11       A.   I don't think I can answer that the way its

12   phrased.

13       Q.   Okay.  Why not?

14       A.   Because the -- and if -- the question implies

15   that if there's a pocket or streak the work should be

16   rejected and I don't believe I've said that.

17       Q.   What should be done if a pocket or streak is

18   found?

19       A.   It should be tested to determine if the

20   material differs substantially in texture or gradation

21   from surrounding materials.

22       Q.   If a pocket, streak or lense existed in the

23   wedge, was it Ardaman's job to see that it was tested

24   appropriately?

25           MR. MEADERS:  Objection to form.

1    A.    Yes.

2    Q.    Are you aware of any occasion during the

3    project where Ardaman tested material in the wedge

4    because a pocket, streak or lens existed?

5         MR. MEADERS:   Objection to form.

6    A.    That may have occurred, yes.

7    Q.    Are you -- it may have occurred, but are you

8    aware of any such instance, sir?

9    A.    I do recall that it did occur with respect to

10   some material where there were clay pockets --

11   Q.    On how many occa- --

12   A.    -- in the embankment.

13   Q.    On how many occasions?

14   A.    I -- I don't recall.

15   Q.    Well, can you give me an approximate order of

16   magnitude?  Was it one, ten or a thousand?

17   A.    I recall one specific event.

18        MR. MEADERS:   Objection to form.

19   BY MR. STANISLAW:

20   Q.    There was one time during the 13 months that

21   the wedge was constructed that you're aware of where

22   Ardaman tested material because they had a concern it

23   contained a pocket, streak or lens, correct?

24        MR. MEADERS:   Objection to form.

25   A.    Pockets of clay.

1    Q.   And after that testing was done, what was the

2    result?

3    A.   I believe that that material was left in

4    place.

5    Q.   And who made the decision to leave it in

6    place?

7         MR. MEADERS:  Objection to form.

8    A.   That I don't recall.

9    Q.   If HDR or Ardaman said that the material

10   should be removed, that would have been Barnard's and

11   McDonald's job to remove it, correct?

12   A.   I believe that's correct, yes.

13   Q.   You're not aware of Barnard or McDonald ever

14   refusing to remove material that Ardaman or HDR said

15   should be removed; are you, sir?

16        MR. MEADERS:  Objection to form.

17   A.   I think that did occur one time.

18   Q.   With the soil in the wedge?

19   A.   I believe that's correct.

20   Q.   Where did that occur?

21   A.   It was after the geotextile had been placed.

22   I don't recall specifically where --

23   Q.   Okay.

24   A.   -- but there was an incident.

25   Q.   You have indicated that Barnard didn't do

1    their job properly and effectively on this job; that HDR

2    didn't do their job properly and effectively on this

3    job; that CDG didn't do their job properly and

4    effectively on this job.  Did Ardaman also not perform

5    properly and effectively on this job?

6              MR. MEADERS:  Objection to form.

7        A.    Yes.

8        Q.    Now, did Ardaman fail to perform their

9    monitoring inspection duties in accordance with the

10   care, skill and diligence customarily provided by an

11   experienced inspection and testing firm rendering the

12   same or similar services as HDR rendered on this

13   project?

14             MR. MEADERS:  Objection to form.

15       A.    Yes.

16       Q.    And what's your basis for that opinion?

17             MR. MEADERS:  Objection to form.

18       A.    My review of the project record.

19       Q.    So it's your opinion that three firms charged

20   with quality control, inspection and quality assurance,

21   as well as the contractor, all failed to perform their

22   jobs properly on this project, correct?

23       A.    That's correct.

24       Q.    There was a total and complete breakdown of

25   the quality control procedure on this project; is that

1    your testimony?

2         A.   That's correct.

3         Q.   And it happened without Dr. Carrier knowing

4    anything about it; is that your testimony?

5              MR. FORZIANO:  Object to form.

6         A.   I don't know precisely what he knew and didn't

7    know.

8         Q.   You have no knowledge or evidence that

9    suggests at all that Dr. Carrier knew that there was a

10   total and complete quality control breakdown on this

11   project, do you, sir?

12             MR. FORZIANO:  Object to form.

13        A.   I do not.

14        Q.   Wouldn't it have been Dr. Carrier's job as the

15   representative of the people of the state of Florida to

16   do something about a total quality control breakdown on

17   this project?

18             MR. FORZIANO:  Object to form.

19        A.   If he knew about it, yes.

20        Q.   And do you have any knowledge or evidence that

21   anyone from Barnard, anyone from HDR, anyone from CDG or

22   anyone from Ardaman ever made any attempts to

23   deliberately or intentionally conceal this breakdown in

24   the quality control process from Dr. Carrier?

25        A.   No, I do not.

1   the embankment?

2          MR. MEADERS:  Objection to form.

3      A.   I think they did.

4      Q.   I beg your pardon?

5      A.   I think they did.

6      Q.   And -- and how do you do a permeability test?

7      A.   There's an ASTM designation for permeability.

8   In fact, I believe there's two different designations

9   for permeability.  It involves the sitting of the

10  material and then a measurement of the flow of water

11  over time through the material.

12     Q.   Did any representative of the State of

13  Florida, Tampa Bay Water, HDR, CDG or Ardaman ever

14  request Barnard to prepare or perform a permeability

15  test on the soil that was used in this embankment?

16         MR. MEADERS:  Objection to form.

17     A.   I would have to check, but I think that

18  Barnard was required to provide test information on the

19  bentonite used in the bentonite-amended soil, which is

20  part of the embankment, but I would need to check that.

21     Q.   Okay.  The wedge is where you've identified

22  the problem is on this project, correct; one of the

23  areas?

24     A.   That's one of the areas, yes.

25     Q.   Okay.  Did -- did anyone -- did anyone from

```
 1    the State of Florida, Tampa Bay Water, HDR, CDG or

 2    Ardaman ever request Barnard to perform any permeability

 3    tests on the soil in the wedge?

 4              MR. MEADERS:  Objection to form.

 5         A.   As I said, with the exception of the

 6    bentonite-amended soil which is in the wedge, I don't

 7    believe so.

 8         Q.   And if Barnard had performed a test for

 9    permeability on soil in the wedge, what permeability

10    would they had to have achieved in order for it to be

11    acceptable?

12              MR. FORZIANO:  Object to form.

13         A.   I don't know that.

14         Q.   You don't know what a passing permeability

15    test would be?

16         A.   I do not know that.

17         Q.   There's no standard in the contract documents

18    that indicates what a passing or acceptable permeability

19    for soil in the wedge would be, is there, sir?

20         A.   As I said, with the exception possibly of the

21    bentonite-amended soil, I believe that's correct.

22         Q.   So how is Barnard supposed to know if they got

23    a passing or failing permeability test if they did do a

24    permeability test on soil from the wedge?

25              MR. FORZIANO:  Object to form.
```

```
 1          A.    That would be up to review by the engineer.

 2          Q.    Does anyplace -- is there anyplace in the

 3    specifications that says the engineer shall review

 4    Barnard's soil permeability test and make a

 5    determination after the fact as to what's passing or

 6    not?

 7          A.    No, it does not say that.

 8          Q.    It's -- it's very, very bad form in the

 9    preparation of construction documents to have a test

10    determined at the discretion of an engineer after

11    construction starts; isn't that true, sir?

12               MR. MEADERS:  Objection to form.

13               MR. FORZIANO:  Object to form.

14          A.    I don't know if it's bad form, but it's not a

15    good idea.

16          Q.    If there had been an intent or desire on the

17    part of HDR, the drafter of the specifications, to have

18    Barnard perform permeability tests, there should have

19    been an acceptable permeability number for the soil in

20    the wedge, correct, stated in the specifications?

21          A.    I --

22               MR. FORZIANO:  Object to form.

23               MR. MEADERS:  Objection to form.

24          A.    I agree with that.

25          Q.    And there wasn't, was there?
```

1      A.    Not that I'm aware of.

2      Q.    Exhibit 228, HDR's quality control program,

3   turn to page 318 and 319.  Pages 318 and 319 are the

4   pages we looked at before that deal with the

5   inspections, observations, approvals and testing for

6   soil-cement -- for earthwork, correct?

7      A.    Yes.

8      Q.    And is there any test indicated in HDR's

9   quality control plan that indicates it is a test for

10  permeability of soil?

11         MR. FORZIANO:  Object to form.

12         MR. MEADERS:  Join.

13     A.    Yes.

14     Q.    Where -- where?

15     A.    ASTM D5084.

16     Q.    And -- and is that under embankment fill and

17  backfill material?

18     A.    No.  It's under bentonite-amended soil and

19  blanket drain material.

20     Q.    Okay.  With respect to embankment fill and

21  backfill material, is there any test there that is a

22  test for permeability?

23         MR. MEADERS:  Objection to form.

24     A.    I do not believe so.

25     Q.    So neither Barnard's specifications nor HDR's

1   quality control plan for the portion of the work dealing

2   with embankment fill and backfill material contain any

3   requirement for testing the soil to determine

4   permeability, correct?

5          MR. FORZIANO:  Object to form.

6       A.   I believe that's correct.

7       Q.   There isn't any piece of paper anyplace that

8   required any of the parties for this project to do soil

9   permeability testing while construction was in progress,

10  is there, sir?

11         MR. FORZIANO:  Object to form.

12      A.   I don't believe that's correct.

13      Q.   Where is it in any of the contract documents

14  dealing with soil and embankment fill or backfill

15  requiring permeability testing?

16      A.   They are listed as tests under quality

17  assurance, item 1.3.A.2, in specification section

18  02200 --

19      Q.   And what tests --

20      A.   -- standard -- D2434 standard test method for

21  permeability of granular soil.

22      Q.   Did -- did any -- and who was supposed to

23  perform those tests -- that test?

24      A.   The QC.

25      Q.   By HDR?

1        A.    Yes.

2                MR. MEADERS:  Objection to form.

3                MR. STANISLAW:  Okay.  We have to stop.

4                MR. MEADERS:  The time is 3:58 p.m.  Off the

5        record.

6                (Brief recess.)

7                THE VIDEOGRAPHER:  The time is 4:11 p.m.

8   BY MR. STANISLAW:

9        Q.    Do you have Exhibit 138, sir?

10       A.    Yes.

11       Q.    Exhibit 138, are these the specifications that

12   you read from indicating that there was supposed to be a

13   permeability test taken?

14       A.    Yes.

15       Q.    And on page three of the earthwork

16   specifications, Exhibit 138, there's a section called

17   "blanket drain material."  Do you see that?

18       A.    Yes.

19       Q.    And under blanket drain material, paragraph C

20   2B -- the blanket drain, that's on the downstream side

21   or the outside of the reservoir, correct?

22       A.    That's correct.

23       Q.    And it's not on the inside of the reservoir

24   where all the problems are, is it?

25                MR. MEADERS:  Objection to form.

587

```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3   TAMPA BAY WATER,
     A Regional Water Supply
 4   Authority,

 5          Plaintiff,      CASE NO.:  8:08-CV-2446-T27-TBM

 6   vs.

 7   HDR ENGINEERING, INC., a
     Nebraska corporation,
 8   CONSTRUCTION DYNAMICS
     GROUP, INC., a Maryland
 9   corporation,
     BARNARD CONSTRUCTION
10   COMPANY, INC., a Montana
     corporation,
11   ST. PAUL FIRE AND MARINE
     INSURANCE COMPANY, a
12   Minnesota corporation,

13          Defendants.
     _____/
14   BARNARD CONSTRUCTION COMPANY, INC.,
     a Montana corporation,
15
            Third Party Plaintiff,
16
     vs.
17

18   MCDONALD CONSTRUCTION CORPORATION,
     a Federal corporation,
19
            Third Party Defendant.
20   _____/

21              VOLUME V OF X
              (Pages 587 - 694)
22
              VIDEOTAPED DEPOSITION OF
23         KENNETH J. O'CONNELL, Ph.D., P.E.

24

25
```

```
 1    layer over the geomembrane a sufficient number of

 2    inspectors to assign to that task?

 3              MR. MEADERS:  Objection to form.

 4              MR. FORZIANO:  Object to form.

 5        A.   My understanding, based on Mr. Milhorn's

 6    testimony, is that with a few exceptions, that was the

 7    case.

 8        Q.   My question is, sir:  Is -- was one inspector

 9    who was assigned full-time to observe the placement of

10    the protective layer over the geomembrane a sufficient

11    number of inspectors, or should more inspectors have

12    been assigned to observe that task?

13        A.   One inspector, in my opinion, would not be a

14    sufficient number.

15        Q.   So in your opinion, HDR failed to assign a

16    sufficient number of inspectors to watch the placement

17    of the protective layer over the geomembrane; is that

18    correct?

19              MR. MEADERS:  Objection to form.

20              MR. FORZIANO:  Object to form.

21        A.   That's not what I said.

22        Q.   Should more than one inspector have been

23    assigned on a full-time basis to observe the placement

24    of the protective layer over the geomembrane?

25              MR. MEADERS:  Objection to form.
```

1    A.   I think, generally speaking, the answer to

2    that is yes.  Obviously, it would depend on the

3    operations that were taking place on any given day.

4        Q.   As a general rule, one inspector, in your

5    opinion, sir, would not be enough to do an adequate job

6    of inspecting the placement of the protective layer over

7    the geomembrane; is that correct?

8        MR. MEADERS:   Objection to form.

9        A.   That is correct.

10       Q.   You have stated that the placement of this

11   protective layer over the geomembrane in a vertical

12   fashion, pushing the material up the hill with dozers

13   was a violation of the specifications, correct?

14       MR. MEADERS:   Objection to form.

15       A.   Yes.

16       Q.   If Barnard Construction was directed by HDR,

17   the engineer on this project, to place the protective

18   layer over the geomembrane by pushing it up the slope

19   with dozers, should Barnard have ignored that direction?

20       MR. MEADERS:   Objection to form.

21       MR. FORZIANO:   Object to form.

22       A.   I think they would have been probably prudent

23   to comply with the direction under protest.

24       Q.   So it's your testimony that Barnard should not

25   have ignored a direction from HDR, the engineer, to

```
 1    opinions and conclusions; have you, sir?

 2         A.    I have done that review.

 3         Q.    You can tell me where aerated soil from the

 4    borrow pits was placed in the embankment by giving me

 5    the station and the elevation where it was placed?

 6         A.    I think in some instances you can do that,

 7    yes.

 8         Q.    Have you done that?

 9         A.    I have looked at that information.

10         Q.    Do you have any summary prepared that would

11    disclose that information?

12         A.    No.

13         Q.    Do you know what the quality of soil was that

14    was aerated on this project?

15         A.    No, I do not.

16         Q.    It's your testimony that the entire embankment

17    was constructed improperly because the soil wasn't

18    adequately mixed, correct?

19         A.    That's correct.

20         Q.    And so just so I'm clear, it's your opinion to

21    a reasonable degree of certainty that over

22    12 million cubic yards of material placed over

23    approximately a two-year period, witnessed by inspectors

24    from HDR and CDG was all placed improperly, correct?

25              MR. MEADERS:   Objection to form.
```

1      A.    That is correct.

2      Q.    Should Barnard have done all of the blending

3  of the soil that was required on this project in the

4  borrow areas before it got to the embankment?

5      A.    Not necessarily.

6      Q.    What percentage of the soil should Barnard

7  have blended in the borrow pits before it was hauled to

8  the embankment, sir?

9      A.    I can't give you a percentage.  It would be

10  whatever would be required to meet the specification.

11      Q.    And is it your opinion, sir, that of the over

12  12 million cubic yards of soil that was placed in the

13  embankment on this project, 100 percent of that soil was

14  improperly or inadequately mixed?

15      A.    I probably cannot say 100 percent.

16      Q.    What -- what is the percent that is

17  inadequately or improperly mixed?

18      A.    I think all of the evidence suggests that the

19  vast majority was improperly mixed.

20      Q.    Your analysis of avoided or not-performed work

21  charges Barnard for the cost of not adequately mixing or

22  blending soil; doesn't it, sir?

23      A.    Yes.

24      Q.    In that analysis you have assumed that

25  100 percent of the soil was not adequately mixed or

```
 1                UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                     TAMPA DIVISION

 3    TAMPA BAY WATER,
      A Regional Water Supply
 4    Authority,

 5           Plaintiff,     CASE NO.:  8:08-CV-2446-T27-TBM

 6    vs.

 7    HDR ENGINEERING, INC., a
      Nebraska corporation,
 8    CONSTRUCTION DYNAMICS
      GROUP, INC., a Maryland
 9    corporation,
      BARNARD CONSTRUCTION
10    COMPANY, INC., a Montana
      corporation,
11    ST. PAUL FIRE AND MARINE
      INSURANCE COMPANY, a
12    Minnesota corporation,

13           Defendants.
      _____/
14    BARNARD CONSTRUCTION COMPANY, INC.,
      a Montana corporation,
15
             Third Party Plaintiff,
16
      vs.
17

18    MCDONALD CONSTRUCTION CORPORATION,
      a Federal corporation,
19
             Third Party Defendant.
20    _____/

21              VOLUME VI OF X
               (Pages 695 - 837)
22
             VIDEOTAPED DEPOSITION OF
23        KENNETH J. O'CONNELL, Ph.D., P.E.

24

25
```

```
 1   build an acceptable test section?

 2              MR. FORZIANO:  Object to form.

 3        A.   No.

 4        Q.   What is your explanation for why the lead

 5   inspector on the project and the primary representative

 6   for the State of Florida would both state that there was

 7   an acceptable test section built, if in fact there was

 8   not?

 9        A.   I don't know why they would state that.

10        Q.   In fact, it was -- HDR was the party that had

11   the responsibility on this project to either accept or

12   reject the test section, correct?

13              MR. MEADERS:  Objection to form.

14   BY MR. STANISLAW:

15        Q.   In the soil-cement?

16        A.   I believe that would be correct.

17        Q.   And Mr. Milhorn was the lead inspector for

18   HDR, correct?

19        A.   Well, he --

20              MR. MEADERS:  Objection to form.

21        A.   He worked for Ardaman, but as I understand it,

22   he was the lead inspector on the project.

23        Q.   The test section that was constructed in

24   December wasn't removed because it was defective, it was

25   removed because it was always part of the plan to remove
```

```
 1        A.    Yes, I believe that's correct.

 2        Q.    And each of the eight items of problems with

 3   the soil-cement facing constitute violations or

 4   deviations from the plans and specifications, correct?

 5             MR. MEADERS:   Objection to form.

 6        A.    I believe that's correct.

 7        Q.    Tampa Bay Water and/or HDR were obligated by

 8   the laws of the state of Florida to report any

 9   deviations from the plans or specifications; weren't

10   they, sir?

11             MR. MEADERS:   Objection to form.

12             MR. FORZIANO:   Object to the form.

13        A.    Well, I'm not sure I can answer the question

14   about the laws of the state of Florida.

15        Q.    Under the terms of the permit that you

16   reviewed, it's true that there was an obligation to

17   notify the State of Florida of any violations from the

18   plans and specifications, correct?

19             MR. MEADERS:   Objection to form.

20             MR. FORZIANO:   Object to form.

21        A.    That is true.

22        Q.    And that was an obligation that both HDR and

23   TBW had, correct?

24             MR. FORZIANO:   Object to form.

25             MR. MEADERS:   Objection to form.
```

1      A.    Yes, I believe that's true.

2      Q.    And with respect to the eight items that are

3    listed here, none of those items were reported by either

4    HDR or TBW to the State of Florida except for item

5    number two, "areas of thin soil-cement"; correct, sir?

6              MR. FORZIANO:  Object to form.

7              MR. MEADERS:  Join.

8      A.    I believe that's correct.

9      Q.    So of the eight items that you've identified

10   as being violations of the plans and specifications in

11   connection with the placement of the soil-cement, both

12   HDR and TBW failed to report several of those items to

13   the State of Florida, correct?

14             MR. MEADERS:  Objection to form.

15             MR. FORZIANO:  Object to form.

16     A.    To the best of my knowledge, I think that's

17   correct.

18     Q.    Each of the eight items that you've listed on

19   page 31, which are a listing of the defects in the

20   soil-cement installation performed by Barnard, were

21   items that a reasonably prudent geotechnical engineer

22   like Dr. David Carrier could have discovered; isn't that

23   true, sir?

24             MR. FORZIANO:  Object to form.

25     A.    Yes.

1   not HDR?

2       A.   There was a quality assurance engineer that

3   was required.  I'm just not sure if this is describing

4   HDR or CDG.

5       MR. PICKERT:  Object to the answer as

6       nonresponsive.

7   BY MR. STANISLAW:

8       Q.   Let me ask you to look at paragraph number 27.

9   It says, "Quality control inspection shall be conducted

10  by the engineer of record or a personal representative."

11  Do you see that?

12      A.   Yes, I do see that.

13      Q.   The engineer of record was HDR, correct?

14      A.   That is correct.

15      Q.   One of the quality control inspections that

16  HDR was required by this permit to conduct was under

17  item H, "construction and testing of soil-cement,

18  interior protection layer."  Do you see that?

19      A.   Yes, I see that.

20      Q.   Did HDR adequately and sufficiently perform

21  the quality control inspections of the soil-cement that

22  they were required by the Florida Department of

23  Environmental Protection permit to perform?

24      MR. MEADERS:  Objection to form.

25      A.   No.

1    Q.    Now, getting back to paragraph number 29.    It

2  says, "An agreement between Tampa Bay Water and the

3  third party engineer describing authority, duties and

4  responsibilities of the third party engineer shall be

5  submitted to the Department for review prior to

6  initiation of reservoir construction to ensure that the

7  agreement provides assurances that the quality control

8  functions will be properly executed."

9         My question is:  Did HDR have the duty and

10  responsibility on this project to assure that the

11  quality control functions with respect to the

12  soil-cement would be properly executed?

13         MR. MEADERS:  Objection to form.

14         MR. FORZIANO:  Object to the form.

15    A.    I believe that they did.

16    Q.    And did they fulfill that duty to provide

17  assurances that the quality control functions with

18  respect to the soil-cement would be properly executed?

19         MR. MEADERS:  Objection to form; misstates the

20     document.

21         MR. FORZIANO:  Object to the form.

22    A.    No.

23    Q.    Did HDR fulfill a standard of care as a

24  professional engineer to provide the degree of skill,

25  diligence and competence in carrying out their quality

1   assurance duties with respect to the soil-cement that an

2   engineering firm having the same or similar -- providing

3   the same or similar services would provide?

4          MR. MEADERS:  Objection to form.

5      A.   I don't recall specifically what the state --

6   stated standard of care was for HDR on this project.

7      Q.   Stated where?

8      A.   In their contract.

9      Q.   I didn't ask you anything about the -- their

10  contract.  What I asked you --

11     A.   You did.  You asked me what the standard of

12  care was, and I believe that I need to review the

13  contract to answer that question.

14     Q.   I'm not asking you about the contract with

15  this question I'm about to ask you now, all right?

16     A.   Okay.

17     Q.   Did HDR meet its standard of care in the

18  industry by providing the level of skill, competence and

19  diligence in carrying out their quality control

20  obligations with respect to soil-cement quality control

21  that an engineer would reasonably expect it to provide

22  doing the same or similar work?

23          MR. MEADERS:  Objection to form.

24     A.   I would still need to look at their contract

25  in order to answer that question.

1   Q.   Why -- why is that?

2   A.   Because I believe that the standard of care in

3   the industry requires that you look at the contract to

4   see what the contractual obligations are.

5   Q.   You have indicated that during your

6   inspections at the project site you saw bulging in the

7   soil-cement?

8   A.   Yes.

9   Q.   Do you know what a rotational failure is, sir?

10   A.   Generally, yes.

11   Q.   What -- what is it?

12   A.   It's a failure that occurs along a curvilinear

13   plane.

14   Q.   You saw evidence of bulging when you visited

15   the reservoir?

16   MR. MEADERS:   Objection to form.

17   A.   I did.

18   Q.   Did you also see evidence of rotational

19   failures?

20   MR. FORZIANO:   Object to form.

21   A.   That's outside of my expertise.

22   Q.   Okay.   Would a lack of adequately curing the

23   soil-cement call -- cause bulging in the soil-cement?

24   MR. FORZIANO:   Object to form.

25   A.   Not without other -- some other mechanism, no.

1    point out what area they want fixed, correct?

2        A.    I do not recall that, no.

3        Q.    On page 16 of Golder's report that's signed by

4    your friend, Dr. Brumund, the report states, quote, HDR

5    did not respond in a timely manner to Barnard when known

6    thin areas were found.

7              Do you agree with that statement, sir?

8              MR. MEADERS:   Objection to form.

9        A.    I do.

10       Q.    To the best of your knowledge and information,

11   Barnard was at all times ready, willing and able to fix

12   any area of thin soil-cement that HDR asked Barnard to

13   fix, correct?

14             MR. FORZIANO:   Object to form.

15       A.    They appeared to me to be willing, yes.

16       Q.    A punch list is a -- a list of items of work

17   that need to be corrected; is that right, sir?

18       A.    Not always.

19       Q.    What's your definition of punch list?

20       A.    A punch list typically is a list of items that

21   need to be completed.

22       Q.    Does it also include items that need to be

23   corrected or fixed?

24       A.    It can.

25       Q.    Okay.  Barnard asked HDR for a punch list with

1    respect to soil-cement on several occasions; didn't

2    they, sir?

3              MR. MEADERS:  Objection to form.

4         A.   I believe that's correct.

5         Q.   And the reason Barnard asked HDR for a punch

6    list for the soil-cement was so Barnard would know what

7    areas HDR wanted repaired if HDR thought the soil-cement

8    was too thin, correct?

9              MR. MEADERS:  Objection to form.

10        A.   I don't know the reason why they requested

11   that.

12        Q.   Did HDR ever furnish in response to Barnard's

13   request a punch list for areas of thin flat-plate

14   soil-cement, sir?

15             MR. MEADERS:  Objection to form.

16        A.   They may have, yes.

17        Q.   When did they do that?

18        A.   I think when they produced a punch list that

19   contained items related to geotextile protruding through

20   the soil-cement and things of that nature.

21        Q.   Have you reviewed the meeting minutes that --

22   prepared by Construction Dynamics Group that trace the

23   history of the soil-cement discussions during the

24   biweekly job site meetings?

25        A.   I believe that I have, yes.

1      Q.   Are you aware that -- and these meeting

2  minutes were distributed to all the principal

3  participants on the project, correct?

4      A.   I believe that's correct.

5      Q.   With a request that if they're not -- not

6  accurately reciting what occurred, that someone indicate

7  that they should be corrected, right?

8      A.   That may not be the specific language, but

9  there was something to that effect at the end of the

10 minutes.

11     Q.   Are you aware that the entry on November 17,

12 '04 with respect to soil-cement states, "Barnard has

13 requested a punch list for flat-plate in October and was

14 informed there would be no punch list"; are you aware of

15 that?

16          MR. MEADERS:  Objection to form.

17     A.   I would have to -- I could look at that.  I

18 generally recall that.

19     Q.   Do you want to look at it?

20     A.   Please.

21     Q.   (Tenders.)

22     A.   Thank you.  Yes, I see that.

23     Q.   And to the best of your knowledge and

24 information, is that an accurate statement; namely, that

25 Barnard did request a punch list for flat-plate

1    soil-cement in October and was later informed there

2    would be no punch list?

3          MR. MEADERS:  Objection to form.

4      A.   Yes, I believe that's accurate.

5      Q.   Is it also accurate that Barnard was -- was

6    not informed by HDR what areas of soil-cement HDR wanted

7    any additional work done on because they were thin?

8          MR. MEADERS:  Objection to form.

9      A.   I think in response to that specific -- those

10   specific requests, I think that's correct.

11         Q.   Another one of your complaints about the

12   soil-cement is that it wasn't properly compacted; is

13   that right?

14         A.   Yes, that's correct.

15         Q.   The compaction didn't comply with the

16   specifications according to your post-construction

17   review?

18         A.   That's correct.

19         Q.   You're aware that Dr. Carrier did a

20   post-construction review and determined that the

21   soil-cement did meet the compaction requirements; aren't

22   you, sir?

23         A.   Yes, I have seen that.

24         Q.   And so your post-compaction review is in

25   disagreement with Dr. Carrier's, correct?

```
 1    joints were sufficient to cause the cracking at the

 2    Tampa Bay Water reservoir?

 3         A.    I believe that I did, yes.

 4         Q.    And what engineering formula was that?

 5         A.    I was -- applied the coefficient of expansion

 6    for soil-cement to the various widths of the sections

 7    that were placed at the dam.

 8         Q.    And -- and where is that analysis done?

 9         A.    That should be in my work papers.

10         Q.    Okay.  Would -- you certainly don't include

11    that in your -- that analysis in your report; do you,

12    sir?

13         A.    No, I did not.

14         Q.    And no place in your report does it state that

15    the intraday joint work done by Barnard caused any

16    unusual cracking at the reservoir; isn't that true, sir?

17         A.    That's correct.

18         Q.    Is this a conclusion you've reached since the

19    preparation of your report?

20              MR. FORZIANO:  Object to form.

21         A.    That I'm not sure of.

22         Q.    Do you know whether or not HDR, after

23    completing their investigation post-construction, ever

24    concluded that improper construction of intraday joints

25    caused unusual cracking at the reservoir?
```

```
 1              MR. MEADERS:  Objection to form.

 2       A.   I don't recall that.

 3       Q.   Do -- do you recall them even considering that

 4  as a possible cause of the cracking?

 5              MR. MEADERS:  Objection to form.

 6       A.   I wouldn't know --

 7              MR. FORZIANO:  Object to form.

 8       A.   I wouldn't know what they consider.

 9       Q.   Based on your review of the records, you don't

10  know what HDR considered in doing their

11  post-construction investigation into the root cause of

12  the problems at the reservoir?

13              MR. MEADERS:  Objection to form.

14       A.   I don't know if they considered the

15  longitudinal joints in there.  I just don't remember

16  that.

17       Q.   Do you have any recollection that -- that

18  Black & Veatch ever concluded that the cause of the

19  unusual cracking at the reservoir was defective work in

20  the longitudinal joints?

21              MR. MEADERS:  Objection to form.

22       A.   I do not recall that.

23       Q.   Do you recall whether or not -- you read

24  Golder and Associates' report; haven't you?

25       A.   There are more than one.  I've read their
```

1    undisturbed for more than 30 minutes, they had the right

2    to tell Barnard to remove that soil-cement, correct?

3         MR. FORZIANO:  Object to form.

4         A.    I think someone had the right to tell them to

5    remove that, yes.

6         Q.    And that someone would have been HDR, correct?

7              MR. MEADERS:  Objection to form.

8         A.    That I'm not sure of.

9         Q.    If it wasn't HDR, who would it have been?

10        A.    I think HDR had the authority to reject that

11   work.  I'm not sure they had the authority to direct

12   them to remove it.

13        Q.    Okay.  HDR had the authority to reject

14   soil-cement work that had been left undisturbed for more

15   than 30 minutes or not compacted within 90 minutes,

16   correct?

17              MR. MEADERS:  Objection to form.

18        A.    Correct.

19        Q.    Did HDR ever exercise that authority at any

20   point during this job?

21        A.    Not that I'm -- not that I'm aware of, no.

22        Q.    Did HDR adequately and sufficiently fulfill

23   their inspection duties and their quality control duties

24   with respect to the contract requirements regarding no

25   undisturbed soil-cement for more than 30 minutes and

1    compacting soil-cement within 90 minutes?

2          MR. MEADERS:  Objection to form.

3      A.   No.

4      Q.   Earlier you were asked to be shown a contract

5    with HDR and TBW to determine the standard of care set

6    forth in the contract, correct?

7      A.   I'm not sure if I asked to be shown it.  I

8    said I would want to look at it before I could answer

9    that question.

10     Q.   Okay.  Let me show you page three from Golder

11   Associates' report dated January 10th, 2010, where

12   Golder and Associates quotes paragraph 18 of HDR's

13   contract entitled "Standard of Performance," which I've

14   highlighted in the margin for you there.

15          If Golder Associates says that's the standard

16   of performance provision in TBW's contract with HDR, are

17   you willing to accept Golder's statement to that effect?

18          MR. MEADERS:  Objection to form.

19     A.   Yes.

20     Q.   Have you had a chance to read --

21     A.   No, I haven't.

22     Q.   Okay.

23     A.   Okay.

24     Q.   Are you aware of any test results that show

25   failed compaction or compaction that didn't meet the

```
 1    specification requirements at the location of a

 2    longitudinal joint, a longitudinal intraday joint?

 3              MR. FORZIANO:  Object to form.

 4        A.   No.

 5        Q.   Should the soil-cement have been tested for

 6    compaction at the location of the longitudinal joints?

 7              MR. MEADERS:  Objection to form.

 8        A.   Yes.

 9        Q.   Was it?

10        A.   I can't --

11              MR. MEADERS:  Same objection.

12        A.   I can't make that determination.

13        Q.   You don't know if it was or not?

14        A.   I do not.

15        Q.   Okay.  What you do know is that HDR had the

16    right to reject soil-cement that was left undisturbed

17    for more than 30 minutes or not compacted within 90

18    minutes, correct?

19        A.   Correct.

20        Q.   Do you have an opinion, sir, as to whether or

21    not HDR met their standard of care as set forth in their

22    contract such that HDR performed the quality control

23    duties with respect to the soil-cement in accordance

24    with the standard of care, skill and diligence

25    customarily provided by an experienced consulting
```

```
1    organization rendering the same services in accordance

2    with sound professional principles and practices?

3            MR. MEADERS:  Objection to form.

4        A.   Yes.

5        Q.   What's your opinion?

6        A.   No, they --

7            MR. MEADERS:  Objection to form.

8        A.   No, they did not.

9        Q.   And what's the basis for your opinion?

10       A.   The standard of care that you've represented

11   is in their contract.

12       Q.   It's your opinion that HDR did not perform

13   their quality control duties in connection with the

14   soil-cement operation at the reservoir in a manner that

15   complied with paragraph 18, "Standard of Performance,"

16   of HDR's contract with TBW; is that right?

17           MR. MEADERS:  Objection to form.

18       A.   That's correct.

19       Q.   And did HDR's failure to meet their standard

20   of care in connection with their quality control duties

21   regarding the soil-cement contribute to the unusual

22   cracking in the soil-cement at the reservoir?

23           MR. MEADERS:  Objection to form.

24       A.   Yes.

25       Q.   And have you attempted to differentiate to
```

1    what extent Barnard's failures to meet the

2    specifications contributed to the unusual cracking in

3    the soil-cement as opposed to a contribution made by HDR

4    because of their failure to contribute -- or failure to

5    perform in accordance with the required standard of

6    care?

7              MR. FORZIANO:  Object to form.

8              MR. MEADERS:  Objection to form.

9         A.   No, I have not.

10        Q.   And I take it CDG was doing quality assurance

11   work there and also supposed to make sure that the

12   soil-cement work was done properly?

13        A.   Yes.

14        Q.   And have you made any attempt to quantify what

15   failures by CDG may have been to the unusual cracking at

16   the -- in the soil-cement at the reservoir as compared

17   to the contribution of HDR or TBW -- or of Barnard?

18             MR. FORZIANO:  Object to form.

19        A.   Can you restate that, please?

20        Q.   Yeah.  Have you attempted to quantify the

21   respective contributions to the unusual cracking to the

22   soil-cement at the reservoir or allocate the

23   contribution of unusual cracking in the soil-cement at

24   the reservoir between Barnard, CDG and HDR?

25        A.   No, I have not.

788

```
 1    prior to the Tampa Bay Water reservoir project, you

 2    can't tell us what a reasonable, normal, average number

 3    of items should be expected for soil-cement stair-step

 4    construction, correct?

 5         A.   I believe that I can.

 6         Q.   And what is that?

 7         A.   Zero.

 8         Q.   So you don't think there should have been any

 9    stair-step soil-cement items on the punch list; is that

10    correct, sir?

11         A.   That's correct.

12         Q.   Should there have been any punch list at all

13    on this project for any items of work?

14         A.   I would anticipate that there would be a punch

15    list prepared by the contractor, yes.

16         Q.   You would anticipate that HDR would prepare a

17    punch list on this project?

18         A.   (Reviewing.)

19         Q.   Let me -- let me withdraw that question and

20    ask you another one so we don't waste any more time.

21              HDR did prepare a punch list on this project,

22    correct?

23         A.   I believe that -- that is correct.

24         Q.   And was it appropriate for HDR to prepare a

25    punch list on this project?
```

```
 1              MR. MEADERS:  Objection to form.

 2         A.   That's what I was trying to determine with

 3    answering your previous question, whether that was

 4    stated in the quality control manual.

 5         Q.   Separate and apart from what's stated in the

 6    quality control manual, based on your understanding of

 7    construction projects, is it appropriate for the

 8    inspector in charge of quality control to prepare punch

 9    lists on a project?

10              MR. MEADERS:  Objection to form.

11              MR. FORZIANO:  Object to form.

12         A.   Not always, no, it's not.

13         Q.   Sometimes it is and sometimes it isn't?

14         A.   More typically, a contractor prepares a punch

15    list and submits it to the engineer.

16         Q.   Okay.  In the course of your testimony, you

17    have indicated that Dr. David Carrier failed to fulfill

18    his duties on behalf of the State of Florida, correct?

19              MR. FORZIANO:  Object to form.

20         A.   I believe that's probably correct, yes.

21         Q.   And you've indicated that Richard Menzies and

22    Amanda Rice failed to adequately observe defective work

23    on behalf of their employer and the owner on this

24    project, Tampa Bay Water, correct?

25              MR. FORZIANO:  Object to form.
```

1      A.    No, I don't believe I've said that.

2      Q.    Okay.  Check your testimony from yesterday

3  afternoon before you're certain of that, would you,

4  please?

5      A.    I'll be glad to, but I -- I don't recall

6  saying that.

7      Q.    Okay.  And you're -- you're aware that --

8  you've testified Barnard committed numerous instances of

9  defective work on this project?

10      A.    Correct.

11      Q.    And -- and Barnard's subcontractor, McDonald,

12  also performed its work defectively throughout the

13  course of building the embankment and the wedge,

14  correct?

15      A.    Correct.

16      Q.    And HDR defectively performed its inspection

17  and quality control duties on this project?

18            MR. MEADERS:  Objection to form.

19      A.    Correct.

20      Q.    And CDG, the quality assurance firm, also

21  defectively and inadequately performed its quality

22  assurance duties on this project?

23      A.    Correct.

24      Q.    So we've -- we've got a project where at least

25  the State of Florida, the contractor, the subcontractor,

1  the quality control firm and the quality assurance firm

2  all defectively performed their -- and unsatisfactorily

3  performed their duties and responsibilities, correct?

4       MR. MEADERS:  Objection to form.

5       A.   I believe that's correct.

6       Q.   In all of your career as an expert, have you

7  ever seen a failure of a project to this magnitude at

8  all levels involving the state's representative, the

9  contractor, the subcontractor, the engineer, the quality

10  assurance firm?

11       MR. MEADERS:  Objection to form.

12       MR. FORZIANO:  Object to form.

13       A.   Yes.

14       Q.   What other projects?

15       A.   The Shark River bridge, for example.

16       Q.   What -- what else?

17       A.   The embankments at Indian River.  There may be

18  others.  I'd have to think.

19       Q.   But those are other projects where you were an

20  expert witness hired to give testimony, paid to give

21  testimony, correct, sir?

22       A.   Incorrect.

23       Q.   Weren't you hired to be an expert witness on

24  both those projects?

25       A.   No.

```
 1    call enhanced photos of anything on this project?

 2         A.   No, I don't believe I have, no.

 3              MS. MUNKITTRICK:  Okay.  I believe that's all

 4         I have.  Oh, and I -- McDonald reserves the right

 5         to continue our questioning following review of his

 6         documents.

 7              MR. MEADERS:  Mr. Forziano.

 8              MR. FORZIANO:  Yes.

 9              MR. MEADERS:  Let me switch this.

10              By due order of pleading of the names, you'd

11         be next in line.  Do you want to take your witness

12         on for examination now, or do you yield the floor

13         to me, who would be next in line after your client?

14              MR. FORZIANO:  Well, I disagree with you.  The

15         way we've been conducting this and the way we've

16         conducted -- I've ever conducted a case like this,

17         or any other case for that matter, this is my

18         witness; however, you get to ask your questions,

19         and if I want to follow up with cross after that or

20         redirect, I -- I can.

21              So I think it's your turn, or if CDG wants to

22         go, it's between you-all as to who wants to go

23         next, but I reserve to ask -- ask my questions at

24         the end if I have any.  I'm not sure if I will.

25              MR. MEADERS:  I was just offering because in
```

1    the order of pleading, it would place you next.  If

2    it's -- if you --

3         MR. FORZIANO:  I appreciate that, thank you.

4         MR. MEADERS:  -- want me to go next, I'll be

5    glad to.  Thank you.

6         MR. FORZIANO:  Thank you.

7                   CROSS-EXAMINATION

8    BY MR. MEADERS:

9         Q.   Mr. O'Donnell --

10        MR. FORZIANO:  O'Connell.

11   BY MR. MEADERS:

12        Q.   Mr. O'Connell --

13        MR. FORZIANO:  Dr. O'Connell.

14   BY MR. MEADERS:

15        Q.   Mr. O'Connell, my name is Kurt Meaders.  I

16   represent one of the defendants that has been brought

17   into this lawsuit by Mr. Forziano's client, Tampa Bay

18   Water.  Specifically, I represent HDR Engineering.

19        It's my understanding that you were hired by

20   Mr. Forziano and his firm to make certain evaluations in

21   this case.  Would that be fair?

22        A.   That's fair.

23        Q.   When they retained you, did they make you

24   aware that your reports and your testimony and opinions

25   in the case would need to meet what were Federal Rule of

```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3    TAMPA BAY WATER,
      A Regional Water Supply
 4    Authority,

 5            Plaintiff,      CASE NO.:  8:08-CV-2446-T27-TBM

 6    vs.

 7    HDR ENGINEERING, INC., a
      Nebraska corporation,
 8    CONSTRUCTION DYNAMICS
      GROUP, INC., a Maryland
 9    corporation,
      BARNARD CONSTRUCTION
10    COMPANY, INC., a Montana
      corporation,
11    ST. PAUL FIRE AND MARINE
      INSURANCE COMPANY, a
12    Minnesota corporation,

13            Defendants.
      _____/
14    BARNARD CONSTRUCTION COMPANY, INC.,
      a Montana corporation,
15
              Third Party Plaintiff,
16
      vs.
17

18    MCDONALD CONSTRUCTION CORPORATION,
      a Federal corporation,
19
              Third Party Defendant.
20    _____/

21              VOLUME X OF X
                (Pages 1211 - 1321)
22
                VIDEOTAPED DEPOSITION OF
23         KENNETH J. O'CONNELL, Ph.D., P.E.

24

25
```

1    Q.   And the letters REJ, reflecting the engineer's

2  rejection of that submittal number, is depicted in that

3  matrix; is it not?

4    A.   It is.

5    Q.   And then beneath it there is two sets of

6  letters.  One is APR, and it has a line through it, and

7  APN is put in its place presumably, correct?

8         MR. MEADERS:  Objection to form.

9  BY MR. PICKERT:

10   Q.   Right under where it says REJ --

11   A.   I -- I see that.  I was just looking at

12 something else.

13   Q.   Okay.

14   A.   Yes, I see that.

15   Q.   So yesterday, I believe, you testified that it

16 was CDG that accepted this CQC plan, and essentially,

17 I'm asking you how you know that.

18   A.   I assumed that because this was a CDG form.

19   Q.   But you don't know if CDG is reflecting what

20 the engineer has decided, correct?

21   A.   Yes, that's correct.  That was my assumption.

22   Q.   So would it be fair to say you don't know

23 whether CDG accepted it or HDR accepted it, or, now

24 based on what you have seen, do you believe that it is

25 HDR that makes the final decision as to whether to

1    accept or reject or change the status of a submittal on

2    this project?

3                MR. MEADERS:  Object to form.

4                MR. FORZIANO:  Object to form.

5         A.   I believe that is HDR's responsibility to make

6    those determinations.

7                MR. MEADERS:  Object to the answer as

8         nonresponsive; move to strike.

9    BY MR. PICKERT:

10        Q.   Would you look at Exhibit 33 to the Barnard

11   report.  I believe Mr. Meaders presented this to you.

12   And it's a two-paragraph field observation scenario

13   dealing with removing geotextile.  Do you remember

14   reading this yesterday?

15        A.   I do.

16        Q.   Okay.  And toward the bottom of that second

17   paragraph, it says -- the writer, who's Herb Potter with

18   HDR, says, "I informed Mr. Mike Milhorn of Ardaman about

19   the discussion noted above at 10:35 a.m.  Mr. Milhorn

20   advised that he would inform Mr. Barry Meyer of HDR

21   about the issues."  Do you see that?

22        A.   No.

23        Q.   Uh-oh.

24        A.   Give me a second.

25        Q.   It's about five lines up from the bottom.