## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| TAMPA BAY WATER, | § | |
| a regional water supply authority, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 8:08-cv-2446-T27-TBM |
| | § | |
| HDR ENGINEERING, INC., a Nebraska | § | |
| corporation, CONSTRUCTION DYNAMICS | § | |
| GROUP, INC., a Maryland corporation, | § | |
| BARNARD CONSTRUCTION COMPANY, | § | |
| INC., a Montana corporation, ST. PAUL | § | |
| FIRE AND MARINE INSURANCE | § | |
| COMPANY, a Minnesota corporation, | § | |
| | § | |
| Defendants. | § | |

## HDR ENGINEERING, INC.'S
## DISPOSITIVE MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

HDR Engineering, Inc. files this Dispositive Motion for Summary Judgment and would

respectfully show the Court as follows:

## I.
## GROUNDS FOR MOTION

HDR seeks judgment as a matter of law on the following claims and grounds:

- TBW cannot link its past lost use damage claim to a Reservoir capacity fill limit placed on the Reservoir from 2008-2009.

- TBW has no evidence of past lost use damages, as the testimony offered thereon is inadmissible under FED. R. EVID. 702.

- TBW's future lost use damage claims are speculative and not reasonably certain.

- TBW has no evidence of future lost use damages, as the testimony offered thereon is inadmissible under FED. R. EVID. 702.

- TBW has no evidence to support its breach of the standard of care claim in Count II of its First Amended Complaint, as the testimony offered to prove a breach of HDR's standard of care and causation is inadmissible under FED. R. EVID. 702.

- TBW's damage claim for future repair costs constitutes economic waste.

- TBW is not entitled to prejudgment interest on future repairs.

## II.
## STATEMENT OF UNDISPUTED FACTS

1.  TBW alleges damages as a result of unusual cracking of the soil cement layer of the C.W. Bill Young Regional Reservoir (the "Reservoir"). *Dkt. #125, Plaintiff's Amended Complaint, ¶¶ 74, 85.*

2.  The Florida Department of Environmental Protection ("FDEP") provided a permit for the Reservoir, which set the maximum Reservoir fill level at 136.5 feet above the National Geodetic Vertical Datum of 1928 ("NGVD") and the maximum drawdown rate at 66 Million Gallons per Day ("MGD") when the Reservoir level is greater than 95 feet NGVD and 33 MGD when the Reservoir level is at or below 95 feet NGVD. *Ex. 1, TBW Application to return Reservoir to permitted capacity and drawdown rate, at FDEP007878 and FDEP007881 (Adams' Exhibit 369)(hereinafter the "TBW Application").*

3.  TBW alleges that in December 2006 unusual cracking was discovered to the upstream soil cement facing of the Reservoir. *Amended Complaint, ¶ 74.*

4.  FDEP placed an interim fill level restriction on the Reservoir of 105 feet NGVD in 2008 and 2009. *Ex. 1, TBW Application (FDEP007880).*

5.  TBW conducted a repair program in the spring of 2009 which filled voids under the soil cement and the cracks in the soil with grout. *Ex. 1, TBW Application (FDEP007881).*

6.  These repairs were successful and returned the Reservoir to its permitted functionality without restrictions. *Ex. 1, TBW Application (FDEP007881).*

7.  TBW represented to the FDEP in June 2009 that the repairs had been successful and that the Reservoir was safe and could be restored to its originally permitted fill level of 136.5 feet and it's originally permitted operational drawdown rate of 66 MGD. *Ex. 1, TBW Application (FDEP007876 and FDEP007878).*

8.  FDEP determined the Reservoir was safe and returned the Reservoir to its fully permitted capacity and drawdown rate in June 2009. *Ex. 2, Carrier's Deposition, 380:11-381:23; see also, Ex. 3, June 12, 2009 FDEP letter to TBW (Adams Exhibit 375)(FDEP007949).*

9.  Although TBW's Third Amended Rule 26 Disclosures alleged past and future damages for lost or diminished use of the Reservoir under both a "Revenue Model" and a "Cost Model," TBW subsequently stated that it will only use the "Cost Model." *Cf. Ex. 4, §V(A)-(B) of TBW's Third Amended Rule 26(a)(1)(A)(iii) Initial Disclosure, December 6, 2010 (hereinafter "December 2010 Disclosures") with TBW's Second Amended Response to Barnard Construction Company, Inc.'s*

*Motion for Sanctions Pursuant to Fed. R. Civ. P. 37(c), p. 17, 20 (December 20, 2010, Dkt. #251).*

10.    Under the "Cost Model," TBW is seeking $6.9 million in past damages for lost or diminished use of the Reservoir from February 2009 to October 2009 during the time it was under the fill limitation issued by the FDEP in 2008 and 2009. *Ex. 4, December 2010 Disclosures, §V(A).*

11.    Under the "Cost Model," TBW is seeking $20 million in future damages for lost or diminished use of the Reservoir during the two-year time period it is scheduled to be out of service in 2013 – 2015 during planned renovations. *Ex. 4, December 2010 Disclosures, §V(B).*

12.    For both past and future damages under the "Cost Model," TBW now claims that it must use costly desalinated water to make up for or replace less expensive water that would have been available had the Reservoir been in full operation. *Dkt. #251, TBW's Second Amended Response to Barnard's Motion for Sanctions, fn. 9.*

13.    For its past lost use damage claims, TBW has attributed 100% of its desalination water plant production from February 2009 to October 2009 to the restricted use of the Reservoir, without any offset for desalination plant production that would have occurred in any event due to extraneous factors unrelated to the Reservoir, such as minimum daily operational requirements, contractual production requirements, or pre-existing budgeted production. *Ex. 4, December 2010 Disclosure and Ex. 5, documents cited in December 2010 Disclosures, TBW317971-TBW317986.*

14.    At a minimum, the desalination plant must operate at 4 MGD to maintain its operational readiness regardless of the availability of the Reservoir and Allison Adams, TBW's designated representative on water supply facilities, has previously stated that the minimal desalination plant operation is 8.4 MGD. *Ex. 6, Adams' Deposition, November 2010, 42:13-43:19; Ex. 7, March 8, 2009 email from Alison Adams to Gerald Seeber, TBW-EM4271852-54.*

15.    TBW budgeted the desalinated water plant production for WY2009 at 15 MGD and actually operated it at 16.9 MGD in order to comply with funding agreement requirements, unrelated to the condition of the Reservoir. *Ex. 8, Tampa Bay Water February 18, 2008 Regular Board Meeting Minutes, p. 71; Ex. 9, Operations Plan Water Year 2009 Summary, p. 5 (Adams' Deposition Ex. 376).*

16.    No contemporaneous statements by TBW for WY2009 could be located attributing any of the production from the desalination plant to any restrictions on the use of the Reservoir.

17.    Alison Adams, TBW's designated representative on water facility use, determined the capacity limit on the Reservoir in WY2008 and WY2009 resulted in an increase in groundwater production but no shift to desalination plant production. *Ex. 10, Adams' Deposition Exhibits 379, 380, and 381.*

18.     Jon Kennedy, TBW's designated representative on damage calculations, admitted he is not qualified to determine how the Reservoir's limitations affected the shifts to other water sources. *Ex. 11, Kennedy's Deposition, October 2010, 374:11-18.*

19.     For its future lost use claim, TBW assumes it will experience two consecutive below-average or "low flow" water years that perfectly coincide with the time the Reservoir is scheduled to be out of service for renovations, and alleges it will be forced to rely on desalinated water to "replace" or make up that "lost" Reservoir water. *Ex. 6, Adams' Deposition, November 2010, 204:19-205:11; 208:21-209:9; 122:20-123:21; 126:3-12; 212:6-22; Ex. 12, Kennedy's Deposition Ex. 668, p. 3.*

20.     TBW has no evidence that its projected below average or "low flow" years are more likely than not to occur at all, in consecutive years, or during the time the Reservoir will be out of operation for renovations. *Ex. 6, Adams' Deposition, November 2010, 124:25-125:10; 126:3-12; 204:3-205:11; 208:2-209:9; 209:23-210:13; 210:20-213:17.*

21.     TBW has no analysis of how the Reservoir outage will effect production based on normal water flow years for 2013 and 2014. *Ex. 6, Adams' Deposition, November 2010, 210:5-210:13; Ex. 11, Kennedy's Deposition, October 2010, 525:13-526:13.*

22.     A normal, average or median year would provide 50 MGD to 55 MGD, which would be more than sufficient to satisfy TBW's needs, thereby avoiding any need to use the desalinated water plant and completely eliminating any future damage claim. *Ex. 6, Adams' Deposition, November 2010, 220:24-221:2; 222:7-225:13; Ex. 11, Kennedy's Deposition, October 2010, 526:25-528:11.*

23.     TBW has been operating the Reservoir at its full operating limit under the FDEP permit without any restrictions since June 2009. *Ex. 6, Adams' Deposition, June 2010, 72:1-73:12; 95:7-9; 103:7-106:25; 107:6-108:16; 112:25-113:7; Ex. 11, Kennedy's Deposition, October 2010, 553:22-554:4; 554:18-555:7; Ex. 13, TBW's Financial Statements for Years Ended September 30, 2009 and 2008, published January 22, 2010 (hereinafter "2008 and 2009 Financial Statements"), p. 3.*

24.     The flat-plate soil-cement is an erosion barrier that provides erosion protection for the embankment and is not a structural component of the Reservoir. *Ex. 13, 2008 and 2009 Financial Statements, p. 46.*

25.     The issue with the soil cement has never been considered a safety issue and the Reservoir is presently safe to operate under the original FDEP permit allowances and poses no public safety hazard. *Ex. 6, Adams' Deposition, June 2010, 116:16-117:1; Ex. 13, 2008 and 2009 Financial Statements, pp. 3, 46.*

26.     After the short-term repair program, TBW has no information that such repairs and monitoring are insufficient to keep the Reservoir at its current permitted level of withdrawals. *Ex. 6, Adams' Deposition, June 2010, 123:10-19.*

27.    The Reservoir is operating at its permitted drawdown rate with no change in service utility. *Ex. 6, Adams' Deposition, June 2010, 95:7-9; Adams' Deposition, November 2010, 242:24-243:14; Ex. 13, 2008 and 2009 Financial Statements, p. 3.*

28.    TBW has assigned no diminution in value, impairment loss or diminished service utility rating to the Reservoir due to any alleged defects in the soil cement facing. *See Ex. 13*, *2008 and 2009 Financial Statements,* p. 9, Table A-3.

29.    Under the permit originally granted by the FDEP, the maximum operational drawdown rate of the Reservoir was 66 MGD. *Ex. 1, TBW Application, (FDEP007880); Ex. 6, Adams' Deposition, June 2010, 83:7-84:6.*

30.    The Reservoir was designed and built as a gravity drawdown reservoir, and its operational drawdown rate is limited by the physical properties of gravity and hydrological restrictions. *Ex. 14, Kennedy's Deposition Ex. 673, B-8 to B-9; Ex. 11, Kennedy's Deposition, October 2010, 544:18– 546:10.*

31.    To obtain greater than 66 MGD from the Reservoir would require system design changes that were not part of the original design parameters. *Ex. 6, Adams' Deposition, June 2010, 77:12-78:13; 88:3-90:5; Ex. 11, Kennedy's Deposition, October 2010, 555:22-556:17.*

32.    To obtain greater than 66 MGD from the Reservoir would require a modification to the existing FDEP permit or an entirely new permit. *Ex. 11, Kennedy's Deposition, October 2010, 555:22-556:17; Ex. 6, Adams' Deposition, June 2010, 77:12-78:13; 95:10-97:7; Ex. 15, Adams' Deposition Exhibit 370.*

33.    TBW is building an off-stream Reservoir Pump Station, scheduled for completion and operation by June 16, 2011, the function of which will be to pump raw water from the Reservoir to the Surface Water Treatment Plant. The off-stream Reservoir Pump Station will have a capacity of not less than 120 MGD. *Ex. 16, Tampa Bay Water's Annual Budget, Fiscal Year 2011, p. 67 (hereinafter "TBW FY 2011 Budget").*

34.    TBW seeks repair damages based on conceptual designs which would repair the entire upstream slope. *Ex. 4, December 2010 Disclosure, II(A).*

35.    TBW is requesting bids for renovation of the Reservoir, scheduled to occur from 2013 – 2015, which, among other things, will seek a change in the daily operational capacity of the Reservoir from its present 66 MGD to 100 MGD, with additional capacity to reach sustained operational drawdown of 120 MGD. *See Ex. 17, TBW's Request for Proposals (TBW317987-318059), pp. 7-8.*

36.    TBW will not consider, review or use any of the remedial design plans prepared by any of the experts in this litigation (including its own) to perform any repairs; the plans are exclusively for use in the litigation *Ex. 11, Kennedy's Deposition, June 2010, 218:6-219:12; 221:2-19; 222:10-223:7.*

37. The soil cement damage is limited to the northeast quadrant and southwest quadrant of the Reservoir. *Ex. 11, Kennedy's Deposition, June 2010, 173:9-174:16.*

38. TBW's expert witness, Golder Associates, admits that monitoring the large sections of the Reservoir embankment that exhibit no cracking would realize significant cost savings over suggested repairs to the entire embankment. *Ex. 18, GOLDER20022253.*

39. Golder Associates recognizes that less expensive repair options (rather than a complete renovation to the entire facility) exist for areas where no cracks have occurred, for example from Stations 106 to Station 182. *Ex. 18, GOLDER20022253.*

40. TBW directed its expert William Brumund of Golder Associates Inc., not to consider whether a remediation plan of partial repairs would adequately address the conditions at the Reservoir. *Ex. 19, Brumund's Deposition, August 2010, 646:5-647:2; 647:24-649:10.*

41. TBW's expert, Brumund, acknowledges the repair work already done to the Reservoir may have restored its functionality. *Ex. 19, Brumund's Deposition, August 2010, 272:21-273:25.*

42. Brumund proposes to repair the entire Reservoir embankment, even though he does not know which areas around the Reservoir have conditions requiring remedial repairs or whether the alleged defective condition exists in areas not already showing cracks. *Ex. 19, Brumund's Deposition, December 2010, 395:20-397:13, 398:9-14.*

43. TBW seeks prejudgment interest on costs of future long term repairs not yet incurred or liquidated. *Ex. 4, December 2010 Disclosures, II (B).*

### III.
### LEGAL STANDARD FOR SUMMARY JUDGMENT

The Court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "When deciding a motion for summary judgment, a district court must consider all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and must resolve all reasonable doubts against the moving party." *Corbitt v. Home Depot U.S.A.*, 573 F.3d 1223, 1238 (11th Cir.2009). The movant "bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). According to the plain language of Rule 56(e), the non-moving party "may not rely merely on allegations or denials in its own pleading," but instead must come forward with "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e); *Matsushita,* 475 U.S. at 587. Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted).

**IV.**
**APPLICABLE LAW ON DAMAGES**

The general rule in breach of contract cases is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed. *Lazovitz, Inc. v. Saxon Constr., Inc.,* 911 F.2d 588, 591 (11th Cir.1990). However, the damages must be established with reasonable certainty as flowing from the wrong alleged. *Westbrook v. Bacskai,* 103 So.2d 241 (Fla.3d DCA 1958). Future damages are unrecoverable if the fact of their accrual is speculative or their amount or nature unprovable. *Zenith Radio Corp.*

*v. Hazeltine Research, Inc.,* 401 U.S. 321, 339, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). The critical inquiry is whether the damages are speculative; the plaintiff must be able to show "the *anticipated* cost with reasonable certainty." *Lazovitz, Inc.,* 911 F.2d at 591 (11th Cir.1990) (emphasis in original) (citing *Lynch v. Fla. Mining & Materials Corp.,* 384 So.2d 325, 327-28 (Fla.2nd DCA 1980); *B & J Holding Corp. v. Weiss,* 353 So.2d 141, 143 (Fla.3d DCA 1977)).

## V.
## PAST DAMAGES FROM "LOST USE" OF THE RESERVOIR

### A.   TBW CANNOT LINK PAST LOST USE DAMAGES TO THE RESERVOIR FILL LIMIT

TBW seeks $6.9 million in past damages, alleging it lost use of the Reservoir during 2008 and 2009 while the FDEP had imposed an interim fill limit of 105 feet NGVD (as opposed to the permitted fill limit of 136.5 NGVD). TBW claims this forced it to increase its production of more expensive desalinated water to make up for or replace the "lost" Reservoir water. Although TBW's Rule 26 Disclosure lists both a "Revenue Model" claim and a "Cost Model" claim, TBW has now abandoned the Revenue Model and is relying solely on the Cost Model.[1] In TBW's own words: "The *only* dispute at this juncture is what that cost model, properly calculated, would reflect – damages because the lost reservoir supply must be replaced by more costly desalinated water, or no damages because the lost supply can be made up for by less expensive ground water?"[2]

TBW designated Jon Kennedy, its Senior Manager of Engineering and Projects, to testify as to this calculation. Kennedy's testimony, however, provides no evidence of the past lost use damages based on a Cost Model analysis. To reach his claimed figure of $6.9 million, Kennedy took the *entire* desalination plant production from February 2009 – October 2009 (approximately

---

[1]    [Dkt. #251] TBW's Second Amended Response to Barnard Construction Company, Inc.'s Motion for Sanctions Pursuant to Fed.R.Civ.P. 37(c), p. 12.  "Kennedy promptly acknowledged that the 'cost model' analysis would be the more appropriate measure of TBW's damages."

[2]    *Id.* at p. 17.

4.6 billion gallons) and multiplied it by the incremental cost difference between surface water and desalinated water (approximately $1.50 per 1,000 gallons).[3] In other words, Kennedy assumed the desalination plant would have been shut down and not operated at all during that nine-month period if the Reservoir had been able to operate at its full permit capacity of 136.5 feet.

As a matter of law, TBW's damage claim fails, because it is unsupported by and contrary to the evidence. There is no evidence that the fill limit on the Reservoir accounted for any use of desalinated water, much less 100% of it. In fact, TBW's own evidence and data shows just the opposite: the fill limit on the Reservoir had no relation to or effect on the production of desalinated water in 2008 and 2009. Therefore, TBW suffered no past damages attributable to the Reservoir.

First, TBW's attribution of 100% of the desalinated water production to the Reservoir is an incorrect formula, because it fails to provide any offset for desalinated water production that would have occurred in any event, regardless of the condition of the Reservoir. TBW itself has admitted the desalination plant must operate under a "base load" or maintenance production rate of anywhere from 4 – 8.4 MGD, regardless of the condition of the Reservoir.[4] Kennedy did not deduct any of this minimum desalination production from his calculation.[5] Instead, he charged 100% of the desalination plant production to the defendants.[6] TBW has also admitted that other contractual agreements—principally, financing covenants—obligated it to operate the desalination plant at a high level, without regard to the condition of the Reservoir. Kennedy calculated the desalination plant operated at 16.7 MGD between February – October 2009, but

---

[3]      4.6 billion gallons x $1.50 per 1,000 gallons = $6.9 million.  *See* Ex. 4, December 2010 Disclosure, §V(A); Ex. 5, documents cited in December 2010 Disclosures, TBW317971-86.

[4]      Ex. 6, Adams' Deposition, November 2010, 42:13-43:19; Ex. 7, March 8, 2009 email from Alison Adams to Gerald Seeber.

[5]      Ex. 4, December 2010 Disclosures; Ex. 5, documents cited in December 2010 Disclosures, TBW317971-86.

[6]      *Id.*

TBW had already budgeted it to operate at 15 MGD anyway to meet contractual requirements.[7] In a retrospective analysis of operations, TBW reported it operated at 16.9 MGD for all of 2009 in order to meet those contractual requirements.[8] Full or empty, the Reservoir had nothing to do with the desalination plant production.

Both Kennedy and Adams recognize that a correct economic analysis would require deduction of the fixed and budgeted production from their damage calculation in order to determine the net or incremental desalinated water production attributable to the Reservoir.[9] In fact, they do deduct the 4 MGD figure from their future damages calculation, but fail to do so from their past damage calculation.[10] Kennedy acknowledged he needed to determine "what did [TBW] budget for the desal plant versus something that was different than expected budget as a result of having to use the desal plant in order to make up water,"[11] but his past damages calculation makes no attempt to do this. He deducted nothing: not the fixed production nor the budgeted production. Most telling is that in the budgeting and operational documents existing in 2009, TBW does not attribute *any* use of the desalination plant—much less 100%—to the condition of the Reservoir. Thus, the formula TBW uses for its past damage claim (100% of the desalination plant production times incremental cost difference) is wrong from the outset.

Second, not only is TBW's damage formula methodologically wrong, it is contrary to TBW's own evidence. TBW claims it was required to use 4.6 billion gallons of costly desalinated water from February - October 2009 because of the fill limit placed on the Reservoir by the FDEP. Kennedy performed the calculation of multiplying gallons times cost, but he relied

---

7       Ex. 8, Tampa Bay Water February 18, 2008 Regular Board Meeting Minutes, p. 71.
8       Ex. 9, Operations Plan Water Year 2009 Summary, p. 5, Adams' Deposition Exhibit 376. The plant was operated at this level in 2009 to meet "production requirements specified in the Second Amendment to the New Water Sources Funding Agreement between the Southwest Florida Water Management District and Tampa Bay Water."
9       Ex. 6, Adams' Deposition, November 2010, 82:11-16; Ex. 11, Kennedy's Deposition, October 2010, 499:12-500:10; 501:8-12; Ex. 12, Kennedy's Deposition Exhibit 668.
10      Ex. 6, Adams' Deposition, November 2010, 82:11-16; *see also,* Ex. 12, Kennedy's Deposition Exhibit 668, p. 3.
11      Ex. 11, Kennedy's Deposition, October 2010, 499:22-500:10.

on Adams to determine how many gallons of what type of water he should plug into the formula.[12] The problem? When Adams studied it, she determined the shift in water production occurred at a different time and from a different water source, which actually was less expensive than Reservoir water. According to Adams, the shift in production occurred between August 2008 and May 2009 (not February 2009-October 2009) and consisted of a one-to-one offset in increased groundwater production (not desalinated water production).[13] In other words, the formula used in TBW's December 2010 Disclosure is based on events that TBW's own in-house expert says did not occur. According to Adams' resource calculations, the fill limit on the Reservoir resulted in a gallon-for-gallon increase in less expensive groundwater production, with no shift to more expensive desalination plant production.[14]

### B.   KENNEDY'S AND ADAMS' TESTIMONY IS INADMISSIBLE UNDER RULE 702 AND RESULTS IN NO EVIDENCE OF PAST LOST USE

Contemporaneously with this Motion, HDR has filed a *Daubert* Motion to Exclude the testimony of Adams and Kennedy related to this past lost use calculation. Adams' and Kennedy's testimony fails to follow proper and basic economic and accounting methodologies in numerous ways. Kennedy looked to Adams for the numbers to plug into his calculation, but then used different numbers than those found by Adams. Neither Adams' nor Kennedy's calculations fit the facts of this case, because adequate surface water existed even with the limitation of the Reservoir. As demonstrated in HDR's Motion to Exclude, this opinion testimony is inadmissible, and TBW's alleged evidence does not meet the rigors of *Daubert*. In the absence of such expert

---

12    Ex. 11, Kennedy's Deposition, October 2010, 374:11-18.
13    Ex. 10, Adams' Deposition Exhibits 379, 380, and 381.
14    Ex. 10, Adams' Deposition Exhibit 380.

testimony, TBW has no evidence of a past lost use claim, making summary judgment appropriate. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1297 (11th Civ. 2005).[15]

# VI.
## FUTURE DAMAGES FROM "LOST USE" OF THE RESERVOIR

### A.    TBW'S FUTURE DAMAGES ARE SPECULATIVE AND UNCERTAIN

TBW seeks $20 million in future lost use damages in years 2013-2015 when it claims the Reservoir will be shut down for renovation. It claims it will have to increase its desalination plant production to make up for water it will not be able to obtain from the Reservoir. The weak link in this analysis is an assumption by Adams of dry year events in 2013-2015 that are not reasonably likely to occur. Adams assumed surface water supplies will be at "low flow" (below average) levels of 37 MGD in 2013 and 41 MGD in 2014.[16] But, she has no evidence and cannot present any evidence that these "low flows" are reasonably likely to occur in any year, let alone occur in the two specific years modeled, or at the levels modeled. She repeatedly testified she could not assign any probability that these events would occur, much less that they were reasonably certain to occur:

> Q.    So you have -- are you saying you have no estimation of the likelihood of -- of having a low-flow condition in 2013?
>
> A.    I have not done that analysis, no.[17]
>
> Q.    And as you sit here today as an expert for Tampa Bay Water, can you put a percentage probability on that low run-of-river flow for 2013?
>
> A.    No, I can't.[18]
>
> Q.    Can you tell the jury that it is more likely than not that the flow in 2013 is going to be 37 million gallons per day or below for run-of-river?

---

15    "Because the district court properly executed its gatekeeper function under *Daubert*, its exclusion of expert testimony was not an abuse of discretion. Furthermore, because sufficient evidence of causation was lacking without the expert testimony, the grant of summary judgment was appropriate." *Rink*, 400 F.3d at 1297.
16    Ex. 6, Adams' Deposition, November 2010, 122:20-123:21; 126:3-12; 204:3-205:11; 208:21-209:9; 212:6-22.
17    Ex. 6, Adams' Deposition, November 2010, 126:3-12.
18    Ex. 6, Adams' Deposition, November 2010, 212:18-22.

A.      No one can sit here today and predict what the flow in 2013 is going to be.[19]

When pressed to say whether the predicted 37 MGD figure for 2013 was going to happen "25% of the time, 50% of the time," Adams candidly admitted: "I don't have an answer to that question."[20] As she stated, "I have not done that type of time-series analysis to be able to give you that answer."[21]

Adams could not assign any probabilities to her forecast because that is not something she does as part of her job for TBW.[22] Consistent with her training and experience, she did not attempt to forecast what she considered "most likely to happen" in 2013 and 2014.[23] Rather, she arbitrarily assigned "low flow" conditions to years 2013 and 2014 and no others.[24] She did not run projections for what would happen if water levels were simply normal or average for the years 2013 and 2014.[25]

"Under the certainty rule, which applies in both contract and tort actions, recovery is denied where the fact of damages and the extent of damages cannot be established within a reasonable degree of certainty." *Miller v. Allstate Ins. Co.*, 573 So.2d 24, 27-28 (Fla. 3d DCA 1990) (citing Restatement (Second) of Contracts §352). Florida law requires that assumptions used to support the conclusions of future damages to be reasonably certain, "not mere best case scenario predictions." *Sun Ins. Mkt. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1247 (M.D. Fla. 2003). *See Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43, 46 (Fla. 3d DCA 2006) ("It is as inappropriate to use purely speculative forecasts of future revenue to determine the market value of a business as it is to use such speculative forecasts in

---

19    Ex. 6, Adams' Deposition, November 2010, 213:12-17.
20    Ex. 6, Adams' Deposition, November 2010, 208:21-209:9.
21    Ex. 6, Adams' Deposition, November 2010, 209:23-210:4.
22    Ex. 6, Adams' Deposition, November 2010, 126:3-12, "It's not -- that's not part of the way that we look at -- it's not part of the normal routine work that I do, to look at low-flow probabilities in that sense for -- for particular years."
23    Ex. 6, Adams' Deposition, November 2010, 210:25-211:5.
24    Ex. 6, Adams' Deposition, November 2010, 204:3-205:1.
25    Ex. 6, Adams' Deposition, November 2010, 209:23-210:13; 219:18-24.

determining future profits."). Here, TBW has no evidence that it will suffer damages from any future loss of use of the Reservoir. The only water year event it has modeled is not established to a reasonable degree of certainty. Rather, for TBW, it is a hypothetical "worst case scenario" prediction. Thus, TBW has not and cannot establish either the fact or extent of damage to a reasonable degree of certainty.

Moreover, the actual evidence presented by TBW itself is that to a reasonable degree of certainty, a normal, average, or median water year will produce 50 to 55 MGD from the run of river to the surface water treatment plant, *regardless* of the availability of the Reservoir.[26] Adams admitted this would be more than enough to meet TBW's needs, thereby eliminating any claim for damages:

> Q.      That goes for any year that you're talking about the Reservoir being off line. If we have an average year of 50 million gallons per day of river flow, we not [sic] would not need to use more desalination than our four million gallons per day?
>
> A.      It's not likely that we would, right.
>
> Q.      Okay. And in addition to that, Tampa Bay Water would not exceed its groundwater permitting limits?
>
> A.      Yes, that's correct.[27]

Kennedy agreed that these average levels would result in no future damages.[28]

Future damages are unrecoverable if the fact of their accrual is speculative or their amount or nature unprovable. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). TBW has no evidence that the events upon which its future damage model is based are likely to occur. In fact, TBW admits the likely result (*i.e.*, an average year) is that it will not sustain any damages. The alleged future lost use damages are unrecoverable because their accrual is unlikely to occur at all, speculative at best, and their

---

26      Ex. 6, Adams' Deposition, November 2010, 220:24-221:2; 222:7-225:13.
27      Ex. 6, Adams' Deposition, November 2010, 225:4-13
28      Ex. 11, Kennedy's Deposition, October 2010, 526:25-528:11.

amount is unprovable. The testimony presented by TBW as a matter of law does not support a future lost use claim.

**B.**   **ADAMS' AND KENNEDY's TESTIMONY ON FUTURE LOST USE IS INADMISSIBLE UNDER 702 AND RESULTS IN NO EVIDENCE OF FUTURE DAMAGES**

In addition to being speculative, Adams' and Kennedy's testimony on future lost use fails in many other ways to meet the rigors required by *Daubert.* Among other things, their opinions are based on a series of improbable events, which underestimate future water supplies while overestimating demand and prices. They fail to consider TBW's historical data of surface water availability, fail to account for increased surface water plant production, and do not fit the facts of TBW's historical and projected water usage and supply patterns. Their opinions are no more than mathematical calculations that fail to follow proper accounting, economic or financial principles and methods used in determining such damages. Contemporaneously with this Motion, HDR has filed a *Daubert* Motion to Exclude their opinion testimony. The testimony presented by Adams and Kennedy is no evidence of future lost damages and also is inadmissible under *Daubert*. In the absence of such testimony, TBW has no evidence of a future lost use claim, making summary judgment appropriate.

## VII.
## HDR IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II (DESIGN DEFECT)

HDR is entitled to summary judgment on TBW's claim in Count II for breach of the standard of care in designing the Reservoir.[29] The TBW/HDR contract defines HDR's standard of care as follows:

> 18.0 STANDARD OF PERFORMANCE. CONSULTANT [HDR] shall perform and complete the Work in . . . accordance [with] *the standard of care, skill, and diligence customarily provided by an experienced consulting organization rendering the same services,*

---

[29]     Dkt. #125, TBW's Amended Complaint at ¶¶ 77-90.

*and in accordance with sound professional principles and practice.*[30]

TBW relies on its expert Brumund to establish both breach of the standard of care and causation. Brumund opines that HDR's design was defective because it erroneously assumed the soil cement and the underlying soils had the same permeability, when (according to Brumund) their permeability rates were substantially different.[31] According to Brumund, this difference in permeability rates explains the cracking of the soil cement.[32] This supposed design error is the sole item Brumund identifies as a breach of the standard of care that caused the alleged damages.[33]

TBW's Count II is dependent upon the admissibility of Brumund's opinions, because Brumund is TBW's only expert who opines that HDR's alleged design error on soil cement permeability values breached the standard of care and caused the unusual cracking. In professional negligence cases such as this, expert testimony is required to establish both the standard of care and show a breach caused the claimed damages. *See*, *Lochrane Engineering, Inc. v. Willingham Realgrowth Inv. Fund Ltd.*, 552 So. 2d 228, 232 (Fla. 5th DCA 1989) (the duty imposed by law upon professionals is to perform their services in accordance with the standard of care used by similar professionals in the community under similar circumstances). Just because the professional opinion of an engineer is wrong does not "*ipso facto* establish that the professional opinion was below the standard for professional competence when given, although later, in obvious hindsight, the professional opinion was not correct." *Id.* The plaintiff must demonstrate he would not have suffered a loss "but for" the defendant's professional

---

30      Dkt. #125, TBW's Amended Complaint at ¶ 80 (emphasis added).
31      Ex. 19, Brumund's Deposition, December 2010, 32:3-25.
32      *Id.*
33      Ex. 19, Brumund's Deposition, December 2010, 33:14-34:5; 192:20-24; 193:23-194:2.

malpractice. *Kelly v. Nelson, Mullins, Riley & Scarborough, LLP*, 2004 WL 4054841, *6 (M.D. Fla. Nov. 17, 2004).

Contemporaneously with the filing of this Motion for Summary Judgment, HDR has moved under Rule 702 and *Daubert* to exclude Brumund's opinion testimony concerning permeability rates and the cause of the cracking.[34] Without Brumund's testimony on these points, TBW will have no evidence of either the standard of care or causation, thereby making summary judgment on Count II appropriate. *Rink v. Cheminova, Inc.*, *supra,* 400 F.3d at 1297. *See*, *e.g., Pride v. The Bic Corp.*, 54 F. Supp. 2d 757, 763 (E.D. Tenn. 1998) (after exclusion of plaintiff's expert, summary judgment granted because plaintiff could not prove essential elements of claim, including causation); *Rising-Moore v. Red Roof Inns, Inc.*, 368 F. Supp. 2d 867, 873 (S.D. Ind. 2005) (without admissible expert testimony, summary judgment granted as no evidence existed to establish defendant was negligent).

## VIII.
## FUTURE REPAIR CLAIM CONSTITUTES ECONOMIC WASTE

For its claim of future damages in this case, TBW seeks $100 to $145 million for "costs of repair," but has made no claim for or presented any evidence of diminution in value of the Reservoir.[35] TBW's proposed repair is so extreme and unreasonable as to constitute economic waste as a matter of law. Since it has elected not to make a claim for diminution in value, TBW is left with no evidence of any future damages.

Under the economic waste doctrine, if the cost necessary to repair or replace defective construction is grossly disproportionate to the results to be obtained and the object is not required to be repaired as a result of an unsafe condition, then the amount of damages is limited to the

---

34      Motion of Defendant, HDR Engineering, Inc., to Exclude Certain Opinions of William Brumund, P.E., Ph.D., a Testifying Expert Retained by Plaintiff, Tampa Bay Water ("Motion to Exclude Brumund").
35      Ex. 4, December 2010 Disclosures, II(A)(seeking $92 to $145 million); Ex. 20, O'Connell's Second Supplement, November 2010, ¶ 32 ($125 million cost estimate).

difference between the value of the building contracted for and the value of the building actually received. *Adalora v. Lindenberger*, 576 So.2d 354 (Fla. 4th DCA 1991); *Bayshore Development Co. v. Bonfoey*, 75 Fla. 455, 78 So. 507, 510 (1918). Even if the defects in a complete structure can only be physically remedied by tearing down and rebuilding, that is not the proper measure of damages if the costs of doing so would be imprudent and unreasonable: "The law does not require damages to be measured by a method requiring such economic waste." *Grossman Holdings Ltd. v. Hourihan*, 414 So. 2d 1037, 1039 (Fla. 1982) (quoting Restatement (1st) of Contracts §346(1)(a), *comment*); Annot., 41 A.L.R.4th 125.

When the cost to repair is not reasonable and would constitute waste, the owner may recover only the diminution in value, *i.e.,* "the difference between the value of the building as actually designed and constructed and the value thereof if it had been properly designed and constructed." *Latite Roofing Co. v. Urbanek*, 528 So.2d 1381, 1383 (Fla. 4th. DCA 1988), *disapproved on other grounds*, 620 So.2d 1244. *See also, Pearce & Pearce, Inc. v. Kroh Bros Development Co.*, 474 So.2d 369 (Fla. 1st DCA 1985); *Tree Construction Corp. v. Caplinger*, 446So.2d 245 (Fla. 4th DCA 1984).[36]

The evidence in this case demonstrates the unreasonable nature of TBW's claim. According to its December 2010 Rule 26(a) Disclosures, TBW claims to have spent in total $7.3 million over the past four years "investigating, monitoring and repairing" the unusual cracking found in the northeast and southwest quadrants of the Reservoir.[37] The repair method adopted by TBW was to grout the cracks in the soil cement and grout-fill any voids underneath the soil cement. The repair program itself was accomplished in a matter of months in the spring of 2009,

---

36   "Sometimes . . . such a large part of the cost to remedy the defects consists of the cost to undo what has been improperly done that the cost to remedy the defects will be clearly disproportionate to the probable loss in value to the injured party.  Damages based on the cost to remedy the defects would then give the injured party a recovery windfall.  Such an award will not be made. . . ."  *See* Restatement (2d) Contracts Section 348, comment c.
37   Ex. 4, December 2010 Disclosures, §1.

without shutting down the Reservoir, at a cost of approximately $2 million.[38] The soil cement is an erosion barrier and is not a structural component of the Reservoir.[39]

The repairs were successful and restored the soil cement's erosion protection, allowing the facility to return to its fully permitted capacity and withdrawal rates.[40] The Reservoir has been declared safe.[41] There are no restrictions on using the Reservoir to its fully permitted capacity and drawdown rate.[42] TBW has no information that monitoring and maintaining the grouted areas will be insufficient to keep the Reservoir at its current permitted level of withdrawals.[43] TBW admits the soil cement damage is limited to the northeast and southwest quadrants of the Reservoir.[44] TBW has always acknowledged that the soil cement cracks do not present a safety issue.[45] TBW's litigation expert cannot say to a reasonable degree of engineering certainty when or where any more cracks will appear.[46]

TBW has not claimed a diminution in value in its Rule 26(a) Disclosures. Nor has it done so in the regular course of its business. It has not assigned any diminution in value, impairment loss or diminished service utility rating due to the cracking or any alleged defects in the soil cement facing of the Reservoir.[47]

Despite this, TBW's lawsuit experts propose a "repair" costing $100 million to $145 million, almost a 2,000% increase over what TBW has spent on all of its investigation, monitoring and repair efforts to date, and as much as it cost to build the entire Reservoir to begin

---

[38]   Ex. 1, TBW Application (FDEP007876-7882); *see also,* Ex. 2, Carrier's Deposition, 380:11-381:23; s*ee also*, Ex. 3, June 12, 2009 FDEP letter to TBW (Adams' Deposition Exhibit 375)(FDEP007949); Ex. 13, 2008 and 2009 Financial Statements, p. 46 (TBW Stated that the short term repair cost was $2 million); Ex. 4, December 2010 Disclosures, §I.
[39]   Ex. 13, 2008 and 2009 Financial Statements, p. 46.
[40]   Ex 1, TBW Application (FDEP007876, 007878, 007881 and 007882); *see also*, Ex. 2, Carrier's Deposition, 380:11-381:23; Ex. 6, Adams' Deposition, June 2010, 116:1-117:17; Ex. 13, 2008 and 2009 Financial Statements, pp. 3, 36.
[41]   *Id.; see also,* Ex. 3, June 12, 2009 FDEP letter to TBW.
[42]   Ex. 6, Adams' Deposition, June 2010, 72:1-73:12; 95:7-9; 103:7-106:25; 107:6-108:16; Adams' Deposition, November 2010, 242:24-243:14.
[43]   Ex. 6, Adams' Deposition, June 2010, 123:10-19.
[44]   Ex. 11, Kennedy's Deposition, June 2010, 173:9-174:16.
[45]   Ex. 6, Adams' Deposition, June 2010, 116:16-117-1; Ex. 13, 2008 and 2009 Financial Statement, p. 46.
[46]   Ex. 19, Brumund's Deposition, December 2010, 395:20-397:13; 398:9-14.
[47]   *See, e.g.*, Ex. 13, 2008 and 2009 Financial Statements, p. 9, Table A-3.

with. In contrast to the grouting repairs (which were completed in a few months and without interruption of service), the proposed "repair" design will require the Reservoir to be drained, shut down and taken completely out of service for two years. Rather than focus on the two quadrants where the unusual cracking has occurred, the proposed "repair" design will rebuild the entire 5-mile embankment perimeter, regardless of whether any cracking has occurred in those areas or whether the alleged defective condition exists in those areas. This presents a textbook case of economic waste.

The reason TBW's experts came up with such a wasteful economic proposal is because TBW specifically directed them to do so and directed them to not evaluate repairing only the cracked portions. TBW's designated expert on repair design, Golder Associates, knew that monitoring the undamaged sections of the embankment could save money over repairing the entire embankment and that less expensive repair options existed for areas with no cracking.[48] TBW, however, instructed its designated expert from Golder, Brumund, to not evaluate those types of repairs for this lawsuit and shielded him from the repairs done to date.[49] Because he was not allowed to study the short-term repair approach already performed, Brumund acknowledges the work already done to the Reservoir could have restored its functionality and he might not even know about it.[50] He also admits that he does not know if any particular areas around the Reservoir require remedial repairs or if the alleged defective condition exists in areas not already cracked.[51] In Brumund's words, he looked at the total perimeter fix because the less expensive

---

48    Ex. 18, Golder20022253.
49    Ex. 19, Brumund's Deposition, August 2010, 272:21-273:6 ("I don't have an opinion on . . . or knowledge of [what other repairs were performed as part of the short term repair program].");  *see also*, 646:5-647:2; 647:24-649:10.
50    Ex. 19, Brumund's Deposition, August 2010, 272:25-273:8.
51    Ex. 19, Brumund's Deposition, December 2010, 395:20-398:14.

monitor-and-maintenance repair option had been "taken off the table [by TBW] as part of our scope of work that we were asked to do."[52]

At the same time TBW directed its experts to look only at the most expensive repair approaches, it also decided that whatever repair proposals they created would be used solely in the lawsuit, not peer reviewed outside of litigation, and not used for actual repairs.[53] The design plans provided by TBW's experts in this case will "absolutely not" be presented to any potential engineering firm bidding on the design of the Reservoir renovation project that is scheduled to take place in 2013-2015.[54] In its "Reservoir Renovation" plan, TBW will not consider, review or use any of the remedial design plans prepared by any of the experts in this case (plaintiff or defendant).[55]

The reason for this inconsistency is because TBW's planned "repairs" include an entirely different drawdown parameter than was contemplated in the original operational drawdown design and which presently exists. At present, the Reservoir has a maximum daily operational drawdown rate that moves from 66 MGD to 33 MGD as the pool level declines.[56] As required by the terms of TBW's Request for Proposals, however, the "repaired" Reservoir must be capable of a sustained maximum operation drawdown of 100 MGD (and potentially as much as 120 MGD) from maximum to minimum pool level.[57] At present, the Reservoir is gravity-drained, which means its drawdown rate is limited by the physical properties of gravity and hydrological restrictions.[58] The "repaired" Reservoir, by contrast, will operate in conjunction with a 120 MGD

---

52  Ex. 19, Brumund's Deposition, August 2010, 646:5-647:2.
53  Ex. 11, Kennedy's Deposition, June 2010, 218:6-219:12; 221:2-19; 222:10-223:7.
54  Ex. 11, Kennedy's Deposition, June 2010, 222:10-13 ("absolutely not"), 223:17-22 (even if requested, "I will not").
55  Ex. 11, Kennedy's Deposition, June 2010, 218:6-221:19; 222:10-223:7.
56  Ex. 1, TBW Application (FDEP007876-7882); *see also*, Ex. 14, Water Shortage Mitigation Plan, B-8 to B-9 (Kennedy's Deposition Exhibit 673).
57  *See* Ex. 17, TBW Request for Proposals, TBW317987-318059, p. 8.
58  Ex. 14, Water Shortage Mitigation Plan, B-8 to B-9 (Kennedy's Deposition Exhibit 673); *see also*, Ex. 6, Adams' Deposition, June 2010, 78:22-79:4; 83:7-84:6.

pumping station.[59] At present, the Reservoir's maximum capacity is 15.5 billion gallons. The Request for Proposals, on the other hand, includes options for adding 3 billion gallons.[60]

These significant design changes are needed in order to even use the pump station, whose 120 MGD daily operational pumping capacity will be nearly twice the Reservoir's current 66 MGD permit limit. To use this new and increased pumping capacity will require system design changes that were not part of the Reservoir's original design parameters.[61] TBW will have to obtain a revised or entirely new permit from the FDEP in order to increase the Reservoir's daily operational drawdown limits.[62] The reality is that the repair estimates and costs proposed in this lawsuit are fictitious and not what TBW is planning to do with the Reservoir. TBW is altering the design and function of the Reservoir, changing it from a gravity-drained to a mechanical pump reservoir, increasing its daily operational capacity by nearly 50% (and potentially up to 400% at the upper and lower limits), and potentially increasing its storage capacity by 3 billion gallons. Neither the Reservoir that HDR designed nor the one that TBW's experts have re-designed is the one TBW will soon be building.

This presents a classic case of speculative damages and economic waste. As noted, under the certainty rule, recovery is denied where the fact of damages and the extent of damages cannot be established within a reasonable certainty. *See Nebula Glass International, Inc. v. Reichhold*, 454 F.3d 1203, 1212 (11th Cir. 2006); *Miller v. Allstate, Ins. Co.*, 573 So.2d 24, 27-28 (Fla. 3d DCA 1990). In *Nebula Glass*, for example, the court found the plaintiff presented sufficient evidence at trial to show that *all* of the construction in issue contained a fatal defect and would inevitably fail. While the court held this evidence was sufficient to uphold a finding that all the

---

59    Ex. 14, Water Shortage Mitigation Plan, B-8 to B-9 (Kennedy's Deposition Exhibit 673); Ex. 16, TBW 2011 Budget, p. 67.
60    Ex. 17, TBW Request for Proposals, pp. 7-8.
61    Ex. 6, Adams' Deposition, June 2010, 88:3-90:5; Ex. 11, Kennedy's Deposition, October 2010, 555:22-556:17.
62    *Id.*

construction was reasonably certain to fail within five years, it recognized even this amount of evidence presented a "close question." *Nebula Glass*, 573 So.2d at 2012-1213. TBW has no such proof here, as its expert Brumund cannot say the conditions he believes caused the cracking exist and will occur around the entire upstream embankment.

The Reservoir as repaired is fully operational to its original permitted capacity and rate of withdrawal. It is safe to operate as originally designed and permitted. None of the proposed solutions are based on safety concerns. TBW cannot say with any degree of certainty that additional cracking will occur, much less when, where or to what extent. It constitutes economic waste to propose a repair program that (a) will shut down the Reservoir for two years, (b) at a cost equal to or greater than the cost of building the entire Reservoir, (c) at a cost almost 2,000% greater than all investigation, monitoring and repair efforts to date, which have restored the full function of the Reservoir and which Golder said would represent substantial cost savings, and (d) when the Reservoir is safe. This is particularly true when TBW's primary objective and plans are to materially change the form and function of the original design.

Under the economic waste doctrine, TBW is restricted to the lesser of the cost of repairs or diminution in value. TBW claims no diminution in value either in its operating documents or this lawsuit. TBW is not entitled to force upon the Defendants a full replacement cost of repair by instructing its experts to forego review of less expensive options and by disclaiming any diminution in value. TBW has chosen a measure of damages that is unrecoverable as a matter of law. HDR is entitled to summary judgment on future repairs.

## IX.
## TBW IS NOT ENTITLED TO PREJUDGMENT INTEREST
## ON FUTURE REPAIR CLAIMS

TBW claims $44.9 million - $56.5 million in prejudgment interest on its planned future repairs to the Reservoir.[63] Prejudgment interest is not available in construction defect cases where the future repairs are unliquidated and uncertain. *Parker's Mechanical Contractor's, Inc. v. Eastpoint Water & Sewer District*, 367 So.2d 665 (Fla. 1st DCA 1979); *see also*, *H & S Corp. v. United States Fidelity & Guaranty Co.*, 667 So.2d 393 (Fla. 1st DCA 1995); *Argonaut, Ins. Co. v. May Plumbing* Co., 474 So.2d 212, 215 (Fla.1985); *Lauderdale Marine Center, Ltd. v. MYD Marine Distrib. Inc.*, NO. 4D08-3638, 4D09-446, 2010 WL 1050020 (Fla. 4th DCA March 24, 2010)("future damages, such as 'anticipated business profits,' are not vested property rights and cannot be liquidated as of a past date certain."). A successful plaintiff is entitled to prejudgment interest when "plaintiff has suffered an actual out-of-pocket loss at some date *prior to the entry of judgment*." *Alvarado v. Rice,* 614 So.2d 498, 499 (Fla.1993).

Here, with respect to its hypothetical future repairs, TBW has not suffered an "actual out-of-pocket loss at a date prior to the entry of judgment." The future repairs are not liquidated as of a date certain, and, as stated in the previous section, the designs proposed by TBW's experts will not even be performed. Moreover, TBW's expert witness, Kenneth O'Connell, prepared cost estimates for repairs as of the date of trial.[64] There can be no pre-judgment interest added to a cost that is based on a future event and which takes into account the time period of the judgment. *See Delta Air Lines, Inc. v. Ageloff,* 552 So.2d 1089, 1092-93 (Fla. 1989); *Mission Square, Inc. v. O'Malley's, Inc.*, 783 So.2d 1151, 1152 (Fla. 1st DCA 2001). As a matter of law, TBW is not entitled to prejudgment interest on the cost of future repairs.

---

[63]     Ex. 4, December 2010 Disclosures, §II(B).
[64]     Ex. 20, O'Connell's Second Supplement, November 2010, p. 30.

WHEREFORE, HDR respectfully requests the Court render summary judgment on the

claims set forth herein and grant HDR such other relief to which it may be justly entitled.

Respectfully submitted,

SEDGWICK, DETERT, MORAN & ARNOLD LLP

*/s/ KURT W. MEADERS*
WAYNE B. MASON, ESQUIRE
Admitted *Pro Hac Vice*
KURT W. MEADERS, ESQUIRE
Admitted *Pro Hac Vice*
1717 Main Street, Suite 5400
Dallas, TX  75201-7367
Telephone 469-227-8200
Facsimile 469-227-8004

FORIZS & DOGALI, P.A.
TIMOTHY D. WOODWARD, ESQUIRE
Florida Bar No.: 0486868
JAMES K. HICKMAN, ESQUIRE
Florida Bar No.: 0893020
4301 Anchor Plaza Parkway, Suite 300
Tampa, FL  33634
Telephone 813-289-0700
Facsimile 813-289-9435

ATTORNEYS FOR HDR ENGINEERING, INC.

## CERTIFICATE OF SERVICE

The foregoing instrument was electronically filed with the Clerk of Court through the CM/ECF system on February 28, 2001, which thereby sent a notice of electronic filing to all counsel of record the same day.

*/s/ Kurt W. Meaders*
KURT W. MEADERS