IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| TAMPA BAY WATER,<br>A Regional Water Supply Authority, | §<br>§<br>§ | |
| Plaintiff, | §<br>§ | |
| v. | §<br>§ | CASE NO. 8:08-cv-2446-T27-TBM |
| HDR ENGINEERING, INC., a Nebraska<br>corporation, CONSTRUCTION DYNAMICS<br>GROUP, INC., a Maryland corporation,<br>BARNARD CONSTRUCTION COMPANY,<br>INC., a Montana corporation, ST. PAUL<br>FIRE AND MARINE INSURANCE<br>COMPANY, a Minnesota corporation, | §<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Defendants. | §<br>§<br>§ | |

**HDR'S *DAUBERT* MOTION TO EXCLUDE OPINION TESTIMONY
ON "LOSS OF USE" DAMAGES BY ADAMS AND KENNEDY**

**I.
SUMMARY OF MOTION**

A.     **TBW's "Loss of Use" Damage Claims**

TBW has asserted approximately $26.9 million in past and future damages due to its alleged inability to use the Reservoir to its full capacity, which allegedly resulted in reliance on more costly desalinated water in place of Reservoir water. For past damages, TBW claims it spent an extra $6.9 million on desalinated water because a fill limit placed on the Reservoir from fall of 2008 through June 2009 prevented TBW from using the Reservoir to its full capacity. For future damages, TBW claims it will spend an extra $20 million on desalinated water because the Reservoir will be out of service for two years between 2013-2015 while undergoing major renovation and rebuilding (which TBW claims are "repairs").

B.       **Exclusion of Kennedy's and Adams' Opinion Testimony**

TBW has not designated a retained expert witness to testify about its "loss of use" damage claims. Instead, it has designated two in-house employees, Jon Kennedy, its Senior Project Manager, and Alison Adams, the manager of its Source Rotation & Environmental Protection Department, for this purpose. Adams provided water usage data, modeling, and forecasts that Kennedy relied on to perform the mathematical calculations for these claims.

Neither Adams nor Kennedy prepared a report outlining their calculation of damages. Instead, TBW listed the damage numbers in its Rule 26(a) Disclosures, provided background documents, and presented Adams and Kennedy for deposition to explain the numbers.

HDR moves to exclude the opinion testimony of Kennedy and Adams on "loss of use" damages. Neither is qualified to perform the economic analysis required to quantify such damages. Moreover, neither used proper methodology for their calculations. For past damages, they relied on inaccurate assumptions regarding desalinated water use and production, and ignored available data that demonstrate no increased use of desalinated water. Their future damage calculations are based on a speculative water supply and demand model that is unlikely to occur and in many instances contrary to known facts. Their opinions as a whole are unreliable, do not fit the facts of the case, and therefore, do not meet the requirements of FED. R. EVID. 702 for admissibility.

## II.
## STANDARD FOR *DAUBERT* MOTION

Before expert testimony can be admitted pursuant to FED. R. EVID. 702, this Court must act as a gatekeeper and screen the proffered evidence to ensure that it is relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Expert testimony is properly admitted when (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the

expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1999). This Court must consider the circumstances of each particular case in determining whether the proffered expert testimony is reliable. *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)*. The party proffering the expert bears the burden of establishing the proper foundation for the admissibility of the expert's testimony by a preponderance of the evidence. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

## III.
## LACK OF QUALIFICATIONS TO PERFORM FORENSIC DAMAGE MODELING

### A.    Adams Lacks Proper Qualifications to Perform Damage Analysis

Alison Adams is TBW's designated corporate representative to testify about the use of its water supply facilities.[1] Ms. Adams has a degree in environmental engineering[2] and is responsible for TBW's internal demand forecasting and planning.[3] However, she has no specialized knowledge in the field of water economics and is not considered a water economist[4] (in fact, TBW's counsel instructed Adams not to answer questions dealing with water economics).[5] Adams admits she did not create models based on a "reasonable degree of certainty" or on events that were reasonably likely to occur. In part, this was because she does not do this type of modeling in the regular course of her duties;[6] but, more importantly, she was

---

[1]     Ex. A, Joint Affidavit of Kevin D. Dennis, CPA/CFF, CMA, and E. Allen Jacobs, Ph.D. in Support of HDR's Motion to Strike Testimony of Alison Adams and Jon Kennedy on Damages due to "lost water" use (hereinafter "Navigant Affidavit"); Ex. A-6, Adams' Deposition, June 2010, 9:10-21.
[2]     Ex. A-6, Adams' Deposition, June 2010, 12:13-17.
[3]     Ex. A-6, Adams' Deposition, June 2010, 15:3-16:24.
[4]     Ex. A-8, Kennedy's Deposition, October 2010, 369:10-16.
[5]     Ex. A-6, Adams' Deposition, November 2010, 239:16-23 ("Mr. Harrison: 'She's not being tendered as an expert in water economics, number one, so she is not going to answer that question.'")
[6]     Ex. A-6, Adams' Deposition, November 2010, 126:3-12.

never asked to do so in this case.[7] While her background may be in budgeting and planning, that does not qualify her to render opinions regarding water economic projections to a reasonable degree of certainty in litigation, especially where she has not even attempted to perform such an analysis.

### B.   Kennedy Lacks Proper Qualifications to Perform Damage Analysis

Likewise, Kennedy is not qualified to present expert testimony regarding past or future lost use. Kennedy is a Senior Project Manager for TBW with an educational background in civil engineering.[8] He, too, is not a water economist.[9] He claims no expertise in performing damage assessments or water resource modeling, and admitted he had to rely on Adams for information on facility demand, use, mix of water sources, and future projections.[10] Kennedy's contribution to the damage calculation was to compare the cost of desalinated water versus other water sources and use a calculator to multiply those costs against Adams' water production numbers. He is not qualified to opine about causation, *i.e.,* that a reduced capacity of the Reservoir caused an increased use of desalinated water.

### IV.
### IMPROPER DAMAGE CALCULATION METHODOLOGY

### A.   TBW's Ever-Evolving Damage Claims

The Court will recall that TBW's "loss of use" damage claims have been something of a moving target in this case. As outlined in Barnard's and HDR's Motions for Sanctions (Docket #243 and #245), TBW has significantly changed its claims as suit has progressed. TBW's Original Complaint, filed in December 2008, included the cryptic statement that TBW was

---

[7]      Ex. A-6, Adams' Deposition, November 2010, 124:25-125:10; 126:3-12; 204:3-205:11; 208:21-209:9; 209:23-210:13; 210:20-213:17; Ex. A-8, Kennedy's Deposition, October 2010, 525:13-526:13.
[8]      Ex. A-8, Kennedy's Deposition, June 2010, 21:13-22.
[9]      Ex. A-8, Kennedy's Deposition, October 2010, 369:10-16.
[10]     Ex. A-8, Kennedy's Deposition, June 2010, 196:15-197:14 ("I cannot develop the amount of water on my own"); Kennedy's Deposition, October 2010, 374:11-18 ("Are you qualified to [develop the amount water]?" A: "I am still not qualified to do that, and that's why I relied on Dr. Adams.").

seeking damages for "loss of use," without providing any information as to what that term meant.[11] In its Rule 26 Initial Disclosures, served in March 2009, TBW did not disclose anything about this claim, saying it was "not yet determined."[12] It was not until June 2010, eighteen months after filing suit, that TBW finally disclosed the amount of this claim, saying it would be $61 - $68 million, based on a "Revenue Model."[13] TBW provided no narrative reports explaining the Revenue Model. Instead, it referenced various source documents from which the calculations were derived and offered Adams and Kennedy to testify.

When Adams was deposed about this in June, however, she admitted that TBW had lost no revenues, as TBW was able to completely fulfill its customers' demands.[14] Barnard retained a water economist, Dr. William Wade, to analyze and respond to these claims. Dr. Wade produced a detailed report in early October 2010 demonstrating, not only, that TBW had suffered no economic losses under the Revenue Model, but, if anything, had realized an economic benefit.

Upon reading Dr. Wade's report, TBW realized he was correct and that the Revenue Model was inappropriate. On the day before the continuation of Kennedy's deposition in his capacity as TBW's corporate representative, TBW amended its Disclosures again and added the "Cost Model" as an *alternative* method for calculating damages.[15] The "Cost Model" cut the claim for future losses by more than half (still leaving them at a substantial $20 million), but left its calculation of past losses unknown, describing them as "to be determined."[16] When asked to explain this at his deposition, TBW's corporate representative, Kennedy, disclosed that TBW was abandoning the Revenue Model in favor of the Cost Model for future losses, but he had not

---

[11]     Original Complaint, filed Dec. 10, 2008, pp. 20-21 [Dkt. #1]. TBW repeated this same uninformative phrase nearly a year later in its Amended Complaint, filed Nov. 20, 2009, pp. 20-21 [Dkt. #125].

[12]     TBW's Initial Disclosures, p. 3 [Dkt. #243-1].

[13]     TBW's First Amended Initial Disclosures regarding Damages, p. 4 [Dkt. #243-5].

[14]     Ex. A-6, Adams' Deposition, June 2010, 221:4-222:5.

[15]     TBW's Second Amended Initial Disclosures regarding Damages, p. 4 [Dkt. #243-7].

[16]     *Id.*

yet tried to calculate a past loss claim under the Cost Model and did not know what TBW intended to do about that claim.[17]

By November, TBW still had not provided any expert report on its "loss of use" damage claim (under either the Revenue or Cost Model), but it did produce 900 pages of documents related to its damage claim in response to a request for production of documents. On December 6, little more than a week before the close of discovery, TBW amended its Rule 26(a) Disclosures a third time, finally quantifying the past lost claim under the Cost Model at $6.9 million, but still listing both the Revenue and Cost Models as alternative measures of damages.

On December 15 (the day discovery closed), TBW produced 2 million pages of emails, many of which were relevant to its damage claims. On December 20, the week after discovery closed, TBW unequivocally abandoned the Revenue Model in favor of the Cost Model:

> The *only* dispute at this juncture is what that cost model, properly calculated, would reflect – damages because the lost reservoir supply *must* be replaced by more costly desalinated water, or no damages because the lost supply *can be* made up for by less expensive ground water?[18]

Only through the process of reviewing hundreds of thousands of pages of TBW's late produced water documents, charts, and calculations, scouring website materials, and coupling that with prior deposition testimony of Adams and Kennedy has it been possible to determine how TBW attempted to calculate TBW's damage claims for "lost use."

### B.    Incorrect, Incomplete and Unreliable Methodology

The way in which TBW has constantly shifted, changed and abandoned its various "loss of use" damage models (coupled with the fact that Adams and Kennedy even espoused the now-abandoned Revenue Model to begin with) evidences the unreliability of any proposed damage

---

[17]    Ex A-8, Kennedy's Deposition, October 2010, 371:2-7; 371:18-372:2; 488:25-489:6; 490:10-15; 492:11-25 [Dkt. #243-8].

calculation. The Revenue Model was not even remotely a proper basis for claiming damages, as TBW has now recognized. Many of the detailed criticisms of the Revenue Model first expressed in Dr. Wade's report not, only carry over to the Cost Model, but are more pronounced. HDR's expert witnesses from Navigant Consulting have analyzed TBW's Cost Model at length and demonstrated it is deeply flawed.[19] Navigant concluded: "The Kennedy/Adams' damage calculations of past and future lost use of the Reservoir do not follow the recognized methodology appropriate to calculate such damages used by experts in the field of forensic accounting, economics, water resource use, or hydrology modeling."[20] Kennedy/Adams' calculation assumes conclusions that are wrong, is based on unrealistic assumptions that are not likely to occur and runs contrary to known facts.

When the expert's methodology and assumptions are inaccurate and against the facts, they fail to meet the requirements of *Daubert* and FED. R. EVID. 702 and must be excluded. *1st Source Bank v. First Resource Fed. Credit Union*, 167 F.R.D. 61 (N.D. Ind. 1996); *Slicex, Inc. v. Aeroflex Colo. Springs, Inc.*, No. 2:04-cv-615, 2006 U.S. Dist. LEXIS 46775, 2006 WL 1932344, at *3 (D. Utah July 11, 2006); *CDA of Am. Inc. v. Midland Life Ins. Co.*, No. 01-cv-837, 2006 U.S. Dist. LEXIS 97327, 2006 WL 5349266, 6 (S.D. Ohio Mar. 27, 2006). Florida law requires that assumptions used to support the conclusions of future damages such as lost profits be reasonably certain, "not mere best case scenario predictions." *Environment Biotech, Inc. v. Sibbitt Enterprises, Inc.*, 2008 U.S. Dist. LEXIS 98870 *13-19 (M.D. Fla. Nov. 24, 2008)(expert testimony was unreliable when it was based on data skewed in favor of higher valuation); *Sun Ins. Mkt. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1247 (M.D. Fla. 2003).

---

[18]     Ex. A-3, TBW's Second Amended Response to Barnard Motion for Sanctions, p. 17 [Dkt. # 251]; Ex. A, Navigant Affidavit, ¶ 18.
[19]     Ex. A, Navigant Affidavit, ¶¶ 19, 44, 56, 79.

In determining whether a plaintiff's alleged future losses were "reasonably certain to arise," the Eleventh Circuit has ruled that "the expenses incurred to produce the [future damages] must be established in specific dollar amounts." *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1351 (11th Cir. 1987). Further, "if the plaintiff presents evidence only of gross receipts or fails to prove expenses with some specificity, an award of damages relating to lost profits will be reversed." *Clayton v. Howard Johnson Franchise Sys., Inc.*, 954 F.2d 645, 652 (11th Cir. 1992). "It is as inappropriate to use purely speculative forecasts of future revenue to determine the market value of a business as it is to use such speculative forecasts in determining future profits." *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43, 46 (Fla. 3d DCA 2006).

Expert testimony must be "based upon sufficient facts or data." FED. R. EVID. 702. Thus, "it remains a basic foundation for admissibility that proposed expert testimony must be supported by appropriate validation - *i.e.*, 'good grounds,' based on what is known." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). Thus, the failure of an expert to follow methodology accepted in the accounting community renders his calculations flawed and inadmissible. *Club Car, Inc. v. Club Car (Quebec) Imp., Inc.*, 362 F.3d 775, 780 (11th Cir. 2004).

This is a case where Kennedy and Adams have shown such a basic failure to use the proper methodology in calculating damages and have created models that are so contrary to known facts that their testimony is inadmissible. *In re Bonham,* 251 B.R. 113, 135 (Bankr. D. Alaska 2000) (debtor's expert exhibited a "gross misunderstanding" in opining that Trustee's expert had missed $3 million in revenue).[21]

---

[20]   Ex. A, Navigant Affidavit, ¶12.
[21]   This is not a case where cross-examination provides sufficient protection against flawed expert testimony, as in *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345-46 (11th Cir. 2003).

**V.**

**EXCLUSION OF OPINION TESTIMONY ON PAST "LOSS OF USE" DAMAGES**

    **A.**    **The Non-Model "Cost Model"**

Although TBW attaches the label "Cost Model" to its calculation of past "loss of use" damages, it really is not a model at all. The "Cost Model" is nothing more than an exercise in arithmetic, where Kennedy multiplied 100% of the desalination plant production from February - October 2009 (4.6 billion gallons) by the incremental cost difference between desalinated water and other water sources (approximately $1.50 per 1,000 gallons), yielding a total claim of approximately $6.9 million. The ability to multiply two numbers together is no substitute for a true calculation of damages. At a minimum, the computation of economic damages requires three steps: (i) an explanation of how some action (or inaction) caused a result different from what would have been expected to occur; (ii) an analysis of the economic consequences of this difference (to value, profit, costs, revenue, *etc.*); and (iii) economic or financial calculations, models, or measurements that are appropriate to estimate the amount of this difference.  These three steps are missing from the Kennedy/Adams "Cost Model."[22]

Kennedy and Adams present their Cost Model as calculating incremental cost in that they posit that the reduced capacity of the Reservoir resulted in the increased use of more expensive desalinated water. In order to determine the actual incremental cost, however, the calculation would have to establish the following: (1) the Reservoir had a reduced availability for usage; (2) this reduced Reservoir availability reduced the availability of surface or groundwater sources; (3) the reduced surface and groundwater availability was replaced by increased desalination plant production; and (4) since desalinated water is more expensive than surface water, the economic

---

[22]    Ex. A, Navigant Affidavit, ¶ 14.

damages would be the incremental difference in the cost of the desalinated water that was used to replace the groundwater and/or surface water that was not available.[23]

The Kennedy/Adams' calculation is missing Steps 2 and 3.[24] It does not attempt to determine whether the reduced availability of the Reservoir actually translated into a reduced availability of surface water or groundwater. Nor does it attempt to determine how much the reduction in availability of the Reservoir actually caused as an increase in the desalination plant production, if any. Instead, Kennedy's arithmetic simply assumes 100% of the desalination plant production resulted from the reduced availability of the Reservoir. Put another way, Kennedy/Adams' calculations assume the desalination plant would have been completely shut down and producing nothing had the Reservoir been fully available.[25] Kennedy/Adams' omission of the two steps of analysis and proof critically turns the "Cost Model" into no "model" at all. Kennedy/Adams' calculations cannot be presented as "expert opinion."

B.    <u>Incorrect Use of "Gross" vs. "Incremental" Desalination Plant Production</u>

One of the fundamental mistakes in the Kennedy/Adams' calculation of past losses is its failure to distinguish between gross and incremental desalination plant production. Kennedy calculated that the desalination plant's production from February to October 2009 totaled 4.6 billion gallons or 16.7 MGD.[26] The damage calculation assumes that 100% of this production was caused by the reduced availability of the Reservoir. It does not provide any offsets for production that would have been required by other factors, regardless of the condition of the Reservoir. This is comparable to making a claim for gross profits rather than net profits, which is wrong as a matter of law. *See* cases cited *supra,* pp.7-8.

---

[23]    Ex. A, Navigant Affidavit, ¶¶ 15-16.
[24]    *Id.*
[25]    Ex. A, Navigant Affidavit, ¶¶ 20-27; Ex. A-4, Tampa Bay Water's Third Amended Rule 26(a)(1)(A)(iii) Initial Disclosure and attachments thereto TBW317971-TBW317986 (hereinafter "December Disclosures").
[26]    Ex. A, Navigant Affidavit, ¶ 22; Ex. A-4, December Disclosures, TBW317986.

In order for TBW to have suffered any past loss, it would have to show the desalination plant production was higher than it would have been if the Reservoir had been operating at full capacity. But the facts show otherwise. Even if the Reservoir had been operating at full capacity, TBW still would have used the desalination plant. Adams testified TBW would never shut down the desalination plant for a year or less.[27] At a minimum, the desalination plant had to produce at least 4 MGD just to maintain operational readiness.[28] Kennedy concurred with this figure.[29] Among the 2 million pages of emails TBW produced on December 15th was an exchange between Adams and TBW's General Manager, Gerald Seeber, in which Adams said the desalination plant's fixed minimum production requirement was 8.4 MGD.[30] As a matter of economic principles, therefore, the Kennedy/Adams' calculation of 16.7 MGD should have been offset by at least 4.0 – 8.4 MGD. (In fact, Kennedy did offset 4.0 MGD from TBW's future loss calculation).[31]

Beyond the desalination plant's operational readiness requirements, various contractual provisions, such as covenants in financial agreements, obligated TBW to operate the plant at even higher levels. TBW budgeted 15 MGD of desalination plant production for WY2009 "guided by the funding agreement requirements,"[32] and operated it during that year at 16.9 MGD, due to requirements specified in its funding agreements.[33] No contemporaneous TBW documents were located attributing any of the desalination plant production to any condition of the Reservoir.

---

[27]     Ex. A-6, Adams' Deposition, November 2010, 49:21-50:21.
[28]     Ex. A-6, Adams' Deposition, November 2010, 42:13-43:5.
[29]     Ex. A-8, Kennedy's Deposition, October 2010, 501:8-12.
[30]     When asked by TBW's General Manager Jerry Seeber in March 2009 for the "lowest annual average flow that we can tolerate at the Desalination Plant," Adams wrote: "[O]ur lowest production at desal is two trains which is 8.4 mgd. So I would use 8.4 mgd as your minimum, this is number I have used in other analysis." Ex. A-7, Email from Gerald Seeber to Alison Adams dated March 8, 2009, TBW-EM4271852-54.
[31]     Ex. A-16, Kennedy's Deposition Exhibit 668, p.3.
[32]     Ex. A-9, Tampa Bay Water February 18, 2008 Regular Board Meeting Minutes, p. 71.

Kennedy/Adams' calculations use gross, rather than net or incremental, production. This is such a fundamental methodological flaw that the past lost use calculation must be rejected as unreliable. *See Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261 (M.D. Fla. 2008) (Whittemore, J.)(expert's use of incorrect underlying rate as basis for determining damages made calculated measure of damages irrelevant, unreliable as a methodology, and not helpful to the trier of fact). In order to be admissible, statistics as well as scientific evidence must be "supported by appropriate validation-i.e., 'good grounds,' based on what is known." *Frazier, supra,* 387 F.3d at 1261. The Kennedy/Adams' calculation of past loss is not based on "good grounds" or "what is known." It does not meet the necessary threshold of reliability.

## C.     Incorrect Dates, Amounts and Sources of Water

Kennedy's mathematical calculation of past lost use is also incorrect because it uses the wrong dates, amounts, and sources of water. According to Kennedy, the fill limit on the Reservoir caused a shift in production of water to the desalination plant from February to October 2009, totaling 4.6 billion gallons.[34]   Kennedy testified he had to rely on the water resource numbers Adams provided, because he was not qualified to determine where the water comes from.[35]

When Adams actually performed an analysis of what occurred in 2008-2009, however, she came up with entirely different dates, amounts of, and sources of water. Adams determined the shift of water sources occurred from August 2008 through May 2009, not February – October 2009. Adams determined the shift totaled 7.2 billion gallons, not 4.6 billion gallons. Most importantly, Adams determined the fill limit on the Reservoir caused a shift to groundwater, <u>not</u>

---

[33]     Ex. A-10, Optimized Regional Operations Plan Water Year 2009 Annual Report, p. 5. (Adams' Deposition Ex. 376) ("[The] average production for the water year was 16.9 mgd . . . operated toward meeting production requirements specified in the Second Amendment to the New Water Sources Funding Agreement").

[34]     Ex. A-4, December Disclosures, TBW317986.

[35]     Ex. A-8, Kennedy's Deposition, October 22, 2010, 374:11-18.

desalinated water.[36] Adams provided a detailed chart showing the production shift month-by-month, which graphically demonstrated that TBW replaced all of the "lost" Reservoir water, by a one-for-one gallon shift to groundwater sources, not desalinated water.[37] This is significant because groundwater sources are less expensive than either the Reservoir or the desalination plant. Thus, if Kennedy would have used, rather than disregarded, Adams' water source calculations provided to Defendants, his arithmetic and "Cost Model" would have shown that TBW saved money during the time of the Reservoir's fill limit. Because Kennedy's arithmetic does not meet with the facts, it must be excluded.

> **D.      Incorrect and Unsupported Assumptions of Causation**

As noted above, one of the key requirements in an incremental cost model would be proof that the fill limit on the Reservoir actually created a water shortage that could only be filled by production from the desalination plant. Once again, however, the Kennedy/Adams' calculation simply assumes the truth of this point, without any supporting evidence. In point of fact, ample sources of other water were available during the time in question, both surface and groundwater. The desalination plant's use was not because of a shortage of other water sources, and certainly not because of the fill limit on the Reservoir.

To begin, it must be recognized that the Reservoir was not empty between February and October 2009. The Reservoir was subject to a "fill limit" to 105 feet rather than 136.5. This limit still left 6.6 billion gallons of water in the Reservoir during the nine-month stretch of time Kennedy calculates lost use. Additionally, TBW had access to other surface water production sources and groundwater sources. The desalination plant was not TBW's only option. The Kennedy/Adams' calculation does not analyze whether TBW had to resort to the desalination

---

[36]     Ex. A, Navigant Affidavit, ¶¶ 28-32; *see also* Ex. A-12, Table 1. Comparison of Consolidated Wellfield Production under actual and normal reservoir operating conditions (Adams' Deposition Ex. 380).

[37]     *Id.*

plant.  HDR's consultant Navigant has done so.[38] Navigant concluded: "the reduced fill limit of the Reservoir did not 'cause' any increase in desalination plant use," and "did not cause a higher cost mix for TBW."[39]

This does not represent a mere difference of opinion between opposing experts. It goes to the very heart of the *Daubert* analysis. The Kennedy/Adams' calculation assumes the truth of a critical point TBW must prove (*i.e.*, that a shift occurred from surface water/Reservoir to desalination water). Rather than prove this, Kennedy/Adams ignore available data, fail to analyze other data, and their work runs directly contrary to TBW's own records and analyses Adams herself performed. Such fundamental flaws doom the reliability of the proffered opinions. When the facts show the assumption is wrong, exclusion of the opinion is required.

## VI.
## EXCLUSION OF OPINION TESTIMONY ON FUTURE "LOSS OF USE" DAMAGES

### A. Unrealistic and improbable assumptions

#### 1. *Reasonable certainty versus speculative claims*

TBW also makes a calculation regarding future "loss of use" damages when the Reservoir is expected to undergo renovation between 2013 - 2015.  Again, the theory presented is that desalination plant production will increase to counter the alleged Reservoir outage, resulting in $20 million in damages. For this claim, the Kennedy/Adams' calculation assumes a highly improbable confluence of events occurring precisely when the Reservoir is undergoing renovation: demand will increase; supply will decrease; and expensive desalinated water will be the only solution.

While claims of future economic damages need not be shown with precision, they must be based on reasonable probabilities, not speculation or formulas designed to produce worst case

---

[38]     *Id.* ¶¶ 33-42.
[39]     *Id.* ¶ 40.

scenarios. Since TBW's claim is a forecast of supply, demand, and costs, the Court can find guidance in cases dealing with lost profits and business valuations. In *Fixel v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43, 46 (Fla. 3d DCA 2006), the court excluded the plaintiff's expert on damages because his reliance on purely speculative forecasts of future revenue was conjectural and unsupported. Similarly, in *North Dade Cmty. Dev. Corp. v. Dinner's Place, Inc.*, 827 So. 2d 352, 353 (Fla. 3d DCA 2002), the court held a business prospectus sheet "was little more than an unsupported wish list of what the lessee hoped would occur in the coming years" and therefore insufficient "to satisfy the mind of a prudent, impartial person as to the amount of profits lost."

### 2.   *Speculative and unrealistic assumptions of increasing demand*

The first weak link in this chain is the assumption of future increasing demand. Adams' calculation assumes that demand will grow 7.2% in 2012 and then hover between 1.2% and 2.4% annually for the next five years.[40] This assumption is at odds with the facts. Water demand has actually been declining on an annual basis for the past decade.[41] Moreover, Adams' demand figures are not reliable. TBW historically overestimates demand and Adams did not assign a rate of error to her numbers.[42] Between June 2008 and December 2010, TBW issued at least four demand forecasts for the years 2013 – 2015. Every report forecast different numbers for those years, but the numbers decreased in each successive report.[43] If one were to graph the decline in TBW's continually corrected forecasts, it would result in a lower forecast than the one Adams has used for this litigation.[44] Not only does this demonstrate the demand forecast is unreliable in

---

[40]     Ex. A, Navigant Affidavit, ¶¶ 56-62.
[41]     Ex. A, Navigant Affidavit, ¶ 61; Ex. A-16, Demand, Supply, and Costs Projections (Kennedy's Deposition Ex. 668);
         Ex. A-19, Long Term Demand Forecasting and Future Water Supply Needs Update.
[42]     Ex. A, Navigant Affidavit, ¶¶ 56-62.
[43]     Ex. A, Navigant Affidavit, ¶ 58.
[44]     *Id.*

its own right, it runs afoul of *Daubert's* caution against opinions created for the courtroom rather than the Boardroom, and a failure to assign a known rate of error.

### 3.   *Speculative and unrealistic assumptions of decreasing supply*

In order to make the calculation show a future need for increased desalinated water, Adams had to artificially reduce the supply of available surface water precisely when the Reservoir is scheduled to be out of service.[45] She accomplished this by assuming that WY2013 and WY2014 would be "low flow" (below average) water years, producing only 37 MGD and 41 MGD respectively.[46] This assumption was not based on an analysis of what was likely to happen in those two years. Rather, it was based on her belief that TBW should "plan for" unlikely scenarios[47] (*i.e.,* "prepare for the worst, hope for the best"). Adams admitted she did not try to analyze what might reasonably happen under expected circumstances.[48] She commented that she did not do this type of probability forecasting in the regular performance of her duties.[49] Forecasting economic damages requires a different methodology than forecasting for water use planning. Adams' approach of contingency planning "fundamentally misstates expected values (and damages)."[50]

Adams admitted she could not assign any level of probability to her forecast, and could not say her assumption of a "low flow" condition was likely to occur at all. Her testimony in this regard is telling:

> Q.   So you have -- are you saying you have no estimation of the likelihood of -- of having a low-flow condition in 2013?

---

[45] Ex. A-6, Adams' Deposition, November 2010, 71:11-72:24; 74:7-75:13; 122:20-123:21; 126:3-12; 204:19-205:11; 208:21-209:9; 212:6-22.
[46] Ex. A-6, Adams' Deposition, November 2010, 122:20-123:21; 126:3-12; 208:21-209:9; 212:6-22.
[47] Ex. A-6, Adams' Deposition, November 2010, 239:25-240:9.
[48] Ex. A-6, Adams' Deposition, November 2010, 217:1-17.
[49] Ex. A-6, Adams' Deposition, November 2010, 217:24-219:7.
[50] Ex. A, Navigant Affidavit, ¶ 48.

A.      I have not done that analysis, no.[51]

Q.      And as you sit here today as an expert for Tampa Bay Water, can you put a percentage probability on that low run-of-river flow for 2013?

A.      No, I can't.[52]

Q.      Can you tell the jury that it is more likely than not that the flow in 2013 is going to be 37 million gallons per day or below for run-of-river?

A.      No one can sit here today and predict what the flow in 2013 is going to be.[53]

When pressed to say whether the predicted 37 MGD figure for 2013 was going to happen "25% of the time, 50% of the time," Adams admitted: "I don't have an answer to that question."[54] As she stated, "I have not done that type of time-series analysis to go be able to give you that answer."[55]

Adams admitted her forecast is not based on expected or average future outcomes.[56] She conceded her future estimate of "low flow" years was not based on any statistical analysis or statistical probability modeling.[57] If any prediction at all is appropriate about the occurrence of two consecutive "low flow" years, it would be that they are <u>not</u> <u>likely</u> to occur, and that future lost use damages are unlikely. Adams testified the probability of a "low flow" year is about 30-35% in any given year.[58] This means the statistical probability of two consecutive "low flow" years would drop to 11%.[59] Indeed, TBW's own historical data confirms this. Over a 31-year historical span back to 1978, back-to-back low flow years (represented by the bottom 33%) only

---

[51]      Ex. A-6, Adams' Deposition, November 2010, 126:3-7.
[52]      Ex. A-6, Adams' Deposition, November 2010, 212:18-22.
[53]      Ex. A-6, Adams' Deposition, November 2010, 213:12-17.
[54]      Ex. A-6, Adams' Deposition, November 2010, 208:21-209:9.
[55]      Ex. A-6, Adams' Deposition, November 2010, 209:23-210:4.
[56]      Ex. A-6, Adams' Deposition, November 2010, 210:5-211:5.
[57]      Ex. A-6, Adams' Deposition, November 2010, 124:25-125:14; 126:3-12; 204:3-205:11; 208:2-209:9; 209:23-210:13; 210:20-213:17.
[58]      Ex. A-6, Adams' Deposition, November 2010, 71:22-72:24; 124:25-125:14; 208:21-209:9.
[59]      Ex. A, Navigant Affidavit, ¶ 46.

occurred 10% of the time, just as random statistics would predict.[60] This same historical data shows that one "low flow" year does not follow another "low flow" year any more than randomly. Therefore, there is no basis at all for saying that two unlikely events will occur at a specific time. When questioned about the uncertainty of a "low flow year," Adams herself stated: "No one can sit here today and predict what the flow in 2013 is going to be."[61] Navigant's conclusion in this regard is appropriate: "Using a potential future condition of two low flow years that are 90% unlikely to occur is an improper methodology to determine potential future damages."[62]

Another way to measure the unrealistic nature of the future prediction of inadequate supplies is to check it against known facts. In order to make her calculations work, Adams had to assume an overestimated demand and an underestimated supply. She did not perform any calculations using any other numbers. However, TBW had done other "what if" scenarios, assuming the Reservoir was out of service, with markedly different results.

As previously mentioned, TBW internally studied 31 years of hydrology data from 1978-2008[63] for the specific purpose of estimating surface water production as if there had been no Reservoir and assuming the surface water treatment plant capacity was 99 MGD of capacity. This analysis showed that even a year in the lower 25th percentile would have produced at least 50.7 MGD of surface water availability, and an average year would have produced 64.1 MGD (even assuming the Reservoir had never been built).[64]

---

[60]     Ex. A, Navigant Affidavit, ¶ 46; Ex. A-17, Email from Alison Adams to Ervin Myers and James Molyneux dated April 23, 2009, B_V146002-146004.
[61]     Ex. A-6, Adams' Deposition, 213:12-17.
[62]     Ex. A, Navigant Affidavit, ¶ 46.
[63]     Ex. A-17, Email from Alison Adams to Ervin Myers and James Molyneux dated April 23, 2009, B_V146002-146004. Adams did not produce this email prior to or during any of her depositions. Likewise, TBW did not produce it from its ESI. It was only produced by Black & Veatch, the recipient of the email.
[64]     As explained in some detail, this is a conservative analysis that probably understates the available surplus water. Ex. A, Navigant Affidavit, ¶¶ 65-72.

At 50 MGD, which the 31-year historical analysis showed was below average, Adams admitted that TBW would have no need to use desalinated water (and hence would have no damages):

> Q.   That goes for any year that you're talking about the Reservoir being off line.  If we have an average year of 50 million gallons per day of river flow, we not would not need to use more desalination than our four million gallons per day?
>
> A.   It's not likely that we would, right.
>
> Q.   Okay.  And in addition to that, Tampa Bay Water would not exceed its groundwater permitting limits?
>
> A.   Yes, that's correct.[65]

If this would be true for a below average (25th percentile) year at 50 MGD, then it obviously would be even more so for an average year at 64 MGD.

The same holds true if one checks Adams' forecast against other years she considered. In explaining the basis for her "low flow" numbers of 37 MGD and 41 MGD, Adams testified that she considered WY2008 and WY2009 representative of "low flow" years.[66] Using the actual water numbers for those years, however, and taking into account the increased surface water plant production capacity that will be available in 2013 (which was not available in 2008-2009), demonstrates 49.3 MGD supply of water will be available, without either the Reservoir or the desalination plant.[67] This is ostensibly the same as the 50 MGD average that Adams admits will result in no future loss.  Thus, even assuming *arguendo* Adams' example of a "low flow" year did occur, there still would be no future damages.

This demonstrates the unreliability of the Kennedy/Adams' calculation. It runs counter to 31 years of TBW's history, which shows that there would be no need to use desalinated water

---

[65]   Ex. A-6, Adams' Deposition, November 2010, 225:4-13.
[66]   Ex. A-6, Adams' Deposition, November 2010, 74:11-75:13.
[67]   Ex. A, Navigant Affidavit, ¶ 67.

(and hence no damages) even in a below-average 25th percentile year of 50 MGD. Certainly in an average year or one reasonably certain to occur, no future damages can be said to exist. Adams' and Kennedy's calculation on these issues should be excluded.

### 4. *Speculative and unrealistic assumptions of increased costs*

Finally, in order to generate the $20 million number, the Kennedy/Adams' calculation uses an incremental cost difference for desalinated water of $2.62 per 1,000 gallons. This means the cost of desalinated water will have to escalate nearly 75% in barely four years from the time of the past damages (2009) to the future damages (2013).[68] No explanation, justification or evidence is offered for such a meteoric rise. Using the $1.50 figure lowers the future damage calculation by $8.5 million. This underscores the speculative nature of TBW's damage calculation.

### B. **Failure to consider facts, probable events, and alternative scenarios**

Not only does the Kennedy/Adams' calculation use speculative and unrealistic assumptions, it fails to consider other variables that directly and dramatically change the results of the calculations. For example, it fails to take into account the increased production capacity of the surface water treatment plant,[69] as well as increased efficiency of production at that plant.[70] It fails to consider alternative ways to optimize water production by varying the amounts produced from surface water sources versus groundwater sources at different times of the year.[71] By failing to consider these variables, the Kennedy/Adams' calculation is based on a worst case scenario. It does not reflect a valid estimate of probable damages. Instead, it produces an inflated estimate of

---

[68] Ex. A. Affidavit, ¶¶ 77-78; Ex. A-23, Email from Jon Kennedy to Ervin Myers dated August 10, 2005 (Kennedy's Deposition Ex. 670); Ex. A-16, Demand, Supply, and Costs Projections (Kennedy's Deposition Ex. 668).
[69] Ex. A, Navigant Affidavit, ¶¶ 66-68.
[70] *Id.*
[71] *Id.*

things that are not likely to happen. In Navigant's words, the calculation "overstates the need for desalination production and future economic damages are biased."[72]

## VII.
## CONCLUSION

Each of these errors alone would doom Adams' and Kennedy's testimony under *Daubert*. Combined, the errors provide appropriate grounds to exclude in total all of the testimony and evidence regarding alleged any "loss of use" damages. An expert's opinion testimony must be based not only on sufficient facts or data, but also must be "the product of reliable principles or methods," which the expert has applied reliably to the facts of the case. *Pierson v. Werntz*, 2010 WL 3447496 (M.D. Fla. August 30, 2010).

In *Pierson*, the plaintiff retained James T. McClave, a Ph.D. in statistics, to calculate damages based on lost earnings. The defendant argued the methodologies failed to take into account facts and data, and that McClave selectively chose assumptions and data to formulate his calculations.[73]  The Court agreed:

> Dr. McClave did not consider sufficient facts or data, ignored available data, and did not apply principles and methods reliably to the facts.  Instead, his opinions are based on unsupported assumptions . . . His failure to account for the differences in the relevant orthopedic markets, Plaintiff's professional situations in each of those markets, the circumstances under which Plaintiff left Chicago, and Plaintiff's actual income just before the events at issue renders Dr. McClave's opinions regarding Plaintiff's lost earnings unreliable under Rule 702, and therefore they must be excluded.

Adams' and Kennedy's opinions suffer from the same flaws. Their calculations of past and future losses are built on unproven assumptions that are contrary to known facts. They

---

[72]   Ex. A, Navigant Affidavit, ¶ 54.
[73]   McClave offered no data to support his assumption that market-to-market comparisons could be made; he neglected to consider the different employment circumstances of the plaintiff in the various cities in which he resided; and failed to account for differences in the practice circumstances or geographic locations where the plaintiff practiced medicine. He assumed the plaintiff's earnings had steadily increased, even though the facts showed that plaintiff's income had dropped significantly and not rebounded. *Pierson,* at *4-6.

assume causation rather than prove it. Kennedy's testimony disregards Adams' past calculations and testimony of shift to groundwater (not desalination water). Their calculation of future losses does not even attempt to forecast a reasonably certain event. Their demand estimates are rebutted by TBW's historical numbers, which they ignored. They ignored TBW's own 31-year historical averages of surface water availability and did not account for the surface water treatment plant's increased ability to process it. They failed to evaluate alternative production possibilities. In short, they rely on numbers and figures geared towards producing a desired result rather than provide a reliable analysis to reach a reliable answer.

The analytical gap is a chasm. Their testimony is so unreliable that correcting the errors does not simply result in "error rate" or only diminish the amount of the damages claimed. Correcting the errors actually eliminates the entire lost use damage claim. In circumstances like this, FED. R. EVID. 702 and *Daubert* dictate that their opinion testimony must be excluded.

WHEREFORE, HDR respectfully prays that the Court grant this Motion, exclude the opinion testimony of Kennedy and Adams on past and future "loss of use" damages, and grant HDR such other relief to which it may be justly entitled.

Respectfully submitted,

SEDGWICK, DETERT, MORAN & ARNOLD LLP

*/s/ KURT W. MEADERS*
WAYNE B. MASON, ESQUIRE
Admitted Pro Hac Vice
KURT W. MEADERS, ESQUIRE
Admitted Pro Hac Vice
1717 Main Street, Suite 5400
Dallas, TX  75201-7367
Telephone 469-227-8200
Facsimile 469-227-8004

FORIZS & DOGALI, P.A.
TIMOTHY D. WOODWARD, ESQUIRE
Florida Bar No.: 0486868
JAMES K. HICKMAN, ESQUIRE
Florida Bar No.: 0893020
4301 Anchor Plaza Parkway, Suite 300
Tampa, FL  33634
Telephone 813-289-0700
Facsimile 813-289-9435

ATTORNEYS FOR HDR ENGINEERING, INC.


## CERTIFICATE OF GOOD FAITH

The undersigned counsel for Defendant HDR Engineering, Inc., has conferred with counsel for all parties in the above styled case via email correspondence dated February 24 and 25, 2010, as to this Motion.  Counsel for Barnard and McDonald do not oppose this Motion. Counsel for TBW opposes this Motion.


*/s/ Kurt W. Meaders*
KURT W. MEADERS


## CERTIFICATE OF SERVICE

Per the Court's request, the foregoing instrument previously filed on February 28, 2011 as a "miscellaneous motion" is being re-filed electronically as a "Motion in Limine" through the CM/ECF system on March 2, 2001, which thereby sent a notice of electronic filing to all counsel of record the same day.


*/s/ Kurt W. Meaders*
KURT W. MEADERS