

# REPLY TO REBUTTAL REPORTS SUBMITTED ON THE TAMPA BAY WATER RESERVOIR PROJECT

**Submitted To:** Allen Dell, P.A.
202 South Rome Avenue
Suite 100
Tampa, FL 33606

**Submitted By:** Golder Associates Inc.
5100 West Lemon Street
Suite 208
Tampa, FL 33609 USA

April 23, 2010                                                                083-89626



EXHIBIT
20



Golder
Associates

GA_RBL000001

Case 8:08-cv-02446-JDW-TBM    Document 349-20    Filed 05/19/11    Page 2 of 65 PageID 19890

## Table of Contents

1.0    INTRODUCTION...............................................................................................................................1

2.0    REPLY TO THE REBUTTAL EXPERT COMMENTS ON DISTRESS CAUSATION AND
OPINIONS, AND THE CONCLUSIONS STATED IN THE GOLDER ASSOCIATES REPORT ................3

   2.1    General...................................................................................................................................3

   2.2    BCI Report – Analysis and Evaluation of Soil-Cement Cracking at Tampa Bay Reservoir..........3

     2.2.1    BCI causation theory (pages 4-15) ............................................................................3

     2.2.2    Golder Associates reply to BCI causation theory............................................................4

     2.2.3    Golder Associates reply to BCI criticisms of the Golder Associates report .................6

   2.3    GEI Report – Preliminary Evaluation of Basis of Claim against HDR Engineers, Inc................12

     2.3.1    GEI causation theory..............................................................................................12

     2.3.2    Golder Associates reply to GEI causation theory ..........................................................12

     2.3.3    Golder Associates reply to GEI criticisms of Golder Associates report ...........................12

   2.4    5RMK Report – Performance Assessment of Barnard Construction Company's Construction of
the Tampa Bay Regional Reservoir...............................................................................................18

     2.4.1    5RMK causation theory ..........................................................................................18

     2.4.2    Golder Associates reply to 5RMK causation theory .........................................................18

     2.4.3    Golder Associates reply to 5RMK criticisms of Golder Associates report .........................19

   2.5    Robert Johnson Report – Expert Report – Relating to Role and Responsibility of Tampa Bay
Water on the C.W. "Bill" Young Reservoir Project .............................................................................19

     2.5.1    Johnson causation theory ........................................................................................19

     2.5.2    Golder Associates reply to Johnson causation theory .......................................................19

     2.5.3    Golder Associates reply to Johnson criticisms of Golder Associates report......................19

   2.6    Devo Seereeram Report (Devo) – Assessment of the Cause of Distress to the Upstream
Embankment of the C. W. "Bill" Young Reservoir, Hillsborough County, Florida ...............................19

     2.6.1    Devo causation theory ............................................................................................19

     2.6.2    Golder Associates reply to Devo causation theory .........................................................20

     2.6.3    Golder Associates reply to Devo criticisms of Golder Associates report ..........................21

   2.7    Rizzo Report – Forensic Investigation Soil-Cement Cracking, C. W. Bill Reservoir...................23

     2.7.1    Rizzo causation theory ............................................................................................23

     2.7.2    Golder Associates reply to Rizzo causation theory...........................................................23

     2.7.3    Golder Associates reply to Rizzo criticisms of Golder Associates report .........................25

   2.8    Freese and Nichols Report (FNI) (Rutledge) – Analysis of the Design and Construction of the
Soil Cement at the C. W. "Bill" Young Regional Reservoir.................................................................25

     2.8.1    Freese and Nichols causation theory............................................................................25

     2.8.2    Golder Associates reply to Freese and Nichols causation theory ....................................25

     2.8.3    Golder Associates reply to Freese and Nichols criticisms of Golder Associates report .....26

   2.9    Lemley Report –Opinion of Jack Lemley ........................................................................26

     2.9.1    Lemley causation theory ..........................................................................................26

     2.9.2    Golder Associates reply to Lemley causation theory........................................................26


Golder
Associates

GA_RBL000002

2.9.3    Golder Associates reply to Lemley criticisms of Golder Associates report ........................ 26

2.10    Kerkes Report – Opinion Report in the Matter between Tampa Bay Water, A Regional Water
Supply Authority, and Construction Dynamics Group Inc. ...................................................... 26

2.10.1    Kerkes causation theory ................................................................................................ 26

2.10.2    Golder Associates reply to Kerkes causation theory .................................................... 27

2.10.3    Golder Associates reply to Kerkes criticisms of Golder Associates report ................. 27

2.11    Landmark Contract Management (LCM) Report – Expert Report of Bradley H. Hornburg ...... 27

2.11.1    LCM causation theory ................................................................................................... 27

2.11.2    Golder Associates reply to LCM causation theory ....................................................... 27

2.11.3    Golder Associates reply to LCM criticisms of Golder Associates report ..................... 27

3.0    GOLDER ASSOCIATES COMMENTS ON REBUTTAL REPORTS ON MATTERS NOT DEALING
WITH CAUSATION OR COMMENTS ON GOLDER ASSOCIATES REPORT ...................................... 29

3.1    BCI Report ...................................................................................................................... 29

3.2    GEI Report ...................................................................................................................... 32

3.3    5RMK Report .................................................................................................................. 40

3.4    Johnson Report .............................................................................................................. 42

3.5    Devo Report .................................................................................................................... 44

3.6    Freese and Nichols (Rutledge) Report ........................................................................... 46

3.7    Rizzo Report ................................................................................................................... 50

3.8    Lemley Report ................................................................................................................ 50

3.9    Kerkes Report ................................................................................................................ 51

3.10    LCM Report ................................................................................................................... 53

4.0    GOLDER ASSOCIATES REPLY TO INCONSISTENCIES IN THE DEFENDANTS REBUTTAL
REPORTS ........................................................................................................................................... 57

4.1    HDR rebuttal experts ...................................................................................................... 57

4.2    Barnard rebuttal experts ................................................................................................. 59

5.0    CLOSING ........................................................................................................................ 60

6.0    REFERENCES ................................................................................................................. 61

## List of Tables

Table 2-1    Check of BCI Figure III-2 – Triaxial Test Data Before and After Consolidation and Prior to
Shear for Remolded Samples

## List of Figures

Figure 2-1    Triaxial Consolidation Data Cited by BCI in Figure III-2 (Using Golder Calculation of
Volume Change)



## LIST OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 5RMK | 5RMK, Inc. |
| ACI | American Concrete Institute |
| AOS | apparent opening size |
| Ardaman | Ardaman & Associates. Inc. |
| Argila | Argila Enterprises, Inc. |
| ATV | all-terrain vehicle |
| B&V | Black & Veatch Corporation |
| Barnard | Barnard Construction Company Inc. |
| BCI | BCI Engineers & Scientists, Inc. |
| CDG | Construction Dynamics Group, Inc. |
| CM | construction management |
| cm/sec | centimeters per second |
| CQA | construction quality assurance |
| CQC | construction quality control |
| DER | Department of Environmental Regulation (predecessor of FDEP) |
| Devo | Devo Seereeram, LLC |
| DWW | Duncan, Wright and Wong |
| El. | elevation |
| ERP | environmental resource permit |
| FDEP | Florida Department of Environmental Protection |
| FNI | Freese and Nichols, Inc. |
| FPSC | flat-plate soil-cement |
| ft | foot |
| ft/day | feet per day |
| GA | Golder Associates Inc. |
| Gears | Gears, Inc. |
| GEI | GEI Consultants, Inc. |
| Golder Associates | Golder Associates Inc. |
| GPR | ground penetrating radar |
| HDPE | high-density polyethylene |
| HDR | HDR Engineering, Inc. |
| H:V | horizontal to vertical (e.g., 2.5H:1V) |
| ICOLD | International Commission on Large Dams |
| in/day | inches per day |
| Johnson | Robert W. Johnson, LLC |
| k | permeability, coefficient of permeability, or hydraulic conductivity |
| Kerkes | David J. Kerkes, Ph.D., P.E. |
| kfill or $k_{fill}$ | permeability of embankment fill including soil wedge |
| kh or $k_h$ | permeability in horizontal direction |
| kh/kv | ratio of permeabilities in horizontal and vertical directions (a.k.a. anisotropy ratio) |
| ksc or $k_{sc}$ | permeability of soil-cement |
| ksf | kilopounds per square foot |
| kv or $k_v$ | permeability in horizontal direction |
| Law | Law Engineering and Environmental Services, Inc. |
| lb | pound |
| LCM | Landmark Contract Management, Inc. |
| LI | Lemley International |
| McDonald | McDonald Construction Corporation |
| MDD | maximum dry density |
| mgd | million gallons per day |
| Olson | Olson Engineering, Inc. |
| OMC | optimum moisture content |



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 5 of 65 PageID 19893

| | |
|---|---|
| PCA | Portland Cement Association |
| pcf | pounds per cubic foot |
| phi or Φ | angle of internal friction of soil |
| psf | pounds per square foot |
| psi | pounds per square inch |
| QA | quality assurance |
| QC | quality control |
| RAI | request for additional information |
| RAI 1 | first request for additional information |
| RAI 2 | second request for additional information |
| Reservoir | C.W. "Bill" Young Regional Reservoir |
| Rizzo | Paul C. Rizzo Associates, Inc. |
| SC | soil-cement |
| Sta | station (embankment centerline) |
| SWFWMD | Southwest Florida Water Management District |
| TBW | Tampa Bay Water |
| USBR | U.S. Bureau of Reclamation |
| USACE or Corps | U.S. Army Corps of Engineers |
| USCS | Unified Soil Classification System |
| XCorps | XCorps LLC |



GA_RBL000005

## 1.0   INTRODUCTION

Tampa Bay Water (TBW) is in litigation with HDR Engineering, Inc. (HDR), Construction Dynamics Group, Inc. (CDG), and Barnard Construction Company Inc. (Barnard) over issues with the C.W. "Bill" Young Regional Reservoir (Reservoir) in Hillsborough County, Florida. As a third-party plaintiff, Barnard has also filed a suit against third-party defendant McDonald Construction Corporation (McDonald) over the matter. Allen Dell, P.A. retained Golder Associates Inc. (Golder Associates or GA) to provide litigation support and other services to TBW on this project. On January 8, 2010, pursuant to a court order, Golder Associates submitted a report on its assessment of the causes of the unusual cracking at the Reservoir and its assessment of the performance of the defendants. The defendants, HDR, CDG, and Barnard, and McDonald filed the following ten rebuttal reports, prepared by their experts, on or about March 26, 2010:

| Retained By | Author's Firm and Name | Report Title |
|---|---|---|
| HDR | BCI Engineers & Scientists, Inc.; Leslie G. Bromwell (BCI) | Analysis and Evaluation of Soil Cement Cracking at Tampa Bay Reservoir |
| HDR | GEI Consultants, Inc.; R. Lee Wooten (GEI) | Preliminary Evaluation of Basis of Claim against HDR Engineers, Inc. |
| HDR | 5RMK, Inc.; Bruce McKellar (5RMK) | Performance Assessment of Barnard Construction Company's Construction of the Tampa Bay Regional Reservoir for Tampa Bay Water |
| HDR | Robert W. Johnson, LLC (Johnson) | Expert Report Relating to Role and Responsibility of Tampa Bay Water on the C.W. "Bill" Young Reservoir Project |
| Barnard & McDonald | Devo Seereeram, LLC (Devo) | Assessment of the Cause of Distress to the Upstream Embankment of the C.W. Bill Young Reservoir, Hillsborough County, Florida |
| Barnard | Paul C. Rizzo Associates, Inc.; Paul C. Rizzo (Rizzo) | Forensic Investigation Soil-Cement Cracking C.W. Bill Young Reservoir Tampa Bay Water Authority |
| Barnard | Freese and Nichols, Inc.; John Lee Rutledge (FNI) | Analysis of the Design and Construction of Soil Cement at the C.W. "Bill" Young Regional Reservoir |
| McDonald | Lemley International; Jack K. Lemley (Lemley) | Claim No. 926067814 – Tampa Bay Water vs. McDonald Construction Company, et al. |
| CDG | David J. Kerkes, Ph.D., P.E. (Kerkes) | Opinion Report In The Matter Between Tampa Bay Water A Regional Water Supply Authority And Construction Dynamics Group, Inc. |
| CDG | Landmark Contract Management, Inc.; Bradley Hornburg (LCM) | Expert Report of Bradley H. Hornburg |

Pursuant to a court order, this report, prepared by Golder Associates, presents its reply to these ten (10) reports. Rather than prepare a separate reply to each rebuttal report, Golder Associates chose to prepare a consolidated reply response.



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 7 of 65 PageID 19895

Golder Associates has reviewed and analyzed numerous project records, other related documents, and the ten rebuttal reports by the defendants' experts. However, discovery in this case is ongoing and is not scheduled to terminate until December 15, 2010. Therefore, we anticipate that additional information will become available as discovery proceeds. Accordingly, Golder Associates expressly reserves the right to supplement, correct and/or amend this report in accordance with Fed. R. Civ. P. 26(e).



GA_RBL000007

## 2.0   REPLY TO THE REBUTTAL EXPERT COMMENTS ON DISTRESS CAUSATION AND OPINIONS, AND THE CONCLUSIONS STATED IN THE GOLDER ASSOCIATES REPORT

### 2.1   General

In this section, Golder Associates comments on each expert's theory of what caused the distress at the Reservoir and addresses each expert's comments on the Golder Associates report. In this and following sections, the specific page numbers where the statements or opinions are found are cited for reference.

### 2.2   BCI Report – Analysis and Evaluation of Soil-Cement Cracking at Tampa Bay Reservoir

#### 2.2.1   BCI causation theory (pages 4-15)

BCI is of the opinion that loose fill present primarily at the bottom of the wedge collapsed when inundated during reservoir filling and caused the unusual cracking observed. This loose fill (pg13) resulted from:

1. the placement of an uncompacted layer of fill, of variable thickness, over the geomembrane ("protective lift"),
2. filling of large erosion gullies with bulldozer-placed fill, and
3. the placement of the top layer of wedge fill with bulldozers.

BCI's opinion is that these loose fill materials collapsed during the initial wetting that took place as the Reservoir water level rose. BCI states that the collapse could be as much as 20 percent of the initial volume of loose fill. BCI (pg 5) refers to Figure III-2 to support the 20 percent collapse volume change.

BCI (pg 7) states that void volume is a better measure of damage than crack frequency. BCI's opinion is that the collapse of the loose fill created voids that (pg 13) progressed to the surface of the wedge fill (immediately under the soil cement). BCI's opinion is that it takes time for the voids to work their way to the surface of the fill and is why it believes cracking did not occur during the first drawdown but began during the second drawdown. BCI cites the scarp between Sta 244 and Sta 253 as evidence of soil-cement that has collapsed into the void space under the slab.

BCI states (pg 14) that cracking in the northeast was the result of collapse of a thick layer of loose, dry fill. It states that, in the southwest, the fill was handled and replaced because of rainfall during work in that area. The bulldozer placed fill for regrading and filling erosion gullies that was loose and ultimately collapsed creating voids under the soil-cement.

BCI (pg 14) states that water infiltration and the redistribution of soil or downslope movement of soil was not significant in terms of increasing the total volume of voids. It states that there was little soil washed out from beneath the soil cement and deposited on the bench or in the Reservoir.



BCI states (pg 15) that if the fill within the wedge had been compacted as specified by HDR, the problems with the soil-cement would not have occurred.

### 2.2.2    Golder Associates reply to BCI causation theory

BCI is correct that very loose soils, in a "metastable" state, can undergo large volume change when sheared or inundated. The term "collapse" is usually applied to native soils that are loose and have some cementing agent supporting the open structure of the soil particles. Examples of these are caliche found in arid regions and some loess deposits along the Mississippi River. Silty sands, like those used in the Reservoir project that were placed in the "protective lift" over the geomembrane, might be moderately loose if dumped at a water content such that the matrix suction in the pore space of the soil is sufficient to support a moderately loose structure. The more moderately loose zone will densify during construction when these soils are:

1.  worked with bulldozers during spreading,
2.  rained upon,
3.  subjected to machine vibrations,
4.  subjected to the loads associated with heavy earthmoving equipment constructing the wedge in horizontal lifts. and
5.  subjected to the increasing weight of compacted fill over the dumped and bulldozed zone.

This densification would take place prior to placement of the soil-cement and prior to reservoir filling. Some additional volume change might occur during inundation as the reservoir fills, but this volume change is not expected to be large.

It appears from the photos in the BCI and GA reports that the thickest lift of fill that was bulldozed up the slope over the geomembrane was near the bottom of the embankment between the upstream toe of the slope and the soil bentonite cutoff wall. Applying the BCI causation theory, the greatest volume of voids, and hence soil-cement cracking, would occur in the lower portion of the soil-cement slope (around El. 100 at Sta 250). There is, however, evidence that the thick zone at the base of the slope did not exist after the final spreading of the protective lift. The worst cracking was not observed in the lower portions of the soil-cement slope; to the contrary, observations and survey data indicate that the lower part of the slope appears have bulged outward which cannot be explained by the BCI causation theory.

The evidence, experts' reports, and Michael A. Milhorn's (Milhorn of Ardaman & Associates, Inc. [Ardaman]) deposition indicate that the completed "protective fill" was a minimum two (2) foot layer bulldozed up the slope from the bottom, placed immediately over the geomembrane, and cut as necessary so the final thickness was no greater than three (3) feet. Any settlement resulting from the wetting of this bulldozed protective fill would be fairly uniform up and down the slope. A uniform settlement in the protective lift of fill does not explain the unusual and irregular cracking in the soil-cement.



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 10 of 65 PageID 19898

The vertical thickness of wedge fill and soil-cement, and applied soil stress over the geomembrane near Sta 250, varies from about 19 feet (about 2.3 ksf) to about 13 feet at El. 136 (about 1.6 ksf). These changes in applied stress vary linearly up the slope; the differences in applied loads on the protective lift cannot explain the observed unusual cracking in the soil-cement.

BCI shows seven (7) data points in its Figure III-2 from samples B-22-C and AU-66. It concludes that the "outlier" that indicates almost 20 percent "volumetric change" could be the amount of "collapse volume change" that occurred at the Reservoir. GA's assessment of the BCI Figure III-2 indicates that BCI is calculating "dry density change" not "volume change." BCI incorrectly portrays Figure III-2 as representing the potential "volume change" that could occur upon wetting. In addition, BCI Figure III-2 incorrectly identifies the sample exhibiting the largest change as coming from boring B-22-C; a triaxial test report included in Law's 2000 site characterization report shows the sample exhibiting the largest volume change (and dry density change) was obtained from boring AU-66 which was compacted to 82 percent and subjected to a confining pressure of 2.88 ksf. Table 2-1 and Figure 2-1 in this report show all 17 data points from the triaxial strength tests performed on remolded samples from the borings cited by BCI (not just seven points as shown on BCI Figure III-2). The data in Table 2-1 presents the pre-shear information for each sample. Samples were compacted to three different levels of compaction (percent compaction) and subjected to three different confining stresses and the samples were saturated. Note that the data from the three samples from AU-66, with an initial percent compaction of around 95 percent, indicate those samples expanded (lost density) as the sample was subjected to an all around uniform pressure. Such a response is impossible; therefore, these data are erroneous. Using the initial dry density and the final dry density, the volume change after applying the confining pressure and wetting can be calculated. The percent volume change calculated by GA is different than represented by BCI (who cited dry density change) and is considered to be an accurate method of calculating the <u>sample</u> volume change.

Note that the percent "volumetric change" (actually "dry density change") cited by BCI for Sample B-22-C (actually AU-66) at an all-around confining pressure of 2.88 ksf and an initial percent compaction of 82 percent was "almost" 20 percent. The "volume change" calculated by GA for this sample was only 16.6 percent.

Table 2-1 also shows the average final percent compaction for the samples tested above when loaded and saturated. For samples with an initial compaction of nominally 80 percent, the final percent compaction, after consolidation and saturation, was approximately 89 percent. For samples with an initial compaction of nominally 87 percent, the final percent compaction was approximately 92 percent. For samples with an initial compaction of nominally 95 percent, the final percent compaction was 97 percent. Note that the sample cited by BCI that experienced "almost" 20 percent "dry density" change is reported to have gone from 82.9 percent compaction to 99.4 percent compaction after being loaded and saturated. None of the other samples tested came close to 99 percent compaction, not even those that were initially



GA_RBL000010

compacted to 95 percent compaction. The data for the sample cited by BCI as exhibiting large "dry density" change is deemed by GA to be inaccurate and unreliable.

It is instructive to examine the other data from boring B-22-C and AU-66. The consolidation pressure had only a minor effect on the percentage volume change after applying a load <u>and</u> saturating the sample.

At the Reservoir, the additional stress on the protective lift was added BEFORE the wetting occurred. Ardaman's Milhorn testified at his deposition that the protective lift was completed at a uniform thickness of between two and three feet. Milhorn also stated that the protective fill was considered to be part of the wedge and when the horizontal lifts of fill were placed, the inspectors excavated down to the protective fill and tested the upper portion of the fill in the protective lift pursuant to the CQC plan. Milhorn testified that he considered that the inspection and testing pursuant to the CQC plan confirmed the fill used in the protective lift was compacted as specified.

GA's opinion is that significantly more than half the volume change in the protective fill took place during the placement and spreading of the fill due to heavy equipment traffic, vibrations, and fill loads during placement of the wedge fill. It is GA's opinion that the protective fill and dozer-tracked fill in erosion gullies, after being placed and spread with tracked equipment, would have a level of compaction between 87 and 90 percent of the standard Proctor dry density. As shown in Figure 2-1, it can be seen that at these initial compaction levels, the volume change after loading <u>and</u> wetting might be in the range of three to six percent. GA estimates that about three to five percent volume change would occur as a result of the placement of the horizontal lifts of fill, construction traffic, machine vibrations, increasing wedge loads, and soil-cement loads. GA estimates that during reservoir filling, the wetting might cause an additional one or two percent of settlement to take place in the protective lift and filled gullies. For a two-foot lift of protective fill, the amount of settlement during wetting from reservoir filling would result in between zero and one-half an inch of the settlement of the fill. This settlement in the protective lift would be reasonably uniform from the toe to the crest of the slope and thus would not cause unusual cracking in the soil-cement facing.

For the above and other reasons discussed in subsequent sections of this report, GA does not agree with the causation theory for soil-cement cracking stated by BCI in its rebuttal report.

### 2.2.3   Golder Associates reply to BCI criticisms of the Golder Associates report

BCI pg 17      GA used a permeability of the soil cement of 0.0028 ft/day not the mean value of its data of 0.127 ft/day.

GA             GA used a range of parameters for the wedge soil and the soil-cement. The permeabilities of the samples tested by GA were generally higher than expected. These samples were taken from stored samples that were not preserved for the express



Case 8:08-cv-02446-JDW-TBM  Document 349-20  Filed 05/19/11  Page 12 of 65 PageID 19900

purpose of measuring the permeability of the soil cement. The literature is fairly extensive in indicating, that when cement is added to soil and the mixture is compacted to a higher density than the embankment soils, the permeability of the soil-cement mixture is substantially less than the permeability of the compacted soil itself. The PCA document on Soil-Cement Information (1991) states that "since soil-cement has a low permeability, the soil-cement facing can add to the effectiveness of the impervious zone (pg 4)." Table 3 of the PCA document also indicates that the permeability of the soil-cement can decrease from 1 to 3 orders of magnitude by adding 9% cement by weight.

In its report (pg 82) GA stated the range of permeabilities is considered to be in the range of 0.003 to 0.3 ft/day. Since there is evidence of geotextile clogging and the fact that the geotextile was located immediately below the soil-cement, the soil-cement and geotextile could be considered as one unit that retarded the escape of water from the wedge. The effective permeability of the soil-cement/geotextile together would be at the lower end of the values used by GA, about 0.003 ft/day, as shown in Figure 5-25 of GA's report.

| | |
|---|---|
| BCI pg 18 | GA did not include either the "fluffy" zone immediately below the soil-cement or the protective lift of fill as more permeable zones in its transient seepage analyses. Inclusion of these zones would have provided some degree of under-drainage to reduce any excess pore pressure. |
| GA | No computer runs were reported in the GA report using different permeabilities for the fluffy zone or the protective lift. GA considers the range of permeabilities it used, along with varying the anisotropy, would bracket the range of conditions to be expected. |
| BCI pg 18 | GA did not take into account the potential relief of excess pore pressures through the construction "day joints" or through shrinkage cracks in the soil-cement. |
| GA | GA used a range of permeabilities for the soil-cement. It is considered that the range of permeabilities used would encompass the weighted average range of permeabilities for soil-cement, shrinkage crack effects, and geotextile. |
| BCI pg 18 | BCI states that excess water pressure beneath the soil-cement as the cause is wrong. |
| GA | GA considers that, during reservoir drawdown, the wedge fill as designed and as constructed is too impermeable to drain effectively and the soil-cement/geotextile over the wedge was too impermeable to permit water to drain through the upstream facing. As a result, excess water pressure did buildup during drawdown causing the soil-cement to crack. This occurred in places during the operational drawdown levels experienced in |



Golder
Associates

GA_RBL000012

2006-2008 and would occur during rapid drawdown. BCI concludes that excess water pressure under the soil-cement was not a major factor in causing the unusual cracking in the soil-cement facing at the Reservoir. GA disagrees with BCI on this issue.

BCI pg 19    GA never confirmed causation mechanism existed at any crack location. It is BCI's opinion that the GA explanation of why cracking occurred in a limited area and not around the entire perimeter is wrong.

GA    GA has explained a mechanism based on a reasonable degree of engineering certainty. Given the variation in permeability of acceptable fill soil, soil-cement thickness variations, variations in the competency of soil-cement because of lift thickness, delays in compacting the soil-cement, impact of inter-day joints, compaction, soil-cement mix variables, layering in the fill, difficulties in modeling the transient unsaturated behavior of the fill, unreliability of the QC and QC documentation, and other factors discussed in other sections of this report, GA does not believe it is possible to specifically identify what happened at any specific point around the Reservoir. The same comments can be applied to the BCI "void theory" of causation.

BCI pg 19    GA stated that excess water pressures were large enough to cause cracking during the first drawdown. No cracking was observed until the second drawdown in December 2006. Because GA did not predict the time sequence of cracking, its mechanism is wrong.

GA    Cracking was first observed in December 2006 by a Veolia inspector in a boat, and Carrier's September 4, 2007 memorandum (FDEP 19075 – 19088) states that the "cracks were not visible from the crest" of the embankment. No one knows when any of the cracks actually occurred. BCI implies that the date a crack is observed is the date the crack occurred – that would be highly improbable. Soil-cement could crack under water as the reservoir is drawn down; cracks could occur at times when no one is there to observe them. Given the above, BCI's comment that GA's mechanism is incorrect because it didn't predict when cracking was <u>observed</u> is not correct.

BCI pg 20    Extent of cracking – GA does not have good explanation for cracking between Sta 75 to 101 and Sta 225 to 254, a distance of 4,760 feet or 18 percent of the Reservoir.

GA    The distance along the Reservoir embankment between the stations cited above is 5,500 feet (21 percent of the length) not 4,760 feet. Figure 2-3 in the GA report dated January 8, 2010, shows unusual cracking (greater than 12 mm) between Sta 0 to 50, Sta 75 to 110, Sta 190 to 200, and Sta 225 to 262. The distance along the Reservoir embankment



between these stations is 13,200 feet or 50 percent of the length of the Reservoir. These cracks occurred during Reservoir operations less than the full operational drawdown. A significant portion of the Reservoir has experienced cracking. It is GA's opinion that the soil-cement throughout the Reservoir would crack under the rapid drawdown withdrawal condition, contrary to HDR's representation in its response to question 30 in RAI 2.

BCI pg 20   Timing of Cracking – GA does not have an explanation of why cracking did not occur during the first drawdown.

GA   This was answered above. The first crack was not necessarily observed on the same date that the crack actually occurred. With the mechanism proposed, cracks could form below the Reservoir water level; in which case these would not visible to an inspector.

BCI pg 20   Many of GA models predict the largest excess pore pressures at lower elevations in the Reservoir. The crack survey doesn't identify many cracks in lower portions of the soil-cement. Failure to predict elevations of cracks is a serious inadequacy of the excess pore pressure theory and begs for a more accurate and comprehensive causation theory.

GA   The soil-cement is a relatively brittle flat slab resting on the subgrade. Some shrinkage cracks may have formed at unknown locations. The thickness of the soil-cement varies at different locations. Given the above and other factors (for example, the variability in strength of the soil-cement, construction defects, etc.). the location of a crack is not necessarily the location where the maximum excess water pressure occurred. Structurally, cracks can occur due to shear or where bending moments in the slab are the greatest. These are often not where the load is applied. The soil-cement slab resistance properties are also affected by irregularities in the soil-cement as constructed.

BCI pg 21   Formation of voids – GA mechanism must explain damage that resulted from voids under the soil-cement. GA cannot explain voids without invoking rainfall. GA explanation is unrealistic...

GA   BCI's comments on the GA mechanism are biased with the precondition that the **"damage… resulted from voids…"** There is no evidence that the voids, per se, were the cause of the initial soil-cement cracking. In fact, in some of the test pits, cracking was noticed where there were no voids beneath the soil cement. In the B&V test pit report dated February 20, 2009, the test pit at Sta 90+40 did not encounter voids. See the sketch on B&V's pg 3-4 and Figure A-15. Also note the erosion feature on B&V's Figure A-10 at Sta 251+30. GA discussed that the upper portion of the wedge was less compacted (fluffy zone) and described the evidence to support that finding. In November



2007 Ardaman reported (ARD-28155 to ARD-28166) that it encountered no voids under the soil cement slab at 21 locations in the southwest and northeast areas that first experienced unusual cracking. Also Carrier of Argila Enterprises, Inc., testified during his deposition on April 1, 2010, that "after the initial cracking there was erosion underneath the soil cement and additional movement and additional cracking" (pg 135, line 23). There is evidence that unusual soil-cement cracks at locations where there were no voids under the slab and that soil erosion features were observed under the slab in other locations.

As excess water pressures increase and exceed the weight of the soil-cement, the soil-cement begins to lift, a small void is created. Due to the excess water pressure some water flows into and along the crack to areas of low water pressure. This sub-slab movement of water can erode the upper surface of the wedge and transport soil material. These erosion features were observed in some of the test pits excavated by B&V.

In his September 4, 2007 memorandum, Carrier commented on the observed cracking. Carrier stated the topmost crack occurred at El. 129 and a second crack was at El. 125. Carrier stated the soil-cement on the upslope side of the crack moved outward and the downslope soil-cement moved inward; this crack pattern suggested to Carrier that high water pressure was the cause of cracking. The B&V slope survey report dated February 20, 2009 shows cross sections where there is a drop in the soil-cement in the range of El. 110 to El. 120 and rise or bulge in the soil-cement in the range of about El. 90 to El. 100. This condition is present at many of the surveyed sections. Note that B&V prepared a memo on the "Erosion Feature Investigation" dated February 18, 2009. The physical evidence is consistent with the GA causation mechanism. The BCI void creation and collapse theory cannot explain how the soil-cement surface appears to have been pushed up above a crack and is higher than the design elevation (bulged) at many locations (particularly in the lower part of the slope). It is GA's opinion that many of the voids that have been observed were not collapse voids but were erosion initiated voids.

BCI pg 22      The 37 feet by 37 feet by three-story building example for grout take. Where did all the soil go?

GA      There are photos and evidence of soil material being washed out from ungrouted boreholes. There were a number of significant drop outs in the soil-cement as a result of erosion. A large drop out in the soil-cement facing took place at Sta 244 around June 24, 2008. This drop out was caused by erosion through an ungrouted borehole (c.f. CAR0024002). As another measure of 55,000 cubic feet of grout, a void of only 0.5 inch under a Reservoir length of 13,200 feet by 100 feet of slope length is equal to 55,000


Golder
Associates

Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 16 of 65 PageID 19904

cubic feet. The dimension 37 feet sounds large but not when considering 1,100 acres (just under two square miles) of Reservoir or five miles (26,300 feet) of Reservoir perimeter. There has been movement of material beneath the soil-cement and there has been erosion of wedge soil from under the soil-cement. BCI stated that it saw no significant redeposition in the Reservoir bottom of eroded material from the sidescan sonar surveys. The Reservoir footprint covers about 1,100 acres. For sake of example, if eroded soil redeposition took place over only 550 acres of Reservoir bottom, the thickness needed to accumulate 55,000 cubic feet would be 0.0276 inches or less than 1/32 of an inch. GA is not aware of sidescan sonar survey equipment that can detect such minimal changes in accretion using elevation changes. Areas representing positive "elevation differences" were measured with the sidescan sonar survey and shown on BCI Figure IX-1. For example, BCI Figure IX-1 indicates a positive elevation difference of one to 2.5 feet near the upstream toe between Sta 242 and Sta 247 based on the sidescan sonar survey. If the approximate width of the depositional area is taken to be 50 feet, then the volume of the depositional area between Sta 242 and Sta 247 represents approximately 25,000 cubic feet of material.

| | |
|---|---|
| BCI pg 23-24 | BCI comments on future performance and notes that GA recommends repairing the entire Reservoir. BCI states it demonstrated that GA's mechanism is not credible and BCI states that it is wrong. BCI recommends doing nothing to repair the soil-cement facing but monitoring and observing any future cracking. |
| GA | GA has outlined a mechanism that explains the data and physical evidence at this site. Because of a multitude of variables, no one can predict with pin point accuracy what has or will happen at any given point in the Reservoir. GA agrees with BCI that, at this point, there is no data to suggest that there is a structural integrity issue with the embankment itself. GA does not agree with BCI that simply monitoring and observing future cracks is a prudent approach. In its response to RAI 2 question 30 in June 2001, HDR represented to FDEP and to TBW that the design it proposed would provide for: |

- Operational Drawdown – "The results...shows that the phreatic surface within the reservoir embankment upstream of the geomembrane is at the same elevation as the reservoir pool elevation as it is lowered. Therefore, a pressure imbalance does not occur that could cause instability of the soil-cement facing."

- Emergency Operational Drawdown – "These results are the same as for the operational drawdown case indicating the effectiveness of the internal geomembrane and the interior drain to control the location of the phreatic surface during drawdown. From the perspective of embankment stability (including the stability of the soil-cement facing), the withdrawal rate could be increased; to rate suggested to be hydraulically feasible."



GA_RBL000016

■ Rapid Drawdown – "The elevation of the phreatic surface upstream of the geomembrane exceeds the pool elevation of 72 ft indicating that there is seepage out of the slope face. However, the soil-cement facing stops at EL 74.7 and the slope below EL 74.7 flattens from 3H to 1V to 5H to 1V...Therefore, this connection should perform satisfactorily during rapid drawdown."

HDR represented to the FDEP, and to its client TBW, that the design for the Reservoir, including the stability and adequacy of the upstream flat-plate soil-cement facing would perform satisfactorily under all operating conditions, including the rapid drawdown condition. About one-half the soil-cement facing has experienced unusual cracking and the Reservoir has been subjected drawdowns at less than full operational drawdown. GA has articulated a mechanism that explains the behavior of the Reservoir to date that is mechanistically and kinematically consistent with the performance data. This mechanism is that excess water pressures were the "trigger" that caused the soil-cement distress. Given that, all the soil-cement facing will exhibit unusual cracking and distress if, and when, the Reservoir is subjected to the rapid drawdown condition. For that reason soil-cement repairs must be applied to all the soil-cement facing in order for TBW to have a Reservoir that will be stable under all conditions it might be subjected to (e.g. rapid drawdown), and that HDR represented would not cause any damage ("perform satisfactorily").

## 2.3    GEI Report – Preliminary Evaluation of Basis of Claim against HDR Engineers, Inc.

### 2.3.1   GEI causation theory

In Section 2 (pg 3), GEI indicates that HDR asked GEI to investigate and make an independent evaluation of HDR's performance relative to its standard of care duty to TBW for engineering design and construction support for the embankment components. GEI does not offer its explanation or theory on why the Reservoir experienced unusual cracking in the soil-cement facing that has occurred.

### 2.3.2   Golder Associates reply to GEI causation theory

No theory was proposed by GEI. Therefore, GA has no response to GEI on causation.

### 2.3.3   Golder Associates reply to GEI criticisms of Golder Associates report

GEI pg 92-93    HDR concluded that any differential water pressure under the soil-cement could drain through the soil-cement because the geomembrane was moved into the embankment after June 2001. HDR based its design on PCA, USACE, and USBR guidance manuals.



Case 8:08-cv-02446-JDW-TBM  Document 349-20  Filed 05/19/11  Page 18 of 65 PageID 19906

GA          Guidance manuals are what the name implies – "guidance" and provide a good place to start the design and evaluation of a site specific design. Guidance documents are never published for a designer's reliance in lieu of evaluating the site specific data and conditions. In GA's opinion, relying completely on published guidance information and not considering or analyzing actual design and site conditions does not meet the standard of care specified in the contract. As GA noted in its report, other published references (e.g. Cedergren, 1977) address the necessary permeability of a soil in order for it to be free draining during drawdown. Standard, generally accepted engineering publications that were available at the time, such as Cedergren's 1977 <u>Seepage, Drainage, and Flow Nets</u>, do not seem to have been used by HDR.

GEI pg 94    HDR based its design on the understanding that pore pressures would be relieved through the soil-cement. HDR modeled for slope stability, not for uplift under the soil-cement. Most of the accusations made by GA against HDR are framed as improper modeling of uplift.

GA          HDR's June 2001 response to question 30 in RAI 2 states that it modeled the drawdown of the phreatic surface in the wedge, upstream of the geomembrane and that its modeling showed that **"a pressure imbalance does not occur that could cause instability of the soil-cement facing."** HDR stated that the design was safe, including the upstream soil-cement facing, for the operational, emergency and rapid drawdown conditions. GEI's statements about HDR not modeling the excess water pressures under the soil-cement are not consistent with the response given by HDR in RAI 2 in June 2001.

GEI pg 94    GEI is aware of HDR's response to question 30 in RAI 2 because it quotes part of HDR's response on pg 94. With respect to HDR's modeling, GEI states that, **"[T]he cross-section plots from the SEEP/W output show relatively flat phreatic surfaces in the wedge soils as the Reservoir level drops. We would expect that the phreatic surfaces would have a noticeable slope from the geomembrane to the embankment slope with the slope being steeper during faster drawdowns. The plots do not show this steeper phreatic surface; however modeling of these phreatic surfaces was not critical to the wedge design for uplift based on the guidance current, in 2001 from PCA, USACE and USBR. HDR relied on these soil-cement guidance documents in concluding that seepage/uplift was not a problem."**

GA          From the above it can be seen that HDR did model the seepage from the wedge during drawdown. GA in its report stated on pg 61 **"…that a competent engineer performing a reasonable technical review would have recognized that the drawdown surfaces**


Golder
Associates

predicted by HDR in its transient modeling of the wedge, especially for the rapid drawdown case, were incorrect, because the embankment fill was to be constructed with SM and SC soils." GA's assessment is confirmed by GEI's recognition that the drawdown surfaces (phreatic levels) predicted by HDR in its apparent transient modeling were not what GEI "expected." Accordingly HDR should have recognized the results of its analyses predicting the drawdown surfaces in the wedge were incorrect. This unrecognized modeling error had a major impact on the performance of the soil-cement during reservoir drawdown because of the buildup of excess water pressures under the soil-cement. It appears, however, that the technical reviews done after June 2001 were more procedural and concentrated on making the specifications and drawings consistent rather than carefully considering the details and impacts of the modified design. Given the above, GA is surprised that GEI states the HDR site specific modeling efforts are not important because HDR relied totally on general published guidance documents rather than the site specific analyses for its design. GA's opinion is that the HDR transient seepage modeling was incorrect and that excess water pressures under the soil-cement were high enough to damage and crack the soil-cement. HDR did not meet its standard of care as required by its contract by only relying on published guidance information for the design of the soil-cement facing for this project.

GEI pg 102    HDR based its design on industry understanding that uplift of soil-cement facing was not a problem. Consequently, HDR did not try to model uplift under the facing. GA misses or ignores the basis of HDR's design -- that uplift of soil-cement was not considered to be a problem.

GA            The cited guidance does not categorically state that uplift is not a problem, and an engineer in responsible charge for the design of a critical structure like the Reservoir would be remiss by not critically reviewing these documents as they relate to its design. PCA (1991) on pg 6 states, **"Special provision against rapid drawdown seems to be a needless expense <u>in most cases</u>."** [emphasis added]. In the USBR Design Standards No. 13 (1990) states on pg 30 that, **"There is some debate as to whether drainage of the soil-cement facing should be provided...The unrelieved pressures may be sufficient to displace the facing, possibly resulting in cracking, distortion, or slipping of the facing. However, none of these conditions have been observed in any Reclamation projects to date."** The USACE Appendix G on the use of Soil Cement of Levee Protection (April 2000) states on pg G-7 that the current thinking is that drainage is not required unless severe drawdown is anticipated. **"...the designer should be aware of the preventative measures that can be used."** The USACE



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 20 of 65 PageID 19908

manual describes various methods to mitigate excess water pressure build up. One is to develop a design with the least permeable material adjacent to the soil-cement. Second is to determine the weight of the facing necessary to resist excess water pressures. Some estimate must be made of the gross permeability of the soil-cement. A third measure is to provide drainage conduits through the soil-cement. GEI cites in several instances that the guidance publications refer to a drawdown more than 15 feet in a few days as a limit when drawdown may be a problem. GA considers that a competent geotechnical engineer would know that the capacity of the fill materials, geotextile, and soil-cement to dissipate water pressures during drawdown cannot be generalized as a blanket recommendation for every project and application. GA does not agree with GEI's statement that a reasonable, competent engineer would base its design on guidance document publications and not assess site specific soil parameters, soil-cement permeability, geotextile filter and permeability characteristics, drainage mechanisms, drawdown rates, and other design details when designing a major facility like a 15 billion gallon reservoir. In its report, GA provided references to standard, generally accepted engineering publications, such as Cedergren's 1977 <u>Seepage, Drainage and Flow Nets</u>, that were available but not used by HDR to make even simplified, or first order, evaluations of the ability of the wedge, geotextile, and soil-cement at the Reservoir to adequately manage water pressures during drawdown.

On October 30-31, 1979, a Florida Power & Light cooling water embankment (Martin Plant) failed. The Interim Final Draft Report on this failure stated (pg 1-6, SFWMD, 1980) that, **"The soil cement slope protection collapsed in place, ending in a heap along the embankment except in the very center of the breach."** The soil-cement facing cracked and shifted during rapid drawdown caused by a dam breach. Anwar Wissa and John Garlanger of Ardaman were appointed to the investigative committee by the Department of Environmental Regulation (predecessor to FDEP) after the failure. Since Ardaman was involved in many aspects of the investigation and design of this Reservoir as a subcontractor to HDR and since Wissa was in some of the meetings with HDR, it is surprising that the HDR team relied only on the PCA, USACE, and USBR guidance documents and did not consider whether damage to the soil-cement facing could occur on the Reservoir given the experience some of the team members had 20 years earlier in Martin County, Florida.

The guidance information is clear that:

–   the designers must be aware the **excess** water pressures beneath the soil cement are a design concern,



    – the magnitude of these pressures should and could be predicted with the application of standard, generally accepted methods that were available, and

    – an estimate must be made of the effective permeability of the soil-cement.

It is GA's opinion that GEI is incorrect when it portrays the guidance information in the PCA, USACE, and USBR manuals as saying uplift is never a problem and that HDR met its standard of care by ignoring the uplift issue under the flat-plate soil-cement at the Reservoir project using only the generalities in the guidance documents.

| GEI pg 105 | GA seepage modeling shows uplift pressures only when assuming the soil-cement facing does not crack. GEI discusses the range of permeability values used by GA. |

**GA**      GA analyzed transient seepage with a range of soil and soil-cement permeability values. GA varied the permeability of the unsaturated soil to reflect changes in the permeability that would occur during reservoir drawdown resulting in desaturation of the soil in the wedge. GEI neglects to recognize the evidence of geotextile clogging and the fact that the geotextile was located immediately below the soil-cement. In locations where geotextile became clogged, the soil-cement and geotextile could be considered as one unit that retarded the escape of water from the wedge. GA considers the range of parameters used bracket the most probable range of conditions that are present at the Reservoir. Based on the above and the modeling that was done, it is GA's opinion that **excess** water pressures that were generated during reservoir drawdown were the trigger for the distress observed at the Reservoir.

**GEI pg 107**      GEI states that HDR told them that it did transient seepage analyses. GEI states they checked the HDR documents and confirmed that HDR did transient analyses. GEI states they did cracked soil-cement transient analyses using SEEP/W and were not able to generate uplift pressures which could cause uplift of the soil-cement.

**GA**      The documents reviewed by GA indicate that HDR represented that it performed transient analyses. It is GA's opinion that HDR analyzed a series of steady-state seepage conditions for different reservoir levels and presented the results of these analyses as predicting transient behavior during reservoir drawdown. A transient seepage analysis would show a slope in the phreatic surface in the wedge like GA's analyses show and as GEI indicated they would expect.

GEI indicates they reviewed the HDR documents and confirmed that HDR ran transient analyses. TBW requested these documents from HDR, but HDR has not produced the computer input files and other key information to confirm what HDR did. HDR



Golder Associates

Case 8:08-cv-02446-JDW-TBM    Document 349-20    Filed 05/19/11    Page 22 of 65 PageID 19910

represented that the computer input files were stored on a single laptop computer that was stolen in 2006.

GEI analyzed transient seepage assuming the flat-plate soil-cement was cracked with a crack spacing of 10 ft. GEI does not report:

- The initial conditions used in the seepage analysis for the rapid ("fast") drawdown or the actual drawdown measured.
- The crack width assumed in the seepage analysis.
- The permeability assigned to the cracks in the seepage model.
- The assumption to account for the effect of geotextile clogging.
- How the differential water pressure was calculated.
- The unsaturated material properties of the embankment fill.
- The geometry of the cross-section used in the seepage analysis.

GA performed seepage analyses for the rapid drawdown (or "fast drawdown" as referred to by GEI) assuming a crack spacing of 10 feet. The GA analyses indicate that excess water pressures (uplift pressures) under the soil-cement exceeding 2.8 feet are predicted with 3-inch-wide cracks.

| GEI pg 107 | Independent reviews of wedge design. |
|---|---|
| GA | The wedge design evolved from meetings in May 2001 with the FDEP regarding safety of the upstream region during drawdown greater than the operational rate. Notes by Dr. Carrier in January 26, 2001 (CAR0000553) indicated at that time he was thinking about a more rapid rate of drawdown than the operational rate. |

Peer reviews were done in 2000 during the design development. None of the early reviews were done on a design with the wedge in place. GEI notes on pg 33 that in April 2001, before the wedge design, a review workshop produced a total of 310 comments on the specifications and 163 comments on the drawings. GEI states that, **"The majority of the comments requested clarifications, corrected typographical errors, or refined the document. Three comments resulted in changes to the embankment design."** Most of the constructability and review comments GA reviewed addressed issues with specifications and drawings. Reviews can take many forms. It would take a comprehensive technical review where the reviewer actually looked at the data, model assumptions, and computer input and output files to be able to assess the reasonableness of a design or identify technical inaccuracies. Only HDR or its subconsultants were responsible and contracted to provide this level of review on this project. The project records reviewed by GA indicate that this level of review was not



|  | done by anyone for the wedge design. Given the foregoing, it is GA's opinion that regarding technical review, HDR did not meet the standard of care on this project as stated by GEI. |
|---|---|
| GEI pg 108 | GEI QC testing – texture, gradation, and color issues. GEI states that HDR did specify testing to confirm the embankment was placed without layers, lenses, or materials that differed substantially in texture or gradation. |
| GA | Fines percentage does not address all of the issues included in the above specification. GEI does not state just what tests were done to confirm there were no lenses or layers in the fill. Note that the PCA manual (1991) that GEI cites includes a description of soils; page G-15 under the section on "Soil" states: **"The inspector should check for uniformity of color, texture, and moisture."** One method to verify that fill was being placed such there were no layers, lenses, or materials that differed substantially in texture or gradation would be to specify that test pits should be excavated at specific intervals during construction. Nothing like this was specified by HDR in its QC program, and Ardaman's Milhorn confirmed this in his testimony. Recall that, during his deposition for administrative hearings in 2001, Mr. Rick Donovan of HDR testified that the embankment **"... would be relatively homogeneous" and that the fill would be "disked and bonded together so you get a homogeneous mass. You don't have a series of poker-chip layers."** (HDR_DONOVAN000382 – 386; DONOVAN003092). Coupling Mr. Donovan's testimony with the requirements HDR listed in the specifications, there is clear evidence of HDR's objective for the level of homogeneity it needed during construction to satisfy its design. |

## 2.4    5RMK Report – Performance Assessment of Barnard Construction Company's Construction of the Tampa Bay Regional Reservoir

### 2.4.1    5RMK causation theory

5RMK does not articulate any theory on why the Reservoir experienced unusual cracking in the soil-cement facing. 5RMK provides opinions on Barnard's failure to properly construct certain portions of the project.

### 2.4.2    Golder Associates reply to 5RMK causation theory

GA has no response to 5RMK on causation.



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 24 of 65 PageID 19912

### 2.4.3  Golder Associates reply to 5RMK criticisms of Golder Associates report

5RMK did not criticize GA's analyses and opinions. Although some of 5RMK's opinions generally support GA's opinions regarding deficiencies in Barnard's construction and quality control practices, it fails to recognize the related deficiencies in HDR's and CDG's implementation of their respective CQC and CQA plans which could have identified, and led to the timely correction of, the construction deficiencies that contributed to the unusual cracking of the soil-cement facing.

## 2.5     Robert Johnson Report – Expert Report – Relating to Role and Responsibility of Tampa Bay Water on the C.W. "Bill" Young Reservoir Project

### 2.5.1  Johnson  causation theory

Johnson was retained to comment on the role and responsibility of TBW.  Johnson did not provide an opinion on causation other than stating (pg 6) that the cracking problems may have been caused by improper construction.

### 2.5.2  Golder Associates reply to Johnson causation theory

GA has no response to Johnson on causation.

### 2.5.3  Golder Associates reply to Johnson criticisms of Golder Associates report

No criticisms were made on the GA report.

## 2.6     Devo Seereeram Report (Devo) – Assessment of the Cause of Distress to the Upstream Embankment of the C. W. "Bill" Young Reservoir, Hillsborough County, Florida

### 2.6.1  Devo causation theory

Devo states (pg 9) in its introduction:

1. The distress to the upstream soil-cement is the result of shallow stability failures in the wedge, which occurred during the first and/or second drawdown cycles.

2. If any clay lenses did exist they didn't cause or contribute to the soil-cement distress.

3. GA did not properly model the final seepage face within the embankment following drawdown.  Devo stated that GA used **"(steady-state) water levels after drawdown, which is not consistent with the water levels which would occur in a poorly drained earth embankment after rapid drawdown."**

4. Slope stability failures are the exclusive result of HDRs design defects and not related to work of Barnard.



- Permeability used by HDR for embankment is not representative of the embankment fill
- HDR did not perform transient seepage analyses
- HDR did not perform a stability analysis consistent with the Duncan, Wright, and Wong methodology
5. The type, gradation and texture of embankment satisfied the specifications.

### 2.6.2   Golder Associates reply to Devo causation theory

GA notes that Devo's theory on causation (i.e., slope failures in the wedge during drawdown) is caused by the inability of the wedge material to drain rapidly enough during drawdown to prevent a substantial slope to the phreatic surface in the wedge zone. This inability of the wedge to drain is also what creates the excess pore water pressure behind the soil-cement facing. In assessing the distress to the soil-cement facing at the Reservoir, GA considered the impacts of the capacity of the wedge to drain coupled with the low permeability of the soil-cement/geotextile facing would have on slope instability and on the buildup of excess water pressure beneath the soil-cement. For the reasons discussed below, GA does not agree with Devo that the distress to the soil-cement facing resulted from slope failures.

On pg 104 of its report, GA explained its interpretation that shear zones observed in two of the test pits in the southwest area occurred during construction of the wedge when heavy equipment and loaded haul trucks were operating near the edge of the fill as the wedge was being constructed (and before the soil-cement was installed). GA's interpretation is supported by photographs of the test pits which show that the shear zones did not coincide with any pronounced shear displacement in the soil-cement and that the soil-cement was not thicker on the downslope side of the scarp. For these reasons, GA does not consider the shear displacement occurred during soil-cement placement or anytime after, including during Reservoir operations.

GA observations and B&V surveys indicate the upstream Reservoir slope, toe, and bench locations are reasonably close to their design locations. In areas of the more unusual cracking, there is no evidence of a "toe bulge" or other geometry to define a limit equilibrium failure surface.

Devo based its opinion on the results of two approaches to slope stability analyses using limit equilibrium methods. In the first approach, Devo incorrectly applies a method put forth by Duncan, Wright and Wong (1990); this is discussed in more detail in the next section. In the second approach, Devo analyzed stability by using pore water pressures that it imported from a transient seepage analysis. However, this approach does not fully couple the seepage and stability analyses since it neglects the changes in pore water pressure during shear. According to Duncan and Wright (2005):

> "the pore pressure changes during drawdown depend on the changes in stress
> that result from the changing water loads on the slope and the undrained response
> of the soils within the slope to these changes in load. While the changes in stress
> can be estimated with reasonable accuracy, particularly at shallow depths beneath
> the surface of the slope, the undrained response of the soil is much harder to


Golder Associates

GA_RBL000025

> **estimate. The changes in pore pressure are considerably different for materials that tend to dilate during shear and those that do not. Although in principle it is possible to estimate these pore water pressures, for example, by using Skempton's pore water pressure coefficients (Skempton, 1954), in practice this is difficult and the results are uncertain (p. 152)."**

Devo stated that the layering that was observed did not cause or contribute to the soil-cement distress. GA disagrees. To properly function, the wedge must drain as the reservoir level falls. The geomembrane is effectively impervious, and the soil-cement is considerably less permeable than the wedge material. Therefore, a dominant pathway for water drainage from the wedge is downward, though the foundation soils and into the Reservoir. Since layering of embankment fill was observed in the test pits and confirmed by laboratory testing during the post-cracking investigations, the most impervious layers or lenses in the wedge substantially reduce the effective vertical permeability of the wedge. This retarded downward flow and contributed to the buildup of excess pore water pressures. GA does not consider that Barnard met the specification for placement of the embankment and wedge materials without layers, lenses, streaks, or material differing in texture.

### 2.6.3   Golder Associates reply to Devo criticisms of Golder Associates report

Devo pg 9      GA did not properly implement Duncan, Wright and Wong (DWW) method in its slope stability analysis. Devo (pg 15, attachment F, memo #3) stated:

> That GA "...failed to define the correct water level conditions immediately after rapid drawdown occurs." It "...**appears that Golder assumed steady-state conditions for the water table after drawdown, as seen in Figure 5-33 from their expert report dated January 8, 2010...In these figures, the final water level in the embankment soils appears flat, indicative of steady-state conditions, and not the conditions which would be expected to occur immediately after drawdown."**

> **"However, it is the opinion of Devo Engineering that the post-drawdown water level conditions which Golder appears to use are inappropriate, since they do not describe a saturated embankment after rapid drawdown."**

GA            The GA analyses were based on a drawdown from the maximum pool elevation at El. 136.5 to El. 90 which represents the levels following the first and second drawdown cycles. GA considered that:

- prior to drawdown, the pore water pressures were at steady-state conditions with the water level in the upstream wedge equal to the maximum pool elevation of El. 136.5; and,

- after drawdown to El. 90 and steady-state seepage conditions were reestablished, the water level in the upstream wedge was at elevation 90 ft.

The USACE Engineering Manual on Slope Stability, EM 1110-2-1902 (2003) provides guidance on using the DWW method for stability of slopes during rapid drawdown. Page G-8 of this manual states:



"c. Second-stage computations. The second stage computations are performed to calculate stability immediately after drawdown, assuming that all low-permeability materials are undrained. The low-permeability materials are assigned undrained shear strength values calculated from Equation G-12, with $\varnothing$ set equal to zero. Effective stress shear strength parameters are used for materials that drain freely, and appropriate pore pressures are prescribed. <u>The pore water pressures for free-draining materials are those after drawdown has occurred and steady-state seepage has been reestablished. The pore water pressures in the low permeability materials are set to zero.</u> If a portion of the slope remains submerged after drawdown, the external water pressures acting on the submerged part of the slope are calculated and applied as external loads to the surface of the slope." (emphasis added)

The criticism by Devo that GA did not use saturated embankment conditions after rapid drawdown (second-stage) is not correct. In the second stage calculations, it is assumed the materials are undrained (i.e. saturated); however, the pore pressures are based on the steady-state seepage level after drawdown. This is the procedure described in the DWW methodology as described in their 1990 technical paper and as described in the Corps' EM 1110-2-1902. It is the opinion of GA, after considering the statements of Devo, that GA properly applied the DWW approach and that Devo is incorrect in the methodology it applied in computing the factor of safety of the Reservoir slopes. The Devo approach would predict substantially lower factors of safety but they are incorrect because they are not in agreement with the DWW prescribed methodology.

GA contacted Dr. Stephen G. Wright, Emeritus Professor at the University of Texas at Austin, regarding the Duncan, Wright, and Wong method. Wright was one of the three co-authors of the Duncan, Wright, and Wong (1990) technical paper, and he was the author of the U.S. Army Corps of Engineers EM-1110-2-1902 Slope Stability Engineer Manual (2003). Wright confirmed that for the method prescribed in Appendix G of EM-1110-2-1902 (2003), the pore water pressures entered for the second and third stages must represent the pore water pressures after drawdown and complete drainage (re-establishment of steady-state seepage with the lowered water level). Wright confirmed this opinion via electronic mail to W. Randall Sullivan of GA following their communication by telephone.

The cross section, shown by Devo in Exhibit 4 of attachment F, illustrates the location of the water level used by Devo in its second stage analysis. After reviewing the DWW methodology, speaking with Wright, and reviewing Devo's Exhibit 4, it is GA's opinion that it properly applied the DWW methodology and that Devo did not apply the DWW method properly and hence erred in calculating the factor of safety for slope stability. The Devo factors of safety are too low because of its assumption of the location of the post drawdown water level. Therefore, Devo was incorrect in indicating GA "...failed to



define the correct water level conditions immediately after rapid drawdown occurs" (pg 15). Given the above, it is GA's opinion that the factors of safety during rapid drawdown GA calculated are correct and that the factors of safety calculated by Devo are incorrect.

Figures 1.1 to 1.3 and 2.1 to 2.3 of Devo's Attachment F illustrate the critical failure surfaces calculated by Devo. All show the toe of the failure shear surface exiting the slope just above to just below the upstream bench. In addition, with calculated factors of safety around 0.92 to 0.93, Devo did not explain why its predicted shear failures did not occur around the entire Reservoir. GA did not observe any evidence of shear failure or shear displacement anywhere in the Reservoir near the bench elevation. It is GA's opinion that the shear failures, as calculated by Devo, did not occur at the Reservoir.

## 2.7    Rizzo Report – Forensic Investigation Soil-Cement Cracking, C. W. Bill Reservoir

### 2.7.1    Rizzo causation theory
Rizzo states (pg 1) that it undertook a forensic analysis that **"...targeted the stability of the slope during the initial five steps of filling and drawdown of the reservoir..."** Rizzo only reports results of seepage and stability analyses. Rizzo concluded that, **"Excess differential water pressure in the soil wedge associated with HDR's defective design was the sole cause of slope failure and collapse. The failed /collapsed soil wedge caused the cracking of the soil-cement" (pg 19).** Rizzo concluded that a series of very shallow, overlapping limiting equilibrium shear failures occurred. Individual shear failures, just above and below the reservoir level, occurred as the reservoir was lowered.

Rizzo concluded that the permeability value selected by HDR for the embankment soil was too high and challenged the permeability value reported by Law in its two site characterization reports in 1999 and 2000 (pg 6).

Rizzo concluded that the geotextile below the soil-cement was clogged and that clogging significantly reduced the ability to drain water from the wedge, resulting in higher uplift pressure on the soil-cement facing (pg 8).

Rizzo concluded that the manner in which the wedge and soil-cement were constructed did not cause, contribute to, or aggravate the slope failures or soil-cement cracking (pg 19).

### 2.7.2    Golder Associates reply to Rizzo causation theory
From the Rizzo report, it appears that Rizzo had a preliminary bias that slope stability was the cause of the failures; its investigation only considered slope stability and how seepage affected stability.



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 29 of 65 PageID 19917

The parameters selected for the Rizzo modeling are very important in understanding its results. Rizzo used a permeability of the soil-cement of 0.0013 ft/day in all its modeling. This value, reported in the GA report, comes from an ACI (1997) publication using four samples. If all six samples in this reference were used, the permeability would be 0.0023 ft/day or about twice the Rizzo value. The 1986 ICOLD publication reports that permeabilities of soil-cement can be reduced, in most cases, to less than 0.0028 ft/day. GA, in its report, considered the lowest soil-cement permeability value in its analyses to be 0.0028 ft/day. The lower soil-cement permeabilities significantly retard drainage out of the wedge and increase the excess pore pressures behind the soil-cement. GA considers a permeability of 0.0013 ft/day too low to be representative of all the soil-cement. GA conducted a variety of analyses where the permeability of the soil-cement was varied from 0.0028 ft/day to 0.28 ft/day. The very low permeability used by Rizzo for the soil-cement and the resulting excess pore water pressures that resulted from this assumption, forced the factors of safety for the Rizzo stability analyses to be lower than actually exist at the Reservoir.

Rizzo used an angle of internal friction of the soil-cement in all its slope stability analyses of 34 degrees which is the same strength as the embankment soil. Rizzo analyzed additional slope stability cases using embankment shear strength values of 32 and 30 degrees in addition to 34 degrees. In essence, Rizzo modeled the soil-cement as having a very low permeability but the same strength as the soil. The soil-cement is a weak concrete. The 28-day average unconfined compressive strength of the soil-cement reported by Argila, based on 240 tests, was 490 pounds per square inch (psi). When excavating the test pits in the Reservoir, workers had to use a diamond saw to cut the soil-cement. The soil-cement is much stronger than the embankment soil, particularly at low confining stresses.

The factors of safety for slope stability calculated by Rizzo are strongly biased to show shallow localized failures because it used a low permeability value for the soil-cement and also assumed the soil-cement had the same strength parameters as the embankment soil. GA analyses indicated that a soil-cement strength of only a fraction of the average unconfined compressive strength were sufficient to prevent the shallow shear failures reported by Rizzo.

Rizzo used SLOPE/W for its stability analyses. SLOPE/W is a two dimensional, limit equilibrium model. As such, it is not possible to determine if "progressive failure" occurs for a given critical failure surface. Figure 5-6 is labeled Progressive Slope Instability. What is shown are a series of shallow failure surfaces that overlap; in a conventional sense, these do not demonstrate progressive failure. It is GA's opinion that, if Rizzo modeled the upstream face by assigning a modest unconfined compressive strength to the soil-cement and did not use the lowest possible permeability of the soil-cement, none of the surfaces shown in Figures 5-3, 5-4, 5-5, 5-6, or 5-7 would have a factor of safety below the acceptable level for slope stability. Furthermore, the coupled seepage and stability analyses applied by Rizzo is similar to the second approach taken by Devo. However as described in a previous section of this report, this



GA_RBL000029

approach does not fully couple the seepage and stability analyses since it neglects the changes in pore water pressure during shear.

The Rizzo causation theory and analyses do not explain why the series of shallow stability failures did not occur everywhere in the Reservoir. With calculated factors of safety in the range of 0.9 it would be expected that the predicted "slope failures" would have been much more widespread around the Reservoir.

Rizzo states (pg 16) that Figure 5-7 is representative of conditions at Sta 250. Figure 5-7 shows the exit location for the failure surface at El. 85 which is the elevation of the bench on the upstream slope. There is no physical evidence near the bench at this location to indicate a massive shear zone. The soil-cement is not displaced or unusually cracked at this location. GA did not observe any evidence of a toe bulge or the exit location of a slide surface at the toe of the embankment anywhere around the Reservoir. The B&V survey at Sta 250 shows a drop in the soil-cement around El. 120 but the Rizzo critical failure surface "scarp" location is at El. 124.6; the soil-cement is not unusually cracked or displaced at this location. Rizzo's Figure 5-7 does not explain the distress observed around Sta 250.

Given the above, it is GA's opinion that the causation mechanism described by Rizzo and the schematic sections shown in Figures 5-6 and 5-7 are incorrect and did not occur at the Reservoir.

### 2.7.3 Golder Associates reply to Rizzo criticisms of Golder Associates report
No comments because Rizzo did not comment on the GA report.

## 2.8 Freese and Nichols Report (FNI) (Rutledge) – Analysis of the Design and Construction of the Soil Cement at the C. W. "Bill" Young Regional Reservoir

### 2.8.1 Freese and Nichols causation theory
FNI is critical of HDR and asserts that the design is flawed; however, FNI does not state a causation theory but rather states that HDR did not account for the **"potential"** failures that a higher phreatic surface would **"likely"** cause such as uplift of the soil-cement, slope failures, or both.

### 2.8.2 Golder Associates reply to Freese and Nichols causation theory
FNI offers the opinion that, when the design was changed to include the "wedge," HDR failed to provide for a competent foundation for the soil-cement under all reasonable drawdown conditions or providing drainage that allowed the wedge to drain. FNI is of the opinion that HDR assumed the wedge and soil-cement had the same permeability; HDR effectively assumed there would be no excess water pressures. FNI considers this to be a fundamental design flaw that led to the damage observed (pg 9). FNI



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 31 of 65 PageID 19919

considers the GA value of effective permeability of the soil-cement of 0.028 ft/day to be reasonable for the soil-cement in an "as normally cracked" condition. FNI is of the opinion that when the geotextile is placed immediately under the soil-cement the effective permeability of the soil-cement/geotextile layer is 0.003 ft/day. This is the lower limit of the values shown by GA in its report in Figure 5-25. FNI considers the placement of the geotextile in contact with the soil-cement in this application is a fundamentally flawed design (pg 11). FNI comments on the GA uplift pressures calculations and computes the thickness of the soil-cement needed to resist these pressures.

### 2.8.3   *Golder Associates reply to Freese and Nichols criticisms of Golder Associates report*

No comments because FNI did not criticize any findings or opinions in the GA report.

## 2.9     Lemley Report – Opinion of Jack Lemley

### 2.9.1   *Lemley causation theory*

Lemley did not provide an opinion on causation.

### 2.9.2   *Golder Associates reply to Lemley causation theory*

GA has no response to Lemley on causation.

### 2.9.3   *Golder Associates reply to Lemley criticisms of Golder Associates report*

No criticisms were made on the GA report.

## 2.10    Kerkes Report – Opinion Report in the Matter between Tampa Bay Water, A Regional Water Supply Authority, and Construction Dynamics Group Inc.

### 2.10.1  *Kerkes causation theory*

Kerkes' opinion (pg 20) is that the root cause of unusual cracking was "**the inability of the water to adequately drain through the soil cement and the geotextile (if the geotextile clogged) during reservoir drawdown.**" Inadequate drainage through the soil-cement and geotextile "**resulted in localized, shallow down slope movement of the soil beneath the slope protection and/or water pressure against the flat-plate slope protection at the geotextile and soil cement.**"

Kerkes (pg 13) noted the localized shear surfaces in the soil in the B&V test pit photographs. Kerkes stated those shear surfaces were consistent with the pattern of distress is consistent with shallow slope movement subsequent to rapid drawdown. Kerkes stated the issue of wedge drainability was foreseeable



GA_RBL000031

Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 32 of 65 PageID 19920

and preventable and was not properly addressed by HDR in its design. Opportunities were provided during the design review for HDR to reexamine its assumptions and rectify the egregious error.

Kerkes (pg21) noted that stair-step soil-cement provided greater resistance to excess water pressure (uplift pressure) than flat-plate soil-cement: this design change was not properly addressed by HDR.

### 2.10.2 Golder Associates reply to Kerkes causation theory

Kerkes agreed with GA that the inability of the wedge to drain was the "trigger" for the subsequent soil-cement distress. Kerkes notes the potential for excessive clogging of the geotextile (pg 14) and the impact clogging would have on wedge drainage and excess water pressure buildup but does not actually state that clogging was an issue at this project (pg 20). Kerkes' opinion (pg 20) is that poor drainage resulted in shallow down slope movement and/or water pressure against the soil-cement, but does not conclude which or if both mechanisms caused the distress to the soil-cement.

### 2.10.3 Golder Associates reply to Kerkes criticisms of Golder Associates report

Kerkes did not have criticisms of the GA report.


## 2.11  Landmark Contract Management (LCM) Report – Expert Report of Bradley H. Hornburg

### 2.11.1 LCM causation theory

LCM stated that the design errors by HDR are so overwhelming that allegations by GA/TBW against CDG are immaterial.

### 2.11.2 Golder Associates reply to LCM causation theory

GA agrees that HDR made design errors. GA also considers that CDG did not meet all of its contract requirements. By not meeting the contract requirements, as noted in the GA report, TBW was not kept informed of some of the non-compliance issues and HDR and Barnard were not warned about their activities that were not in compliance with their contracts. CDG had the right to stop work, if and when it observed activities that were not in accordance with the contract documents. CDG had knowledge that there were non-compliant issues with the soil-cement, but the soil-cement placement was not stopped to resolve these issues.

### 2.11.3 Golder Associates reply to LCM criticisms of Golder Associates report

LCM pg 6        GA wrongly criticized CDG for not making comments on the contractor's means and methods during constructability reviews.



GA_RBL000032

GA     In its constructability reviews, CDG provided a multitude of comments on the specifications and drawings. There was little input on the "constructability" of the project. Placing flat-plate soil-cement at the Reservoir project was difficult. Placement of 16 inches of flat-plate soil-cement on a 3.0H:1V slope was difficult. Some of the issues included trafficability, sequence of placement, time of placement, grade control, protection of the geotextile, and compaction. GA saw nothing in the CDG constructability reviews that addressed general construction issues; this differs from commenting on the contractors specific means and methods.

LCM pg 6     QA duties

GA     CDG was responsible for QA. The CQA plan states:

**"The Construction Quality Assurance Plan (CQAP) to be implemented through the Construction Quality Assurance Engineer, establishes the framework for conducting an independent review of the work performed by CQC engineer to ensure that the work is being done in accordance with the project plans, specifications and due observance of the requirements established in the Environmental Resource Permit."**

To the degree that work was not done according to the plans and specifications, CDG has some responsibility. Thin soil-cement, layering of the fill, not meeting the time limitations for placing the soil-cement, and placing lifts of soil-cement thinner that permitted by the specifications are examples of deviations from the specifications that contributed to the unusual cracking observed in the Reservoir.

Given the above, GA considers that CDG did not meet its standard of care as defined in its contract.


Golder Associates

Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 34 of 65 PageID 19922

## 3.0   GOLDER ASSOCIATES COMMENTS ON REBUTTAL REPORTS ON MATTERS NOT DEALING WITH CAUSATION OR COMMENTS ON GOLDER ASSOCIATES REPORT

### 3.1   BCI Report

BCI pg 2      The second paragraph of Section 2.0 describes the soil-cement placement.   Related to the stair-step portion, it states that the stair-steps were 12 inches thick.

GA            According to HDR's plans, Sheet C-22. the stair-step soil-cement is 9 inches thick.

BCI pg 3      Loose fill was placed over the geomembrane, in erosion gullies, and elsewhere.

GA            BCI describes its assessment of fill that was placed loosely as the protective lift over the geomembrane and in erosion gullies.   However, its meaning of "loose fill placed elsewhere" is not clear to GA.  BCI provides no further description of these locations and cites no supporting documentation.

BCI pg 4      "The wedge fill placed by bulldozers was not tested, according to daily reports and discussions with HDR and Ardaman personnel."

GA            Milhorn of Ardaman testified that the protective lift was completed with a uniform thickness of between two and three feet thick prior to placing horizontal lifts to complete the wedge.   Milhorn also stated that the protective fill was considered to be part of the wedge, inspected and tested pursuant to the CQC plan, and approved by HDR.   The inspectors periodically tested compaction in the protective lift by excavating near the contact between the surface of the protective lift and horizontal lifts that were placed against it.   Milhorn stated that fill placed by bulldozers in erosion gullies was inspected and occasionally tested.   Milhorn testified that he considered that the inspection and testing pursuant to the CQC plan confirmed the fill used in the wedge, including the protective lift and erosion gully repairs, was compacted as specified.

BCI pg 8      The last sentence of the third paragraph says that Figure V-3 shows dry fill being pushed over the geomembrane.

GA            GA cannot ascertain from this photograph that the material being pushed over the geomembrane is dry.   Even if it was dry of optimum, it could have been wetted and compacted per the specifications before it was completed.  Documents cited by BCI and other project records indicate the contractor was using water trucks when needed to add moisture to fill material, and the project records indicate that less than one percent of the density tests failed on the project, usually due to too much moisture.  Milhorn testified that



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 35 of 65 PageID 19923

the photograph shows work in progress and not the "final product." Milhorn also testified that he considered that the inspection and testing pursuant to the CQC plan confirmed the fill used in the wedge, including the protective lift, was compacted as specified and approved by HDR.

| | |
|---|---|
| BCI pg 8 | Discussion of dry fill from Reservoir Progress Meeting Minutes (excerpts from BCI Attachment C). |
| GA | The Progress Meeting Minutes cited by BCI as evidence also have notes indicating the contractor was using water trucks (e.g., McD doing a good job keeping up with the water truck, McD is running water trucks, etc.). |
| BCI pg 8 | In the last paragraph, BCI discusses a sketch that indicates the protective layer as 3 feet minimum. |
| GA | BCI's citations of the notes from the meeting held on 8/26/03 include two sketches indicating agreement between HDR, Ardaman, and Barnard that the thickness of the protective lift over the liner would be a minimum of two feet or two to three feet thick. These notes are consistent with sworn testimony by Ardaman (Mr. Milhorn) that the protective lift thickness was completed uniformly about two to three feet thick throughout the project. |
| BCI pg 8 | The last sentence on the page states "...photographs taken in the northeast area during initial wedge construction show dry fill being placed in very thick lifts." |
| GA | Milhorn stated that the photographs cited by BCI show placement of the protective lift on the geomembrane while the work was in progress and not the "final product." The conditions purported in these photographs do not indicate the thickness or moisture content of the protective fill when it was completed. The photograph in Figure V-6 shows standing water over much of the ground at the toe of the slope. The presence of standing water at this location would indicate that the fill was wetted either by rainfall or by the contractor's water truck. If the water came from either rainfall or a water truck, it would probably mean that the material being used to cover the liner was not dry as stated by BCI. |
| | BCI fails to cite evidence from inspectors, engineers, or other personnel on-site that indicate that the thickness over the geomembrane was being placed too thick. Milhorn of Ardaman testified that the protective lift was completed with a uniform thickness of between two and three feet thick prior to placing horizontal lifts to complete the wedge. |



GA_RBL000035

Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 36 of 65 PageID 19924

Milhorn also stated that the protective fill was considered to be part of the wedge, inspected and tested pursuant to the CQC plan, and approved by HDR. The inspectors periodically tested compaction in the protective lift by excavating near the contact between the surface of the protective lift and horizontal lifts that were placed against it. Milhorn testified that he considered that the inspection and testing pursuant to the CQC plan confirmed the fill used in the wedge, including the protective lift and erosion gully repairs, was compacted as specified.

| | |
|---|---|
| BCI pg 9 | Figure V-6 shows a thick lift over the geomembrane, using inspectors for scale. The fill is estimated to be 10 feet thick based on BCI Figure V-7. |

GA    As confirmed by Milhorn's testimony, these photographs show placement of the protective lift on the geomembrane while the work was in progress and not the "final product." The conditions purported in these photograph do not indicate the thickness or moisture content of the protective fill when it was completed. GA cannot ascertain from this photograph the dimensions and thicknesses of materials by using only the inspectors and geomembrane seams for scale. GA considers that confirmation by a person who was present during and familiar with the construction activities is necessary to interpret the dimensions purported in this photograph. Milhorn was present and familiar, and he has provided his testimony in this regard.

BCI pg 9    Discussion of Figure V-8

GA    The photograph is taken hundreds of feet away from the slope being discussed so it is impossible to tell if the dozer tracks are ruts. Also, there is no way of knowing from a photograph if the fill is loose. GA considers again that Milhorn's testimony confirmed that these photographs show placement of the protective lift on the geomembrane while the work was in progress and not the "final product." Milhorn stated that he considered that the inspection and testing pursuant to the CQC plan confirmed the fill used in the wedge, including the protective lift and erosion gully repairs, was compacted as specified and approved by HDR.

BCI pg 9    A sentence in the fourth paragraph refers to Figure V-12.

GA    There is no Figure V-12 in the BCI report; even the Bates numbers assigned are sequential through the BCI figures.

BCI pg 9    "Portions of the fill were placed drier than in other areas of the embankment."



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 37 of 65 PageID 19925

GA      Milhorn testified that he considered that the inspection and testing pursuant to the CQC plan confirmed the fill used in the wedge, including the protective lift and erosion gully repairs, was compacted as specified and approved by HDR. Furthermore, the project records indicate that less than one percent of over 9,000 compaction tests taken on this project failed, usually due to moisture contents wet of optimum. Documents cited by BCI in its report indicate the use of water trucks to raise moisture when fill materials were dry.

BCI pg 11      In Section 6.0, BCI is discussing the wedge construction at the southwest area between Sta 88 and Sta 100. In the third paragraph, BCI states that Figure VI-2 shows erosion damage to the earth fill after a heavy rain in June 2003. BCI claims Figures VI-3 through VI-6 show severe erosion of exposed slopes.

GA      The photograph on Figure VI-2 is from a CDG Quality Assurance Report dated January 2003 (see TBW047429) not June 2003. The other two photographs show the exterior slope of the Reservoir, dates and locations unknown. Regardless of these discrepancies, Milhorn stated that fill placed by bulldozers in erosion gullies was inspected and occasionally tested. Milhorn testified that he considered that the inspection and testing pursuant to the CQC plan confirmed the fill used in the wedge, including the protective lift and erosion gully repairs, was compacted as specified.

BCI pg 11      The BCI report states that Figure VI-8 "shows a bulldozer pushing fill to repair a downstream slope damaged by heavy rain".

GA      This photograph is from a CDG Quality Assurance Report dated January 2003 (see TBW047430) and is not related to the wedge fill between Sta 88+00 and Sta 100+00. Furthermore, the photograph does not necessarily show the condition of the completed fill, as inspected, tested, and approved by HDR.

BCI pg 13      Second paragraph discusses key aspects of the wedge construction "...and the fill placement and grading of the top layer of wedge fill with bulldozers."

GA      There is no proof offered by BCI that the method of fill placement and grading of the top layer of wedge material was any different in the areas of increased damage.

## 3.2   GEI Report

GEI pg 3      The first paragraph indicates that the Reservoir exists today through the efforts in part of the FDEP.



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 38 of 65 PageID 19926

GA
The FDEP is the state agency with authority to issue permits for management and storage of surface waters and for environmental impacts. In this role, the FDEP reviewed the permit application prepared by HDR. GEI exaggerates the role of the FDEP by including it on the team that developed the project.

GEI pg 9
The final hearing on an arbitration initiated by Hillsborough County and the Environmental Protection Commission of Hillsborough County (EPCHC) began on March 16, 2001 and ended on April 9, 2001. In its last sentence in Section 3.2.7, GEI quotes paragraph 169 of the findings of fact by the arbitration panel's award on May 15, 2001. The quoted finding indicates that the rapid drawdown analysis was not required and was "excessively conservative" and that the operational and emergency drawdown scenarios were reasonable for the Reservoir.

GA
GEI neglects to note that paragraph 160 of the findings of fact in the arbitration award defines rapid drawdown as an analysis that "has the water surface in the Proposed Reservoir theoretically lowered instantaneously in order to evaluate the embankment stability." The term "rapid drawdown" is used in the arbitration award to mean an instantaneous drawdown of the reservoir level.

In its June 2001 response to Questions 30 and 43 of RAI 2, HDR also used the term "rapid drawdown" and defined it as drawing the reservoir level down at a rate of 19.9 in/day from El. 136.5 to El. 110 and an average drawdown rate 21.3 in/day (to El. 62). HDR stated that the Reservoir would "perform satisfactorily" when subjected to the rapid drawdown rate of water withdrawal. This is also confirmed in Paragraph 168 of the arbitration award which indicates that Mr. Donovan of HDR **"testified that the embankment is designed to be stable for emergency drawdowns of up to one and one-half feet per day"** and **"the embankment remains stable at any lesser drawdown rates."**

GEI pg 12
GEI states that the "reservoir operated without unexpected cracking of the soil-cement facing during the first drawdown and refilling cycle."

GA
Cracking was first observed in December 2006 by a Veolia inspector in a boat, and Carrier's September 4, 2007 memorandum (FDEP 19075 – 19088) states that the "cracks were not visible from the crest" of the embankment. No one knows when any of the cracks actually occurred.

GEI pg 17
GEI states: "This design evolution was a collaborative process between HDR, TBW, regulatory agencies, and peer review firms."



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 39 of 65 PageID 19927

GA          The statement misstates the responsibility of regulatory agencies and their consultants in
            the design process and overstates the responsibility of TBW and peer review firms in the
            design of the Reservoir. The project records indicate that HDR was the firm responsible
            for developing the design for the Reservoir embankment.

GEI pg 17   In the first paragraph of Section 4.2.1, GEI indicates the design standards to be applied
            to the Reservoir project were discussed at a meeting held on January 13, 1999 and cites
            two documents (HDR_Donovan000514 and 511) to backup its statement.

GA          One of the two cited documents (HDR_Donovan000511) appears to be a page from a
            presentation by TBW staff and not notes from a meeting held on January 13, 1999. The
            other cited document (HDR_Donovan000514) is an agenda for a meeting on January 13,
            1999 to discuss the scope of work for site investigations. This agenda or handwritten
            notes taken during the meeting (HDR_Donovan000516 through 518) do not indicate
            design standards were discussed at this meeting.

GEI pg 17   Again in the first paragraph of Section 4.2.1, GEI indicates the design criteria such as
            stability, sliding, and slope protection were discussed at a meeting held on January 28,
            1999 and cites two documents (HDR_Donovan000489 and TBWRice001574-1578) to
            backup its statement.

GA          Although the agenda for this meeting (HDR_Donovan000489 and TBWRice001574)
            indicates that embankment design criteria were to be discussed as part of the
            engineering issues, the notes from the meeting (TBWRice0001575-1578) do not indicate
            design criteria such as stability, sliding, and slope protection were discussed at this
            meeting.

GEI pg 19-20   GEI asserts that HDR issued a Draft Preliminary Embankment Design Report
            (HDR_003840-3841) on January 31, 2000 and that XCorps wrote a letter on January 24,
            2000 with comments on this document.

GA          The dates suggest that XCorps may have reviewed the January report before it was
            issued or it may have reviewed an earlier draft that was finalized on January 31st. The
            dates of the review comments being earlier than when the report was actually finalized
            are confusing. If HDR has a preliminary draft embankment design report earlier than the
            January 31, 2000 report, GA would like to review the earlier draft also.

GEI pg 25   In the first full paragraph, GEI indicates Black & Veatch, the FDEP, and other regulatory
            agencies attended TBW's pre-application meeting that was held on June 6, 2000.



Golder
Associates

| GA | GEI's rationale for only including a partial list of the attendees is not apparent to GA. First. Black & Veatch is not a regulatory agency.   The only attendees representing entities with regulatory authority over the project were from FDEP, SWFWMD, and Hillsborough County (including EPCHC).   Finally, the other attendees, not listed by GEI, also included representatives from HDR and its subconsultant Ardaman. |
|---|---|
| GEI pg 30 | GEI states that Dr. Carrier did not object to or comment on the design assumption that soil-cement shrinkage cracks would have an effective permeability similar to that of the embankment soils. |
| GA | In its September 7, 2000, Embankment Design Report, HDR did not discuss shrinkage cracks in the soil-cement.  In this report, HDR stated the following assumption: |

> **_"The upstream face of the embankment will be protected with soil-cement (Figure 2-2).   However, the soil cement was not considered as a separate material layer. <u>For the seepage analyses the soil cement facing was not included in the analyses because it is relatively permeable.</u>  For the stability analyses the cross section area occupied by the soil cement was assigned the physical properties of the embankment fill.  This is conservative since the soil cement is a relatively high strength material compared to the underlying embankment fill."_** (Emphasis added) (FDEP 03816-3817, pg 58-59)

> HDR's report did not discuss shrinkage cracks and stated no basis for its assumption that the soil-cement would be "relatively permeable."  GEI's statement is not consistent with HDR's Embankment Design Report.

| GEI pg 31 | GEI discusses HDR's February 2001 response to Question 61 of RAI 1.  In part, HDR responded that the permeability of the embankment fill materials would be revised from 0.28 feet per day to 0.5 feet per day. |
|---|---|
| GA | Question 61 in RAI 1 referred to page 28 of Appendix H.7 of the September 2000 ERP Application.   However, HDR used two different values for the permeability of the embankment fill materials in its September 2000 ERP Application.   Appendix H.7 contained HDR's Reservoir Seepage Evaluation Report, which confirms that HDR assigned a permeability of 0.28 feet per day for the embankment fill materials.  Appendix I of the September 2000 ERP Application contained HDR's Embankment Design Report. which indicates that HDR assigned a permeability of 0.5 feet per day for the embankment fill materials. |



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 41 of 65 PageID 19929

| | |
|---|---|
| GEI pg 36 | In the third paragraph in Section 4.3.1, GEI states that HDR's basis for changing the design of the soil-cement facing from stair-step to flat-plate was the consensus from the Value Engineering meeting. |
| GA | A Value Engineering workshop was held in February 2000.  A value engineering proposal, VE-11, was listed at this meeting.  VE-11 was to switch from stair-step soil-cement to flat-plate soil-cement below El 125.  The Executive Summary to the VE study states that a thorough review and complete engineering design by the design team is required prior to implementation of any VE proposal. |
| | A second VE workshop was held in June 2000.  VE-10 was to reduce the width of the soil-cement stairs from 9.5 feet to 8 feet and to reduce the step height from 12 inches to 9 inches.  VE-10 considered that the upstream soil-cement facing would be constructed by stair-step soil-cement from the upstream bench at the toe up to the crest.  By June 2000, flat-plate soil-cement as proposed in the first VE workshop was no longer considered.  HDR apparently rejected the earlier VE proposal to switch from stair-step to flat-plate construction and submitted its final design in September 2000 with the upstream facing shown as stair-step soil-cement from the upstream bench at the toe up to the crest.  In its December 2000 response (TBW_Copeland007124-7128) to the second VE workshop, HDR indicated that it had accepted VE-10 into its design. |
| | Although HDR has not stated its basis for changing the design to incorporate flat-plate soil-cement, its analysis to determine the flat-plate soil-cement thickness, or its analysis of uplift on the flat-plate soil-cement during reservoir drawdown, these documents confirm that HDR's basis for the design change was apparently not "consensus from the Value Engineering meetings." |
| GEI pg 48 | In the first full paragraph, GEI states that construction quality assurance reports indicate that tests were <u>continually</u> performed on fill materials. |
| GA | GA notes that testing on fill materials was conducted periodically, at the specified frequency, or routinely.  Testing was not done continually. |
| GEI pg 49 | HDR relied on Barnard's expertise in means and methods for placement of the protective layer.  GEI stated that Barnard's request to place the 2-feet-thick lift against the geomembrane was approved and that HDR did not waive the density requirement. |



GA_RBL000041

Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 42 of 65 PageID 19930

|  |  |
|---|---|
|  | Based on discussions with HDR managers and field personnel, GEI stated that HDR and Ardaman field personnel were to advise CDG and Barnard if they observed fill placement which was not as specified. |
| GA | GA and other experts identified several construction deficiencies and non-compliant works. With the exception of a few daily reports with notes about rejecting loads of non-compliant fill materials during the early part of 2003, GEI and other experts have not provided evidence that construction deficiencies and non-compliant work was documented in accordance with CQC and CQA plan requirements and for tracking and informing the involved parties, including TBW. |
| GEI pg 49 | GEI states that disks were not used on a regular basis to scarify, but that the irregular surface left by the sheepsfoot compactors achieved the desired effect of blending and bonding with the overlying lift. |
| GEI pg 51 | Based GEI discussions with Ardaman field staff, GEI understood that bulldozers were generally used instead of disks to mix the fill. |
| GA | GEI apparently contradicts itself with these two statements. A sheepsfoot roller is used to compact fine-grained soils such as clays. Although the inspector's daily reports indicate sheepsfoot rollers were used to compact fill materials at the Reservoir, GA considers that sandy, granular soils like the fill materials at the Reservoir are normally compacted using drum rollers with padded or knobbed drums, which are often incorrectly referred to as sheepsfoot rollers. Rollers with padded drums do leave a rough surface on the fill, however they produce very little if any mixing over a 12-inch lift of fill material. Likewise, GA does not believe dozers would be effective at mixing a 12-inch lift. |
| GEI pg 54 | The last paragraph of Section 5.3.2.1 regarding the protection of the geomembrane indicates that rubber-tired ATV's were allowed to run on the geomembrane because they were used by the geomembrane installers to assist with the geomembrane deployment. |
| GA | The HDPE specification 02775 prohibits the use of vehicular traffic on unprotected HDPE and requires that any foot traffic is to be minimized. ATVs may be used to help pull the geomembrane off the roll during deployment. However, it was not allowed by the specifications for this project, nor is it necessary, to run an ATV or any other vehicle on exposed geomembrane that is on the ground. GA does not agree with GEI on the above statement. In GA's opinion, operating ATVs on deployed geomembrane is poor practice and it does not assist in geomembrane deployment. |



| April 2010 | 38 | 083-89626 |
|---|---|---|

GEI pg 55  December 31, 2003 HDR memo – Meyer allowed not repairing ¾-inch diameter holes in geotextile.

GA  GA considers that HDR should have advised TBW and CDG of its basis for waiving a part of the specification at the time Meyer wrote the cited memorandum and that CDG should have requested that HDR document its basis.

GEI pg 56  GEI states that Barnard completed a test section on January 12, 2004 to demonstrate that it could place soil-cement in a single 16-inch lift and that HDR's field engineers accepted the change based on their observations and satisfactory compaction tests.

GA  The field technician's daily field report for January 12, 2004, indicates that Barnard placed and compacted soil-cement in a single lift that day and that the compaction tests were satisfactory. However, GA did not find any other documentation of these events or any documentation referring to the work on January 12, 2004 as a formal test section as defined in the specifications. There were no photographs taken, no plans or pre-activity meetings held, and no persons who observed the test section listed. Apparently, Ardaman's Frank Luman was the only person on the CQC team that observed this work. Luman's daily field report was signed on January 15, 2004, and the "reviewed by" box on his daily field report was not signed. GA found no documentation of the approval of this change by HDR's Barry Meyer or any of the other senior engineers working with and under him on the project.

GEI pg 56  GEI states that HDR and CDG performed 95 field depth verification tests on the soil-cement facing. These tests were conducted in April 2004 and discovered deficiencies in the thickness of soil-cement.

GA  GEI confirms that GA review of the project records indicates that verification of the soil-cement thickness was not implemented as a quality control measure from the onset of soil-cement placement starting on December 30, 2003.

GEI pg 62  GEI notes that CDG granted substantial completion to Barnard on April 14, 2005, while HDR was still performing 250 borings in the field trying to quantify the extent of the areas with soil-cement thickness less than 16 inches.

GA  As evidence that GEI's assertion is inaccurate, HDR's memorandum dated March 8, 2005 (TBW019938-19940) indicates that HDR completed its review of the areas of the flat-plate soil-cement with thickness less than 16 inches more than one month before CDG's letter to Barnard granting substantial completion. Furthermore, HDR wrote a letter



Case 8:08-cv-02446-JDW-TBM Document 349-20 Filed 05/19/11 Page 44 of 65 PageID 19932

to CDG on February 23, 2005 (TBW019963), to recommend granting Barnard a partial substantial completion for all elements of the project except for the aeration system.

GEI pg 90     GEI states that Carrier insisted that HDR redesign the embankment to provide a factor of safety of 1.3 or greater during rapid drawdown.

GA     Carrier served as a consultant to the FDEP to provide technical support in reviewing the documents submitted with the ERP application and RAI responses for reasonable assurance that the documents prepared by HDR satisfied the conditions for issuing a permit. GA found no documentation indicating Carrier insisted that HDR modify its design, and GEI cites no documentation to support its claim.

The notes of the May 3, 2001 meeting HDR had with the FDEP indicate that it was agreed that TBW would evaluate operational, emergency and rapid drawdown. "TBW (HDR) was to model and determine what the maximum safe rate of drawdown is." Given this, GA considers that GEI is incorrect by stating that "Carrier insisted" what the applicant should do.

GEI pg 97     GEI claims that B&V acted as TBW's eyes, ears, and most importantly, intelligence relative to dam design.

GA     B&V was the System Engineer for TBW. HDR was retained to investigate and design the Reservoir. The roles of the parties are clear in their contracts. GEI has provided no facts or documents to support the innuendos about B&V being the eyes, ears, etc. for TBW relative to dam design.

GEI pg 102     GEI indicates that soil-cement placement in a single lift on January 12, 2004, was pre-approved by CDG and HDR.

GA     GEI cites no documentation of this claim, and GA found no documentation of pre-approval of this event by CDG and/or HDR.

GEI pg 102     GEI asserts Carrier knew about the contractor's means and methods because he visited the project frequently during construction and that he did not object to the contractor's means and methods.

GA     Reviewing the contractor's means and methods for conformance with the contract documents was not Carrier's responsibility and the fact that he did not object does not mean he approved. The responsibility for reviewing, approving, monitoring, and



documenting the contractor's work lay solely with HDR and CDG, who were retained by TBW to provide these services.

## 3.3   5RMK Report

5RMK pg 7 &12 First opinion is that Barnard did not maintain an adequately dry work area and its third opinion is that Barnard allowed fill materials to dry out.

GA            Both of these conditions may have occurred at different locations and during different time periods. However, 5RMK provides no explanation or facts to support where and when these conditions occurred during construction.

5RMK pg 8-9    Photographs cited as Exhibits 01.3.001 and Exhibit 01.3.006 shows the protective lift covering the geomembrane.

GA            If these photographs show the typical construction operations, they purport to show the protective lift covering the geomembrane was spread to a uniform thickness over the geomembrane on the slope. The thickness of the protective fill shown on these photos appears to be relatively uniform, as confirmed by Milhorn's testimony that the completed "protective fill" was a minimum two (2) foot layer bulldozed up the slope from the bottom,' placed immediately over the geomembrane, and cut as necessary so the final thickness was no greater than three (3) feet. 5RMK's exhibits 01.3.007 and 01.3.011 also provide photographs showing protective lift over the geomembrane having a relatively uniform thickness.

5RMK pg 12    5RMK states areas that were exposed for long periods of time dried out. These exposed slopes needed to be re-wetted and re-compacted before additional fill was placed.

GA            5RMK's Exhibit 03.2.002 is one page from CDG's Monthly QA report for May 2003 (HDR_C020113) with a note from an inspector's daily report indicating Barnard was using water trucks to control moisture of the fill materials. Its exhibit apparently does not support 5RMK's opinion. Furthermore, GA commented in Section 3.1 of this report that inspectors made notes that water trucks were being used adequately during a relatively dry period during construction.

5RMK pg 14    Fourth opinion is that Barnard did not properly repair fills that were damaged by rainfall, and its first exhibit includes a photograph showing excavation of a rain-damaged area to receive fill in horizontal lifts.



Golder
Associates

| | |
|---|---|
| GA | Its exhibit apparently does not support 5RMK's opinion. |

| | |
|---|---|
| 5RMK pg 16 | Includes a photograph that was taken during preparation to repair an erosion feature under the geomembrane liner as evidence to support its fifth opinion that Barnard deployed geomembrane on fill slopes that were not properly prepared. |

| | |
|---|---|
| GA | This exhibit does not appear to support 5RMK's opinion because it shows the contractor purportedly preparing to place horizontal lifts to repair a rain damaged area of the fill, with a CQC inspector present. |

| | |
|---|---|
| 5RMK pg 20 | Repairs of deficient work or rain damage was not documented. |

| | |
|---|---|
| GA | GA agrees with 5RMK that the project records contain inadequate documentation of the extent and methods of repairing erosion and rain-damage during construction and CQC and CQA testing to verify repairs complied with the contract documents. Milhorn testified during his deposition that fill placed by bulldozers in erosion gullies was inspected and occasionally tested. However, the inspector's daily report provide no documentation of the extent of the repairs, the volume of material that was removed or reworked, or the results of testing to confirm the repairs were completed to satisfy the specifications for this project. |

| | |
|---|---|
| 5RMK pg 30 | The distance between longitudinal joints in the soil-cement facing was too narrow. |

| | |
|---|---|
| GA | The contract documents did not specify any requirements for the spacing of joints in the soil-cement. The distance between the longitudinal joints was controlled by the output from the mixing plant, the lift thickness, and the specified time constraints for spreading and compacting the soil-cement. |

| | |
|---|---|
| 5RMK pg 33 | Barnard failed to produce a Quality Control Plan. |

| | |
|---|---|
| GA | 5RMK's exhibit 15.2.001—23 included Barnard's Quality Control Plan that was approved by HDR. Although some of 5RMK's opinions generally support GA's opinions regarding deficiencies in Barnard's construction and quality control practices, it fails to recognize the related deficiencies in HDR's and CDG's implementation of their respective CQC and CQA plans which could have identified and led to the contemporaneous correction of construction deficiencies that contributed to the unusual cracking of the soil-cement facing and other deviations from the contract documents.   GA considers 5RMK's contradictory and unsupported opinions to indicate its report is biased to lend support to BCI's theory on causation. |


Golder
Associates

## 3.4   Johnson Report

Johnson pg 3   Johnson states that responsible owners have staff directly involved in planning, design, and construction of large projects, even if they retain outside consultants (pg 3).

GA   TBW does not have the experience and expertise to provide meaningful input into the planning, design, or construction of a project like the Reservoir.   TBW staff that participated in the design and construction meetings was not there to make technical comments but was there to provide coordination and oversight and to keep others in TBW generally aware of progress on the project.   GA considers Johnson's comments appropriate for an agency like the USBR but inappropriate for an agency like TBW.

Johnson pg 4   Thoughtful consideration – don't rush to blame and engage lawyers.   Responsible manager/owner will undertake appropriate investigation to develop appropriate solutions.

GA   Once the unusual cracking was discovered in December 2006, TBW worked with its design firm (HDR) to monitor, instrument, assess, and evaluate the cause of cracking and options for repair of the Reservoir.   TBW worked with HDR for 22 months in assessing the problem.   GA does not consider that TBW rushed to **"…blame others and defer the problem to lawyers and litigation."**

Johnson pg 4   Owners should "…recognize that solutions to design and/or construction problems should not require more that what is necessary to make the project functional in a manner consistent with the original plan."

GA   GA considers Johnson's implication that TBW is attempting to achieve a betterment is incorrect.   TBW expected it was getting a Reservoir that would be stable and functional for the life of the facility.   HDR stated that the Reservoir would be stable and functional when subjected to the operational, emergency, and rapid drawdown conditions.   The Reservoir has experienced unusual cracking under only the operational drawdown.   GA considers that, for the owner to get a repaired facility that meets the design criteria and functions as designed for the life of the facility, the entire embankment must be repaired so the Reservoir will be stable, without experiencing unusual cracking, when subjected to the rapid drawdown condition.

Johnson pg 4   New information and unforeseen circumstances

Johnson indicates that if there are **"…unforeseen circumstances, responsible owners would not require consultants and contractors to bear the full burden…Fairness**



               dictates that owners be responsible for the cost burden of unforeseen circumstances…"

GA         Although not specifically stated, the implication of Johnson is that some of the issues at the Reservoir were the result of unforeseen conditions (differing site conditions). GA does not consider that there were unforeseen conditions at the Reservoir site. GA is not aware the parties have alleged any differing site conditions as a cause for the unusual cracking in the soil-cement.

Johnson pg 5     Johnson states that TBW is not constructively pursuing collaborative solutions to the project problems.

GA         GA responded to this statement earlier in this section.

Johnson pg 6     TBW and B&V participated in the value engineering studies. There was a value engineering option that addressed potential changes to the soil cement facing that could save money. Johnson states that the value engineering changes were **"…partially motivated by a desire by TBW to reduce the project and ensure financability [sic]."**

GA         The first value engineering study was done in February 2000. The agenda shows that there were three classes of attendees, TBW Representatives, Design Team, and VE Team. The TBW Representatives did not attend full-time. The VE-11 value engineering option (flat-plate soil-cement) came out of the February 2000 session. The flat-plate soil-cement design did not appear in the HDR design until June 2001, at the same time the geomembrane was moved inside the embankment and the wedge added. The Executive Summary to the VE study states that a thorough review and complete engineering design by the design team is required prior to implementation of any VE proposal. Given the above, GA does not consider that TBW has liability for the performance of the embankment or the flat-plate soil-cement just because it participated as a non-technical participant in the VE meetings. The project record reviewed by GA does not include any documentation that TBW ever directed the parties to reduce the project cost by reducing or sacrificing quality, performance, or safety of the project. Johnson's statement is without basis.

Johnson pg 6     If TBW and B&V participated in construction oversight, they bear some responsibility for cracking problems that were caused by improper construction.

GA         TBW retained HDR to be responsible for the QC program and provide resident engineering services. TBW retained CDG to be responsible for the QA and construction


Golder Associates

management functions. HDR and CDG are well qualified for these tasks and had major roles during construction. TBW retained Barnard as the contractor for this project. Barnard had a contractual obligation to construct the facility in accordance with the plans and specifications. TBW had staff on site for contract administration and assistance with permit compliance reporting. GA does not agree with Johnson that the owner has any responsibility for improper construction.

## 3.5    Devo Report

Attach E pg 3    The average rapid drawdown rate from HDR's response to Question 30 in RAI 2 is cited as 18.9 inches per day (El. 136.5 to El 75 in 39 days).

GA    GA notes that the tables prepared by HDR in its response to Question 30 in RAI 2 also indicate for the rapid drawdown that the Reservoir could be drawn down from El 75 to El 62 (transmission main invert) in 3 additional days (i.e., drawdown from El 136.5 to El 62 in 42 days).

Attach E pg 12    Exhibit 8 shows the location of the lenses of sand and clay that Devo modeled to assess the impact of having layers or lenses of material in the embankment. The results of that modeling are shown in Exhibits 9 and 10.

GA    GA does not consider that providing four discrete one-foot thick lenses in the wedge above the bench with a width of about half the width of the wedge is a reasonable approach to simulating the impact of layering in the wedge. From the test pit records more than four layers were seen in an individual test pit. It is GA's opinion that the layering in the wedge was much more frequent than about one layer every 10 feet in elevation and that the layers were, in general, thinner than one foot thick. The impact on the drainability of the wedge when having many layers distributed throughout the wedge is far different than would be predicted using the Devo approach. GA considers that the Devo approach would indicate a minimal impact of layering while GA considers the layering would significantly reduce the wedge drainability in the vertical direction.

Attach F pg 1    Devo states the low permeability of the embankment fill prevents effective internal drainage. The excess pore pressure creates the "unacceptably low" factor of safety with respect to slope stability.



GA          Permeability of the soil-cement, clogged geotextile, geomembrane, and surficial sands also contribute to the development of the excess water pressure under the soil-cement facing during reservoir drawdown.

Attach G pg 1   Devo refers to the "HDR-approved methodology" for Barnard's means and methods.

GA          Barnard's contract indicated it was obligated was to construct the Reservoir in accordance with the contract documents.  GA found no documentation that Barnard requested waiving or that HDR waived the requirements in Part 3.3.B.5 of Section 02200 of the Technical Specifications.

Attach G pg1    Devo states the installed embankment fill fully conformed with the material quality and compaction requirements.

GA          The above statement is artfully worded.  The classification of the fill soils met the material specification; the records indicate that where compaction tests were conducted the tests passed.  Devo, however, did not comment on the observed lenses and layering of the fill in the wedge as evident in the test pits.

            GA does not agree with Devo that Barnard & McDonald performed its "...embankment works in full compliance with the project specifications..."

Attach G pg 8   In Section 2.1, Devo asserts that the upper 15 feet of the surficial soils used to construct the Reservoir embankment did not exhibit a consistent pattern of fines content with depth.

GA          Devo cites no documentation or analyses to support its assertion.  In Section 6.2 (pg 6-2) of its 1999 Geotechnical Site Characterization Report, Law stated "[b]ased on borings drilled in the unmined area of the site, there is a clear trend of increasing fines content with depth."

Attach G pg 19  At the bottom of the page, Devo states that there was, "Continuous evaluation and monitoring of engineering properties of the soil installed in the embankment."

GA          GA does not agree that there was "continuous" evaluation.  Density tests were done at specified intervals during fill placement.  Inspectors were not everywhere all the time.  Notwithstanding the testing and monitoring, Barnard and McDonald had an obligation, as stated in their contract, to comply with all the contract documents.



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 51 of 65 PageID 19939

## 3.6    Freese and Nichols (Rutledge) Report

FNI pg 11    Refers to photographs in Figures 4 and 5.

GA           Figures 4 and 5 are not photographs.  The photographs described in the text appear to be Figures 2 and 3.

FNI pg 15    FNI states "claims that differences in Barnard's construction might have enabled the soil-cement to provide greater resistance to the loads placed on it are immaterial to the causation as, again, the damage is due to loads that the soil cement was neither designed nor intended to bear."

GA           Barnard had a contract requirement to meet the project specifications, including fill placement without layers and lenses, placing soil-cement in a minimum lift of 6 inches, placing and compacting the soil-cement within 90 minutes of adding cement, and placing an absolute minimum thickness of 16 inches of soil-cement.  Barnard did not satisfy these requirements in all areas within the Reservoir.

FNI pg 15-16    Placing lifts less than 6 inches – FNI states that the only requirement is the thickness prior to compaction.

GA           The specifications in 02520 Part 3.8.A state that the minimum thickness of soil-cement that can be placed shall not be less than 6 inches.  Many photos indicate this requirement was not met.  Thin lifts increase the probability that bulldozers will damage the underlying geotextile, that the initial "set" of thin lifts will be faster than thick lifts, and that cracking of the lower lifts may occur.  FNI neglects to discuss these requirements of the contract documents.

FNI pg 16    Specifications required a minimum thickness of soil-cement to be measured immediately prior to starting compaction operation.

GA           Paragraph 3.5 of Section 02520 of the Technical Specifications requires the completed soil-cement to conform to the absolute minimum thickness shown on the plans.  Since the soil-cement was compacted, the thickness prior to starting compaction would have to be somewhat more.

FNI pg 16    Clay balls in soil from which soil-cement was made – FNI asserts this was an isolated event

GA           Gears in January 2004 issued a letter (BCCI_118734) to the effect that the stockpile of material they were provided for soil-cement did not meet the specifications.  Milhorn



Golder
Associates

Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 52 of 65 PageID 19940

testified that the quality of the soil-cement aggregate was improved before becoming a non-compliance issue. However, Gear's comments on its daily production reports and other project records do not suggest the clay balls and quality of the aggregate were an isolated event (for examples, see BCCI18749, BCCI118760, BCCI118761, BCCI118763, BCCI119014, BCCI119025, BCCI119027, BCCI119026, BCCI119019, BCCI119016, BCCI119017, and BCCI135568).

| | |
|---|---|
| FNI pg 16 | FNI states that damage caused by running tracked equipment on uncovered geotextile was repaired. |
| GA | Several photographs in GA report show that the geotextile was being dragged down slope when tracked equipment was deployed on or near the geotextile. This could cause tears in the geotextile or tears in the seams of the geotextile that was deployed horizontally. GA has never seen large portions of geotextile deployed horizontally as indicated in the photographs in its report. The drag wrinkles in the geotextile and potential seam tears may not be fully known and it may be difficult to fully repair any damage. The specifications in 02778 Part 3.2.B states that "No equipment will be permitted to traffic in direct contact with the geotextile." GA in its report show several photographs that indicate the contractor did not meet the specification requirements regarding geotextile installation. |
| FNI pg 16 | FNI states that running ATV equipment on exposed geomembrane is not a significant issue. FNI states, "...if any damage occurred to the geomembrane, it would have helped the wedge soils drain better and would have tended to reduce the loading concerns on the wedge soils and the soil cement." |
| GA | The specifications 02775 Part 3.2-A.2.d states, "No vehicular traffic is permitted on unprotected HDPE geomembrane, unless authorized by the Engineer." The geomembrane is the primary barrier to seepage through the embankment. Leakage through the geomembrane will result in a higher phreatic surface in the downstream embankment, increased seepage into the blanket drains, and a reduced factor of safety for the stability of the downstream slope. Depending on degree, perforations in the geomembrane could lead to embankment failure and risk to life safety. GA considers FNI's response to ATV traffic on the geomembrane and remark about the benefit of unrepaired tears and punctures in the geomembrane (which could ultimately lead to a more dangerous situation) to be contrary to good engineering and construction practice and is not in compliance with the specifications. |



GA_RBL000052

| | |
|---|---|
| FNI pg 17 | FNI stated that not meeting the specification requirement of 90 minute minutes to place and compact the soil-cement from the time cement was added was not important as long as the strength and durability of the soil-cement was satisfactory. |
| GA | Unconfined compressive strength of a core of soil-cement does not ensure that there is an integral soil-cement unit that is being tested. Delaminations, cold joints and other defects may not be reflected in the unconfined compressive strength values or durability tests. Barnard, by contract, was required to comply with the contract documents, notwithstanding the fact that FNI may not consider them to be important. |
| FNI pg 17 | FNI states that, "perfection in construction is neither possible nor the standard of care for contractors." |
| GA | Barnard signed a contract that required Barnard to meet the requirements in the contract documents (specifications and construction drawings). This was not done in many cases and the non-compliance contributed to the distress observed at the Reservoir. |
| FNI pg 18 | Thickness of soil-cement – FNI considers the investigations biased. |
| GA | There are 480 physical measurements of the thickness soil-cement. GA cored 47 holes at random locations prior to running the ground penetrating radar (GPR) surveys. These data were not biased and are included in the 480 data points cited above. GA made 26 additional corings to determine thickness at various points to confirm the predictions of the GPR survey. These data are included in the 480 data points cited above. |

The GPR survey was conducted over 12,300 linear feet of embankment along lines parallel to the centerline. Each parallel line was five feet downslope from the upper line. GPR thickness determinations were made at specified intervals. These 606,149 GPR thickness determinations made on the flat-plate soil-cement were done on a grid and do not reflect any bias. Figure 5-8 in the GA report compares the cumulative probability distribution curves from the 480 physical measurements with the 606,149 GPR thickness determinations. The distributions of the physical measurements and GPR determination agree quite consistently, which indicates a reasonable degree of reliability in the assessment of the soil-cement thickness using these methods. GA believes that the approach suggested by FNI (i.e., to ignore one-third of the data because it is outside one standard deviation of the mean) is arbitrary and cannot justified given the way the data was obtained systematically over a significant area. Barnard was required to ensure there was an absolute minimum of 16 inches of flat-plate soil-cement. The physical testing and the GPR testing over 46 percent of the Reservoir indicates that over 28



Golder
Associates

percent of the time Barnard failed to meet the specification requirement of providing an absolute minimum of 16 inches of soil-cement. This non-compliance explains some of the unusual cracking in the soil-cement.

FNI pg 19    Thickness of soil-cement – there is no correlation between the location of the thin areas and the unusual cracking.

GA           FNI Figure 5 shows the limits of approximately two thirds of the data (mean plus and minus one standard deviation) over the limits as tabulated by GA in its Table 5-5. The data indicate that the AVERAGE soil-cement thickness was less than 16 inches (approximately 15.2 inches) between Sta 210 and Sta 213+70 and between Sta 227 and Sta 232+50. The actual measurements tabulated by GA in its report also indicate that the average soil-cement thickness between Sta 210 and 235 is 15.2 inches; the soil-cement was as thin as approximately 9.8 inches within this area according to one measurement. These data indicate that nearly two-thirds of the soil-cement thickness in these areas was less than 16 inches. Recall also that unusual cracking started at Sta 230 within these locations where the soil-cement is thinner, and the excess water pressure needed to lift up the soil-cement is proportionately less at locations where the soil-cement thickness is less. That unusual cracking started where the soil-cement is thinnest is evidence that the thickness of the soil-cement contributed to the unusual cracking.

FNI pg 22    As long as the density of the soil-cement is achieved, the 90-minute compaction criterion is not material.

GA           The specifications are written to ensure many aspects of the finished product are achieved. A contractor might be able to achieve a given density and not ensure that the material is intact and monolithic. Depending on how extensively soil-cement placement and compaction was non-compliant with the specifications, a homogeneous intact soil-cement layer was not achieved in all areas of the flat-plate soil-cement. FNI seems to be willing to ignore the contract specifications and only select the piece of the specifications that the contractor was able to meet. Barnard had a contract obligation to meet all the specifications in the contract documents and construct the Reservoir as shown in the contract drawings.


Golder
Associates

Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 55 of 65 PageID 19943

## 3.7    Rizzo Report

**Rizzo pg 8**     Rizzo included Figure 3-2 which showed clogging of the geotextile.  The location of this photograph is not identified.

**GA**     GA had not seen that photograph in its review of the project documents.  The photograph does indicate that there has been downslope movement of soil behind the geotextile and that there is some clogging of the geotextile **as** evidenced by the stream of water emanating from an apparent cut in the geotextile.

It is not clear why there is **a** bulge in the geotextile at the lower portion of the embankment slope.  Sheet C-23 of the project drawings does not provide for an anchor trench or other restraint of the ends of the geotextile at the top or bottom of the slope.

**Rizzo pg 19**     Third opinion indicates that the manner in which the wedge and soil-cement was constructed did not cause, contribute to, or aggravate the unusual cracking

**GA**     Rizzo did not discuss or cite evidence to substantiate this opinion.  Its report includes an overview of the construction sequence on pages 4 and 5 and no detailed discussion of Barnard's means and methods for constructing the wedge or soil-cement.

## 3.8    Lemley Report

**Lemley pg 6-7**   HDR and CDG observed, tested, and accepted the work.

**GA**     Paragraph 6.7 of Barnard's contract with TBW stipulates that **"Tampa Bay Water's payment to Contractor of any progress or final payment shall not release the Contractor of any liability and shall not be deemed evidence of performance or be construed as an acceptance of defective or improper Work, or Work that does not comply with the requirements of the Contract Documents."** General condition 3.1.1 of Barnard's contract states CDG's and HDR's authority to reject non-compliant work by the Contractor "shall not affect Contractor's responsibility to perform the Work in accordance with the Contract Documents." General condition 3.2.1 states that visits and observations made by CDG and HDR "shall not relieve the Contractor of its obligations..."

**Lemley pg 29**   Cores or test pits passing through several layers of fill would identify compliance with the earthworks specifications.



GA | In 2001, Donovan of HDR testified as to the level of homogeneity it needed and it specified in the fill to satisfy HDR's design. The project records and data indicate that Barnard failed to construct the fill "free from lenses, pockets, streaks, and layers of material differing substantially in texture or gradation from the surrounding material" at all locations, and all involved parties failed to implement QC and QA measures to verify conformance with this part of the earthwork specification. GA agrees with Lemley that cores or test pits excavated periodically through several lifts could have verified compliance.

Lemley pg 34 | The delivery method was established before the contractor was involved in the project.

GA | Barnard was responsible for developing the means and methods for developing borrow areas and constructing the embankment in a manner that conformed with the specifications.

## 3.9   Kerkes Report

Kerkes pg 4 | Specification 02200 Part 3.3.B.5 – "A literal interpretation has been applied to this specification, which is both unreasonable and unrealistic."

GA | The contract is in English. The words comprise the contract. To GA knowledge, Barnard never asked for a clarification of this section of the specifications. In GA's opinion, GA knows of no other way to interpret the contract specifications other than to use a literal interpretation and if the section is ambiguous, Barnard was obligated by its contract to request a clarification.

Kerkes pg 5 | It "was impossible to perform such laboratory tests on every cubic foot of soil."

GA | Testing of every cubic foot of soil was not required on this project.

Kerkes pg 6 | States "color is not necessarily an indication of soil type."

GA | GA agrees that color is not an element of the soil classification system specified to be used on this project. However, color is often used in geotechnical and earthfill control as an indication of changes in soil type.

Kerkes pg 10 | Role of inspector in accepting fill – layering of variations of fill were the inevitable result of HDR's decision to allow the use of several soil types.



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 57 of 65 PageID 19945

| | |
|---|---|
| GA | Fill was placed with trucks and with scrapers. The site characterization indicated the potential borrow became gradually finer with depth. Given this, if each lift of fill was disked and blended, each lift would be relatively homogenous. Looking at the test pit photos and the GA boring logs, there are many subtle lenses and layers of fine grained material within each lift. Functionally, the wedge needed to have a reasonably high vertical permeability in order for the wedge material to drain. HDR assumed a permeability of 0.5 ft/day ($2 \times 10^{-4}$ cm/sec). The specification 02200 Part 3.3.B.5 would ensure each lift would be homogenously placed and compacted. Using a reasonable interpretation, any reader of this specification would understand that the design requirement was for the embankment to be thoroughly mixed and blended before compaction. |

| | |
|---|---|
| Kerkes pg 12 | Inability of the wedge to drain -- consequently provisions are normally incorporated into the design to either facilitate drainage of the upstream slope and/or compensate for these water pressures. |

| | |
|---|---|
| GA | GA agrees with Kerkes to a degree. Another option would be to make every effort to ensure the specified embankment fill did not have any lenses or layers of materials that would inhibit drainage out of the wedge. The fine grained lenses (high clay content) acted like "layers of plastic" spread horizontally across the wedge. Such layers would inhibit the vertical drainage from the wedge and increase the excess water pressures behind the soil-cement. Specification 02200 Part 3.3.B.3 may have been the designer's measure to prevent these thin layers to occur in the embankment. |

| | |
|---|---|
| Kerkes pg 16 | HDR concluded that only 0.3% of the area of the soil cement was less than 16 inches. |

| | |
|---|---|
| GA | Table 5.5 in the GA report presents the thickness results from the GPR survey. Of all the areas surveyed, 25 percent of the data indicated the soil-cement thickness was less than 16 inches. Between Sta 210 and Sta 213+70 and between Sta 227 and Sta 232+50 about 63 percent of the data indicated the soil-cement was less than 16 inches thick. |

| | |
|---|---|
| Kerkes pg 17 | Kerkes cites ACI and PCA publications that indicate flat-plate soil-cement thickness may be as thin as six inches. |

| | |
|---|---|
| GA | On this project, the contract documents required the absolute minimum soil-cement thickness to be 16 inches. |

| | |
|---|---|
| Kerkes pg 18 | Photographs of ATV equipment on the geomembrane. |


Golder Associates

| GA | Kerkes implies the photograph is an isolated event.  However, photographs were taken periodically "for the record."  Photos are not necessarily taken only to document errors or non-conformances.   The geomembrane is a key element of the embankment and is crucial to the integrity of the safety (life safety) of the entire embankment design. |
| | |

Dams, as with other civil engineering structures, do not fail because of their average properties.  They fail where there is a defect or a "weak link."  Operating vehicular traffic on a deployed geomembrane is not necessary under any circumstance, it is not good practice, it is not the industry standard, and the consequences of this practice can ultimately lead to a dangerous situation if the seepage control measures in the embankment are compromised.  The specifications were written to prohibit the practice. Barnard was obligated to meet its contractual requirements but did not put effective procedures in place to meet the specifications.  GA disagrees with Kerkes' representation of driving ATVs on the geomembrane – this is an important issue.

| Kerkes pg 21 | Item d. states that a decision was made to continue lowering the reservoir level after cracks were found. |

| GA | GA understands that TBW's obligations to satisfy demands on its system and to comply with its environmental permits required either operating the Reservoir or violating conditions of its environmental permit(s).   The decision was made to operate the Reservoir, only after TBW's consultants were satisfied that continued operation would not compromise the safety of the dam and the FDEP issued its approval. |

## 3.10   LCM Report

| LCM pg 7 | Soil-cement test sections were completed on December 29, 30, and 31, 2003, and another one was completed on January 12, 2004. |

| GA | The soil-cement placement on December 29, 2003 was referred to as a test panel by the inspector who observed the work.  GA notes that the discussion on soil-cement activities during the construction progress meeting held on December 17, 2003 (BCCI_138200) indicated "Initial placement will be considered a test section."  On December 18, 2003, HDR approved Barnard's Alternative Placement Method with conditions that "the method is considered to be part of the test section" and "the Engineer will inform the Contractor if placement method is acceptable." However, the information reviewed by GA did not include any documentation regarding approval of the placement method.   The only documentation of the test section was field notes and daily reports from two inspectors, |



Case 8:08-cv-02446-JDW-TBM Document 349-20 Filed 05/19/11 Page 59 of 65 PageID 19947

whose daily reports were not even signed as "reviewed." Andre Bankston's field notes on December 29, 2003 (cited on LCM pg. 9) state the contractor "decided to do a test strip to get the moisture corrected and a rolling pattern obtained." These notes suggest the "test section" on this day was unplanned and done opportunistically. It is GA's opinion that CDG had a responsibility to verify that this test section was properly planned, executed, observed, documented, and approved.

On December 30 and 31, 2003, Barnard placed and compacted soil-cement in the flat-plate portion of the embankment beginning at Sta 205+00 and working north. The inspector's daily reports and CDG monthly QA reports cited by LCM (pg 10) do not indicate that the activities on these days were considered test sections. The inspector's notes state "compaction was accomplished using methods established in the test panel." GA considers he was referring to the test panel completed on or before December 29, 2003, because the inspector did not note that any test panel was completed on these two days and because LCM (pg 13) states "these methods included using loaded trucks for compactive effort as discussed in the October 21, 2003 meeting." CDG's Bankston's field notes (TBW044297) indicate that he was "not at work" on December 30, 2003; yet Bankston completed and signed a daily field report for that day. CDG's Bankston also completed a daily report for January 1, 2004 (TBW038166) that noted the Contractor was hauling, placing, and compacting soil-cement. Yet Bankston's field notes have no entry for January 1, 2003 (TBW044297), and CDG's Monthly QA report for that month (see TBW045373 and TBW045396) indicated no work was conducted on that holiday. GA questions the reliability of the documentation of CDG's inspection of construction activities.

On January 12, 2003, the inspector's daily report notes that soil-cement was placed in one lift and that testing verified that satisfactory compaction was achieved for the full 16 inch thickness. LCM cites (pg 11) one inspector's daily report and CDG's Monthly QA report for January 2003 as the only documentation of this activity as a test section. On this day, even Andre Bankston (the only other person who documented the test section on December 29, 2003) was apparently absent from observing and monitoring this work. The two cited documents do not refer to the soil-cement activities on this day as being a test section. Although LCM states (pg 12) HDR approved the change to place soil-cement in a single lift, it does not cite any documentation that the activities on this day were reviewed or approved by HDR.



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 60 of 65 PageID 19948

The information reviewed by GA did not include any documentation that the soil-cement operations on December 30 and 31, 2003 and January 12, 2004 were considered to be test sections. The documents cited by LCM (pg 10-11) confirm GA's review.

LCM pg 21    Strongly disagrees that the specifications require the material to be mixed... therefore, HDR was not concerned with mixing fills.

GA    During his deposition for administrative hearings in 2001, Donovan of HDR testified that the embankment "... would be relatively homogeneous" and that the fill would be "disked and bonded together so you get a homogeneous mass. You don't have a series of poker-chip layers." Coupling Mr. Donovan's testimony with the requirements HDR listed in the specifications, there is clear evidence of HDR's objective for the level of homogeneity required during construction. Barnard failed to construct the fill "free from lenses, pockets, streaks, and layers of material differing substantially in texture or gradation from the surrounding material" at all locations, and all involved parties failed to implement QC and QA measures to verify conformance with this part of the earthwork specification. It should also be noted that CDG performed a constructability review of the project and did not include any comments on compliance with the specification requiring the fill to be "free from lenses, pockets, streaks, and layers of material differing substantially in texture or gradation from the surrounding material."

LCM pg 23    Cites the inspector's daily report on December 11, 2003 as evidence that compaction tests all passed and that the fill was adequately blended.

GA    The inspector's daily reports did not routinely note the number of passing and failing compaction tests. For example, pages 10 and 11 (of 30) of the compaction test data report dated February 9, 2004 indicate that two compaction tests on fills failed due to excessive moisture on January 10, 2004. The inspector's daily report for that day notes that a "total of 19 compaction tests were run in the embankment and sand drain" with no indication that any of the compaction tests failed on January 10, 2004. LCM's "thorough" review apparently did not pick up on the deficiencies in the QA and QC programs in adequately documenting the work and identifying and correcting construction deficiencies. The inspector's daily reports do not appear to have been reviewed regularly. The inspector's were never inspecting for adequate blending of the fill materials as required in the specifications. Furthermore, GA considers that CDG should have identified or corrected these shortcomings and/or identified them as constructability issues.

LCM pg 28    The FDEP demanded design modifications after April 2001.


Golder Associates

Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 61 of 65 PageID 19949

GA          The FDEP requested that TBW and HDR provide calculations to demonstrate that the
            embankment and soil-cement facing would not be damaged by Reservoir drawdown.
            Design modifications were made by HDR to address the FDEP's request.  LCM's claim
            that the FDEP demanded the design modification is wrong.

LCM pg 28   CDG coordinated a constructability review that addressed the bidding and buildability
            issues of the plans and specifications, as well as other constructability issues.

GA          In its constructability reviews, CDG provided a multitude of comments on the
            specifications and drawings.  There was little input on the "constructability" of the project.
            Placing 16 inches of flat-plate soil-cement on a 3.0H:1V slope was difficult.  Some of the
            issues included trafficability, sequence of placement, time of placement, grade control,
            protection of the geotextile, and compaction.  GA saw nothing in the CDG constructability
            reviews that addressed general construction issues; this different than commenting on
            the contractor's specific means and methods.   LCM does not describe what "other
            constructability issues" were addressed by CDG.



GA_RBL000061

## 4.0   GOLDER ASSOCIATES REPLY TO INCONSISTENCIES IN THE DEFENDANTS REBUTTAL REPORTS

### 4.1   HDR rebuttal experts

**BCI pg 8**      BCI quotes the December 10, 2003, meeting notes indicating "moistures are low" and "some tests are failing." Also notes the word "dry" on the notes during the meeting on December 12, 2003.

**GEI pg 52**     GEI quotes that less than one percent of the density tests failed, usually due to too much water.

**GA**           GA reviewed the results of the compaction tests that were taken between December 1, 2003 and December 12, 2003. The data indicate that 5 out of 20 tests taken on December 9, 2003 failed because the fills were 3 to 5 percent dry of optimum. However, only 3 out of 192 tests taken between December 1st and 8th (inclusive) failed due to moisture contents that were 5.5 to 6.5 percent <u>wetter</u> than optimum; the other 189 tests taken during this period satisfied the specified compaction criterion. It appears the notes cited by BCI were in response to conditions during the day prior to the meeting and not indicative of the fills being too dry.

The compaction tests taken on December 11 and 12, 2003 also resulted in six tests (out of 53) that failed the specified compaction criterion for moisture, with moisture contents in the failing tests ranging from about **4 to 10 percent <u>wetter</u> than optimum**. These test results are contrary to the December 12, 2003, meeting notes cited by BCI as evidence that Barnard placed dry fills.

**BCI pg 9**      Portions of the wedge were completed using bulldozers.

**GEI pg 54**     According to discussions with HDR senior project managers, the embankment was typically overbuilt and cutback to final grade in an effort to ensure that proper grade was met.

**GA**           HDR's description recounted by GEI is contrary to BCI's description of the means and methods used to complete the final fill surface which formed the soil-cement subgrade. Milhorn's testimony confirmed GEI's statement that the final fill surface was typically overbuilt and cutback to final grade. BCI's causation theory does not fit, if the embankment was overbuilt and cutback to final grade – particularly at the southwest area.

**BCI pg 18**     Cracking and construction joints would help relieve excess water pressures.



Case 8:08-cv-02446-JDW-TBM   Document 349-20   Filed 05/19/11   Page 63 of 65 PageID 19951

| | |
|---|---|
| GEI pg 55 | Barry Meyer told GEI that the specification for repairing geotextiles was waived because the bonding of the soil-cement to the geotextile would provide a seal of the small stake penetrations. |
| GA | If the bonding of soil-cement and geotextile seals holes in the geotextile, a similar mechanism could also impede drainage through cracks or tear the geotextile at cracks. |
| BCI pg 11 | Very unlikely that wedge fill placed by bulldozers achieved the required density. |
| GEI pg 66 | GEI cites a document as evidence that Ardaman found medium dense soil and no voids in the soil-cement subgrade in some locations that experienced unusual cracking (ARD-26149 to 28166). |
| GA | Ardaman's report indicated that testing was conducted from Sta 0 to Sta 5, Sta 88 to Sta 93, Sta 245 to Sta 250, and Sta 257 to Sta 258. Ardaman's testing identified loose subgrade soils and a possible void between Sta 94+40 and Sta 94+60 and dense or medium dense subgrade soils at the other locations. |
| BCI pg 8-9 | BCI refers to Figure V-6 which is a photograph showing the contractor placing a protective lift over the geomembrane between Sta 230 and Sta 240. On pg 8, BCI refers to meeting minutes on November 11, 2003, as evidence the fill materials used to construct the protective lift between these stations was "[a] little dry." |
| 5RMK pg 8 | The same photograph is cited as evidence that the fill material for the protective lift was being placed over an area with standing water and saturated materials. |
| GA | The same photograph cannot show both that fill materials (taken from excavations within the Reservoir) were dry and that the materials at the ground surface near the interior toe of the embankment was saturated with standing water. |
| BCI pg 4 | Loose, dry fill will collapse into a denser state (and a higher degree of compaction) upon saturation. |
| 5RMK pg 20 | The protective fill placed in a loose condition over the geomembrane would have lost any initial compaction as a result of saturation of the soil. |
| GA | GA estimates that about three to five percent volume change in the protective fill would occur during the placement of the horizontal lifts of fill, construction traffic, machine vibrations, increasing wedge loads, and soil-cement loads, and wetting of the fill as 5RMK describes would help with densification during construction. |



GA_RBL000063

BCI pg 18      The intra-day and inter-day joints in the soil-cement provide for some relief of uplift pressures on the base of the soil cement.

5RMK pg 30      The distance between longitudinal joints in the soil-cement facing was too narrow.

GA      According to BCI's theory, more widely spaced joints would have increased uplift pressures. According to 5RMK's theory, more widely spaced joints would have reduced weaknesses in the soil-cement facing. The project record reviewed by GA does not indicate that the joint spacing was deliberately selected based on either of these issues.

## 4.2   Barnard rebuttal experts

Rizzo pg 13      Undrained shear strength of compacted fill assigned a friction angle of 45 degrees and no cohesion.

Devo Memo 3 pg 13      Analyzed stability for three cases with undrained shear strength compacted fill assigned friction angle and cohesion values of 29 degrees and zero, 39 degrees and 700 psf, and 25 degrees and 100 psf.



## 5.0    CLOSING

Pursuant to a court order, this report, prepared by GA, presents its reply to the ten (10) rebuttal reports submitted by the Defendant's experts on or about March 26, 2010. Rather than prepare a separate reply to each rebuttal report, GA chose to prepare a consolidated reply response.

GA has reviewed and analyzed numerous project records, other related documents, and the ten rebuttal reports by the defendant's experts. However, discovery in this case is ongoing and is not scheduled to terminate until December 15, 2010. Therefore, we anticipate that additional information will become available as discovery proceeds. Accordingly, GA expressly reserves the right to supplement, correct and/or amend this report in accordance with Fed. R. Civ. P. 26(e).

**GOLDER ASSOCIATES INC.**

William F. Brumund, Ph.D., P.E.          Kerem H. Esin, P.E.
Principal                                Senior Engineer & Associate

WFB/KHE/lcr

GA Reply Report - 04-23-2010.docx

