

January 17, 2011

Timothy D. Woodward, Esq.
Forizs & Dogali, P.A.
4301 Anchor Plaza Parkway
Suite 300
Tampa, FL 33634

Re:    Supplemental BCI Expert Report on Analysis and Evaluation of Soil Cement Cracking at Tampa Bay Reservoir
BCI Project No. 13354.5

Dear Mr. Woodward:

In accordance with your request, I have reviewed the Golder Associates' (Golder) rebuttal report, supplemented and dated November 15, 2010, with regard to opinions relating to my expert report dated April 2010. Specifically, Golder's report discusses various aspects of my opinion that the primary cause of damage to the soil cement facing at the Tampa Bay Reservoir (Reservoir) was collapse upon wetting of loose soil placed over the geomembrane liner in the wedge area of the embankment fill.

My discussion of the Golder rebuttal report is presented in this letter report. My observations and opinions herein are consistent with my previous report and the testimony that I gave in my deposition during November and December 2010.

In this letter report, I also respond in more detail to certain lines of inquiry during my deposition in November-December 2010. This includes my response to questions regarding additional photographs that illustrate construction of the protective layer and wedge fill; and Barnard Construction's contractual responsibilities with regard to the damage that occurred during operation of the Reservoir.

With regard to deposition questions that related to HDR Engineering's (HDR) contractual obligations and compliance with the engineer's standard of care, I defer to detailed studies and analyses made by Lee Wooten, P.E. of GEI, Inc., who has issued an expert report and a supplemental report that address these matters.

**Scope of Report**

This letter report is organized in three sections:

1. Response to Golder's supplemental report of November 15, 2010;

2. Construction photographs illustrating construction of wedge;

3. Discussion of Barnard's contractual responsibilities.



EXHIBIT
29

1.   Golder's Supplemental Report November 15, 2010

My reply to Golder's criticisms of BCI Engineering & Scientists' (BCI) Collapse Mechanism follows Golder's discussion in chronological order. The format first lists each page reference[1] in Golder's report and describes Golder's criticism, followed by my response to Golder's opinion. The items in dispute primarily involve 1) the extent to which soils at the site are susceptible to collapse upon wetting; 2) thickness of the protective layer and additional bulldozer placed fill in the damaged areas of soil cement; and 3) degree of compaction of the bulldozer placed fill.

---

*GA pg. 4*      *"observations and survey data indicate that the lower part of the (soil cement) slope appears (to) have bulged outward which cannot be explained by the BCI causation theory."*

BCI          Golder's statement contradicts their previous assessment,[2] which concluded that outward bulging of the slope was slight to non-existent. Golder states on pg. 64 of their January 8, 2010 report: "There is no evidence of any toe bulge in this area into the Reservoir." (Sta. 240 to 250, which includes the most damaged area of soil cement).

Our examination of stereo pairs of aerial photographs, taken in May 2009 when the Reservoir was drawn down, showed no evidence of systematic bulging of the lower part of the soil cement slope.

In addition, the BCI report[3] (pg. 14) identifies down-slope movement of cracked areas of soil cement as a secondary mechanism resulting from rainfall or reservoir water filling the cracks and underlying voids. The stick-slip downward movement detected by extensometer instruments is further evidence of this secondary slope movement mechanism, which resulted in slight bulges in the lower portion of the slope in some of the cracked areas.

---

*GA pg. 6-1*    *"It (BCI) opined that the collapse settlement could be as much as 20 percent." "....the BCI settlement estimate of 20 percent was based on erroneous data and interpretation from a triaxial compression test."*

---

[1] Note that the Golder November 15, 2010 supplemental report includes pages numbered 6-1 through 6-13 following page 6 of their original April 23, 2010 report. Use of those page numbers is continued in this letter report.
[2] Assessment of the Cause(s) of Distress to the Upstream Facing at the Tampa Bay Water Storage Reservoir in Hillsborough County, Florida, Golder Associates, January 8, 2010
[3] Analysis and Evaluation of Soil Cement Cracking at Tampa Bay Reservoir, March, 2010.

HDR Engineering                                           BCI Project No.13354.5
Supplemental BCI Expert Report on Analysis and Evaluation                    January 2011
of Soil Cement Cracking at Tampa Bay Reservoir                              Page 2

BCI_SUPRPT000002

BCI        Golder (pg. 5) correctly states that the maximum volume change observed in the Law triaxial tests was 16.6 percent, and the "nearly 20 percent" cited by BCI was the change in density, not volume. The allegation that the data were erroneous is incorrect, and even larger volume changes (collapse) can occur at lower densities than were used in the Law tests, as documented in the Golder supplemental report.

Golder (Table 2-2) ran wetting tests on samples of silty sand taken from Black & Veatch test pits excavated in the upstream slope of the Reservoir in 2009. Ten samples were compacted in Lucite cylinders at various densities and moisture contents. The lowest density sample showed a volume decrease of 30.3 percent upon wetting, significantly greater than the Law triaxial tests. This demonstrates that BCI's estimate of 20 percent collapse is less than the maximum that could occur for the fill soils at the Reservoir.

---

GA pg. 6-2     *"...wet fine-grained sands, silty sands, and clayey sands (SP, SP-SM, SM, SC) excavated from below the water table in Florida that are remolded, compacted, and used to construct embankments are not known for their susceptibility to collapse upon wetting."*

BCI        This generalized statement by Golder is irrelevant, given the Law triaxial tests and the Golder wetting tests, which demonstrated the collapse of soil samples from the site. In particular, Golder's reference to wet and compacted soils is disingenuous, since BCI specifically referred to collapse of dry (not wet) and loose (not compacted) fill placed in the wedge.

---

GA pg. 6-4ff   *Section 2.2.2.2.2.2 of the Golder report describes four collapse potential laboratory tests performed on test specimens of embankment fill from a B&V test pit. The samples showed less than 1% change in compaction during the wetting phase of the test.*

BCI        The Golder collapse potential tests were run on soil samples that had been previously compacted during construction in accordance with the project specifications; i.e., 95 percent density and within the specified moisture content range. Compaction to 95 percent density destroys the metastable fabric of a collapsible soil, thereby eliminating the possibility of future collapse.

If the samples had been dried prior to running the test, the metastable fabric would likely have been re-established, allowing collapse to occur when water was added. However, Golder did not dry the samples prior to testing.

---

GA pg. 6-4     *Golder describes the sequence of loading and then inundating the samples in their collapse potential tests (ASTM D5333). They correctly state that this sequence is different from the Law triaxial tests, which first inundated the samples and then applied the consolidation load.*

---

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
Page 3

BCI_SUPRPT000003

*Golder then implies that because the Law triaxial tests cited by BCI did not follow the sequence that occurred in the field, the results are not representative of the actual collapse behavior of the soil.*

BCI          The fact that the soil samples were inundated prior to loading (which is standard procedure for triaxial tests) would not have a significant effect on the amount of volume change (collapse) that occurred.

For example, Lawton et al. (1992), one of the references cited by Golder, states (pg. 1377) "the double-oedometer procedure...is based on the assumption that the deformations induced by wetting are independent of the loading-wetting sequence."

*GA pg. 6-6ff   "The work by Lee and Singh (1971) shows that the loosest the protective cover could be initially dumped would be about 80 to 85 percent compaction."*

BCI          In fact, the minimum dry density reported by Lee & Singh is approximately 50 percent compaction. That is a more reasonable value for the loosest dumped fill in the protective layer, compatible with Golder's reported value of 53 percent compaction for the loosest sample in their wetting tests (pg. 6-10). Golder described the sample preparation as "carefully placing the soil in the cylinder using a spoon and a very light touch." That is essentially the procedure recommended by ASTM D4424 for determining the loosest density of a soil in the laboratory.

*GA pg. 6-10   "It is Golder Associates' opinion that there is no possibility that the embankment soil at the Reservoir could have been placed and spread at less than 87 percent compaction."*

BCI          This opinion by Golder is based on two erroneous assumptions; namely that the protective layer thickness did not exceed 3 feet in any location, and that loosest density of the protective layer as dumped was 80 percent compaction or greater. In fact, as pointed out above, Golder's own wetting test data show a minimum density of only 53 percent compaction; and the thickness of the protective layer, based on photographic evidence discussed in more detail herein, exceeded 3 feet in portions of the northeast area where the greatest volume of collapse occurred.

*GA pg. 6-7   "Dudley (1970) noted that one of the prime requirements for collapse to occur is for the soil the have a loose structure (i.e., high porosity). Although Dudley focused primarily on naturally occurring deposits, he stated that collapsing soils have usually been associated with regions of moisture deficiency as opposed to areas having considerable rainfall. Florida is not considered to be a moisture-deficient areas or an area without considerable rainfall."*

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
Page 4

BCI_SUPRPT000004

BCI      Golder selectively quotes from Dudley and thereby misrepresents his conclusion. The final two sentences from the Dudley paragraph, which were not quoted by Golder, state the following: "Although desiccation is usually a product of an arid climate, such a climate is not essential. For example, although Mississippi is not an arid state, the loess of that area is subject to collapse on soaking."

It is worth noting that the annual rainfall in Mississippi (54 inches) is essentially the same as central Florida.

It is also curious that Golder, after documenting collapse with their own tests on soils from the Reservoir embankment, continues to rely on general comments from literature sources to argue that Florida soils are not collapsible.

2. Construction photographs illustrating construction of the wedge fill

The March 25, 2010 BCI expert report includes photographs illustrating placement of the protective layer and construction of the wedge fill. These photographs were representative of those obtained during discovery, and were not inclusive of all photographs in my possession that relate to the opinions expressed in the report.

I have reviewed all of the photographs to identify additional ones that relate to my conclusions and opinions. I have included the additional photographs with some of the original photographs from the March 25, 2010 report, in **Appendix A** to this letter report. Portions of the photographs have been enlarged to illustrate the significant points regarding placement of the protective layer and additional bulldozer placed fill in the wedge. The captions included with the photographs describe the relevant points.

The approximate locations of the photographs are given in the captions, where identification could be made. Such identifications were based on dates of the photographs (where available) and visual observation of Reservoir geometry. It should be noted that the only area of the Reservoir where excessive thicknesses of bulldozed fill were positively identified is the northeast area, where the greatest damage to the soil cement occurred.

3. Barnard's Contractual Responsibilities

I reviewed Barnard's contract ("Agreement") with Tampa Bay Water dated June 11, 2002, which described the Contractor's responsibilities for construction of the Reservoir. Prior to that review, which I undertook during preparation for my last deposition session December 15, 2010, I was not aware of the Contractor's responsibilities as stated in the Agreement.

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
Page 5

BCI_SUPRPT000005

During my review, I highlighted various sections, of the General Conditions in the Agreement, which are shown in the attached **Appendix B.** These sections detail the Contractor's responsibilities with regard to performing the Work in accordance with the project plans and specifications.

The following section summarizes the Contractor's responsibilities, and makes it clear that the Contractor agreed to perform the Work in accordance with the Contract requirements, independent of any guidance or instructions, or lack thereof, from the Engineer, Owner, or Construction Manager.

Furthermore, the Agreement states that any defective construction work, which would include areas where the bulldozer-placed fill in the wedge was placed too thick, too dry, and too loose, was the responsibility of the Contractor.

These contract requirements are consistent with my experience on earthwork projects over many years. The contractor bears the responsibility to employ means and methods that will fulfill the intent of the contract plans and specifications.

General Conditions

Pg. 8  2.3.2  Contractor shall report in writing to Construction Manager any conflict, error, omission, or ambiguity in the Contract Documents, and shall obtain a written interpretation or clarification from Construction Manager before proceeding with any affected work.

Pg. 9  3.1.1  Construction Manager's and Engineer's authority shall not affect Contractor's responsibility to perform the Work in accordance with the Contract Documents.

Pg. 9  3.2.1  Visits and observations by Construction Manager or Engineer shall not relieve Contractor of its obligations ....to furnish materials and perform acceptable work.

Pg. 9  3.2.3  Observations by Project Representative shall not relieve Contractor of its obligations....to furnish materials and perform fork.

Pg. 9  3.2.4  Onsite observations by Engineer, Construction Manager, Project Representatives, and other assistants shall not relieve Contractor from its obligation to perform the Work in accordance with the Contract Documents, nor constitute acceptance of Defective Work.

Pg. 10 3.3.1  Construction Manager's and Engineer's authority does not relieve      Contractor from its responsibility to perform in accordance with the Contract Documents.

Pg. 10 3.3.2  Failure on the part of Construction Manager or Engineer to condemn or reject Defective Work shall not be construed to imply acceptance of such work.

HDR Engineering                                                    BCI Project No.13354.5
Supplemental BCI Expert Report on Analysis and Evaluation                  January 2011
of Soil Cement Cracking at Tampa Bay Reservoir                              Page 6

BCI_SUPRPT000006

Pg. 21 4.17.2 Contactor shall establish a quality control system to ensure sufficient supervision, inspection, and testing of all items of Work, including those of the Subcontractors and Suppliers, and to ensure conformance to the applicable Contract Documents.

Pg. 24 5.1.4   Tampa Bay Water, Construction Manager, Engineer, and any of their respective consultants or contractors will not be responsible for Contractor's means, methods, techniques, sequences, or procedures of construction, … and neither Tampa Bay Water, Construction Manager, nor Engineer or any of their consultants or contractors shall be responsible for Contractor's failure to perform or furnish the Work in accordance with the Contract Documents.

Pg. 38 7.6.1   Neither the inspection by Tampa Bay Water, Engineer, or Construction Manager nor any payment for, or acceptance of, the whole or any part of the Work by Tampa Bay Water, Engineer or Construction Manager, …. shall operate as a waiver of any provision of the Contract Documents.

---

Summary

It is my continued opinion that if the Reservoir had been constructed as intended and designed by the Engineer of Record, HDR Engineering, Inc., the damage to the soil cement would not have occurred.

Investigation and study of the Reservoir is ongoing, with continuing investigations into the conditions present, and the performance during drawdown. For these reasons, I reserve the right to amend, correct, or supplement the information, analyses, and opinions contained in this report as may be necessary prior to the trial of this case.

Sincerely yours,

*Leslie G Bromwell*

Leslie G. Bromwell, Sc.D., P.E.
Principal Engineer
Florida Registration No. 18234

lgb/dl
enclosures      Appendix A
               Appendix B

HDR Engineering                                                     BCI Project No.13354.5
Supplemental BCI Expert Report on Analysis and Evaluation                        January 2011
of Soil Cement Cracking at Tampa Bay Reservoir                                       Page 7

BCI_SUPRPT000007

**APPENDIX A**
**Construction Photographs**

BCI_SUPRPT000008





**Photograph 1:**
Northeast Area. Area behind and left of upper truck shows second layer of fill pushed over protective layer.

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000009



**Photograph 2:**
Approx. Sta 02 to 07. Triangular-shaped area shows second layer of full pushed over protective layer

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000010



**Photograph 3:**
Approx. Sta 03 to 07. Enlarged portion of photo shows thick protective layer. Note height of fill relative to vehicles and crouched inspector on adjacent geomembrane

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000011





**Photograph 4:**
   Approx. Sta 03 to 07. Enlarged portion of photo shows multiple layers of fill being pushed over protective layer

HDR Engineering                                                                    BCI Project No.13354.5
Supplemental BCI Expert Report on Analysis and Evaluation                          January 2011
of Soil Cement Cracking at Tampa Bay Reservoir                                     APPENDIX A

BCI_SUPRPT000012



**Photograph 5:**
Approx. Sta 238 to 243. Photo shows thick protective layer – note person sitting on adjacent geomembrane.

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000013



Photograph 6:
    Approx. Sta 240 to 246. Enlarged portion of photo shows additional bulldozed fill placed over protective layer

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000014



**Photograph 7:**
    Approx. Sta 240 to 246. Enlarged portion of photo shows additional bulldozed fill placed over protective layer

HDR Engineering                                                              BCI Project No.13354.5
Supplemental BCI Expert Report on Analysis and Evaluation                                January 2011
of Soil Cement Cracking at Tampa Bay Reservoir                                            APPENDIX A

BCI_SUPRPT000015



**Photograph 8:**
　Approx. Sta 240 to 246. Enlarged portion of photo shows additional bulldozed fill placed over protective layer

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000016



**Photograph 9:**
> Approx. Sta 240 to 246. Enlarged portion of photo shows vertical edge of loose thick bulldozed fill placed as protective layer

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000017



**Photograph 10:**
　Approx. Sta 240 to 246. Enlarged portion of photo shows additional fill bulldozed laterally over protective layer

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000018





**Photograph 11:**
Approx. Sta 240 to 246. Enlarged portion of photo shows additional fill bulldozed laterally over protective layer

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000019



**Photograph 12:**
   Approx. Sta 240 to 246. Enlarged portion of photo shows additional fill  bulldozed vertically over protective layer

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000020



**Photograph 13:**
 Approx. Sta 240 to 246. Enlarged portion of photo shows additional fill  bulldozed laterally over protective layer

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000021



**Photograhp 14:**
   Approx. Sta 240 to 246. Enlarged portion of photo shows additional fill  bulldozed vertically over protective layer

HDR Engineering                                                    BCI Project No.13354.5
Supplemental BCI Expert Report on Analysis and Evaluation                    January 2011
of Soil Cement Cracking at Tampa Bay Reservoir                               APPENDIX A

BCI_SUPRPT000022





**Photograph 15:**
Approx. Sta 240 to 246. Enlarged portion of photo shows additional fill bulldozed over protective layer

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000023





**Photograph 16:**
    Approx. Sta 240 to 246. Enlarged portion of photo shows additional fill bulldozed over protective layer

HDR Engineering                                                                BCI Project No.13354.5
Supplemental BCI Expert Report on Analysis and Evaluation                        January 2011
of Soil Cement Cracking at Tampa Bay Reservoir                                     APPENDIX A

BCI_SUPRPT000024





**Photograph 17:**
   Approx. Sta 240 to 246. Enlarged portion of photo shows additional fill bulldozed over protective layer

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000025



**Photograph 18:**
  Approx. Sta 253 to 03. Enlarged portion of photo shows thick layer of protective fill being placed. Note thickness relative to height of inspectors. Also, note that bulldozer operator has no direct view of fill in front of blade

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000026



**Photograph 19:**
    Approx. Sta 250 to 260. Lateral placement of bulldozed fill on slope of wedge

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000027



**Photograph 20:**
   Lateral placement of bulldozed fill on slope of wedge

HDR Engineering
Supplemental BCI Expert Report on Analysis and Evaluation
of Soil Cement Cracking at Tampa Bay Reservoir

BCI Project No.13354.5
January 2011
APPENDIX A

BCI_SUPRPT000028

**APPENDIX B**

**Barnard Agreement General Conditions**

BCI_SUPRPT000029

PROJECT NO.: 01302                                          General Conditions

effective to (a) change the duties and responsibilities of CONTRACTOR, TAMPA BAY WATER, CONSTRUCTION MANAGER, or ENGINEER, or any of their consultants, agents, or employees from those assigned in the CONTRACT DOCUMENTS, or (b) to assign to CONTRACTOR, TAMPA BAY WATER, CONSTRUCTION MANAGER or ENGINEER, or any of their consultants, agents, or TAMPA BAY WATER employees, any duty or authority to supervise or direct the execution of the WORK or to assume responsibility contrary to the provisions of the CONTRACT DOCUMENTS.

## 2.2      Priority of the Contract Documents

**2.2.1**     In resolving inconsistencies among two or more sections of the CONTRACT DOCUMENT, CONTRACTOR shall be obligated to comply with the more costly or stringent requirement, as determined by TAMPA BAY WATER. Figure dimensions on DRAWINGS shall take precedence over scale dimensions. Detailed DRAWINGS shall take precedence over general DRAWINGS.

## 2.3      Examination and Verification of Contract Documents

**2.3.1**     Before undertaking each part of the WORK, CONTRACTOR shall carefully study and compare the CONTRACT DOCUMENTS with each other, check and verify pertinent figures and all applicable field measurements, and compare and coordinate related requirements for WORK (i.e. location, dimensions, fit, completeness, consistency, etc.).

**2.3.2**     CONTRACTOR shall, immediately upon discovery, report in writing to CONSTRUCTION MANAGER any conflict, error, omission, or ambiguity in the CONTRACT DOCUMENTS which CONTRACTOR discovers, whether prior to or while performing the WORK, and shall obtain a written interpretation or clarification from CONSTRUCTION MANAGER before proceeding with any affected WORK.   CONSTRUCTION MANAGER shall promptly investigate the matter and until such interpretation or clarification is obtained from CONSTRUCTION MANAGER, any WORK done by CONTRACTOR which is directly or indirectly affected by same, will be at CONTRACTOR'S risk and CONTRACTOR shall bear all resultant costs and delays.

## 2.4      Documents to be Kept on the Project Site

**2.4.1**     CONTRACTOR shall keep at least one copy of the CONTRACT DOCUMENTS on the PROJECT site in good order, available to TAMPA BAY WATER and its representatives. CONTRACTOR shall maintain on a daily basis at the PROJECT site, and make available to CONSTRUCTION MANAGER on request, one current set of AS-BUILT CONTRACT DOCUMENTS which have been accurately marked by CONTRACTOR to indicate all modifications in the completed WORK that differ from the original CONTRACT DOCUMENTS. As a condition precedent to FINAL COMPLETION of the WORK, CONTRACTOR shall give CONSTRUCTION MANAGER one complete set of these AS-BUILT CONTRACT DOCUMENTS.

## 2.5      Additional Contract Documents

**2.5.1**     ENGINEER through the CONSTRUCTION MANAGER shall furnish to CONTRACTOR five (5) sets of sealed DRAWINGS and one (1) reproducible sets of the CONTRACT DOCUMENTS.

## 2.6      Ownership of Contract Documents

**2.6.1**     All portions of the CONTRACT DOCUMENTS, and copies thereof furnished to CONTRACTOR are the property of TAMPA BAY WATER. They are not to be used on other work and are to be returned to CONSTRUCTION MANAGER at the completion of the WORK with the

8

PROJECT NO.: 01302                                          General Conditions

exception of CONTRACTOR'S record set.   Any reuse or adaptation of these materials by
CONTRACTOR without specific written permission by TAMPA BAY WATER is expressly prohibited
and shall be at the risk of CONTRACTOR and without liability or legal expense to TAMPA BAY
WATER, ENGINEER or CONSTRUCTION MANAGER. CONTRACTOR shall hold TAMPA BAY
WATER, CONSTRUCTION MANAGER and ENGINEER harmless from any and all damages and
claims, including reasonable attorneys' fees and legal assistants' fees, for such unauthorized use.

III.      ENGINEER AND CONSTRUCTION MANAGER

3.1       Authority

3.1.1     CONSTRUCTION MANAGER and ENGINEER shall be representatives of TAMPA BAY
WATER during the CONTRACT TIME for performance of the WORK.   CONSTRUCTION
MANAGER and ENGINEER each shall have authority to reject WORK which does not conform to the
CONTRACT DOCUMENTS.   ENGINEER'S rejection of WORK shall be submitted through
CONSTRUCTION MANAGER to CONTRACTOR.   However, CONSTRUCTION MANAGER'S
and ENGINEER'S authority shall not affect CONTRACTOR'S responsibility to perform the WORK in
accordance with the CONTRACT DOCUMENTS.

3.2       Duties and Responsibilities

3.2.1     CONSTRUCTION MANAGER shall make visits to the PROJECT site at intervals appropriate
to the various stages of construction to observe the progress and quality of the WORK and to determine if
the WORK is proceeding in accordance with the CONTRACT DOCUMENTS. Visits and observations
made by CONSTRUCTION MANAGER or ENGINEER are solely for the benefit of TAMPA BAY
WATER and shall not relieve CONTRACTOR of its obligations, including, but not limited to,
CONTRACTOR'S obligations to conduct comprehensive inspections of the WORK and to furnish
materials and perform acceptable work, and to provide adequate safety precautions, all in accordance with
the CONTRACT DOCUMENTS.

3.2.2     CONSTRUCTION MANAGER shall respond, in writing, within 21 days of receipt (unless
more time is reasonably required for response), to all claims by TAMPA BAY WATER or
CONTRACTOR required for performance of the WORK and requests for clarification or interpretation
of the CONTRACT DOCUMENTS. CONSTRUCTION MANAGER'S response shall be of factual
and/or technical nature, and shall not include the legal interpretation of the CONTRACT
DOCUMENTS.

3.2.3     CONSTRUCTION MANAGER may assign one or more PROJECT REPRESENTATIVES to
observe the WORK.  It is understood that such PROJECT REPRESENTATIVES shall have authority to
issue NOTICES of non-conformance and make decisions within the limitations of authority of
CONSTRUCTION MANAGER.  CONTRACTOR shall furnish all reasonable assistance required by
CONSTRUCTION MANAGER, ENGINEER or any PROJECT REPRESENTATIVE for proper
observation of the WORK.  Observations by the PROJECT REPRESENTATIVE shall not relieve
CONTRACTOR of its obligations including, but not limited to, CONTRACTOR'S obligation to
conduct comprehensive inspections of the WORK and to furnish materials and perform work, and to
provide adequate safety precautions, all in accordance with the CONTRACT DOCUMENTS .

3.2.4     On-site observations by ENGINEER, CONSTRUCTION MANAGER, PROJECT
REPRESENTATIVES and other assistant shall not relieve CONTRACTOR from its obligation to
perform the WORK in accordance with the CONTRACT DOCUMENTS, nor constitute acceptance of

9

PROJECT NO.: 01302                                              General Conditions

DEFECTIVE WORK, nor give rise to any duty on their part to make the observations for the benefit of CONTRACTOR.

3.2.5.   CONSTRUCTION MANAGER shall return reviewed SUBMITTALS within the times specified in the General Requirements, or if not specified, within 21 days of receipt (unless more time is reasonably required for review) for conformance with the design of the PROJECT and for compliance with the CONTRACT DOCUMENTS. ENGINEER'S or CONSTRUCTION MANAGER'S review shall not extend to means, methods, techniques, sequences, nor to procedures of construction (except where a specific means, method, technique, sequence, or procedure of construction is indicated in or required by the CONTRACT DOCUMENTS), nor to safety precautions or programs incident thereto.

3.3      Rejected Work

3.3.1.   CONSTRUCTION MANAGER and ENGINEER, through the CONSTRUCTION MANAGER, each shall have authority to disapprove or reject WORK at any time during the performance of the WORK, which they believe to be DEFECTIVE, or to require special inspection or testing of the WORK, whether or not the WORK is fabricated, installed, or completed. CONSTRUCTION MANAGER'S and ENGINEER'S authority does not relieve CONTRACTOR from its responsibility to perform in accordance with the CONTRACT DOCUMENTS. When CONTRACTOR is notified by CONSTRUCTION MANAGER of rejection of DEFECTIVE WORK, CONTRACTOR shall take immediate action to correct same.

3.3.2.   All DEFECTIVE WORK, whether discovered before or after FINAL COMPLETION, shall be removed and replaced by CONTRACTOR, without cost to TAMPA BAY WATER, with WORK which shall conform to the requirements of the CONTRACT DOCUMENTS. Failure on the part of CONSTRUCTION MANAGER or ENGINEER to condemn or reject DEFECTIVE WORK shall not be construed to imply acceptance of such WORK. TAMPA BAY WATER shall reserve and retain all of its rights and remedies at law or equity against CONTRACTOR and its Surety for correction of or damages arising from any and all DEFECTIVE WORK.

3.4      Lines and Grades

3.4.1.   Lines and grades shall be established as provided in the DRAWINGS or the Supplementary Conditions. All information, stakes or marks shall be carefully preserved by CONTRACTOR, and if the information, stakes or marks are destroyed or removed, all such information, stakes or marks shall be replaced at CONTRACTOR'S expense.

3.5      Detail Drawings and Instructions

3.5.1.   If required, ENGINEER through CONSTRUCTION MANAGER shall furnish within 21 days (unless more time is reasonably required), in writing, additional instructions by means of DRAWINGS or otherwise, as required for the proper execution of the WORK. All such DRAWINGS and instructions shall be in writing and consistent with the CONTRACT DOCUMENTS.

IV.      CONTRACTOR and Its Employees

4.1      Contractor

4.1.1.   CONTRACTOR shall independently perform all WORK included in the CONTRACT DOCUMENTS and shall not be considered an agent of TAMPA BAY WATER or of ENGINEER or CONSTRUCTION MANAGER, nor shall CONTRACTOR'S SUBCONTRACTORS, SUPPLIERS,

BCI_SUPRPT000032

PROJECT NO.: 01302                                    General Conditions

4.17     Tests, Samples, and Observations

4.17.1.  CONTRACTOR shall furnish, with no increase in CONTRACT PRICE, the necessary test pieces and samples, including facilities and labor for obtaining the same, as required by the CONTRACT DOCUMENTS or requested by CONSTRUCTION MANAGER or ENGINEER through CONSTRUCTION MANAGER. When required by the CONTRACT DOCUMENTS or requested by CONSTRUCTION MANAGER or ENGINEER through CONSTRUCTION MANAGER, CONTRACTOR shall furnish certificates of any designated tests of materials and equipment.

4.17.2.  CONTRACTOR shall establish a quality control system to ensure sufficient supervision, inspection and testing of all items of WORK, including those of the SUBCONTRACTORS and SUPPLIERS, and to ensure conformance to the applicable CONTRACT DOCUMENTS with respect to products, workmanship, construction, maintenance, finish, functional performance, and identification. CONTRACTOR'S quality control system shall include checking, approval, and coordination of SUBMITTALS and the surveillance of all specified tests.

4.17.3.  TAMPA BAY WATER, CONSTRUCTION MANAGER, ENGINEER, authorized government agents and their representatives shall at all times be provided safe access to the WORK whenever it is in preparation or progress, and CONTRACTOR shall provide facilities for such access and for observations, including maintenance of temporary and permanent access.

4.17.4.  If the CONTRACT DOCUMENTS, LAWS AND REGULATIONS or any public authority requires any WORK to be specially tested or approved, CONTRACTOR shall give timely NOTICE to CONSTRUCTION MANAGER of its readiness for testing or approval.

4.17.5.  If any testing, inspection, or approval reveals failure of any part of the WORK to conform to the CONTRACT DOCUMENTS, CONTRACTOR shall not recover any costs made necessary by that failure, and shall reimburse TAMPA BAY WATER for all direct, indirect, and consequential costs made necessary by that failure including those of repeated procedures, and compensation for the services of CONSTRUCTION MANAGER and ENGINEER. Such reimbursement may be withheld from payment to CONTRACTOR.

4.17.6.  If a portion of the WORK is covered contrary to CONSTRUCTION MANAGER'S request or to requirements specifically expressed in the CONTRACT DOCUMENTS, it must, if required by CONSTRUCTION MANAGER, be uncovered for CONSTRUCTION MANAGER'S or ENGINEER'S examination and be recovered at CONTRACTOR'S expense without change to the CONTRACT TIME or CONTRACT PRICE. If any WORK should be covered up without approval or consent of CONSTRUCTION MANAGER, re-examination of questioned WORK may be ordered by CONSTRUCTION MANAGER, and if so ordered, the WORK shall be uncovered by CONTRACTOR. If it is found that such WORK is DEFECTIVE, CONTRACTOR shall bear all direct, indirect, and consequential costs of such uncovering, exposure, observation, inspection, correction of the DEFECTIVE WORK, and testing and of satisfactory reconstruction, (including but not limited to fees and charges of engineers, architects, attorneys, and other professionals) and TAMPA BAY WATER shall be entitled to reimbursement or to deduct the costs from payment to CONTRACTOR. If it is found that such WORK is not DEFECTIVE, TAMPA BAY WATER shall reimburse CONTRACTOR for the cost of uncovering, inspecting, and recovering such WORK.

4.18     Royalties and Patents

4.18.1.  CONTRACTOR shall pay all royalty and patent fees unless otherwise specified. Pursuant to the indemnity provisions of the General Conditions, *Article 4.4, Indemnity*, CONTRACTOR shall defend all

21

BCI_SUPRPT000033

PROJECT NO.: 01302                                                      General Conditions

4.20.4. DEFECTIVE WORK identified for correction during the CORRECTION PERIOD but remaining DEFECTIVE after its expiration shall be considered as part of the obligations of the warranty or guarantee.

4.20.5. CONTRACTOR agrees to defend, indemnify and hold TAMPA BAY WATER, CONSTRUCTION MANAGER and ENGINEER harmless from liability of any kind arising from damage due to DEFECTIVE WORK.   CONTRACTOR shall make all repairs and replacements promptly upon receipt of written order for same from TAMPA BAY WATER, or CONSTRUCTION MANAGER.   If CONTRACTOR fails to make the repairs and replacements promptly, or in an emergency, where delay would cause serious risk, loss, or damage, TAMPA BAY WATER may have the DEFECTIVE WORK corrected or the rejected WORK removed and replaced, and CONTRACTOR and its Surety shall be liable for the cost thereof.

4.20.6. CONTRACTOR'S subagreements with its manufacturer(s) and the SUPPLIER(S) of all materials shall permit CONTRACTOR to assign to TAMPA BAY WATER all express and implied warranties from the manufacturer(s) and the SUPPLIER(S).   CONTRACTOR hereby assigns to TAMPA BAY WATER all express and implied warranties from the manufacturer(s) and the SUPPLIER(S) of all materials used in the WORK.

4.20.7. The specified warranties and guarantees and CONTRACTOR'S obligations for correction of WORK specified in this Article are in addition to and not in limitation of any other specific remedies provided in the CONTRACT DOCUMENTS or by LAWS AND REGULATIONS.

4.20.8. Tests, inspections or approvals shall not in any way relieve CONTRACTOR from its obligations to perform the WORK in accordance with the CONTRACT DOCUMENTS, or to warrant and guarantee the WORK as provided in the CONTRACT DOCUMENTS.

4.20.9. These provisions shall not be construed to prohibit TAMPA BAY WATER from seeking damages or any remedy at law or equity against CONTRACTOR for breach of the CONTRACT, DEFECTIVE WORK or the warranties provided herein.

4.21    Allowances

4.21.1   CONTRACTOR shall not proceed with any ALLOWANCE item unless and until it has received express written authorization from TAMPA BAY WATER.   The CONTRACT PRICE shall be adjusted by CHANGE ORDER or CHANGE AUTHORIZATION based upon the actual cost of the ALLOWANCE items authorized in writing by TAMPA BAY WATER.

V.    TAMPA BAY WATER/OWNER

5.1    General Provision

5.1.1.   Written communications from TAMPA BAY WATER or ENGINEER to CONTRACTOR shall in general be issued through CONSTRUCTION MANAGER, but if issued directly by TAMPA BAY WATER, a copy shall be provided to CONSTRUCTION MANAGER and ENGINEER.

5.1.2.   TAMPA BAY WATER may issue without negotiation, at its discretion CHANGE AUTHORIZATIONS, as provided in the CONTRACT DOCUMENTS.   Only TAMPA BAY WATER is empowered under the CONTRACT DOCUMENTS to order changes in the WORK that affect CONTRACT TIME or CONTRACT PRICE or quality.

BCI_SUPRPT000034

PROJECT NO.: 01302                                             General Conditions

5.1.3. If the WORK is DEFECTIVE, or CONTRACTOR fails to supply sufficient skilled workers or suitable materials or equipment, or fails to furnish or perform the WORK in a way that the completed WORK will conform to the CONTRACT DOCUMENTS, TAMPA BAY WATER may order CONTRACTOR to stop the WORK, or any portion of the WORK in question, until the cause for the stop order has been eliminated; however, this right of TAMPA BAY WATER to stop the WORK shall not give rise to any duty on the part of TAMPA BAY WATER to exercise this right for the benefit of CONTRACTOR or any other party. CONTRACTOR shall not be allowed to recover any costs resulting from an order to stop the WORK, and CONTRACTOR shall reimburse TAMPA BAY WATER for all direct, indirect, or consequential costs attributable to an order to stop the WORK; those costs to be documented as to reasonableness, and TAMPA BAY WATER shall be entitled to an appropriate decrease in CONTRACT PRICE, or to withhold such decrease against any amounts recommended for payment. CONTRACTOR shall remain responsible for maintaining and performing in accordance with the PROGRESS SCHEDULE and shall not be entitled to any extension in CONTRACT TIME or any increase in CONTRACT PRICE.

5.1.4. TAMPA BAY WATER, CONSTRUCTION MANAGER, ENGINEER, and any of their respective consultants or contractors will not be responsible for CONTRACTOR'S means, methods, techniques, sequences, or procedures of construction, or the safety precautions, and programs related to safety, and neither TAMPA BAY WATER, CONSTRUCTION MANAGER nor ENGINEER or any of their consultants or contractors shall be responsible for CONTRACTOR'S failure to perform or furnish the WORK in accordance with CONTRACT DOCUMENTS.

## VI.    Progress of the WORK

### 6.1    Beginning of the WORK

6.1.1. Prior to starting the WORK, CONTRACTOR shall prepare and submit to CONSTRUCTION MANAGER, a PROGRESS SCHEDULE and a schedule for SUBMITTALS in a format acceptable to TAMPA BAY WATER and CONSTRUCTION MANAGER and as specified in the General Requirements showing the dates on which each part or division of the WORK is expected to be started and completed, and a schedule for SUBMITTALS.

6.1.2. No sooner than ten (10) DAYS before the LIMITED NOTICE TO PROCEED is issued, a pre-construction conference shall be held to review the steps undertaken by CONTRACTOR to comply with the schedule requirements; review the qualifications of CONTRACTOR'S on-site personnel; review CONTRACTOR'S plans for lay-down and staging areas, construction traffic, and access to the PROJECT site, parking, communications, procedures, and other similar matters.

### 6.2    Schedules and Progress Reports

6.2.1. The PROGRESS SCHEDULE, or schedule recovery actions, once reviewed and accepted by TAMPA BAY WATER and CONSTRUCTION MANAGER , shall be utilized to report progress or schedule recovery actions, and to evaluate CONTRACTOR'S PAYMENT APPLICATIONS. CONTRACTOR shall be required to keep TAMPA BAY WATER informed of the progress of the WORK by delivering updated PROGRESS SCHEDULES prior to the seventh (7th) day of each month, for review and acceptance by TAMPA BAY WATER and CONSTRUCTION MANAGER. CONTRACTOR'S submittal of acceptable monthly updates to the PROGRESS SCHEDULES is a condition precedent to TAMPA BAY WATER'S obligation to make payments to CONTRACTOR hereunder. Notwithstanding anything in the CONTRACT DOCUMENTS to the contrary, it is expressly acknowledged and agreed that no review or acceptance of any PROGRESS SCHEDULE by TAMPA BAY WATER or CONSTRUCTION MANAGER shall be construed as an admission or

BCI_SUPRPT000035

PROJECT NO.: 01302                                    General Conditions

applicable, TAMPA BAY WATER shall pay to CONTRACTOR all monies due it under the provisions of these CONTRACT DOCUMENTS.

### 7.6     No Waiver of Rights

7.6.1.   Neither the inspection by TAMPA BAY WATER, ENGINEER or CONSTRUCTION MANAGER nor any payment for, or acceptance of, the whole or any part of the WORK by TAMPA BAY WATER, ENGINEER or CONSTRUCTION MANAGER, nor any extension of time, nor any possession taken by TAMPA BAY WATER, shall operate as a waiver of any provision of the CONTRACT DOCUMENTS, or any right to damages, nor shall such waive any subsequent breach. Acceptance of final payment shall not release CONTRACTOR of any liability under the CONTRACT DOCUMENTS or otherwise, and shall not be deemed evidence of performance or be construed as acceptance of DEFECTIVE or improper WORK.

### 7.7     Acceptance of Final Payment Constitutes Release

7.7.1.   The acceptance by CONTRACTOR of the final payment shall release TAMPA BAY WATER, CONSTRUCTION MANAGER and ENGINEER from all claims and all liability to CONTRACTOR for all things done or furnished in connection with the WORK, and every act of TAMPA BAY WATER and others relating to or arising out of the WORK except claims previously made in writing and identified by CONTRACTOR in its final PAYMENT APPLICATION as still unsettled. No payment, however, final or otherwise, shall operate to release CONTRACTOR or its Sureties from obligations under the CONTRACT DOCUMENTS and the Performance Bonds, Payment Bonds, and other bonds and warranties, as herein provided.

### 7.8     Record Maintenance and Auditing Rights

7.8.1.   CONTRACTOR shall keep all books, records, files and other documentation, including all electronically stored items, which concern or relate to the WORK hereunder (collectively referred to herein as the "Records"), for a minimum of three (3) years from the date of expiration or termination of this CONTRACT or the date of FINAL COMPLETION or as otherwise required by law, whichever date is later. TAMPA BAY WATER, or any duly authorized agents or representatives of TAMPA BAY WATER, shall have the right to audit, inspect and copy all such Records as often as they deem necessary during any such period of time. This right to audit, inspect and copy CONTRACTOR'S Records shall include all of the Records of the SUBCONTRACTORS and SUPPLIERS.

### 7.9     Hazardous Materials

7.9.1.   If CONTRACTOR encounters on the PROJECT site any materials reasonably believed by CONTRACTOR to be petroleum or petroleum-related products, or other hazardous or toxic substances which have not been rendered harmless, CONTRACTOR immediately shall (i) stop WORK in the area affected and (ii) report such condition to TAMPA BAY WATER and CONSTRUCTION MANAGER in writing. If the WORK is so stopped and hazardous material is found, the WORK in the affected area shall not thereafter be resumed except by CHANGE ORDER. Any such CHANGE ORDER shall include, but not be limited to, an adjustment to the CONTRACT TIME as appropriate. If no hazardous material is found after the WORK has stopped, no CHANGE ORDER is required to resume the WORK in the affected area. Further, if the hazardous material was generated or caused by CONTRACTOR, or any of its employees, agents, SUBCONTRACTORS or SUPPLIERS, no CHANGE ORDER will be required for an adjustment in the CONTRACT TIME and CONTRACTOR shall indemnify TAMPA BAY WATER for any costs incurred by TAMPA BAY WATER with respect to such hazardous material.

38