1   A.   Just to correct the beginning.  I'm not sure
2   it was the beginning of 2004, but it was early in 2004,
3   as I recall.  And no, I had not -- not been at the site
4   until after the first cracking was found.
5   Q.   Okay.  Now, you're aware that in December of
6   '06 unusual cracking in the flat-plate soil-cement was
7   discovered, correct?
8   A.   Yes, I am.
9   Q.   Okay.  And you've inspected the reservoir once
10  the unusual cracking was discovered; is that correct?
11  A.   Yes, I have.
12  Q.   How many times have you been out to the
13  reservoir to inspect it since the unusual cracking was
14  discovered?  When I say "you," I'm talking about you
15  personally.
16  A.   I think four times.
17  Q.   Do you know the dates that you were out there?
18  A.   I don't recall the exact dates.  I know
19  approximately.
20  Q.   And what were the approximate dates?
21  A.   I believe the first time was in June of 2007.
22  Q.   Okay.
23  A.   And I was there sometime about a year later,
24  sometime, I believe, summer of 2008.
25  Q.   Okay.

EXHIBIT 33

```
 1        Q.   And at some point you became involved with
 2   HDR's investigation; is that right?
 3        A.   Yes, I did.
 4        Q.   Okay.
 5             MR. STANISLAW:   What are we starting from?
 6             MR. FORZIANO:   We're up to?  We're going to
 7   start with --
 8             THE COURT REPORTER:   674.
 9             MR. FORZIANO:   Okay.  Thank you.
10             (Exhibit Number 674 was marked for
11   identification.)
12   BY MR. FORZIANO:
13        Q.   Mr. Bromwell, I'm going to hand you a document
14   that's been marked for identification as Exhibit 674.
15   It's got Bates numbering at the bottom and has your
16   name, so I believe that's an indication it came from
17   your files; is that right?
18        A.   It came from the BCI file, that's correct.
19        Q.   And it's an e-mail dated August 10th of 2007
20   and attached to it is BCI's task order number four; is
21   that correct?
22        A.   I'm sorry.  I don't see a BCI task order.
23        Q.   If you turn the page, it's a three-page
24   document.  I believe attached to this e-mail is task
25   order number four.  Do you see that there?
```

```
 1        A.   Yes.
 2        Q.   Okay.  Now, this task order is dated
 3   August 10, 2007.  Do you see that on -- toward the
 4   bottom of the -- on the part five, period of service?
 5        A.   Yes.
 6        Q.   Okay.  To -- to start, it says August 10,
 7   2007, "conclusion" says "open," right?  Is that right?
 8        A.   Yes.
 9        Q.   Okay.  And that means that basically your
10   services are going to continue until your work's done or
11   HDR tells you, we don't need your services anymore; is
12   that right?
13        A.   That would be my understanding, yes.
14        Q.   Okay.  Now, if you look at part two of task
15   order number four, the scope of basic services to be
16   performed, could you read that, please?
17        A.   (Complies.)
18        Q.   I'm sorry.  Can you read it out loud?
19        A.   Oh, you want me to read task, part two down
20   the --
21        Q.   Yes, sir.
22        A.   Scope --
23        Q.   Just this little part right here (indicating).
24        A.   And go.
25        Q.   Okay.
```

1   A.   It says "provide as-needed consultation
2   regarding geotechnical engineering matters pertaining to
3   HDR's investigation of cracking that is occurring in the
4   soil-cement protective armoring along the interior face
5   of the referenced reservoir.  Services may include but
6   not be limited to inspection of the facility,
7   consultation with HDR representatives, review of field
8   and laboratory data, participation in meetings with the
9   owner, rendering of opinions regarding the cause and
10  effect of the cracking, and assisting in the development
11  of one or more repair" -- "repair measures."
12      Q.   And part one of the task order number four
13  identifies the project as the C.W. Bill Young Regional
14  Reservoir, correct?
15      A.   That's correct.
16      Q.   Okay.  Now, prior to the issuance of this task
17  order number four -- and you'll see on the second page
18  it's been executed by Wendy A. Lee on behalf of BCI.  Do
19  you see that?
20      A.   Yes.
21      Q.   Who's Wendy Lee?  Is she still with BCI?
22      A.   Yes.  She's the CFO of -- of BCI.
23      Q.   Okay.  And is your understanding she executed
24  this on behalf of BCI Engineers?
25      A.   Yes.

1  Q.  Okay.  And it's signed by Paul Bowdoin, do you
2  see that, for HDR?
3  A.  I see that he signed it, yes.
4  Q.  Okay.  Prior to August 10 of 2007, did you or,
5  to your knowledge, BCI have any involvement with regard
6  to the unusual cracking at the regional reservoir?
7  A.  My recollection is that before this date, I
8  had received a call from Barry Meyer and asked to go out
9  and visit the -- the reservoir with him and -- which I
10  did.  And then I think I probably had some subsequent
11  discussions with -- with Mr. Meyer and probably with
12  John Ranon.  And I guess that, from reading this, it led
13  to this task order in August.
14  Q.  I see that this is a task order -- it's
15  identified as task order number four.  Were there any
16  prior task orders with reference to the unusual cracking
17  at the regional reservoir?
18  A.  Well, it's possible there might have been a
19  previous task order that covered some of that initial
20  work that I've just described of the initial visit
21  and -- and talking with Barry Meyer, John Ranon, but I
22  don't know that for a fact.  And I suspect this is the
23  first task order relating to the -- to that reservoir
24  work.
25  Q.  A few minutes ago I asked you how many times

1  you had been out to inspect the reservoir, and I think
2  the -- you said you couldn't tell me the exact date, but
3  you believe you -- the first one was out there in June
4  of '07.  Is that in relation to your meeting with
5  Mr. Meyer where he took you out to the reservoir prior
6  to the issuance of this task authoriza- -- task order?
7       A.   Yes, it would be.
8       Q.   Okay.  When you went out to the reservoir with
9  Mr. Meyer, what did he tell you with regard to the
10 unusual cracking?
11      A.   Well, I think he told me that -- approximately
12 when it had -- when it had -- it had first been noticed
13 and reported.  I think I knew that it had happened at
14 the end of -- near the end of December '06.
15           I think he outlined to me what they had done
16 in the interim period as far as reviewing some of the
17 construction data, planning and investigation, including
18 some instrumentation, and that we were, at some point,
19 going to want to kind of brainstorm, review that --
20 review what they were coming up with as far as
21 additional investigation and evaluation of it, and kind
22 of brainstorm what some potential causes might be and
23 what some fixes might be to repair the cracking.
24      Q.   And when you said when you were initially
25 contacted by HDR, was -- was it Mr. Meyer who called you

Case 8:08-cv-02446-JDW-TBM   Document 349-33   Filed 05/19/11   Page 7 of 9 PageID 20140

# DiAnn Lisica

**From:** DiAnn Lisica
**Sent:** Friday, August 10, 2007 2:53 PM
**To:** Wendy Lee
**Cc:** Judy Harris
**Subject:** HDR project

Wendy,

Dr. B is with Mr. Ranon of HDR at this moment. He has already begun "work" on a new project for them, approx $,5000. For all I know it could be completed by day's end. I emailed Dr. B yesterday with the possibility of a point # on an existing project, using a Contract/Task Order, but preferably a new project setup, etc.

I just got off the phone with him and Mr. Ranon. Mr. Ranon wants to draft a new general contract (I believe our existing contract dated 11/2004 was their contract, not BCI's) and issue a Work Order/Task for this new project based on our current 2007 fee schedule, which I emailed a few moments ago. I told him a new contract was the preferred option. I told Mr. Ranon, to fax or email the documents and you would review and we'd proceed from that point.

On the one hand, I'm thrilled they are going for the new contract. On the other hand, another Dr. B "project". :)

How badly did I mess this up?

[x]

DiAnn Lisica
Geotechnical Administrative Coordinator



EXHIBIT 674
Bromwell

8/10/2007

BROMWELL0001925

## GENERAL ENGINEERING SERVICES

## BCI ENGINEERS & SCIENTISTS, INC.

## TASK ORDER NO. 4

8-13354.2

This Task Order pertains to an Agreement by and between **BCI Engineers & Scientists, Inc.** ("Subconsultant"), and HDR Engineering, Inc. ("HDR"), dated **November 2, 2004** ("Agreement"). Subconsultant shall perform Services on the Project described below as provided herein and in the Agreement. This Task Order shall not be binding until it has been properly signed by both parties. Upon execution, this Task Order shall supplement the Agreement as it pertains to the Project described below.

PART 1.0    PROJECT DESCRIPTION: C.W. "Bill" Young Regional Reservoir – Post-construction Consultation

PART 2.0    SCOPE OF BASIC SERVICES TO BE PERFORMED BY SUBCONSULTANT ON THE PROJECT: Subconsultant will assist with the following tasks listed in this Task Order:

Provide as needed consultation regarding geotechnical engineering matters pertaining to HDR's investigation of cracking that is occurring in the soil-cement protective armoring along the interior face of the referenced reservoir. Services may include, but not be limited to inspection of the facility, consultation with HDR representatives, review of field and laboratory data, participation in meetings with the Owner, rendering of opinion(s) regarding the cause and effect of the cracking, and assisting in the development of one or more repair measures.

Specific requests will be communicated in writing via regular mail or email by HDR's E&RM Business Group Manager, John Rañon, or by HDR's Senior Geotechnical Engineering Consultant, Barry Meyer.

PART 3.0    ADDITIONAL SERVICES, NOT PART OF BASIC SERVICES: not applicable

PART 4.0    HDR'S RESPONSIBILITIES: HDR will provide pertinent data from the project construction and post-construction phases.

PART 5.0    PERIOD OF SERVICE: The anticipated period of service shall be as follows:

| | |
|---|---|
| Start | August 10, 2007 |
| Conclusion | Open |

PART 6.0    SUBCONSULTANT'S COMPENSATION FOR SERVICES:
1. Subconsultant will work on a time and materials basis for an amount not to exceed $10,000 without prior written authorization. Hourly billing rates

will be in accordance with Subconsultant's Schedule of Rates (attached); direct expenses shall be billed at actual cost. Invoices shall be submitted on a monthly basis. Payments will be made to Subconsultant based on completion of deliverable(s) and acceptance by HDR. No longer than 90 days from date of invoice. *PB*

2. Compensation for Additional Services: The scope and budget of this task order can be extended based on mutual agreement between the Subconsultant and HDR.

PART 7.0    OTHER: IN WITNESS WHEREOF, the parties have executed this Task Order as of the day and year first written above.

| BCI ENGINEERS & SCIENTISTS, INC. | | HDR ENGINEERING, INC. | |
|---|---|---|---|
| "Subconsultant" | | "HDR" | |
| BY: | *[signature]* | BY: | *[signature]* |
| NAME: | Wendy A. Lee | NAME: | Paul Bowdoin, P.E. |
| TITLE: | CFO/Vice President | TITLE: | Senior Vice President |
| ADDRESS: | P.O. Box 5467<br>Lakeland, FL 33807 | ADDRESS: | 2202 N. Westshore Blvd.<br>Suite 250<br>Tampa, Florida 33607 |
| DATE: | 8-25-07 | DATE: | |