UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TAMPA BAY WATER,
a Regional Water Supply Authority,

**Plaintiff,**

vs.                                              Case No. 8:08-CV-2446-T-27TBM

HDR ENGINEERING, INC., et al.,

**Defendants.**

_____/

## ORDER

**BEFORE THE COURT** are (1) Defendant HDR Engineering, Inc.'s ("HDR") Dispositive Motion for Summary Judgment (Dkt. 287), Plaintiff Tampa Bay Water's ("TBW") response (Dkt. 314), and the parties' supplemental submissions (Dkts. 343, 358, 370); and (2) HDR's Motion to Exclude Opinion Testimony on "Loss of Use" Damages by Adams and Kennedy (Dkt. 300), to which TBW has responded (Dkt. 313). Upon consideration, the Motion to Exclude (Dkt. 300) is GRANTED. The Motion for Summary Judgment (Dkt. 287) is GRANTED in part.

## Background

TBW alleges that the cause of unusual cracking in the flat-plate soil-cement facing at the C.W. "Bill" Young Regional Reservoir (the "Reservoir") is the development of excess water pressure at the base of the soil-cement on the upstream (or inside) slope of the Reservoir's earthen embankment during reservoir drawdown. TBW claims that this caused the brittle soil cement to be lifted from the embankment, causing it to crack. TBW alleges that the development of excess water pressure was a result of HDR's defective design of the Reservoir and its inadequate quality control services during construction.

## Motion to Exclude Testimony

HDR requests that the Court exclude the opinion testimony of Alison Adams and Jon Kennedy relating to TBW's alleged future loss of use damages on the grounds that neither is an expert qualified to offer their preferred opinions and that, in any event, such opinions are wholly unreliable.[1] TBW responds that the opinions offered by both witnesses are sufficiently reliable, reasonably certain, and will assist the trier of fact.

### *Daubert Standard*

In determining the admissibility of expert testimony under Rule 702, Federal Rules of Evidence, "[t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007). A determination of admissibility requires findings that "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert* [*v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993)]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The proponent of expert testimony bears the

---

[1] HDR also requests that the Court exclude the testimony of Kennedy and Adams with respect to the issue of *past* lost of use damages for the period that TBW operated the Reservoir under a temporary limit of its capacity. As TBW has withdrawn its demand for damages based on past lost use of the Reservoir, this request is now moot. *See* Dkts. 343-1, 343-2.

burden of establishing each requirement by a preponderance of the evidence. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005).

The focus of the *Daubert* analysis is "on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "Thus, the proponent of the [expert] testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." *Allison v. McGhan Med. Corp.*, 184 F .3d 1300, 1312 (11th Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3rd Cir. 1994)). "The evidentiary requirement of reliability is lower than the merits standard of correctness. *Daubert* states that a judge should find an expert opinion reliable under Rule 702 if it is based on 'good grounds,' *i.e.*, if it is based on the methods and procedures of science." *In re Paoli*, 35 F.3d at 744. Hence "in most cases, objections to the inadequacies of a [scientific] study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)).

### *Daubert Discussion*

TBW offers the opinion testimony of Alison Adams and Jon Kennedy to establish the existence and amount of its future loss of use damages. Kennedy calculated TBW's future loss of use damages by multiplying (1) the increased operating cost of producing treated water from TBW's seawater desalination plant (as compared to the cost of producing treated water from surface water sources) (the "incremental desalination cost") by (2) the quantity of desalinated water (exceeding the amount that must be produced in any event [the "baseline desalination production"], which TBW's

3

expert Alison Adams previously stated to be 4 million gallons ["MGD"] per day) that will be needed during the repair period owing to the unavailability of the Reservoir (the "desalination water need"). Adams estimated TBW's desalination need based on her assumptions about available surface water and water demand during the repair period.

HDR argues, *inter alia*, that Adams' opinion as to incremental desalination cost and desalination water need is based on unreliable methodology and, therefore, is inadmissible under *Daubert*.[2] In support of this argument, HDR demonstrates that (1) Adams's calculation of available surface water during the repair period assumes the occurrence of highly improbable events, an assumption without a reasonable basis, and (2) a forecast of available surface water during the repair period based on average or expected outcomes shows that TBW will in all likelihood experience no desalination water need during the repair period.

Adams initially assumed that Water Years ("WY") 2013 and 2014 (*i.e.*, October 1, 2012-September 30, 2014) will be "low flow conditions," producing about 37 MGD and 41 MGD, respectively from surface water sources, assuming the unavailability of the Reservoir. Significantly, this assumption was not based on a statistical analysis or probability study. Nor did Adams assume

---

[2] As Kennedy's calculations of TBW's future loss of use damages is based on Adams' assumptions, the admissibility of his opinion is necessarily dependent on the reliability of Adams' opinion.

4

normal or average water flows.[3]  Rather, Adams assumes low flow years for the specific years the

Reservoir is scheduled to be out of operation while under repair using contingency-planning

methodology, basing her assumption on two instances of "very low rainfall/stream flow periods" in

Hillsborough County since 1999, the years 1999-2001 and 2006-2009. *See* Mar. 17, 2011 Affidavit

of Alison Adams, Ph.D., P.E. ("Adams Aff." [Dkt. 313-4]) at ¶¶ 29-30. Despite acknowledging that

"[t]here is no accepted method in the field of water resources planning and management that allows

a water supply utility to predict the next drought," (Adams Aff. at ¶ 24), she has done exactly that,

without any factual, statistical or scientific analysis.

    In contrast to Adams' methodology, HDR experts Kevin Dennis and E. Allen Jacobs

calculated expected available surface water in WYs 2013 and 2014 as the *average* of the 31 years

of available hydrology data (64.1 MGD). *See* Feb. 28, 2011 Joint Affidavit of Kevin D. Dennis,

CPA/CFF, CMA, and E. Allen Jacobs, Ph.D. ("Navigant Aff." [Dkt. 300-1] at ¶ 69).  Dennis and

Jacobs persuasively demonstrate that, if this volume occurs, TBW will have sufficient surface water

to meet expected demand, will not need to increase desalination production to compensate for lost

surface water production, and will suffer no lost use damages. *Id.* at ¶¶ 74-75. Dennis and Jacobs

demonstrate that, even assuming the 25% percentile of historical surface water data (50.7 MGD),

---

[3] *See* Deposition of Alison Adams (Dkts. 287-6, 358-1) at 126:3-12 (Adams had not done an analysis of the likelihood of a low-flow condition in 2013, no one had asked her to do such an analysis, and estimating the probability of low-flow conditions in particular years is not part of her normal work); 204:7-206:19 (Adams assumed low-flow conditions in WYs 2013 and 2014, not average or normal conditions); 209:23-210:13 (Adams had not analyzed and could not state the probability of low-flow or normal conditions in WY2013 and WY2014); 210:25-212:3 (Adams was not asked to determine what was most likely to happen based on historical data, *i.e.*, she was not directed to base her projection on a "normal average water year"); 212:19-213:7 (Adams could not "put a percentage probability" on the 37 MGD flow she assumed for 2013 and she could not tell a jury that it is more likely than not); 278:25-219:24 (Adams did not analyze normal or average flows); 239:25-240:23 (Adams could not state the probability of a 37 MGD water year). When pressed, Adams suggested that two consecutive low-flow years might have happened about 35% of the time. *Id.* at 209:2-6.

TBW will have sufficient surface water to meet expected demand, will not need to increase desalination production to compensate for lost surface water production, and will suffer no lost use damages. *Id.* at ¶¶ 69, 73-74, 76.

Recently, Adams revised her assumptions or projections of available surface water, expected demand, and baseline desalination production. Adams revised the baseline desalination production from 4 MGD to 8 MGD. *See* Dkt. 370-1 at 4 ("Demand and Supply Scenario for Reservoir Return to Service," updated May 19, 2011 [hereafter, "Rev. Demand and Supply Scenario"]); Deposition of Alison Adams ("Adams Dep." [Dkts. 287-6, 358-1]) at 384:2-23; 389:14-390:12. She revised expected demand to 165 MGD and 167 MGD for WY2013 and WY2014, respectively. Rev. Demand and Supply Scenario.

Adams also revised her assumption of available surface water to 41 MGD for both WY2013 and WY2014. *Id*; Adams Dep. at 395:2-4. This amount represents the 10th percentile (not the 25th percentile) of 33 years of hydrological data. *See* Adams Dep. at 397:22-398:15; 445:17-21; Rev. Demand and Supply Scenario. Adams believed that this assumption was appropriate for conservative, "what-if" contingency planning. *See* Adams Dep. at 414:14-19; 415:15-25; 416:10-15; *see also* 420:25-421:7 (stating that using the expected value of the surface water flows "would not be good contingency planning"). She did not "forecast" water flow for WY2013 and WY2014, or estimate it to a reasonable degree of certainty, or estimate what was reasonably likely to happen, or

estimate the "expected value" of the water flow during those years.[4]  Moreover, and most telling,

Adams agreed that:

> (1)    Assuming the low-flow, 10th percentile amount of 41MGD occurs, TBW
> will experience no desalination water need in WY2013.  Adams Dep. at
> 395:18-22; *see also* Rev. Demand and Supply Scenario. Rather, in that event,
> TBW will experience a surface water surplus. Adams Dep. at 396:21-22.
>
> (2)    Assuming the 25th percentile of historical flows occurs in WY2014, TBW
> will experience a surface water surplus. *Id.* at 412:22-413:10.
>
> (3)    Assuming the median of available surface water data over the years 1995-
> 2009 (49.3 MGD) occurs, TBW will experience a surface water surplus in
> both WY2013 and WY2014. *Id.* at 420:5-423:19; 422:15-423:19.
>
> (4)    Assuming the average of surface water flow over the same period
> (58.1 MGD), TBW will experience a surface water surplus in both WY2013
> and WY2014. *See id.* at 420:16-20.

Adams justifies her assumption as contingency planning for a water supply utility, which

"must plan for events that are not expected." *See* Adams Aff. at ¶¶ 29-30.  Adams described her

37 MGD and 41 MGD assumption as representing the "25th percentile," Adams Aff. at ¶ 29,

meaning, apparently, the 25th percentile of historical hydrological data.  According to Adams,

"[b]est management practices" require TBW to use "contingency planning and *what-if scenarios* to

plan source allocation to meet demands during water shortage and hydrologic drought events." *Id.*

at ¶ 25 (emphasis added).

While Adams' reliance on "what-if scenarios" may be an acceptable practice in water utility

planning, it does not survive the exacting analysis mandated by *Daubert,* which requires that an

---

[4] *See* Adams Dep. at 413:14-22 (Adams was not asked to predict water flows for WYs 2013 and 2014); 415:9-14 (Adams did not attempt to predict to a reasonable degree of certainty the water flows in WYs 2013 and 2014 and her assumption was not intended to be a "forecast"); 416:2-9 (nobody asked Adams to estimate and she did not estimate "what was reasonably likely to occur in 2013 through 2015 with respect to the available surface water"); 417:8-18 (in selecting the 10th percentile amount, Adams did not intend to make a forecast based on reasonable probabilities).

expert's opinion be the "product of reliable principles or methods." An expert's bald assertion of validity is not enough. *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004), *cert. denied*, 544 U.S. 1063 (2005). Accordingly, Adams' testimony "must be supported by appropriate validation- *i.e.*, 'good grounds,' based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 590). The advisory committee's note to Rule 702 instructs that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702, advisory committee's note (2000 amendments).

Adams' prediction of low flow years during WYs 2013 and 2014 based on water utility planning is simply not based on "good grounds," since it is not based on known facts. Rather than extrapolate from existing data, such as the 31 years of hydrology data available to her, she simply assumes that low flow years will occur during back to back years without regard to normal or average water flows and concludes that there will be an increased demand on the desalination plant. Yet she admits, that at an average of 50 MGD (which the 31 year hydrology data showed would be below average), TBW would have no need to use desalinated water. Adams Dep. at 225:4-13.

A court's gate-keeping function under *Daubert* must "ensure that speculative, unreliable expert testimony does not reach the jury under the mantra of reliability that accomplishes the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (quoting *McCrory v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002); *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to

existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Essentially, Adams' testimony demonstrates no methodology or scientific analysis at all, merely a prediction.  Speculating that an event (back to back low flow years) will repeat itself without any supporting basis in fact renders her methodology and opinions unreliable.  Further, Adams' assumption that back to back low flow years will occur during the very years the Reservoir will be non-operational while repairs are undertaken demonstrates that the assumption is tantamount to a results oriented approach.  In sum, this assumption is not based on sufficient facts or data, as required by Rule 702, Federal Rules of Evidence.

Based on the forgoing, the Court concludes that TBW has failed to demonstrate, by the preponderance of the evidence, that the opinions offered by Adams and Kennedy are sufficiently reliable under *Daubert* or otherwise admissible under Rule 702, Federal Rules of Evidence.

## Motion for Summary Judgment

HDR moves for summary judgment on (1) TBW's design defect claim in Count I of the Second Amended Complaint,[5] (2) TBW's claim for future loss of use damages, (3) TBW's claim for future repair costs, and (4) TBW's demand for prejudgment interest.  The Court construes the motion

---

[5] While HDR refers to "Count II" in its motion for summary judgment, Count II does not purport to seek relief against HDR.  *See* Second Amended Complaint (Dkt. 386) at pp. 15-20.  The Court assumes HDR intended to seek summary judgment on Count I of the Second Amended Complaint.

9

as a request for an interlocutory order dismissing Count I with prejudice pursuant to Fed. R. Civ. P.

56(a) and for an order pursuant to Fed. R. Civ. P. 56(g).[6]

### Summary Judgment Standard

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to

interrogatories, affidavits and admissions on file show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "An issue of fact is 'material' if, under the

applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm

Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as

a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the

evidence and factual inferences reasonably drawn from the evidence must be viewed in the light

most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970);

*Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of

a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use

---

[6] TBW's contention that HDR's motion for summary judgment should be summarily denied because it seeks adjudication of discrete damages issues is rejected. Initially, the Court questions the continued viability of pre-2010 case law discussing the propriety of partial summary judgment. *See, e.g., Servicios Espaciales Al Comerico Exterior v. Johnson Controls, Inc.*, No. 08-CV-1117, 2011 WL 2037017, at *4-5 (E.D. Wis. May 24, 2011) (discussing impact of 2010 amendments to Rule 56); *Isovolta Inc. v. Portrans Int'l, Inc.*, No. 1:08-cv-1319-JMS-DML, 2011 WL 221886, *2 (S.D. Ind. Jan. 19, 2011) (same). Second, TBW's reliance on decisions stating that "independent" Rule 56 motions seeking adjudication of issues that do not resolve a claim are disfavored is misplaced. HDR's motion is proper under Rule 56(a) to the extent it seeks to dispose of Count I in its entirety. It is not therefore an "independent" Rule 56 motion. Finally, even if it lacks the authority to enter a "judgment" as to HDR's ultimate liability, the Court may properly "enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact so established in the case." Fed. R. Civ. P. 56(g); *see also Biggins v. Oltmer Iron Works*, 154 F.2d 214, 217 (7th Cir. 1946) (recognizing that then existing version of Rule 56 granted district court's the to enter order fixing that portion of claim not in dispute).

of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. The evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

### *Summary Judgment Discussion*

HDR argues that it is entitled to summary judgment on TBW's "design defect" claim (Count I) because to demonstrate breach of the applicable standard of care and causation, TBW must rely on the expert testimony of William Brumund and for the reasons stated in HDR's Motion to Exclude Certain Opinions of William Brumund, P.E., Ph.D. (Dkt. 295), Brumund's testimony is inadmissible. As the Court has denied HDR's motion to exclude Brumund's testimony (Dkt. 389), HDR's argument fails.

HDR also requests a determination that, on the undisputed facts, TBW cannot prove with reasonable certainty the fact or amount of its claimed damages from lost use of the Reservoir (*i.e.,* lost ability to store water for future use and distribution) during the period when the Reservoir is expected to be out of service for repairs.[7] Specifically, HDR argues that the evidence offered by TBW to establish loss of use damages (*i.e.,* the opinion testimony of Adams and Kennedy) is inadmissable as a matter of law or, in the alternative, that such evidence is insufficient to establish future loss of use damages with the certainty required by Florida law. TBW contends that, applying its latest method of calculating future loss of use damages and the revised assumptions underlying

---

[7] HDR also requests a determination that TBW cannot prove past loss of use damages for the period that TBW operated the Reservoir under a temporary limit of its capacity. As TBW has withdrawn its demand for damages based on past lost use of the Reservoir, this request is now moot. *See* Dkts. 343-1, 343-2.

11

those methods, a jury could reasonably and without speculation find that TBW will incur substantial costs for lost use of the Reservoir during the repair period.

The Court previously determined that the opinions of Adams and Kennedy as to loss of use damages are inadmissible under Rule 702. As TBW identifies no other evidence supporting its claim for future loss of use damages,[8] the Court concludes that TBW has failed to present sufficient admissible evidence as required to survive a motion for summary judgment as to that claim. *See Finestone v. Florida Power and Light Co.*, 272 Fed.Appx. 761, 768, 2008 WL 863894, *6 (11th Cir. 2008) (holding that when district court properly rejected unsupported assumptions underlying experts' methodologies, plaintiffs failed to present sufficient admissible evidence to survive motion for summary judgment).

The Court notes that even if it were to consider the opinions of Adams and Kennedy, the record would still be devoid of evidence sufficient to establish TBW's entitlement to future loss of use damages.

Under Florida contract law, "an injured party may look to the legal system to place it in the position it would have been in had the bargain been performed as agreed to; in other words, to achieve its expectation interest." *Air Caledonie Int'l v. AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1337 (S.D. Fla. 2004) (citing *MCA Television Ltd. v. Pub. Interest Corp.*, 171 F.3d 1265, 1271 (11th Cir. 1999)). However, "[u]nder the certainty rule, which applies in both contract and tort actions, recovery is denied where the fact of damages and the extent of damages cannot be established within a reasonable degree of certainty." *Miller v. Allstate Ins. Co.*, 573 So. 2d 24, 27-28

---

[8] Indeed, TBW's counsel conceded during oral argument that TBW's claim for future loss of use damages is unsupportable if average available surface water is assumed for WYs 2013 and WY2014.

(Fla. 3d DCA 1990) (citing Restatement (Second) of Contracts § 352 (1981)).[9] Similarly, "Florida law requires that assumptions used to support [future damages] conclusions be reasonably certain, not mere best case scenario predictions." *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1247 (M.D. Fla. 2003).

In Florida, future damages are deemed speculative, and thereby without a reasonable basis, where the evidence is so meager or uncertain as to provide no reasonable basis for inference. *See 4 Corners Ins., Inc. v. Sun Publications of Florida, Inc.*, 5 So.3d 780, 783 (Fla. 2d DCA 2009) ("Speculative profits are those the evidence of which is so meager or uncertain as to afford no reasonable basis for inference.").

The undisputed facts demonstrate that Adams' methodology and assumptions were not intended to reflect and do not in fact reflect probable or expected outcomes. Moreover, Kennedy agreed that since Adams had not, by her own admission, attempted to predict with a reasonable degree of certainty the water flows in WYs 2013 and 2014, Kennedy's calculations of TBW's future loss of use damages based on Adams's assumptions were likewise not made to a reasonable degree of certainty. *See* Kennedy Dep. (Dkt. 358-2) at 31:9-44:10. Kennedy also agreed that, assuming the median or "normal" flow of 49.3 MGD for WYs 2013 and 2014, TBW will not need to increase its desalination water production during those years beyond its baseline desalination production and TBW will suffer no loss of use damages. *Id.* at 6:10-13:1. As a result, TBW has failed to offer

---

[9] *See also Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1213 (11th Cir. 2006) ("It is settled under Florida law that lost profit damages, like all damages, cannot be speculative and must be proved with reasonable certainty.") (citations omitted).

13

evidence sufficient to establish with reasonable certainty that it will actually suffer loss of use damages.

Based on the forgoing, the Court concludes that TBW has failed to offer admissible evidence that would entitle it to an award of future loss of use damages and that an order treating this issue as established is appropriate under Rule 56(g), Federal Rules of Procedure.

HDR next contends that TBW's claim for future repair damages of $100 to $145 million is premised on an incorrect measure of damages, since TBW has not presented any evidence of diminution of value of the Reservoir. *See* Dkt. 287 at 17. According to HDR, "if the cost necessary to repair or replace defective construction is grossly disproportionate to the results to be obtained and the object is not required to be repaired as a result of an unsafe condition, then the amount of damages is limited to the difference between the value of the building contracted for and the value of the building actually received," that is, diminution in value. *See id.* at 17-18. HDR essentially contends that TBW's proposed repair (and the associated cost) is "so extreme and unreasonable as to constitute economic waste as a matter of law." *Id.* at 17.

In *Grossman Holdings, Ltd. v. Hourihan*, 414 So. 2d 1037, 1039 (Fla. 1982), the Florida Supreme Court adopted the Restatement (First) of Contracts measure of damages for defective or unfinished construction. The First Restatement provides that an owner may recover damages for defective or unfinished construction measured as:

(i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or

(ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if

14

construction and completion in accordance with the contract would involve unreasonable economic waste.

Restatement (First) of Contracts § 346(1)(a) (1932).[10]  Damages are measured as of the date of the breach.  *Hourihan*, 414 So.2d at 1040.  The Restatement commentary explains that:

> [t]he purpose of money damages is to put the injured party in as good a position as that in which full performance would have put him; but this does not mean that he is to be put in the same specific physical position.  Satisfaction for his harm is made either by giving him a sum of money sufficient to produce the physical product contracted for or by giving him the exchange value that that product would have had if it had been constructed. . . . Sometimes defects in a completed structure cannot be physically remedied without tearing down and rebuilding, at a cost that would be imprudent and unreasonable.  *The law does not require damages to be measured by a method requiring such economic waste.  If no such waste is involved, the cost of remedying the defect is the amount awarded as compensation for failure to render the promised performance.*

Restatement (First) of Contracts § 346(1)(a) cmt. b (1932) (emphasis added).

Under *Grossman Holdings*, therefore, either diminution in value or the cost of repairs is a proper measure of damages for breach of a construction contract, absent evidence of "economic waste." *Id.* at 1039.  Where evidence is presented on cost to repair and diminution in value, the jury may be instructed on both measures of damages. *See Austin-Westshore Constr. Co., Inc. v. Federated Dep't Stores, Inc.*, 934 F.2d 1217, 1225 (11th Cir. 1991) ("The jury was in the best

---

[10] *See also McCray v. Murray*, 423 So. 2d 559, 561 (Fla. 1st DCA 1982) ("Stated simply, [Restatement § 346(1)(a)] says that, depending upon whether completion of the construction would involve economic waste, the proper measure of damages is either the cost of completion or the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff."); *Smith v. Mark Coleman Constr., Inc.*, 594 So. 2d 812, 813-14 (Fla. 2d DCA 1992) ("In short, a party is entitled to recover the cost of repairing a defect so that it is in compliance with the contract or, if that would result in economic waste, the diminution of value between a house built in accordance with the contract and the one actually built."); *Heine v. Parent Constr.*, Inc., 4 So. 3d 790, 792-93 (Fla. 4th DCA 2009) (applying the doctrine of economic waste to a home built at an elevation one foot lower than specified in the contract to limit the owner's damage recovery to the diminution in value amount of $25,000 rather than the cost to correct the elevation error estimated at $930,000), *rev. denied*, 19 So. 3d 310 (Fla. 2009); *Tree Constr. Corp. v. Caplinger*, 446 So. 2d 245, 245 (Fla. 4th DCA 1984) (in non-jury trial, trial court improperly applied diminution-in-value measure rather than cost-to-repair measure of damages where repair cost "would [not] have constituted economic waste").

position considering the extensive evidence presented on the damages issue to determine whether the economic waste measure of damages should apply to this case."); *cf.* 11 Corbin on Contracts § 60.1 (suggesting that economic waste is generally a question of fact).

Contrary to HDR's argument, TBW's failure to offer evidence of diminution in value is not, therefore, fatal to TBW's claim for future repair damages. *See Pearce & Pearce, Inc. v. Kroh Bros. Development Co.,* 474 So.2d 369, 372 n. 2 (Fla. 1st DCA 1985). HDR has the burden of establishing that TBW's repair estimates are so unreasonable as to constitute economic waste.[11]

Moreover, in Florida, because publicly owned facilities, unlike privately held land, do not lend themselves to traditional value determination, diminution in value may not justly compensate the owner in defective construction cases and restoration costs may be the proper measure of damages. *See Davey Compressor Co. v. City of Delray Beach*, 639 So.2d 595, 596-97 (Fla. 1994). In *Davey,* the Florida Supreme Court refused, based on public policy, to apply the diminution in value measure of damages to a municipal water supplier's claim for damages, even where restoration costs exceed that value. *See id.* at 597 ("Recognizing the environmental dangers that are directly associated with the negligent contamination of groundwater, we find that public policy supports restoration costs as the measure of damages in this case."). TBW makes a good argument

---

[11] *See* 6 Bruner & O'Connor Construction Law § 19:30 ("Once an owner has proven its cost of repair, the burden shifts to the contractor to prove that the cost of repair exceeded the diminution in value and thus resulted in economic waste.") (collecting cases); *id.*§ 19:59 ("The burden of proving that 'diminution in value' is less than 'cost of repair' rests with the contractor.") (collecting cases); *cf. American Equity Ins. Co. v. Van Ginhoven*, 788 So. 2d 388, 392 (Fla. 5th DCA 2001) (rejecting contention that damages based on cost to replace and repair damaged pool were improper where plaintiff proved replacement and repair costs and "[t]he record fail[ed] to demonstrate that this cost exceeded the value of the pool in its original condition or its depreciation in value."); *Tillman v. Howell*, 634 So. 2d 268, 272 (Fla. 4th DCA 1994) (Farmer, J., concurring in part and dissenting in part) (describing the damages limitation recognized in *Hourihan* as a "defense").

that Florida courts would also recognize the *Davey* exception to the contract damages rule adopted in *Grossman Holdings* for "special use structures."[12]

This point need not be resolved at this stage. Construed favorably to TBW, the non-moving party, the undisputed facts relied on by HDR do not demonstrate that TBW's claimed repair costs necessarily constitute economic waste (*e.g.*, because they are substantially greater than or grossly disproportionate to the diminution in value to the Reservoir resulting from the alleged design defects). HDR bears the burden of persuasion on this issue and it has not carried its burden.

Finally, HDR argues that TBW is not entitled to prejudgment interest on its repair costs because prejudgment interest is not available in construction defect cases where anticipated future repairs are "unliquidated and uncertain"[13] and prejudgment interest cannot be "added to a cost that is based on a future event and which [already] takes into account the time period of judgment." (Dkt. 287 at 24). TBW responds that although many Florida decisions discussing prejudgment interest state that an award of prejudgment interest is mandated once a jury verdict fixes the amount of an

---

[12] TBW points out that other jurisdictions also allow an award of restoration costs for damage to a "special use property," even if the cost of repair or replacement exceeds the value of the damaged property, chiefly because such property is generally not bought and sold on the open market, and so a determination of its market value (or reduction in market value) cannot readily be made. (Dkt. 314 at 13, n.13); *see also* 6 Bruner & O'Connor Construction Law § 19:59 ("'Diminution' [in value] is particularly difficult to establish for 'special purpose' property (such as the property of a nonprofit, charitable, or religious organization), because there is not generally an active market from which the diminution of market value may be determined."); 17 Fla. Jur. 2d Damages § 63 ("The cost of repairs may be a more accurate method of measuring damages where the property damaged is not generally bought and sold on the open market and the concept of market value is difficult to apply.") (citing Am. Jur. 2d Damages § 287).

[13] Among other decisions, TBW quotes *Lauderdale Marine Ctr., Ltd. v. MYD Marine Distrib., Inc.*, 31 So. 3d 256, 257 (Fla. 4th DCA 2010) ("Future damages, such as 'anticipated business profits,' are not vested property rights and cannot be liquidated as of a past date certain.") (citing *Bosem v. Musa Holdings, Inc.*, 8 So. 3d 1185, 1187 (Fla. 4th DCA 2009)). The Florida Supreme Court reversed the Fourth District's decision in *Bosem*, concluding that the trial court's award of prejudgment interest on lost profits was proper, once the amount of the plaintiff's loss was fixed by the jury's verdict, and the Fourth District's characterization of the of the lost profits as unliquidated was "irrelevant" under the "loss theory" of prejudgment interest adopted in *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212 (Fla. 1985). *Bosem v. Musa Holdings, Inc.*, 46 So.3d 42, 44-46 (Fla. 2010).

"out of pocket loss,"[14] the absence of an actual expenditure does not preclude an award of prejudgment interest so long as the amount of the loss is fixed as of a date prior to judgment, and in any event, HDR's assumption that TBW's expert has only prepared costs estimates as of the trial date is wrong. *See* Dkt. 314 at 15-16.

This dispute need not be resolved at this time. Under Florida law, prejudgment interest is computed after the jury verdict fixes the plaintiff's damages as of the date of the loss. *See Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985). The Court will not speculate what the evidence will show or the jury will find as to the date or the amount of TBW's loss, if any.

Accordingly, it is **ORDERED AND ADJUDGED** that:

(1)    HDR's Motion to Exclude Opinion Testimony on "Loss of Use" Damages by Adams and Kennedy (Dkt. 300) is **GRANTED**.

(2)    HDR's Dispositive Motion for Summary Judgment (Dkt. 287) is **GRANTED** in part and **DENIED** in part. The Motion is **GRANTED** solely with respect to the Court's conclusion that TBW has failed to offer reliable evidence sufficient to create a disputed issue of fact as to it claim for future "loss of use" damages. The Court will treat this matter as established for purposes of all future proceedings, including trial.

**DONE AND ORDERED** in chambers this _25_th day of July, 2011.

J̶A̶M̶E̶S̶ D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record

---

[14]  *See, e.g., Argonaut*, 474 So. 2d at 215 ("[W]hen a verdict liquidates damages on a plaintiff's *out-of-pocket, pecuniary* losses, plaintiff is entitled, as a matter of law, to prejudgment interest ... from the date of that loss.") (emphasis added).