UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TAMPA BAY WATER,
A Regional Water Supply Authority

    Plaintiff,                        CASE NO.: 8:08-cv-2446-JDW-TBM

v.

HDR ENGINEERING, INC., a
Nebraska corporation,

    Defendant.
_____/

### TAMPA BAY WATER'S RESPONSE IN OPPOSITION TO HDR ENGINEERING INC.'S MOTION IN LIMINE NO. 3 REGARDING THE RESERVOIR RENOVATION & UPGRADE PROJECT

Tampa Bay Water, A Regional Water Supply Authority ("Tampa Bay Water"), by and through its undersigned counsel, hereby files this response in opposition to HDR Engineering, Inc.'s ("HDR") "Motion in Limine No. 3 Regarding the Reservoir Renovation & Upgrade Project" (Dkt. 434)(the "Motion").

**I.    SUMMARY**

The Motion should be denied. As HDR correctly notes, Tampa Bay Water assured the Court that it would not call as witnesses at trial any of the three bidders on the Reservoir Renovation Project. It will not. No order or action by the Court is necessary on that issue, as Tampa Bay Water's commitment in that regard is clear and the Court is well aware of it. But Tampa Bay Water did not forego the presentation of *all evidence* concerning the actual repair design or cost – in fact, it expressly advised the Court that it *did* intend to adduce such evidence at trial. Such evidence is both clearly relevant and not cumulative. And, as the

complete lack of even a single case citation in HDR's Motion might suggest, there is no grounds upon which to exclude it.

## II. ARGUMENT AND AUTHORITIES

### a. HDR Misconstrues Tampa Bay Water's Assurances to the Court Regarding Evidence of the Reservoir Repairs

As it is prone to do, HDR selects snippets of conversations out of lengthy hearings, jumbles them up to suit its position, and ignores the remainder of the discussion and any pertinent context. In this instance, what Tampa Bay Water committed to do is clear: it assured the Court that it would not call as witnesses at trial any of the bidders on the Reservoir renovation project. HDR's attempt to stretch this straightforward assurance into something far broader – a commitment to not put on *any evidence* concerning the actual design or cost of the reservoir repairs – is belied by the record. Although Tampa Bay Water is hesitant to burden this response with lengthy excerpts from the hearing transcript, doing so is the necessary consequence of HDR's distorted presentation.

It is also important to remember the context in which the pertinent discussion was taking place. The hearing held on July 15, 2011, was a hearing on HDR's motion for summary judgment (Dkt. 287). That motion raised a number of issues, but after other rulings by the Court the only aspects of the motion for summary judgment remaining at the time of the hearing were (a) Tampa Bay water's claim for future loss of use damages; (b) HDR's claim of "economic waste"; and (c) Tampa Bay Water's entitlement to prejudgment interest on its repair costs.[1] The Court instructed the parties to address only the issues of loss of use

---

[1] Transcript of Hearing, Dkt. 399, at 19:25 – 20:4 and 20:15-25.

damages and economic waste.[2]

The hearing began with argument by HDR on the loss of use issue[3] and the economic waste issue.[4] Tampa Bay Water then responded on the loss of use issue.[5] The Court then queried Tampa Bay Water concerning the "economic waste" issue, which is what prompted the discussion concerning the renovation project and the evidence that Tampa Bay Water intends to adduce at trial:

> THE COURT: Let's talk about the waste issue. That's another intriguing issue, at least I think it is. You've got a witness or witnesses who will tell this jury how much it's going to cost to build this thing in the way it should have been built, according to your experts; right?
>
> MR. HARRISON: Yes, sir.
>
> THE COURT: And that's basically your – part of your damage component.
>
> MR. HARRISON: Right. That's our repair cost.
>
> THE COURT: As I understand the argument, it's not even necessary to do that. **What the county really wants to do -- Tampa Bay Water, excuse me, is build a bigger and better reservoir with a greater capacity.** So what's your response to all of that?
>
> MR. HARRISON: All right. Well, there are several different issues all mixed up together in that question, Judge, so let me take them one at a time.
>
> First of all, **we do not intend to put on any evidence about the cost of building any bigger, better reservoir. We do not intend to put on any evidence about what the design of some bigger, better reservoir would be.**
>
> In this case Dr. Brumund has come up with a design for a long

---

[2] Transcript of Hearing, Dkt. 399, at 21:1-4.
[3] Transcript of Hearing, Dkt. 399, at 21:5 - 27:3.
[4] Transcript of Hearing, Dkt. 399, at 27:4 - 33:5.
[5] Transcript of Hearing, Dkt. 399, at 33:7 - 48:24.

3

term repair that he says will address the cracking issue and, in essence, is what HDR should have done. Dr. O'Connell has estimated the cost of building what Dr. Brumund says is necessary to make those repairs.

**Separate and apart from that, Tampa Bay Water is actually in the process of hiring a real contractor to make some real changes. They're going to fix it. They're also going to expand it by three million gallons of storage. We're not seeking in any way to recover for the increased storage, absolutely not going to happen.**

The repair costs, the cost to build what HDR should have designed in the first place is a cost, we've got an estimate, and then there's a first cost analysis. Certain deductions have to be taken off of that and our expert has done that. Dr. O'Connell has said to build this repair design costs X, but there are certain deductions that we have to make, in fairness to HDR under the first cost analysis. And he subtracted out 30 million and he gets to just under a hundred million dollars.

That's the evidence that we intend to put on about the long term repair costs. The issue of whether the repairs are necessary is certainly contested, but I don't know that it really addresses the waste issue.[6]

HDR then responded on the economic waste issues:

MR. MEADERS: On the economic waste argument, Your Honor, if they're not asking for an upgrade or an expansion on cost, **why have they identified as their witnesses in this lawsuit the three bidders on the project that's out there** that --

THE COURT: **That's a good question, Harrison. Why don't you answer it real quick.**

MR. HARRISON: Sure.

THE COURT: You can stay there at the mic. **It's a simple answer. Are you going to call them or not?**

MR. HARRISON: **I don't think we're going to call the proposers themselves**. We have the –

---

[6] Transcript of Hearing, Dkt. 399, at 48:25 – 51:1 (emphasis supplied).

4

THE COURT: **Then that's the answer. Then you're not going to call the bidders.**

MR. HARRISON: **We're not going to call the bidders**.

THE COURT: **And you said a little while ago you're not going to put on any evidence of this new, improved, greater capacity reservoir.**

MR. HARRISON: **We're not going to put on any evidence as to the increased capacity. We may through Mr. Kennedy offer testimony as to what the actual cost of the actual repairs that compare to restoring the facility to what HDR should have done.**

THE COURT: **But the bidders are out of the picture?**

MR. HARRISON: **Yes, sir.**

THE COURT: All right. Let's go back to Meaders.

MR. MEADERS: Your Honor, if they're not going to be asking for an upgrade or expansion cost, why just in June 2010 did their spokeswoman, Michele Wrap, say to the press, it's hoped that the federal lawsuit against HRD --

THE COURT: I don't know and I don't care.

MR. MEADERS: Okay, Your Honor.

THE COURT: Let's stay on the record.

MR. MEADERS: Will do so, Your Honor. **They are asking for an expansion of the reservoir even through Mr. Kennedy, not in the context of the water level of three billion gallons. However, they are asking for an increase of the reservoir from its permitted capacity of 66 million gallons up to 120 million gallon per day drawdown rate, which could only occur by virtue of the fact that they have increased the surface water treatment plant** by double and they have --

THE COURT: **I'm sure you're going to bring that out in cross-examination if we get there; right?**

5

> MR. MEADERS: Yes, Your Honor. But it is not correct to tell this Court that they're not seeking an expansion of the reservoir when–
>
> THE COURT: I have an elephant's memory, Mr. Meaders. Don't worry. If Harrison does what he says he's not going to do, he's going to get an ear full.[7]

Tampa Bay Water's assurance to the Court is crystal clear when the discussion at the hearing is considered in full and in context. Tampa Bay Water agreed that it would not call the bidders at trial. Notwithstanding HDR's exaggeration, it most certainly did not tell the Court that it would forego "any evidence concerning"[8] the repairs now being performed at the Reservoir. To the contrary, Tampa Bay Water expressly stated that it may put on evidence of the actual costs of the actual repairs now being undertaken at the Reservoir, but not evidence as to the increase in capacity (or the associated costs) that is part of the current work.

Tampa Bay Water can readily distinguish the actual cost of the repairs only, without any expansion, from the cost of the expanded facility. At the time the bidders were required to submit their proposals, Tampa Bay Water had not decided whether it would merely repair the existing facility or whether it would contract for an expansion of the capacity to be built in conjunction with the repairs. To allow the Board of Directors the flexibility to either choose or forego the expansion based on pertinent costs submittals, but also because it anticipated this very issue, Tampa Bay Water *required* the bidders to submit separate but complete price proposals – one for repairs of the existing facility only, the other for the repairs plus expansion. The winning proposer, Kiewit Infrastructure, complied with this

---

[7] Transcript of Hearing, Dkt. 399, at 62:25 – 65:7 (emphasis supplied).
[8] Motion, Dkt. 434, at p.3.

6

requirement and submitted separate firm, fixed-price price proposals for the Baseline 15.5 Billion Gallon Storage Reservoir Renovation Project[9] and the Increased Capacity 18.5 Billion Gallon Storage Reservoir Renovation Project.[10]

Some of the confusion related to this issue derives from HDR's ongoing claims that Tampa Bay Water is building (and allegedly wants HDR to pay for) a "bigger and better" Reservoir. Even the Court used this phrase in the hearing.[11] Tampa Bay Water is certainly building a bigger Reservoir in conjunction with the necessary repairs, because it is increasing the storage capacity by 3 billion gallons. But it just as surely is not seeking damages from HDR for the costs of that expansion. As counsel reiterated at the hearing, "We're not seeking in any way to recover for the increased storage, absolutely not going to happen."[12] And as noted above, the cost of the repairs can be separated from the additional costs of the expansion.

The rest of the confusion stems from HDR's persistent argument that Tampa Bay Water, apparently in some ingeniously devised conspiracy, is attempting to "take advantage" of the damage at the Reservoir to compel HDR to "pay" for a "bigger and better" facility – in the sense that Tampa Bay Water intends to increase the operational drawdown rate of the Reservoir to accommodate the enhanced capacity of its Surface Water Treatment Plant ("SWTP"), which treats all water leaving the Reservoir prior to distribution. This is a classic red herring.

First, the evidence indisputably establishes that Tampa Bay Water decided to expand

---

[9] Attached as **Exhibit A**.
[10] Attached as **Exhibit B.**
[11] Transcript of Hearing, Dkt. 399, at 49:10-14. The use of the phrase by the Court appears to relate directly to the additional storage capacity being constructed at the Reservoir.
[12] Transcript of Hearing, Dkt. 399, at 50:9-11.

the SWTP capacity and increase the drawdown capability of the Reservoir (by the addition of a pump station) *more than two years before* any cracking at the Reservoir was discovered. This is reflected in, among other places, the approval of the Downstream Enhancements Project (Phases A and B) by Tampa Bay Water in October of 2006.[13] The expansion of the SWTP was completed in 2010, wholly independent of this litigation or of any recovery that might ultimately be achieved by Tampa Bay Water in this case. The decision to enhance the SWTP capacity and to increase the Reservoir drawdown rate to accommodate that additional capacity was made well before the cracking at the Reservoir was discovered, not in response to it.

According to HDR, increasing the drawdown rate of the Reservoir is tantamount to creating a "bigger and better" facility, because the original permitted maximum operational drawdown rate was 66 mgd. But that original permitted operational capacity was never a function of HDR's design – rather, it was dictated by the operational capacity of the SWTP as it then existed. Because the SWTP could not treat more than 66 mgd, there was no practical reason for Tampa Bay Water to draw any more than that from the Reservoir. Any increased drawdown rate that Tampa Bay Water intends to implement at the Reservoir is well within the drawdown parameters of HDR's original design. HDR represented to Tampa Bay Water and the Florida Department of Environmental Protection during the permitting of the facility that drawdown rates as high as 133 mgd and 160 mgd had been examined, and that a

---

[13] See Depo. Ex. 672, attached as **Exhibit C**, Agenda Memo Item F1b for Tampa Bay Water Board of Directors meeting, recommending approval of Downstream Enhancements Project (Phases A and B) for System Configuration II. Note 15 on Table 1 of the Exhibit (Bates #TBWMRPD0038) describes the Downstream Enhancements Project as including, among other things, a reservoir pump station, an additional regional high speed pump station pump and expansion of the SWTP to 99mgd capacity. The cracking at the Reservoir was discovered in December 2008.

8

discharge rate of 160 mgd was determined to be hydraulically feasible. HDR stated that "From the perspective of embankment stability (including the stability of the soil-cement facing) the withdrawal rate could be increased to rate *[sic]* to be hydraulically feasible."[14]

Because any increased drawdown rate is well within the design parameters that HDR represented were feasible and would result in no embankment instability, increasing the drawdown rate does not result in a "bigger and better" facility than that which HDR originally designed. In fact, but for the cracking of the soil cement at the Reservoir, Tampa Bay Water would have been able to secure such a permit change through a simple "letter modification" based on the data and representations contained in the original permit application and supporting materials. This issue about the "increased" drawdown rate has been vigorously contested throughout this litigation, has been covered extensively in the depositions and discovery, and will no doubt be an issue at trial on which conflicting evidence will be presented and argued. But it is no basis upon which to exclude evidence of the repair or the cost of the repairs being actually undertaken at the Reservoir. As the Court observed at the summary judgment hearing, this issue of the drawdown rates is an appropriate topic for cross-examination at trial.[15]

### b. The Proposals from the Unsuccessful Bidders are Relevant and Should Not Be Excluded

HDR seeks to exclude testimony and evidence from the other two bidders on the Reservoir Renovation Project.[16] HDR asserts, without any supporting legal argument, that

---

[14] Kennedy Affidavit, Dkt. 313-1, at ¶45 and referenced exhibits. This issue of the drawdown rates is discussed in detail in Kennedy's Affidavit at ¶¶37-45 and the accompanying exhibits.
[15] Transcript of Hearing, Dkt. 399, at 64:23-25 (THE COURT: "I'm sure you're going to bring that out in cross-examination if we get there, right?")
[16] Granite Construction Co. and Skanska USA Civil Southeast, Inc.

9

these proposals are not relevant under Fed. R. Evid. 402 merely because Tampa Bay Water did not select them, or that such evidence should be excluded under Fed. R. Evid. 403. Again, Tampa Bay Water has stated that it will not call the bidders to testify as witnesses at trial. But evidence of the repair proposals submitted by those proposers is still relevant and should not be excluded.

The mere fact that Tampa Bay Water chose one proposal over the other two does not render the other two repair proposals irrelevant. They are still firm price proposals for repairs to the Reservoir, tendered by competent and reputable large public works contractors. They each contain a proposed repair design and set out a firm fixed price for the proposed repairs. Such evidence is relevant to a number of issues in this case, including the need for repairs (an aspect of HDR's "economic waste" argument) and the nature of the repairs required. It is also relevant to a number if damages issues: for example, to the extent HDR contends that the repair costs estimate prepared by Tampa Bay Water's retained expert is too high, evidence of the cost of repairs proposed by contractors actually willing to do that work is surely relevant.

HDR's unsupported claims that the evidence is "prejudicial" and "misleading" should also be summarily rejected. In our adversarial process, all evidence presented by the opposing party is "prejudicial" to the extent that it supports the proponent's view of the case. And absent some explanation as to how or why such evidence is "misleading," any such issues are appropriate fodder for cross-examination but do not warrant exclusion of relevant evidence. The exclusion of evidence under Fed. R. Evid. 403 "is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." *United States v. Merrill*, 513 F.3d 1293, 1301 (11th Cir. 2008).

### c. Evidence of the Actual Repairs Being Undertaken at the Reservoir is Relevant and Should Not Be Excluded

HDR's contends that "[t]o justify the admissibility of any aspect of the Reservoir Renovation & Upgrade Project, TBW would have to establish that the Project is substantially similar to the design parameters HDR used when it designed the Reservoir more than a decade ago." HDR cites no case law to support this contention; indeed, it does not cite a single case anywhere in its Motion.

Conceptually, it is difficult to understand how evidence related to repairs of the Reservoir that is the very subject of this litigation would have to meet some test of being "substantially similar" as suggested by HDR. "Substantially similar" to what? Itself? The evidence in question is evidence that directly relates to the same facility, not to some other reservoir. Moreover, as noted above, Tampa Bay Water can distinguish between the cost of the repairs only and the cost of the repairs plus the expansion, because it received *separate* firm fixed price proposals for each.

If HDR wants to argue that the repair designs proposed or the actual repairs being undertaken were influenced by certain assumptions made by Tampa Bay Water, or "imposed" on the proposers by Tampa Bay Water, it is free to do so. If HDR wants to argue that the repairs result in some "bigger, better" reservoir, or that the repairs in whole or in part are unnecessary, or that Tampa Bay Water is paying too much for them, it is free to do so. If HDR wants to argue that the repair cost includes "first costs" or "betterments" or other items requiring adjustment of the contract price, it is free to do so. But, as was suggested by the Court during the summary judgment hearing, this is all in the nature of argument for HDR to present through cross-examination or otherwise. Evidence of repairs made to the *very facility*

11

that is the subject of the action is clearly relevant and should not be excluded.

The documents concerning the Reservoir repair project were also made available to HDR in a timely fashion. Tampa Bay Water issued the Request for Proposals ("RFP") for the repair work on November 11, 2010. The technical proposals from the bidders were submitted to Tampa Bay Water on March 25, 2011. The price proposals were submitted on April 8, 2011.[17] The RFP and all of the proposals received by Tampa Bay Water were hand delivered to counsel on April 23, 2011.[18] The contract with Kiewit was approved by Tampa Bay Water at its meeting on August 15, 2011[19] and the signed contract was delivered to counsel on August 17, 2011.[20] The documents were produced promptly, and HDR's claim of "unfairness"[21] is meritless.

### d. Evidence of the Reservoir Repairs is Not Cumulative or Confusing

The testimony that Tampa Bay Water will offer at trial regarding the Reservoir repairs is not cumulative, and is therefore not prohibited by Fed. R. Evid. 403. Relevant evidence is presumptively admissible and may be excluded under Rule 403 only if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The exclusion of evidence under Rule 403 "is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." *United States v. Merrill*,

---

[17] **Exhibit D**, Agenda Item F1b for June 20, 2011, Tampa Bay Water Board of Directors meeting, at p. 4 (summarizing the RFP process and calendar).
[18] Bates Nos. TBW-REN00001-TBW REN04743.
[19] **Exhibit E**, Agenda Item F1 for August 15, 2011, Tampa Bay Water Board of Directors meeting (recommending approval of contract with Kiewit).
[20] **Exhibit F**, Transmittal letter to counsel dated August 17, 2011.
[21] Motion, Dkt. 434, at p. 9.

513 F.3d 1293, 1301 (11th Cir.2008). "Rule 403 does not mean that a court may exclude evidence that will cause delay regardless of its probative value. If the evidence is crucial the judge would abuse his discretion in excluding it." *Johnson v. United States*, 780 F.2d 902, 905 (11th Cir. 1986).

Expert testimony is not cumulative if it is based in part on evidence not relied upon by other experts, or if the analysis is "somewhat different." *Johnson v. United States*, 780 F.2d 902, 906 (11th Cir. 1986). The fact that an expert relies on some evidence that will also be relied on by other experts does not make the testimony cumulative. *Banks v. United States*, 99-4451 L, 2010 WL 1837701 (Fed. Cl. May 4, 2010)("The mere presence of overlap, reference to another expert's report or a similar conclusion, however, does not render an expert report unnecessarily "cumulative" pursuant to FRE 403."); *Rodriguez v. County of Stanislaus*, 2010 WL 2720940, *2 (E.D. Cal. July 8, 2010)(holding despite fact that both experts may offer testimony concerning the same issue did not render the testimony cumulative where qualifications of experts were vastly different).

Evidence concerning a *theoretical* reasonable repair design and a cost estimate to construct that design, to be presented through Tampa Bay Water's retained experts, is in no way "cumulative" of other evidence concerning the *actual* repairs being currently undertaken at the Reservoir, which will be presented through a Tampa Bay Water employee. That the repair concepts generated in this litigation by the retained experts for the parties were not considered by Tampa Bay Water's Board of Directors is not pertinent to the issues raised by the Motion. It is surely not the legal test of whether evidence of the actual repairs is relevant under Rule 402 or should be excluded under Rule 403.

13

The evidence is also not confusing or misleading, despite HDR's protestations. If the jury can be expected to comprehend, analyze and assess the complex and detailed engineering, design and cost testimony that will be presented through the parties' retained expert witnesses, it should have no difficulty comprehending the evidence and testimony concerning the proposals for the Reservoir repairs and the actual repairs that Tampa Bay water has agreed to perform.

## CONCLUSION

For all of the foregoing reasons, the Motion should be denied.

        **s/ Richard A. Harrison**
        **Richard A. Harrison, Esquire**
        Florida Bar Number 0602493
        rharrison@allendell.com
        Lead Trial Counsel
        **Misty C. Leafers, Esquire**
        Florida Bar Number: 416894
        mleafers@allendell.com
        **Barbara M. Cowherd, Esquire**
        Florida Bar Number: 0469203
        bcowherd@allendell.com
        **ALLEN DELL, P.A.**
        202 South Rome Avenue, Ste. 100
        Tampa, Florida 33606
        Phone: (813) 223-5351
        Fax: (813) 229-6682
        Attorneys for Plaintiff, Tampa Bay Water

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 14th of December, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

**s/ Richard A. Harrison**
**Richard A. Harrison, Esquire**
Florida Bar Number 0602493
ALLEN DELL, P.A.
202 South Rome Avenue, Ste. 100
Tampa, Florida 33606
Phone: (813) 223-5351
Fax: (813) 229-6682
rharrison@allendell.com