IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TAMPA BAY WATER,
a regional water supply authority,
        Plaintiff,

v.                                                      Case No. 8:08-cv-02446-JDW-TBM

HDR ENGINEERING, INC., a Nebraska
corporation,
        Defendant.
_____/

### DEFENDANT HDR ENGINEERING INC.'S RESPONSE TO PLAINTIFF TAMPA BAY WATER'S MOTION IN LIMINE NO. 3 TO EXCLUDE CDG AS A *FABRE* DEFENDANT [DKT. 440]

HDR Engineering, Inc. responds to TBW's Motion in Limine No. 3 [Dkt. 440]:

### 1. SUMMARY OF ARGUMENT

TBW is improperly using a Motion in Limine as a Rule 12 Motion to Strike or for a More Definite Statement, as a delayed and improper Motion for Summary Judgment or as a premature Rule 50 motion for judgment. TBW argues a pleading standard for affirmative defenses that does not exist. TBW presupposes what the evidence adduced at trial will be and then requests a ruling based on that imagined evidentiary trial record. In the process, it misreads HDR's pleadings, misstates the law, and instructs the Court to declare certain admittedly relevant evidence off limits. HDR (based on TBW's pleadings and expert reports) identified the issue of CDG's negligence as a party in its Amended Answer [Dkt. 223] in October 2010. HDR identified the issues as *Fabre* issues in the Joint Pretrial Statement filed seven months ago and amended its pleadings before trial to timely recognize the party change of CDG as a *Fabre* defendant. If TBW wanted to contest the pleadings, the proper way to so do is a Motion to Strike or for more definite pleading. It has not done so because HDR has met the pleading standard. If TBW

believes the evidence of record does not support CDG's negligence and responsibility for the cause of the cracking, then the proper procedural avenue would have been a dispositive motion.

## 2.
## TBW'S MOTION IS NOT A PROPER MOTION IN LIMINE AND IS PREMATURE

TBW is attempting to use a Motion in Limine where both a Motion to Strike Pleadings or a Motion for Judgment would fail on the merits. TBW's Motion is not a Rule 50 motion for judgment or Rule 51 objection to the jury charge. TBW argues that HDR's pleadings are inadequate, but it does not cite any pleading standards. TBW argues that HDR cannot present expert testimony because no expert testimony as to CDG's duty, breach and causation exists in this case. TBW does not argue that there is no evidence in the record of CDG's negligence because it cannot: (a) TBW originally plead CDG's negligence and (b) TBW's experts William Brumund and Kenneth O'Connell have saturated the record with evidence of CDG's negligence and responsibility.

> TBW dooms its own Motion in Limine in its footnote number 4 (page 2):
>
> Tampa Bay Water does not seek to exclude factual evidence of the various reviews or work performed by CDG. Whether such evidence is relevant to some other issues remains to be seen . . . Irrespective of whether such evidence may be relevant or sufficient for some other purpose, HDR cannot satisfy is burden . . . to have CDG included on the jury verdict form.

Thus, TBW does not seek to exclude evidence of CDG's responsibility, reviews or work performed. Rather, it seeks to exclude an argument that such is evidence of CDG's comparative responsibility. Where the evidence is admissible for any purpose a Motion in Limine is not proper. *Stewart v. Hooters of America, Inc.*, 2007 U.S. Dist. LEXIS 44056, 2007 WL 1752873 *1 (M.D. Fla. June 18, 2007). A court has the power to exclude evidence in limine only when evidence is clearly inadmissible on *all* potential grounds. *Id.* (citing *Hawthorne Partners v. AT&T Techs.*, 831 F.Supp. 1398, 1400 (N.D. Ill. 1993)). In *King v. Cessna Aircraft Co.*, 2010

U.S. Dist. LEXIS 53585 (S.D. Fla. May 6, 2010) the court stated "the purpose of a motion in limine is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence" and found Defendant's request for collateral estoppel by Motion in Limine was improper as it should have been raised in a Motion for Summary Judgment. *King, at* *44-45.

TBW has a lengthy discussion of how it anticipates HDR will prove its defense at trial and whether that anticipated evidence will warrant inclusion of CDG as a *Fabre* defendant on the jury charge. This conjecture is an improper use of a motion in limine. As this Court commented in September, determination of which parties will be included in the jury charge as *Fabre* defendants typically must wait until the close of evidence.[1]

TBW's lengthy reliance on *W.R. Grace & Co. – Conn v. Dougherty,* 636 So.2d 746 (Fla. 2 DCA 1994) and related cases is entirely misplaced. TBW incorrectly suggests that Florida courts strike *Fabre* defenses or limine out *Fabre* arguments at the pre-trial stage where evidence otherwise exists based on the plaintiff's speculative assumptions about defendant's evidence at trial. But, the *W.R. Grace & Co* case and others do not relate to motions in limine. In every single one of the cited cases, the defendant was allowed to present and argue the *Fabre* defense at trial. The question presented on appeal was whether the defendant's trial evidence was sufficient to warrant inclusion of the *Fabre* defendant in the jury charge.[2] This determination can

---

[1] Transcript of Sept. 15, 2011 hearing, p.65 (Ex. A attached hereto). ("But my experience has been that I can't say yes or no about a *Fabre* party . . . until there's some evidence. So you can anticipate that that motion likely is – the competing motions are likely to be denied pending whatever evidence that you have").

[2] *See W.R. Grace & Co. – Conn. v. Dougherty,* 636 So.2d 746 (Fla. 2 DCA 1994) (evidence presented *at trial* insufficient to warrant inclusion of *Fabre* defendant in jury charge); *Lagueux v. Union Carbide Corp.*, 861 So.2d 87, 88-89 (Fla. 4 DCA 2003) (same); *Garlock, Inc. v. Harriman*, 665 So.2d 1116, 1118-19 (Fla. 3 DCA 1996) (same); *Owens-Illinois, Inc. v. Baione*, 642 So.2d 3, 3-4 (Fla. 2 DCA 1994) (same); *Snoozy v. U.S. Gypsum Co.*, 695 So.2d 767, 769 (Fla. 3 DCA 1997) (directed verdict dismissing defendant's *Fabre* claims *after close of evidence*).

only be made at the close of the evidence. It certainly cannot be made at the pre-trial stage through a motion in limine that would prevent the defendant from even mentioning the *Fabre* defense, and none of the cases TBW cites holds otherwise. Moreover, the evidence which will be presented at trial simply will not be of the "them too" type claimed by TBW but rather direct documentary evidence and testimony as to CDG.

3.
**<u>HDR'S AFFIRMATIVE DEFENSE *FABRE* PLEADING IS ADEQUATE</u>**

TBW begins its argument by claiming HDR's pleadings of a *Fabre* defense is inadequate. However, TBW fails to even address proper pleading standards and tries to impose a strict precise factual pleading requirement that does not exist. TBW's argument fails from the outset. TBW cites the various paragraphs where HDR *has plead* the affirmative defense of CDG as a *Fabre* defendant and the precise factual allegations made in support of the *Fabre* defense. It also cites the various places where HDR raises what CDG specifically did wrong: "CDG never raised any of the issues that TBW now makes about HDR's designs, including the wedge, permeability values, site characterization studies, seepage and stability analyses, etc.," and "to the extent that any of TBW's allegations are correct, then CDG and B&V each breached their duty to TBW." In fact, HDR's Answer to TBW's Second Amended Complaint has eight specific paragraphs raising the *Fabre* affirmative defenses. HDR has plead *Fabre* allegations and plead in considerable detail the facts showing that CDG owed TBW a duty, alleged that it breached that duty, and alleged that this breach was a cause of TBW's alleged damages. *See* HDR's Answer to TBW's Second Amended Complaint, pp.15-17, ¶¶142-147 (July 15, 2011).

Citation of more facts is not necessary here as a *Fabre* affirmative defense does not require any, let alone specific, factual allegations as TBW would argue. Unlike FRCP 8(a), which requires the plaintiff's complaint to contain a greater level of detailed pleading "<u>showing</u> that the

pleader is <u>entitled</u> to relief," FRCP 8(b) and (c) only require a defendant to "<u>state</u>" its defenses. The Eleventh Circuit has held that the purpose of Rule 8(c) is to give plaintiff notice of the defendant's defenses. Thus, the complete failure to plead an affirmative defense is harmless if the plaintiff had adequate notice of the intended defense prior to trial. *See Hewitt v. Mobile Research Technology, Inc.,* 285 Fed. App'x 694, 696 (11th Cir. 2008) ("[T]he failure of defendant to plead the affirmative defense does not prejudice the plaintiff, and it is not error for the district court to hear evidence on the issue"); *Hassan v. USPS,* 842 F.2d 260, 263 (11th Cir. 1988) (defendant allowed to raise unplead affirmative defense of collateral payments at trial).[3] Contrary to TBW's protestations of lack of factual pleading, it is not even necessary to include detailed factual support for a *Fabre* defense. *Adams v. JP Morgan Chase Bank, N.A.*, 2011 U.S. Dist. LEXIS 79366, 9-10 (M.D. Fla. July 21, 2011)("If it is not even required that a defendant plead an affirmative defense (so long as the plaintiff has notice of the defense), it cannot be necessary for a defendant to include factual allegations supporting each affirmative defense.")

Neither *Nash v. Wells Fargo Guard Services, Inc.,* 678 So.2d 1262, 1264 (Fla. 1996) nor *Millette v. Tarnove*, 2011 U.S. App. LEXIS 15108, *5-7 (11th Cir. July 22, 2011) help TBW. In, *Nash*, the Florida Supreme Court resolved a conflict among the circuit courts by holding that the plaintiff was entitled to *advance notice* before trial of an intended *Fabre*. HDR has done that here. However, even *Nash* has been relaxed -- a *Fabre* defendant not identified by name in pleadings, but known to the plaintiff through discovery, may be submitted. *See Florida Power &*

---

[3] Although there was some early disagreement among district courts in the 11th Circuit as to whether the heightened pleading requirements placed on plaintiffs by *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 127 S. Ct. 1955 (2009) apply to affirmative defenses, the current trend holds they do not apply. *See Ioselev v. Schilling*, 2011 U.S. Dist. LEXIS 134656, *3-4 (M.D. Fla. Nov. 22, 2011)(**"**the heightened pleading standards set forth in [*Twombly* and *Iqbal*] do not apply to affirmative defenses"); *Dougan v. Armitage Plumbing, LLC*, 2011 U.S. Dist. LEXIS 136993, *2 (M.D. Fla. Nov. 14, 2011;  Jirau v. Camden Dev., Inc.*, 2011 U.S. Dist. LEXIS 80022, *6-7 (M.D. Fla. July 22, 2011); *Adams v. JP Morgan Chase Bank, N.A.,* 2011 U.S. Dist. LEXIS 79366, *6-10 (M.D. Fla. July 21, 2011) ("it cannot be necessary for a defendant to include factual allegations supporting each affirmative defense").

*Light Co. v. Tursi*, 729 So. 2d 995, 997-98 (Fla. 4th DCA 1999). In *Millette*, the question was whether the trial court had listed an intentional tortfeasor under *Fabre*, which Section 768.81 expressly prohibits. Only in that context did the court address the sufficiency of the defendant's *Fabre* pleading, which consisted of exactly one sentence.[4] Even then, the Eleventh Circuit specifically noted that the defendant would have an opportunity on remand to amend its pleadings. *Id.* at *6-7. There are no such technical deficiencies in HDR's pleading. Yet, even if there were, HDR should be afforded the same remedy.[5]

TBW certainly had notice of CDG and its negligence. TBW's pleadings (until it was granted leave to amend in July 5, 2011) contained specific allegations of CDG's negligence and responsibility for the cracking at the Reservoir. TBW from the inception of this case in December 2008 until July of 2011 maintained several allegations of negligence against CDG arising from CDG's failure to perform its duties pursuant to the contract between CDG and TBW (the "CDG Contract"). See Amended Complaint and Demand for Jury Trial [Dkt. 125], ¶¶9, 34, 35, 59, 64, 70, 110–118. HDR's pleading goes further than any notice pleading would require and factually identifies the specific contractual agreements and obligations by which CDG was to participate in the design process, construction management and quality assurance (the same contracts TBW previously alleged that CDG breached). HDR alleges that TBW contracted with CDG in February 2009 and there were five amendments to that contract. [Dkt. 388, ¶144]. HDR alleges that pursuant to those contracts, CDG agreed to provide Tampa Bay Water construction

---

[4] "Pursuant to *Fabre*. . . Defendant is not responsible for Plaintiff's alleged damages, in whole or in part, to the extent that the damages, if any, were caused by the negligence, fault and/or responsibility of Webster Bank, N.A., Pablo Camus, DEK Technologies, Inc., Steven Cummings, and Todd Mitchell Smith."

[5] This is the approach routinely taken by this Court in ruling on motions to dismiss. *See, e.g., Nickerson v. HSNi, LLC,* 2011 U.S. Dist. LEXIS 90703, *9-10 (M.D. Fla. Aug. 15, 2011)(Whittemore, J.); *Broaders v. Polk County Sch. Bd.,* 2011 U.S. Dist. LEXIS 71143, *6 (M.D. Fla. )(Whittemore, J.). The same rationale would apply here, since TBW's complaints go to sufficiency of the factual pleadings, not the substantive applicability of the *Fabre* defense.

management services, including review of design documents as set forth in the CDG Contract and also perform on-site construction quality assurance services. [Id.] CDG conducted repeated reviews of HDR's design documents at various stages of completion and TBW requested a final review of the complete set of design documents and HDR alleges that CDG failed to raise any of the issues that TBW claims about HDR's design, including the wedge, permeability values, site characterization studies, seepage and stability analyses, etc. [Dkt. 388, ¶146]. TBW had notice of CDG's alleged design review errors: TBW's own expert O'Connell detailed them in his separate report directly attacking CDG's design review and construction management. In his "Evaluation of Performance by Construction Dynamics Group," O'Connell opined that "CDG failed to properly review the design documents and make proper recommendations to the owner . . ."[6]

While HDR wholly rejects TBW's criticisms of its design, if those criticisms are correct, then HDR has adequately plead that CDG shares some responsibility for these alleged design errors. *Id.* ¶¶146-147. To satisfy TBW's apparent demand for greater detail would require HDR to quote the design criticism allegations from TBW's complaints and expert reports back to it. Providing such specific factual detail is simply not required by law.

HDR also has adequately provided notice of CDG's comparative responsibility for Construction Management and Quality Assurance failures under ¶148 of its Amended Answer. HDR alleges that CDG contracted with TBW to inspect the progress of the construction and advise owners of any deviations, defects or deficiencies observed in the work. [Dkt. 388, ¶148]. HDR alleges that "CDG also failed to discover Barnard's defective construction, which could

---

[6] The details of expert opinions are further addressed in the following section. However, as this Court knows, TBW's expert has changed his position regarding one aspect of this case claiming that lenses, pockets, streaks and layers occurred in the embankment solely because of HDR. Putting aside for the moment that the court has found as a matter of law that lenses, etc. did not cause the damage, if the specification was vague, that is a matter that CDG should have caught in its design review to look for clarity and consistency within the design documents. O'Connell himself has rendered this precise opinion against CDG. *See* Ex. B, Discussion of Defendant's Expert Reports, April 23, 2010, p.17-22.

have been eliminated and which resulted in TBW's damages." TBW certainly had notice of this aspect of CDG's responsibility and breach. TBW asserted, prior to amendment in July 5, 2011 that "[a]s a result of CDG's breach, CDG failed to discovery Barnard's defective construction, which could have been eliminated . . had CDG properly performed its Construction Phase Services." [Dkt.125, filed November 2009, ¶114]. TBW plead that CDG was negligent under the same contractual provisions that HDR cites in its pleadings (3.5.11 and 3.5.11.2). See TBW Amended Complaint [Dkt. 125 at ¶¶111(b) and (d)].[7] HDR has plead that if the jury were to accept TBW's allegations of improper construction (which TBW still alleges that HDR failed to discover) then CDG also failed to perform its duties and discover those same construction deficiencies. HDR's pleadings simply are not deficient under any standard; the pleadings provide even more detail than TBW's original assertions.

TBW raises the strawman of "delay" without providing any legal authority.[8] First, as HDR may have raised this affirmative defense first at trial, delay of its formal assertion would be of no consequence here. Second, HDR changed the formal pleading of CDG's negligence as a party to one of a non-party *Fabre* defense over 5 months ago and long before trial. In any event, HDR did not delay in raising CDG's negligence as an affirmative defense issue nor in changing the status of the defense from an allegations concerning CDG change from a party to a non-party

---

[7] The parties stipulated in the Joint Pretrial Statement that "Pursuant to its contract, CDG agreed to provide Tampa Bay Water construction management services for the Reservoir, including review of design documents as set forth in the CDG Contract and construction assurance services." Dkt. 346, Section I, ¶9.  The CDG Contracts by stipulation of the parties will be presented at trial as a Joint Stipulated Exhibit.  Presently, they are filed as Dkt. 125-5, p. 1 through Dkt. 125-6 p. 52.

[8] TBW in previously resisting HDR's Response to TBW Motion for Leave to Amend at p. 19-20 noted the pleading standard: "even if the Court were to find . . . delay* in filing, . . . prejudice [must be shown]." *Floyd v. Eastern Airlines, Inc*., 872 F.2d 1462, 1490 (11th Cir. 1989)("The mere passage of time, without anything more, is an insufficient reason to deny leave to amend."),*rev'd on other grounds*, 499 U.S. 530 (1990); *See also Loggerhead Turtle v. County Council of Volusia County*, 148 F.3d 1231, 1256 (11th Cir. 1998)(finding plaintiff's failure to request leave to file an amended complaint several months earlier supported a finding of "delay," not "undue delay" or "dilatory" action, where plaintiff filed within the time prescribed in the court's scheduling order and nothing in the record suggested that the gap in time was anything more than the "mere passage of time.").

status. Even before its formal pleadings of CDG as a *Fabre,* HDR presented notice of its intent to submit CDG's comparative responsible as a party in HDR's Amended Answer and Affirmative Defense filed in October 2010. [Dkt. 223 ¶147]. In addition, HDR gave notice of the *Fabre* defense against CDG in the Joint Pretrial Statement in May 2011. Section K lists the issue of "whether the breach of contract or negligence by CDG was a legal cause any damage to Tampa Bay Water and, if so, the percentage of fault attributable to CDG," and "the apportionment of fault or responsibility for Tampa Bay Water's damages, if any, among all parties and non-parties including Tampa Bay Water, HDR, CDG, Barnard, McDonald and Black & Veatch." [Dkt. 346, p. 44, ¶27 and p. 48, ¶58]. At that stage, TBW had not amended its pleadings dropping its negligence allegations against CDG. TBW was granted leave to amend its pleadings in June 2011, amended its pleading July 5, 2011 dropping its negligence pleading versus CDG. HDR promptly within the time period provided by the Court amended its Answer changing the allegations of negligence against CDG from party to non-party *Fabre* status. Not only was TBW aware of CDG's negligence, based on its own pleadings and expert reports, it was also aware from HDR's assertion of CDG's comparative responsibility since October 2010, aware of it as a *Fabre* defense from the Joint Pretrial Statement (which merges prior pleadings) and HDR timely changed its formal pleadings of negligence of CDG from party to non-party *Fabre*. Delay is not an issue and there is no prejudice.

4.<br>
<b><u>HDR'S <i>FABRE</i> EVIDENCE IS SUFFICIENT</u></b>

The Court can be fully satisfied that there will be sufficient evidence submission of CDG as a *Fabre* defendant. In this regard, it is important to recognize that TBW does not question whether there is proof of CDG's negligence. Rather, TBW focuses almost exclusively on an argument that HDR did not affirmatively designate an expert supporting CDG negligence and

breach of the standard of care. HDR did not separately designate an expert on CDG's negligence and breach because TBW plead CDG's negligence and TBW's own expert's reports and deposition testimony support CDG's comparative responsibility and HDR's *Fabre's* defense with respect to CDG. TBW's argument is notable because it utterly fails to address the bulk of evidence of record adduced from its own experts. In fact, TBW's own experts, Dr. Brumund and Kenneth O'Connell, have provided all the expert testimony TBW says is necessary.

A party does not have a proprietary interest to its own expert witness evidence. *Doe v. Eli Lilly & Company, Inc.*, 99 F.R.D. 126, 128 (D.Col. 1983)("even an expert whose knowledge has been purchased cannot be silenced by the party who is paying him."). Even where an expert is subsequently withdrawn, the "expert is recognized as presenting part of the common body of discoverable, and generally admissible, information and testimony available to all parties." *House v. Combined Insurance Company of* America, 168 F.R.D. 236, 245 (N.D. Iowa 1996). "A deposition preserves the testimony of the expert, should the expert later become unavailable, or provides a basis for impeachment, should the expert's opinion offered at trial differ." *Id.* Here, TBW retained O'Connell and Brumund and has designated them as a testifying experts at trial. Their designation does not somehow imbue TBW with dominion to control the circumstances and manner through which their testimony reaches the jury. *Kerns v. Pro-Foam of South Alabama*, 572 F. Supp. 2d 1303, 1311 (D.C. Ala. 2007). The testimony regarding CDG's *Fabre* comparative fault will be elicited on cross-examination in Plaintiff's case-in-chief. Such cross-examination at trial does not require affirmative Rule 26 designation or reports from HDR. *Kerns,* at 1309-10 ("The rules governing expert disclosures are intended to shield litigants from unfair surprise, not to be used by opportunistic litigants as a sword to strike down witnesses whose identities and proposed testimony have been known to them from the outset of the

lawsuit."). TBW has not moved to strike O'Connell or Brumund's prior opinions. TBW has not moved for summary judgment on these issues. TBW has not withdrawn O'Connell and Brumund. In fact, the Joint Pretrial Statement acknowledges that TBW will call them.

Formal appendages of the words are not necessary and, the expert need not incant any talismanic phrases to survive a motion for directed verdict; the expert's testimony should be considered as a whole. *Clair's Boutiques, Inc., v. Locastro*, 2011 Fla. App. LEXIS 6662, *7-8 (Fla. 4th DCA 2011); *see also*, *Edwards v. Simon,* 961 So. 2d 973, 974-75 (Fla. 4th DCA 2007) As noted by the Court, (Dkt. 363, Order at n.1), the case of *Guinn v. AstraZeneca Pharmaceuticals LP*, 598 F. Supp. 2d 1239 (M.D. Fla. 2009), suggests that under Florida law, a concurring legal cause need not be one that would, standing alone, be sufficient to cause the damage in question. *Guinn*, 598 F. Supp. 2d at 1246. In negligence cases, like the present one, "Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." *Gooding v. Univ. Hosp. Bldg., Inc.,* 445 So. 2d 1015, 1018 (Fla. 1984). If sufficient evidence is offered to meet this standard, the remaining questions of causation are to be resolved by the trier of fact. *Wallace v. Dean,* 3 So. 3d 1035, 1047 n.18 (Fla. 2009).

HDR should not have to marshal all its proof as to CDG's duties and responsibilities in response to a Motion in Limine as this evidence will come by way of cross-examination of Plaintiff's experts and is part of its attorney work product. Suffice it to say, if *any* evidence of CDG's duty, breach and causation exists, then TBW's motion is without merit. Accordingly, the evidence that HDR sets forth below is not exclusive of all the evidence that it expects may be adduced through cross-examination of TBW's experts as to CDG's duties and breach and causation.

A.  Responsibilities of Design Review and Breach by CDG

There is no dispute that CDG had design review responsibilities. TBW's experts O'Connell and Brumund establish CDG's design review responsibilities. Likewise, HDR's expert Wooten laid out the actions CDG took under its design reviews.[9] In its Motion, TBW tries to pigeonhole CDG's design review to "constructability" to argue that there will be no admissible evidence of CDG's breach of design review of the plans and specifications. However, *both* of TBW's expert witnesses established a design review breach by CDG and rendered opinions that CDG *failed* to conduct a proper review of the plans and specifications creating issues in the design which caused the unusual cracking at the reservoir. The fact that TBW wants to run from those opinions now that it has settled with CDG does not make those opinions inadmissible or outside of the scope of CDG's design review responsibilities. TBW can't limit CDG's design review scope via treatise where its own experts have opined CDG breached that very duty.

O'Connell laid out in his separate January 2010 report directed specifically at CDG's liability CDG's design review responsibility and failure: (1) "CDG failed to properly review the design documents and make proper recommendation to the owner as to the constructability of the project."[10] O'Connell reiterated those opinions in his Report of April 23, 2010.[11] Moreover, TBW's expert Brumund provided similar opinions in his report, "CDG did not perform a thorough constructability review or comment on the apparent difficulty of constructing the work," "did not comment on difficulty of meeting the specification of the wedge fill [and] grade

---

[9] Ex. C, GEI Consultants, Inc Report dated March 24, 2010 (sections from TBW's Motion).
[10] Ex. D, O'Connell, Evaluation of Performance by CDG, January 8, 2010, OCL_CDG00048.
[11] *See also*, Ex. B, O'Connell, Discussion of Defendant's expert reports, April 23, 2010, pp. 11, 13, 14, 16, 17-22, 26, 27, 31, and 32.

specifications for elements upstream of the geomembrane."[12] Brumund further opined CDG was responsible under its design review because CDG gave "little input on the constructability of the project" including "grade control."[13] Brumund further opined regarding other aspects of design review failure stating that "a competent engineer" would have noted the alleged deficiencies in HDR's design and would have corrected them:

> Golder Associates considers that **competent reviewer**s would have stated that the flat-plate soil-cement facing would retard flow of water from the soil wedge during drawdown and should be modeled as a separate distinct layer from the embankment fill in the transient seepage modeling.[14]

Brumund repeated this theme:

> *Had these reviews been done*, the modeling and parameter assumptions could have been questioned and the designs changed as necessary.[15]

Brumund further opined that if an outside reviewer had reviewed the HDR design during the design process, "HDR's seepage modeling *errors* . . . in the final design **would have been discovered and** appropriate **changes** could have been **made** to the design."[16] O'Connell opined that "the constructability review conducted by CDG was little more than a Quality Control review and CDG failed to address many of the key elements normally included in a constructability review for a project."[17]

---

[12] Ex. E, Golder January 8, 2010 Report, at GA_RPT000129.

[13] Ex. F, Golder Reply to Rebuttal Reports, April 23, 2010, GA_RBL000033.  Grade control includes measurements of the thickness of lifts of earthwork during construction within the embankment.  Thus, it would include thickness control of the protective layer.

[14] Ex. E, Golder January 8, 2010. Report at GA_RPT000068-69 (emphasis added).

[15] *Id.*, at GA_RPT000127, §6.1 (emphasis added).

[16] *Id.*, at GA_RPT000064-65 (emphasis added). Dick Veath also testified that during the constructability and technical reviews of which CDG was a part there were no discussions of soil cement permeability, hydrostatic pressure under the soil cement or blending of the embankment soils. Ex. G, Veath Depo. Vol. II: 196:3-197:7.

[17] Ex. D, at OCL_CDG000047.

In his deposition, Brumund reiterated that "competent" engineer in design review would have commented that the soil-cement was not modeled correctly [18] and should have been considered a separate layer from the earthwork fill.[19] One final point: when asked about the review of permeabilities of the soil fill and whether a competent engineer would have provided comment on it, Brumund testified.

> Q. Would you have thought about it?
> A. Hindsight's a great teacher. Would I have thought about it? I'd like to think yes.
> Q. But you don't know for sure, do you?
> A. But -- but I've already been involved with this thing. I'd say yes. If you would have asked me would I look at the permeability of the fill and say "too high," I'd say yes to that also.[20]

As part of its design review, CDG submitted to HDR the review comments of Mr. Mohammed Alawi of PB.[21] CDG stated this review was being provided "at the request of Tampa Bay Water."[22] In short, in CDG's review, it commented on the "permeability coefficient" which HDR assigned to the embankment soil and did not find them to be high.[23] Thus, according to Brumund's theory CDG's review would have been in error.

---

[18] Ex. H, Brumund Depo. Vol. IV: 455:12 – 456:2 (Aug. 26, 2010).
[19] *Id.,* Vol. IV: 457:23-458:20.
[20] *Id.,* Vol. IV: 464:21 – 465:16.
[21] *See* Ex. C, GEI Report of March 24, 2010, p. 25 (GEI_RPT000031). The CDG/PB letter of review is part of the record and attached as Ex.I.
[22] Ex. C, GEI Report at p. 25.
[23] Ex. I (Letter at p. 6). In fact, not only did CDG provide this review by Alawi, it also conducted a multi-day design review meeting in April 2001 with four CDG representatives present where none of the issues that Brumund opines should have been raised by CDG were raised. *See* Ex. J (Depo. Ex. 419), Ex. C, GEI Report at p. 32-33 and Ex. G, Veath Depo. Vol. II: 196:3-197:7. TBW requested that both CDG and Black & Veatch "provide one final review of the complete set of documents." Ex. K (Depo. Ex. 75). HDR submitted the plans and documents. Ex. L (Depo. Ex. 149 submitting the 95% plans) and Ex. M (submitting the 100% plans to CDG). According to testimony elicited in this case, a final design review meeting was never conducted by CDG (Ex. G, Veath Depo. Vol. II: 210:5-211:24) and no comments of review of the 100% documents could be located from CDG (Ex.C, GEI Report at p. 100).

Accordingly, evidence exists that CDG breached its duty to conduct a design review in accordance with its professional obligations under its contract and such breach would be a contributing cause of the alleged damages asserted by TBW.

B.  Construction Management and Quality Assurance

O'Connell specifically laid out in his January 2010 report against CDG, CDG's construction management and quality assurance responsibilities and failures:

- "CDG failed to properly monitor the Quality Assurance/Quality Control procedures,"
- "CDG failed to properly inspect the contractor's work,"
- "CDG failed to properly implement the Quality Assurance Program required it its agreement with TBW,"
- "CDG failed to advise the Owner of deviations, defects, or deficiencies observed in the work,"
- "CDG wrongfully certified the quality of the work performed by [Barnard] on the Project was in accordance with the contract documents and that [Barnard] was entitled to payment," and
- "CDG failed to meet the standard of care required by the terms and conditions of the construction management services agreement between CDG and TBW."[24]

TBW's expert O'Connell further opined that CDG's "failures contributed to defective construction not being corrected," which "exacerbated the condition of the upstream face of the reservoir embankment."[25] Moreover, TBW's expert Brumund provided similar opinions in his reports stating that "CDG did not ensure adequate monitoring, inspection, and quality assurance testing to ensure the contractor satisfied the requirements of the contract documents and did not adequately notify the owner of non-compliance issues . . . [and] did not require the contractor to comply with the plans and specifications."[26] Additionally, Brumund opined that "to the degree work was not done according to plans and specifications, CDG has some responsibility"

---

[24] Ex.D, at OCL_CDG000048.
[25] *Id.* at OCL_CDG000049.
[26] Ex. E, at GA_RPT000129.

including for "layering of the fill," and in this manner CDG did not meet its standard of care defined in the contract.[27]

O'Connell later testified by regarding CDG's responsibility and breach of those responsibilities. Specifically, O'Connell testified by deposition that "CDG failed to perform the construction management services on the project pursuant to CDG's contract with TBW,"[28] that "CDG's failures contributed to defective construction not being corrected on the project,"[29] that "the actions and inactions of CDG exacerbated the condition of the upstream face of the reservoir,"[30] and that "CDG, the quality assurance firm, also defectively and inadequately performed its quality assurance duties on this project."[31] O'Connell testified that CDG as construction manager on this project "basically handled all the obligations of the owner with respect to this project in managing the construction of this project."[32] O'Connell testified that CDG as construction manager had the "responsibilities for coordination of testing under paragraph 3.5.1.7."[33] O'Connell further testified that CDG did not meet its obligations as construction manager or in quality assurance "by failing to ensure that the work was performed in accordance with the plans and specifications."[34] O'Connell further testified that the approval of the Contractor's Quality Control Plan, was part of CDG's responsibilities as construction manager and, under its quality assurance obligations, and that "approval of the Contractor's Quality Control Plan by CDG as construction manager for Tampa Bay Water was in error [and]

---

[27] Ex. F, GA_RBL000033
[28] Ex. N, O'Connell Depo. Vol. IV: 529:16-530:9.
[29] *Id.*, 532:18-21.
[30] *Id.*, Ex.N, O'Connell Depo. Vol. IV: 533:1-4.
[31] *Id.*, Ex. N, O'Connell Depo. Vol. VI: 790: 20-23.
[32] Ex. N, O'Connell Depo. Vol. VII: 876:6-878:12.
[33] *Id.*, 899:24-901:8.
[34] *Id.*, 881:19-885:8.

in violation of the specifications."[35] He further testified that "CDG had a responsibility on . . .the after-the-fact review of that plan under quality assurance to make sure that that plan would fully meet the plans and specifications."[36] With respect to CDG's responsibilities as to inspection of ongoing work on the project (which would have included the embankment fill), O'Connell opined that "under section 3.5.1.11.2 . . .CDG, as construction manager, [had] responsibilities to inspect the ongoing work on the project"[37] and that "it did not meet those obligations."[38]

This Court has determined that HDR has presented reliable expert testimony of a construction error in the placement of the protective layer too thick, too dry and without proper compaction which resulted in settlement-caused cracking of the soil cement. [Order Dkt. 483]. With respect to CDG's comparative responsibility as to the construction of the thickness of earthwork layers on the project, O'Connell testified:

> Q. And is it your opinion that based on what you've written here as to the control measures adequate to provide a product which conforms to contract requirements, that it is your opinion that as part of the Contractor Quality Control Plan, it should have included a statement on how the lifts of thickness was to be measured?
> A. Yes.
> Q. And is -- is it your opinion that the -- well, did you ever find a contractor quality control plan submitted to Tampa Bay Water for the approval of CDG that included measurements on how the thickness of the embankment lift was to be measured?
> A. No.
> Q. Is it your opinion that the failure to provide that would have been a violation of specification 1400 [requiring a Contractor Quality Control Plan]?
> A. Yes.[39]

---

[35] *Id.*

[36] *Id.*, 881:19-885:8.

[37] ¶3.5.1.11.2 of CDG's Contract provides: "The CM will inspect the progress of the Work at times appropriate to the construction and advise the Owner of any deviation, defects, or deficiencies observed in the Work. The CM shall reject any portion of the Work and transmit to the Owner and Contractor a notice of nonconforming Work when it is the opinion of the CM, Owner, or Design Professional that such Work does not conform to the requirements of the Contract Documents." The Third Amendment to CDG's Contract did not change CDG's obligations under section 3.5.1.11.2. *See*, Ex. N, O'Connell Depo. Vol. VII: 901:19-904:6, and Dkt. 125-6, Page 15 of 52 PageID 4608.

[38] Ex. N, O'Connell Depo. Vol. VII: 904:21-906:19.

[39] Ex. N, O'Connell Depo. Vol. VIII: 1007:3-20. *See also* Ex. B, O'Connell Discussion of Defendant's Expert Reports, April 23, 2010, p.31-32 ("CDG had an obligation to, among other things, inspect the

As previously set forth, CDG's approval of the Contractor's plan was in error. Brumund also opined: "CDG bears responsibility under design review and quality assurance for poor grade control."[40] In other words, CDG's failing to ensure proper thickness placement of the earthwork is a failure in both design review and quality assurance. In short, there is more than sufficient evidence from TBW's own experts of CDG's responsibility for errors which are the alleged cause of the cracking the Reservoir.[41]

C. <u>Standard of Case</u>

TBW argues a lack of expert testimony as to CDG's standard of care and breach. Nothing could be farther from the record. According to O'Connell:

> Q. . . .[D]o you have an opinion whether or not CDG's performance in its construction management obligations met the standard of care of similarly situated firms under similar circumstances in this case?
> A. Yes.
> Q. And what is your opinion?
> A. It did not.

---

work. . .and to certify the quality of the work performed was in accordance with the contract documents. . .variability in the soil-cement thickness (both less and significantly greater than the 16" minimum) is an indicator of poor grade control on this project and failure of CDG's quality assurance."); Ex. E, GA_ RPT000033 where Brumund opines: "CDG bears responsibility under design review and quality assurance for poor grade control."

[40] Ex. E, GA_ RPT000033

[41] HDR has moved to exclude any evidence of lenses, pockets, streaks and layers ("lenses, etc."). [Dkt. 430]. As this Court has found "[i]n light of the Agreed Facts, TBW cannot seriously contend that the presence of lenses, pockets, streaks, and layers was a concurring cause which contributed to its damages. . . . . Given the stipulations . . . , TBW is in no position to argue that lenses, pockets, streaks and layers "contributed substantially" to producing its damages." Brumund changed his opinions in March 2011 claiming that a lack of clarity in the earthwork specification led to lenses, etc. If TBW is allowed to present any testimony regarding lenses, HDR should be able to rebut this 11th hour change of theory with TBW's own expert's testimony. O'Connell has opined that "CDG was required to provide a review of the Contract Documents to insure that they were clear concise … and well defined" and "CDG failed to review the Contract Documents and insure that they were clear and concise in that regard." *See* Ex. B Discussion of Defendant's Expert Reports, April 23, 2010, p.17-22. O'Connell has testified "if there were lenses, pockets or streaks observed by …CDG, it was their job to document it, point it out and reject the work." Ex. N, O'Connell Depo. Vol. III: 412:2-11. CDG's contract specifically requires CDG to review the specifications for clarity [Dkt. 125-5, Page 9 of 60 PageID 4542, Section 3.3.1.4] and HDR has plead this design review responsibility. See ¶145 of its Answer to TBW's Second Amended Complaint (CDG had design review responsibility to make recommendation as to "constructability, clarity and consistency of documentation.")"

> Q.  Do you have an opinion whether or not CDG's performance of its obligations under its quality assurance functions met the standard of care of similarly situated engineering firms under the same or similar circumstances?
> A.  Yes.
> Q.  And what is that opinion?
> A.  It did not.[42]
> Q.  In the performance of -- in the evaluation of performance report, Construction Dynamics, you say at page three that, "The opinions reached herein were reached with a reasonable degree of engineering certainty."  Do you see that?
> A.  Yes.
> Q.  What does that mean in the context of the role that CDG played on this project?
> A.  That would relate, at least in some part, to their standard of care on the project.
> Q.  I don't understand your answer.  What do you mean by that?
> A.  CDG's standard of care included that of prudent engineering as well as prudent construction management.[43]

O'Connell also discussed the standard of care and CDG's breach thereof in his Discussion of Defendant's Expert Reports, at pp. 11, 13, 14, 16, 17-22, 24, 26, 27, 31, and 32.[44] Brumund also discussed CDG's standard of care and CDG's failure to meet that standard of care.[45] To summarize his opinions, O'Connell testified "there [was] a total breakdown of the quality assurance work done by CDG on the wedge."[46]

## 5. CONCLUSION

In sum, by the end of TBW's case-in-chief, the jury will have heard expert testimony sufficient to warrant submission of a jury question as to CDG's negligence and causation. While HDR wholly rejects TBW's criticisms of its design, those criticisms are equally applicable to CDG's design review. TBW's own experts have rendered those opinions. While HDR rejects

---

[42] Ex. N, O'Connell Depo. Vol. VII: 907:4-908:7.
[43] Ex. N, O'Connell Depo. Vol. X: 1310:4-18. *See also* CDG's Contract at ¶1.1.2 Dkt. 125-5 (Page 6 of 60 PageID 4539) and Ex. B, Discussion of Defendant's Expert Reports, April 23, 2010, pp. 11, 13, 14, 16, 17-22, 24, 26, 27, 31 and 32.
[44] Ex. B, Discussion of Defendant's Expert Reports.
[45] Ex. E, GA_RPT000129.
[46] Ex. N, O'Connell Depo. Vol. II; 296:15-17.

TBW's criticism of its inspections of the embankment fill, those criticisms are equally applicable CDG in failing to monitor and inspect and advise of any deviations, defects or deficiencies. TBW's own experts have rendered those opinions. Thus, if the jury were to be convinced of TBW's case as to design or construction, then there is ample evidence of CDG's responsibility as well. The proper time to evaluate all of this, however, will be at trial, during and after presentation of the evidence.

**WHEREFORE,** HDR requests that the Court deny TBW's Motion in Limine #3 in all respects and grant unto HDR such other relief to which it may be entitled.

Respectfully submitted,

*s/ Kurt W. Meaders*
KURT W. MEADERS

| | |
|---|---|
| **SEDGWICK LLP** | **FORIZS & DOGALI, P.A.** |
| All Admitted *Pro Hac Vice* | TIMOTHY D. WOODWARD, ESQ. |
| WAYNE B. MASON, ESQ. | Florida Bar No.: 0486868 |
| wayne.mason@sedgwicklaw.com | twoodward@forizs-dogali.com |
| KURT W. MEADERS, ESQ. | JAMES K. HICKMAN, ESQ. |
| kurt.meaders@sedgwicklaw.com | Florida Bar No.: 0893020 |
| DAVID C. KENT, ESQ | jhickman@forizs-dogali.com |
| david.kent@sedgwicklaw.com | |
| | |
| 1717 Main Street, Suite 5400 | 4301 Anchor Plaza Pkwy., Suite 300 |
| Dallas, TX  75201-7367 | Tampa, FL  33634 |
| Telephone 469-227-8200 | Telephone 813-289-0700 |
| Facsimile 469-227-8004 | Facsimile 813-289-9435 |

**ATTORNEYS FOR HDR ENGINEERING, INC.**

### CERTIFICATE OF SERVICE

The foregoing instrument was electronically filed with the Clerk of Court through CM/ECF on December 15, 2011, which sent a notice of filing to all counsel of record the same day.

*s/ Kurt W. Meaders*
KURT W. MEADERS