# EXHIBIT
# A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TAMPA BAY WATER,
A Regional Water Supply
Authority,

   Plaintiff,

vs.              CASE NO: 8:08-cv-2446-T-27-TBM

HDR ENGINEERING, INC., a
Nebraska corporation,
CONSTRUCTION DYNAMICS
GROUP, INC., a Maryland
corporation, BARNARD
CONSTRUCTION COMPANY, INC.,
a Montana Corporation,
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, a
Minnesota corporation,

   Defendants.
_____/

BARNARD CONSTRUCTION COMPANY, INC.,
a Montana corporation,

   Third Party Plaintiff,

vs.

MCDONALD CONSTRUCTION CORPORATION,
a Federal corporation,

   Third Party Defendant,
_____/

VOLUME IV

VIDEOTAPED DEPOSITION OF: AMANDA RICE

Page 467

1  Q. So supposedly there was a point during the
2  design phase where the factor of safety was less
3  than 1.0, but there were design changes made to
4  correct that issue to raise the factor of safety
5  to above 1.0, correct?
6  A. There were -- the design change was
7  made -- that particular factor of safety was in
8  regards to the stability of the soil-cement
9  lining, the erosion protection feature, not the
10 embankment itself. And the design change, I
11 believe, caused that factor of safety calculation.
12 Q. Has any registered professional engineer
13 employed by Tampa Bay Water to your knowledge read
14 any of the expert reports furnished by Rizzo &
15 Associates or Devo Engineering?
16 A. I don't know.
17 Q. If your capacity as a registered engineer
18 in the State of Florida, if you become aware of a
19 life safety issue on behalf of Tampa Bay Water,
20 are you obligated to raise that?
21 A. I may be, I'm not certain.
22     MR. FORZIANO: Object to form. Go ahead.
23 BY MR. STANISLAW:
24 Q. In your studies to become a registered
25 professional engineer, you did not become aware of

Page 468

1  a statute in the state of Florida requiring you to
2  take action if you become aware of a life safety
3  issue in connection with a structure?
4     MR. FORZIANO: Object to form. Go ahead.
5     THE WITNESS: I don't recall coming across
6  that specific piece of information. It may be
7  accurate.
8  BY MR. STANISLAW:
9  Q. And let me ask you again, Ms. Rice, would
10 it cause you any concern based on your now 12
11 years of experience dealing with the Tampa Bay
12 reservoir to find out that the factor of safety
13 for the embankment of the reservoir is less than
14 1.0?
15    MR. BETANZOS: Object to form.
16    THE WITNESS: I haven't seen the report
17 you're referring to. I don't know the basis of
18 that finding. I really can't speculate on how
19 I would interpret it or -- I would need to
20 review it.
21 BY MR. STANISLAW:
22 Q. Well, let me ask you this: If you did
23 review an expert report prepared by a geotechnical
24 engineer, whose job was to determine the root
25 cause of the failure, would you be technically

Page 469

1  competent to understand that report or would that
2  be another issue where, because of your lack of
3  geotechnical experience, you wouldn't be able to
4  understand it?
5  A. I would say there's very good chance that
6  I would not be able to understand it. But I
7  really can't tell you for sure unless I saw the
8  specific report you're referring to.
9  Q. Now, you became the project manager for
10 the Tampa Bay reservoir in what year?
11 A. 1998.
12 Q. And you were not a registered professional
13 engineer at that time, were you?
14 A. No.
15 Q. You became a registered professional
16 engineer in what year?
17 A. 2001.
18 Q. 2001. When did you get your master's
19 degree?
20 A. 1996.
21 Q. And you had fulfilled your experience
22 requirements to become a registered professional
23 engineer before 2001, hadn't you?
24 A. I had, yes.
25 Q. Did you ever sit for the registered

Page 470

1  professional engineer's exam before 2001?
2  A. I did.
3  Q. When did you do that?
4  A. I sat for it a total of four times, and
5  the final time was in April of 2001.
6  Q. Did you fail that test on occasion?
7  A. I failed it three times, yes.
8  Q. And so what I want to be sure about is
9  that the Tampa Bay Water department put in charge
10 of the design process for this reservoir for the
11 period of -- from the period of 1998 to 2001 a
12 person who was not a registered professional
13 engineer because that person had failed the exam
14 three times, is that correct?
15    MR. FORZIANO: Object to form.
16    THE WITNESS: For that entire period, I'm
17 not certain if I was eligible to have taken it.
18 I was not in fact a licensed engineer during
19 that period.
20 BY MR. STANISLAW:
21 Q. What month in 2001 did you finally pass
22 the exam?
23 A. I took the exam in April and I believe I
24 was licensed in June of 2001.
25 Q. Between the period of 1998 to 2001, you

16 (Pages 467 to 470)

Page 471

1  were basically the public face of Tampa Bay Water
2  in response to the numerous public meetings that
3  were occurring regarding permitting of the
4  reservoir, correct?
5       MR. FORZIANO:  Object to form.
6       THE WITNESS:  I represented the project to
7     the public, yes.
8  BY MR. STANISLAW:
9     Q.  You were Tampa Bay Water's spokesperson to
10  the public with respect to permitting for the
11  project, correct?
12       MR. FORZIANO:  Object to form.
13       THE WITNESS:  With respect to the project,
14     yes.
15  BY MR. STANISLAW:
16     Q.  And you were also Tampa Bay Water's
17  spokesperson to the public with respect to the
18  design that was being undertaken by HDR during the
19  period of 1998 to 2001, correct?
20       MR. FORZIANO:  Object to form.
21       THE WITNESS:  The design in terms of it
22     being a part of the project, yes.
23  BY MR. STANISLAW:
24     Q.  Handing you what's been marked as
25  Exhibit 133, do you recognize this as a project

Page 472

1  update published by the Tampa Bay Water
2  department?
3     A.  Yes.
4       (Exhibit 133 marked for identification.)
5  BY MR. STANISLAW:
6     Q.  And it's dated February of 2000?
7     A.  Yes.
8     Q.  And who is this project update circulated
9  to?
10     A.  I'm not sure of the exact mailing list.  I
11  believe it was all of those individuals that had
12  attended any of the project's public meetings,
13  perhaps our Board of Directors, our utility
14  directors.  And the mailing list may also have
15  included residents adjacent to the property.
16     Q.  So basically it would have been mailed to
17  any entity or neighbor or person who has expressed
18  an interest in the project or may have been
19  affected by the project, is that correct?
20       MR. FORZIANO:  Object to form.
21       THE WITNESS:  I think generally that
22     that's an accurate statement.
23  BY MR. STANISLAW:
24     Q.  This Exhibit 133 contains an open letter
25  from you to all of those recipients, correct?

Page 473

1     A.  Yes.
2     Q.  And in that open letter that you signed as
3  project manager, you recite all the benefits that
4  this reservoir is going to provide for the region,
5  correct?
6     A.  Do you mind if I take a moment to read
7  this real quick?
8     Q.  No.
9     A.  Okay.
10     Q.  I'll repeat my question.  One of the
11  things you do in this open letter to the neighbors
12  and interested parties and government agencies is
13  to tell them what the benefits of this project
14  are, correct?
15     A.  Yes.  There is -- well, a description of
16  what -- of how it will be used, yes.
17     Q.  Well, the start of the fourth paragraph
18  says, "To realize these benefits."  That means the
19  benefits of building the reservoir, correct?
20     A.  I believe so, yes.
21     Q.  And it says, "We at Tampa Bay must address
22  the key engineering and environmental issues."
23  Who at Tampa Bay Water was responsible for
24  addressing the key engineering issues in February
25  of 2000, was that you?

Page 474

1       MR. FORZIANO:  Object to form.
2       THE WITNESS:  Myself and through me, HDR
3     Engineering.
4  BY MR. STANISLAW:
5     Q.  It doesn't say anything about relying on
6  HDR Engineering in the letter you sent to the
7  public, does it, ma'am?
8     A.  No.  But the following page provides a
9  very thorough description of the team, the efforts
10  of the HDR team on the geotechnical investigation
11  and the design.
12       MR. STANISLAW:  I'm going to move to
13     strike that as non-responsive.
14  BY MR. STANISLAW:
15     Q.  My question was:  You were the person at
16  Tampa Bay Water who was responsible for addressing
17  the key engineering issues, correct?
18       MR. FORZIANO:  Object to form.
19       THE WITNESS:  And I believe my response
20     was me and through me HDR Engineering.
21  BY MR. STANISLAW:
22     Q.  And your open letter to the public makes
23  no reference to HDR Engineering, does it, ma'am?
24     A.  My open letter does not, but the following
25  page does.