# EXHIBIT

# B

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


TAMPA BAY WATER,
A Regional Water Supply
Authority,

    Plaintiff,

vs.            CASE NO:  8:08-cv-2446-T-27-TBM

HDR ENGINEERING, INC., a
Nebraska corporation,
CONSTRUCTION DYNAMICS
GROUP, INC., a Maryland
corporation, BARNARD
CONSTRUCTION COMPANY, INC.,
a Montana Corporation,
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, a
Minnesota corporation,

    Defendants.
_____/


BARNARD CONSTRUCTION COMPANY, INC.,
a Montana corporation,

    Third Party Plaintiff,

vs.

MCDONALD CONSTRUCTION CORPORATION,
a Federal corporation,

    Third Party Defendant,
_____/


VOLUME I

VIDEOTAPED DEPOSITION OF:  RICK MENZIES, PE


ORANGE REPORTING 800.275.7991

Electronically signed by Kerry Mercade (201-272-218-5740)
Electronically signed by Kerry Mercade (201-272-218-5740)

dac2a230-1a65-409f-b02f-a2a1b2071dfa

Page 22

1    A.  I really don't remember.  It was some time
2  in the 1980s, but I don't remember exactly when
3  Sabre came into being with the Air Force.
4    Q.  Before you became involved in 1992, did
5  you have involvement with the Sabre project?
6    A.  They were part of our civil engineering
7  squadron that I was a part of, but I was not
8  involved in any of their projects or anything.
9    Q.  Did Sabre only deal with renovations of
10 existing buildings?
11   A.  Yes.  Or facilities, yes.
12   Q.  Besides buildings, what type of
13 facilities?
14   A.  It could have been waterlines, it could
15 have been roads, could have been taxiways,
16 runways, things -- something that needed to be
17 done quickly.
18   Q.  That takes us up to 1993.  What changed in
19 1993?
20   A.  I was chief of Sabre from '92 through '96
21 or '93 through '96.
22   Q.  I'm sorry, I wrote it down -- yes, '96.
23 What changed in 1996?  My apologies.
24   A.  That's when I decided I would try being an
25 insurance adjuster.

Page 23

1    Q.  Had you ever worked in the insurance
2  industry before?
3    A.  No.
4    Q.  Why the change?
5    A.  I knew Mr. Duncan.  He was already doing
6  the business.  He talked to me.  It sounded like
7  something that I would enjoy doing, so I decided
8  to pursue it.
9    Q.  Did you go back to school to get any
10 training?
11   A.  I attended a few classes to become an
12 insurance adjuster.
13   Q.  Were those at any university or were
14 they --
15   A.  No.
16   Q.  The Kenneth -- I'll get the name wrong
17 here, but I'm not sure I can find it.  Kenneth
18 Duncan & Associates.
19   A.  Yes.
20   Q.  Is that located here in Tampa?
21   A.  Yes.
22   Q.  How did you know Mr. Duncan?
23   A.  We met at our church.
24   Q.  So you were out of the -- well, during
25 1996 to 1998, you worked as an insurance adjuster,

Page 24

1  correct?
2    A.  Yes.
3    Q.  So at that point in time, did you work at
4  all in any type of civil engineering field?
5    A.  No.
6    Q.  Did you do any type of moonlighting where
7  you would job shop yourself out in any type of
8  civil engineering capacity?
9    A.  No.
10   Q.  In October of 1998, you were -- became
11 employed by Tampa Bay Water Authority?
12   A.  Yes.
13   Q.  And just so the -- there is no gap in
14 between being the insurance adjuster to working at
15 Tampa Bay Water Authority, is there?
16   A.  No.
17   Q.  How did you become employed at Tampa Bay
18 Water Authority?
19   A.  I saw a position being advertised as a
20 contract administrator, and I applied for it.
21   Q.  Where did you see the position of contract
22 administrator?
23   A.  I believe it was the newspaper.
24   Q.  Were you looking for a position at that
25 point in time when you saw the newspaper ad?

Page 25

1    A.  Yes.
2    Q.  Were things not going as hoped as an
3  insurance adjuster?
4    A.  Yes.
5    Q.  Was the contract administrator position
6  for any particular project?
7    A.  When it was advertised, no.  I mean, in
8  the advertisement, it wasn't for any particular
9  project.
10   Q.  Did you come to find out when you became
11 employed that it was for a particular project?
12   A.  It was a particular program being started
13 up, the master water program at Tampa Bay Water.
14   Q.  So during your job interviews, did you
15 determine that this contract administrator
16 position was specifically being created in order
17 to deal with this new program?
18   A.  Yes.
19   Q.  Any involvement whatsoever with Tampa Bay
20 Water Authority before that?
21   A.  No.
22   Q.  Besides the work that you said you had
23 done on some pipeline issues, any type of water
24 treatment work that you had done in your years of
25 civil engineering besides what you have already

Electronically signed by Kerry Mercade (201-272-218-5740)
Electronically signed by Kerry Mercade (201-272-218-5740)

dac2a230-1a65-409f-b02f-a2a1b2071dfa

Page 62

1    following up on the contractual obligations of
2    CDG?
3         MR. FORZIANO:  Object to form.
4         THE WITNESS:  I would administer their
5    contract, yes.
6    BY MR. MEADERS:
7    Q.  What all is involved, in your
8    understanding, of administering CDG's contract on
9    behalf of Tampa Bay Water?
10   A.  It would be getting updates of the status
11   of construction projects, reviewing their invoices
12   for payment.
13   Q.  Anything else?
14   A.  Not that I recall offhand.
15   Q.  You said that you were not involved in the
16   original contract negotiations of CDG's contract,
17   but you were involved in amendments.
18   A.  Yes.
19   Q.  Do you recall which amendments you were
20   involved in?
21   A.  On CDG's contract it would have been --
22   Q.  With respect to negotiation, I'm sorry.
23   A.  It would have been all the amendments to
24   their contract I was involved in.
25   Q.  You were -- strike that.

Page 63

1         In 1998, you were hired as the contracts
2    supervisor with Tampa Bay Water.  Did at any point
3    in time your position change?
4    A.  Not my position, my title has changed.
5    Q.  Okay.  When did your title first change
6    from contracts supervisor?
7    A.  I don't recall what year it was, but it
8    changed from contracts supervisor to projects
9    supervisor, projects, plural.
10   Q.  What is different between your duties as
11   contract supervisor as opposed to your duties as
12   projects supervisor?
13   A.  There really is no difference.
14   Q.  Were you given more responsibilities as
15   projects supervisor?
16   A.  No.
17   Q.  Were you projects supervisor over all
18   projects within the south region of the master
19   water program?
20   A.  Yes.
21   Q.  Were you projects supervisor over any
22   other projects besides what was going on in the
23   south region of the master water program?
24   A.  I believe it was just projects involved in
25   the master water plan.  I don't believe we had any

Page 64

1    other construction projects going on at that time.
2    Q.  Did you become projects supervisor prior
3    to the beginning of construction of the reservoir?
4    A.  I don't recall when that was changed, but
5    I do believe it was before the start of reservoir
6    construction.
7    Q.  As part of your negotiations of the
8    amendments for CDG's contract -- well, strike
9    that.
10        Did at any point in time you review the
11   plans and specifications for the reservoir?
12   A.  No, I did not.
13   Q.  At any point in time, as being the
14   projects supervisor of the reservoir, did you ever
15   review the plans or specifications?
16   A.  I've looked at plans and specifications, I
17   don't know what you mean by "review."  But I had
18   seen plans and specifications, but I was not
19   looking for -- just to get familiar with the
20   project.
21   Q.  Well, let's start with first principles
22   and then we'll move forward.
23   A.  Okay.
24   Q.  You have seen the plans and specifications
25   on the reservoir project?

Page 65

1    A.  Yes.
2    Q.  You just testified that you looked at
3    plans and specifications for the reservoir
4    project, correct?
5    A.  Yes.
6    Q.  When you were looking at the plans and
7    specifications of the reservoir project, what were
8    you looking for?
9    A.  To become familiar with the project.
10   Q.  How do you become familiar with the
11   project by looking at the plans and
12   specifications?
13   A.  To see what the design was, what is being
14   built.
15   Q.  And you actually look at it, internalize,
16   and think about the plans and specifications,
17   correct?
18   A.  Somewhat, yes.
19   Q.  Okay.  In part of your looking at the
20   plans and specifications, did you look at the
21   plans and specifications for any of the
22   negotiations of the amendments to CDG's contract?
23   A.  No, I don't believe I did.
24   Q.  Let's do it by a temporal time.  Did you
25   look at the plans and specifications before you

Electronically signed by Kerry Mercade (201-272-218-5740)
Electronically signed by Kerry Mercade (201-272-218-5740)

dac2a230-1a65-409f-b02f-a2a1b2071dfa



Page 66

1   were tasked with the responsibility at Tampa Bay
2   Water for negotiating the CDG amendments?
3       A.  I don't recall which CDG amendment
4   pertained specifically to the reservoir.  So if
5   that's what you are talking about, I don't recall
6   if I actually looked at the drawings and specs
7   before that amendment or not.
8       Q.  Do you recall when the drawings and specs
9   were finalized for the reservoir?
10      MR. FORZIANO:  Object to form.
11      THE WITNESS:  I don't recall the exact
12   date, but it wasn't -- from what I recall,
13   there wasn't much time before bids were open
14   when they were finalized.
15  BY MR. MEADERS:
16      Q.  How about before construction began?  Did
17  you obtain a copy of the plans and specifications
18  of -- let's just start there.  Did you obtain a
19  copy of the plans and specifications before
20  construction?
21      A.  Yes.
22      Q.  And did you obtain what you believed, as
23  the projects manager for Tampa Bay Water, was the
24  final plans and specifications for the reservoir?
25      A.  I don't recall.  And the reason I'm saying

Page 67

1   that is because I know there was -- trying to get
2   the ERP permit finalized, there may have been --
3   once that permit was obtained, there may have been
4   some changes made and I did not have a set of
5   those plans and specifications.
6       Q.  You did not have a plan -- you didn't have
7   a copy of the set of the plans and specifications
8   after the ERP permit was finalized?
9       A.  I don't know if I had a set of those
10   before the construction contract opened bids.
11      Q.  Did you have a set of those before
12   construction?
13      A.  Yes.
14      Q.  So you had a set of the finalized,
15   approved ERP permit plans before construction?
16      A.  Yes.
17      Q.  And same questions about -- I want to make
18   sure we're dealing with the right issue.  As part
19   of looking at the plans and specifications, you
20   looked at those final plans and specifications,
21   correct?
22      A.  I've seen them.
23      Q.  Do you have a general understanding of
24   what is within them?
25      A.  General understanding, yes.

Page 68

1       Q.  If you needed to find something within the
2   plans and specifications, would you know where to
3   look?
4       A.  Yes, pretty much so.
5       Q.  If you had a question about the design or
6   the project that related to the plans and
7   specifications, you would know to look within
8   them?
9       A.  Yes.
10      Q.  And would you know where to look within
11   them?
12      A.  Pretty much so, yes.
13      Q.  As part of your background as a civil
14   engineer, you've reviewed plans and specifications
15   before?
16      A.  Yes.
17      Q.  And general in the industry, although
18   there are some differences between them, they are
19   generally set up quite similar between projects,
20   right?
21      A.  Yes.
22      Q.  That's so as an engineer you can know
23   where to go and what to look for, correct?
24      A.  Yes.
25      Q.  So if there is ever a question about

Page 69

1   whether something was done with respect to the
2   plans and specifications, you would know where to
3   look within them, correct?
4       A.  I would rely on CDG, our construction
5   manager for this particular project, to tell me
6   whether it was done according to the plans and
7   specifications or not.
8       Q.  I appreciate that, but that really wasn't
9   my question.
10      MR. PICKERT:  I move to strike as
11   nonresponsive.
12  BY MR. MEADERS:
13      Q.  My question was:  If you had a question
14  about whether something was being done in
15  accordance with the plans and specifications, you
16  as a civil engineer would know where to look
17  within the plans and specs, correct?
18      A.  Are talking about the reservoir project or
19  just in general?
20      Q.  Let's start in general.
21      A.  Yes.
22      Q.  If you -- as the projects manager for
23  Tampa Bay Water on the reservoir project, if you
24  had a question about whether something was being
25  done within the plans and specifications, you

Electronically signed by Kerry Mercade (201-272-218-5740)
Electronically signed by Kerry Mercade (201-272-218-5740)

dac2a230-1a65-409f-b02f-a2a1b2071dfa

Page 70

1    would know where to look, wouldn't you?
2        MR. FORZIANO:  Object to form.
3        MR. STANISLAW:  Could I have the question
4    read back, please?
5        (Previous question read by the reporter.)
6        MR. STANISLAW:  I object to the form of
7    the question.  I don't think he's ever said he
8    was the project manager.
9        MR. FORZIANO:  Object to form.
10   BY MR. MEADERS:
11       Q.   As the projects manager for Tampa Bay
12   Water Authority, you had responsibility for
13   projects within the south region, correct?
14       MR. STANISLAW:  Object to the form of the
15   question.
16       MR. FORZIANO:  Object to form.
17   BY MR. MEADERS:
18       Q.   Let's start with first principles.  You
19   were titled the projects manager for Tampa Bay
20   Water, correct?
21       A.   I was projects supervisor.
22       Q.   Thank you.  Appreciate it.  My apologies
23   for misspeaking.
24       As the projects supervisor on behalf of
25   Tampa Bay Water for the reservoir, and as a civil

Page 71

1    engineer, if you had a question about whether
2    something was done within the plans and
3    specifications of the reservoir, you would know
4    where to look within those plans and specs,
5    correct?
6        MR. FORZIANO:  Object to form.
7        THE WITNESS:  I would go to CDG and ask
8    them or I would go to HDR and ask them.
9    BY MR. MEADERS:
10       Q.   You wouldn't ever look at the plans and
11   specifications yourself if you had a question?
12       A.   I would look at the plans and
13   specifications to get an idea of what the project
14   was about.  If there was any question about
15   whether things were being done according to the
16   plans and specifications, I would ask CDG or HDR
17   if that was the case.
18       Q.   As the projects supervisor, were you also
19   considered the project supervisor of the reservoir
20   on behalf of Tampa Bay Water?
21       A.   Once the construction contract was let,
22   awarded, I was the main point of contact for Tampa
23   Bay Water on the reservoir project.
24       Q.   Anyone else at Tampa Bay Water have
25   greater authority than you with respect to what

Page 72

1    was going on on-site?
2        MR. FORZIANO:  Object to form.
3        THE WITNESS:  Yes.
4    BY MR. MEADERS:
5        Q.   Whom?
6        A.   My supervisor.
7        Q.   That would be Mr. Moscinski?
8        A.   He was not my supervisor at the time of
9    the reservoir construction.
10       Q.   Who was your supervisor at the time of the
11   reservoir construction?
12       A.   Chuck Carden.
13       Q.   When did Mr. Carden become your
14   supervisor?
15       A.   I don't recall the exact time, but it was
16   either late 2002, early 2001, as best as I can
17   remember.
18       Q.   I may have misheard you or you may have
19   misspoke or I may not be understanding correctly.
20   You said late 2002, early 2001?
21       A.   No.  I don't recall what I said, but I
22   meant to say late 2000, early 2001.
23       Q.   Okay.  Was Mr. Moscinski still with Tampa
24   Bay Water at that time?
25       A.   Yes, he was.

Page 73

1        Q.   Can you explain the transfer of the
2    supervisor capacity from Mr. Moscinski to Mr. --
3        A.   Carden.
4        Q.   -- Carden?
5        A.   Mr. Carden was selected to be the
6    supervisor of our construction department as well
7    as the maintenance and instrumentation and control
8    departments.  And Mr. Moscinski, he was moved to
9    be a projects supervisor.
10       Q.   Did Mr. Moscinski take over the north
11   region?
12       A.   No.
13       Q.   Did he take over part of the projects of
14   the master water plan?
15       A.   No.  He took over another pipeline project
16   that was not part of the master water plan.
17       Q.   As part of your work as project
18   supervisor, did you review the HDR contract prior
19   to the amendments that you were involved on?
20       A.   No.
21       Q.   Did you have any involvement with the
22   design of the reservoir?
23       A.   No.
24       Q.   Any involvement whatsoever regarding plans
25   and specifications for the reservoir?

Electronically signed by Kerry Mercade (201-272-218-5740)
Electronically signed by Kerry Mercade (201-272-218-5740)

dac2a230-1a65-409f-b02f-a2a1b2071dfa

Page 130

```
 1              CERTIFICATE OF OATH
 2
 3    STATE OF FLORIDA
 4    COUNTY OF HILLSBOROUGH
 5       I, Kerry Mercade, CSR, Notary Public, State
 6    of Florida, certify that RICK MENZIES, PE,
 7    personally appeared before me on May 10, 2010, and
 8    was duly sworn.
 9
10        Signed this 27th day of May, 2010.
11
12
13
14
15
16        Kerry Mercade
          Notary Public - State of Florida
17        My commission No. DD 911319
          Expires:  July 27, 2013
18
19
20
21
22
23
24
25
```

Page 131

```
 1          CERTIFICATE OF REPORTER
 2    STATE OF FLORIDA
 3    COUNTY OF HILLSBOROUGH
 4        I, KERRY MERCADE, CSR, Court Reporter and
 5    Notary Public, HEREBY CERTIFY THAT I was
 6    authorized to and did stenographically report the
 7    deposition of RICK MENZIES, PE, that a review of
 8    the transcript was requested; and that the
 9    foregoing transcript, Pages 6 through 129, is a
10    true and accurate record of my stenographic notes.
11        I FURTHER CERTIFY that I am not a
12    relative, or employee, or attorney, or counsel of
13    any of the parties, nor am I a relative or
14    employee of any of the parties' attorney or
15    counsel connected with the action, nor am I
16    financially interested in the action.
17        DATED this 27th day of May, 2010.
18
19
20
21        _____
          KERRY MERCADE, CSR, CRI, FPR
          CERTIFIED COURT REPORTER
22
23
24
25
```

Page 132

```
 1    IN RE:  Tampa Bay Water vs. HDR, et al.
 2    DATE:     May 10, 2010
 3    DEPONENT:  RICK MENZIES, PE
 4
 5    Page  Line  Correction and Reason
      ____  ____  _____
 6    ____  ____  _____
      ____  ____  _____
 7    ____  ____  _____
      ____  ____  _____
 8    ____  ____  _____
      ____  ____  _____
 9    ____  ____  _____
      ____  ____  _____
10    ____  ____  _____
      ____  ____  _____
11    ____  ____  _____
      ____  ____  _____
12    ____  ____  _____
      ____  ____  _____
13    ____  ____  _____
      ____  ____  _____
14    ____  ____  _____
      ____  ____  _____
15    ____  ____  _____
      ____  ____  _____
16    ____  ____  _____
      ____  ____  _____
17
           Under penalties of perjury, I declare that
18    I have read the foregoing document and that the
      facts stated are true.
19
20    Date_____
21    Signature_____
22
23
24
25
```

Page 133

```
                     May 27, 2010
      Rick Menzies, PE
      C/O David Forziano, Esquire
      Allen Dell, P.A.
      202 S. Rome Avenue, Suite 100
      Tampa, Florida 33606
      In Re:  Deposition of RICK MENZIES, PE
            May 10, 2010

      Dear Mr. Menzies:

      This letter is to advise that the transcript for
      the above-referenced deposition has been completed
      and is available for review.  Please contact our
      office at (800)275-7991 to make arrangements for
      read and sign or sign below to waive review of
      this transcript. It is suggested that the review
      of this transcript be completed within 30 days of
      your receipt of this letter, as considered
      reasonable under Federal Rules; however, there is
      no Florida Statute to this regard.
      The original of this transcript has been forwarded
      to the ordering party and your errata, once
      received, will be forwarded to all ordering
      parties for inclusion in the transcript.

      Sincerely,

      Kerry Mercade
      Orange Reporting, Inc.

      cc:  David Forziano, Esquire
           Richard M. Stanislaw, Esquire
           Kate B. Munkittrick, Esquire
           Kurt Meaders, Esquire
           James K. Hickman, Esquire

      Waiver:

      I, _____, hereby waive the reading &
      signing of my deposition transcript.

      _____
      Deponent Signature/Date
      *Federal Civil Procedure Rule 30(e)/Florida Civil
      Procedure Rule 1.310(e).
```

Electronically signed by Kerry Mercade (201-272-218-5740)
Electronically signed by Kerry Mercade (201-272-218-5740)

dac2a230-1a65-409f-b02f-a2a1b2071dfa

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


TAMPA BAY WATER,
A Regional Water Supply
Authority,

    Plaintiff,

vs.           CASE NO:  8:08-cv-2446-T-27-TBM

HDR ENGINEERING, INC., a
Nebraska corporation,
CONSTRUCTION DYNAMICS
GROUP, INC., a Maryland
corporation, BARNARD
CONSTRUCTION COMPANY, INC.,
a Montana Corporation,
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, a
Minnesota corporation,

    Defendants.
_____/


BARNARD CONSTRUCTION COMPANY, INC.,
a Montana corporation,

    Third Party Plaintiff,

vs.

MCDONALD CONSTRUCTION CORPORATION,
a Federal corporation,

    Third Party Defendant,
_____/


VOLUME II

VIDEOTAPED DEPOSITION OF:  RICK MENZIES, PE


ORANGE REPORTING 800.275.7991

Page 175

1    A.  No.
2    Q.  Do you have any issues with respect to the
3  communication from CDG to Tampa Bay Water
4  Authority with respect to any of those particular
5  situations?
6    A.  No.
7    Q.  Did you have an understanding about how
8  the soil was -- the soil wedge over the
9  geomembrane was supposed to be constructed?
10    A.  A general knowledge, yes.
11    Q.  What was your general knowledge?
12    A.  That it was to be constructed in
13  horizontal lifts.
14    Q.  Anything else?
15    A.  And to meet the density requirements.
16    Q.  Did you have any understanding with
17  respect to what was a cover layer or a protective
18  layer that was first placed over the geomembrane?
19    A.  Yes.
20    Q.  What was your understanding with respect
21  to that?
22    A.  My understanding from HDR was that a
23  protective layer was needed so that during
24  horizontal placement of lifts of soil that the
25  geomembrane would not be damaged and so this

Page 176

1  protective layer was needed.
2    Q.  Was that -- that was communicated to you?
3    A.  Yes.
4    Q.  And who communicated that to you?
5    A.  Somebody from HDR.
6    Q.  Do you remember who it was?
7    A.  I don't recall exactly, but it would
8  either have been Ed Copeland or Barry Meyer.
9    Q.  How was that communicated to you?
10    A.  Verbally.
11    Q.  When that was communicated to you, did you
12  have any question or issue with it?
13    A.  No.
14    Q.  Did you raise any issue with respect to
15  that with CDG or with Mr. Meyer or Mr. Copeland?
16    A.  No.
17    Q.  Any further details with respect to that
18  cover layer or protective layer?
19    A.  No.
20    Q.  Did you have any type of understanding of
21  what the thickness of that cover layer or
22  protective layer should have been?
23    A.  No.
24    Q.  Was it ever communicated to you as to what
25  that cover layer or that protective layer's

Page 177

1  thickness was to be?
2    A.  I don't recall that, no.
3    Q.  Did you ask any questions with respect to
4  the thickness or composition of that cover layer
5  or protective layer?
6    A.  Not that I recall, no.
7    Q.  Was Mr. Meyer or Mr. Copeland, whoever
8  provided you this information, were they -- how
9  long did the meeting last or the conversation last
10  where you were provided this information?
11    A.  As I recall, it was just in a conversation
12  on one of the site visits to the project.
13    Q.  Were you actually out at the site watching
14  something going on or were you in a trailer?
15    A.  How I recall we was actually out on the
16  site.
17    Q.  Was there a protective layer or a cover
18  layer being put in place at the time or was --
19    A.  I believe so, yes.
20    Q.  And did you ask any questions about that
21  cover layer or protective layer?
22    A.  Not that I recall.
23    Q.  You didn't ask about the thickness?
24    A.  I don't recall.  I remember it was either
25  Mr. Copeland or Mr. Meyer saying that this is what

Page 178

1  was needed in order to place the wedge.  And I
2  don't recall asking questions that specific about
3  thickness of it or anything like that, no.
4    Q.  Did you ask any questions whether or not
5  either the protective layer or the soil layer was
6  something that was recommended by the geomembrane
7  manufacturer?
8    A.  I don't know that.
9    Q.  Did you ask any questions of whether it
10  was or whether it wasn't?
11    A.  No, I didn't.
12    Q.  Did you ask any questions about how that
13  complied with or deviated from any plans or
14  specifications?
15    A.  No, I don't believe I did.
16    Q.  Did you ever raise an issue with respect
17  to that protective layer with anybody at CDG?
18    A.  I don't believe I did, but CDG could have
19  been at the same site meeting when this was
20  communicated to me by either Mr. Copeland or
21  Mr. Meyer.
22    Q.  So they may have been standing there with
23  you?
24    A.  Yes.
25    Q.  Who would it have been at CDG that was

Electronically signed by Kerry Mercade (201-272-218-5740)
Electronically signed by Kerry Mercade (201-272-218-5740)

4f4caa39-a9dd-447b-8995-54052a23c28c

Page 179

1   probably there with you?
2       MR. PICKERT:  Object to the form.
3       MR. MEADERS:  Fair enough.
4   BY MR. MEADERS:
5       Q.  Who would have been there at that meeting,
6   if you recall?
7       A.  Most likely would been Ron Fields and
8   George Inlow.
9       MR. PICKERT:  Object to the form, move to
10  strike.
11  BY MR. MEADERS:
12      Q.  When you were discussing this issue with
13  Barry Meyer or Ed Copeland, were there more than
14  just you and he talking about it?
15      A.  I don't recall exactly.  Like I said,
16  there could have been CDG people there as well.  I
17  really don't recall.
18      Q.  As the point person for Tampa Bay Water,
19  did it seem to you to be a major issue?
20      MR. FORZIANO:  Object to form.  Go ahead.
21      THE WITNESS:  It wasn't raised to me as
22  being an issue.
23  BY MR. MEADERS:
24      Q.  Did you observe the cover layer or
25  protective layer ever being constructed?

Page 180

1       A.  Yes.
2       Q.  And in general, what were your thoughts
3   about the cover layer and the -- well, let me ask
4   you this:  How many occasions do you recall seeing
5   cover layer or the protective layer being
6   constructed?
7       A.  I don't recall how many occasions.  But I
8   mean, it was an ongoing thing, and I would do site
9   visits at least once a week.  I don't recall how
10  many times I seen it.  It would have been numerous
11  times.
12      Q.  There was one time -- well, strike that.
13      The one time that Barry Meyer or Ed
14  Copeland was discussing it with you, were you
15  watching the cover layer being constructed at that
16  time?
17      A.  I believe so, yes.
18      Q.  At that particular time, was that the
19  first time that you noticed that there was some
20  sort of cover layer or protective layer being
21  placed on the geomembrane?
22      A.  Yes.
23      Q.  Had there -- was this early on in the
24  construction of the soil wedge over the
25  geomembrane?  In other words, had there been other

Page 181

1   areas on the embankment where the geomembrane had
2   already been placed and the soil wedge had been
3   constructed or was this early on?
4       A.  I believe this was early on.  I'm not
5   aware of the wedge being installed anywhere else
6   without this protective layer.
7       Q.  My question is within the discussion --
8   when this discussion was had with you by Mr. Meyer
9   or Mr. Copeland, it would have been early on in
10  the initial stages of the covering of the
11  geomembrane?
12      A.  Yes.
13      Q.  The documents indicate that the
14  geomembrane and the soil wedge first -- strike
15  that.
16      The geomembrane and the soil wedge being
17  put on top of it, the first part of that
18  construction happened in the fall or beginning of
19  the winter of 2003.  Does that comport with your
20  memory?
21      A.  I really couldn't tell you without going
22  back and looking, researching it for the actual
23  time frames.  I don't know.
24      Q.  I'll show you some records about that in a
25  bit.

Page 182

1       A.  Okay.
2       Q.  If I get the opportunity.
3       But to your memory, this discussion that
4   you had with Barry Meyer or Ed Copeland would have
5   been early on in the initial stages of the
6   covering of the geomembrane?
7       A.  Yes.
8       Q.  Okay.  When you were there discussing it
9   with Mr. Meyer or Mr. Copeland, you can't remember
10  who?
11      A.  It may have been both of them there.  I
12  just know HDR was there.
13      Q.  When that discussion was taking place, do
14  you recall what the thickness was that the
15  protective layer was being placed?
16      A.  No, I do not.
17      Q.  Do you recall on what location of the
18  embankment it was being placed in?  When I say
19  "location," bad question.  Was it in the
20  northeast, southeast, southwest, northwest, any
21  particular area such as that, to your knowledge?
22      A.  I don't recall.  I don't know.
23      Q.  Any times that you watched the protective
24  layer or the initial layer over the geomembrane
25  being constructed, did you have an occasion to

Electronically signed by Kerry Mercade (201-272-218-5740)
Electronically signed by Kerry Mercade (201-272-218-5740)

4f4caa39-a9dd-447b-8995-54052a23c28c

Page 267

1    would you be willing to continue today?
2         THE WITNESS:  That is up to my counsel.
3         MR. MEADERS:  Are you feeling okay?
4         MR. FORZIANO:  We're done.
5         THE WITNESS:  We're done.
6         MR. MEADERS:  Okay.
7         (Proceedings recessed at 5:05 p.m.)
8         (End of Volume II.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 269

1              CERTIFICATE OF REPORTER
2    STATE OF FLORIDA
3    COUNTY OF HILLSBOROUGH
4         I, KERRY MERCADE, CSR, Court Reporter and
5    Notary Public, HEREBY CERTIFY THAT I was
6    authorized to and did stenographically report the
7    deposition of RICK MENZIES, PE, that a review of
8    the transcript was requested; and that the
9    foregoing transcript, Pages 139 through 267, is a
10   true and accurate record of my stenographic notes.
11        I FURTHER CERTIFY that I am not a
12   relative, or employee, or attorney, or counsel of
13   any of the parties, nor am I a relative or
14   employee of any of the parties' attorney or
15   counsel connected with the action, nor am I
16   financially interested in the action.
17        DATED this 27th day of May, 2010.
18
19
20
21   _____
     KERRY MERCADE, CSR, CRI, FPR
     CERTIFIED COURT REPORTER
22
23
24
25

Page 268

1              CERTIFICATE OF OATH
2
3    STATE OF FLORIDA
4    COUNTY OF HILLSBOROUGH
5         I, Kerry Mercade, CSR, Notary Public, State
6    of Florida, certify that RICK MENZIES, PE,
7    personally appeared before me on May 10, 2010, and
8    was duly sworn.
9
10        Signed this 27th day of May, 2010.
11
12
13
14
15   _____
16   Kerry Mercade
     Notary Public - State of Florida
17   My commission No. DD 911319
     Expires:  July 27, 2013
18
19
20
21
22
23
24
25

Page 270

1    IN RE:   Tampa Bay Water vs. HDR, et al.
2    DATE:     May 10, 2010
3    DEPONENT:  RICK MENZIES, PE
4
5    Page  Line  Correction and Reason
     ___  ___  _____
6    ___  ___  _____
7    ___  ___  _____
8    ___  ___  _____
9    ___  ___  _____
10   ___  ___  _____
11   ___  ___  _____
12   ___  ___  _____
13   ___  ___  _____
14   ___  ___  _____
15   ___  ___  _____
16   ___  ___  _____
17   ___  ___  _____
18        Under penalties of perjury, I declare that
     I have read the foregoing document and that the
19   facts stated are true.
20   Date_____
21   Signature_____
22
23
24
25

Electronically signed by Kerry Mercade (201-272-218-5740)
Electronically signed by Kerry Mercade (201-272-218-5740)

4f4caa39-a9dd-447b-8995-54052a23c28c

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


TAMPA BAY WATER,
A Regional Water Supply
Authority,

    Plaintiff,

vs.             CASE NO:  8:08-cv-2446-T-27-TBM

HDR ENGINEERING, INC., a
Nebraska corporation,
CONSTRUCTION DYNAMICS
GROUP, INC., a Maryland
corporation, BARNARD
CONSTRUCTION COMPANY, INC.,
a Montana Corporation,
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, a
Minnesota corporation,

    Defendants.
_____/


BARNARD CONSTRUCTION COMPANY, INC.,
a Montana corporation,

    Third Party Plaintiff,

vs.

MCDONALD CONSTRUCTION CORPORATION,
a Federal corporation,

    Third Party Defendant,
_____/


VOLUME V

VIDEOTAPED DEPOSITION OF:  RICK MENZIES, PE

352c2ff2-1f6f-43e2-8704-57adaac8e8d8

Page 620

```
 1        Q.  Very well.  Incidentally, how many times
 2    did you sit for the civil engineer exam in the
 3    State of Florida?
 4        A.  Sit for the exam?
 5        Q.  Yeah.
 6        A.  How many times I took the exam?
 7        Q.  Yeah.
 8        A.  Once.
 9        Q.  Now, you indicated yesterday that this
10    wedge was supposed to be built in horizontal
11    lifts, is that right?
12        A.  Yes.
13        Q.  You also indicated that there was a
14    protective layer somewhere between two to three
15    feet that was pushed up vertically along the
16    geomembrane, correct?
17        A.  I don't recall saying two to three feet,
18    but there was a protective layer.
19        Q.  Of some depth?
20        A.  Yes.
21        Q.  So do you remember what the depth was?
22        A.  No, I don't.
23        Q.  Well, the -- the protective layer that was
24    pushed up vertically on the geomembrane was
25    vertical and not horizontal, correct?
```

Page 621

```
 1        A.  Yes.
 2        Q.  So that's contrary to the specifications,
 3    isn't it?
 4        A.  I'm not --
 5        MR. FORZIANO:  Object to form.
 6        THE WITNESS:  -- that familiar with the
 7    specifications to answer that.
 8    BY MR. STANISLAW:
 9        Q.  Well, didn't you say yesterday it was your
10    understanding that the soil wedge was supposed to
11    be constructed in horizontal lifts?
12        A.  Yes.
13        Q.  Pushing up a layer vertically is not a
14    horizontal lift, is it?
15        A.  If it was a change to the specifications,
16    I would have expected HDR and/or CDG to let us
17    know that -- or let Tampa Bay Water know that
18    something was being deviated.
19        Q.  In your tours of the site that you made
20    almost every Wednesday, there were many Wednesdays
21    where you saw this protective layer being pushed
22    up vertically, correct, sir?
23        A.  Yes.
24        MR. FORZIANO:  Form.
25    BY MR. STANISLAW:
```

Page 622

```
 1        Q.  Did you ever ask anyone from CDG or HDR
 2    why is the wedge being built with this vertical
 3    lift when the specifications say it's supposed to
 4    be constructed horizontally?
 5        A.  I don't recall asking anybody why it was
 6    done that way, but I do remember it being
 7    explained to me that it was needed in order to
 8    protect the geomembrane during the placement of
 9    the horizontal lifts.
10        Q.  But even though that may have been why it
11    was needed, it was not a procedure that was
12    contemplated by the specifications, which required
13    horizontal lifts, correct?
14        MR. MEADERS:  Object to form.
15        THE WITNESS:  Yes, the specification says
16    horizontal lifts.
17    BY MR. STANISLAW:
18        Q.  And you saw vertical lifts being
19    constructed?
20        A.  Of protective layer.
21        MR. FORZIANO:  Object to the form.
22    BY MR. STANISLAW:
23        Q.  And did you ever ask CDG or HDR why are
24    they putting in this vertical lift, which is
25    contrary to the specifications?
```

Page 623

```
 1        A.  I don't recall asking, but I remember it
 2    being explained to me that it was needed.
 3        Q.  And in your role as the contract
 4    administrator, weren't you the one that was
 5    supposed to make sure that the change order
 6    process was handled properly?
 7        A.  No, that --
 8        MR. FORZIANO:  Object to form.
 9        THE WITNESS:  -- would be CDG's
10    responsibility.
11    BY MR. STANISLAW:
12        Q.  Well, didn't you have a responsibility on
13    behalf of Tampa Bay Water to at least make inquiry
14    to CDG as to why aren't we having a change order
15    for this layer that's being placed vertically?
16        A.  That wasn't my role.  That was CDG's role
17    to make sure --
18        Q.  Your role wasn't to even ask questions of
19    CDG --
20        A.  Oh, I was --
21        Q.  -- if you had a question?
22        A.  I was free to ask questions.
23        Q.  You never did ask CDG, "Why don't we have
24    a change order for this..." --
25        A.  I don't recall asking, no.
```

352c2ff2-1f6f-43e2-8704-57adaac8e8d8