# EXHIBIT E

```
              UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
                    TAMPA DIVISION

TAMPA BAY WATER,
A Regional Water Supply
Authority,

        Plaintiff,     CASE NO.:  8:08-CV-2446-T27-TBM

vs.

HDR ENGINEERING, INC., a
Nebraska corporation,
CONSTRUCTION DYNAMICS
GROUP, INC., a Maryland
corporation,
BARNARD CONSTRUCTION
COMPANY, INC., a Montana
corporation,
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, a
Minnesota corporation,

        Defendants.
_____/
BARNARD CONSTRUCTION COMPANY, INC.,
a Montana corporation,

        Third Party Plaintiff,

vs.


MCDONALD CONSTRUCTION CORPORATION,
a Federal corporation,

        Third Party Defendant.
_____/

                 VOLUME IV of X
                (Pages 435 - 586)

              VIDEOTAPED DEPOSITION OF
          KENNETH J. O'CONNELL, Ph.D., P.E.
```

ORANGE REPORTING 800.275.7991

59b5ae6e-7513-4378-b544-e83cf867abfe

Page 552

1    A.   That is correct.
2    Q.   In connection with your review of the project
3  records, did you observe that Ms. Amanda Rice was a
4  participant in this construction pro- -- project?
5        MR. FORZIANO:  Object to form.
6    A.   Yes, I did.
7    Q.   And did -- in your review of the project
8  records, did you observe that Richard Menzies was a
9  participant in the project?
10       MR. FORZIANO:  Object to form.
11   A.   Yes, I did.
12   Q.   And what did you understand the roles of -- of
13 Ms. Rice to be during construction?
14   A.   During construction, I understood her role to
15 be that of the liaison with the permitting entity.
16   Q.   Did she have any other duties and
17 responsibilities during construction?
18   A.   Not that I recall.
19   Q.   So she was the one who should have been
20 reporting to the permitting agency, the Florida
21 Department of Environmental Protection, any deviations
22 from the plans and specifications or any violations of
23 the permit, correct?
24       MR. FORZIANO:  Object to form.
25

Page 553

1  BY MR. STANISLAW:
2    Q.   What -- what are you looking for?  Maybe I can
3  help you find it.
4    A.   I'm looking for the permit.
5    Q.   That's Exhibit 153, sir.
6    A.   No, I wouldn't agree with that.
7    Q.   Wasn't Ms. Rice, according to your testimony
8  that you just gave us under oath, the person on behalf
9  of TBW who was supposed to be the liaison for the
10 Florida Department of Environmental Protection?
11   A.   Yes.
12   Q.   And what were her duties and responsibilities
13 with respect to being the liaison between the
14 construction project and the State of Florida?
15   A.   Part of it would be to maintain contact and to
16 make sure that the permit was being complied with.
17   Q.   And if there were material deviations of
18 the -- of the plans and specifications or violations of
19 the plans and specifications, the permit would not be
20 deemed compliable, would it?
21   A.   That's correct.
22   Q.   And so it would have been at least part of
23 Ms. Rice's duties and responsibilities to report to the
24 Florida Department of Enviro- -- Environmental
25 Protection deviations from the plans and specifications

Page 554

1  or violations of the plans and specifications, correct?
2        MR. FORZIANO:  Object to form.
3    A.   Correct.
4    Q.   And what were Mr. Menzies' duties and
5  responsibilities during construction?
6    A.   Mr. Menzies was the project manager during
7  construction for Tampa Bay Water.
8    Q.   And as the project manager during construction
9  for Tampa Bay Water, now that you've given me his title,
10 what were his duties and responsibilities?
11   A.   General oversight of the project on behalf of
12 Tampa Bay Water.
13   Q.   And Mr. Menzies was responsible in his role as
14 manager to approve the payments to Barnard, wasn't he?
15       MR. FORZIANO:  Object to form.
16   A.   Based on the recommendation of CDG, I believe
17 that's correct.
18       MR. PICKERT:  Object to the answer as
19 nonresponsive.
20       MR. STANISLAW:  Join.
21 BY MR. STANISLAW:
22   Q.   Did Ms. Rice ever report any violations of the
23 permit, any deviations from the plans and specifications
24 or any other problems or defects in Barnard's
25 construction to the Florida Department of Environmental

Page 555

1  Protection?
2        MR. FORZIANO:  Object to form.
3    A.   Not that I recall.
4    Q.   Did Mr. Menzies ever withhold any money from
5  Barnard during the course of construction because of
6  defective construction from Barnard or Barnard's
7  subcontractor, McDonald?
8    A.   I believe yes.
9    Q.   And when was that?
10   A.   I believe that was for the issue with the
11 turb- -- turbidity of the discharge water.
12   Q.   Okay.  That was a consent issue that really
13 had nothing to do with defective construction, right?
14       MR. FORZIANO:  Object to form.
15   A.   I don't know if I'd agree with that.
16   Q.   Okay.  Did -- did Mr. Menzies, on behalf of
17 Tampa Bay Water, ever withhold any money from Barnard
18 because of defective construction work having been
19 performed on the embankment, in the wedge or the
20 soil-cement by Barnard or McDonald?
21   A.   Not that I recall.
22   Q.   In your opinion should Ms. Rice have reported
23 to the Florida Department of Environmental Protection
24 deviations from the specifications and violations of the
25 permit that occurred during this project?

Page 556

1      MR. FORZIANO: Object to form.
2      A.  If she was aware of them, yes, I believe she
3  should have.
4      Q.  Should Mr. Menzies have withheld money from
5  Barnard during the course of construction because of
6  defectively performed work in the embankment, the wedge
7  and the soil-cement?
8      A.  Yes, if he was aware of that, he should have.
9      Q.  And you're familiar with the roles played by
10 owners on major construction projects, correct?
11     A.  Yes.
12         MR. FORZIANO: Object to form.
13 BY MR. STANISLAW:
14     Q.  And it would be fair to characterize this as a
15 major public works construction project, correct?
16     A.  Yes.
17     Q.  And you're familiar with the roles played by
18 the project manager and the liaison on behalf of public
19 owners on major public works construction projects,
20 correct?
21     A.  Yes, I am.
22     Q.  Do you have an opinion as to whether or not
23 Mr. Menzies and Ms. Rice adequately and sufficiently
24 performed their duties in -- during construction of the
25 Tampa Bay Water reservoir?

Page 557

1      MR. FORZIANO: Object to form.
2      A.  Yes.
3      Q.  And what is your opinion?
4      A.  I -- I believe that they did.
5      Q.  And do you believe that Mandi Rice, who's a
6  professional engineer, and Mr. Menzies, who's a
7  professional engineer, diligently and prudently
8  conducted adequate investigations and observations
9  during the course of construction to familiarize
10 themselves with whether or not the construction work was
11 being performed properly or not?
12         MR. FORZIANO: Object to form.
13     A.  I don't know that.
14     Q.  Do you believe that a lens, pocket or streak
15 should be recognizable by any registered professional
16 engineer in the state of Florida?
17         MR. FORZIANO: Object to form.
18     A.  Not necessarily.
19     Q.  Well, if a registered engineer can't recognize
20 a lens, pocket or streak, how can a contractor recognize
21 it?
22     A.  Well, I think it's unlikely that a registered
23 electrical engineer would be able to recognize that,
24 while perhaps an experienced earthwork contractor would
25 be expected to.

Page 558

1      Q.  Do you think I said electrical engineer?
2      A.  You said registered engineer.
3      Q.  Do you think a registered civil engineer in
4  the state of Florida should be able to recognize lenses,
5  pockets and streaks in an embankment such as the one
6  that was built at the Tampa Bay reservoir?
7      A.  Yes.
8      Q.  And both Ms. Rice and Mr. Menzies are
9  registered professional civil engineers, aren't they,
10 sir?
11         MR. FORZIANO: Object to form.
12     A.  I believe that's correct, yes.
13     Q.  And so if there were lenses, pockets and
14 streaks in the reservoir -- at the Tampa Bay Water
15 reservoir, they should have been recognized by
16 Mr. Menzies and/or Ms. Rice, correct, sir?
17         MR. FORZIANO: Object to form.
18     A.  I believe that's correct.
19     Q.  And your criticism of the curing process for
20 the cement is that dirty water was used and firehoses
21 were used, correct?
22     A.  That's part of it, correct.
23     Q.  And -- and that process went on for
24 approximately a nine-month period of time, correct?
25     A.  That's approximately correct.

Page 559

1      Q.  And -- and do you have any knowledge or
2  information that Ms. Rice or Mr. Menzies ever complained
3  about the use of dirty water or firehoses to cure the
4  cement?
5      A.  I have no information about that, no.
6      Q.  The use of dirty water and the use of
7  firehoses should have been readily observable to anybody
8  who was regularly observing the work at the Tampa Bay
9  Water reservoir, let alone the registered professional
10 engineer getting paid by the Tampa Bay Water district to
11 be the project manager and the liaison with the
12 permitting agency, correct, sir?
13         MR. FORZIANO: Object to form.
14     A.  During the time that it was occurring, yes, I
15 would agree with that.
16     Q.  Do you have any knowledge or information that
17 Mr. Menzies or Ms. Rice ever complained about the use of
18 dirty water or firehoses to do the curing on the
19 soil-cement?
20     A.  No.
21     Q.  They should have observed that, though,
22 shouldn't they have, sir, the use of dirty water and the
23 use of firehoses?
24         MR. FORZIANO: Object to form.
25     A.  If they were on site when it was occurring and

Page 560

1  they were out in the field, yes, I believe they would --
2  should have observed that.
3      Q.  And you read the deposition testimony of both
4  Ms. Rice and -- and Mr. Menzies, correct?
5      A.  I read Mr. Menzies.  I have only skimmed
6  Ms. Rice's.
7      Q.  Well, at least with respect to Mr. Menzies,
8  you know that he made regular site visits as part of his
9  duties as the project manager during construction, don't
10 you?
11     A.  Yes.
12     Q.  And as a project manager for a public owner on
13 a public works project, the public -- the project
14 manager should regularly observe the construction work
15 in progress, shouldn't they, sir?
16         MR. FORZIANO:  Object to form.
17     A.  Well, that would depend.
18     Q.  On a project such as the Tampa Bay Water
19 reservoir, wouldn't it be reasonable and proper for the
20 project manager on behalf of Tampa Bay Water to make
21 regular observation trips to the reservoir to observe
22 the construction?
23     A.  Yes.
24     Q.  And Mr. Menzies did in fact do that, didn't
25 he, sir?

Page 561

1      A.  Yes.
2      Q.  And one -- as the person who is responsible
3  for issuing checks to Barnard Construction Company, one
4  of the things that the project manager for Tampa Bay
5  Water should have been doing on those observation trips
6  of his was to observe whether or not the construction
7  work being performed by Barnard was being performed in
8  accordance with the plans and specifications, correct?
9          MR. FORZIANO:  Object to form.
10     A.  I don't believe he was the individual
11 responsible for issuing checks to Barnard.
12     Q.  What -- what was his role with respect to
13 Barnard getting paid?
14     A.  I believe he had signature authority on the
15 requisitions that were submitted.
16     Q.  As a person who had signature authority on the
17 requisitions that resulted in checks being issued to
18 Barnard, shouldn't Mr. Menzies, during his regular
19 observation trips to the reservoir, have been making
20 observations to determine if the construction work was
21 being done in accordance with the plans and
22 specifications?
23         MR. FORZIANO:  Object to form.
24     A.  To some extent, yes, but also relying on his
25 consultants to assist him in that.

Page 562

1      Q.  Well, is it reasonable and proper for the
2  project manager for a public agency on a major public
3  works project to turn a blind eye to the construction
4  and simply rely on the input from his consultants?
5          MR. FORZIANO:  Object to form.
6      A.  No, that would not be reasonable.
7      Q.  It would be reasonable for a project manager
8  who's a registered professional engineer on a major
9  public works project to regularly observe the
10 construction, to form his own conclusions and to make
11 his own observations as to whether or not construction
12 work is being done in accordance with the plans and
13 specifications, correct?
14     A.  To some extent, yes, that's correct.
15     Q.  At no time during the course of this project
16 did Mr. Menzies, the project manager for Tampa Bay
17 Water, ever issue a nonconforming work notice as a
18 result of defective work being performed by Barnard, did
19 he, sir?
20     A.  Not that I'm aware of, no.
21     Q.  There was a procedure in this contract in the
22 event that Barnard was performing defective work,
23 whereby nonconforming work notices would be issued to
24 Barnard?
25     A.  There were procedures, yes.

Page 563

1      Q.  There was never a nonconforming work notice
2  issued to Barnard at any time during the course of this
3  project for defective work being performed in the
4  embankment, the wedge or the soil-cement, correct?
5      A.  Not that I recall, no.
6      Q.  This contract, the construction contract
7  between Barnard and Tampa Bay Water, had a three-year
8  warranty period, didn't it?
9          MR. FORZIANO:  Object to form.
10     A.  I'm not sure if it was described precisely as
11 a warranty period.
12     Q.  How would you describe it?
13     A.  I think there was a period described for the
14 correction of defective work.
15     Q.  And that period, whereby Barnard was obligated
16 to perform corrective -- correction of defective work,
17 started in February of '05 and ran through February of
18 '08, correct?
19         MR. FORZIANO:  Object to form.
20     A.  I'm not sure about those dates.  I don't -- I
21 don't recall those specific dates.
22     Q.  And are you willing to accept my
23 representation that those are the accurate dates?
24     A.  If you represent that to me as being accurate,
25 I can't dispute it at this time.