```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                    TAMPA DIVISION

 3    TAMPA BAY WATER,
      A Regional Water Supply Authority,
 4
           Plaintiff,
 5
                vs.              CASE NO. 8:08-CV-2446-T-27TBM
 6                               16 FEBRUARY 2012
                                 TAMPA, FLORIDA
 7                               9:05 AM-12:10 PM/1:30 PM-3:00 PM
                                 PAGES 1 - 184
 8
      HDR ENGINEERING, INC.,
 9    A Nebraska Corporation,

10         Defendant.

11    _____/

12        TRANSCRIPT OF HEARING ON MOTIONS IN LIMINE
           BEFORE THE HONORABLE JAMES D. WHITTEMORE
13               UNITED STATES DISTRICT JUDGE

14    APPEARANCES:

15    For the Plaintiff:    Richard Anthony Harrison
                            Allen Dell, PA
16                          Suite 100
                            202 S. Rome Avenue
17                          Tampa, Florida 33606

18                          David Forziano
                            Allen Dell, PA
19                          Suite 100
                            202 S. Rome Avenue
20                          Tampa, Florida 33606

21    For the Defendant:    Wayne B. Mason
                            Sedgwick LLP
22                          Suite 5400
                            1717 Main Street
23                          Dallas, Texas 75201

24     Proceedings recorded and transcribed by
      computer-aided stenography.
25
```

1                                    **David C. Kent**
                                     Sedgwick LLP
2                                    Suite 5400
                                     1717 Main Street
3                                    Dallas, Texas 75201

4                                    **Kurt W. Meaders**
                                     Sedgwick LLP
5                                    Suite 5400
                                     1717 Main Street
6                                    Dallas, Texas 75201

7                                    **Timothy D. Woodward**
                                     Forizs & Dogali, PA
8                                    Suite 300
                                     4301 Anchor Plaza Parkway
9                                    Tampa, Florida 33634

10      Court Reporter:              Linda Starr, RPR
                                     Official Court Reporter
11                                   801 N. Florida Avenue
                                     Suite 13B
12                                   Tampa, Florida 33602

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              COURTROOM SECURITY OFFICER:  All rise.  This

2     Honorable Court is now in session, The Honorable

3     James D. Whittemore presiding.

4              Be seated, please.

5                    P R O C E E D I N G S

6              THE COURT:  Good morning.  We are here for

7     some argument on some motions in limine.  We'll take

8     them in the order in which they have been filed

9     generally.  I will ask counsel to keep their remarks

10    succinct.

11             The first motion is Docket 348, which is Tampa

12    Bay Water's motion for jury view.  Mr. Harrison,

13    I've read your motion.  The defendant raises some

14    legitimate concerns that I share, the first of which

15    is the physical aspects of an inspection by the jury

16    of a project of this size.

17             On page three of the response, in a footnote

18    HDR sets forth the release that TBW required of HDR

19    or its representatives.  If the release was so

20    important to TBW because of concerns of safety to

21    those entering the property, why in the world should

22    we expose a jury to at this point in time, the

23    limitations or physical capabilities of which we do

24    not know, to these risks?

25             MR. HARRISON:  Thank you, Your Honor.  Good
```

1      morning.  The short answer is that we can accomplish

2      the purpose of the jury view without, frankly, ever

3      having the jurors exit from the bus or the van.  The

4      releases we required of all of the experts, and we

5      may have even required it from our own experts, was

6      because the experts, the engineers were going out to

7      the reservoir and actually climbing down the slope,

8      which is at a grade that is certainly challenging.

9      It's more challenging when it's wet or damp or

10     there's plant slime.

11          We're not asking the jurors to climb down the

12     slope.  That's why we requested releases in the case

13     of inspections by the experts because they were

14     walking all over the slope all the way down to the

15     water line and up and down.

16          And all we're asking --

17          THE COURT:  Well, I failed to mention snakes

18     and other things that are referenced by HDR.

19          MR. HARRISON:  Yes.  There are certainly --

20          THE COURT:  Alligators.

21          MR. HARRISON:  -- complete with wildlife

22     including a very large alligator.  But they tend to

23     stay in the water.  We're not asking anybody to go

24     down to the water line.  We're not asking anyone to

25     leave the crest road.  And if the court's concerned

1    about safety at crest road, that road is traversed

2    by vehicles all the time.  It's just driving up the

3    slope and driving around in a circle.

4         THE COURT:  Is that a paved surface?

5         MR. HARRISON:  It is paved in the sense that

6    it is paved with soil cement.

7         THE COURT:  It's not paved, then, it's not

8    asphalt or concrete or --

9         MR. HARRISON:  Well, it's soil cement which is

10   close to concrete.  But it handles vehicles much

11   larger than anything that we would be doing.

12        So the safety concerns that we had with people

13   climbing up and down the slope, going down to the

14   water line and doing those sort of things simply

15   aren't present here.

16        THE COURT:  How far is the reservoir from the

17   courthouse?  You said 22 miles.  Is that an

18   accurate --

19        MR. HARRISON:  Did we Map Quest that distance?

20   I think we did a Map Quest.  That sounds like it's

21   right, Judge.  It's in southeastern Hillsborough

22   County out near Fish Hawk; right?

23        THE COURT:  That is by my own experience is

24   roughly about a 45-minute drive if there's no

25   traffic.  Would you agree?

1          MR. HARRISON:  Yes.  It typically takes us

2     from our office not far from here 45 minutes to an

3     hour, depending on traffic.

4          THE COURT:  So what you're proposing is that

5     these jurors get in get in a vehicle of some kind, a

6     bus, presumably, drive out there, drive around the

7     rim and come back?

8          MR. HARRISON:  Yes, sir.

9          THE COURT:  You don't think that can be

10    accomplished by an aerial video that has been

11    prepared?

12         MR. HARRISON:  I don't, Judge.  We've seen the

13    aerials.  HDR had a helicopter do an aerial, we had

14    a helicopter do our own aerial.  We've looked at all

15    these.  There is nothing, no photograph, no aerial,

16    no verbal description, no video that can convey to

17    the jurors the size and scale of this project.  And

18    without that, there's no context for the evidence

19    they're going to hear.

20         Every expert who's going to testify in this

21    case has gone out there repeatedly, repeatedly.  And

22    every expert has said, it's important to get out

23    there on the ground.  We've got to see what's going

24    on.

25         THE COURT:  But you just said you don't expect

1      the jury to get out beyond the ground.

2          MR. HARRISON:  Well, I don't expect them to

3      climb down the slope for the safety reasons the

4      court's already addressed.  But getting them out to

5      see the facility is better than not seeing it.

6      There is nothing in the -- in the lifetime of an

7      average juror that is going to give them any

8      familiarity with something like this.

9          It's not a house, it's not a school, it's not

10     a shopping center, it's not a car, it's not a

11     washing machine.  It is something that these jurors

12     will have never seen.  And it is very difficult --

13         THE COURT:  How is that going to assist them

14     in determining whether TBW was negligent in its

15     design, in -- in drafting the design?

16         MR. HARRISON:  It's going to help them

17     understand, one, the configuration of the reservoir.

18         THE COURT:  Well, we have experts.

19         MR. HARRISON:  We do.

20         THE COURT:  More than we need to tell the jury

21     about that.  So what else?

22         MR. HARRISON:  We've got the scale of the

23     facility, we've got putting the evidence in context.

24     Again, HDR wants to show a photograph taken from a

25     thousand feet away.

1          THE COURT:  Well, you have photographs taken

2     much closer.

3          MR. HARRISON:  But my point, Judge, is to put

4     the photographic evidence in context, the jury's got

5     to see the size and scale of this facility.  Me

6     saying it's big, me saying it enormous, it's huge,

7     and showing a helicopter flying over doesn't do it.

8          THE COURT:  Well, is it not undisputed that no

9     one, at least in the United States, had ever

10     designed a reservoir of this nature?  Isn't that

11     what the experts say?

12          MR. HARRISON:  I won't go quite that far, but

13     it's certainly different.

14          THE COURT:  Well, as I recall, one of the

15     experts said point blank something like this had

16     never been designed before.  It was the first time.

17     Am I incorrect in my recollection?

18          MR. HARRISON:  I'm reasonably confident

19     that's true in Florida.  Whether the expert said

20     anywhere in the United States, but yes, it is --

21          THE COURT:  Well, Florida, then.

22          MR. HARRISON:  It is unique, for all practical

23     purposes.

24          THE COURT:  And you think this will take only

25     a half a day?

1          MR. HARRISON:  Yes.  If we take -- it takes an

2     hour to drive out there --

3          THE COURT:  An hour at what time of the day?

4          MR. HARRISON:  I would suggest just, depending

5     on the considerations of comfort, that we do it

6     first thing in the morning, load the jury here.

7          THE COURT:  All right.  It takes a half hour

8     or so to load the jury onto a bus; would you agree?

9          MR. HARRISON:  I would think that's right.

10          THE COURT:  Another 45 minutes to an hour to

11     get there.  In the morning, I would say an hour and

12     a half.  So we're already at two hours.  How long do

13     you think it would take to drive around the rim of

14     the reservoir?  And I say rim, that may not be the

15     correct term but --

16          MR. HARRISON:  No.  That's what we're talking

17     about.  Driving around the crest road, 30 minutes,

18     certainly no more.

19          THE COURT:  On a surface which, if it's

20     raining, could conceivably be slippery.  At what

21     height are we talking about from the normal road

22     surface, highway surface down below the reservoir?

23          MR. HARRISON:  About 65 feet.

24          THE COURT:  Sixty-five feet.  And how wide is

25     the crest road, roughly?

1          MR. HARRISON:  Twenty, 25 feet wide.

2          THE COURT:  That reminds me of driving in the

3   North Carolina mountains or the Montana mountains in

4   a car.  I don't know about that.  All right.  So you

5   think it would take about a half hour to drive

6   around the crest?

7          MR. HARRISON:  Yes, sir.

8          THE COURT:  So we're at two and a half hours,

9   another hour and a half to get back.  That's four

10  hours.  That's well more than half a trial day.  Are

11  you willing to give up half a trial day in your

12  case?

13         MR. HARRISON:  For purposes of --

14         THE COURT:  Is it that important?

15         MR. HARRISON:  Yes.  I think it is that

16  important.

17         THE COURT:  All right.  Well, we'll make note

18  of that, then.  All right.  Who's going to respond

19  on behalf of HDR?

20         MR. MASON:  I will, Your Honor.  Wayne Mason.

21         THE COURT:  Mr. Mason, go right ahead.

22         MR. MASON:  Your Honor, I think we set forth

23  in our response, so I'll be brief.  There are other

24  practical ramifications, being gone those number of

25  hours, there are limited resources out there even

1    for restroom breaks.  So the practical matter of a

2    30-minute just drive around is probably not

3    practical.  Additionally, the limitations --

4         THE COURT:  Well, I presumed the vehicle would

5    have facilities.  But aside from that, go ahead.

6         MR. MASON:  The -- one of the primary issues,

7    Your Honor, is -- is we believe they want this jury

8    view because of the lack of maintenance that they

9    have made it a determination about because they're

10   going to essentially do a different reservoir now,

11   and they're engaged in this process.  They have not

12   performed the maintenance that would otherwise

13   provide an opportunity for the jury to see the way

14   in which the facility should look through a proper

15   maintenance.

16         So -- and additionally, the 65-foot level

17   there with the view that they get would be very

18   limited.  And, frankly, the aerial view is a better

19   opportunity for them.  I mean, what I just heard was

20   a desire for them to see the magnitude of this

21   reservoir.  There is no question with an aerial view

22   it's -- it's like seeing a football stadium.  If you

23   have a blimp or you see the nature of it, you can

24   see how large the five miles around are.  And the

25   aerial view goes all the way around.

1          And so just the nature of the magnitude is all

2     I heard Mr. Harrison talk about with respect to

3     the -- that can clearly be accomplished by the

4     aerial viewing which, again, we're happy for the --

5     Your Honor to view prior to, if the court wishes,

6     making a decision to see whether it's adequate or

7     not.

8          THE COURT:  You have been there, I take it?

9          MR. MASON:  I have, Your Honor.

10         THE COURT:  What concerns do you have as an

11    officer of the court in putting a bus-type vehicle

12    at that facility and driving around the crest?  Are

13    there barriers, fencing?  Is there any type of a

14    preventative barrier to avoid a vehicle from

15    slipping off that crest or anything of that nature?

16         MR. MASON:  As an officer of the court, I do

17    not wish to -- I would not paint a picture of a

18    mountain side precipice.  However, I would say to

19    Your Honor that there is no railing, there is no

20    protection there with respect to a vehicle.

21         And the court's -- the one thing that struck

22    me was the court's comment about the weather.  I do

23    believe in protecting the citizens here that taking

24    a large bus or a bus on that facility, particularly

25    in a weather condition would -- would concern me.

1     If it were my family member, I would not want them

2     doing that.

3         And then when you limit -- and, quite frankly,

4     getting out of that bus, I would certainly not want

5     them out there walking around with respect to the

6     facing and things like that.  There's going to be

7     curiosity.  And the limited ability to see from a

8     bus of just driving around it seems to me is of

9     little value.

10        Are there potential security things?  Yes.  I

11    don't want to overstate them and -- but I do believe

12    that there are -- there are -- my recollection is

13    there's no kind of barriers or anything like that.

14        THE COURT:  Well, it should be pretty obvious

15    that I am skeptical about engaging in such a field

16    trip, if you will.  It seems to me that,

17    notwithstanding the -- the size of this particular

18    facility that there are just too many variables and

19    concerns to expose this jury to, when we have so

20    many technological alternatives available, including

21    videos, photographs, eyewitness descriptions.

22        And as counsel for TBW acknowledges, these

23    jurors would not be -- it would not be appropriate

24    to allow them to exit the bus and walk around for

25    obvious concerns, safety concerns.  So they'd be

1    basically a captive audience driving around in a bus

2    with limited visibility, much like looking at a

3    large screen TV, in my view.

4         Seeing it obviously would give them a better

5    perspective of the size.  But I fail to see how

6    simply the perspective of the size of the facility

7    is going to assist this jury in understanding the

8    issues in this case, when you have a plethora of

9    experts and other witnesses who are certainly going

10   to be describing it in more detail than they can

11   imagine.

12        It's just not necessary in this case, in my

13   view, considering all of these considerations.  The

14   time alone, and I think we have to be conservative,

15   it's going to take five to six hours at a minimum to

16   do all of this, between instructing the jury,

17   loading the jury, driving out there, accessing the

18   crest, driving around the crest, stopping so they

19   can at least look around through the windows, and

20   there would probably be more than one stop, and then

21   returning to downtown Tampa.  You're talking at

22   least five, if not six hours.  That's an entire

23   trial day.  And we have weather concerns and we have

24   safety concerns.

25        So I'm going to deny this motion.  I am

1    comfortable that the parties in this case are

2    prepared to present to this jury visual depictions

3    of the particular reservoir that will certainly

4    allow the jury to appreciate the scale.

5         Obviously, if something happens at trial, I

6    can revisit this.  But safety concerns, logistical

7    concerns, the variables, the fact that this facility

8    has not been maintained as nicely, perhaps, as it

9    might otherwise have been, I don't know how that

10   could factor into the jury's view.

11        There's a lot of discussion in the pleadings

12   about observing the caulking, the repairs.  And I

13   don't know why all that's in there if no one is

14   suggesting they exit the bus.  So far all of those

15   reasons, including the potential safety and security

16   concerns and weather factors, I will deny this

17   motion.

18        I will be watching the video when it's shown,

19   of course.  And if there's any deficiencies or

20   concerns about whether it accurately depicts the

21   reservoir, I will certainly revisit this.  And I

22   have read *Auto Owners versus Bass* at 684 F.2d 764,

23   an Eleventh Circuit decision discussing some of the

24   concerns that in that case echo mine.  In that case

25   there was a 30 to 35 mile trip from the courthouse,

1    but the parties had more than a hundred photographs

2    taken shortly after the particular fire.  I think

3    there's some analogy there.

4         The second motion is the defendant's motion in

5    limine, number one, regarding the evidence of

6    lenses, pockets, streaks and layers.  And as I

7    understand it, TBW filed a response not only to this

8    motion, but also HDR's motion number five, which is

9    the motion addressing quality control.  So we can

10   take these at the same time.  Mr. Mason.

11        MR. MASON:  Thank you, Your Honor.  The

12   determination regarding any issue of a causation of

13   the problems at this reservoir regarding the lenses,

14   pockets, streaks and layers was -- was handled,

15   determined in the stipulation.  And it is that

16   stipulation and the facts therein that we raise this

17   issue about, because there is no relevance with

18   respect to this issue any further as it relates to

19   design.

20        The -- and this whole issue of quality control

21   and the lack of -- of expert testimony with respect

22   to quality control as well as this issue of lenses,

23   pockets and layers -- streaks and layers, Your Honor

24   has pointed out that they are intertwined.  In fact,

25   they responded in one brief responding to it.

1          So it is our position that they have -- by the

2     way that they have structured their deal with

3     Barnard with respect to the lenses, pockets, streaks

4     and layers and their affirmative determination,

5     which we pointed out to the court those statements

6     with respect to the fact that it could not cause the

7     damages in this case.  If it was not a construction

8     related matter that caused the damages in this case,

9     then how could we be responsible for improper

10    oversight of something that otherwise did not cause

11    the damages?

12         So it is our position that the quality control

13    issues in this case should be disposed of.  There

14    should not be evidence with respect to quality

15    control in light of their determination that there

16    was no construction related defect.  Mr. Brumund --

17         THE COURT:  How does that impact on your

18    defense that you wish to present?

19         MR. MASON:  Our defense is related to

20    causation, Your Honor, and the fact that this is

21    quality control with respect to what was done in

22    overseeing what others had done.  That was a

23    separate --

24         THE COURT:  Well, that's my point.  How does

25    it relate to your contention, as I understand it

1    from the pleadings and argument, that Barnard was

2    responsible for causing this -- these cracks and --

3    isn't the presence of the pockets, lenses, streaks

4    and layers part of that contention?

5        MR. MASON:  Not part of the contention with

6    respect to the collapse upon wetting.  There the --

7        THE COURT:  That's the sole theory that you're

8    proceeding on by way of defense, collapse upon

9    wetting?

10       MR. MASON:  It is our contention that the

11   collapse upon wetting is what caused it.  That's

12   correct.  They have raised the issue initially

13   regarding lenses, pockets, streaks and layers.

14       So the issue that we believe should be tried

15   in this case that remains in this case or should

16   remain is, as the court pointed out the other day, a

17   clear, professional liability claim based on design

18   and causation related thereto, and that our ability

19   to raise the -- the collapse upon wetting as an

20   alternative causation in defeating their prima facie

21   case that they seek to put on, and defeating that

22   causation.

23       The issue of quality control was a separate

24   cause of action, as the court recognized the other

25   day, that was related and was limited.  Mr. Brumund

1    has said he has no criticisms with respect to the

2    protective layer.  There was no -- there was no

3    testimony with respect to -- there is no testimony

4    with respect to quality control by an expert witness

5    in this case as required in this state.

6         The only reference that they may make with

7    respect to the lenses, pockets, streaks and layers

8    is try and tie it back into design in terms of the

9    permeability and the soil cement analysis that was

10   done at the time of design.  That's a different

11   issue.

12        We -- we do not dispute the fact if -- that we

13   know that Mr. Brumund is taking the position that

14   our permeability analysis that Mr. Myers did in

15   designing this was not right.  But that's a

16   different issue with respect to the range or what

17   permeability that we assigned to make our

18   determinations about design.

19        This is a different issue.  This is an issue

20   regarding lenses, pockets, streaks and layers and

21   how it was constructed.  And they stipulated that

22   away when they made their determination.  So it's --

23   it's a different issue than the one that we -- that

24   we believe remains in this case or should remain in

25   this case, and that is our design.

1          THE COURT:  How does -- if it does, how does

2     the existence of lenses, pockets, streaks and

3     layers, how does that relate to the question of

4     permeability and the assumptions that are critical

5     or criticized by TBW's expert.

6          MR. MASON:  It does not.  And it

7     specifically -- it does not because they stipulated

8     away and said that the lenses, pockets, streaks and

9     layers did not --

10          THE COURT:  Well, apart from that, apart from

11     that.

12          MR. MASON:  No, it's -- even still, Your

13     Honor, the issue is -- when it comes to the soil,

14     the issue of what we did in our design of the

15     permeability of what assumptions we made or what we

16     relied on, we understand we'll have to defend that,

17     and that that's something that they can talk about.

18          But that's very different than what was found

19     out there with respect to the lenses, pockets

20     streaks and layers, which they then made the

21     determination to do this stipulation and suggest

22     that that had nothing to do with causation in this.

23          THE COURT:  But the existence of those things

24     is not related to the permeability of the soil, or

25     is it?  I thought it was.  I may be wrong.

1              MR. MASON:  No, sir.  It is -- it is our

2    position that the existence of those is a

3    construction related issue, and that whether the

4    design originally considered the possibility of a

5    spec of lenses, pockets, streaks and layers is -- is

6    irrelevant now or immaterial because of their

7    determination that it could not have caused this.

8         THE COURT:  That's not what -- I understand

9    that.  Put that aside for the moment.  Is the

10   existence of lenses, pockets, streaks and layers

11   related to the permeability of the soil?

12        MR. MASON:  It's our position that it is not.

13        THE COURT:  Well, I understand.  But what do

14   the experts say?  Is that a characteristic of the

15   soil that effects permeability?

16        MR. MASON:  The lenses, pockets, streaks and

17   layers would relate to the -- would relate to the

18   pressure within the wedge and the way it was built

19   and the particular soils that were used within the

20   particular wedge; again, a construction related

21   issue.  Now, what they would say is --

22        THE COURT:  Well, that's what I'm asking.

23   That's not a characteristic per se of the type of

24   soil used.  It's a result of the impacting of the

25   dirt and the compressing of the dirt and the

1      layering of the dirt?

2              MR. MASON:  That's correct.

3              THE COURT:  All right.  And your position then

4      is that essentially TBW is collaterally estopped if

5      not judicially estopped from asserting that the

6      existence of lenses, pockets, streaks and layers

7      contributed to the cause of the cracking because of

8      their agreed facts?

9              MR. MASON:  That is correct, Your Honor.  And

10     then commensurate with that, if that is the --

11     the -- that is -- the result of that is then we

12     could not be responsible for quality control of the

13     way in which it was built or not built vis a vis the

14     lenses, pockets, streaks and layers because if it

15     couldn't have caused the problem in the first

16     place --

17             THE COURT:  That's the second claim, correct,

18     the breach of contract.

19             MR. MASON:  That's the -- yeah, the quality

20     control issue related to it.

21             THE COURT:  And is your collapse upon wetting

22     theory of causation distinct from the existence of

23     pockets, lenses, streaks and layers?

24             MR. MASON:  Yes, Your Honor.

25             THE COURT:  No relationship, correct, as far

1    as you're concerned?

2        MR. MASON:  That is correct.  Dr. Bromwell

3    testified that the lenses, pockets, streaks and

4    layers was not an issue in his analysis of the

5    causation of collapse upon wetting.

6        THE COURT:  All right.  Let me hear from

7    Mr. Harrison.  Thank you.

8        MR. HARRISON:  Mr. Forziano has this one, Your

9    Honor.

10        MR. FORZIANO:  Good morning, Your Honor.

11        THE COURT:  Good morning.

12        MR. FORZIANO:  Well, I would start off by

13    saying I humbly and respectfully disagree with

14    Mr. Mason.  This is a design related issue.  These

15    issues regarding layers, pockets, streaks and lenses

16    and the QC are interrelated, Your Honor.

17        And what I specifically disagree with

18    Mr. Mason's characterization is his statement that

19    the existence of the layers, pockets, streaks and

20    lawyers do not affect the permeability of the soil.

21    That is not the case, Your Honor.  And I'd also like

22    to clarify the stipulated --

23        THE COURT:  Well, when you say that's not the

24    case, tell me why.

25        MR. FORZIANO:  Well, Your Honor, as far as the

1    design, and that's what we're really focusing on is

2    our complaint regarding HDR's design, when they

3    designed the reservoir, it's not disputed that their

4    design analysis assumed a homogenous mass of soil in

5    the embankment, not only the embankment proper, but

6    the wedge.  That's the way -- those are their design

7    assumptions.  That's how they modeled it.

8         THE COURT:  All right.  How does that -- how

9    is that related to the existence of lenses, pockets,

10   streaks and layers?

11        MR. FORZIANO:  Because those different layers

12   and lenses of soil have varying permeabilities that

13   range dramatically lower and higher than what HDR

14   assumed in its design.

15        THE COURT:  Is that a characteristic of the

16   soil or is it a result of the manner in which the

17   sole is laid down?

18        MR. FORZIANO:  Well, Your Honor, it's both.

19        THE COURT:  When you start with well, that

20   tells me that you are not certain of your position.

21        MR. FORZIANO:  No.  I am certain of my

22   position, Your Honor.  It's -- it's got nuances to

23   it, though, and let me explain.

24        At first when our experts looked at this, they

25   looked at the design and they looked at the

1    specifications.  And the way the specifications were

2    written and the way the design was performed --

3        COURT REPORTER:  You need to slow down, Mr.

4    Forziano.

5        MR. FORZIANO:  I'm sorry.  Our experts assumed

6    that it was a construction defect.  However, after

7    hearing the testimony of HDR's lead designers who

8    were involved with designing and preparing the

9    specifications, their clear deposition testimony

10   interpreted those provisions such that our experts

11   now believe that's the way they intended it to be

12   designed, to have different lenses, pockets, streaks

13   and layers.

14       Therefore, when Your Honor was considering the

15   summary judgment for Barnard, it recognized the

16   supplemental report by Golder, our experts, and

17   their change of position that the existence of

18   lenses, pockets, streaks and layers was no longer,

19   in their opinion, a construction defect but, rather,

20   a design defect.  And that's one of bases for the

21   court issuing the summary judgment against Barnard

22   and -- and finding that lenses, pockets, streaks and

23   layers is not a construction defect.

24       THE COURT:  Well, assuming that it is a design

25   defect, your response to the motion doesn't even

1    address the facts that you and your client agreed to

2    in the summary judgment motion and the -- the

3    stipulated or agreed facts.

4        MR. FORZIANO:  Well, Your Honor, what we

5    believe the existence of lenses, pockets, streaks

6    and layers does is very relevant to show that

7    Bernard's -- I'm sorry, that HDR's design assumption

8    of homogenous mass of soil is incorrect.  When you

9    look at -- and our experts have done this, they look

10   at the borrow sources and the information that was

11   available --

12       THE COURT:  All right.  Assuming it's

13   incorrect, how does it cause the cracking that

14   you've -- your client complains of, when you have

15   stipulated under oath through your client that there

16   would have been unusual cracking in the soil cement

17   even in the absence of lenses, pockets, streaks and

18   layers and they were not the reason the reservoir

19   has to be repaired?

20       I understand what you're saying.  But you have

21   agreed in a sworn statement of facts through your

22   client that they didn't cause the cracking.  So my

23   point is, and not to be colloquial, but so what?

24   The lenses, pockets, streaks and layers are there.

25   They might have been there because it was an

1    assumption or they might have been there because

2    Barnard layered the dirt in a way that it should not

3    have.  But if it didn't have any cause or didn't

4    cause the cracking, what's the relevance?

5        MR. FORZIANO:  Our experts' opinions regarding

6    why the design failed boiled down to a couple of

7    things.  Primarily among them are the permeability

8    values that HDR assigned to the soil.  And the

9    permeabilities they assigned to the soil cement.

10   This is evidence that the design assumption is

11   wrong.

12       Now, the layers, pockets, streaks and lenses,

13   do they cause the pour pressure?  No.  That was

14   caused by HDR's poor design assumption regarding the

15   permeability of the soils and their assuming that

16   it's homogenous mass.  But this evidence is relevant

17   to show that those design assumptions were

18   incorrect.

19       THE COURT:  But how does that relate to

20   causation?  It might be a wrong assumption.  But if

21   it's not related to causation, what's the relevance?

22       MR. FORZIANO:  Well, ultimately, it's the

23   permeability values that are in the embankment

24   that -- that's the proof in the pudding, Your Honor.

25   Our investigation team went out to the embankment

1      and actually collected samples from the embankment.

2      And those samples demonstrate that the permeability

3      of the soils in the embankment is dramatically lower

4      than what HDR assumed in its design.

5           THE COURT:  Okay.

6           MR. FORZIANO:  That goes to prove, also, Your

7      Honor, that as part of their design process, they

8      were supposed to evaluate the borrow material.

9      That's the area from which they we're going to take

10     the dirt and use the dirt to build the embankment.

11          And as Your Honor's already recognized in a

12     prior order, that is part of HDR's design

13     responsibility to analyze the borrow material.  It's

14     called a geotechnical site investigation work.  And

15     the presence of lenses, pockets, streaks and layers,

16     having dramatically different permeabilities than

17     what HDR assumed in its design and, quite frankly,

18     which could have been predicted had HDR done an

19     adequate job in is site characterization, goes to

20     prove HDR's negligence with regard to the design.

21          THE COURT:  That's a conclusion.  You haven't

22     give me the factual connection between that theory

23     of a wrong assumption and what caused the cracks.

24     It sounds like what you want to do is criticize

25     their assumptions and then segue into a causation

1    issue.  And I'm suggesting to you that's completely

2    irrelevant in light of your stipulated facts.

3         MR. FORZIANO:  I'll try to clarify, Your

4    Honor.  I apologize.

5         THE COURT:  Well, you're having a tough time

6    because you have stipulated away this issue.  And

7    that's the point that Mr. Mason is making.  And I

8    certainly want to hear your response.  It wasn't in

9    the -- it wasn't in your response to the motion,

10   conspicuously absent.  You can't avoid something

11   that's so blatantly obvious in this record.

12        I'm not trying to be difficult.  But both

13   sides have put themselves in a very difficult

14   posture as a result of this summary judgment.  It is

15   what it is, water under the bridge.  I'm not

16   revisiting it, by the way; although I have

17   discretion to do so.

18        MR. FORZIANO:  Okay.

19        THE COURT:  I'm just trying to understand how

20   it relates to causation in light of your stipulation

21   that it doesn't.  And I'm thinking of an analogy.

22   Let's say your theory is that they didn't adequately

23   staff their engineering crew, and they assumed they

24   could get away with two engineers and they should

25   have had five.  And let's say you're right.

1           But if that's not what caused the cracking

2       that's an irrelevant consideration.  It's just

3       throwing mud at the defendant.  That's highly

4       prejudicial.

5           MR. FORZIANO:  Well, Your Honor, I --

6           THE COURT:  Maybe that's a bad analogy but I'm

7       trying to understand the issue.

8           MR. FORZIANO:  Sure.  Well, I think what we

9       need to do is shift focus away from the construction

10      and go back to the design.  And that's where we --

11      that's what our response is focused on, Your Honor.

12          We don't believe now that the lenses, pockets,

13      streaks and layers is a result of bad construction.

14      That's based on the testimony of their own

15      employees, their own designers, who say we intended

16      it to be that way, despite what the specifications

17      say, despite the fact that the specifications say

18      there shouldn't be lenses, pockets, streaks and

19      layers.

20          During their sworn testimony, they testified

21      that, no, the way we interpret it is such that you

22      can have one layer of soil that is materially

23      different from another as long as you use one of the

24      five approved soil types.  Our expert being an

25      expert in soil and having analyzed these soils has

1   determined that five approved soil types can vary in

2   permeability by orders of magnitude that's tens and

3   hundreds of times lower than what they assumed in

4   their design.  And, furthermore, they should have

5   known that based on the site characterization work

6   that they performed.

7         THE COURT:  You can prove that without

8   referencing the existence of lenses, pockets,

9   streaks and layers; can you not.

10        MR. FORZIANO:  Yes, Your Honor, we can.

11        THE COURT:  I mean, if that's the design

12  theory that your experts say resulted in the

13  cracking, then it seems to me that you don't need to

14  refer to the existence of lenses, pockets, streaks

15  and layers, and that would simply inject an issue in

16  the case which would result in extensive

17  cross-examination about these stipulated facts and

18  then the settlement and then the procedural posture,

19  which is a slippery slope that I think leads to

20  confusion of the issues and it's going to cause

21  issues for the jury that's not an issue in the case.

22        MR. FORZIANO:  I agree with Your Honor.  We

23  can prove that without the discussion of lenses,

24  pockets, streaks and layers.

25        THE COURT:  Well, the reason I'm pushing a

1    little bit because -- and I think HDR's correct in

2    its citation of authority, evidence of a defect that

3    doesn't support TBW's theory of causation or damages

4    is irrelevant.  And my poor analogy is just an

5    attempt to show that if you've got a discrete issue

6    that can be -- or a criticism that can be levied at

7    a defendant but it's not related to causation or

8    damages, then we shouldn't have that injected into

9    the trial.

10         Now, you disagree with Mr. Mason that the

11   existence of lenses, pockets, streaks and layers was

12   a result of the construction techniques of Barnard.

13   You say it's a characteristic of the soil; correct?

14         MR. FORZIANO:  That's correct, Your Honor.

15         THE COURT:  Well, you guys have a fundamental

16   difference of opinion, then.

17         MR. FORZIANO:  We do, Your Honor, and our

18   position is based on the testimony of their

19   employees.

20         THE COURT:  Well, but what does your expert

21   say?

22         MR. FORZIANO:  That's exactly what he says, is

23   that he's issued a supplemental report over a year

24   ago that addresses that very issue that says when we

25   first looked at this, we saw these lenses, pockets,

1    streaks and layers, we assumed that they were a

2    construction defect based on the specifications.

3         However, after listening to the deposition

4    testimony of the lead designers for HRD, we said,

5    no, that's the way we intended it to be.  They

6    changed their opinion to say, yes, those lenses,

7    pockets, streaks and layers are now a design

8    specification defect.

9         THE COURT:  So if I were to grant this motion,

10   your expert or experts would still be able to

11   criticize the permeability assumption that HDR made

12   based on what?  I mean, they're going to have to

13   explain that -- that criticism.  What are they going

14   to say if they cannot reference lenses, pockets,

15   streaks and layers?

16        MR. FORZIANO:  What they can reference, Your

17   Honor, is both the site characterization work that

18   was performed by HDR and its subcontractors during

19   the design phase and, also, the site investigation

20   work performed by Golder and others working for

21   Tampa Bay Water in collecting and analyzing soil

22   samples from the reservoir without referencing that

23   it's a lens, pocket, strike or layer.

24        THE COURT:  But how are they going to explain

25   the variable permeability?

1          MR. FORZIANO:  What they'll do is they will

2     look at the -- they'll present the site

3     characterization reports which show that in the

4     borrow area that was approved by HDR, there were

5     varying soil types, and that HDR in its

6     specifications approved five different soil types.

7     And by ASTM standards, those five soil types have

8     varying permeabilities.  They have -- permeability

9     is generally function of the fines content of the

10    soil, that's the small particles, Your Honor, and

11    the fines content of those five approved soils vary

12    from zero to 49 percent, which means that the

13    permeability of those five approved soils can vary

14    by a dramatic, significant amount.

15         THE COURT:  Would that not be -- and I'm

16    seriously asking this because I don't know.  Would

17    that not be something that you would typically

18    encounter in a borrow situation, a borrow pit

19    situation where you're exacting soil in large

20    quantities, obviously, and you're going to get

21    different permeability factors?

22         MR. FORZIANO:  In this part of Florida, yes,

23    Your Honor, that's correct.

24         THE COURT:  All right.

25         MR. FORZIANO:  And they should have taken that

1    into account in their design, and they didn't.

2    Rather, they chose one very high permeability value

3    and a single permeability value for the entire

4    amount of soil.

5         THE COURT:  What are your experts going to say

6    should have been the assumption and specification

7    concerning permeability in light of these

8    anticipated permeability variables?

9         MR. FORZIANO:  That's all covered in our

10   expert reports which have been disclosed to HDR.

11        THE COURT:  I know.  But I'm asking you right

12   now.

13        MR. FORZIANO:  Oh, what the numbers are?

14        THE COURT:  Educate me.  No, not the numbers.

15   I mean, they -- what are they going to say that an

16   engineer does to address or account for the variable

17   permeability?

18        MR. FORZIANO:  Well, there are several

19   different things that you can do, Your Honor.

20   First, what you can do is you can do further site

21   investigation work to better characterize.  Within a

22   600 acre borrow area, Your Honor, they only have six

23   data points.  And they were allowed to excavate down

24   to 15 to 20 feet.  So we're talking about millions

25   of cubic yards of soil to characterize with six data

1      points.  That's insufficient.  What they can do --

2           THE COURT:  Well, that doesn't answer my

3      question.  So you only had six points.

4           MR. FORZIANO:  Um-hum.

5           THE COURT:  Let's say they had a hundred

6      points.  They're going to find same -- the same

7      permeability variations in this 600 acre borrow pit.

8      How does an engineer account for that in designing

9      an earthen embankment like we have here?  Is it the

10     compaction that's different?  Is it the construction

11     technique that has to differ?

12          MR. FORZIANO:  I see what you're saying, Your

13     Honor.  I see what you're saying, Your Honor.  Your

14     Honor, in designing an embankment like this there

15     are various analyses that are performed.  You --

16     some of the analysis look on basically the stability

17     of the downstream slope of the embankment, the

18     outside of embankment, and some look at the upstream

19     slope.

20          And typically what engineers do is they don't

21     use one value for both analyses.  Engineers by

22     nature are conservative.  And what they do is when

23     they're looking at the effects downstream, they're

24     looking to see how much water could flow through the

25     embankment and basically destabilize the downstream

1    slope.

2        And typically they'll use a higher

3    permeability value when making that analysis.  And

4    when they're looking at the effects of upstream

5    slope, which is water getting trapped in the

6    upstream slope and destabilizing it during a

7    drawdown, they'll use a different or a lower

8    permeability.  And that's typically what's been done

9    in Florida with like -- with like reservoirs.

10        THE COURT:  All right.  Let's --

11        MR. FORZIANO:  And HDR didn't do that.

12        THE COURT:  I understand that.  How does that

13   translate into the manner in which the facility or

14   the reservoir is actually constructed?  What do they

15   do --

16        MR. FORZIANO:  It has nothing to do with the

17   way it's constructed, Your Honor.  It's the design

18   assumptions.  They assume that the soil was going to

19   be very permeable.

20        THE COURT:  Well, there obviously has to be a

21   manner in which a reservoir can be constructed or

22   designed that eliminates the cracking, as you've

23   talked about it.  So given the variable

24   permeabilities, varying, I should say,

25   permeabilities, understanding that engineers have to

1    account for that in their design, how does that

2    translate into the actual construction of the

3    reservoir.

4         MR. FORZIANO:  Well, Your Honor, once again,

5    it's not a construction issue, it's a design issue.

6    And the way they can account for that, there's many

7    different ways.  There's more than one way to skin a

8    cat.

9         The way you can account for it is you could

10   add drains so that you can drain the water from the

11   low permeability soil.  You can buttress the soil

12   cement, basically make it thicker so that it can

13   withstand uplift forces by water getting trapped in

14   the wedge.  You can make the downstream tow drain.

15   There's a drain there currently in the current

16   design.  You can make it more robust if you think

17   more water's going to get through.  You can use a

18   different erosion protection.  Rather than soil

19   cement, you can use rip rap or something else which

20   allows more fluid drainage through the embankment

21   and through the erosion protection.

22        THE COURT:  So do I understand then correctly

23   you have to accept the permeability variables,

24   considering the borrow pit, and then design around

25   it.

1           MR. FORZIANO:  Correct, Your Honor.  You don't

2      modify your construction defect.

3           THE COURT:  So the characteristics of the soil

4      that's thrown into the embankment really is not

5      anything other than a given in Florida?

6           MR. FORZIANO:  What you do is you analyze what

7      you have, then you -- you say, this is the type of

8      soil we have to work with, and then you design

9      around it.  And if you can't design around it, then

10     you say to the owner, owner, this is going to be

11     expensive.  We have to truck in a lot of other soil

12     or a lot of other material from someplace else.

13          THE COURT:  So it's the nature and

14     characteristics of Florida's soil found in the

15     borrow area that the engineers have to design

16     around?

17          MR. FORZIANO:  Correct.

18          THE COURT:  Because it's a given that the

19     permeability factors will vary substantially in a

20     pit of that size?

21          MR. FORZIANO:  Correct.

22          THE COURT:  So that does, indeed, render the

23     existence of streaks, layers, pockets and lenses

24     irrelevant because it's a given; correct?  I'm kind

25     of just going down the logical inferences.

1      MR. FORZIANO:  Well, it -- it only is relevant

2    when you compare it to the design assumption of a

3    homogenous mass of soil with a single engineering

4    value for permeability.

5      THE COURT:  But that relates to the inherent

6    characteristics of the soil, does it not, that

7    you've just agreed with me?

8      MR. FORZIANO:  Yes, Your Honor.  But that's

9    their design assumption.  Their design assumption

10   doesn't match reality.  So it's relevant for showing

11   that particular point.

12     THE COURT:  All right.  Well, thank you.

13   Mr. Mason, brief response.

14     MR. FORZIANO:  Your Honor, if I could on the

15   quality control.

16     THE COURT:  Oh, the quality control.  Yes,

17   sir, I'm sorry.  Go right ahead.

18     MR. FORZIANO:  Your Honor, you may recall at

19   our last hearing you gave Tampa Bay Water until I

20   think the 21st after the board meeting --

21     THE COURT:  Right.  It might be a little early

22   for that.

23     MR. FORZIANO:  Yeah.  We're a little early on

24   that.  But -- and, also, this issue may be mooted by

25   our motion in limine number 10.  And I know

1    that's -- I'm getting the cart in front of the horse

2    on that one, but I wanted to point that out.

3         Depending on those two things, if -- even if

4    we were to drop our construction quality control

5    claim against HDR, and if you were not to throw out

6    their collapse theory, then we'd still want to

7    present evidence regarding their construction

8    quality control obligations and what they actually

9    did, because it's very relevant to their defense of

10   collapse upon wetting.

11        THE COURT:  Well, that would be a rebuttal

12   position.

13        MR. FORZIANO:  It would be rebuttal.

14        THE COURT:  All right.

15        MR. FORZIANO:  It wouldn't be an affirmative

16   claim, it would be rebuttal, Your Honor.  I just

17   wanted to point that out to the court.

18        THE COURT:  All right.

19        MR. FORZIANO:  And I believe we covered that

20   in our response, Your Honor.

21        THE COURT:  Thank you.  Mr. Mason.

22        MR. MASON:  Your Honor, I believe Mr. Forziano

23   affirmed what I said to the court, that it was a

24   different issue.  The issue of design and

25   permeability would remain and the issue of the

1    lenses, pockets, streaks and layers, as the court

2    pointed out, as a result of their stipulation, could

3    not have caused it, becomes an issue which should be

4    removed from the case.

5         And so he indicated that his experts can still

6    contest it.  We know we have to and we are fully

7    prepared and recognize that that is a fundamental

8    issue that we'll defend in this case with respect to

9    the permeability assumptions that were made by

10   Mr. Myers and what was done in the soil

11   characterization study which, by the way, has been

12   described as the most significant in the history of

13   the State of Florida, and that there was reviewed by

14   at least eight people.

15        So I'm not trying to make jury argument.  But

16   the point is that is an issue that will be

17   addressed.  But I think he himself acknowledged that

18   fact.

19        Now, with respect to the quality control

20   issue, there is no reason for quality control to be

21   addressed in this case.  From a -- from a design

22   standpoint, if there's an alternative causation with

23   respect to the reason that it happened, the jury

24   should be asked about design and determine whether

25   it was our design that caused it -- that caused the

1     damages or not.

2          To suggest that -- that quality control is

3     somehow otherwise relevant in rebuttal, just because

4     we raised the issue in defending ourselves of

5     causation of what was done is just an attempt on

6     their part to suggest that we should have

7     responsibility somehow and to place responsibility

8     on us for something that we believe will ultimately

9     and should not be in the case.

10          THE COURT:  Well, doesn't that necessarily

11    depend on whether and to what extent in your defense

12    you point your finger at Barnard in the techniques

13    and manner in which it constructed the reservoir?

14          MR. MASON:  The fact that the reservoir and

15    the collapse upon wetting was the reason for this

16    is -- is the explanation to defeat their prima facie

17    case that they're required to put on in terms of

18    causation.

19          THE COURT:  But the collapse upon wetting

20    necessarily relies on the too thick, too thin, too

21    wet and all that stuff; right?

22          MR. MASON:  That's correct.

23          THE COURT:  And who did that?

24          MR. MASON:  That was done by the earth movers,

25    McDonald and Barnard.

1          THE COURT:  So if you're laying it on them

2     under this collapse upon wetting theory, why

3     shouldn't TBW be able to come back on rebuttal and

4     say, well, if that happened, HDR had quality control

5     responsibilities and they missed it?

6          MR. MASON:  Because the court has already

7     determined, first of all, to the extent that lenses,

8     pockets, streaks and layers have -- have been

9     stipulated away, and the fact that they have no

10    evidence of quality control against us, their own

11    experts, they have designated no expert, and a cause

12    of action like this would require under Florida law

13    an expert testimony to show the professional

14    negligence on our part of quality control.  They --

15         THE COURT:  Why do they need an expert on a

16    breach of contract theory?

17         MR. MASON:  Well --

18         THE COURT:  And I'm saying assuming they drop

19    that claim.  But they're in rebuttal and they're

20    basically saying you didn't comply with your

21    contractual obligations, and that explains why

22    Barnard laid it too thick, too thin and too wet, too

23    dry, whatever the characteristics are.

24         MR. MASON:  But that's not -- that's

25    irrelevant.  If they're not being asked to opine as

1    to whether we are at fault for quality control,

2    which we -- you can't be responsible -- you

3    shouldn't be responsible for quality control when

4    the only thing that they have suggested with respect

5    to the building of the reservoir in the first place

6    was stipulated away, and there is no claim on their

7    part whatsoever of any improper building of the

8    wedge.

9        So they have not asserted in any way a quality

10   control issue against us.  So to bring that evidence

11   in, then, to suggest and to try and confuse the jury

12   or to suggest in some way that we would have

13   responsibility for design, which is the -- which

14   should be the remaining question that they're asked

15   because we didn't oversee something that they

16   stipulated would not cause the damage in the first

17   place.  It doesn't follow.

18       THE COURT:  All right.  Thank you, everybody.

19   This is an interesting issue.  And it is the first

20   step in addressing the ultimate issue, in my view.

21   But there are some distinctions here.

22       MR. FORZIANO:  Your Honor --

23       THE COURT:  Sir, don't interrupt me when I am

24   making a ruling.

25       MR. FORZIANO:  Sorry, Your Honor.

```
 1          THE COURT:  The motion is granted.  First of

 2     all, TBW has stipulated through sworn, agreed facts

 3     that lenses, pockets, streaks and layers did not

 4     cause the cracking, that the cracking would have

 5     occurred even in the absence of lenses, pockets,

 6     streaks and layers, and that this -- the existence

 7     of lenses, pockets, streaks and layers is not the

 8     reason that repairs were required.

 9          Essentially, TBW has stipulated this issue out

10     of the case.  And whether it be collateral estoppel,

11     judicial estoppel, issue preclusion, however you

12     wanted to characterize it, it would be inappropriate

13     for TBW to take a contrary position at trial.  That

14     would necessarily raise questions concerning the

15     stipulated facts, under what circumstances they were

16     agreed to, the existence of the settlement with

17     Barnard which may or may not come up but it

18     shouldn't come up except in a very controlled,

19     cautionary instruction to the jury, sanitized, if

20     you will.

21          Secondly, evidence of a defect which TBW

22     claims this was but which does not support the

23     theory of causation or damages is simply irrelevant.

24     And it's nothing more than casting an aspersion on

25     the defendant that has nothing to do with causation
```

1        or damages.

2               I certainly understand the positions of the

3        parties.  TBW chooses not to address the agreed

4        facts, for obvious reasons.  But by counsel's

5        concession, it would not be prejudiced by this

6        motion being granted because its experts can

7        certainly testify and support the theory of

8        professional negligence by criticizing the

9        permeability assumptions of HDR without pointing to

10       a characteristic of the soil which, by their own

11       admissions, would not have caused the cracking.

12              And I appreciate counsel's candor in that

13       regard.  Permeability values in the soils, the

14       assumption of a homogenous mass can certainly be

15       challenged by experts and described as part of the

16       design flaws without injecting into the issue or

17       into the trial this lenses, pockets, streaks and

18       layers issues.

19              Now, as it relates to quality control, it

20       seems to me that as part of the plaintiff's case in

21       chief, assuming that the second claim is withdrawn,

22       would not be admissible.  So what I'm going to do is

23       grant the motion as to lenses, pockets, streaks and

24       layers, period.  And with respect to quality

25       control, grant it provisionally, meaning that no

1    counsel or witness shall allude to or make reference

2    to this quality control issue without first seeking

3    permission from the court.

4         So avoid it in opening statements, voir dire,

5    anything of that nature.  It may be that after the

6    defendant presents its case -- again, assuming that

7    this claim has been withdrawn or abandoned by TBW,

8    that, in rebuttal, the defendant would be -- I mean,

9    the plaintiff would be able to address some aspects

10   of quality control.

11        I don't want to assume anything, but I simply

12   recognize that that's an issue that would be better

13   addressed after the defense has rested its case, or

14   perhaps even during cross-examination of the defense

15   witnesses.

16        Mr. Mason makes a compelling argument.  I want

17   to consider that -- those arguments in the context

18   of the testimony after it's been presented.  So the

19   motion, which is docket -- actually, there's two

20   motions, Dockets 430 and 436 are both granted, with

21   that explanation.

22        The next motion, and then we'll take a comfort

23   break, is TBW's motion, which is Docket 451,

24   addressed to HDR's first affirmative defense.  This

25   is the warranty and failure to implicate warranty

1    defense.  Mr. Harrison?

2         MR. HARRISON:  Thank you, Your Honor.

3         THE COURT:  Now, you know the standard on the

4    motion to strike so let's --

5         MR. HARRISON:  We know the standard on the

6    motion to strike, and I think this one is extremely

7    straightforward, Judge, to some extent.  It is

8    contingent on the court's ruling on our motion in

9    limine number 10.

10        At the time we filed prior to the court's

11   summary judgment order, which was the order that was

12   the result of the motion to void the settlement, up

13   until the court granted summary judgment in favor of

14   Barnard, this would have been a sufficient legal

15   defense for HDR.  HDR would have been perfectly

16   entitled while Barnard was still in the case to say

17   if Barnard did bad construction, you, Tampa Bay

18   Water, should have implicated that warranty and made

19   a claim against Barnard.

20        When the court ruled and granted summary

21   judgment in favor of Barnard and exonerated it on

22   the merits, that defense no longer makes sense.

23   It's no longer a sufficient legal defense to say we

24   should have made a warranty claim against a

25   contractor who has been exonerated on the merits.

1          What was my warranty claim supposed to be for?

2              That's the motion.  And it is, again, to some

3     extent contingent on what the court does with number

4     ten.  But the fact of the matter is HDR has never

5     presented a case to the court, not back on the

6     settlement issues, not on summary judgment, not on

7     *Fabre*, and not today in response to our motion in

8     limine number 10, they have never presented a case

9     to the court that says you can somehow parse their

10    theory of why Barnard should be responsible from

11    whatever our theory of why Barnard sure be

12    responsible.

13             The fact of the matter is Barnard's either at

14    fault or it's not at fault, and it can't be both at

15    the same time.  Once the court exonerated Barnard on

16    the merits, how can it be a defense that we didn't

17    make a warranty claim against somebody who has no

18    responsibility?  That's our motion.

19             THE COURT:  What about the timeliness of the

20    motion?

21             MR. HARRISON:  The timeliness is driven by the

22    court's summary judgment order.  If I had filed this

23    motion within 21 days after HDR filed their answer,

24    you would have laughed at me because the court had

25    not yet made the summary judgment ruling that

1    exonerated Barnard.  Twenty-one days after they

2    submitted their answer, this was a legal --

3    sufficient legal defense.

4         THE COURT:  All right.  Thank you.  Mr. Mason,

5    I assume.  I don't know who's addressing this.

6         MR. MASON:  Your Honor, I'm going to address

7    number 10, but Mr. Woodward is going to address the

8    warranty issue.  So I would ask that to the extent

9    that there has been a suggestion of overlap that I

10   be able to fully address the number 10 myself,

11   please.

12        THE COURT:  All right.  Mr. Woodward?

13        MR. WOODWARD:  Thank you, Your Honor.  The

14   issue on the failure to implicate warranty, we would

15   agree, is in part contingent on your ruling on the

16   motion in limine number 10.  Setting that aside for

17   the time being, I'll address the other issues.

18        The primary substantive issue that seems to be

19   in debate here is whether the affirmative defense

20   failure to implicate the warranty still stands in

21   light of the court's entry of summary judgment.  We,

22   of course, contend that it does.

23        The argument that collateral estoppel somehow

24   applies so as to preclude such a claim simply

25   doesn't make sense in the context of how this has

1        come down, Your Honor.  It is true, as the court is

2        well aware, that in August 2011, summary judgment

3        was entered for Barnard on Tampa Bay Water's

4        warranty claim.  Barnard was, in accordance with

5        that order, absolved of liability to Tampa Bay Water

6        for the warranty claim.

7              The summary judgment order explicitly cites

8        references, the fact that the parties, Tampa Bay

9        Water and Barnard, not HDR, entered into

10       stipulations which specifically addressed the

11       warranty claim.  In particular, it says that there

12       is no warranty claim, that there is no defect.

13             That -- the timing here is what's important,

14       and that's my point, Judge.  I can be, I think,

15       quite succinct here.  As of August of 2011 when the

16       court entered the summary judgment, because of the

17       stipulations of Tampa Bay Water and Barnard, there

18       wasn't a warranty claim anymore.

19             Mr. Harrison is correct in that statement.  A

20       warranty claim, as all of us know, sounds in

21       contract, and Tampa Bay Water and Barnard

22       effectively amended their contract in 2011 so as to

23       make it so there was no warranty claim anymore.

24       That's what really happened here, I think we all

25       recognize.

1          Our affirmative defense goes to, well, you,

2     Tampa Bay Water, should have implicated this

3     warranty with Barnard in 2007 or 2008 or 2009 before

4     you entered into this stipulation that's got so much

5     of our attention about how there is no warranty

6     claim.  Our claim is, Tampa Bay Water, you knew that

7     you had construction defects and you could have

8     tapped the shoulder of your contractor, Barnard, who

9     had issued a warranty for the work and had them do

10    the whatever needed work was required to remedy

11    those construction defects without costing Tampa Bay

12    Water or HDR a dime, and you didn't do it, Tampa Bay

13    Water.

14          Your summary judgment order in August of 2011

15    addressed the status of the world as of August 2011

16    and did rightly so.  There was a stipulation that

17    Barnard could not lose that claim to Tampa Bay

18    Water.  Sounded in contract, they agreed it couldn't

19    happen.  You were right in entering that summary

20    judgment.  We would agree.

21          But it does not address and collateral

22    estoppel cannot apply because there is no exact

23    match of the issues.  We never litigated what

24    Barnard's obligations were or should have been in

25    2007, 2008 or 2009, and whether Tampa Bay Water had

1        knowledge it should have been made Barnard do this.

2              That's -- that's the argument in a nutshell,

3        Your Honor.  I think that's really the main place

4        that we disagree.

5              THE COURT:  So you argue a mitigation theory,

6        failure to mitigate?

7              MR. WOODWARD:  That's correct.

8              THE COURT:  But up until August of 2011, after

9        which you acknowledge there's no warranty?

10             MR. WOODWARD:  There's no way they can do it

11       today, Judge.  They've agreed that they --

12       contractually, the contract does an apply.

13             THE COURT:  How would you present that, then,

14       as part of your defense?

15             MR. WOODWARD:  By presenting evidence that

16       prior to the entrance of the stipulations that

17       during the pendency of the warranty period Tampa Bay

18       Water had knowledge of construction defects in the

19       work, that it should have tapped Barnard's shoulder

20       and said, fix them.

21             And if it had, under the warranty the work

22       would have been performed, could have been performed

23       without costing Tampa Bay Water or HDR a dime

24       because it had already been part of the contract

25       that Barnard had provided.  So that would be

1    generally speaking how it would be presented.

2         THE COURT:  Well, in a vacuum I understand.

3    But how are you going to factually present a

4    responsibility on Barnard's part to honor the

5    warranty without delving into the quality of its

6    workmanship?

7         MR. WOODWARD:  I think we necessarily have to,

8    Judge.  In full candor, we would necessarily have to

9    present evidence of the quality of Barnard's work

10   because there would have to be work that would

11   implicate the warranty, meaning it would have to

12   qualify as defective work.

13        THE COURT:  But Barnard has never admitted

14   that it constructed the reservoir defectively; has

15   it?

16        MR. WOODWARD:  No.  They have never to my

17   knowledge admitted that they constructed the

18   reservoir defectively nor have we ever completely

19   litigated the issue of whether they ever did.

20   Therein lies the overlap to the motion in limine

21   number 10, Judge.

22        THE COURT:  All right.  Mr. Harrison, your

23   response.

24        MR. WOODWARD:  Thank you.

25        THE COURT:  Thank you.

1          MR. HARRISON:  Thank you, Judge.  I don't want

2     to start debating what the factual evidence would be

3     at trial because this is a motion to strike.  We

4     ought to be focussed on the legal sufficiency.

5          But since the court asked the practical

6     question, if this issue is litigate at trial, HDR is

7     going to say we should have made a warranty claim

8     and we're going to put on evidence of all the times

9     that HDR told us in that timeframe that this was not

10    a construction defect and, in fact, told us, don't

11    bother making a warranty claim.  But those are

12    factual matters.

13         The legal issue is counsel is trying to make a

14    distinction between 2007 and August of 2011 when the

15    court grants summary judgment in favor of Barnard.

16    I don't think that distinction has any merit here.

17    There is always a time lag between the time a

18    lawsuit is filed and the time somebody is

19    adjudicated to have fault or not have fault.

20         The suggestion that Barnard can be exonerated

21    from fault but that we still should have made a

22    warranty claim against them, I don't know how you

23    reconcile those things.  We should have made a

24    warranty claim against a party that the court has

25    now exonerated from fault.

1         And again, HDR has never explained how it is

2    we're supposed to parse different theories of

3    Barnard's fault.  Barnard has been exonerated on the

4    merits.  They have no liability to Tampa Bay Water

5    under their contract.  Therefore, it follows that

6    there would have been no purpose in us making a

7    warranty claim.  What good is making a warranty

8    claim against a party who has no responsibility?

9         That's the legal sufficiency basis of the

10   motion.  Absolutely, if the thing is litigated at

11   trial, there will be conflicting factual evidence

12   about what they told us at the time.  My point is we

13   shouldn't have to litigate this issue.  Barnard has

14   no liability to Tampa Bay Water.  If they have no

15   liability to us, what sense does it say -- does it

16   make to say we should have made a warranty claim?

17        THE COURT:  Well, first of all, the timing

18   issue raised by HDR, I think that the motion is, by

19   virtue of the summary judgment order, timely.  As

20   Mr. Harrison points out, up until that summary

21   judgment order, then it was a viable defense.  So I

22   don't have any problems with the timing of the

23   motion.

24        So to that extent the motion is denied.  I

25   mean -- I'm sorry, the -- not the motion, but the

1    objection to the motion or opposition to the motion

2    by HDR is rejected.

3         Why don't we go ahead and take our comfort

4    break.  Let's just take five minutes, guys.  It's

5    10:20.

6         COURTROOM SECURITY OFFICER:  All rise.

7         (Recess was taken at 10:20 until 10:30 AM.)

8         (Back on the record.)

9         COURTROOM SECURITY OFFICER:  All rise.  This

10   Honorable Court is again in session.

11        Be seated, please.

12        THE COURT:  I'm going to defer on motion

13   number 451 for a moment.  Excuse me.

14        Let's look at Docket 520, which is Tampa Bay

15   Water's motion directed to Mr. Bromwell's

16   calculations that first surfaced during the *Daubert*

17   hearing.

18        MR. FORZIANO:  Good morning, Your Honor,

19   again.  May I approach?  I've got a small binder

20   with exhibits and cases that we've cited.

21        THE COURT:  No.

22        MR. FORZIANO:  Okay.

23        THE COURT:  I'm relying on your argument,

24   Mr. Forziano.  You know, there was an order I

25   entered that I expected counsel to comply with so

1      that those motions are not unduly lengthy and

2      exhaustive.  And you have for the most part done

3      that and I appreciate it.  But that's not an

4      invitation to start loading things up on my desk

5      during a hearing.  I want your oral advocacy.

6          MR. FORZIANO:  That's fine, Your Honor.  We're

7      ready to proceed.

8          As Your Honor correctly noted, this motion in

9      limine seeks to exclude the handwritten calculations

10     that first surfaced at the *Daubert* hearing on

11     September 15th, 2011.  These calculations are

12     intended to show for the first time precisely how

13     much Dr. Bromwell believes the density change shown

14     in his ASTM test were the result of saturation

15     versus loading.  By our estimation, they are over

16     500 days late from when he should have included them

17     in his initial --

18         THE COURT:  All that's a given.  My question

19     to you, to cut through this, do you intend on

20     cross-examination to bring out either his failure to

21     make calculations or his inability to make

22     calculations to support his theories?

23         MR. FORZIANO:  Your Honor, what we plan to do

24     is discuss his ASTM testing which he admitted in his

25     deposition doesn't distinguish between saturation

1    versus loading, Your Honor, and that he did not do

2    the calculations.  Because at his deposition, I

3    asked him --

4         THE COURT:  Well, if you bring that up, then,

5    is it not fair for him to respond, well, I have done

6    the calculations, counsel, since my deposition?

7         MR. FORZIANO:  No, Your Honor, it's not fair

8    because we'd be unduly prejudiced by that.

9         THE COURT:  Why?

10        MR. FORZIANO:  Why?  Well, we've not been

11   allowed any discovery on that issue, Your Honor.  If

12   you look at his calculations which were provided to

13   the court back in September, there are two pages of

14   handwritten notations.  There's no discussion of the

15   data that they're based on, the methods he used, how

16   he calculated, where the numbers come from.  Nothing

17   at all, Your Honor.

18        During his deposition he said he didn't do

19   that.  I asked him, hey, you just explained to me

20   how you could do it.  Did you do that in developing

21   your opinions in this report?  He said, no, he

22   didn't.  He didn't recall.  Did you ask anyone else

23   to do that and they told you about it?  I don't

24   recall.  I don't recall.  Is it anywhere in your

25   report?  No, it's not.

1          He could have cured this, Your Honor, after

2     that by having a supplemental report back after his

3     November 4th deposition.  He chose not to do that.

4     He chose rather not -- he could have supplemented,

5     also, or attempted to supplement after we filed our

6     *Daubert* motion, and he didn't do that.

7          Rather, they waited some nine months or

8     actually ten months after the deposition to produce

9     him without any explanation at the *Daubert* hearing.

10    While we attempted to explore what his calculations

11    would be, we never got them, we never received them

12    and we didn't have adequate preparation during

13    discovery regarding them.  We were denied access to

14    those -- to those calculations.

15         Subsequently, HDR has indicated repeatedly

16    with our request that they would not allow further

17    discovery, expert discovery in this case.  So we

18    were prejudiced, Your Honor, that they were -- that

19    we were surprised by these calculations in light of

20    the fact that Dr. Bromwell said he didn't do them in

21    formulating his opinions.

22         Also, it's not very important apparently to

23    HDR, Your Honor, because during the *Daubert* hearing

24    themselves, Mr. Mason told the court at least twice

25    that these calculations are not necessary for the

1    formulation of Dr. Bromwell's opinions.

2         If they're not necessary and he didn't do them

3    and we didn't get any discovery, they shouldn't be

4    admitted.

5         THE COURT:  All right.  Thank you.  Mr. --

6         MR. FORZIANO:  Thank you, Your Honor.

7         MR. MASON:  Kent, David Kent.

8         THE COURT:  Mr. Kent, go right ahead, sir.

9         MR. KENT:  Thank you, Your Honor.  David Kent

10   for HDR.  You put your finger right on the issue,

11   Your Honor.  They can certainly continue to cross

12   examine Dr. Bromwell, what was the state of your

13   work as of the time of your deposition, as of this

14   date, as of that date, as of any date.

15        What they can't do is say, and you've never

16   done it, have you, and you couldn't do it, you just

17   can't do it, you never have done it.  He's entitled

18   to say, yes, I can.  I can write it out on a piece

19   of paper.  I have done that.

20        The flaw in the argument they present is that

21   they said that the purpose of these calculations is

22   to show precisely what the percentage of saturation

23   is.  That's not the purpose at all.  It was not

24   necessary to his original opinion, to his original

25   report, to the sufficiency of his opinion for the

1     *Daubert* purposes.  That's what we said at the time.

2     Nobody looked at those calculations to say, is it 85

3     percent, is it 92 percent, is it 97 percent.  That

4     isn't the purpose of the calculations.

5          He had already done a sufficient extrapolation

6     from the data to know that there was a basis for his

7     opinion.  That's what you ruled.  This is not -- if

8     you were going to say, how are we going to use these

9     calculations, I'd put it between a will call and may

10    call exhibit.  This is one of those may call

11    exhibits because we don't have to have that for his

12    opinion to be admissible.  You've already ruled on

13    that, for his opinion to be sufficient at trial.

14         If on the other hand they try to attack his

15    credibility and say, you've never done it, you can't

16    do it, you don't know how to do it, nobody can do

17    it, he can answer that.  And at that point those

18    calculations, if they needed to be shown, could be

19    shown.

20         But for a blanket exclusion at this point

21    pretrial without anyone ever hearing what the

22    questions will be, it's just inappropriate.

23         THE COURT:  This motion which is Docket 520 is

24    fairly straightforward.  To some extent, it was

25    touched upon by the court in its comments during the

1    *Daubert* hearing.   To the extent that these

2    calculations would be offered by HDR as part of

3    Mr. Bromwell's testimony, these calculations are

4    untimely under the rule, Rule 26(a)(e)(2).   So to

5    that extent the motion is granted.

6         There would be prejudice and surprise,

7    although I doubt it would be at the time of trial

8    beyond the ability of TBW to counter those

9    calculations.   And I suspect it has already done so

10   through its own witness.

11        So although in a vacuum I can say this would

12   be surprise and prejudice, I have some question

13   about whether that really will be the case at the

14   time of trial.

15        But I'm granting this provisionally because,

16   clearly, TBW would not be able to challenge

17   Mr. Bromwell's failure to or inability to make these

18   calculations when, in fact, he is able to and has

19   made them, albeit late.   So while I'm granting it to

20   the extent that HDR is precluded through its witness

21   Bromwell from presenting to the jury these

22   calculations, if Mr. Bromwell is challenged on

23   cross-examination, he may certainly fairly respond

24   to a suggestion or inference that he's unable to or

25   has not made these calculations.

1          And, obviously, the fact that he made them

2    late can then come up, and whatever answer TBW has

3    through its expert comes up.  And that's fair and I

4    think that's consistent with the manner in which

5    these types of experts conduct their business.

6          It's pretty obvious to me that everybody's

7    experts have filed a number of supplemental reports

8    as late as January, and they're duty-bound to do

9    that as long as it's truly a supplement and not some

10   new theory or calculation or opinion.

11         So the motion is granted with the

12   understanding that, if challenged, Mr. Bromwell will

13   be able to fairly respond.  Thank you, counsel, for

14   your brief comments.

15         All right.  Let's turn then to Docket 523,

16   Tampa Bay Water's motion in limine regarding its

17   expectation that HDR will be using Tampa Bay Water's

18   financial statements during the course of the trial.

19   Mr. Harrison?

20         MR. HARRISON:  Thank you, Your Honor.  This is

21   a motion in limine to exclude the financial

22   statements which is listed as a trial exhibit on

23   HDR's exhibit list.  Tampa Bay Water's financial

24   statements for the years 2008, 2009 is a 49-page

25   document in very small type.  If we converted it to

1      12 point type that's customary for court filings, it

2      would be well over a hundred pages.

3          It's a typical financial statement for

4      business.  In this case it's a government.  But it

5      is, of course, replete with all sorts of information

6      that is not relevant to anything in this case, all

7      sorts of information that will be highly

8      prejudicial.  The jury doesn't need to know, ought

9      not know that Tampa Bay Water has investment assets

10     that are worth $80 million.  That's never relevant

11     in terms of any issue in this case.

12         Much of what's in here, 99 and a half percent,

13     maybe more of what's in here has no bearing on

14     anything.  What HDR wants to use it for is to

15     demonstrate, to attempt to demonstrate that there's

16     no damage to Tampa Bay Water because as an

17     accounting function, we did not recognize any

18     impairment of our capital asset, the reservoir.

19     That's what they want to use it for.

20         None of their experts has relied on the

21     financial statement for that opinion.  They have no

22     expert who's given any opinion about that.  None of

23     their experts has relied on the financial statement

24     for any other opinion, with one exception and, that

25     is, to ascertain that Tampa Bay Water's cost of

1    funds, its financing costs during this timeframe was

2    approximately five percent a year.

3         Fine.  That's an accurate statement.  We would

4    stipulate to that.  I don't know why that's an issue

5    in the case.  But we don't need the financial

6    statements to prove it.

7         They've tried to find some other things in

8    their response and say, look, here's more things

9    that are relevant, things that are so basic that

10   certainly we don't need the highly prejudicial

11   financial statement to prove.

12        We don't need the financial statement to prove

13   the fact that Tampa Bay Water has said repeatedly

14   that the soil cement is not a structural component,

15   it's for erosion protection.  I think that statement

16   is in every report that every expert has written in

17   this case.

18        So they're trying to bolster their relevancy

19   with these other very minor and cumulative points

20   when what they really want to do is get back to the

21   issue of impairment.  And that's exactly why it

22   shouldn't come in, because impairment in the

23   financial statements is an accounting function.

24   Tampa Bay Water is governed by the governmental

25   accounting standards board rules, correspond to the

1    FASB rules in the private sector.

2         And if we took ten government accountants and

3    put them over there in that jury box, they could

4    debate all day the meaning of impairment of a

5    capital asset under the GASB rules.  We can't

6    possibly hand this to the jury and say, here you go,

7    go figure out what these arcane government

8    accounting terms mean.

9         But that's what they want to do, because they

10   have no expert who's going to do it.  They have no

11   expert who has an opinion based on this.  They have

12   no expert who's going to talk about the GASB

13   standards or what those accounting terms mean.

14        They want to hand it to the jury and say,

15   look, Tampa Bay Water talks about impairment of its

16   reservoir and says there's no impairment in the

17   accounting sense.  And so, jurors, from that, you

18   should decide they haven't been damaged.  That's

19   what they want to do with this.

20        It's not relevant on the question of damage

21   because as we said in the response, if we're talking

22   about diminution in value, we're talking about

23   market value, not some accounting theory called

24   impairment of a capital asset.

25        So it's not relevant there, and they have no

1    expert who's got any opinion about market value and

2    we probably shouldn't get to market value, anyway,

3    for reasons that we discussed back at the summary

4    judgment stage.  There is no market value of a

5    reservoir.

6         And if they want to put it in for just this

7    sort of statement of impairment, without some

8    explanation, without somebody to say to the jury,

9    here's what that means, it's grossly misleading.

10   It's not relevant because it doesn't mean what they

11   want it to mean.  It doesn't mean the value hasn't

12   been diminished.

13        It's an accounting function.  And they have

14   nobody that they've identified who's going to come

15   give any opinion based on this financial statement,

16   based on these accounting theories as to what this

17   means or why it's relevant in any way.

18        And these other attempts to bolster it by

19   finding little nuggets in here that it may or may

20   not say I think is really not the point of what

21   they're trying to do with this.  Some of those,

22   frankly, we could stipulate to.  Others of them,

23   just about everything else on there is covered in

24   other testimony, other exhibits, other witnesses,

25   other documents.

1          They want this financial statement in front of

2      the jury for the part that says we're not

3      recognizing an impairment of this capital asset.

4      That's what they want to use it for.  That's

5      prejudicial because it doesn't what they want it to

6      mean.

7          THE COURT:  All right.  Thank you,

8      Mr. Harrison.  On behalf of the defendant?

9          MR. MEADERS:  Thank you, Your Honor.  Kurt

10     Meaders for HDR.  May it please the court.

11         One point of beg of difference.  I would beg

12     to differ that it doesn't mean what we want it to

13     mean.  Really what it doesn't mean is what Tampa Bay

14     Water doesn't want it to mean.  Our experts will

15     testify that this reservoir, by virtue of the

16     cracking of the soil cement, has not been impaired.

17         That opinion and that statement is separate

18     and apart from any evidence that maybe within the

19     financial statement.  Tampa Bay Water themselves

20     dooms their own motion in limine by saying on page

21     three of their own motion that the majority of the

22     financial statement is irrelevant.

23         But there's relevant evidence in the financial

24     statement, and the financial statement should not

25     excluded because there are statements within there

1    that are highly relevant to this jury to determine

2    damages and whether or not this cracked soil cement

3    is considered as a maintenance item to Tampa Bay

4    Water.

5         2008, the limitation was placed on the

6    reservoir.  2009, the reservoir was down for what

7    Tampa Bay Water terms as short term repairs.  Those

8    repairs were booked by their accounting department

9    and looked at by Ernest and Young as a maintenance

10   item.  And because that's done under the acceptable

11   standards, that makes it highly probative of how

12   Tampa Bay Water treated this so-called damage to the

13   reservoir.

14        That doesn't exclude that from coming into

15   evidence as being more prejudicial than probative.

16   It's the fact that it's done under the accounting

17   standards and they docked it as a maintenance item

18   and not as any impairment to service utility.

19        If you look at the language of the financial

20   statement, it's not about impairment.  It's not

21   about diminution of value.  It's a determinant of

22   whether or not the service utility of the reservoir

23   has been diminished.

24        They booked these repairs as a maintenance

25   item, determining that the service utility of the

1    reservoir was not impaired.  That's highly probative

2    to the jury whether or not continued repairs such as

3    the nature that they did undertake are reasonable to

4    keep the reservoir up to its service utility, which

5    they determined, or whether they -- it's reasonable

6    to tear off the entire face of this reservoir and

7    start over.

8         We suggest to the court that the information

9    within the financial statement is highly relevant to

10   all of those terms.  It shouldn't be excluded

11   because it's -- because it was done under accounting

12   principles, and that's the reason why they made

13   those determinations, and that there is the question

14   of diminution in value and whether at the end of the

15   day we are able to argue no loss of service utility,

16   booking these as a maintenance cost equals economic

17   waste argument is a question to be answered at the

18   time of -- as the evidence is being presented.

19        I don't intend to argue with respect to the

20   question of whether there is a complete diminish in

21   value of this reservoir.  That's not the question.

22   The question is whether based on the maintenance

23   that was performed, did Tampa Bay Water determine

24   that there was not a decrease in the service utility

25   of this facility.  And that's what they determined.

1          THE COURT:  And that goes to --

2          MR. MEADERS:  That goes to the big question,

3     Your Honor, of whether this reservoir which was

4     designed as a gravity drawdown reservoir to drain at

5     66 million gallons day at the top of its reservoir

6     and 33 million gallons a day as it got down to the

7     bottom of the reservoir, whether that service

8     utility was impaired, whether or not that service

9     utility was diminished at all, and whether or not

10    these repairs which are maintenance only could

11    continue to have this reservoir kept in its current

12    operating condition.

13         I won't go back over the summary judgment -- I

14    mean, back over the summary judgment issues that we

15    raised with respect to the service utility of the

16    reservoir.  But those issues -- it goes to those

17    issues with respect to whether or not continued

18    maintenance as that was performed by Tampa Bay Water

19    could appropriately keep this reservoir at its

20    service utility.

21         THE COURT:  And that goes both to damages as

22    well as liability.

23         MR. KENT:  It goes to damages, it goes to

24    liability.  I believe it also, Your Honor, goes to

25    the question of our liability with respect to

1   design, in that the -- Tampa Bay Water has

2   considered those short term repairs to return this

3   reservoir to its full permitted capacity.  FDEP has

4   considered to be returned to its full permanent

5   capacity.

6        The fact that they have explained to their

7   accountants that there is no impairment, there is no

8   loss of the reservoir which would -- should be

9   considered a diminishment in the service utility is

10  relevant.

11       THE COURT:  So you're not offering it, then,

12  for any diminution in value.

13       MR. MEADERS:  Whether or not at the end of the

14  day the maintenance costs and the fact that it was

15  not booked as an impairment could lead to an

16  argument that there is no diminution in value I

17  believe is a question for another day, Your Honor.

18       The terms "diminution in value" are not

19  mentioned in the financial statement.  The

20  triggering concept in the financial statement is

21  loss of service utility.  We're going to argue that

22  the repairs put this reservoir back in the condition

23  of its service utility as understood by Tampa Bay

24  Water and their financial statements, which are

25  their public records of what they booked these

1     assets as, are highly relevant to what they believe

2     the service utility of this facility was.

3          THE COURT:  An admission of sorts, is that

4     what you're suggesting?

5          MR. MEADERS:  Well, the -- yes, Your Honor.

6     The financial statement is a document of theirs.  It

7     is a business record of theirs.  It's a -- they have

8     not argued that it is not authentic.  They have not

9     made any argument that it should be excluded because

10    it is not a statement of theirs.  They're trying to

11    include their own statement, their own financial

12    statement that the repairs, short term repairs

13    placed this reservoir in what was its expected

14    service utility.

15         THE COURT:  Who do you expect to testify and

16    explain what the Government Accounting Standards

17    Board standards are, not to be are redundant?

18         MR. MEADERS:  I expect to use this financial

19    statement on cross-examination of various

20    potentially -- of Tampa Bay Water's own witnesses,

21    that being Gerald Seeber and that being John Kennedy

22    and potentially Allison Adams, if she is called,

23    though not listed by the plaintiffs.

24         THE COURT:  And one or more of those people

25    will have personal knowledge of this particular

1     financial statement or statements?

2          MR. MEADERS:  I don't want to give up my work

3     product, Your Honor, but there is listed on our

4     exhibit list an e-mail where those individuals were

5     listed in the context of meeting with Ernst and

6     Young to determine what the impairment meant in the

7     context of a financial statement.  So I believe that

8     I'm entitled to ask those witnesses what they

9     discussed as those meetings.

10         THE COURT:  All right.  Thank you.

11    Mr. Harrison, your response.

12         MR. HARRISON:  Just briefly, Your Honor,

13    because I think Mr. Meaders has made the point that

14    I was trying to make, and he might have made it

15    better than I did.  We're going to now have a little

16    mini trial on what the government accounting

17    standards are and what they mean and what the term

18    impairment of service utility in relation to a

19    capital asset means and why in this case Tampa Bay

20    Water and its accountants made a determination that

21    the expense of the short term repair would be called

22    something like maintenance and not treated

23    accounting-wise.

24         That's all this is.  The only purpose of this

25    financial statement is to present a fair accounting

1    of Tampa Bay Water's assets and liabilities.  We're

2    going to have a day of testimony on what these

3    standards mean and what the debate was and why it

4    was decided to treat it accounting-wise in one way

5    and not some other way.

6         Nobody is going to call Ernst and Young who's

7    actually the author of this document to come explain

8    why they ultimately made a decision.  There's nobody

9    on their witness list.  There's no expert who's

10   going to explain it.  So they're going to ask

11   Mr. Seeber, our general manager, did you have some

12   conversations about this impairment issue.  Yeah.

13   Okay.  Well, what was the determination?

14        He -- I don't think he's a government

15   accountant.  He's the chief executive of the agency.

16   They're not going to call any accountants, they're

17   not going to call any experts to say what all this

18   stuff means.  This is like handing the jury the

19   Internal Revenue Code and saying, here, go make

20   sense out of it.

21        There's no context, there's no explanation.

22   They want to throw this at the jury and say, look,

23   see.  We think that's not relevant because it

24   doesn't mean what they want it to mean and there's

25   no basis to present this to the jury and ask them to

1      sort it out.

2           THE COURT:  All right.  Thank you.  Docket

3      523, Tampa Bay Water's motion in limine number eight

4      will be denied.  I am satisfied there's a sufficient

5      basis from what I've heard to support a finding of

6      relevance and materiality in the cross-examination

7      of one or more of Tampa Bay Water's witnesses.  It

8      doesn't sound like it's being offered in and of

9      itself; although, that may have happen during the

10     course of the trial.  But there's no reason to

11     prohibit or limit its use at this juncture.  So the

12     motion is denied.

13          Docket 526 is Tampa Bay Water's motion to

14     determine privilege and to clawback inadvertently

15     produced documents.  Mr. Harrison?

16          MR. HARRISON:  Let me beg the court's

17     indulgence here and say this as gently as I can,

18     Judge.  At the pretrial, the court indicated we

19     would be arguing pending motions in limine, which is

20     also what the minutes of the pretrial reflected.  So

21     we did not anticipate that this would be among the

22     things we'd be arguing today.  I'm happy to make a

23     run at it and give the court the benefit of some

24     argument, but we would certainly like --

25          THE COURT:  I don't understand what you just

1     said.  Are you surprised?

2          MR. HARRISON:  The court at the pretrial said

3     come back on Thursday, we're going to argue pending

4     motions in limine.  And the court's minutes of the

5     pretrial reflect pending motions in limine.

6          THE COURT:  Isn't this essentially a motion in

7     limine?

8          MR. HARRISON:  I don't think it is but,

9     again --

10          THE COURT:  Well, I consider it to be so let's

11     move forward.  This is an easy issue.  You've got

12     three documents that you contend were inadvertently

13     produced?

14          MR. HARRISON:  We do, Your Honor, and the

15     argument is fairly straightforward.  Way back when,

16     shortly after all the electronic production took

17     place, I want to say that was in December, in

18     January HDR located a handful of the documents in

19     our electronic production, e-mails, about six

20     documents, 20 something pages and did exactly what

21     counsel is supposed to do at that point.  They sent

22     us an e-mail and said, hey, we've found these things

23     in your however many millions of pages we produced,

24     they appear to be privileged so we're alerting

25     you --

1          THE COURT:  What are they?  Just tell me what

2     they are, e-mails?

3          MR. HARRISON:  E-mails between attorneys, us

4     and the general counsel of Tampa Bay Water and staff

5     members of Tampa Bay Water discussing issues related

6     to the litigation, attorney/client privileged

7     materials.

8          THE COURT:  Well, the contention by HDR is

9     that you've waived this because you had an

10    opportunity to review your disclosures and you

11    waited a year to --

12         MR. HARRISON:  And that's the heart of the

13    issue, Judge.  Their position, though, is that

14    that's not the e-mails they want to use.  That's the

15    point.  They identified promptly six e-mails.  We

16    looked at those six e-mails within days and said,

17    you're right, thank you very much, these are

18    privileged, don't use them.  They acknowledged that

19    they're privileged and weren't going to use them.

20         That's not the e-mails we're talking about.

21    Now years later on their exhibit list, actually a

22    supplemental exhibit list, turn up some different

23    e-mails from the same production, same electronic

24    document production which are attorney/client

25    privileged discussions between lawyers, us and

1    inhouse lawyers and Tampa Bay Water's staff, nobody

2    on any of these e-mails who is not a Tampa Bay Water

3    employee or an attorney, discussing issues related

4    to the litigation.

5          And their theory is, well, when I told you

6    about those six e-mails, 20 pages out of hundreds of

7    thousands of documents and millions of pages,

8    somehow you should have gone back and re-reviewed

9    the hundreds of thousands of pages and the millions

10   -- the hundreds of thousands of documents and the

11   millions of pages, to go do it all again, which is

12   exactly what the rules contemplate we don't have to

13   do.  If they had --

14        THE COURT:  The response to your motion says

15   that two of the documents are communications to your

16   experts.  Am I missing something?

17        MR. HARRISON:  No.  That may be what they

18   tried to say --

19        THE COURT:  Well, they don't try.  They say,

20   quote, two of the three documents in issue are not

21   even arguably privileged, dash, they are to or from

22   TBW's designated expert, closed quote, Docket 533,

23   page one.

24        MR. HARRISON:  What they are referring to are

25   Tampa Bay Water employees who at one point were

1     going to give opinion testimony.  Dr. Adams in one

2     case on the loss of use issues which are no longer a

3     part of the case, and Mr. Kennedy at one point on

4     the loss of use issues which are no longer a part of

5     the case.

6          They were not e-mails to our retained experts

7     which would certainly make them discoverable and

8     usable if they were.  So that's why I --

9          THE COURT:  When you said staff a little bit

10    earlier, you included the inhouse experts?

11         MR. HARRISON:  Yes.

12         THE COURT:  All right.  That explains it.  I

13    just wanted to make sure I understood what you were

14    saying.

15         MR. HARRISON:  Right.  It was not outside

16    experts.  And so that's really the heart of the

17    issue.  If they in their initial indication to us

18    had done -- had indicated that there had been some

19    massive failure of our screening to put us on notice

20    that there had been a significant breach of our

21    review process, I agree, we would have had some

22    obligation at that point to go do more.

23         But that's not what happened.  They said,

24    here's six e-mails out of hundreds of thousands of

25    documents.  We immediately looked at them and said,

1        you're right, they're privileged, thank you very

2        much.

3              Interestingly, they never sent the same

4        e-mail.  They never sent the same communication to

5        us about the ones that they actually now want to

6        use.  They never said, oh, hey, we --

7              THE COURT:  Well, couldn't that be easily

8        explained because at that time you were still

9        planning to use Kennedy and Adams as experts and,

10        therefore, the e-mails would have been properly

11        disclosed?

12              MR. HARRISON:  Well, number one, I don't think

13        these e-mails had anything to do with anything they

14        were going to give expert testimony about.

15              THE COURT:  Well, I don't know that it

16        matters.  If it's communication to an expert that's

17        listed as a designated expert, then the other side

18        is entitled to that communication, presumably, if

19        the experts relied on it.

20              MR. HARRISON:  But at the time of the

21        communications there were no designated experts

22        because there was no case.  Nobody had designated

23        experts.  These were communications shortly before

24        the lawsuit was filed or in one case shortly after.

25              Nobody had designated any experts.  These were

1    communications with Tampa Bay Water's staff inhouse

2    employees, who later, for very limited purposes,

3    would have been entitled to give opinion testimony.

4        THE COURT:  Well, let me ask you, then,

5    hypothetically, at that point in time when you

6    designated them as experts, were these e-mails not

7    then discoverable?

8        MR. HARRISON:  I don't think these e-mails

9    have any bearing on what these experts were going to

10   give opinions about, so the answer would be to that

11   extent --

12       THE COURT:  That's not my question.  Were they

13   discoverable?  Whether you think they had bearing on

14   it or not is not the issue.

15       MR. HARRISON:  No.  They're only discoverable

16   once we designate a staff employee who's going to

17   give opinion testimony.  I would agree that if there

18   are otherwise privileged e-mails to that person that

19   are within the area that the person's now going to

20   give opinion testimony about, they ought to be

21   discoverable.

22       But to say that every routine e-mail

23   discussing the litigation becomes discoverable

24   because one of the staff members is going to give

25   opinion testimony on a very narrow issue, loss of

1        use damages, I think is --

2            THE COURT:  Well, tell me what these e-mails

3        were about, then, these two that -- we're only

4        talking about three documents, two of which are

5        e-mails to these inhouse people who at one point in

6        time were designated as experts.

7            MR. HARRISON:  I'll have to locate them,

8        Judge.  I'm sorry.

9            THE COURT:  You can certainly just paraphrase.

10       I'm not questioning your ability to recall

11       accurately.  I don't need an exact synopsis.

12           MR. HARRISON:  My recollection is, and it is

13       purely my recollection because I don't have them in

14       front of me.  We did ask to file them under seal,

15       but that was denied.

16           My recollection is that they are discussing

17       issues related to the filing of the lawsuit,

18       potential liability, and issues related to whether

19       the system engineer, Black and Veatch whose name

20       you've heard, played some role in the design review

21       process and whether that would become an issue in

22       this litigation.

23           And again, if I'm wrong about that, that is

24       strictly my recollection of these e-mails.  But I'm

25       reasonably certain that none of them, for example,

1    that go to Mr. Kennedy are discussing the issues

2    Mr. Kennedy was going to give opinion testimony

3    about, being loss of use.

4         THE COURT:  And Adams, as I recall, was the

5    future loss of use --

6         MR. HARRISON:  Dr. Adams would make

7    projections and make allocations in terms of which

8    water resources would be allocated to meet the

9    demand, and you considered all of that on the

10   *Daubert* motion way back when.

11        THE COURT:  Okay.  Thank you.  On behalf of

12   HDR, Mr. Mason?

13        MR. MASON:  Your Honor, I do want to say up

14   front that I take no pleasure in addressing this

15   particular issue because I recognize the challenge

16   that lawyers have with significant documents.

17        But this is an issue that I believe is

18   appropriate.  I never would have brought it to the

19   court's attention for a number of reasons, and I'll

20   address those as I go.

21        But first let me address this issue you just

22   raised with respect to Mr. Kennedy in particular.

23   Unlike the statement that was just made with respect

24   to Mr. Kennedy and what he might testify about, Your

25   Honor, Mr. Harrison has represented to this court

1    recently that Mr. Kennedy is going to talk about the

2    bids and the bids process that the court said would

3    be permitted.

4         I would also direct the court's attention to

5    the pretrial that was -- that was completed and is

6    document number 346.  And on page 16 of that under

7    Jonathan Kennedy, he lists the subject matter --

8    counsel lists the subject matter, and this has not

9    been altered or amended -- that he would talk about

10   things including the cost incurred by Tampa Bay

11   Water in connection with the operation and

12   maintenance of its facilities, both historically and

13   currently, as well as projections of future

14   operation and maintenance costs.

15        The communications, as the court pointed out,

16   once Mr. Kennedy was determined that he would be a

17   testifying expert, these documents are not

18   privileged, I would submit to the court.  And there

19   were other documents that have already been used in

20   the *Daubert* hearing that were addressed from

21   Mr. Harrison to Kennedy, the same person, that had

22   been made public record and that he has not

23   addressed or tried to clawback.

24        THE COURT:  What is the subject matter, then,

25   of the two communications to Kennedy?  Or maybe

1       there's just one.

2               MR. MASON:  There are two, Your Honor.

3               THE COURT:  In general, what is the subject

4       matter?

5               MR. MASON:  Well, the intent to fix the

6       reservoir, a discussion about what they need to know

7       about defects, design and an appropriate fix, and

8       about Black and Veatch's unwillingness to commit to

9       an opinion as to the defects and also the position

10      on the design fix.

11              And it relates directly to these bids and

12      Mr. Kennedy's testimony about what they were going

13      to do with respect to designing, quote, the mother

14      of all fixes, is one of the references in here.  So

15      it is directly related to what has been said with

16      respect to what he would be testifying -- one of the

17      areas that he would testify about.

18              The other issue related to the construct

19      ability review and the work that was done by Black

20      and Veatch with respect to the project and their

21      role in the project, that that is the subject matter

22      of those two.

23              Now, with respect to the third document, Your

24      Honor --

25              THE COURT:  Well, let's stay on those two, if

 1     you don't mind.

 2          MR. MASON:  I apologize.

 3          THE COURT:  So when you reference Docket 346,

 4     I presume that's a description of Kennedy's

 5     subject -- testimony and subject matter in the

 6     context of expert opinion?

 7          MR. MASON:  That was what it is listed under.

 8          THE COURT:  And now that he is no longer an

 9     expert, if he had not ever been designated as an

10     expert, would you agree that these two e-mails were

11     not discoverable?

12          MR. MASON:  They would still be waived, Your

13     Honor, but they would arguably -- they would at

14     least be able to argue privilege with respect to

15     them.  So I would disagree that they would not

16     otherwise be discoverable for the reasons that I

17     will address in a moment.

18          THE COURT:  All right.  Go ahead.

19          MR. MASON:  But no one has represented that

20     I'm aware of that Kennedy has been withdrawn as an

21     expert in this case, and will only testify as

22     factual, either.

23          THE COURT:  Harrison, what's the deal with

24     Kennedy?  Is he going to be an expert or not?  I

25     thought you just said he was not going to be an

1    expert.

2         MR. HARRISON:  He's not going to be an expert

3    as to remediation because that's not opinion

4    testimony.  Mr. Kennedy is going to say Tampa Bay

5    Water put out a proposal that said this, here's the

6    document, that's fact.  We got three responses from

7    bidders who said they could build this for this

8    amount of money.  That's fact.  There's no opinion

9    involved in any of that.

10        THE COURT:  Okay.  All right.  Go ahead,

11   Mr. Mason.

12        MR. MASON:  Your Honor, may I move to the

13   other issue?  You asked me not to before and I want

14   to make sure I --

15        THE COURT:  Yes, sir.

16        MR. MASON:  Thank you.  The second issue is

17   Mr. Harrison just said interestingly to the court as

18   he stood here, had HDR put us on notice a year ago

19   about the extent of the disclosure and the problems

20   with the disclosure, it would be a different story.

21   But he said to this court, it was only six documents

22   before, Your Honor.

23        And as we put in our brief, we notified them

24   that our search revealed 23,000 documents containing

25   his name on them, or trial counsel's name on them

1    internally as well as a hundred thousand e-mails

2    from Tampa Bay Water's inhouse expert witnesses.

3         He was put on notice.  Now, we've cited cases

4    to this court that one document is sufficient to put

5    him on notice.  But with his own words in terms of

6    the extent of that -- and the interesting thing

7    here, Your Honor, was that Mr. Harrison responded to

8    that and took the affirmative responsibility on

9    apparently recognizing that under 502(b)(3), that is

10   an affirmative responsibility that exists that he

11   has.

12        And he has yet not provided this court with

13   one bit of evidence that I'm aware of that the

14   holder -- under Rule 502(b)(3), the holder promptly

15   took reasonable steps to rectify the error when they

16   were aware of it.

17        And that -- the cases we've cited are

18   significant in terms of the fact that the first go

19   around, maybe that was understandable.  But once he

20   was placed on notice and once he was -- recognized

21   particularly the magnitude of it, and he

22   affirmatively said, I will make that review and I

23   will do this, he did not provide this court or us

24   with any evidence.

25        And the cases that I've reviewed, Your Honor,

1    talk about people that come in and show what they

2    did and what they went back and did.  And the court

3    then would make a determination as to whether it was

4    appropriate under 502(b)(3).  But here there is no

5    evidence.  And they have wholly failed to do that

6    apparently because they did not comply with that

7    responsibility.

8         Now, specifically, what's so troubling about

9    this, Your Honor, is that this particular document

10   is absolutely amazing in terms of the

11   representations that have been made to this court

12   both verbally as well as I would point the court to

13   document 487 which was the reply from Tampa Bay

14   Water to allow the bidders repair costs.

15        And they have consistently represented to this

16   court that they would not seek damages for

17   enhancement, and that all it is is repair, and that

18   in their mind, what -- not in their mind but they

19   have clearly indicated that that was the case.

20        We have consistently said, as Mr. Meaders

21   represented to the court, this design was a gravity

22   drawdown design for 66 million gallons a day.

23   That's what they paid for, that's what they got.

24        Now, this new design, including all these bids

25   where they pump these numbers up, is a totally

1    different drawdown.  It's a continuous drawdown.

2    And it's three times the rate at the -- particularly

3    at the lower portion of the -- and two times in

4    other portions.  It is a different drawdown rate

5    which is an enhancement, which is a different thing.

6         Now, they told the court that they're not

7    seeking damages for enhancement.  This document

8    specifically acknowledges the fact that what we have

9    said is true.  And the fact that the increased

10   drawdown rate that they wish to present to this jury

11   suggesting that, oh, that's within their original

12   design parameters, that's nothing new, is not the

13   case, and this internal document shows it.

14        That's why it's so disturbing that we received

15   this.  And with the privilege waived, the

16   recognition to -- for them to suggest to a jury in

17   this case that, oh, we're not seeking all of these

18   tens of millions and hundreds of millions of dollars

19   doesn't include an enhancement because it's not an

20   enhancement of the way we want to draw it down, is

21   refuted in this e-mail.

22        THE COURT:  What's the date of that e-mail?

23        MR. MASON:  The e-mail is December the 30th of

24   2008.

25        THE COURT:  From who to who?

1          MR. MASON:  It is from Mr. Harrison to their

2     general counsel, Mr. Lotspeich, and the president of

3     Tampa Bay Water, Mr. Seeber.

4          THE COURT:  Well, I've not seen the connection

5     from an e-mail in December of 2008 to

6     representations made to this court over the last

7     several months.  We're now in a trial posture.

8     Representations were made, as I recall, in response

9     to very specific questions about TBW's claim for

10    damages.  And as I understood their representation,

11    TBW is not claiming anything other than the cost of

12    repair.  So why is this somehow shocking to you

13    and --

14         MR. MASON:  Because that's not the case.  When

15    they say they're just repair and cost of repair,

16    that's not the case.

17         THE COURT:  Well, does the e-mail say we're

18    going to hoodwink the court and tell him one thing

19    and then do something else?

20         MR. MASON:  No, sir.  No, Your Honor.  But

21    when they represent the fact that as part of the

22    repair of this, that when they want to operate this

23    reservoir at a totally different drawdown, at a

24    fundamentally different basis, that that is not

25    anything new and that that's just repairing it,

1    that's not the case and they knew it back in

2    December of 2008.

3         So when they suggest to the jury or wish to

4    suggest to the jury in this case that these

5    humongous bids that they have and Brumund's attempt

6    to repair it, to suggest that it's apples to apples

7    in a repair, this goes directly to the fact that

8    that's not the case, that they knew as early as

9    December of 2008.

10        THE COURT:  But you would agree that this kind

11   of a communication is absolutely privileged.

12        MR. MASON:  This would otherwise have been

13   privileged but for the fact of failure to comply

14   with 502(b)(3).

15        THE COURT:  Well, assume for the moment that I

16   agree with you.  What are you going to do, put

17   Mr. Harrison on the stand?

18        MR. MASON:  No.  No, Your Honor.  What I would

19   expect is if they take the position in this case to

20   suggest that this drawdown rate is not an

21   enhancement and this new design of this -- this much

22   significant drawdown rate is not an enhancement,

23   which was what our position is, then I think I have

24   the right to impeach with it.

25        THE COURT:  Impeach who?

1          MR. MASON:  The witness that asserts that.

2          THE COURT:  Well, you can't impeach Mr. Seeber

3     by a statement of Harrison; can you?  It's not his

4     statement.

5          MR. MASON:  I could show the document, the

6     fact of the -- with respect to what was discussed

7     and his understanding of it.

8          THE COURT:  Is there any objection to me

9     looking at these three documents in camera?

10         MR. MASON:  Not by us, Your Honor.

11         THE COURT:  Mr. Harrison?

12         MR. HARRISON:  No, sir.

13         THE COURT:  All right.  Tender them up, let me

14    see them.

15         MR. MASON:  May I approach, Your Honor.

16         THE COURT:  Yes, sir.

17         MR. MASON:  Would the court wish for me to

18    point out on the document where --

19         THE COURT:  No, sir.  Just let me take a look

20    at them, please.

21         MR. MASON:  All right, sir.

22         (Brief pause.)

23         THE COURT:  Well, like so many things in this

24    case, counsel's interpretation, if you will, of

25    these documents is not necessarily consistent with a

1    firsthand observation.  And I'm certainly not

2    questioning them.

3          But I do note in these e-mails, two of them,

4    the ones dated October 20th of 2009 and December

5    31st of 2008, essentially is an e-mail chain that

6    originated with a lengthy e-mail from Mr. Harrison

7    to his client, clearly privileged communications.

8    The very short responses from Michele Rap and

9    Rick -- I hope I don't mispronounce his name --

10   Lotspeich, L-o-t-s-p-e-i-c-h, their names haven't

11   even been mentioned this morning.

12         So on their face they appear to be

13   attorney/client communications.  Those responses

14   are, in fact, addressed to Mr. Harrison.  They

15   simply are copied to Mr. Kennedy, Mr. Forziano and

16   Mr. Seeber.

17         The third e-mail is an October 19th, 2008

18   e-mail from Mr. Kennedy to Mr. Lotspeich again, a

19   copy to a Mr. Polmann, P-o-l-m-a-n-n.  It's a

20   three-line e-mail that originated from the four

21   paragraph e-mail from Mr. Harrison that followed the

22   exchange of the tolling agreement.  These

23   discussions are replete with references to liability

24   insurance on the part of HDR.

25         I don't -- I don't quite understand, candidly,

1      Mr. Mason, your position.  These seem to all be

2      without any question attorney/client communications,

3      absolutely privileged.  And the only question,

4      therefore, is whether or not TBW has complied with

5      Rule 503(b).

6          I'm sorry, but I don't see the argument you

7      just made in this e-mail about this expanded

8      reservoir.  But, again, you're much more

9      knowledgeable than me.  So let's turn our attention

10     then, which I think is the dispositive issue, and

11     that is whether or not there's a 503(b) question

12     here.

13         I think the parties have agreed that the issue

14     turns on inadvertence in terms of waiver, but I'll

15     return these to -- I presume they came from HDR.

16         MR. MASON:  May I approach?

17         THE COURT:  Yes, sir.

18         MR. MASON:  Did you want me to address it

19     further?

20         THE COURT:  Yes, sir.  The 503(b), if you have

21     any additional comments.  You have addressed it

22     but --

23         MR. MASON:  I believe it's 502(b)(3), Your

24     Honor.

25         THE COURT:  I misspoke.  502(b)(3).  I'm

1    sorry.

2         MR. MASON:  Just to be succinct, once the

3    issue was raised a year ago, the cases we've cited

4    as well as the interaction between the lawyers,

5    there was not only a responsibility under 502(b)(3)

6    to take steps, but also the affirmative

7    representation by counsel that they acknowledged and

8    would do so, and the failure to provide this court

9    with any evidence whatsoever of anything that was

10   done with respect to that is -- is really the crux

11   of our position.

12        THE COURT:  All right.  Mr. Harrison, your

13   response.  And you might as well address these

14   things, since that's the crux of their position.

15        MR. HARRISON:  Thank you, Judge.  Again, upon

16   being notified initially, we responded, reviewed the

17   documents, said they were privileged.  We said at

18   that time because HDR immediately tried to turn this

19   around and turn it into a blanket waiver, we said,

20   no, if there's anything else in the hundreds of

21   thousands of documents, millions of pages, if

22   there's anything else in there that's privileged, it

23   was produced inadvertently.

24        We said that immediately.  And they've

25   consistently tried to turn it around back on us and

1    say, you're now obligated to go back and do a

2    re-review of millions of pages of e-mails.  That's

3    what the rule does not contemplate.

4         THE COURT:  What did you do?  What did TBW do

5    to avoid having attorney/client communications

6    inadvertently disclosed?

7         MR. HARRISON:  We screened the electronic

8    production for attorney names and, clearly, some

9    stuff got through.

10        THE COURT:  How was that done, exactly, as you

11   understand it?

12        MR. HARRISON:  Again, you know, now we're into

13   the realm of IT experts and what I understand

14   happened --

15        THE COURT:  Did they do a word search with

16   your name?

17        MR. HARRISON:  I understand it was a word

18   search basis.  And, clearly, something got through.

19   There's no question.  The cases recognize that the

20   more stuff you produce, the more likely it is that

21   something gets by.

22        THE COURT:  And how many documents were

23   produced by TBW?  There's a number in one of the --

24   in the motion, but I presume that that's accurate.

25        MR. HARRISON:  It is accurate, Your Honor.

```
 1      And I should be able to find it.

 2          THE COURT:  888,138 documents containing more

 3      than 4,079,170 pages, according to HDR.

 4          MR. HARRISON:  That's according to us.  Yes.

 5          THE COURT:  Okay.  So after being notified by

 6      HDR that there was some potential documents that may

 7      be privileged, you undertook this screening process

 8      or this search process for attorney names?

 9          MR. HARRISON:  We attempted to do that again,

10      and I want to say we accomplished that.  But merely

11      having an attorney name doesn't mean that it's

12      necessarily privileged.

13          THE COURT:  When you say attempted to do that

14      again, did you or did you not do it?

15          MR. HARRISON:  I believe that we did.

16          THE COURT:  I mean, did you instruct that it

17      be done?

18          MR. HARRISON:  Yes.  And I can't tell you what

19      the outcome was.  We did not ever go back to HDR and

20      say, we found more things that are privileged, send

21      them back to us.

22          THE COURT:  So there's an initial search and

23      then when put on -- when HDR put you on notice that

24      there were some problems, you directed that a second

25      search be accomplished?
```

1          MR. HARRISON:  I did.  And I believe it was

2     accomplished.  And what I can't say is that we ever

3     went back and then identified additional documents

4     out of whatever was produced back to HDR and said,

5     oh, here's some more that are privileged.

6          THE COURT:  Are these documents produced in an

7     electronic manner on discs, for example?

8          MR. HARRISON:  Yeah.  This was all e-mails

9     produced through the copy center on some

10    electronic -- I don't know if it was a disc or a

11    hard drive or a box.  But, yes.

12         THE COURT:  But electronically.

13         MR. HARRISON:  Yes, sir.

14         THE COURT:  As opposed to boxes of hard copy

15    documents.

16         MR. HARRISON:  Some parties chose to get heard

17    copies, as well, but everyone got electronic

18    versions.

19         THE COURT:  All right.  I don't think anybody

20    needs to make any apologies for these issues.

21    I'm -- they're issues and we've got to deal with

22    them and appreciate the professionalism exhibited.

23         Candidly, I think this is a lot to do about

24    nothing.  These are clearly attorney/client

25    communications.  The brief recitations by

1   Mr. Kennedy or some of these other individuals are

2   simply responsive to Mr. Harrison's privileged

3   communication with his client.  They are facially

4   privileged.  I don't see any aspect of the three

5   e-mails that bear on Mr. Kennedy's earlier

6   designation as an expert witness or his current

7   status, whatever it may be, presumably a non-expert

8   fact witness.

9        But regardless, under Rule 502(b)(3), it would

10  seem to me and I do so find that in addition to this

11  disclosure being entirely inadvertent, considering

12  the millions of pages, that TBW took reasonable

13  steps to avoid the disclosure of privileged

14  communications between counsel and client.

15       While they obviously missed these documents,

16  which raises a question about how that second search

17  was accomplished, certainly Mr. Harrison, in

18  directing that it be accomplished, took reasonable

19  steps and he could reasonably rely on the IT people

20  to do that.

21       So I am going to grant this motion, determine

22  the documents are privileged, and direct that they

23  be returned to TBW.

24       The next couple of motions should not take

25  extended discussion, guys.  Docket 530 is the

1    defendant's motion in limine number seven concerning

2    nonparty deposition testimony, as I understand it,

3    from a former employee of TBW by the name of

4    Donovan.  Mr. Mason, whoever, Mr. Meaders.

5          MR. MASON:  Mr. Meaders is going to handle it.

6          THE COURT:  Harrison, unless you're going to

7    concede.  I mean, you stood up there quickly, but --

8          MR. HARRISON:  No, sir, I'm just confused,

9    Your Honor.  It happens.

10         THE COURT:  All right.

11         MR. MEADERS:  Thank you, Your Honor.  May it

12    please the court.

13         To be brief, Your Honor, I -- my

14    interpretation of the evidence rules are that with

15    respect to this former testimony given in a

16    deposition not in this case, that Rule 32 controls

17    the admissibility of the deposition transcript

18    itself.  801 would govern the statements made at the

19    time by Mr. Donovan.  But that 801 admission, if you

20    will, at that time does not govern the admissibility

21    of the former testimony or transcript which has to

22    comply with Rule 32 or another rule of hearsay

23    evidence, and it does not.

24         The cases cited by Tampa Bay Water to try to

25    say that an admission given as former testimony does

1    not need to also meet 32 to get in the transcript or

2    not at all applicable, that none of them even

3    address Rule 32.

4         The *Wilkinson* case is a statement made by a

5    witness in court and does not deal with an

6    out-of-court statement.  The *Royal Bahamas* --

7    *Bahamian* case does not deal with a 32 objection at

8    all because in that case, the person was deposed as

9    a corporate representative in that particular

10   matter.  That particular deposition then falls under

11   the rule of 32(a) as a testimonial transcript taken

12   of a corporate representative in a case under

13   Rule 32.  And, therefore, there was no Rule 32

14   objection made in that case.

15        And the other case they cited was the

16   *Tuscaloosa* case.  It was a coconspirator giving

17   direct in-court testimony that somebody who was a --

18   made a statement to them out of court, and that

19   out-of-court statement was considered to be an

20   admission of the party opponent, but the testimony

21   of that statement being made was -- the person was

22   directly in court.

23        So our position is that the former testimony

24   of Mr. Donovan must meet both, his statement being

25   made as hearsay.  I would acknowledge that that is

1    an admission by -- his statement is an admission,

2    but the former testimony, the deposition transcript

3    itself must also meet a hearsay objection, and they

4    have not addressed that at all.

5         THE COURT:  Now, go -- you confused me.  I'm

6    sorry.  Go back through that last analysis.  It's an

7    admission by HDR.

8         MR. MEADERS:  It would be -- it would fall

9    underneath the party statement, the 801 hearsay

10   exception.

11        THE COURT:  So it's not hearsay.

12        MR. MEADERS:  Mr. Donovan making the -- making

13   the statement is not hearsay.  However, the

14   deposition transcript is hearsay and must meet a

15   Rule 32 former testimony rule or a Rule 801 former

16   testimony rule under the rules -- under the Federal

17   Rules of Evidence.

18        THE COURT:  How about Rule 32(a)(3)?

19        MR. MEADERS:  32(a)(3), Your Honor, the crux

20   of the issue with 32(a)(3) happens to do with

21   32(a)(1), and that is 32(a)(1) says that the

22   testimony, the deposition -- the deposition is only

23   admissible under 32(a)(1) if it meets all the prongs

24   of A, B and C.  The first prong of A is that the

25   party was present or represented at the taking of

1    the deposition or had reasonable notice of it.

2         HDR was not present at that arbitration

3    deposition.  We were not part of that arbitration

4    proceeding.  So without meeting A1, it can't meet

5    A -- Federal Rule of Civil Procedure 32(a)(3),

6    because it must meet A1 first, all of those prongs,

7    and then under C, to use it as allowed under

8    32(a)(2) through (8).

9         You referred to Rule 32(a)(3), but in that

10   situation or that context, since HDR was not a party

11   to or represented at the original taking of the

12   deposition, A3 becomes inapplicable -- I'm sorry,

13   A1 -- A3 becomes inapplicable.  Yes.

14        THE COURT:  The bottom line is HDR was not a

15   party or present during this arbitration; therefore,

16   it's not the deposition contemplated under Rule

17   32(a)(1).

18        MR. MEADERS:  Correct.

19        THE COURT:  All right.  Harrison, response.

20        MR. HARRISON:  Thank you, Judge.  And I think

21   we would agree with that.  HDR was not a party to

22   the arbitration.  It was between Tampa Bay Water and

23   Hillsborough County.  However, I think counsel is

24   misreading subsection 8 in terms of the use of the

25   deposition.  They're trying to separate the

1       deposition transcript from the statement,

2       Mr. Donovan's words contained in the deposition

3       transcript.

4            THE COURT:  Well, is he going to testify live?

5            MR. HARRISON:  I believe he is on their list.

6       I don't know if he's going to testify live.  We're

7       not going to call him live but --

8            THE COURT:  So you'd be using it, then, in

9       cross-examination of Mr. Donovan if he testified

10      inconsistently, I take it?

11           MR. HARRISON:  If he testifies inconsistently.

12           THE COURT:  Well, that would be permissible,

13      would it not, Mr. Meaders?

14           MR. MEADERS:  If it were ultimately shown --

15           COURT REPORTER:  I'm sorry.  You need to get

16      close to a microphone.

17           MR. MEADERS:  Forgive me.

18           THE COURT:  In other words, using it for

19      cross-examination and impeachment would be

20      permissible as opposed to the substantive deposition

21      itself.

22           MR. MEADERS:  If, in fact, it were shown to be

23      inconsistent with any testimony that Mr. Donovan

24      gave in this case.  There has not been a showing by

25      the plaintiffs that they intend to use the statement

1    from the arbitration deposition as being

2    inconsistent with anything he testified in this

3    case.

4        THE COURT:  Well, he hasn't testified yet so

5    we don't know that.  But that would be a permissible

6    use of a prior sworn statement of a witness,

7    inconsistent, if he testified inconsistently.

8        MR. MEADERS:  If, in fact, it was shown to be

9    inconsistent.  And the witness has to give the

10   opportunity to explain himself with that

11   particular -- with that particular rule.

12       THE COURT:  All right.  This is an easy one,

13   guys.  The deposition in and of itself is not

14   admissible.  TBW doesn't intend to put it into

15   evidence.  It only intends to use it if Mr. Donovan

16   testifies inconsistently if called by HDR.  And in

17   that manner, it would be able to use the deposition,

18   that is, his prior sworn statement to impeach his

19   testimony.  Plain and simple; right?

20       So HDR's motion which is Docket 530 is granted

21   to the extent that the deposition itself is not

22   admissible under Rule 32(a)(1)(A), because HDR was

23   not present or a party to the arbitration.

24       But of course, if Mr. Donovan testifies by --

25   on behalf of HDR, and TBW believes his testimony is

1    inconsistent with his prior sworn testimony, it may

2    certainly impeach him by using those prior sworn

3    statements.

4         That probably didn't require argument, but I

5    wanted to make sure I understood your positions.

6         All right.  The next one is Docket 531, HDR's

7    motion in limine concerning newspaper articles.

8    Mr. Harrison, I think your response is disingenuous.

9    I say that in the spirit of knowing you well enough

10   to say that without fear it's going to hurt your

11   feelings.  But newspaper articles are not

12   admissible.  Period.  I don't know of any situation

13   where they're admissible.  So it's your ball.

14        MR. HARRISON:  It's certainly an uphill

15   battle, Your Honor.

16        THE COURT:  I'm sorry?

17        MR. HARRISON:  It's certainly an uphill

18   battle.

19        THE COURT:  Well, then, let's not waste a lot

20   of time on it.

21        MR. HARRISON:  This is not the most critical

22   issue of the day.

23        THE COURT:  No, it's not an issue at all.  The

24   motion is granted.  Newspaper articles are

25   inherently hearsay.  They're admissible.  They can

1    be used for some purposes, but certainly not for the

2    reasons that are addressed by the motion.

3        The next one is also a fairly easy one.  This

4    is Docket 532, Tampa Bay Water's motion in limine

5    number nine.  When I say easy, I've looked it.  And

6    it seems to me that TBW is worried about something

7    that it really has no control over, and that is the

8    manner in which Mr. Bromwell testifies.

9        He's not going to give legal opinions, but he

10   can certainly rely on the contractual documents that

11   he has reviewed in explaining his opinions.  And I

12   don't see that as interpreting the contracts,

13   anymore so than if TBW's experts allude to contracts

14   and the various responsibilities.

15       So I'll hear you on your motion, Mr. Harrison,

16   or whoever is going to speak.  But zero in on what

17   the concern is.

18       MR. HARRISON:  The concern here, Judge, is

19   pretty straightforward, assuming we get past other

20   motions.  If Dr. Bromwell is going to be allowed to

21   talk about his collapse theory, he can certainly

22   talk about things that he finds in the contracts

23   that may bear on his theory of causation, because

24   that's why he's being called as an expert.

25       What he cannot do is go the next step and give

1    the legal conclusion that this is Barnard's fault,

2    which is exactly the reason he wrote his

3    supplemental report to say, I've looked at the

4    contracts, I've read the contracts, and the collapse

5    upon wetting that I believe to be the cause of the

6    damage is Barnard's responsibility under Barnard's

7    contract with Tampa Bay Water.

8         That is the only reason he wrote his

9    supplemental report in January of 2011, and even

10   says in there, after my deposition in November and

11   December of 2010, there were some things that I

12   couldn't answer.  One of them was Barnard's

13   contractual responsibility with regard to the damage

14   that occurred.

15        So he writes a report that says, I went back

16   and I read Barnard's contract, because I was not

17   aware of the contractor's responsibilities when I

18   gave my deposition.  And I highlighted parts of

19   their contract, and the defective construction, if

20   there was any, is Barnard's fault.

21        He's interpreting the contract to say it's

22   Bernard's fault.  He can talk, if the court allows

23   him to talk, about collapse.  That's an engineering

24   issue and he can certainly give opinions about that.

25   He can't interpret a contract and say, if the

1    collapse happened, I'm now putting on my lawyer's

2    hat and saying it's Barnard's fault because I've

3    read their contract.

4         That's our concern.  Dr. Bromwell can give

5    engineering opinions.  He can't give legal opinions.

6    And he certainly can't give opinions that contradict

7    the express terms of the contract.

8         THE COURT:  Response.

9         MR. KENT:  David Kent for HDR.  I think

10   Mr. Harrison's drawing too much -- predicting too

11   much about what Dr. Bromwell intends to say and

12   drawing far too much out of his report.

13        Dr. Bromwell was responding to questions that

14   had been placed at the deposition as to who did what

15   out there at the -- on the worksite.  And he went

16   back and said, well, look at the various provisions

17   of the contract.  Here's where it shows.  Barnard

18   did build it, Barnard had to build it, they had to

19   follow the plans and specifications.

20        And in that regard, he's no different than

21   TBW's own experts, Dr. Brumund, Dr. O'Connell and

22   their own construction manager, Rick Menzies, who

23   every one of them said, as we put in our response,

24   exactly what Dr. Bromwell said.  And, in fact,

25   Mr. O'Connell cited the very same provision in the

1    contract that Dr. Bromwell cited that said that

2    Barnard ultimately is responsible.

3         They have to follow the plans and specs.  They

4    cannot turn to the inspector and say, well, you

5    approved it or you missed it or something,

6    therefore, it's okay.  We don't have to worry about

7    it.  It's not our mistake.  It's not a mistake

8    because it was built too thick, too loose, too dry

9    because you didn't tell us that.  Therefore, it was

10   not a mistake.

11        And they can't do that.  Nobody says they can

12   do that, either on the plaintiff or the defense

13   side.  The only person who might have said that

14   would have been Barnard, but they're not going to be

15   here to say that.

16        So I don't see, as you said, where this leads

17   to in terms of the necessity of a motion in limine

18   or how one could craft it beyond saying the obvious,

19   that he's not going to express legal opinions to try

20   to determine legal relationships between the

21   parties.

22        The cases that we cite give examples of where

23   expert witnesses every day come in and say, I looked

24   to the terms of the contract.  Here's the

25   relationship of the parties, and it explains and

1    amplifies the facts surrounding the operative facts

2    of the case.

3         THE COURT:  So you're comfortable that

4    Mr. Bromwell will not be asked to render or will not

5    voluntarily offer unsolicited legal opinions.

6         MR. KENT:  Oh, absolutely.  He's not going to

7    be sitting there saying this is 90 percent

8    somebody's fault, 50 percent somebody's fault, you

9    know.  That's not -- because you've already said

10   we're not going to be apportioning fault.  He's not

11   going to be trying to give legal interpretations of

12   the contract.  He certainly is going to be able --

13        THE COURT:  But he will have reviewed the

14   contracts, the relationships between the parties and

15   the respective responsibilities of the parties vis a

16   vis the construction of the facility, assuming we

17   get into that.

18        MR. KENT:  Certainly, Your Honor.

19        THE COURT:  All right.  The motion in limine

20   number nine is granted to this extent.  No expert

21   witness, including Mr. Bromwell, will render or

22   offer legal opinions as to liability.  That does not

23   prevent these experts from explaining the obvious

24   and, that is, that they have reviewed the

25   contractual relationships of the parties to

1    understand the respective parties' responsibilities

2    and to amplify on those relationships in explaining

3    and supporting opinions concerning causation is

4    certainly permitted.

5         So I'll grant it to the limited extent.  No

6    legal opinions by any expert, including

7    Mr. Bromwell.

8         The next motion filed in order was HDR's

9    motion for miscellaneous relief.  I think we've

10   talked about this.  It's Docket Number 535.  I do

11   agree that the video should be shown to the jury.

12   The question is do we show it to them before we

13   begin voir dire, after voir dire.  I don't really

14   have a preference other than I don't want to unduly

15   prolong voir dire.

16        We can talk about that when we're ready to go.

17   Be prepared, however, to have it available at the

18   beginning of trial.  I presume it's in HDR's

19   possession.  You guys have collaborated, as I

20   understand it.  So I'll grant the motion to that

21   extent.

22        I am not going to designate eight ten minute

23   opportunities during the trial for you to impress

24   the jury.  So to that extent, it's denied.  I do

25   consider -- I will consider, as we talked about at

1    pretrial, enabling counsel to address the jury

2    perhaps in somewhat of a summation at the end of

3    each trial week.

4         But I want to caution you that I expect that

5    will not be unnecessary argument.  It would simply

6    be a recounting of the facts as you understand them

7    to be and how they relate to the ultimate questions

8    on the verdict form.  In other words, assist the

9    jury in putting what they just heard for four or

10   five days together in a context of their verdict,

11   particularly if this trial lasts over several weeks.

12        But I do not envision final arguments, mini

13   final arguments.  That wouldn't be fair.  It would

14   be disruptive because as far as I'm concerned at the

15   end of the first week, we're still looking at TBW's

16   case in chief.

17        And I think we can, to use a colloquial term,

18   wing it in that regard.  I want to help this jury

19   understand the evidence.  And if you can assist in

20   that regard, I certainly think we can agree on some

21   procedure.

22        The next one is the motion that everyone wants

23   to talk about and, that is, Docket Number 4 -- I'm

24   sorry, 540.  I have read your pleadings.  And I

25   appreciate it.  I do not appreciate being inundated

1    with supplemental authority when you had an

2    opportunity to cite those cases when you filed your

3    motion and response.  I'm not sure those authorities

4    help me make a decision in this particular -- on

5    this particular issue, in any event.

6         There is an Eleventh Circuit decision -- I

7    apologize, a Fourth DCA decision from Florida cited

8    by HDR.  The plaintiff's name was L-o-u-r-e-i-r-o

9    versus Pools by Greg, Inc., 698 So.2d 1262.  There's

10   a quotation at document 553, the bottom of page two,

11   which is an accurate quotation from that case,

12   albeit dicta, that says even had the issue of

13   nonparty liability been omitted from the

14   instructions and the verdict form, the defendant

15   could still have contended at trial that it was not

16   negligent and that the negligence of others was the

17   sole legal cause of injury.

18        I have perused this morning the Home Design

19   Services decision by Judge Spalding, as I recall --

20   Judge Fawcett.  Excuse me.  I have not had a chance

21   to read the Mitchell decision, so I will certainly

22   encourage you to enlighten me as to what that

23   decision says.

24        And what have you got, Harrison?  Have you got

25   law clerks looking up cases?  You filed two

1    supplemental notice of intents to rely on additional

2    authorities.  I mean, there's a limit.  I certainly

3    want the cases that are binding, but I don't know

4    why you couldn't have cited these when you first

5    filed your motion.  But go ahead.  Give me your best

6    shot at this.

7         MR. HARRISON:  Okay.  Judge, first of all --

8         THE COURT:  We're only going to go for a

9    little bit.  We might come back after lunch because

10   this court reporter is going to be exhausted here.

11        MR. HARRISON:  Yes, sir.  Only one of those

12   supplemental notices bears on this motion.  The one

13   that I think you just referred to --

14        THE COURT:  You're right.  I misspoke.  That's

15   when I was up here fumbling.  I read the *Allen* case,

16   the *Spellman* case, looked at the New Jersey decision

17   in B-a-h-r-l-e.  Those are the ones that apply.

18        MR. HARRISON:  That's right.  And the *Allen*

19   case, Your Honor, is as close as we can possibly get

20   to where we sit today.  It could not be any closer

21   factually, legally or procedurally.

22        THE COURT:  Well, it's a product case; is it

23   not?

24        MR. HARRISON:  I don't think it matters.  It

25   is a products case, but so what?  The procedure is

1    exactly what has happened here.  Codefendant --

2        THE COURT:  How does it trump a Florida

3    appellate decision that says exactly to the

4    contrary?

5        MR. HARRISON:  It -- that case, the pool case,

6    and I can't pronounce the first time, the Fourth DCA

7    case Your Honor referred to, first of all, it is

8    dicta.  First of all, when you read that case, it

9    has no bearing on what we're dealing with here.

10       There was no other defendant exonerated by

11   summary judgment in that case.  And what that case

12   is about was a situation where *Fabre* parties were

13   erroneously included on the verdict form, who should

14   have been there.  And the court ultimately says,

15   harmless error because the jury found no liability

16   so they never had to apportion to any of these

17   people who didn't have to be there.

18       None of the cases cited by HDR, none of them

19   involves a summary judgment granted to a codefendant

20   on the merits.  The cases they're citing involve

21   parties who are entities who are not parties to the

22   litigation by virtue of some form of immunity,

23   parental immunity, spousal, immunity, governmental

24   immunity or employer immunity.

25       And at the end, they boldly say this is just

1    about immunity, Barnard had immunity.  And the

2    court's already rejected that concept.  There's no

3    immunity that applies to Barnard.  They don't cite

4    any case where a codefendant obtains summary

5    judgment, tries to get *Fabre*d in which is properly

6    denied and then the plaintiff does what we did,

7    which is exactly what happened in the *Allen* case,

8    say you, the remaining codefendant who did oppose do

9    not now get to argue that it's not your fault

10   because it's the fault of the other guy who's been

11   exonerated.

12        That's our facts, Judge.  It doesn't matter

13   that it's a product case.  That has no bearing on

14   anything.  The issue is they didn't oppose, in fact,

15   they advocated for, in fact, it was their idea.

16   This all flows from their tactical decision that

17   Barnard should be out on summary judgment.

18        They didn't oppose it.  The court granted

19   summary judgment, just like in the *Allen* case.  We

20   file a motion that says they should not get to

21   disprove their liability by saying it's Bernard's

22   fault, which is exactly what collapse upon wetting

23   is.

24        Dr. Bromwell is not going to come in and say

25   collapse upon wetting happened and we don't know

1    whose fault it is.  He's going to come in say, and

2    it's the contractor's fault.  The *Allen* case is our

3    case, and it doesn't matter that it's a product

4    liability case.  That is exactly our set of facts

5    and our procedural posture.  This is not something I

6    made up.  And it goes back to the very same issue,

7    how can you parse different theories of why somebody

8    is at fault.

9         THE COURT:  Well, it seems to me to beg the

10   issue.  HDR is not a party to the motions for

11   summary judgment.  It certainly has the opportunity

12   to weigh in.  It chose not to.  I'll say that

13   understanding that Mr. Mason is going to disagree

14   with that.  But it certainly didn't present

15   evidence.  It chose not to present any evidence.

16        Why is it precluded from then relying on a

17   theory which was not part of the summary judgment

18   motion and the agreed facts?

19        MR. HARRISON:  Because Barnard can't be at

20   fault and not at fault at the same time.

21        THE COURT:  Well, there is a distinction

22   between causation and fault.

23        MR. HARRISON:  There's not, and that's what

24   *Allen* says.  *Allen* says if you don't --

25        THE COURT:  *Allen* is a case from a colleague

 1     of mine, certainly is not binding, at best

 2     persuasive.  But I've looked to a Florida District

 3     Court of Appeal decision that says just the

 4     opposite, albeit in dicta.

 5          MR. HARRISON:  Again, we have to remember the

 6     context here.  Once the court exonerates Barnard on

 7     the merits, everybody is collaterally estopped.

 8     Everybody is bound by that decision.  HDR

 9     participated in that.  They didn't present evidence

10     of their theory, that's correct.  But they certainly

11     litigated the issue of Barnard's fault.

12          It was their idea.  They filed motions.  They

13     filed briefs on that issue.  That issue was

14     litigated.  Barnard's fault for our damage is an

15     issue that's been litigated.  And what the *Southern*

16     *Bell* case says is that as between codefendants, a

17     determination under *Fabre*, if you don't oppose, the

18     two codefendants are collaterally estopped by that.

19          There is no case, no case that they have ever

20     presented to the court that says after a summary

21     judgment on the merits they can come make this

22     causation argument.  They've got a lot of general

23     stuff, general cases that say as a general

24     proposition in a negligence case a defendant can

25     show it's somebody else's fault.

1            Sure, that's the general rule.  That's a great

2      rule right up until the moment that the other person

3      has been exonerated on the merits.  And they don't

4      have any case that says after a codefendant's

5      exonerated, I can still come say it's their fault.

6      That's the critical issue.

7            THE COURT:  Let me hear from Mr. Mason,

8      please.  You've heard the charge.  What is your

9      response?  You haven't cited one case that stands

10     for your position in a summary judgment setting.  So

11     what's your response to that?

12           MR. MASON:  Well, Your Honor, we have cited

13     two Florida cases, the pool case and the *Clement*

14     case, which we believe provide guidance to the court

15     with respect to this.  As the court has indicated

16     already, this is a unique situation with respect to

17     the stipulation and the way in which this

18     transpired.

19           And what I heard counsel suggest was that we

20     should be collaterally estopped.  But when we look

21     at the law of collateral estoppel, the law of

22     collateral estoppel is clear with respect to the

23     requirements of what was determined or adjudicated,

24     whether it was an identical issue, whether it was

25     fully litigated in a prior proceeding.

1        The issue of collapse upon wetting, as the

2    court pointed out, goes to causation.  And it goes

3    to the responsibility or not for design and

4    causation of that design that they allege.

5        And that was never the subject matter of the

6    proceeding and the adjudication there where the

7    court made the determination about the stipulation

8    that had been entered into.

9        THE COURT:  What was the other case you

10   mentioned?  Plemon?

11       MR. MASON:  I'm sorry.  *Clement*, Your Honor.

12       THE COURT:  *Clement versus Rousseau*.

13       MR. MASON:  Yes, sir.

14       THE COURT:  That's just by analogy; right.

15       MR. MASON:  That is -- that is another case,

16   as well, that has language which we think addresses

17   this issue with respect to the ability to put on for

18   showing causation and the like and the ability for

19   us to put this evidence on.

20       THE COURT:  Does the issue turn, then, from

21   your perspective on the fact that the collapse upon

22   wetting theory was not the subject of the agreed

23   facts and the summary judgment arguments, and that

24   the arguments focussed only on streaks, layers,

25   etcetera?

1          MR. MASON:  Certainly the issue of collapse

2     upon wetting was not adjudicated with respect to

3     that determination.  There was not a full

4     opportunity to address that issue.

5          THE COURT:  Well, before you say that --

6          MR. MASON:  And an identical -- the identical

7     issue that is presented here, which is causation,

8     does collapse upon wetting cause -- does the design

9     cause the damages that occurred here.

10          THE COURT:  You could have, could you not,

11     have submitted testimony or an affidavit with

12     respect to collapse upon wetting to preclude summary

13     judgment from being entered against Barnard, at

14     least in that discrete area?

15          MR. MASON:  The issue was between Tampa Bay

16     Water and their determination with Barnard and

17     what -- what plaintiff could prove or not prove.

18     And, in fact, in the court's -- in the court's order

19     with respect -- the ultimate order, it talks about

20     the fact that the -- on page three of document 417,

21     where you indicated that the court instructed Tampa

22     Bay Water to identify evidence disclosed by the

23     parties that would support a finding for plaintiffs

24     on counts two and five.

25          THE COURT:  Well, that may be.  But it's not

1    as if you did not have an opportunity on behalf of

2    HDR to inject this collapse upon wetting theory to

3    preserve Barnard as a *Fabre* defendant and perhaps

4    block an entire summary judgment, maybe a partial

5    summary judgment on plaintiff's claims.  And that

6    seems to be what the *Allen* decision stands for.

7         MR. MASON:  The issue was one of fault.  It's

8    the determination of the *Fabre* and the *Fabre*

9    submission.  That was not a determination that was

10   made with respect to the collapse upon wetting and

11   the viability of that and whether that was a cause

12   of the damages in the case.

13        And we do believe that the pool case, as the

14   court pointed out, does provide guidance with

15   respect to our ability to assert that.

16        THE COURT:  And do I understand that the focus

17   of your contention is that, one, the issues were not

18   identical in the summary judgment proceeding as to

19   what we have now and, secondly, collapse upon

20   wetting was not litigated and it's a collateral

21   estoppel issue; right?

22        MR. MASON:  Under the collateral estoppel

23   issue we think each of the elements were not met

24   with respect to the collapse upon wetting.  That is

25   correct, Your Honor.

1              THE COURT:  Okay.  All right.  Gentlemen, I

2    will let you go to lunch.  Please come back at 1:30.

3    I will either announce my ruling or ask a couple of

4    questions.  And then I've got to turn my attention

5    to other matters this afternoon.  Thank you.

6              COURTROOM SECURITY OFFICER:  All rise.

7              (Recess was taken at 12:10 until 1:30 PM.)

8              (Back on the record.)

9              COURTROOM SECURITY OFFICER:  All rise.  This

10   Honorable Court is again in session.

11             Be seated, please.

12             THE COURT:  I didn't know if you guys were

13   aware of our local custom that if you're in a

14   courtroom more than three or four hours, you have to

15   take a CJA appointment just by default.

16             Okay.  I'm sure you've been chewing on your

17   roast beef sandwiches or salads and have a couple

18   more words you'd like to inject into the issue

19   raised by the motion in limine number 10.  So,

20   Mr. Harrison, give me your last best shot.

21             MR. HARRISON:  Thank you, Your Honor.  I will

22   try to be brief and not repeat things that we've

23   already said.

24             The *Allen* case is procedurally our case.  It

25   doesn't matter that it's a products case.  The

1    remaining codefendant, the guy left was sued for

2    negligence.

3         THE COURT:  If you were sitting here in an

4    Article III capacity, and this is a tough question,

5    what would you do with the *Allen* decision in the

6    setting in which it sits?

7         MR. HARRISON:  I would consider it for what

8    it's worth.  What it's worth is it is a case on

9    procedurally identical posture.

10         THE COURT:  What is it?

11         MR. HARRISON:  It's a recommendation of a

12    magistrate.

13         THE COURT:  It's a report and recommendation,

14    never acted upon by the district judge.  So it sits

15    somewhat in an unusual procedural posture.  It's not

16    ruling on a judgment.

17         MR. HARRISON:  It's a judge -- it is what it

18    is.  It's a recommendation from a Magistrate

19    Spalding.  It never got to the judge because,

20    according to the docket, the case settled the next

21    day in mediation.  I don't think those two things

22    were unrelated, by the way.

23         THE COURT:  Probably not.  If I were so lucky.

24         MR. HARRISON:  We're trying to help you get

25    there, Judge.  But it is what it is.  Yes, we

1      understand it's not an order.  And even if it were a

2      district judge's order, it's certainly not binding

3      on you.  Absolutely.  We've never said it's binding.

4      But it's awful close in terms of the setup, the

5      facts, the procedures and the issues.  And by the

6      way, it's the only thing anybody's given you that

7      that's close.  You know, HDR is citing you cases

8      about the strict liability for owning a wild monkey.

9      So it's close.

10           The second case that we have cited in the --

11           THE COURT:  Well, let's share some criticism.

12      You're giving me state court cases from all over the

13      country.  Certainly, I would expect -- the Eleventh

14      Circuit would expect of me that I stay within this

15      circuit and State of Florida.

16           MR. HARRISON:  Judge, I think we've exhausted

17      Florida law.  There is no Florida case that answers

18      this question.  The cases that HDR has cited to you

19      don't answer it because none of them involve a

20      summary judgment in favor of the codefendant.

21           THE COURT:  Let's get past the R&R of Judge

22      Spalding who is a fine magistrate judge, by the way.

23      I've known for professionally for longer than you

24      could imagine.

25           MR. HARRISON:  All right.

1          THE COURT:  Isn't the issue collateral

2     estoppel?

3          MR. HARRISON:  That'S certainly one element of

4     the issue.  It's either collateral estoppel or

5     judicial estoppel because HDR sought a benefit

6     getting Barnard of the case, which they got and now

7     they want to blame Barnard.  So I think judicial

8     estoppel applies, as well.

9          The issue, by the way, there was a lot of talk

10    this morning about whether the issue of collapse

11    upon wetting has been litigated or could have been

12    litigated.  The collapse upon wetting issue is

13    addressed in the stipulated facts with Barnard.

14    There's 10 or 12 paragraphs at the end of that

15    stipulated facts on which the show cause order was

16    based which then led to the summary judgment that

17    talk about collapse upon wetting, that recognize

18    that HDR's got this theory and Barnard and McDonald

19    say the facts necessary for that to happen didn't

20    happen, but it's covered in the stipulated facts.

21         When we opposed the summary judgment, we tried

22    to put on evidence that HDR was going to use in

23    HDR's collapse upon wetting theory, and they

24    objected.  But to say that the issue was not or

25    could not have been litigated I don't think is

1    correct.

2         The issue of fault of Barnard was litigated

3    and encompassed within the issue of Barnard's fault

4    is their theory of collapse upon wetting because the

5    only person they're saying at fault is Barnard.

6    They've still not given you a way to parse different

7    theories of negligence and get to where they want to

8    get to.

9         The pool case, the Fourth DCA case that we

10   discussed this morning, absolute dicta, number one,

11   and it has nothing to do with our situation because

12   there was nobody in that case.  It was granted on

13   summary judgment.  It's the blanket rule that

14   applies generally that says a defendant can defeat

15   the causation negligence of a negligence claim by

16   saying it's somebody else fault.

17        We're past that.  What we have to answer is

18   can they do that when the somebody else whose fault

19   they want to say it is has been exonerated on a

20   summary judgment.  And they have given the court

21   nothing, nothing that answers that question.

22        THE COURT:  Do you know the docket number for

23   the agreed facts you just alluded to?

24        MR. HARRISON:  It's docket 307, Your Honor.

25        THE COURT:  Let me pull that up just a moment.

1          (Brief pause.)

2          THE COURT:  All right.  Mr. Mason.

3          MR. MASON:  Your Honor, the issue of

4    collateral estoppel, as you indicated, let me go

5    right to that.  The recitation of pretty much

6    whatever they wanted to put in their agreed facts

7    with Barnard is a different issue than the claims

8    that they had versus Barnard.  And the issue of

9    collapse upon wetting was not -- was not adjudicated

10   there.

11          The issue was not identical.  Our ability

12   to -- our issue is a defense to the design claim in

13   the causation in the fact that they say that the

14   design caused the damages in this case.  And our

15   assertion that that is not the correct, and the

16   ability to demonstrate to them -- to this jury that

17   there is an alternative explanation is, we believe,

18   fundamental to -- to our ability to refute their

19   prima facie case.

20          Their attempt to use collateral estoppel as a

21   shield when they are the ones that did this deal in

22   the first place, they were not claimed -- it was not

23   litigated.  These other claims with respect to a

24   determination on summary judgment relate to the

25   claims that plaintiff had.

1           Had Barnard filed a motion for summary

2    judgment based on no collapse upon wetting, that

3    would be more analogous to the cases that they cite.

4    But they did not.  And the issue of collapse upon

5    wetting was not -- it was not identical in what the

6    court was asked to determine there.

7           It was the claims that TBW had against Barnard

8    and the fact that they reference collapse or they

9    make conclusions in an agreed upon deal that they

10   were cutting with -- that is obvious on its face

11   about the statements that they wish to make

12   demonstrates that it is not -- was not something

13   that was actually litigated in the prior suit as

14   collateral estoppel requires.  It was not an

15   identical issue.  They did not assert that claim.

16   TBW did not.

17          This is a -- this is a causation analysis and

18   the opportunity for a defendant who is being sued

19   for design defect and allegation of causation to be

20   able to present an alternative causation theory.

21   The fact that they stipulated to other facts and

22   made mention to things like collapse upon wetting

23   and all sorts of other things as the court sees,

24   there's a ton of paragraphs and pages and pages, is

25   not controlling with respect to whether collateral

1       estoppel applies here.

2           And when determining the facts and the record

3       here in terms of that, I submit to the court that

4       there was not and there is not collateral estoppel,

5       that we should be permitted -- that plaintiffs

6       should be able to put on their design case against

7       us, let the jury make a determination as to whether

8       there's design and causation, allow us to put on our

9       collapse upon wetting analysis and theory as to why

10      it's not design and let the jury decide.  Thank you.

11          THE COURT:  You will not, then, attribute

12      fault to anyone other than defending against the

13      allegation of your fault, meaning your client's, of

14      course?

15          MR. MASON:  Well, the logistics, Your Honor,

16      of what the court will permit and what is -- is

17      something that we need to work through.  I think the

18      cases that we cited with respect to the

19      determinations would indicate that in making our

20      analysis, we should be able to say that this was

21      constructed by someone else, you know, that the --

22      that it was too dry and too thick, and that was the

23      cause of this.

24          THE COURT:  You're going to keep it in the

25      realm of causation.

1              MR. MASON:  That is -- that is what I intend

2         to pursue, Your Honor.  Absolutely.

3              THE COURT:  All right.

4              MR. MASON:  That's what it's relevant for,

5         to -- to prove causation.

6              THE COURT:  Well, let me begin by, you know,

7         this is an issue that is very important to the

8         parties, but also an issue that does not have a

9         history in the cases, at least those that have been

10        cited.

11             Certainly, there are some cases that have been

12        cited from other states that have touched upon the

13        issue, but we are in a very unusual posture, which

14        distinguishes this case from all of those other ones

15        in my view, including Judge Spalding's R&R;

16        although, you could take that recommendation and

17        report and certainly suggest that those are similar

18        procedural issues.

19             I do think there may be a difference in a

20        products case versus a case like we have because of

21        the procedural posture in which the summary judgment

22        was entered in this case.  I don't know what the

23        procedural posture was in her case.  As I recall, it

24        was entered -- summary judgment was entered in state

25        court before it was removed.

1          In our case we have essentially a summary

2     judgment order exonerating Barnard from any

3     liability to TBW.  Although HDR certainly had the

4     opportunity and did weigh in on the issue, in fact,

5     suggested that as an alternative to addressing the

6     voidability of the settlement agreement, it is

7     apparent to me, even having now reviewed the agreed

8     facts that Mr. Harrison alluded to, that these

9     facts, although a part of the record, are not the

10    type of evidentiary observations that guide me in

11    what I think is a very interesting and challenging

12    issue.

13         I think this is plain and simple a matter of

14    whether or not HDR is collaterally estopped from

15    litigating a cause for the cracking that it

16    attributes to Barnard.  The elements of collateral

17    estoppel are not in dispute.  Both parties have

18    discussed them.  But for the record, as far back at

19    1998 in *Pleming*, P-l-e-m-i-n-g, *versus Universal*

20    *Rundle Corp*, at 142 F3d 1354 at page 1359, the

21    Eleventh Circuit set forth the requirement of a

22    party relying on the doctrine of collateral

23    estoppel.  First, that party must show that the

24    issue at stake is identical to the one involved in

25    the prior proceeding; second, that the issue was

1    actually litigated in the prior proceeding; and,

2    third, that the determination of the issue in the

3    prior litigation must have been a critical and

4    necessary part of the judgment in the first action;

5    and, fourth, that the party against whom collateral

6    estoppel was asserted must have had a full and fair

7    opportunity to litigate the issue in the prior

8    proceeding.

9        In reverse order, although HDR certainly had

10   an opportunity to litigate if it chose in response

11   to the summary judgment this concept of collapse

12   upon wetting, that wasn't an issue raised by TBW or

13   Barnard, and it really had nothing to do with TBW's

14   claim against Barnard; so, therefore, it wasn't part

15   of that summary judgment proceeding.

16       Certainly, it was referenced in the agreed

17   facts and there's some tidbits about the experts

18   having some disagreement.  But that wasn't a

19   contention that TBW had that was resolved in favor

20   of Barnard.

21       So it was not the identical issue.  It was not

22   actually litigated in that summary judgment

23   proceeding.  And it certainly was not a critical and

24   necessary part of that summary judgment.  What was

25   resolved in that proceeding was simply that TBW

1    could not under any set of circumstances prove its

2    case against Barnard.  The issue then was Barnard's

3    liability to TBW on its claims.

4         The collapse upon wetting theory of causation

5    that HDR now seeks to present is a defense to the

6    plaintiff's claim.  It's not something that would

7    have been brought up in the summary judgment other

8    than gratuitously through the agreed statement of

9    fact between Barnard and TBW.

10        I am going to, based on my thoughts as I've

11   just articulated, and determining whether collateral

12   estoppel applies and, if so, whether it prevents HDR

13   from presenting its collapse upon wetting theory,

14   deny the motion of Tampa Bay Water, which is Docket

15   Number 540.

16        In *CSX Transport, Inc. versus Brotherhood of*

17   *Maintenance of Way Employees* at 327 F3d 1309 at page

18   1317, the Eleventh Circuit again addressed

19   collateral estoppel or issue preclusion and whether

20   or not it forecloses re-litigation of an issue of

21   fact or law that has been previously litigated.  In

22   that case it was in a prior lawsuit.  In our case

23   it's actually within the same case.  And the court

24   stressed that the issue at stake must be identical

25   to the one involved in the prior litigation.

1          I understand TBW's argument that as far as it

2     was concerned the issue at stake in the summary

3     judgment was Barnard's fault.  But if you look

4     closely, it's not fault.  It's the liability of

5     Barnard to TBW.  Under no set of facts that TBW

6     could advance was there any liability of Barnard to

7     TBW.  That is a wholly different issue than whether

8     or not HDR can as a defense point to collapse upon

9     wetting as the cause for the cracks that TBW

10    complains of and the allegation that the design was

11    negligent.

12         The court in CSX reiterated that the issue

13    must have been actually litigated.  The collapse

14    upon wetting issue was not litigated.  It was

15    alluded to, it was mentioned, but it was not

16    litigated.  And to the extent that those agreed

17    facts might be argued to have raised issues of fact

18    because the experts disagreed on the question of

19    collapse upon wetting, I find now in hindsight that

20    that or any dispute in the facts was not material to

21    the issues between TBW and Barnard.

22         There may have been factual issues concerning

23    collapse upon wetting, but they weren't material

24    issues to the dispute between Tampa Bay Water and

25    Barnard, because it wasn't an issue between the two

 1    and, therefore, would not have precluded summary

 2    judgment.

 3         And as I said earlier, the -- it was not --

 4    collapse upon wetting was not a critical and

 5    necessary part of the judgment, and that was whether

 6    or not TBW, under any set of circumstances, could

 7    prove that Barnard was liable to it on its claim.

 8         I don't think it's a question of parsing out

 9    theories or splitting hairs.  I think it's a matter

10    of applying collateral estoppel or not in a very

11    unusual and somewhat, as far as I'm concerned,

12    precedent-setting procedural posture that we find

13    ourselves in.  But for this settlement and agreed

14    set of facts, we would have had a more traditional

15    lawsuit where TBW attempts to prove its case against

16    two defendants who may point at each other.

17         The sole question as far as I'm concerned in

18    this -- on this motion is whether the issue of

19    collapse upon wetting is the identical issue at

20    stake in the summary judgment ruling, and I find

21    that it was not.

22         There is a difference between TBW's claim

23    against Barnard and this defense that HDR is

24    raising.  HDR is entitled and it would be unfair not

25    to allow it to defend the allegation that its design

1    negligence was the proximate cause of the cracking.

2    It should be able to defend against an allegation by

3    establishing that the cause was other than a

4    negligent design, that is, that it was a result of

5    collapse upon wetting.

6        I think it important that all of this be

7    presented to the jury from the perspective of

8    causation as opposed to fault, and that is how I'm

9    instructing counsel to approach this issue in front

10   of the jury.

11       I appreciate all the efforts.  It's an

12   interesting issue.  It's intriguing.  And I may not

13   be the last judge to look at it in this case.  But

14   that is my ruling.  And I have carefully applied the

15   precedent from *Pleming* and *CSX* from the Eleventh

16   Circuit in determining that HDR is not collaterally

17   estopped.  And as far as all of the cases that have

18   been cited, the *Allen* decision is but an R&R which I

19   cannot give much weight to since it was never passed

20   upon by the district court, the *Loureiro versus*

21   *Pools by Greg, Inc.* case does have a statement in

22   dicta that supports my finding, but I acknowledge

23   that was not a summary judgment case.

24       The *Clement versus Rousseau Corporation* was

25   not on point.  That was an immunity case.  I guess

1    by analogy one might argue that it's helpful.  The

2    *Southern Bell* case cited by TBW, the 668 So.2d 1039,

3    discussion at page 1041 really focuses on the *Fabre*

4    issue and whether or not the *Fabre* defendant who had

5    been exonerated because of no evidence of fault

6    would go on the verdict form.  That's just not the

7    issue before me today.

8         Now, let's revisit some of the issues I

9    reserved on.  I believe it was Docket 430 and 436,

10   was it not, the lenses, pockets, streaks and layers?

11        MR. MASON:  No, Your Honor, you already ruled

12   on those.

13        COURTROOM DEPUTY CLERK:  Your Honor, I have

14   451.

15        THE COURT:  451.  I stand corrected by the

16   clerk.  Thank you.  That was the motion to strike

17   the affirmative defense, the failure to implicate

18   the warranties.  Any final comments on that?  That's

19   your motion, Mr. Harrison.

20        MR. HARRISON:  Thank you, Judge.  Our position

21   remains the same.  However we got there, Barnard's

22   been exonerated from liability.  So it seems not

23   possible that we would have had a warranty claim to

24   have asserted against someone who has no fault in

25   this case.  That's our position.  And it doesn't

1    matter whether they had been adjudicated not liable

2    at the time.  They have since been found to have no

3    liability to us.  It seems wholly inconsistent to

4    say we should have made a warranty claim against

5    them.

6          THE COURT:  Mr. Woodward?

7          MR. WOODWARD:  Judge, our position really

8    isn't any different on this, either.  I think

9    it's -- in light of your ruling now, it's seems

10   clearer to me that the issue of Barnard's liability

11   to Tampa Bay Water is distinguishable from whether

12   Barnard had obligations under the warranty prior to

13   finding itself in a position where it had no

14   liability.  I don't think I need to belabor that

15   point any further, unless you'd like me to.

16         THE COURT:  It would seem to me that,

17   consistent with my logic, hopefully right, but right

18   or wrong, that there is a distinction between the

19   summary judgment ruling finding that TBW could not

20   prove a case against Barnard; therefore, Barnard

21   could not under any circumstance be liable to TBW,

22   and your defense that your design did not cause the

23   cracking.

24         If I carry that logic out to its logical

25   conclusion, not to be redundant, if TBW is

1    foreclosed from asserting any liability against

2    Barnard and, therefore, Barnard has been exonerated

3    with respect to TBW's claims, I don't know how the

4    question of warranty comes into play without

5    contradicting the summary judgment order.

6         So your response to that.  I know that's a

7    tough question because I probably didn't articulate

8    it very well.

9         MR. WOODWARD:  I think I follow you, Judge.

10   It's -- I think it does come into play here because,

11   again, the summary judgment ruling does find that

12   Barnard has no legal liability to Tampa Bay Water as

13   of the day of that summary judgment, August whatever

14   it was, 2011.  But there's nothing in that summary

15   judgment order nor is there anything in the record

16   that would show that we ever actually litigated,

17   because this is a collateral estoppel issue, as

18   well, as alleged by Tampa Bay Water, that showed we

19   actually litigated what Barnard's obligations under

20   that warranty were at times at which the warranty

21   could have been implicated, which are in years prior

22   to the summary judgment and, therefore, years prior

23   to the factual stipulations, contractual

24   stipulations entered into between Barnard and Tampa

25   Bay Water.

1              If we had the same discussion in 2010 or 2009,

2      it -- there wasn't any agreement that would have

3      kept Barnard out of it.  It's not a matter of

4      whether the jury finds Barnard has liability to

5      Tampa Bay Water today, because this is just a

6      failure to mitigate affirmative defense and that

7      necessarily contemplates that what we're talking

8      about is could Tampa Bay Water have mitigated its

9      damages better years ago by calling upon Barnard

10     when it had a warranty obligation.  Whether it did

11     or didn't could still be litigated.  I don't think

12     we've done it yet.

13             If I under -- that's my response, if I

14     understood your question correctly, Judge.

15             THE COURT:  All right.  Thank you.

16             MR. WOODWARD:  Thank you.

17             THE COURT:  I'm going to grant the motion and

18     find, consistent with the summary judgment

19     adjudication, that Barnard cannot and is not liable

20     to TBW, that that issue has been resolved such that

21     there is no breach of warranty or warranty claim

22     that TBW could have asserted against Barnard.

23             I don't think it so much a matter of

24     collateral estoppel as to HDW -- HDR, excuse me, as

25     it is -- it might be judicial estoppel, the slight

```
1    distinction being that I have adjudicated that there
2    is no liability flowing from Barnard to TBW.  That
3    being the case, past and future, there could not
4    have been without violating that determination any
5    claim of warranty on the part of TBW against
6    Barnard.
7         And that, again, is simply another example of
8    the unusual procedural posture that we find
9    ourselves in, having this summary judgment issue
10   raised in the context of a settlement.  And I don't
11   think it to be inconsistent that HDR can defend on
12   causation by advancing their collapse upon wetting
13   theory by precluding them from arguing failure to
14   mitigate when TBW could not have by virtue of the
15   summary judgment prevailed on a claim against
16   Barnard.
17        Do I have any other motions that I reserved
18   on, Anne?
19        COURTROOM DEPUTY:  No, Your Honor.
20        THE COURT:  I'm sorry.
21        MR. MASON:  Yes, Your Honor.
22        THE COURT:  Which one?  Let have the clerk
23   tell me and then you can tell me if you agree.
24        MR. MASON:  I thought you were addressing me.
25        COURTROOM DEPUTY CLERK:  Did you finish 544?
```

1      That's it.

2           THE COURT:  We haven't gotten there yet.

3      Which one did you think, Mr. Mason, I had not

4      completely addressed?

5           MR. MASON:  Your Honor, my notes reflect that

6      we have not addressed 544.

7           THE COURT:  We haven't gotten there yet.  I'm

8      talking about any of the ones we talked about this

9      morning.

10          MR. MASON:  I apologize.

11          THE COURT:  So I've ruled on all those?

12          MR. MASON:  Yes, your Honor.

13          THE COURT:  All right.  Last motion, 544.

14     This is Tampa Bay Water's motion in limine number 11

15     to exclude, I'm just reading, Dr. Bromwell's new

16     opinions and photographs.  Mr. Forziano?

17          MR. FORZIANO:  Yes, Your Honor.  Good

18     afternoon.

19          THE COURT:  Good afternoon.

20          MR. FORZIANO:  You're correct.  We are here on

21     a new report issued by Dr. Bromwell 10 days ago

22     that contains new opinions and references new

23     photographs, Your Honor.

24          In all fairness, the report is purported to be

25     a rebuttal to new supplemental report that our

1      expert submitted last month.  And we are not

2      challenging those portions of Dr. Bromwell's new

3      report.  That properly rebuts our expert's report.

4      Rather, there are provisions of Dr. Bromwell's new

5      report that are brand new.  They are new opinions

6      that are unrelated to rebuttal, and there is -- and

7      he relies on those new opinions on photographs that

8      are new, as well, Your Honor.

9           Our expert's report from last month, Your

10     Honor, is supplemental and it's new because it's

11     based on new evidence.  It's based on operations of

12     the reservoir last year, in 2011, and some new

13     cracks and recracking that occurred in the northeast

14     portion of the reservoir.

15          Now, it's uncontested, in fact, HDR's expert

16     will tell you that the northeast area of the

17     reservoir is a significantly damaged area of the

18     reservoir.  So that's not the issue.  And that's the

19     entire focus of the Golder's report, Your Honor.

20          But in his rebuttal, Dr. Bromwell provides

21     opinions regarding what he calls the majority of the

22     reservoir, the other areas besides the northeast.

23     And what he does is he offers brand new opinions

24     that the performance -- and I'm quoting, the

25     performance and appearance of the soil cement around

1      the majority of the Tampa Bay Water reservoir in

2      accordance with generally accepted expectations for

3      erosion protection.  It is consistent with other

4      soil cement projects that I have designed, inspected

5      and observed.  And then he bases his opinion based

6      on his 50 some odd years of experience and

7      photographs of his other projects which are not

8      included in his report but are referenced to an HDR

9      trial exhibit.  And it's HDR trial exhibit 579.

10           And that trial exhibit, Your Honor, as a side

11     note is the series of 41 unlabeled photographs.  And

12     from looking at them, one can't determine what the

13     projects are, where they are, where they were built,

14     what state they're in, what the designs are, what

15     the soil cement mix design was, when they were

16     constructed or whether Dr. Bromwell had anything to

17     do with them.

18           The only mention in Golder's three page

19     supplemental report, and it does have some exhibits,

20     it has photographs and some graphs, but that's all

21     of the northeast, his three page report is simply to

22     say with regard to collapse upon wetting that the

23     fact that the reservoir is still cracking after six

24     years of operation is inconsistent with the theory

25     of collapse upon wetting because Dr. Bromwell has

1      opined that collapse of thick, loose, dry protective

2      layers occurs immediately upon wetting.

3          Now, he does say that the void that's formed

4      down there in the protective layer takes some time

5      to reach the surface.  But that has nothing to do

6      with his brand new opinion saying the majority of

7      the reservoir is okay.  And I can tell you that

8      because of my experience with these other projects.

9          Now, HDR raises two issues in their response.

10     First, they say it's not a new opinion and then say

11     it's rebuttal to Golder's report.  With regard to it

12     not being a new opinion, it is, Your Honor.  What

13     they tried to do is they try to kind of bootstrap

14     this to his opinion in his original Rule 26 report

15     from March of 2010.

16         In that report, he does say the majority of

17     the reservoir is okay.  But he does so by comparing

18     it to the damaged area.  He says there's a big

19     difference between the damaged area and the majority

20     of the reservoir.  He never once does he ever refer

21     to his other projects and say, based on the way this

22     soil cement at the reservoir is performing compared

23     to these other projects, never makes that

24     comparison.

25         Now, during his deposition that I took in

1       November, Your Honor, of 2010, I asked him about

2       other projects, not because he brought them up,

3       because I wanted to know what his experience was.

4       And he described other projects he's been involved

5       with.

6            Right after that deposition, we subpoenaed him

7       regarding his other projects.  Both he and his firm

8       and HDR objected.  They said those other projects

9       aren't relevant.  They're substantially different.

10      You can't have them.

11           We filed a motion to compel.  They raised

12      those same arguments with Magistrate McCoun, and

13      Magistrate McCoun agreed.  He said those are not

14      relevant.  You can't have the documents.  But now

15      they're trying to refer to these other projects.

16           We've been prejudiced in that we cannot

17      conduct discovery.  We've been refused discovery on

18      this.  It's a brand new opinion.  It was never

19      discussed in his Rule 26 report.  And during his

20      deposition, he never compared those projects to the

21      vast majority of the reservoir or any portion of our

22      reservoir.

23           I'm trying to flip through so I can summarize

24      so I don't take too much of the court's time, Your

25      Honor.  I think that summarizes what our -- what our

1        opposition to this new evidence is, Your Honor.

2            THE COURT:  So you don't have any problem with

3        his rebuttal opinion to Mr. Golder's discovery of

4        the new cracks in the spring and summer of 2011.

5        What you object to is his reliance on prior projects

6        and photographs demonstrating, I presume, whatever

7        cracking was found as being consistent or normal?

8            MR. FORZIANO:  Yes, Your Honor.

9            THE COURT:  I'm paraphrasing, of course.

10           MR. FORZIANO:  Sure.  The majority of his

11       report, his rebuttal report, actually addresses the

12       cracking.  It says, no, no, Golder's got it wrong.

13       This is how we think, there'll be conditional

14       movement and cracking in the northeast area.  That's

15       fine.  We don't object to that, Your Honor.  That's

16       rebuttal.

17           But what he addresses in his rebuttal report

18       is the other areas of the reservoir that wasn't

19       addressed by Golder.

20           THE COURT:  Well, isn't that in the context of

21       if Golder says, there's new cracks and here's why,

22       wouldn't he be, in fairness, able to look at the

23       entire reservoir and put it in a perspective that

24       the jury can understand?

25           MR. FORZIANO:  No, Your Honor, because he

1    doesn't do that in his report.  He doesn't explain

2    how one area of the reservoir and its performance

3    relates to the other.  He doesn't do that in his

4    rebuttal report.  What he does is he tries to fill a

5    gap and provide new opinions and new evidence

6    regarding his opinion formed and expressed in his

7    March of 2000 report -- I'm sorry, 2010 report.

8        The focus of Golder's report is just the

9    northeast.  It says, hey, there's continued cracking

10   of this area which is inconsistent with the collapse

11   theory that you get collapse immediately upon

12   wetting.  And Dr. Bromwell goes a step further and

13   says, that's wrong.  And as a side note, the rest of

14   the reservoir is performing just fine, which has

15   nothing to do with the -- with Golder's supplemental

16   report.  Golder focussed on the northeast.

17       And in Dr. Bromwell's original report, he

18   never references his prior experience.  Now, if he

19   wanted to talk about his 50 years of experience in

20   these other projects, he could have and by rule

21   should have discussed that in his -- in his -- in

22   his original report, which is now 600 days old,

23   plus.

24       When you look through his report, you look

25   through his deposition, this is brand new opinion

1    and brand new basis.

2           THE COURT:  All right.  Thank you.

3           MR. FORZIANO:  Thank you, Your Honor.

4           THE COURT:  Mr. Meaders?

5           MR. MEADERS:  Thank you, Your Honor.  May it

6    please the court.

7           I would beg to differ with counsel on one very

8    important part, which is important to the

9    supplementation by Dr. Bromwell.  Counsel states

10   that the entire focus of Golder's report is in the

11   northeast corner.

12          Really, nothing could be further from the

13   truth with respect to that, Your Honor.  In fact,

14   what Golder's report says is looking at the

15   northeast corner and that Tampa Bay Water has hired

16   Black and Veatch to go all around the reservoir and

17   look at every single new, unusual crack and flag it,

18   identify every single new crack, and he talks about

19   new cracks all around the reservoir, but he doesn't

20   put -- Golder doesn't put those new cracks that he's

21   claiming around the reservoir in any type of

22   context.

23          What he does is he then focuses on five cracks

24   in the northeast corner to say that those cracks by

25   extrapolation show something inconsistent with

1      Bromwell and these other cracks, which I won't

2      really describe in his report the way Golder does

3      it, are unusual, too.  Rule 26(a -- formerly A3, now

4      I think it's D, Your Honor, with respect to a

5      supplemental report says that that can be solely to

6      contradict, rebut the same subject matter of the

7      report by an expert that's provided as long as it's

8      provided within 30 days.

9          Now, I take it interesting that counsel gets

10     up here and with disdain says that our report was

11     served some ten days ago.  We didn't receive their

12     report, their expert's ninth until 15 days ago, or

13     17 days ago, if you count the weekend, Your Honor.

14         All Bromwell was doing was supplementing his

15     report to contradict or rebut on the same subject

16     matter of what Golder in his report is talking

17     about, and it is really cracks around the entire

18     reservoir.  He testified in his deposition that he

19     had years of experience in --

20         THE COURT:  Talking about Bromwell?

21         MR. MEADERS:  Yes.  He testified that he had

22     years of experience with respect to soil cement,

23     what it looks like, how it's supposed to act, what

24     it's supposed to do.  Counsel questioned him for

25     hours on those projects.  Not once in those hours

1      did they ask, well, what do those other projects

2      look like.

3           All he's doing is relying on his experience in

4      those other projects to say this is how soil cement

5      reacts in the world.  And what's happening in the

6      northeast corner is so strikingly different that

7      these cracks that are occurring elsewhere are not

8      out of the norm.

9           That is fair rebuttal when their expert 30

10     days before trial renders a new opinion that the

11     cracks that he says he sees are inconsistent with

12     Bromwell's original opinion.  All Dr. Bromwell is

13     doing is putting those cracks in context, as the

14     court noted, with respect to what soil cement, how

15     it performs, how it reacts.

16          THE COURT:  Why did you oppose, then, the

17     motion to compel that was heard by Magistrate

18     McCoun?

19          MR. MEADERS:  Because the real topic of the

20     motion to compel, and look at the order that we have

21     supplied to the court, we quoted the court, what

22     they asked Dr. Bromwell to produce was his modeling,

23     was all the technical literature, all of the data,

24     all of the computer work, everything that went

25     behind determining what soil cement permeability

1    should be in analyzing issues such as seepage

2    analysis, upstream slope stability and the like.

3         Our objection to that was with respect to the

4    configuration and dynamics of an embankment, and

5    they're all different.  Some of them have a cutoff

6    wall that goes right up and down the middle of the

7    embankment, not even close to what this one is.

8    Some of them don't even have a geomembrane.

9         So with respect to modeling, scientific

10   analysis, a determination of whether or not the

11   slope's stable, with that there's little relevancy

12   in the type of data they were going to obtain

13   through that subpoena, in connection with the vast

14   majority of time and cost that Dr. Bromwell would

15   have to go through and his staff would have to go

16   through to produce that data.

17        The judge sided with us simply saying that

18   there's probably little relevancy in it at the late

19   stage as when that was in the litigation back a year

20   ago or a year and a half ago.  And if there is a

21   little relevancy to it, it's way outweighed by the

22   cost that they were asking an outside expert to go

23   through to produce data and his staff to produce

24   data for what they claimed it was going to show.

25        Interestingly, they never asked, can we see

1    photographs from these other locations.  So their --

2    their quest was much different than what they tried

3    to tell the court that we were trying to -- we

4    objected to.  And the court sided with us with that

5    objection because on balance, it wasn't going to

6    supply the information that they requested

7    reasonably for a cost to our particular expert.

8         THE COURT:  In your words how does Bromwell's

9    reliance on these prior projects and these

10   photographs rebut Dr. Golder's new opinions -- well,

11   supplemental opinions, I should say, the January

12   2012 opinions.

13        MR. MEADERS:  In twofold, Your Honor.  First,

14   I'll point out that the rule says rebut -- rebut,

15   contradict or respond I believe to the report or the

16   subject matter of the report.  So it doesn't

17   necessarily have to be directly in rebuttal to a

18   direct opinion.  It needs to be responding to,

19   contradicting or -- sorry.  Responding to,

20   contradicting or rebutting the same subject matter.

21        The subject matter of Golder's report was

22   cracking around the entire reservoir.  The way this

23   goes to rebut and contradict that, first of all, is

24   because it puts in context that the cracking at the

25   majority of the reservoir, 90 percent, not the

1    northeast corner, is cracking that is found in other

2    soil cement conditions.  That's how soil cement

3    performs.  That is a rebuttal to Golder saying that

4    this new crack mapping around the reservoir has

5    found great and unusual cracks around the reservoir.

6         In addition, Your Honor, because Golder

7    attempts to point specifically to the northeast

8    corner as being inconsistent with Dr. Bromwell's

9    previous opinions, these photographs, this

10   information, whether it be the majority of the

11   remainder of the reservoir or other soil cement

12   projects directly rebuts and contradicts that

13   subject matter because Bromwell's opinion is in the

14   northeast corner.

15        The phenomenon that is occurring is unique and

16   strikingly different to the remainder of this

17   reservoir and soil cement projects in general.

18   Therefore, it is not a design question around the

19   entire reservoir because it's not occurring.

20   Therefore, it's not a design question because these

21   cracks that are seen elsewhere in the reservoir are

22   expected, are those that are not unusual in the

23   context of soil cement performance.

24        What Brumund intends to say is because the

25   northeast has some additional movement, that's

1    inconsistent with Dr. Bromwell.  He addresses that

2    specifically.  He then goes on to say the cracks

3    that you are talking about in your new report,

4    Dr. Brumund, are not inconsistent with soil cement

5    performance.  And for you to say that is incorrect.

6         That's why his report, those photographs, his

7    reliance on four years of experience on soil cement

8    do go directly to contradict, rebut or respond to

9    the subject matter of what Golder supplied to us in

10   a report basically 30 days before trial, although he

11   had done the inspections, Your Honor, back in

12   January, February, June, August of last year.

13        And their photographs that he took back in

14   that time weren't produced to us until 30 days ago.

15        THE COURT:  All right.  Thank you,

16   Mr. Forziano, any response?

17        MR. FORZIANO:  Yes, Your Honor.  First, HDR's

18   taken inconsistent positions, what they're saying

19   today and what they said in the motion to compel.

20   In response to the motion --

21        THE COURT:  Well, it sounds like you are, too,

22   from what he's saying.

23        MR. FORZIANO:  Well, that's not correct, Your

24   Honor.

25        THE COURT:  Well, I'm not going to be a

1    referee.  It sounds like you both are taking some

2    liberties.  But I've got an issue before me

3    concerning the admissibility of expert testimony,

4    so let's talk about that.

5         MR. FORZIANO:  Okay.  The new opinions and the

6    new photographs by Dr. Bromwell really have nothing

7    to do with new cracking in the northeast.  How can

8    one say that the additional movement in the

9    northeast is not due to collapse upon wetting

10   because the rest of the reservoir looks fine?  That

11   doesn't make sense.  That's what he -- that's what

12   the evidence is going to show.

13        He wants -- what he really wants to do, Your

14   Honor, is he wants to bootstrap and he wants to

15   buttress his original opinion back in March of 2010

16   that most of the reservoir okay.  And now he wants

17   to use this rebuttal report as a vehicle to

18   supplement the basis for that opinion.

19        That's all that's going on here, Your Honor.

20   What he wants to now do is say, hey, jury, not only

21   look at my original opinion comparing the -- most of

22   the reservoir to the northeast, but now compare them

23   to all my other projects, which HDR and Dr. Bromwell

24   stated in pleadings are not substantially similar to

25   the reservoir.

1          They also wrote that these five reservoirs

2     differ substantially from the construction of the

3     embankment of the Tampa Bay Water reservoir, and all

4     five reservoirs, they also point out, don't have a

5     soil wedge.

6          THE COURT:  Don't have a soil wedge?

7          MR. FORZIANO:  That's what they pointed out,

8     don't have a soil wedge.  And they were trying to

9     identify distinguishing features between

10    Dr. Bromwell's other projects and this project to

11    show and convince Magistrate McCoun, don't let them

12    have these documents because there's such a

13    difference.

14         Whatever he can glean, it's going to be

15    prejudicial, it's going to be misleading, all those

16    things because they're not substantially similar

17    facilities, Your Honor.  And we were denied

18    discovery on those projects.  And it wasn't just

19    modeling we asked for, we asked for basis design

20    reports, we asked for a whole long list of

21    documents, Your Honor.  We did ask for the modeling

22    as well because that is an issue that we wanted to

23    look at, but it was more than just modeling reports,

24    Your Honor.

25         As far as Golder's new photographs, Your

1    Honor, that they reference, well, those are new

2    photographs as they were taken after the close of

3    discovery.  Dr. Bromwell very easily, if he was

4    trying to distinguish and compare the performance of

5    the soil cement reservoir to his other projects, he

6    could have done that back in March of 2010.  There

7    was nothing preventing him from doing that.

8         In fact, in his March 2010 report, he doesn't

9    at all discuss the expectations of the soil cement.

10   All he makes is a blanket statement that most of

11   it's fine, there's a couple of damaged areas, but

12   most of it's fine.  And when you compare the damaged

13   areas to the undamaged areas, they're very

14   different.

15        But he never talks about or expresses opinions

16   about the expectations of soil cement or how the

17   soil cement in other projects behave.

18        THE COURT:  Just a moment, please.

19        (Brief pause.)

20        THE COURT:  I'm sorry.  But our security locks

21   are clicking on and off and it sounded like someone

22   was trying to come in.  Not that I'm concerned about

23   it, other than it's distracting me.  Sorry,

24   Mr. Forziano.

25        MR. FORZIANO:  That's okay, Your Honor.  So

1      this is a brand new opinion, Your Honor.  It's a

2      brand new basis to support his previous opinion.

3      And it doesn't properly rebut or respond to Golder's

4      focused report of cracking in the northeast, which

5      is a previously damaged area.

6          THE COURT:  Does Golder reference cracking

7      throughout the reservoir in this most recent report?

8          MR. FORZIANO:  No, Your Honor.  They have

9      tables and charts and discussions all in the

10     northeast.

11         THE COURT:  You say no.  All I want is no.  He

12     doesn't say that?

13         MR. FORZIANO:  No, Your Honor.

14         THE COURT:  Meaders, you said that he

15     referenced it.  Let me see it.

16         MR. MEADERS:  In fact, it's attached to our

17     response, I believe, Your Honor.  Look at Docket

18     550-1.

19         THE COURT:  What page?  I've got it here.

20     Thank you.  I've got it.  What page.

21         MR. MEADERS:  It appears just from copying

22     here that that page may not have gotten over there,

23     Your Honor, but let me quote it for the record.

24     Tampa Bay Water tasked Black & Veatch and Veolia,

25     that's V-e-o-l-i-a Water in July 2011 to perform

1    crack mapping inventory to document the locations,

2    widths, lengths of new unusual cracks in the flat

3    plate soil cement.  During this inventory Black &

4    Veatch and Veolia Water marked new unusual cracks

5    with flags and identification numbers along with red

6    spray paint at locations for crack and width

7    measurements.

8        What those flat plate soil cement reports show

9    or intend to show is a mapping of every single crack

10   in the reservoir, including those that are two

11   millimeters in lengths or two millimeters in width

12   or less, and that that crack mapping is entirely

13   around the reservoir.  So Dr. Golder is talking

14   here --

15       THE COURT:  Wait, wait, wait.  Read the last

16   portion and then close your quote.

17       MR. MEADERS:  The crack width measurements,

18   the identification numbers for the new unusual crack

19   measured and photographed by both -- I'm sorry.

20   Forgive me, Your Honor.

21       THE COURT:  Why don't you just give me page

22   three.

23       MR. MEADERS:  Fair enough.

24       THE COURT:  That would be easier.  I might be

25   able to pull it up electronically but --

1          MR. MEADERS:  My apologies.

2          THE COURT:  That's all right.

3          COURTROOM DEPUTY CLERK:  This way, sir.

4          THE COURT:  This is why we all went to law

5     school.  Maybe somebody of you went to engineering

6     school.  I don't know.

7          All right.  I'm looking at page three of the

8     January 27th, 2012 report of the Golder Group.

9          MR. MEADERS:  Yes.  What Golder does --

10         THE COURT:  Wait, wait.  Let me read it.

11         MR. MEADERS:  Forgive me, Your Honor.

12         (Brief pause.)

13         THE COURT:  Did you ever wonder how an

14    alligator got inside this thing?  You Texas guys

15    ought to know about this.  You've got alligators,

16    too.

17         MR. MASON:  I can tell the court because I

18    asked the question when I was out there.

19         THE COURT:  Did it climb up the embankment and

20    jump in?

21         MR. MASON:  Yes, sir.  They've photographs of

22    it and they've seen it.  They go under the fence

23    even at the base of the back of the reservoir and

24    then they come up and literally climb up over.

25         THE COURT:  They went up the 65 feet slope?

1      It went up the 65 foot slope?

2          MR. MASON:  No.  The back side is a grass so

3      it's not that --

4          THE COURT:  Okay.

5          MR. MASON:  -- same slope.

6          MR. WOODWARD:  The real question is how they

7      know there is water on the other side, Judge.

8          THE COURT:  If I were to ask you where are

9      Stations 246, 248 and 252, what would you say,

10     Mr. Meaders?

11         MR. MEADERS:  They're in the northeast section

12     of the reservoir.

13         THE COURT:  Well, I'm sorry.  I don't see a

14     reference to the entire reservoir, although I'm

15     having to glean from this report he obviously found

16     new cracking.  And the mapping data that's attached

17     is not easily decipherable, other than through the

18     photos.

19         MR. MEADERS:  Right.  The -- what Golder does

20     is he makes a -- he makes a general statement to the

21     overall crack mapping of the entire reservoir by

22     Black and Veatch and Veolia, and talks about that

23     being as new and unusual cracking.  Then he

24     personally focuses on the northeast corner.

25             But the subject matter of his report is not

1        only the northeast corner, it is the claimed new and

2        unusual cracking around the entirety of the

3        reservoir as found in what he claims are Black &

4        Veatch and Veolia flat plate soil cement reports.

5        What Dr. Brumund was doing was trying to say an

6        extrapolation from the northeast applies to the

7        whole with respect to that type of analysis.

8             What Dr. Bromwell did in rebuttal or

9        contradiction to that opinion or position taken by

10       Dr. Brumund in his report there is to say that these

11       cracks, this crack mapping that's being done all

12       over the reservoir is not consistent with what's in

13       the northeast corner, therefore showing the

14       northeast as strikingly different.  But you have to

15       be able to refer to the usual in order to show the

16       unusual.  And that's all that Dr. Bromwell was doing

17       with respect to this report.

18            However, Your Honor, I submit those opinions

19       are not new.  Dr. Bromwell's position in this case

20       has always been that the northeast corner and the

21       southwest that shows some collapse upon wetting from

22       erosion gullies is strikingly different than the

23       cracking that's occurring around the majority of the

24       reservoir which is consistent with how soil

25       cement -- the majority is consistent with how soil

1    cement performs and acts as an erosion protection.

2        With this report and those photographs, all he

3    is doing is rebutting these new opinions supplied by

4    Brumund at the eleventh hour to show, no, that's not

5    inconsistent with soil cement performance.  It's not

6    inconsistent with my previous opinions.  And this

7    further settling in the northeast corner that you

8    want to specifically point to and say it's

9    inconsistent is also not inconsistent with my

10   opinions.

11       I submit to the court that that's fair

12   rebuttal.  That's a fair contradiction, a fair

13   rebuttal to the subject matter of what Golder has

14   tried to say in his latest report.

15       THE COURT:  Any last words, Mr. Forziano?

16       MR. FORZIANO:  Yes, Your Honor.  And I'll be

17   brief.  Nowhere in the Golder supplement report does

18   he compare the northeast to any other portion of the

19   reservoir.  That's a leap of analysis that I think

20   Mr. Meaders is making.  He's focused entirely on the

21   northeast.  All the data that he references is in

22   the northeast, as Your Honor pointed out by the

23   station numbers.

24       Putting that aside, Your Honor, getting back

25   to Dr. Bromwell's photographs and his opinion, in

1    his report he refers to HDR's trial exhibit which

2    has 41 unlabeled photographs.  In his report he

3    doesn't tell us anything about the photographs.  He

4    doesn't tell us where these projects are located or

5    anything about them, when they were constructed, how

6    they're operated, what the materials are -- were

7    made of.  Nothing at all.

8         So with this late addition of a brand new

9    opinion and brand new photographs which is not to

10   rebut Golder's report, we have no basis to

11   cross-examine him.  We have to do a complete voir

12   dire at trial to find out anything about these

13   photographs.  There's 41 of them unlabeled and all

14   but I think three or four of them are undated, as

15   well.  We don't know when they were taken, who took

16   them, what they're of, where they're of.  We're at a

17   complete disadvantage, Your Honor.

18        THE COURT:  All right.  The motion will be

19   denied.  I find that Dr. Bromwell's report as

20   proffered is fair rebuttal to the supplemental

21   report of Golder and Associates dated January 30th

22   of 2012.

23        I am concerned, however about these unlabeled

24   photographs, 41 of them.  That certainly is not

25   something that can be said to have been part of the

```
 1    original opinions of Dr. Bromwell.  I presume they

 2    are representative of some of these prior projects,

 3    Mr. Meaders.  They're unlabeled, most of them are

 4    not dated, there's no foundation.  How in the world

 5    is one to cross-examine him with respect to these

 6    photographs?

 7            MR. MEADERS:  Is that a question, Your Honor?

 8            THE COURT:  Yes, sir.

 9            MR. MEADERS:  I believe first and foremost,

10    Your Honor, I'll be happy to label them.  The

11    question of whether Dr. Bromwell can authenticate

12    them and where they're from is an evidentiary

13    question for trial.  He intends to authenticate

14    them.

15            THE COURT:  Well, they are new exhibits.  So

16    it's not a question of whether they're authenticated

17    in trial.  The question is whether he should be able

18    to use them at all.

19            MR. MEADERS:  We would contend, Your Honor,

20    first of all, they're not new exhibits.  These

21    exhibits were supplied to the plaintiffs under the

22    exhibit list that we had to supply back in our joint

23    pretrial statement in April, and we supplied those

24    to the plaintiff at that time.  So they have been

25    aware of them since over a year ago in April before
```

1    their expert went out and looked at the reservoir

2    again.  And so they're not new in that context at

3    all, Your Honor, they have been supplied to the

4    plaintiffs for some time.

5         THE COURT:  Well, how in the world do they

6    come up in April of last year when Bromwell doesn't

7    do his supplemental report on which he relies on

8    these photographs until this month?

9         MR. MEADERS:  Your Honor, the question is not

10   whether he was -- the photographs were supplied

11   before.  The question with respect to the

12   supplementation of the report is are they rebuttal

13   to the subject matter of what Golder states.

14        With respect to the photographs, they were

15   produced and supplied at the time in our exhibit

16   list as demonstrative of how flat plate soil cement

17   looks.  We have talked about -- plaintiff's counsel

18   argued in one of the first motions today that they

19   could have used rip rap, could have used something

20   else.  They've tried to argue that photographs of

21   the reservoir won't adequately show the jury what

22   soil cement looks like.

23        THE COURT:  Are these photographs of this

24   reservoir?

25        MR. MEADERS:  They're photographs of other

1    soil cement embankments and how soil cement

2    generally looks.  They're demonstrative for the jury

3    as the concept of how soil cement generally looks.

4         THE COURT:  Where did they come from?

5         MR. MEADERS:  They are -- one of -- some of

6    them are from Monford Dam.  I don't have all of them

7    at the top of my mind where they come from, but I

8    can certainly supply those.

9         THE COURT:  Well, did Bromwell furnish them to

10   you is my question.  Is he the source of the

11   photographs?

12        MR. MEADERS:  Bromwell is not the source of

13   some of the photographs.  He is the source of some

14   of the photographs.  He has visited the facilities.

15        THE COURT:  Are you going to offer them as

16   something he relied on in forming his opinions?

17        MR. MEADERS:  All 41 of them, I do not

18   anticipate, Your Honor.  To the extent that the

19   plaintiffs argue that Dr. Bromwell does not know

20   what an unusual crack is and not an unusual crack

21   is, then we would use them to rebut that type of --

22        THE COURT:  Let me make a suggestion to you

23   guys.  It's not very effective advocacy to point

24   your finger at the other side when I'm asking

25   specifically about your exhibits or your witnesses

1    or your theories or your strategies or your conduct.

2    That's a playground tactic.  It doesn't work in

3    courts of law, not with judges who have seen it and

4    heard it before.

5        The question is where did these photographs

6    come from, how are you going to authenticate them

7    and why are they not considered new evidence as

8    Mr. Forziano says they are?  I understand they're

9    listed in your pretrial exhibit list back in April.

10   Listed in what sense?  In a vacuum just as exhibits?

11       MR. MEADERS:  They're listed as exemplar soil

12   cement photographs.

13       THE COURT:  SO not offered into evidence on

14   their own, simply as demonstrative exhibits?

15       MR. MEADERS:  Yes, Your Honor.  Just simply as

16   demonstrative exhibits of how soil cement generally

17   looks.  The jury I anticipate is going to be shown

18   photographs of soil cement out at the reservoir that

19   some of the flat plate is cracked off and moved down

20   the slope.  That happens.  That's in -- that's --

21   these are exemplar demonstrative photographs of

22   other locations of how soil cement looks.

23       He has relied upon them now in rebuttal to

24   Golder's report because Golder's report attempts to

25   juxtapose the northeast corner to the remainder of

1    the reservoir.  And we would contend that that is

2    fair rebuttal to the subject matter of Golder's

3    report.

4         How do we plan on authenticating them?  We

5    plan on Dr. Bromwell authenticating them to the

6    extent that they need to be, that those are taken at

7    those locations, that he has been to those locations

8    or has spoke with other individuals who have been to

9    those locations and have seen that condition.  And

10   that is consistent with the condition of the soil

11   cement at those other locations.

12        THE COURT:  But he relied on them, regardless

13   of where they came from, as examples?

14        MR. MEADERS:  Well, he's relied on his four

15   years of experience in soil cement and how it looks.

16   He doesn't need a photograph to tell him how it

17   looks.  These are demonstrative and --

18        THE COURT:  They're not going to be offered

19   into evidence, simply data and information on which

20   he has relied in explaining his opinions.

21        MR. MEADERS:  The photographs themselves?

22        THE COURT:  Yes, sir.

23        MR. MEADERS:  The photographs will be used as

24   demonstrative and to the extent that he's allowed to

25   explain that they're demonstrative of his personal

```
1    experience with soil cement, then we would offer

2    them as exhibits.  I think he --

3         THE COURT:  Demonstrative exhibits don't come

4    into evidence, and neither does the data underlying

5    an expert's opinion, unless the opponent wants to

6    put it in.  But if you're just offering them as

7    examples or he's going to be describing them as

8    examples, that's one thing.

9         MR. MEADERS:  That's the intent, Your Honor.

10        THE COURT:  Well, Forziano, he says they

11   listed them as an exhibit back in April as -- how

12   did you list them, extrinsic?  Not extrinsic.  You

13   said --

14        MR. MEADERS:  Exemplar photographs.

15        THE COURT:  Exemplars.

16        MR. FORZIANO:  Your Honor, they were listed

17   back in April of 2011.  And I've got them here.

18   They're completely unlabeled.

19        THE COURT:  Were they listed as exemplars or

20   exemplar exhibits?

21        MR. FORZIANO:  I don't know, Your Honor.  But

22   I do know that they were in no way connected to

23   Dr. Bromwell or any of his reports or referred to in

24   any of his reports.

25        THE COURT:  Okay.  Thank you, guys.  I
```

1    appreciate all of your efforts.  This motion is

2    denied.  I find that this is fair rebuttal to the

3    Golder and Associates supplemental report of January

4    30th, 2012.  Under Rule 26(a)(2)(D)(ii), I don't see

5    any real surprise.  Certainly, the defendant -- or

6    plaintiff has an opportunity and has the ability to

7    cure any surprise through cross-examination.

8    They're not going to be offered as substantive

9    exhibits, that's pretty apparent.

10         I think that takes care of all the motions.

11   Has there been any further discussion about this

12   summary trial suggestion that I made, Mr. Harrison

13   or Mr. Forziano?

14         MR. HARRISON:  There has, Your Honor.  We've

15   discussed it preliminarily with our client.  We will

16   discuss it further with the board Monday morning.

17   Nobody has said no.

18         THE COURT:  All right.  That's fine.

19         MR. HARRISON:  There seems to be interest.

20         THE COURT:  Mr. Mason?

21         MR. MASON:  I have engaged in discussion.

22         THE COURT:  All right.  Well, here's what I'm

23   thinking.  And I really do think it would be a great

24   exercise.  I don't think it would be a waste of

25   time.  Even if it were to be limited to causation by

1    agreement, I would hope you would agree you could

2    have a two question verdict, liability and damages.

3    But I realize damages is a much more complicated

4    issue.

5        But I really think we could do that in the

6    span of a day at very, very -- at the very most two

7    days, an expedited jury selection without too much

8    concern about backgrounds, just whether they have

9    any knowledge of the dispute.  The burden would be

10   on the shoulders of the lawyers to be succinct and

11   accurate in their summation of the evidence from the

12   record.  And, of course, you would be able to call

13   your two experts, one on each side, or even two, if

14   you think you can do that.  But not for eight hours,

15   not for six hours.  I still want to remind you --

16   Anne, if you'll pass that back, please, I think to

17   Mr. Meaders.

18       MR. MEADERS:  May I approach, Your Honor.

19       THE COURT:  Yes, sir.  Please, please give

20   some serious thought to that.  And then I'd like the

21   two lawyers, meaning the two legal teams to confer

22   after the board considers it.  I'll defer to that,

23   Mr. Harrison.  I don't know that their yay or nay on

24   it really is determinative.  I don't want to order

25   you to do it.  I really think it's a good idea

1    considering the length of this trial, and it would

2    be nice if the clients agreed.  If they don't agree,

3    we can still revisit it.

4         I've got you scheduled first after my criminal

5    trials, so we've got a little bit of leeway

6    time-wise.  But I want to remind you again that I

7    expect you to be efficient and to revisit your

8    length of examinations respectively of these

9    witnesses.

10        So that's all I can ask.  And thank you in

11   advance that you will do what I ask you to do.  And

12   certainly I don't mind having a telephonic

13   discussion sometime next week.  When are we next

14   scheduled to do something in this case?

15        MR. MASON:  I think the 8th, Your Honor.

16        MR. HARRISON:  Right.  I think we have a jury

17   instruction conference on the 8th, if we need it.

18   We have some interim deadlines.  Tuesday we're going

19   to notify the court about the other count.  And I'll

20   have an answer on the summary jury trial.  The next

21   get together I think is the 8th of March.

22        THE COURT:  Okay.  If that's necessary.  What

23   I was going to suggest is I'm leaving next

24   Wednesday.  I'll be back Thursday afternoon, late.

25   So I would be available for a telephonic, a short

1      telephonic discussion maybe sometime Tuesday, if

2      necessary, or Friday.  I hate to schedule it

3      Wednesday or Thursday because I'll be travelling,

4      and you never know how that's going to be.  And then

5      the following week I think I leave for the west

6      coast on Wednesday.

7           So if we can have a productive discussion

8      about this summary jury trial and the parameters, if

9      it's something that the clients are agreeable to, we

10     can nail all that down and get that going as quick

11     as we can.

12          MR. HARRISON:  Can I ask a question, Your

13     Honor.  I think I just heard the court say you would

14     entertain -- I don't know to say bifurcated, a

15     limited summary on liability.  Is that something the

16     court would entertain?

17          THE COURT:  Well, I mean, I'm open to either

18     suggestion.  I think it would be helpful to both

19     sides to get a definitive yes or no on liability

20     from a summary jury panel.  Unless you agree it's

21     not binding, it's certainly going to give the

22     clients of what these six people thought.  But I

23     don't know that that would help us, given the

24     dynamics.  I think it ought to be both questions.

25          MR. MASON:  It's not going to work, Your

1    Honor.  And I have -- I can say at least at this

2    point that the client is not interested in

3    nonbinding.  So at least I express that to

4    Mr. Harrison so he can communicate that.

5         THE COURT:  Well, whatever.  We've talked

6    about it.  We're trying to avoid --

7         MR. MASON:  We're trying, Your Honor.

8         THE COURT:  -- an expensive, long trial.  And

9    I think we owe it to the jurors and to your clients

10   to explore all options.  So just talk Monday and let

11   the clerk know where we are and if we need to

12   discuss things.

13        MR. MASON:  I think there might be some

14   benefit, Your Honor, regardless of the decision on

15   the other to get some clarity on the time.  I

16   absolutely agree with the court.  I've cut mine way

17   down, if we do do the full blown trial.  But I think

18   it might be some benefit for a telephonic conference

19   one way or the other.

20        THE COURT:  I'm not opposed to that.  I'm not

21   entirely comfortable in arbitrarily limiting both

22   sides.  I saw the rolled eyes.  But I also

23   understand that -- and appreciate that you cannot

24   expect a jury to be able to concentrate and

25   understand and follow the evidence in this case over

 1    three or four or five weeks.  I'm sorry, but it's

 2    just too much to ask.

 3         MR. MASON:  I agree.  I'll agree to time

 4    limitations as long as we could -- something that

 5    makes sense for all so --

 6         THE COURT:  Well, that's what I'm hoping you

 7    guys will come up, something more palatable than

 8    what we looked at the other day.  And that's a start

 9    and I appreciate the efforts.

10         With that I'm going to turn to a criminal

11    matter.  See you guys.  Thank you.

12         (Proceedings concluded at 3:00 PM.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4     STATE OF FLORIDA              )

5     COUNTY OF HILLSBOROUGH    )

6         I, Linda Starr, RPR, Official Court Reporter for

7     the United States District Court, Middle District,

8     Tampa Division,

9         DO HEREBY CERTIFY, that I was authorized to and

10    did, through use of Computer Aided Transcription,

11    report in machine shorthand the proceedings and

12    evidence in the above-styled cause, as stated in the

13    caption hereto, and that the foregoing pages,

14    numbered 1 through 184, inclusive, constitute a true

15    and correct transcription of my machine shorthand

16    report of said proceedings and evidence.

17        IN WITNESS WHEREOF, I have hereunto set my hand in

18    the City of Tampa, County of Hillsborough, State of

19    Florida, this 6th day of March 2011.

20

21

22          _____/s/ Linda Starr_____
            Linda Starr, RPR, Official Court Reporter
23

24

25