UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**TAMPA BAY WATER,**

    Plaintiff,

vs.　　　　　　　　　　　　　　　　　　　　　　　Case No. 8:08-CV-2446-T-27TBM

**HDR ENGINEERING, Inc.,**

    Defendant.
_____/

## ORDER

**BEFORE THE COURT** is Tampa Bay Water's motion for a new trial (Dkt. 648) and HDR's response in opposition (Dkt. 651). Upon consideration, the motion is DENIED.[1]

### Discussion

In this action tried before a jury, TBW claimed that HDR negligently designed the C.W. Bill Young Regional Reservoir which caused cracks to form in the reservoir embankment. In summary, TBW presented expert testimony and supporting evidence that the unusual cracking was caused by excess water pressure created during the draw-down of the reservoir which de-stabilized the soil, causing the water within the wedge to push the soil cement up, creating voids. TBW's expert witness, William Brumund, was critical of, among other things, HDR's permeability rate assumption, its modeling, the adequacy of its test borings, the accuracy of its data reporting, and the

---

[1] Notwithstanding its 26 page motion (and 62 exhibits) raising no less than 13 claims of error, its liberal use of footnotes and at least 4 pages on unremarkable recitation of applicable legal principles, TBW complains that its "ability to present the grounds for this Motion and appropriate legal argument have been severely hampered by the Court's denial of its motion (Dkt. 637) and amended motion (Dkt. 639) for leave to exceed the 25-page limit set forth in Local Rule 3.01" (Dkt. 649, n. 1). The Court is unsympathetic. Considering the 650+ docket entries in this case, and the number of motions and their length, no good cause was shown by TBW for exceeding the page limitation prescribed by Local Rule 3.01, a rule of this Court for years. The numerous filings and length of the many motions and exhibits filed in this case imposed an extraordinary burden on the Court, particularly as the case approached trial. Indeed, it was TBW's 39 page motion in limine and 39 pages of attached exhibits which prompted the Court to impose a deadline for all motions in limine and a five page limitation on those motions (Dkt. 519). In the post trial setting, there should be even more reason for TBW to be succinct in its filings.

design and incorporation of a flat plate soil cement surface rather than a stair step configuration. Brumund told the jury that in his opinion, within a reasonable degree of geotechnical probability, HDR did not meet the applicable standard of care in selecting a permeability factor, failing to conduct independent checks of its modeling, and in designing the reservoir. Further, he opined that the design of the reservoir did not meet the applicable engineering standard of care.

In defending TBW's claim, HDR presented the testimony of its expert, Leslie Bromwell, who opined that HDR's design met the applicable standard of care. Bromwell explained to the jury that stress in the soil cement was not caused by excess pore pressure as originally thought, but by faulty construction by the contractor, Barnard and its subcontractor, McDonald. He explained that the contractor had placed dry soil on the embankment that was too loose and too thick, making it susceptible to collapse when exposed to water from heavy rain. In explaining his "collapse upon wetting theory," he relied on, among other data, the contractor's field notes indicating that the soil seemed to be dry, photos of the soil being placed on the embankment in thicknesses greater than what was called for in the design, the nature and location of the erosion, and the pattern of cracking after repairs had been made. He also presented demonstrative evidence of four dams which were larger than the Tampa Bay Reservoir, all of which had surface cracking in the soil cement. Three of those were designed with a flat plate soil cement surface similar to HDR's design.

Bromwell reasoned that since the damage to the reservoir did not occur during the first draw-down and the heaviest damage was essentially confined to two isolated areas, amounting to no more than 10% of the reservoir, this was consistent with "collapse upon wetting" rather than excess pore pressure. Referring to the pattern of the corrective grouting which had been applied to repair the cracking and the large continuous cracking, he noted that 35,000 cubic feet of fill had been used to fill the voids. He found no indication that the soil which was replaced had washed down into the

2

reservoir. He found that this supported his conclusion that the soil had collapsed upon itself, consistent with collapse upon wetting.

Additionally, HDR's expert Lee Wooten, a geotechnical engineer, testified that HDR's design met the applicable standard of care and that HDR's design team gave appropriate consideration to potential uplift pressure. HDR also presented testimony that the damage to the reservoir could be repaired and with periodic maintenance, the reservoir would function as designed.

After a nineteen day trial, and only four hours of deliberation, the jury returned a verdict in favor of HDR. TBW moves for a new trial, arguing that the verdict was against the great weight of the evidence, evidentiary errors affected its substantial rights, and pretrial rulings were erroneous or inconsistently enforced. On close examination, TBW's contentions have little to do with the factual determination of the jury, which evidently concluded that TBW did not meet its burden of proof, an unsurprising conclusion, considering HDR's evidence and the weaknesses in TBW's evidence.

**I. The Verdict and Great Weight of the Evidence**

A new trial may be granted where the jury's "verdict is against the great, not merely the greater weight of the evidence." *Auto-Owners Ins. Co. v. Southeast Floating Docks, Inc.*, 571 F.3d 1143, 1145 (11th Cir. 2009) (quotation omitted). TBW acknowledges that in considering its argument that the verdict was against the "clear weight of the evidence," the court may "independently weigh the evidence favoring the jury verdict against the evidence favoring the moving party." (Dkt. 648, p. 2)(citing *Mendez v. Unitrin Direct Property & Casualty Ins. Co.*, 622 F. Supp.2d 1233, 1237 (M.D. Fla. Oct. 31, 2007)).[2]

---

[2] Although the trial was long and the engineering testimony was certainly challenging to follow, the case was not terribly complicated. As TBW's attorneys' fee expert observes: "More importantly, none of those attorneys believe this case to be particularly complex." (Dkt. 661, p. 5). To the parties' credit, the primary experts for both parties greatly assisted the jury in explaining the manner in which the reservoir was designed and constructed, utilizing informative and helpful demonstrative exhibits. The single issue on liability for the jury was whether HDR negligently designed the reservoir and whether the design caused the cracking on the surface of the reservoir. The parties' presentations presented a classic swearing contest between the experts, a conflict the jury was uniquely qualified to resolve as the trier of fact.

The verdict in this case was well supported by the evidence. It was not, contrary to TBW's seemingly passing contention, against the great weight of the evidence. TBW focuses almost entirely on HDR's evidence, as opposed to its own evidence. At most, TBW points to inconsistencies or contradictions in the testimony and evidence presented by HDR, none of which required the complete rejection of HDR's evidence by the jury or, for purposes of the instant motion, the court. That said, the verdict was entirely consistent with HDR's evidence, which apparently the jury found more persuasive than TBW's, at least with respect to whether HDR's design was negligent.

Notwithstanding that TBW took eight days to present its case in chief, TBW's case showed signs of weakness at virtually every turn. For example, the jury learned that TBW's primary causation expert, Dr. Brumund, changed his opinion late in the case concerning the culpability of the contractor, placing the entire blame on HDR's design.

Initially, after TBW brought this lawsuit against Barnard and Construction Dynamics Group ("CDG"), Brumund authored a report finding that Barnard and CDG caused or contributed to the unusual cracking at the reservoir. At the time, according to Brumund, he opined there was a construction defect, explaining that "there were some things done that were not in conformance with HDR's designs and specifications" which caused or contributed to the cracking.[3] Brumund acknowledged, however, that his opinion about the contractor's fault changed when TBW "reversed its position in the lawsuit about Barnard and CDG." Brumund acknowledged on cross examination that he "issued a new report that matched the change of position" of TBW. Brumund then placed the entire fault on HDR's design.

---

[3] See pages 43-45 of Brumund's cross examination and page 59 of his re-direct examination. Prior to trial, Barnard settled with TBW. By virtue of 133 paragraphs of stipulated facts sworn to by representatives of TBW and Barnard, Barnard was absolved of any fault in the construction of the reservoir. Accordingly, summary judgment was entered in favor of Barnard (Dkt. 417). Neither party brought up the settlement in the presence of the jury and no evidence of the settlement was introduced.

One can reasonably presume that in the eyes of the jury, Brumund's change in opinions effectively bolstered HDR's faulty construction defense and the "collapse upon wetting" theory of HDR's expert, Dr. Bromwell. HDR introduced compelling testimony that the protective layer in the northeast area of the reservoir was at least 5 feet thick and as much as 8-9 feet thick, rather than the 2-3 feet required by HDR's design. Bromwell explained that the more severe cracking in two areas of the reservoir was the result of a protective layer which had been placed too thick by the contractor. Of course, it was undisputed that Barnard and its subcontractors were responsible for placement of the protective layer. And another TBW expert witness, Kenneth O'Connell, acknowledged that during his deposition, he opined that Barnard's defective construction work, standing alone, was sufficient to cause the unusual cracking in the flat plate soil cement, although he explained that he had made that observation in the context of joint cracking.

Additionally, there was persuasive testimony presented during HDR's cross examination of TBW's employees that they knew that cracking was an expected phenomenon in this type of construction. Indeed, before construction began, HDR's staff had shown TBW's project manager, Amanda Rice, other reservoirs constructed in a similar way which had surface cracking. Further, Dick Veatch testified that his firm, Black & Veatch had been engaged by TBW as a consulting engineer and was, as he acknowledged, effectively an "extension" of TBW. The jury heard that it was Black & Veatch which recommended that HDR change its design of the embankment by incorporating a flat plate soil cement design rather than HDR's initial stair step design. And it was this flat plate design, among other things, that TBW's expert, Brumund, criticized.

HDR's primary causation expert, Bromwell, opined that cracking and stress in the soil cement was not caused by excess pore pressure, although he initially thought that was the likely cause. Among other observations, he explained since the unusual cracking occurred in two distinct

5

areas and the cracking had not occurred during the first draw down, he began to consider other potential causes such as construction issues. Ultimately he concluded that the contractor had placed the soil too thick, too loose and too dry, supporting his "collapse upon wetting" theory. Bromwell was a credible witness whose opinions were not impeached by prior inconsistent opinions like TBW's experts.

In sum, HDR's evidence that faulty construction caused the cracking was, at a minimum, equally as convincing as TBW's evidence. And one could reasonably find, after weighing the evidence, that it was more credible and persuasive. The parties' design experts simply disagreed as to whether HDR's design met the standard of care. The parties' causation experts disagreed on why the reservoir suffered unusual cracking. And the experts disagreed on whether the cracks could be repaired and maintained or the wedge of the reservoir had to be completely re-built. The jury resolved those disagreements and its decision is not contrary to the great weight of the evidence.

Moreover, the strength and credibility of TBW's contention that HDR negligently designed the reservoir was undermined by testimony, albeit disputed, that notwithstanding the cracking, the reservoir was functioning as intended and would continue to function as intended, with periodic repairs and maintenance. Further undermining the credibility of TBW's case was testimony from TBW personnel that TBW never intended to repair the reservoir in the manner recommended by its damages experts. TBW's witnesses confirmed that TBW intended to use any damages awarded to construct a larger reservoir with greater capacity. There was even evidence that TBW's management had plans for the larger reservoir even before it sued HDR.

In sum, TBW's theory of liability was refuted by HDR's witnesses, its experts were effectively challenged, and the jury could have found its claim for damages exaggerated, thereby undermining the credibility of its entire case. Independently weighing the evidence, this Court

concludes that the jury's verdict absolving HDR of negligently designing the reservoir was not against the great weight of the evidence. The relatively short length of deliberations (just under four hours including lunch), says as much.

## II. Evidentiary rulings

Courts have "broad discretion in determining the admissibility of evidence." *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1243 (11th Cir. 2009). A new trial will not be granted on the ground of erroneous evidentiary rulings unless those rulings, alone or in combination, caused "substantial prejudice" or "affect[ed] any party's substantial rights." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004); Fed. R. Civ. P. 61.

### A. HDR's inspections during construction

TBW complains that the Court's "systematic[] exclu[sion]" of the inspection evidence "completely deprived TBW of the opportunity to contradict HDR's theory of causation and affected TBW's substantial rights" (Dkt. 648, p. 4). This exaggerated contention misconstrues the Court's evidentiary rulings and overlooks testimony TBW was allowed to present concerning those inspections.

TBW's contention concerns a pre-trial order preventing it from introducing evidence that HDR did not fulfill its contractual quality control responsibilities, and evidentiary rulings during trial preventing TBW from introducing evidence concerning quality control. To consider this contention in its proper context, two procedural events must be noted. First, and most significantly, shortly after the pre-trial conference, TBW voluntarily dismissed Count III of its Second Amended Complaint (Dkt. 558). In TBW's own words, Count III was a claim "alleging inadequate field observations, testing and quality control by HDR." (Dkt. 558, p. 1). Essentially, Count III was a claim that HDR breached its contractual duty to exercise quality control over the construction of the

7

reservoir, which included field inspections. When TBW dismissed Count III, therefore, any issues concerning quality control were removed from the case.

Second, HDR's motion in limine addressed, in part, evidence of alleged quality control deficiencies (Dkt. 430). That motion was granted after a hearing (Dkt. 557). As TBW presented its evidence, therefore, HDR objected to testimony concerning HDR's quality control responsibilities, consistent with these two procedural events. Indeed, notwithstanding the order in limine and its dismissal of Count III, TBW attempted no less than three times during Amanda Rice's testimony to introduce evidence of the purpose of the quality control requirement and quality control assurance. HDR's objections were sustained, prompting TBW to request a bench conference. TBW is correct that the bench conference was summarily terminated, because TBW's counsel continued to argue with the rulings.

Notwithstanding, TBW continued to test the Court's prior rulings in its cross examination of HDR's primary engineer, Barry Meyer. On cross examination, TBW asked Meyer several questions concerning quality control, prompting an objection by HDR and a bench conference outside the hearing of the jury. HDR's objection was sustained and TBW's counsel was admonished and directed not to delve into quality control matters, with the exception of the protective layer, which HDR had brought up in its direct examination of Meyer.

Essentially, TBW was held to the pre-trial order in limine and the consequences of its dismissal of Count III. HDR's objections to TBW's attempts to introduce evidence of quality control were consistently, rather than systematically, sustained. Contrary to its contention, TBW was not, by virtue of these rulings, "completely deprived" of the opportunity to contradict HDR's theory of causation.

8

TBW brought out without objection through its expert witness Brumund that inspectors who were on site never reported that the contractors were deviating from the specifications. TBW also was allowed to cross examine Barry Meyer about the same topic because HDR brought it out on his direct examination. And TBW introduced testimony through Amanda Rice and Janice Swenson of the fact of construction inspections. Moreover, there is nothing to indicate that TBW did not have access to the contractor's personnel who ostensibly would have personal knowledge of the manner in which the protective layer was constructed. If TBW believed HDR's theory of faulty construction could be contradicted, they apparently chose not to call the witnesses who had personal knowledge.

TBW contends that it was "not seeking to introduce evidence that HDR breached its standard of care" when the Court sustained HDR's several objections to questions related to inspections by HDR personnel. Yet that was the very nature of the questions TBW posed to the witnesses. For example, TBW asked Amanda Rice what the purpose of a quality control requirement was and questions about quality assurance. Objections to these questions were sustained. And similar questions related to quality control were propounded to Barry Meyer.

TBW was not permitted to ask Amanda Rice questions regarding quality control because TBW had dismissed its claim that HDR had breached the quality control provision in the contract, thereby removing the issue from the case. The questions during Rice's testimony to which objections were sustained related to HDR's quality control duties, not observations regarding the thickness of the protective layer. (Trial Tr. 3/15/12 AM, pp. 95-98). And the questions TBW posed to Barry Meyer to which objection was made likewise were suggestive of some deviation in HDR's exercise of quality control.

During trial, HDR presented evidence that the embankment cracked because the underlying protective layer was thicker than three feet. TBW contends that it was precluded from introducing

9

evidence that HDR's inspectors never reported that the protective layer exceeded three feet after inspecting the work as part of HDR's quality control duties, thereby drawing a negative inference that the alleged defective construction never occurred. Yet, TBW asked these very questions of HDR's Engineer of Record, Barry Meyer, who was responsible for the quality control inspections, after HDR asked him related questions during direct examination. (Trial Tr. 3/28/12, pp. 221-26).

While TBW may have wanted the jury to draw a "negative" inference from the testimony which was disallowed, a competing inference inconsistent with the dismissal of Count III would have been available for the jury to draw, that is, that HDR did not perform adequate quality control inspections, since appropriate inspections would have discovered that the protective layer was too thick.[4]

Moreover, TBW was not precluded from suggesting to the jury the very negative inference it urges. There was evidence that HDR had inspectors on site when the protective layer was put in place. There was no ruling preventing TBW from arguing to the jury that if there were construction deficiencies, they would have been noted by HDR's inspectors but were not. TBW's substantial rights were not affected by those rulings which were made in the context of the dismissal of Count III.

TBW argues that Richard Menzies should have been permitted to offer rebuttal testimony that HDR's inspectors never informed him that the protective layer had been placed too thick. (See Trial Tr. 4/9/12 AM, p. 13). But the obligation to inspect the protective layer and inform Menzies of any defects was part of HDR's quality control duties. Whether HDR breached those duties was

---

[4] The significance of the dismissal of Count III cannot be overstated. During deliberations, the jury asked, "Does execution of design fall under 'quality control' as stated on page nine of the jury instructions?", demonstrating that it correctly distinguished between negligent design and quality control in deciding the case, all the more reason for preventing TBW from introducing evidence suggestive of HDR's failure to exercise quality control..

not an issue at trial. Menzies had no personal knowledge of the thickness of the protective layer, and therefore, his testimony was not proper rebuttal. (*Id.*, pp. 8-13). In any event, the rulings regarding Rice and Menzies did not have a substantial effect on the verdict, as TBW presented the same evidence through Meyer, who testified that no one informed him that the protective layer was more than two or three feet.

### B. Rice's testimony regarding the emails and photographs

In its cross-examination of TBW's project manager, Amanda Rice, HDR introduced two emails that recounted a conversation in which Rice stated that several photographs depicted the protective layer as "quite thick, not a thin veneer." (Trial Ex. 1018). The photographs themselves were not part of the trial exhibit. On redirect examination, TBW asked Rice: "Can you describe what you saw in the photographs?" (Trial Tr. 3/15/12 PM, p. 25). The Court sustained objections of relevance, unfair prejudice, and failure to produce the photographs in discovery.

TBW contends that the photographs were in fact produced in discovery by a third-party. But the trial exhibit did not contain the photographs, and TBW never attempted to introduce them into evidence. There was no error in excluding Rice's interpretation of photographs that TBW chose not to put into evidence. Nor did the exclusion of her testimony cause substantial prejudice. TBW never asked Rice what she meant by the phrase "quite thick," and any perceived prejudice was cured by Rice's testimony that she never saw a photograph or written report that showed the protective layer exceeded three feet thick. (Trial Tr. 3/15/12 PM, p. 26).

### C. The Rañon memorandum

A memorandum from HDR employee John Rañon addressed to in-house counsel regarding a future trench drain test was excluded on grounds of attorney-client privilege. But TBW was permitted to question Rañon about all material points in the memorandum, including his viewpoints,

11

opinions, and concerns about the test. TBW was instructed that the privilege issue would be revisited if Rañon denied anything in the memorandum. (Trial Tr. 3/20/12 PM, pp. 65-68). At the end of its examination, TBW's counsel conceded that Rañon did not deny anything of substance in the memorandum. (Trial Tr. 3/20/12 PM, p. 94). Regardless of whether the privilege was waived, the memorandum itself was unnecessary and cumulative of Rañon's testimony. Its exclusion did not substantially affect the verdict.

### D. Swenson rebuttal

TBW requested to recall Janice Swenson to rebut testimony presented by HDR that only three new cracks had appeared in a single area following the 2009 short-term repairs (Trial Tr. 4/9/12 AM, pp. 1-7). However, in its case in chief, TBW had already attempted, unsuccessfully, to establish that the reservoir suffered new cracking through Dr. Carrier, but Dr. Carrier testified that the inspection reports showed only three new cracks since 2009. TBW then turned to Janice Swenson to establish that recent cracking had been observed. Before Swenson testified in TBW's case in chief, TBW proffered that she would describe post-repair cracking as well as recent cracking in the reservoir, (Trial Tr. 3/19 PM pp. 4-8) consistent with remarks TBW made in its opening statement (Trial Tr. 3/13 PM, pp.11-12, 35).

In overruling HDR's objections to questions concerning recent cracking observed by Swenson, the Court instructed HDR that it could not prevent testimony about new cracking, even cracking which was discovered as recently as "last week." Thereafter, TBW introduced evidence of post repair and more recent cracking during Swenson's direct examination (Trial Tr. 3/19 PM, pp. 27-28, 81-82; 3/20 AM, pp. 35-36) and later through its expert, Dr. Brumund.

Notwithstanding the Court's ruling, for whatever reason, TBW did not to delve into Swenson's observations of recent cracking during its case in chief. While TBW apparently sought

12

to present more detail regarding recent cracking as rebuttal, this evidence could and should have been presented in its case in chief, when Swenson was testifying on the subject. Rebuttal should not be used to present evidence that should have been introduced as part of TBW's case in chief. *See Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc.*, 389 F.3d 1339, 1354 (11th Cir. 2004); *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1181 n.7 (11th Cir. 2002).

E.     **Brumund rebuttal**

TBW requested to recall Dr. Brumund as a rebuttal witness on six topics which it proffered to the Court. Brumund was permitted to testify as a rebuttal witness on several topics, including but not limited to the repair options and transient seepage analysis. He was not, however, permitted to be recalled to testify to matters which were not in his expert reports, such as criticism of Bromwell's collapse upon wetting theory, and his opinion that "sand boils" and "deltas" were sufficient to account for the dirt that was missing below the cracks and his specific opinion regarding transient seepage analysis.[5] And he was not permitted to repeat his testimony on topics covered while he was on the stand during TBW's case in chief.[6]

Other topics, such as the performance of the load testing or the materiality of errors in the permeability analysis of certain soil samples, were covered extensively in TBW's case in chief. One topic, which related to the stability of the slope, was not even an issue in the case. The remaining topic, the Georgia Dam Standards, was not part of the "refine[d]" list of issues on which TBW requested that Brumund be permitted to testify. (Tr. 4/9/12 AM, p. 7). Further, that topic had been addressed in TBW's case in chief. TBW's substantial rights were not affected by the restrictions placed on Brumund's rebuttal testimony.

---

[5] Brumund was allowed to testify regarding transient seepage analysis in general.

[6] Brumund testified in TBW's case in chief for approximately 6 ½ hours on direct examination and for just over 2 hours on re-direct examination.

13

### F. TBW's financial statements and evidence of impairment

Contrary to TBW's argument, the manner in which it treated the damage and repairs to the reservoir in its financial statements, specifically the failure to recognize any impairment, was relevant evidence. That the financial statements were prepared for other business purposes went to the weight of the evidence, not its admissibility. And there was no error in the jury instruction regarding economic waste. The instruction related to the reservoir's "functional value," that is, the extent of any loss of utility, not the diminution of the reservoir's market value. (Dkt. 630, p. 12). More importantly, however, these matters related to damages, an issue the jury never reached. These arguments therefore afford no basis for a new trial.

### G. Cross-examination of O'Connell

TBW argues that HDR improperly questioned O'Connell on opinions he reached which were not addressed in his direct examination. Under Fed. R. Evid. 611(b), the Court has discretion to "allow inquiry into additional matters as if on direct examination." TBW has not shown that its substantial rights were affected or that it suffered prejudice from this ruling.

### H. Bromwell's scaled photograph

HDR was permitted to display a scaled photograph as a demonstrative aid during Bromwell's testimony. TBW contends this was error because the scaled photograph was not produced as part of Bromwell's reports. But it was Bromwell's testimony that constituted evidence, not the demonstrative exhibit. And in any event, TBW's substantial rights were not affected. While the scale only appeared in the demonstrative, Bromwell used reference points in other photographs, such as vehicles and people, to estimate the thickness of the protective layer depicted. The jury was able to consider the thickness of the protective layer even without the scaled photograph.

**I.     Jury view**

Decisions to permit a jury view, like other evidentiary rulings, are within the sound discretion of the court, as TBW acknowledged during argument on its motion for a jury view. *Johnson v. Ellis & Sons Iron Works, Inc.*, 604 F.2d 950, 958 (5th Cir. 1979).[7] TBW's request for a jury view was denied for reasons that were thoroughly discussed and explained on the record during the hearing conducted on the motion, including juror safety concerns, the extraordinary logistics and time needed for the view, and the available alternatives which would accomplish what a physical jury view would.

After discussion, and to their credit, the parties agreed to a jointly-prepared helicopter "flyover" video, which was presented to the jury at the beginning of the trial. (Hr'g Tr. 2/16/12, pp. 13-16). Not only were the size and physical characteristics of reservoir adequately and effectively depicted in the video, numerous photographs introduced into evidence and the descriptions of the reservoir by the many witnesses accomplished what a physical view would have. And TBW concedes that it did not contemplate that the jurors would traverse the embankment to see the cracking (thereby avoiding the steep embankment and encounters with snakes and the resident alligator), only that they would ride around the narrow (20 feet wide), surface of the rim in a bus. However, the rim did not have guard rails, was unpaved and was 65 feet above the ground. And concerns about the unpredictable weather in the Tampa Bay area that time of year added to the mix.

Simply put, juror safety concerns, logistical concerns, and the availability of an excellent alternative supported the denial of TBW's request for a jury view. TBW's substantial rights have not been shown to have been affected by this ruling.

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit prior to October 1, 1981

**III.     Enforcement of pretrial disclosure orders**

TBW's suggestion that the disclosure deadlines were not enforced equally is without merit. TBW did not provide HDR with a copy of one of its demonstrative exhibits until approximately 13 hours before the beginning of trial. This violated the disclosure deadline. HDR's scaled photograph, by contrast, was disclosed as a demonstrative exhibit well in advance of the deadline. To the extent TBW suggests that HDR should not have been permitted to introduce certain photographs that Bromwell did not timely disclose, the Magistrate properly rejected this argument when he denied TBW's motion to strike Bromwell's supplemental report. (Dkt. 409, pp. 8-10).

Other photographs, which showed the use of flat plate soil cement in other reservoirs, were also properly received, as they were introduced as demonstrative exhibits in response to Brumund's testimony that flat plate soil cement was not appropriate for such projects. As for the questioning of O'Connell, there was no error in the scope of cross-examination, as discussed. Finally, HDR introduced a short excerpt of testimony from Lemley's deposition. Because that testimony was factual, not expert, HDR was not required to cross-designate Lemley as an expert witness.

**IV.     Pretrial rulings**

TBW argues that it is entitled to a new trial on account of erroneous rulings on its tenth motion in limine, its motion for leave to amend, and its motion to exclude the expert testimony of Bromwell. TBW's tenth motion in limine was denied for reasons that were thoroughly discussed on the record during the hearing (Hr'g Tr. 2/16/12 pp. 136-143). TBW references its prior arguments but has not given any reason to reconsider this ruling.

TBW's motion for leave to amend was denied with respect to Counts VI and VII based on undue delay, prejudice, and futility. (Dkt. 383). Contrary to TBW's apparent suggestion, these grounds apply even under the liberal standard of Rule 15(a)(2).

TBW's motion to exclude Bromwell's expert opinion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) was denied in a written order which clearly stated why Bromwell would be permitted to testify. (Dkt. 483). TBW simply incorporates its prior arguments, which were rejected in the order. To the extent TBW suggests that Bromwell's trial testimony contradicted various representations at the *Daubert* hearing, its arguments come too late. TBW had ample opportunity to depose Bromwell and it was TBW's responsibility to present that testimony at the time of the hearing. In short, TBW cannot rely on evidence adduced at trial to argue that its pretrial *Daubert* motion should have been granted. The trial testimony relied on by TBW was before the jury, which was well-equipped to assess the weight that Bromwell's testimony should be given.

## V.     Adequacy of Rebuttal proffer

Finally, this Court's determinations on the scope of TBW's proposed rebuttal were made based on counsel's proffer at the close of HDR's case. To the extent, therefore, TBW's after-the-fact proffer of rebuttal exceeded the original proffer, its complaint that the limitations on rebuttal were error are misguided and candidly, disingenuous. Without question, absent objection, counsel's proffer of proposed testimony can preserve a claim of error. *See United States v. Stephens*, 365 F.3d 967, 974 (11th Cir. 2004). However, the substance of the testimony must be made known to the Court or be apparent from the context. *Id*. In this regard, TBW's proffer after the jury retired to deliberate came too late and failed to preserve its claim of error based on that proffer.

TBW was forewarned during a pre-trial hearing after HDR raised the issue that rebuttal would not be allowed as an opportunity to present TBW's case in chief again. TBW was instructed that rebuttal would be limited, consistent with Eleventh Circuit precedent. TBW makes no showing of prejudice or that its substantial rights were affected by the limitations placed on its timely proffer of rebuttal.

## Conclusion

In sum, TBW has not shown any errors, much less errors that, alone or cumulatively, had a substantial effect on the verdict. Accordingly, TBW's motion for a new trial (Dkt. 648) is DENIED.

**DONE AND ORDERED** this 3rd day of August, 2012.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record