## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**TAMPA BAY WATER,**

     **Plaintiff,**

**vs.**                                                          **Case No. 8:08-CV-2446-T-27TBM**

**HDR ENGINEERING, Inc.,**

     **Defendant.**

_____/

## <u>ORDER</u>

     In their contract, Tampa Bay Water and HDR Engineering agreed that the prevailing party in any litigation arising from their agreement would be entitled to recover all of its attorneys' fees, costs, and litigation expenses.[1] HDR is therefore entitled to an award of fees and costs. The parties have filed affidavits of their respective attorneys' fee experts, legal memoranda, and supporting evidence relating to HDR's attorneys' fees, costs, and expenses. An evidentiary hearing was held during which the parties' expert witnesses testified and argument was presented. In its motions and supplemental evidentiary submissions, HDR has requested a total of $10,474,291.50 in attorneys' fees, and $11,878,959.95 in litigation expenses and taxable costs.

     By any account, the amount of attorneys' fees to which HDR is entitled is extraordinary. Tampa Bay Water's fee expert opines that a reasonable attorneys' fee is between $5.1 and $5.5 million. HDR's fee expert opines, on the other hand, that a reasonable attorneys' fee is $9,772,406.70 and that the reasonable litigation expenses and taxable costs incurred by HDR amount

---

[1] The contract provides, "In any litigation arising out of this Agreement or in any way related to the performance of the Work, the prevailing party shall be entitled to recover all costs and expenses incurred, including, without limitation, attorneys' and legal assistants' fees and costs incurred prior to trial, at trial, on any appeal, and in any bankruptcy proceedings."  (Dkt. 644-1, Agreement for Professional Services, ¶ 21.4).

to $11,103,671.80.[2]  And while not determinative of the reasonableness of HDR's fees, costs, and expenses, it should be noted that Tampa Bay Water spent $5,347,233.00 in attorneys' fees and $6,281,116.97 in costs and expenses, adding some perspective to the fees and expenses sought by HDR.

Upon careful consideration, HDR is awarded $9,249,219.85 in attorneys' fees and $10,898,186.22 in litigation expenses and taxable costs.[3] To put this extraordinary fee and cost award in its proper perspective, the nature of the litigation must be considered.

This was no ordinary engineering malpractice case. According to HDR's fee expert, Mr. Hill, "[t]he uniqueness of the design of the reservoir together with the exposure to HDR in a case tried to a jury combine to make this an unprecedented case" (Dkt. 653-3, p. 4).   And Dennis Frostic, an attorney who was the "point person" for HDR's insurers with nearly 40 years experience working with insurers in large, complex cases, told Mr. Hill that to his knowledge, "this case is the largest engineering professional liability case ever tried to a jury" (*Id.*, p. 9).

This case may be the largest engineering professional liability case, in terms of damages sought, ever tried to a jury (Dkt. 653-3, p. 9). Tampa Bay Water's initial demand from HDR was $225 million.  In the parties' Joint Pretrial Statement, Tampa Bay Water projected that its total damages exceeded $131 million, plus interest, attorneys' fees and costs.  At trial, Tampa Bay Water asked the jury to award it more than $100 million in damages from HDR (exclusive of attorneys' fees and expenses). The litigation spanned more than three years. After a five week trial, the jury returned a verdict in favor of HDR.

---

[2] This is the combined total of the amounts set forth in Mr. Hill's initial affidavit and supplemental affidavits (Dkts. 653-3, 658-3, 680-1).

[3] The parties stipulated that the hourly rates reflected in HDR's attorneys' billing statements are reasonable, with the modification that some associates' billing rates are limited to $185 per hour (Dkt. 653-1, ¶ 39).

**Background**

HDR contracted with Tampa Bay Water to design the C.W. Bill Young Reservoir and was the Engineer of Record for the design and permitting of the Reservoir. By all accounts, the design of the reservoir was unique. A reservoir of its size had never been built before. It encompassed more than a thousand acres and was designed to hold approximately 15,500,000,000 gallons of surface water for use as a potable water supply. It took nearly three years to build. Tampa Bay Water began operating the Reservoir in June of 2005.

In December of 2006, during the Reservoir's second draw-down cycle, unexpected cracking in the flat-plate soil cement was discovered. As the water elevation continued to be lowered, more cracking was discovered. Claiming that these cracks were the result of design errors and construction defects, Tampa Bay Water sued HDR, Construction Dynamics Group, Inc. ("CDG"), which served as the project's construction manager, Barnard Construction Company, Inc., the contractor, and Barnard's subcontractor, McDonald Construction Corporation.

Needless to say, the case has a lengthy and contentious history. Tampa Bay Water amended its original complaint twice. More than 20 experts were retained by the parties. The Joint Pretrial Statement listed seven trial experts for Tampa Bay Water, two for Barnard, and one for McDonald.[4] HDR listed nine expert witnesses. Discovery in the case included 2.7 million files comprising more than 17 million pages of documents (Dkt. 653-1, ¶ 17). Between Tampa Bay Water and HDR alone, 35 depositions were taken in 40 sessions over 80 days in eight cities in five different states, resulting in 19,000 pages of transcripts (*Id.*, ¶ 20). As of August 30, 2012, when Tampa Bay Water filed its Notice of Appeal, there were 678 separate docket entries, including 11 motions to strike, 2 motions to dismiss, 6 motions for protective order, 11 motions to compel, 3 motions to quash, a motion for

---

[4] CDG settled early on in the case.

sanctions, a motion for summary judgment (with two supplements), 4 *Daubert* motions, 29 motions in limine, and dozens of non-substantive motions.   Tampa Bay Water alone filed 11 motions in limine and 7 dispositive motions (Dkt. 653-2, ¶ 23). HDR was required to respond to "approximately 20 contested discovery-related and pre-trial motions" filed in the case by either Tampa Bay Water, Barnard or McDonald (Dkt. 653-1, ¶ 22).

From the inception of the lawsuit, the battle lines were drawn, with HDR having to defend itself on all fronts, not just against Tampa Bay Water's claims.   Barnard and McDonald also claimed that HDR's design was to blame for the unusual cracking in the Reservoir. In a sense, Tampa Bay Water, Barnard, and McDonald were aligned against HDR. Indeed, just two months before the pretrial conference, Tampa Bay Water settled with Barnard and McDonald utilizing a controversial "high-low" settlement agreement (Dkt. 307).[5]

Significantly, the settlement agreement included 133 paragraphs of "Agreed Facts."  These "Agreed Facts"  effectively absolved Barnard and McDonald of any fault whatsoever. Curiously, Barnard agreed to participate in the trial but agreed not to present any evidence on Tampa Bay Water's claims, agreed to call certain witnesses but not to call other witnesses, and agreed not to file any trial and post-trial motions. These provisions resulted in yet another round of legal skirmishes between Tampa Bay Water and HDR in which HDR challenged the agreement as a collusive "Mary Carter" agreement (Dkt. 323).  Based on the "Agreed Facts," summary judgment was entered in favor of Barnard and McDonald and against Tampa Bay Water, ending their participation in the case (Dkt. 417, Order granting summary judgment).

The parties actually prepared for trial twice,  adding to the cost of the litigation. The trial was originally scheduled for the July 2011 trial term, but because of other docket demands, was passed

---

[5] HDR filed eight motions or briefs "directly relating to the settlement and its aftermath" (Dkt. 653-1, ¶ 24).

over and placed on 'stand-by' status for September, 2011 due to its length and other calendar demands (Dkt. 444). In anticipation of trial, the parties filed numerous motions in limine and trial related motions, including three motions to strike filed by Tampa Bay Water directed to HDR's affirmative defenses. In short, the parties were gearing up for trial. Then, however, the landscape of the litigation changed substantially.

In September of 2011, Tampa Bay Water announced that it had settled with HDR. The case was removed from the trial docket, dismissed without prejudice and administratively closed (Dkt. 454). Although Tampa Bay Water's Board of Directors initially voted to approve the settlement, it subsequently voted to reject it, and the case was re-opened (Dkt. 474). By then, HDR's agreement to pay Tampa Bay Water $30 million to settle the case had become public knowledge and generated extensive publicity.

The rejection of the settlement by Tampa Bay Water's Board and the highly publicized terms of the aborted settlement spawned more litigation, including HDR's motions to enforce the settlement and for a change in trial venue. Finally, despite numerous formal and informal attempts to resolve the case, the case proceeded to trial in March of 2012.[6]

Before trial, Tampa Bay Water voluntarily dismissed Count III of the Amended Complaint, (breach of contract - quality control) (Dkt. 558). The case was tried on Count One of Tampa Bay Water's Second Amended Complaint (breach of contract - defective design) (Dkt. 386). Tampa Bay Water listed 25 potential witnesses in its final trial witness list and 505 potential exhibits. HDR listed

---

[6] Mr. Hill summarized the attempts made to resolve the case and Tampa Bay Water's determination to try it:

Initially, Tampa Bay Water made a demand of $245 million to settle with all defendants. Attempts were made by HDR to settle, even before the lawsuit, but Tampa Bay Water was not interested. Prior to trial there were three mediations, all unsuccessful. It became clear Tampa Bay Water was going to force HDR to trial. The demands made before trial by Tampa Bay Water made it likely this case would go to trial. If there was any doubt about that likelihood, it was removed after Tampa Bay Water aborted the September settlement agreement. A "no holds barred" position by Tampa Bay Water caused intense preparation for the trial which began March 12." (Dkt. 653-3, p. 7).

24 potential witnesses and 774 potential exhibits. The trial lasted 19 days over five weeks. Numerous expert and technical witnesses testified.

In sum, the contentious nature of the litigation, the issues involved, and the length of trial generated extraordinary attorneys' fees for both sides. To the extent Tampa Bay Water criticizes HDR's attorneys for the number of hours they spent defending the case, one cannot reasonably quarrel with those efforts, considering the result obtained. Certainly, there were other considerations driving the attorneys. HDR's international engineering reputation was on the line. And the consequences of an adverse verdict in the range sought by Tampa Bay Water would have been devastating to HDR's employee owners.

To appreciate the fees and expenses invested in this case by HDR, one must consider that Tampa Bay Water's initial demand of HDR was $225 million, well in excess of HDR's available insurance coverage. In the Pretrial Statement, Tampa Bay Water's damages, exclusive of pre-judgment interest, attorneys' fees and costs, was stated to be in excess of $131 million. At trial, Tampa Bay Water asked the jury to award it in excess of $100 million in damages (exclusive of attorneys' fees and costs).

Explaining the vigor with which HDR defended Tampa Bay Water's lawsuit, Mr. Hill noted that HDR is an employee-owned company and that Tampa Bay Water's claim "significantly exceeded the limits of (HDR's) insurance coverage." He opined that "an adverse verdict over the policy limits" would cause HDR and its employees to suffer "a severe financial impact" (Dkt. 653-3, p. 8). In sum, while the parties can debate whether this was or was not a "bet the company case," the stakes were considerable for HDR.

It likewise bears noting that the voluminous pleadings filed by both sides significantly contributed to the extraordinary fees incurred in the case. As trial loomed, the numerous motions

6

in limine filed by the parties (including lengthy supporting memoranda and numerous exhibits) became increasingly burdensome. Indeed, it was one of Tampa Bay Water's lengthy filings that prompted remedial measures by the Court. After Tampa Bay Water filed a 13 page motion in limine with 39 pages of exhibits on an issue which could have been adequately addressed in a 3 to 5 page motion, the Court noted that "[t]he motion invites a similarly lengthy response . . ." The parties were admonished that "[u]nnecessarily lengthy pleadings waste precious judicial resources and *unnecessarily add to the cost of litigation*" (Dkt. 519, n 2)(emphasis added). Thereafter, the parties' motions and responses were restricted to five pages (Dkt. 519).

As discussed, the case involved somewhat atypical legal maneuvering which resulted in the expenditure of attorneys' fees which ordinarily would not have expected in litigation of this nature. First, there was Tampa Bay Water's controversial settlement with Barnard and McDonald. Then, as noted, Tampa Bay Water dropped its quality control breach of contract claim on the eve of trial, rendering the time HDR's attorneys spent preparing to defend that claim somewhat of a waste. Then there was Tampa Bay Water's aborted settlement with HDR.

Tampa Bay Water must therefore accept its proportionate share of responsibility for generating hundreds of thousands of dollars in fees incurred by HDR in responding to and in some instances challenging the events with which HDR was confronted. Indeed, Ben Hill, HDR's fee expert, implicitly suggested that Tampa Bay Water's litigation tactics significantly increased the fees incurred by the parties beyond what would reasonably have been expected if the case had just been tried on its merits. That is not to say, however, that those litigation tactics were unreasonable or vexatious, only that both sides share responsibility for the millions of dollars in fees being sought by HDR.

Simply put, this was an extraordinarily complex engineering malpractice case and trial, the

facts of which were, according to Mr. Hill, "unprecedented." While the jury may have been asked to answer a single liability question, because of the highly technical subject matter and HDR's potential exposure, the extraordinary sums expended by HDR in its defense of Tampa Bay Water's claims is understandable, if not entirely justified.  The efforts of HDR's attorneys were obviously not in vain. After just four hours, the jury returned its verdict in favor of HDR, an unsurprising result, as discussed in this Court's order denying Tampa Bay Water's motion for a new trial (Dkt. 671).

HDR's fee expert, Benjamin Hill, is an experienced litigator who has tried several multi-million dollar construction/engineering cases to juries in state and federal courts. Drawing from his litigation experience in similar complex cases, he opines that the fee charged by HDR in this case was not "in excess of what would be expected for a similar case (if there is one)" (Dkt. 653-3, p. 30). Notwithstanding, and underscoring the objectivity with which he approached his task, he recommended across-the-board adjustments to the hours charged in several areas in arriving at what he opines is a reasonable fee using the lodestar approach. His total recommended lodestar is $9,772,406.70, notwithstanding that HDR actually paid its attorneys in excess of $10 million in fees.[7]

In analyzing the services rendered and hours of HDR's attorneys and staff, Mr. Hill divided the services into four phases, Phase I (initial investigation), Phase II (discovery), Phase III (trial preparation), and Phase IV (trial). Acknowledging the "inevitable duplication of effort associated

---

[7] Mr. Hill found it significant that HDR and its insurers scrutinized every invoice for reasonableness and necessity, noting that HDR's insurers "were vitally interested in not incurring fees or expenses which were not reasonable" (Dkt. 653-3, p. 9). Mr. Hill explained that HDR's insurance limits were "burning," meaning that "all expenses including attorneys' fees by HDR or on behalf of HDR reduced the coverage available to HDR." (*Id.*). Mr. Mason's affidavit outlines the extraordinary level of client/insurer scrutiny over the attorneys' billing invoices (Dkt. 653-1, ¶¶ 31, 32).

While not determinative of reasonableness, this client/insurer oversight demonstrates a degree of control over fees and expenses which marshaled against unnecessary and unreasonable expenditures by HDR's counsel, and which no doubt complemented the exercise of billing judgment by the attorneys themselves. And it undercuts Tampa Bay Water's contention that the case was tried by HDR's attorneys with a "big firm mentality," whatever that is intended to imply.

with getting the Sedgwick firm up to speed" during the discovery phase and that this time "was likely less efficient than it could have been given the accelerated timeframe," he proposes an across-the-board 15% adjustment in that phase. He likewise applies a 5% across-the-board adjustment for the trial preparation phase (Phase III) "for the inevitable duplication of effort which occurs in a case of this size" (*Id.*, p. 39). In reviewing the time expended in Phase IV (trial), Mr. Hill opines that although the time is significant, he found it to be "in line with the time required to try a lengthy jury trial of this magnitude (essentially, every waking hour)" (*Id.*, p. 40). Mr. Hill's reasoned analysis and opinions are persuasive.

Like Mr. Hill, Tampa Bay Water's fee expert, John Vento, enjoys an excellent reputation in the state and federal legal community based on his professionalism, experience, and ability to try complex cases. Unlike Mr. Hill, however, Mr. Vento did not make a lodestar determination of what a reasonable fee would be in this case. Mr. Vento applied, in his words, a "global" approach to arrive at a reasonable fee, which he opines is between $5.1 and $5.5 million. While Mr. Vento's approach is certainly helpful in analyzing Tampa Bay Water's specific objections to certain services for which HDR seeks recovery, Mr. Hill's opinions are based on a more thorough review of the hours expended by HDR's attorneys, significantly, their redacted and unredacted time records.

Unlike Mr. Hill, Mr. Vento did not review any of the billing records of HDR's attorneys. Nor did he ask to review them. He explained that a review of those records would not have been helpful because he was not critical of specific time entries. Rather, he criticized certain general categories of services as unnecessary or unreasonable, such as the use of eighteen contract attorneys to review documents, attorney Steinmann's trial time, and billing Mr. Kent's services as "special counsel" to the Sedgwick firm.

Mr. Vento was critical of HDR for hiring out of state counsel. He acknowledged, however,

that he is often retained to represent clients and litigate throughout Florida, and he recently tried a case in Texas. And he was not critical of Barnard for hiring out of town and out of state counsel. While he suggested that there were several Tampa area firms, including his own, which were capable of representing HDR, he conducted no conflict analysis with respect to any of those Tampa area firms. Moreover, he acknowledged that his firm typically sues engineers and does not represent engineers "like Mr. Woodward's firm." Mr. Hill, on the other hand, determined that several Tampa area firms, including his own, could not have represented HDR because of conflicts and that the hiring of out of state counsel by HDR was reasonable in this case.

Tampa Bay Water's several comparisons of the time and services rendered by Barnard's and McDonald's attorneys is unhelpful in determining a reasonable fee to which HDR is entitled. As noted, and contrary to Mr. Vento's understanding, it was apparent that Barnard and McDonald were essentially aligned against HDR, each contending that HDR's design was defective and that their construction of the embankment complied with HDR's design specifications. The services rendered by those attorneys cannot, therefore, be fairly compared in terms of reasonableness and necessity, considering the higher stakes HDR faced and the adverse postures of Barnard and McDonald. Indeed, during oral argument, Tampa Bay Water conceded that a "one to one" comparison of HDR's discovery efforts to Barnard's and McDonald's was not a fair comparison.[8]

Nor can the hours spent by Tampa Bay Water's attorneys be fairly compared in determining what was reasonable and necessary for HDR's attorneys. *See Johnson v. Univ. College of the Univ. of Ala. in Birmingham*, 706 F.2d 1205, 1208 (11th Cir. 1983), *cert. denied*, 464 U.S. 994

---

[8] Mr. Vento suggests that HDR should not have performed a computer review of the massive volume of documents in this case and, instead, should have created "issue files" which were limited to documents that, on an initial review, were determined to be relevant. According to Mr. Vento, this is the manner in which Barnard's and CDG's attorneys handled the documents. Essentially, Mr. Vento's suggestion is that HDR was unreasonable in conducting a thorough review of the documents. But as noted, Barnard's and CDG's handling of the documents does not offer a fair comparison to HDR, and the Court has no quarrel with the manner in which HDR handled the 17 million pages of documents involved in this action.

(1983)(hours needed by one side to prepare may differ substantially from that of opposing counsel, since the nature of the work may vary dramatically and the case may have far greater precedential value to one side than the other); *HCA Health Servs. of Fla., Inc., v. Hillman*, 870 So. 2d 104, 106 (Fla. 2d DCA 2003)(fees of prevailing party cannot be predicated on fees of opponent).

**Enforcement of parties' contract**

The substantive law of Florida controls the award of attorneys' fees in this diversity case. *Insurance Co. of N. Am. v. Lexow*, 937 F.2d 569, 571 (11th Cir. 1991). As noted, HDR and Tampa Bay Water expressly agreed in their contract that the prevailing party in any litigation arising from their agreement "shall be entitled to recover all costs and expenses incurred, including, without limitation, attorneys' and legal assistants' fees and costs incurred prior to trial, at trial, on any appeal, and in any bankruptcy proceeding" (Dkt. 644-1, Agreement for Professional Services, ¶ 21.4). Provisions of this nature are generally enforced as indemnification agreements. *North Am. Clearing, Inc. v. Brokerage Comp. Sys., Inc.*, 395 Fed. Appx. 563, 567 (11th Cir. 2010)(citing *Lashkajani v. Lashkajani*, 911 So. 2d 1154, 1158 (Fla. 2005)).

While the parties' contract provides for an award of "all" attorneys' fees, HDR requests only that a reasonable fee be awarded, consistent with Florida law. *Dunn v. Sentry Ins.*, 462 So. 2d 107, 108 (Fla. 5th DCA 1985) (contractual provision that losing party will pay prevailing party's attorneys' fees is agreement for indemnification, i.e., "to indemnify the prevailing party for fees reasonably contracted or incurred"). A reasonable attorneys' fee is determined by multiplying the number of hours reasonably expended by the reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

Here, the parties stipulated as reasonable the hourly rates for the various attorneys. They focus their dispute on the amount of time reasonably expended.  In determining a reasonable fee in this case, the Court has not examined every hour billed for every service provided, a formidable task

not required in this Circuit. *See Kenny A. ex rel. Winn v. Perdue*, 532 F.3d 1209, 1220 (11th Cir. 2008)(where billing records are voluminous, district court "may make a reasonable across the board reduction in hours instead of engaging in the pick and shovel work necessary to make a more precise determination"). Rather, representative unredacted billing invoices of HDR's attorneys have been reviewed *in camera*.

In addition to attorneys' fees, HDR seeks to recover its litigation expenses and taxable costs. As noted, the parties' contract provided that the prevailing party is entitled to recover "all costs and expenses incurred" to the extent they are reasonable. A smaller subset of HDR's litigation expenses, consisting of the specific items identified by 28 U.S.C. § 1920, may also be awarded as taxable costs.

**HDR's burden**

HDR has satisfied its burden of "supplying the court with detailed evidence from which the court can determine a reasonable fee." *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1311 (11th Cir. 2001) (quotation omitted). HDR has adequately documented the hours its attorneys and staffs spent. HDR has filed redacted billing invoices detailing the hours and services performed by its attorneys and their staffs. Unredacted copies have been submitted to the Court for an *in camera* review. Those billing invoices clearly describe the services rendered.

**Redacted attorney billing invoices**

Tampa Bay Water acknowledges that "[a] party may assert privilege under the attorney-client or work-product doctrines in certain information contained in legal bills" (Dkt. 660, p. 6). It is apparent that Tampa Bay Water, unlike its fee expert, closely reviewed HDR's attorneys' redacted billing records, as demonstrated by its calculation that "HDR's two law firms combined redacted entries that account for 12,807.5 hours with a billed value of $3,306,846.50" (Dkt. 660, p. 7). To the extent Tampa Bay Water complains that the redacted billing invoices "prejudices [Tampa Bay Water] in its ability to meaningfully respond to the fee claim," that complaint is hollow at best, since

Tampa Bay Water never sought access to the unredacted invoices. Nor did Tampa Bay Water object to an *in camera* review of the unredacted billing statements.

As noted, the Court has conducted an *in camera* review of representative invoices from the four phases identified by Mr. Hill (initial investigation, discovery, trial preparation, and trial), as well as invoices from the post-trial period. *See Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1328 (11th Cir. 2006) (approving district court's *in camera* review of unredacted billing statements in determining reasonable award of attorney's fees).

The review and comparison of representative redacted invoices with their unredacted counterparts supports Mr. Hill's finding that "[g]iven the procedural posture of this case the redactions were reasonable and necessary to protect information that is privileged, confidential, or if revealed to Tampa Bay Water would be detrimental to HDR if this case is appealed and/or re-tried" (Dkt. 672-2, ¶ 1). To be sure, several redactions were made of material that was arguably not work-product or protected by the attorney-client privilege. However, that information, as Mr. Hill noted, was properly deemed confidential or determined to be detrimental to HDR if this case was retried.

In any event, the issue is not whether HDR's redactions were proper but whether its redacted entries reflect attorney work that was reasonable and necessary. For the most part, this can be determined without examining the unredacted invoices. Most entries were not severely redacted. Mr. Mason represented during oral argument that 12% of the billing invoices contained "complete redactions." However, based on the Court's review, the "complete redactions" referred to by Mr. Mason were not, in fact, fully redacted entries but, instead, maintained descriptive words of the services performed, such as "teleconference," "research," or "review." Even from the redacted entries, a determination could be made that the time was spent performing legal research or discussing this case with individuals whose identities had been redacted. *See Oxford Asset Mgmt.,*

13

*Ltd. v. Jaharis*, 297 F.3d 1182, 1197 (11th Cir. 2002). Moreover, Mr. Hill reviewed the unredacted invoices (Dkt. 672-2, p. 2). His expert opinion supports the Court's finding that the redacted invoices do not prevent a determination of the hours spent and the reasonableness and necessity of the services provided by the attorneys and their staffs, contrary to Tampa Bay Water's protestations.

The vast majority of the redactions consist of services that were both reasonable and necessary. To the extent there is any inefficiency or duplication reflected in the unredacted billing entries, it is no more extensive than that which appears in the redacted entries. Therefore, any across-the-board reductions for inefficiency or duplication (discussed below) will be applied equally to all billing records, redacted and unredacted, to capture such matters in the redacted portions of the records. The *in camera* review did, however, reveal isolated instances of time spent on matters that were collateral to the litigation, such as review of media reports and articles, which cannot be fairly passed along to Tampa Bay Water. These entries were small in number, however, warranting an across-the-board reduction of only 0.1%, or **$10,474.29**.

Further, Tampa Bay Water's contention that the time HDR's attorneys spent in redacting their invoices should not be awarded is persuasive. Although necessary to protect privileged communications, it is unreasonable to pass the cost of the redaction efforts on to Tampa Bay Water. Accordingly, all time spent redacting invoices, with a billed value of **$24,740.00**, will be deducted from HDR's fee claim.

**Tampa Bay Water's burden**

In opposing HDR's fee application, Tampa Bay Water has an obligation to raise specific objections that are "reasonably precise." *American Civil Liberties Union of Ga. v. Barnes*, 168 F.3d 423, 428-29 (11th Cir. 1999) ("The more specific the objections to a fee application are, the more specific the findings and reasons for rejecting those objections can be."). Significantly, rather than raise objections to specific hours billed by HDR's attorneys, Tampa Bay Water raises several broad

objections to specific categories of services provided by HDR's attorneys. Tampa Bay Water's objections will therefore be considered in that context.[9]

**Billing judgment**

Fee applicants must use "billing judgment," which means that "'excessive, redundant or otherwise unnecessary' hours should be excluded from the amount claimed." *Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292, 1301 (11th Cir. 1988) (quoting *Hensley*, 461 U.S. at 434, 437). To the extent Tampa Bay Water contends that "[t]here is no evidence that anybody at F&D applied the required billing judgment with respect to fees charged by that firm," that contention is contradicted by Tampa Bay Water's acknowledgment in the very next sentence that Mr. Woodward avers in his affidavit that his firm made downward adjustments of fees and expenses (Dkt. 660, p. 4). Indeed, Mr. Woodward avers that he reviewed all invoices before they were submitted to HDR and "made some downward adjustments of both fees and expenses" (Dkt. 653-2, ¶¶ 12, 13).

With respect to the responsibility of the Sedgwick firm to exercise billing judgment, the record includes the affidavit of Mr. Mason who avers that he and his trial team members "reviewed each invoice before finalizing and submitting it to HDR" and "exercised prudent judgment to determine an appropriate amount to bill each month." (Dkt. 653-1, ¶ 36). In sum, the Court is satisfied, based on Woodward's and Mason's affidavits, that they exercised appropriate billing judgment, eliminating what they considered to be excessive, redundant or otherwise unnecessary hours. Tampa Bay Water has not articulated any legitimate criticism directed to the absence of billing judgment, and in any event fails to raise "reasonably precise" objections in that regard.

---

[9] In its memorandum in opposition to HDR's motion for attorneys' fees, Tampa Bay Water includes a sub-title "Block Billing," but inexplicably fails to discuss the legal principles quoted therein and how they relate to HDR's fee claim (Dkt. 660, p. 8). Tampa Bay Water also includes a sub-title "Fees for Litigating the Issue of Fees and Costs," but ultimately concedes that "an award of such fees is appropriate" (Dkt. 660, pp. 17-18).

**Fees for work with experts either excluded or withdrawn**

Without citing any authority, Tampa Bay Water asserts that any attorneys' fees "for work in connection with" expert witnesses who were either excluded by the court (Johnson) or withdrawn by HDR (McKellar) "should not be awarded to HDR" (Dkt. 660, p. 5). Tampa Bay Water provides no explanation for why it was unreasonable or unnecessary for HDR's attorneys to consult with these experts as part of their investigation and preparation of its defense. Nor does Tampa Bay Water state any specific objections to any time spent by HDR's attorneys in connection with these experts. In short, Tampa Bay Water has not raised  a reasonably precise reason for disallowing this time. Its objection is therefore overruled.

**Multiple attorneys**

Tampa Bay Water next challenges HDR's use of multiple attorneys to work on pleadings and to attend hearings, depositions, and trial.  Tampa Bay Water acknowledges, however, that this Circuit recognizes that "[t]here is nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer." *Norman*,  836 F.2d at 1302. To recover for the hours of multiple attorneys, HDR bears the "burden of showing that the time spent by those attorneys reflects the distinct contribution of each lawyer to the case and is the customary practice of multiple-lawyer litigation." *Barnes*, 168 F.3d at 432. A reduction in hours for redundancy is warranted "only if the attorneys are unreasonably doing the same work." *Id*.

Relevant to Tampa Bay Water's criticism of the number of attorneys assigned to various tasks by the Sedgwick firm, Mr. Hill correctly noted that between Tampa Bay Water, Barnard and McDonald, at least seventeen attorneys appeared of record either on the docket or during depositions, all of whom were aligned against HDR. And this excludes the five attorneys who represented CDG, which settled in August 2010, months before discovery closed (Dkts. 227, 244, 252). Considering

16

the nature of the case, it was entirely reasonable for both parties to have had multiple attorneys and staff assisting in their respective representations. HDR is therefore entitled to recover for services rendered by its several attorneys, so long as they were not doing the same work.

In his affidavit, Mr. Mason identifies the attorneys who worked on this case and describes their responsibilities and the distinct contributions of each attorney (Dkt. 653-1, ¶¶ 33, 34). It is fair to say, however, that duplication inevitably occurred, notwithstanding the efforts to avoid duplication of services. Mr. Hill, relying on the "inevitable duplication" of effort by HDR's counsel during the discovery phase, or what he refers to as the "ramp up" time after the Sedgwick firm was retained, made an across-the-board adjustment to the Sedgwick firm's hours of 15%, or $510,575.25 (Dkt. 653-3, p. 36).

Bringing in the Sedgwick firm after the litigation was underway was HDR's right. However, HDR had already paid for one law firm, Forisz and Dogali, to become familiar with and prepare to litigate this action. That cost has already been passed on to Tampa Bay Water, and it is not reasonable for Tampa Bay Water to bear the cost for two law firms to get up to speed. Based on a careful review of the invoices, and noting the "ramp up" cost associated with bringing in another law firm, as well as the sheer number of billers utilized by Sedgwick, the Court finds that a 20% reduction of Sedgwick's time, or **$680,767.00**, is appropriate for the inevitable duplication of effort that occurred during this phase.[10]

With respect to the trial preparation phase (Phase III), Mr. Hill made an across-the-board adjustment of 5% ($166,139.85) for work performed by Sedgwick, again on the basis of "inevitable duplication" (Dkt. 653-3, p. 39). The Court likewise agrees that an across-the-board adjustment is appropriate for inevitable duplication during this phase of the case. That adjustment, however,

---

[10] As noted, this across-the-board reduction has been applied to all fee entries, including redacted entries.

17

should be somewhat higher than recommended by Mr. Hill. As noted by Tampa Bay Water, Sedgwick utilized a large number of billers during this phase, and an *in camera* review of representative redacted and unredacted invoices revealed some duplication of efforts, albeit inevitable. The Court therefore concludes that a 10% adjustment for the Sedgwick firm's time during this phase is appropriate, in the amount of **$332,279.70**.[11]

**Special counsel**

Mr. Vento submits that no Sedgwick attorneys who are considered "Special Counsel" should have billed to the file, specifically Mr. Kent. Mr. Vento assumes that this title equates to non-equity partner and suggests that it was redundant, unnecessary, or excessive to utilize special counsel in the case. But the standard for determining whether to award fees for work performed by multiple attorneys has nothing to do with the attorneys' titles within the law firm. As the Eleventh Circuit explains, "[t]he retaining of multiple attorneys in a significant, lengthy . . . case such as this one is understandable and not a ground for reducing the hours claimed." *Johnson*, 706 F.2d at 1208. "[A] reduction is warranted only if the attorneys are *unreasonably* doing the *same* work." *Id.*

Based on Mr. Hill's and Mr. Mason's descriptions of each attorney's responsibilities, Mr. Kent made a distinct contribution to the case, and his work was not redundant of any other attorneys. Indeed, Mr. Kent was an active participant in various trial and pretrial hearings. To the extent Mr. Vento suggests that the tasks performed by Mr. Kent could have been accomplished by other attorneys, his position, at best, is that the addition of Mr. Kent caused some inevitable duplication. Because appropriate reductions have been made for duplicative work, no further reduction is warranted for the use of "Special Counsel."

---

[11] Mr. Hill did not recommend an adjustment to Forisz and Dogali's time. The Court agrees that this time need not be reduced, as Mr. Woodward had significant trial responsibilities and his trial preparation appears to have been primarily focused on his individual responsibilities.

**Work performed by multiple attorneys**

In addition to its broad objection that multiple attorneys billed to the file, Tampa Bay Water criticizes certain tasks performed by those attorneys. First, Tampa Bay Water challenges what it characterizes as "instances of multiple attorneys reviewing pleadings, documents or drafts of documents, or reviewing the same research, or otherwise duplicating effort" (Dkt. 660, p. 10). Tampa Bay Water cites no examples, however, of any such duplicative work. To the extent, therefore, this passing contention is unsupported by references to specific time entries or groups of time entries, it is not sufficiently specific to warrant consideration. And a fair inference can be drawn that Mr. Hill's reductions for "inevitable duplication" of work during the discovery and trial preparation phases reflect the kind of duplication Tampa Bay Water contends, but fails to demonstrate, are reflected in the billing records.

Next, under the heading "Multiple Attorneys Attending Hearings," Tampa Bay Water cites authority for the principle that "time billed for an excessive number of lawyers in a court room or conference, 'may obviously be discounted'" (Dkt. 660, p. 10). Again, however, Tampa Bay Water cites no examples supporting a reduction in hours under this principle, merely concluding this section of its memorandum with the unremarkable statement: "Similarly, there was not a single hearing, status conference or other proceeding in this case that was not manned with multiple attorneys on behalf of HDR" (Dkt. 660, p. 11).

Notwithstanding Tampa Bay Water's failure to offer examples of excessive attorney participation in hearings, the undersigned conducted all of the hearings in this case other than those presided over by the Magistrate Judge, and is in a unique position to determine whether multiple representation during court proceedings was reasonably necessary.  It was and is apparent to the undersigned, as the docket entries demonstrate, that it was unnecessary for multiple attorneys to appear in court on behalf of HDR at every hearing.  The exceptions, of course, are the pretrial

conference at which each attorney participating in the trial is required to attend, and those hearings where more than one attorney had an assigned role, either to present legal argument, participate in case management discussions, or to examine witnesses.

An example of unnecessary attorney presence on behalf of HDR was demonstrated during the hearings on fees and costs, during which HDR had two or more attorneys present, a fact noted on the record by the Court. That is not to say, however, that HDR did not benefit from having multiple attorneys present during hearings, or that there was anything inappropriate about that, merely that the expense of multiple attorneys should not be reasonably passed on to Tampa Bay Water. An additional across-the-board adjustment is therefore appropriate to reflect this, albeit a relatively nominal one.

A review of the docket demonstrates that, apart from the pretrial conference and trial itself, extensive hearings were not conducted in the case. There were just two hearings in the discovery phase, five hearings in the trial preparation phase, several hearings during the course of trial, and two days of hearings on the motion for fees and costs. Given the small proportion of time spent in hearings relative to the total time billed by HDR's attorneys, the across-the-board reduction will be limited to 0.5% of the total time billed in all phases, including post-trial.[12] HDR's fee request is therefore reduced by an additional **$52,371.46**.

**Multiple attorneys attending trial**

During trial, each of HDR's  attorneys who actively took part in the trial were responsible for specific witnesses or discrete tasks. This was an entirely appropriate team approach to complex litigation, as recognized in 1983 in this Circuit. *Johnson*, 706 F.2d at 1208 (retaining of multiple attorneys in a significant, lengthy case  is understandable and not a ground for reducing the hours

---

[12] The post-trial work is found in HDR's supplemental evidence (Dkt. 658) and second supplemental evidence (Dkt. 680).

claimed;  use of a team of attorneys in involved litigation who divide up the work is common today

for both plaintiff and defense work).  After considering the manner in which HDR was defended,

this Court has no quarrel with HDR's team approach to trying the case, at least insofar as the

courtroom time reflects that the attorneys divided up trial responsibilities.

Significant to Tampa Bay Water's criticism of HDR having five attorneys representing it

during trial, Tampa Bay Water acknowledged during oral argument that it also had five attorneys

assisting in Tampa Bay Water's representation during trial. Again, there can be no reasonable

criticism of either party having a team of attorneys and staff assisting in the trial of this case. A team

approach was certainly reasonable and necessary for an effective presentation of the technical

evidence to the jury. Accordingly, other than attorney Steinmann's trial time (and the reduction for

hearings during trial, as noted above), there is no need to adjust HDR's attorneys' time for the trial.

**Attorney Steinmann's time**

Tampa Bay Water challenges the reasonableness and necessity of  Sedgwick associate Cori

Steinmann's time. Tampa Bay Water contends that it should not be "legally obliged to pay" for the

trial time of Ms. Steinmann, citing authority which deducted time for two attorneys who billed for

trial time but did not actively participate in that particular trial (Dkt. 660, p. 11). Ms. Steinmann,

according to Mr. Mason, observed the trial each day in the courtroom and took notes of each day's

proceedings and prepared outlines for witness examinations for Mr. Mason's use. She was, according

to Mr. Mason, "fully engaged" in the trial, assisting with discovery and documents, which she knew

"like no one else." She was in charge of the demonstrative exhibits and photographic evidence and

exercised legal judgment in pulling evidence for use by the attorneys conducting examinations of

witnesses.  Another of her functions, albeit limited, was to summarize each day's proceedings and

communicate that to the client.

The Court agrees with Tampa Bay Water and Mr. Vento that Tampa Bay Water should not

21

be responsible for all of attorney Steinmann's time, however useful her time was in assisting Mr. Mason and his trial team in preparing for the next trial day. While Mr. Meaders and Mr. Kent were not in the courtroom every single day during trial, they were certainly present most of the time. Mr. Mason and Mr. Woodward were present every day. Ms. Steinmann's presence in the courtroom was therefore unreasonably duplicative, particularly during hearings conducted outside the presence of the jury, opening statements and closing argument.

Notwithstanding, attorney Steinmann no doubt served an important and necessary role in managing the evidence and demonstrative exhibits and assisting Mr. Mason in preparing for the next day's testimony.  And it was certainly reasonable for Mr. Mason to have an attorney, as opposed to a non-attorney, observe the trial and assist him in preparing the examination of witnesses. The Court determines, therefore, that an across-the-board reduction of 50% of Ms. Steinmann's time during the trial phase, or **$103,482.50**,  is appropriate, representing the time she spent summarizing the case for the client, the duplication of trial time with the other attorneys, her presence during matters conducted outside the presence of the jury, and her presence during other non-testimonial stages of the trial.

**Multiple senior attorneys attending depositions**

Tampa Bay Water's complaint that HDR had "multiple senior attorneys" attending depositions is somewhat misleading. Tampa Bay Water acknowledges that HDR had only two attorneys attend some, but not all of the depositions.  Moreover, Tampa Bay Water's criticism is somewhat hollow since it acknowledged during oral argument that it did the same for some depositions, although fewer than HDR. Regardless,  the Court finds that having two attorneys present during the depositions in this case was entirely reasonable, if not necessary, considering the nature of the litigation, the number of experts deposed, and the highly technical subject matter of those depositions.

22

During oral argument, HDR's lead counsel, Mr. Mason,  explained that it was his judgment call to have Mr. Woodward present as the second attorney during several of the depositions because of his expertise in construction and because he had been on the case from the beginning. The presence of Mr. Woodward was therefore reasonable and necessary to assist Mr. Mason in effectively deposing these witnesses. Considering the complexity of the evidence and that many of those depositions were of expert witnesses, the Court finds no valid justification for reducing the number of hours billed by HDR's attorneys just because two of them attended the same deposition on occasion. And Tampa Bay Water proffers no specific examples demonstrating otherwise.

**Engaging out-of-state counsel**

Tampa Bay Water argues HDR should not be entitled to recover for travel time of its out-of-state attorneys. "[T]he exclusion of out-of-town counsel's travel time is proper only if it was unreasonable not to hire qualified local counsel." *Johnson*, 706 F.2d at 1208. As for whether it was reasonable for HDR to retain an out-of-state law firm to represent it at trial, instructive is Mr. Hill's determination that several otherwise qualified firms in the Tampa area, including his own firm, had conflicts which would have prevented those firms from representing HDR. He also points out that contrary to Tampa Bay Water's contentions, Carlton Fields, another Tampa firm, could not have represented HDR because it represented Barnard in unrelated litigation when Tampa Bay Water filed this lawsuit (Dkt. 672-2, p. 3).  He also noted the practical conflicts which likely would have precluded other local firms from representing Tampa Bay Water because of the many "political subdivisions that make up Tampa Bay Water (such as Hillsborough County, Pinellas County, Pasco County, the City of Tampa, and the City of St. Petersburg)," all of whom are current or former clients of local firms.

When the case was filed, HDR was represented by the Tampa firm of Forizs & Dogali. Tim Woodward of that firm actively participated in HDR's defense at trial. In 2009, when it became

23

apparent the case would not settle, HDR consulted with its insurers and together they agreed to retain the Sedgwick firm. Wayne Mason from the firm's Dallas office was selected as lead attorney. One of HDR's insurers had experience with Mr. Mason in other large, complex cases and had confidence in his ability to defend HDR in a case of this nature.

Notwithstanding the capability of Mr. Woodward and his firm, HDR's decision to engage the Sedgwick firm and Mr. Mason as lead counsel was entirely reasonable, for the reasons articulated by Mr. Hill in his testimony and fee affidavit.  Mr. Hill opined that the nature of the case, including its size, the complexity of the technology involved, and the requisite skill and ability to try a case like this "required a level of skill and experience only a very small percentage of lawyers have" (Dkt. 653-3, pp. 21-22).  Unquestionably, Mr. Mason and his firm possess that level of skill and experience, as demonstrated throughout this litigation and by the verdict. While there may very well have been conflict-free law firms in the Tampa area which could have handled this case, it was certainly reasonable for HDR and its insurers to select an attorney with whom the insurer had experience in similarly complex cases, particularly considering the complexity of the litigation and stakes involved. HDR is therefore entitled to recover the travel time of its out of state counsel. *See Johnson*, 706 F.2d at 1208.

HDR also requests the travel expenses for its out-of-state counsel, as the contract provides for "all costs and expenses incurred . . . " (Dkt. 644-1, Agreement for Professional Services, ¶ 21.4). Because it was reasonable for HDR to retain out-of-state counsel, HDR is entitled to recover its attorney's reasonable travel expenses under the contract, as well as expenses for shipping case files, exhibits, and supplies. However, the Court agrees that the expense of establishing a "war room" or "virtual office" in Tampa and filling it with rented office equipment is not something that should be passed on to Tampa Bay Water, particularly when HDR had also retained local counsel with offices in Tampa.  *Centex-Rooney Const. Co., Inc. v. Martin Cnty.*, 725 So. 2d 1255, 1261 (Fla. 4th DCA

1999) (reversing award of time charged to set up and dismantle an office at the site of the trial).

Accordingly, **$128,472.57** will be deducted from HDR's claim for litigation expenses.

**Contract attorneys**

Tampa Bay Water's expert opines that HDR's use of contract attorneys at a rate of $85.00 per hour was unnecessary and ineffective and that their fees should be reduced by 50%. Mr. Hill observed that contract attorneys were tasked with reviewing and coding documents (Dkt. 653-3, p. 35). This was confirmed by Mr. Mason, who averred that contract attorneys reviewed and coded the document productions for responsiveness and privilege (Dkt. 653-1, ¶ 13; Dkt. 672-1, p. 6, ¶ 15).

Mr. Vento suggests that the fees incurred by contract attorneys were unreasonable because the contract attorneys made errors which resulted in the inadvertent disclosure of privileged documents. As HDR explained in its reply brief, the production of privileged documents was caused by a vendor computer error, not contract attorneys (Dkt. 672, p. 6). Further, given the 17 million pages of documents in this case, it is unrealistic to assume that there would be no inadvertent production of privileged documents. Indeed, it appears that Tampa Bay Water may have inadvertently produced some 23,000 privileged documents (Dkt. 316-12, Meaders Aff. ¶ 6).

Mr. Vento also contends that contract attorneys performed work that was duplicative of outside vendors. But as Mr. Mason explained, outside vendors performed "objective coding," which involved reviewing documents and noting items such as the author, recipient, date, and document type. Internal teams, which included the contract attorneys, were tasked with "issue coding," which involved a more thorough review of the documents for privilege, responsiveness, and substantive issues. There was, therefore, no duplication in the coding process.

To the extent Tampa Bay Water objects to the number of contract attorneys used by HDR, it misses the point. The review and coding of some 17 million pages of documents requires the same number of hours, whether the work is performed by one contract attorney or twenty-eight. While the

contract attorneys' fees are not insubstantial, it was certainly reasonable for HDR to utilize these individuals to conduct an adequate review of the massive volume of documents, whether it was eight or eighteen.

As noted, Mr. Hill recommended that all Sedgwick fees in the discovery and trial preparation phases, which included the fees billed by contract attorneys, be subject to an across-the-board reduction due to inevitable duplication. Since contract attorneys' fees have already been reduced as part of the overall reduction of Sedgwick's fees, no further reductions are necessary.

**Paralegals**

Tampa Bay Water argues that HDR should be limited to the recovery of paralegal fees that were charged for work that is traditionally performed by an attorney. This distinction is without substance, given that the parties' contract provided for the prevailing party to recover "all costs and expenses incurred, including, without limitation, attorneys' and legal assistants' fees and costs incurred," not just attorneys' fees (Dkt. 644-1, Agreement for Professional Services, ¶ 21.4). To the extent Mr. Vento suggests that paralegals billed for administrative tasks, such as scheduling depositions and witness preparation, such fees are nonetheless recoverable under the contract, which provided for an award of "all costs and expenses" and specifically mentioned work performed by legal assistants, which includes time billed on administrative tasks.

Mr. Vento challenges the assertion that HDR's paralegals reviewed and coded documents, suggesting that this work was done entirely by outside vendors. As discussed, outside vendors performed different layers of coding than paralegals and contract attorneys. Paralegal time reviewing and coding documents was certainly necessary and reasonable.

Mr. Vento opines that HDR's use of 28 paralegals was unreasonable, as the other Defendants employed no more than two paralegals. For reasons previously discussed, the manner in which Barnard and CDG managed the case does not offer a fair comparison. And while Mr. Vento is

correct that 28 paralegals billed to the file, the records show that the vast majority of the work was performed by just four paralegals, who billed a total of 8,700 hours. The remaining 1,500 hours were divided among 24 paralegals, seven of which billed less than ten hours. While the total number of hours was indeed sizeable, that is understandable and therefore reasonable considering the massive nature of the litigation. That required HDR to be efficient, and effective, in marshaling, organizing, reviewing, and utilizing the 17 million pages of documents. Under the circumstances, the manner in which HDR used its paralegals was not unreasonable.

Mr. Hill recommended across-the-board reductions to all of Sedgwick's time in the discovery and trial preparation phases, which included time billed by paralegals. Accordingly, no further reduction will be made for paralegal time.

**Motions without merit**

As noted, Tampa Bay Water's decision to renege on the settlement with HDR resulted in a highly publicized disclosure that HDR had agreed to settle the case for $30 million. HDR accordingly sought a change of venue, which was successfully opposed by Tampa Bay Water. Tampa Bay Water contends that HDR's change of venue motion was without authority and therefore without merit, and any fees generated by that work was unreasonable.

Contrary to Tampa Bay Water's contention, HDR's motion was not so utterly lacking in merit to preclude an award of fees for the hours HDR's attorneys devoted to the motion and hearing. Indeed, in the motion, HDR cited cases which granted contested venue transfers, although none addressed the specific basis on which HDR's motion was denied. Further, HDR's motion relied on data collected by a consulting company  hired to perform market research to determine the extent to which the jury pool was aware of the failed settlement agreement. Indeed, that information was influential in the Court's decision to utilize a carefully-worded jury questionnaire coupled with individual questioning of potential jurors to ensure that prospective jurors had not been exposed to

media reports of the aborted settlement.

Under the circumstances (which were brought on solely by Tampa Bay Water's actions), it was reasonable for HDR to collect data regarding the jury pool's knowledge of the settlement and to file the change of venue motion. HDR is entitled to recover for fees incurred in these efforts, notwithstanding that they were unsuccessful.

**Expert witnesses**

Tampa Bay Water filed the affidavit of its lead trial attorney, Mr. Harrison, who opines that it was unreasonable for HDR to use more expert witnesses than Tampa Bay Water.[13] At trial, Tampa Bay Water's expert witness, Dr. Brumund, offered opinions on multiple topics, from the cause of the cracking to deficiencies in HDR's design, the standard of care, and the design of repairs and remediation. HDR used several different expert witnesses to address these issues. Dr. Bromwell testified as to causation, Mr. Wooten testified as to the standard of care. Mr. Kelley testified about Tampa Bay Water's proposed remedial design.

Mr. Harrison postulates that this "unnecessary duplication of experts obviously comes at some expense" (Dkt. 662, ¶ 53). But there was nothing unreasonable in having multiple expert witnesses, with each testifying in his own area of expertise. An expert must be qualified in the specific area of his or her opinion testimony, and it was perfectly reasonable for HDR to present the expert witnesses who, in its belief, were the most qualified to testify about each topic.

Mr. Harrison asserts that HDR has not demonstrated how the work performed by one of its consulting experts, Genterra Consultants, was different than that of its testifying witnesses. Genterra's services, however, were sufficiently described in the affidavit of Joe Kulikowski (Dkt.

---

[13] HDR seeks to recover nearly $6.7 million in expert witness fees. Mr. Harrison avers that Tampa Bay Water's expert witness fees were approximately $5 million, not including the work that Black & Veatch performed for this litigation.

653-8). Moreover, Tampa Bay Water has not explained why it was unreasonable or unnecessary for HDR's attorneys to consult with Genterra in investigating and preparing its defense. Multiple engineers had investigated the cracking both before and after suit was filed. No clear consensus emerged, and even throughout trial, the experts continued to disagree about the cause of the cracking. Under the circumstances of this highly technical, complex case, it was perfectly reasonable for HDR to consult with multiple expert witnesses, including Genterra, in investigating and preparing its defense.

Notwithstanding, Mr. Hill recommends that Genterra's fees be reduced by 60% because HDR determined during the discovery phase that Genterra's services would not be needed on an ongoing basis. Mr. Hill suggested recovery of 40% of Genterra's fees based on certain modeling Genterra created which was utilized by HDR's other experts. Mr. Hill's recommended 60% reduction appears fair under the circumstances. Accordingly, HDR's request for litigation expenses will be reduced by **$766,697.33**.

**Use of technology at trial**

Tampa Bay Water criticizes the reasonableness of HDR's use of technology at trial, particularly, its purchase or rental of a "smartboard," which is essentially a large, interactive whiteboard. As HDR made clear, however, it is not seeking to recover any expenses related to the smartboard itself (Dkt. 672-1, ¶ 19). Tampa Bay Water also challenges HDR's payment of some $300,000 in other technology- related services, which was considerably more than the $111,000 spent by Tampa Bay Water. From the perspective of the presiding judge, however, the technology HDR utilized at trial was incredibly effective in explaining the design and construction of the reservoir and in assisting the jury in understanding the theories espoused by the competing experts. While HDR's expenditures may indeed have exceeded Tampa Bay Water's, the technology expenses HDR incurred at trial were reasonable under the circumstances.

**Pro Hac Vice costs**

HDR requests an award of $50 in *pro hac vice* fees under 28 U.S.C. § 1920 or, alternatively, the contract. While Tampa Bay Water is correct that such fees are not properly taxed under § 1920, *Eagle Ins. Co. v. Johnson*, 982 F. Supp. 1456, 1459-60 (M.D. Ala. 1997), *aff'd*, 162 F.3d 98 (11th Cir. 1998), they were reasonably incurred and will be awarded as agreed in the parties' contract.

**Service of Subpoenas**

Private process server fees may be awarded under § 1920(1), to the extent they "do not exceed the statutory fees authorized in § 1921," which is $55.00 per hour for each item served, plus travel costs and out-of-pocket expenses. *E.E.O.C. v. W & O, Inc.*, 213 F.3d 600, 624 (11th Cir. 2000); 28 C.F.R. § 0.114(a)(3). HDR has not documented its process servers' costs or expenses, and therefore the recoverable fee is $55.00 per item or the actual amount charged, whichever is less. *See James v. Wash Depot Holdings, Inc.*, 242 F.R.D. 645, 649-50 (S.D. Fla. 2007). "[R]ush fees" are not compensable. *See id.* at 650. Further, service of subpoenas on unidentified individuals will not be awarded. Nor will multiple charges for attempting to serve the same individual at different addresses. Accordingly, HDR's request for costs will be reduced by **$1,048.04**.

**Transcript costs**

"Fees for printed or electronically recorded transcripts necessarily obtained for use in the case" may be taxed under § 1920(2). HDR requests costs for transcripts of pretrial hearings, the trial, and numerous depositions. The pretrial hearing transcripts were necessary for use in the lengthy and complex trial. Those transcripts were cited by the parties and, in at least one instance, relied on by the Court. Although most pretrial hearings were transcribed at minimal cost, HDR requested transcripts of the pretrial conference and motions in limine hearing on an expedited basis, resulting

30

in a higher rate. But as the invoice shows, HDR waited two weeks before placing its order. The additional expense was not necessary or reasonably incurred, and therefore will not be taxed as a cost or awarded under the parties' contract. This invoice will be reduced to $280, based on the reporter's ordinary rate, for a total reduction of **$942.20**.

Daily trial transcripts were cited by the parties on multiple occasions. And, as was explained at the hearing, HDR's counsel and expert witnesses relied on daily transcripts throughout the trial. Given the length and complexity of the trial, daily transcripts were both reasonable and necessary and will be awarded under the parties' contract. *See Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1226 (11th Cir. 2002).

Tampa Bay Water does not argue that any deposition transcripts were not necessary for use in the case. It objects to costs for video depositions, copies of deposition exhibits, electronic and ASCII transcripts, shipping costs, and formatting video transcripts.

Where a party properly notices a videotaped deposition and no objection was made, it is appropriate to award costs for videotaping and transcribing the deposition. *Morrison v. Reichhold Chems., Inc.*, 97 F.3d 460, 464-65 (11th Cir. 1996). There is no evidence that Tampa Bay Water objected to the videotaping of any depositions. Several videotaped depositions were played at trial, which was often necessitated by the unavailability of the respective witnesses. And transcripts were required under Rule 32(c) and necessary for preparing appropriate deposition designations. HDR is therefore entitled to recover the costs of videotaping and transcribing the depositions.

Exhibits to deposition transcripts may be taxed as "costs of making copies of any materials where the copies are necessarily obtained for use in the case." § 1920(4). In this document-intensive case, copies of exhibits were necessary for understanding and accurately preserving the testimony

31

of the dozens of fact and expert witnesses that were deposed. Costs for exhibits to the deposition transcripts therefore will be awarded.

Postage costs are not taxable under the statute. *See Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir. 1996). Nor are charges for expedited transcripts, condensed transcripts, ASCII or electronic transcripts, and formatting or synchronizing video depositions. *Ferguson v. Bombardier Servs. Corp.*, 2007 WL 601921, at *4 (M.D. Fla. Feb. 21, 2007); *Waste Servs., Inc. v. Waste Mgmt., Inc.*, No. 6:05-cv-320-Orl-22DAB, 2007 WL 1174116, at *4-*5 (M.D. Fla. Apr. 18, 2007). However, those items were reasonably incurred and will be awarded under the parties' contract.

**Witness expenses**

Witness fees are limited to "$40 per day for each day's attendance," as well as "for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance." 28 U.S.C. § 1821(b). Actual expenses for travel by common carrier "at the most economical rate reasonably available," taxi fares, and parking fees are also recoverable. § 1821(c)(1)-(3). In addition, a "subsistence allowance" may be recovered "when an overnight stay is required at the place of attendance because such place is so far removed from the residence of such witness as to prohibit return thereto from day to day." § 1821(d)(1). This allowance shall not "exceed the maximum per diem allowance prescribed by the Administrator of General Services, pursuant to section 5702(a) of title 5, for official travel in the area of attendance by employees of the Federal Government." § 1821(d)(2). The per diem for travel to Tampa, Florida at the time of trial was $112 for lodging and $51 for meals and miscellaneous expenses, which is reduced to $38.25 for the first and last day of travel. *See* 41 C.F.R. § 301–11.6 (per diem rates established by GSA available at http://www.gsa.gov/perdiem).

HDR requests to recover witness fees and subsistence expenses for 17 days for Wooten, 18 days for Bromwell, 13 days for Kelley, and 6 days for Sandhagan. But as Tampa Bay Water observes, Bromwell only testified for three days, Wooten testified for two days, Kelley testified for one day, and Sandhagan testified for three days. However, it was certainly reasonable for these witnesses to be present in the courtroom, so that they could be consulted on the technical matters of this case. Indeed, Tampa Bay Water's own expert witnesses remained in the courtroom throughout trial. And Tampa Bay Water never requested that any of HDR's experts be excluded from the courtroom. Those witness fees and subsistence expenses are reasonable and will be awarded both as costs and under the parties' contract.

HDR also requests the following lodging expenses: 32 nights for Wooten, 24 nights for Bromwell, 17 nights for Kelley, and 13 nights for Sandhagan. HDR contends that the additional nights were necessary so that the witnesses could stay in town over weekends, which was more cost-effective than multiple round-trip tickets. Such costs were indeed necessary and reasonable and will be awarded. However, HDR requests lodging expenses at a rate of $178.08 per night, including taxes, which exceeds the $112 per night rate allowed by the statute and regulations. Any amounts in excess of the allowed rate were not reasonable and will not be awarded as costs or under the parties' contract. Accordingly, HDR's request for witness travel expenses will be reduced by **$5,682.88.**

Tampa Bay Water objects that Wooten's $2,675.95 airfare was not supported by proper documentation. In a supplemental affidavit, Mason averred that the missing receipt for Wooten's travel was "found and filed herewith" (Dkt. 672-1, ¶ 16). However, the documentation was not provided, and therefore Wooten's airfare will not be awarded under the statute or the parties'

contract. Tampa Bay Water also objects that Sandhagen's $4,910.50 airfare includes multiple flights, change fees, and other unexplained fees. Mason avers that the changes in Sandhagen's travel schedule were necessitated by the slow pace of trial. Notwithstanding, charges for multiple tickets and change fees will not be awarded under the statute or the parties' contract. Based on the documentation provided by Sandhagen, the most economical rate reasonably available for round-trip airfare between Atlanta to Tampa is $577.60. Accordingly, HDR's request for witness fees will be reduced by **$7,008.85**.

**Copying and document production costs**

HDR requests internal copying costs,[14] external copying costs, document production costs, and electronic discovery costs. Because "costs such as general copying . . . are clearly nonrecoverable," the prevailing party must demonstrate that the copies were "necessarily obtained for use in the case." *Duckworth*, 97 F.3d at 1399; § 1920(4). "Copies attributable to discovery, copies of pleadings, correspondence, documents tendered to the opposing party, copies of exhibits, and documents prepared for the Court's consideration are recoverable," whereas "[c]opies obtained only for the convenience of counsel," such as "[e]xtra copies of filed papers, correspondence, and copies of cases" are not. *Desisto College, Inc. v. Town of Howey-In-The-Hills*, 718 F. Supp. 906, 913 (M.D. Fla., 1989), *aff'd* 914 F.2d 267 (11th Cir. 1990) (Table), *disapproved on other grounds by W & O, Inc.*, 213 F.3d at 624. "[U]nspecified copying . . . which d[oes] not allow the court to determine whether the documents were necessarily obtained for use in the case" cannot be recovered. *Gary Brown & Assocs., Inc. v. Ashdon, Inc.*, 268 Fed. Appx. 837, 846 (11th Cir. 2008); *Cullens v. Georgia Dept. of Transp.*, 29 F.3d 1489, 1494 (11th Cir. 1994).

---

[14] Although HDR refers to internal copying costs as "fees for printing," the invoices submitted by HDR reflect that the charges are more accurately categorized as copying costs.

34

With respect to internal copying, HDR submitted a 314 page printout from Forisz & Dogali containing no more detail than "copy expense," "photocopy charge," or "color copy." These unspecified entries fail to provide the level of detail necessary to recover copying costs under § 1920(4). Nor can they support an award under the parties' contract, as it is impossible to determine whether such copying costs were reasonably incurred. An additional five page printout by Sedgwick contains a small number of entries for "coding material" and "obj to subpoenas." These entries describe copies attributable to discovery and therefore will be awarded in the total amount of $62.85. The remaining items, which are either designated as "copies" or contain no description at all, cannot support an award under § 1920(4) or the parties' contract. Accordingly, HDR's request for internal copying costs will be reduced by **$70,574.40**.

As for external copying, HDR seeks costs for copies of documents produced by other parties. Tampa Bay Water does not object, and these costs they will be awarded.

HDR also requests an award of approximately $3.1 million in electronic discovery costs. Tampa Bay Water argues that most of these costs relate to the collection, storage, formatting, coding and organization of electronically stored information ("ESI"), which cannot be taxed as costs. In addressing the taxation of electronic discovery charges under § 1920(4), the Third Circuit persuasively reasoned that "only the conversion of native files to TIFF (the agreed-upon default format for production of ESI), and the scanning of documents to create digital duplicates are generally recognized as the taxable 'making copies of material.'" *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 167 (3d Cir. 2012).

But in this case, the precise scope of § 1920(4) is immaterial because HDR is entitled to recover its reasonable ESI costs under the parties' contract. This was a lengthy, highly technical case

which involved 17 million pages of documents. Under the circumstances, the electronic discovery costs incurred by HDR were certainly reasonable[15] and necessary in managing this complex, document-intensive case. While a large part of the $3.1 million in ESI costs is attributable to the storage and hosting of ESI, that amount was reasonable and necessary to the effective utilization of ESI in this case. Accordingly, no reductions will be made for the ESI costs incurred by HDR.

**Supplemental evidence**

After filing its motion, HDR submitted supplemental evidence on two separate occasions, reflecting additional work that had been performed in this matter and additional costs that HDR had incurred. Tampa Bay Water has not objected to any of the amounts set forth in the supplemental evidence. The additional work performed by HDR's attorneys and the additional expenses incurred were reasonable, necessary, and will be awarded, with some exceptions. With respect to the first supplement, Mr. Hill recommended reductions for document scans, local travel expenses, and post-trial meals. The Court agrees and will reduce the fees, costs, and litigation expenses requested in the first supplement by **$347.46**. With respect to the second supplement, Mr. Hill recommended a 20% reduction for mediation time and time spent vetting appellate counsel. The Court agrees that these items should not be passed on to Tampa Bay Water under the parties' contract and therefore will reduce the fees requested in the second supplement by **$20,956.70.**

## Conclusion

Accordingly, HDR's motions for attorneys' fees, expenses, and costs (Dkts. 653, 654, 655) are GRANTED *in part*, to the extent that HDR is awarded $9,249,219.85 in attorneys' fees and $10,898,186.22 in litigation expenses and taxable costs. The clerk is directed to enter judgment

---

[15] To put it in perspective, the total electronic discovery costs would equate to a charge of approximately $0.18 per page for a single copy of the 17 million pages of documents involved in this case.

awarding HDR's attorneys' fees, costs, and expenses, as set forth above.

DONE AND ORDERED this 2ⁿᵈ day of November, 2012.


JAMES D. WHITTEMORE
**United States District Judge**


Copies to:
Counsel of Record